| 1. Shipbroker<br>N/A | BIMCO STANDARD BAREBOAT CHARTER<br>CODE NAME: "BARECON 2001" PART I |
|---|---|
| | 2. Place and date<br>MADISONVILLE, LA |
| 3. Owners/Place of business (Cl. 1)<br>SEATRAN MARINE LLC<br>107 HWY 90 W<br>NEW IBERIA, LA 70560 | 4. Bareboat Charterers/Place of business (Cl. 1)<br>GUICE OFFSHORE LLC<br>P.O. BOX 1698<br>MANDEVILLE, LA 70470 |
| 5. Vessel's name, call sign and flag (Cl. 1 and 3)<br>MR. STEVEN<br>OFFICIAL NO. 1249191<br>US FLAG CREWBOAT | |
| 6. Type of Vessel<br>205 FT. DPS-2 HSC CREWBOAT<br>ABS CLASS | 7. GT/NT<br>96 US / 496 ITC |
| 8. When/Where built<br>GULFCRAFT SHIPYARD<br>NOVEMBER 2014 | 9. Total DWT (abt.) in metric tons on summer freeboard<br>502.07 LT |
| 10. Classification Society (Cl. 3)<br>ABS | 11. Date of last special survey by the Vessel's classification society<br>MARCH 9, 2017 |
| 12. Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 3)<br>CLASS / REGULATORY CERTS GOOD THROUGH COMPLETION OF INITIAL<br>1 YR. BAREBOAT TERM (NO D.D. REQUIRED) | |
| 13. Port or Place of delivery (Cl. 3)<br>MUTUALLY AGREED U.S. GOM PORT | 14. Time for delivery (Cl. 4)<br>OCT 15, 2017 | 15. Cancelling date (Cl. 5)<br>OCT 15, 2017 |
| 16. Port or Place of redelivery (Cl. 15)<br>MUTUALLY AGREED US GOM PORT | 17. No. of months' validity of trading and class certificates upon redelivery (Cl. 15)<br>N/A |
| 18. Running days' notice if other than stated in Cl. 4<br>AS STATED IN Cl. 4 | 19. Frequency of dry-docking (Cl. 10(g))<br>AS PER CLASS |
| 20. Trading limits (Cl. 6)<br>US GOM, US EAST COAST, CARIBBEAN WATERS | |
| 21. Charter period (Cl. 2)<br>1 YEAR (365 DAYS) | 22. Charter hire (Cl. 11)<br>$3,300.00 PER DAY |
| 23. New class and other safety requirements (state percentage of Vessel's insurance value acc. to Box 29)(Cl. 10(a)(ii))<br>N/A | |
| 24. Rate of interest payable acc. to Cl. 11 (f) and, if applicable, acc. to PART IV<br>AS STATED IN Cl. 11(f) | 25. Currency and method of payment (Cl. 11)<br>US DOLLARS<br>60 DAYS IN ARREARS |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



| | |
|---|---|
| 26. Place of payment; also state beneficiary and bank account (Cl. 11)  SEE ATTACHMENT "B" FOR WIRE INSTRUCTIONS | 27. Bank guarantee/bond (sum and place) (Cl. 24) (optional)  N/A |
| 28. Mortgage(s), if any (state whether 12(a) or (b) applies; if 12(b) applies state date of Financial Instrument and name of Mortgagee(s)/Place of business) (Cl. 12)  As PER Cl. 12 (b) | 29. Insurance (hull and machinery and war risks) (state value acc. to Cl. 13(f) or, if applicable, acc. to Cl. 14(k)) (also state if Cl. 14 applies)  $15,500,000.00 |
| 30. Additional insurance cover, if any, for Owners' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g))  N/A | 31. Additional insurance cover, if any, for Charterers' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g))  BREACH OF WARRANTY AND INNOCENT OWNERS COVERAGE |
| 32. Latent defects (only to be filled in if period other than stated in Cl. 3)  AS PER Cl. 3 | 33. Brokerage commission and to whom payable (Cl. 27)  N/A |
| 34. Grace period (state number of clear banking days) (Cl. 28)  30 DAYS | 35. Dispute Resolution (state 30(a), 30(b) or 30(c); if 30(c) agreed Place of Arbitration must be stated (Cl. 30)  HOUSTON, TX |
| 36. War cancellation (indicate countries agreed) (Cl. 26(f))  N/A | |
| 37. Newbuilding Vessel (indicate with "yes" or "no" whether PART III applies) (optional)  N/A | 38. Name and place of Builders (only to be filled in if PART III applies)  N/A |
| 39. Vessel's Yard Building No. (only to be filled in if PART III applies)  N/A | 40. Date of Building Contract (only to be filled in if PART III applies)  N/A |
| 41. Liquidated damages and costs shall accrue to (state party acc. to Cl. 1)  a) b) N/A c) | |
| 42. Hire/Purchase agreement (indicate with "yes" or "no" whether PART IV applies) (optional)  N/A | 43. Bareboat Charter Registry (indicate with "yes" or "no" whether PART V applies) (optional)  N/A |
| 44. Flag and Country of the Bareboat Charter Registry (only to be filled in if PART V applies)  N/A | 45. Country of the Underlying Registry (only to be filled in if PART V applies)  N/A |
| 46. Number of additional clauses covering special provisions, if agreed  N/A | |

PREAMBLE - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and only form part of this Charter if expressly agreed and stated in Boxes 37, 42 and 43. If PART III and/or PART IV and/or PART V apply, it is further agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

Signature (Owners)  
*[signature]*  
Charles Tirnard, Exec. V.P.

Signature (Charterers)  
*[signature]*  
Nathan Guidry, Member

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
## "BARECON 2001" Standard Bareboat Charter

1. **Definitions**
   In this Charter, the following terms shall have the meanings hereby assigned to them:
   "The Owners" shall mean the party identified in Box 3;
   "The Charterers" shall mean the party identified in Box 4;
   "The Vessel" shall mean the vessel named in Box 5 and with particulars as stated in Boxes 6 to 12.
   "Financial Instrument" means the mortgage, deed of covenant or other such financial security instrument as annexed to this Charter and stated in Box 28.

2. **Charter Period**
   In consideration of the hire detailed in Box 22, the Owners have agreed to let and the Charterers have agreed to hire the Vessel for the period stated in Box 21 ("The Charter Period").

3. **Delivery**
   (not applicable when Part III applies, as indicated in Box 37)
   (a) The Owners shall before and at the time of delivery exercise due diligence to make the Vessel seaworthy And in every respect ready in hull, machinery and equipment for service under this Charter.
   The Vessel shall be delivered by the Owners and taken over by the Charterers at the port or place indicated in Box 13 in such ready safe berth as the Charterers may direct.
   (b) The Vessel shall be properly documented on delivery in accordance with the laws of the flag State indicated in Box 5 and the requirements of the classification society stated in Box 10. The Vessel upon delivery shall have her survey cycles up to date and trading and class certificates valid for at least the number of months agreed in Box 12.
   (c) The delivery of the Vessel by the Owners and the taking over of the Vessel by the Charterers shall constitute a full performance by the Owners of all the Owners' obligations under this Clause 3, and thereafter the Charterers shall not be entitled to make or assert any claim against the Owners on account of any conditions, representations or warranties expressed or implied with respect to the Vessel but the Owners shall be liable for the cost of but not the time for repairs or renewals occasioned by latent defects in the Vessel, her machinery or appurtenances, existing at the time of delivery under this Charter, provided such defects have manifested themselves within twelve (12) months after delivery unless otherwise provided in Box 32.

4. **Time for Delivery**
   (not applicable when Part III applies, as indicated in Box 37)
   The Vessel shall not be delivered before the date indicated in Box 14 without the Charterers' consent and the Owners shall exercise due diligence to deliver the Vessel not later than the date indicated in Box 15. Unless otherwise agreed in Box 18, the Owners shall give the Charterers not less than thirty (30) running days' preliminary and not less than fourteen (14) running days' definite notice of the date on which the Vessel is expected to be ready for delivery.
   The Owners shall keep the Charterers closely advised of possible changes in the Vessel's position.

5. **Cancelling**
   (not applicable when Part III applies, as indicated in Box 37)
   (a) Should the Vessel not be delivered latest by the cancelling date indicated in Box 15, the Charterers shall have the option of cancelling this Charter by giving the Owners notice of cancellation within thirty-six (36) running hours after the cancelling date stated in Box 15, failing which this Charter shall remain in full force and effect.
   (b) If it appears that the Vessel will be delayed beyond the cancelling date, the Owners may, as soon as they are in a position to state with reasonable certainty the day on which the Vessel should be ready, give notice thereof to the Charterers asking whether they will exercise their option of cancelling, and the option must then be declared within one hundred and sixty-eight (168) running hours of the receipt by the Charterers of such notice or within thirty-six (36) running hours after the cancelling date, whichever is the earlier. If the Charterers do not then exercise their option of cancelling, the seventh day after the readiness date stated in the Owners' notice shall be substituted for the cancelling date indicated in Box 15 for the purpose of this Clause 5.
   (c) Cancellation under this Clause 5 shall be without prejudice to any claim the Charterers may otherwise have on the Owners under this Charter.

6. **Trading Restrictions**
   The Vessel shall be employed in lawful trades for the carriage of suitable lawful merchandise within the trading limits indicated in Box 20.
   The Charterers undertake not to employ the Vessel or suffer the Vessel to be employed otherwise than in conformity with the terms of the contracts of insurance (including any warranties expressed or implied therein) without first obtaining the consent of the insurers to such employment and complying with such requirements as to extra premium or otherwise as the insurers may prescribe.
   The Charterers also undertake not to employ the Vessel or suffer her employment in any trade or business which is forbidden by the law of any country to which the Vessel may sail or is otherwise illicit or in carrying illicit or prohibited goods or in any manner whatsoever which may render her liable to condemnation, destruction, seizure or confiscation.
   Notwithstanding any other provisions contained in this Charter it is agreed that nuclear fuels or radioactive products or waste are specifically excluded from the cargo permitted to be loaded or carried under this Charter. This exclusion does not apply to radio-isotopes used or intended to be used for any industrial, commercial, agricultural, medical or scientific purposes provided the Owners' prior approval has been obtained to loading thereof.

7. **Surveys on Delivery and Redelivery**
   (not applicable when Part III applies, as indicated in Box 37)
   The Owners and Charterers shall each appoint surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at the time of delivery and redelivery hereunder. The Owners shall bear all expenses of the On-hire Survey ~~including loss of time, if any,~~ and the Charterers shall bear all expenses of the Off-hire Survey ~~including loss of time, if any, at the daily equivalent to the rate of hire or pro rata thereof.~~ \* EXCLUDE LOSS OF TIME

8. **Inspection**
   The Owners shall have the right at any time after giving reasonable notice to the Charterers to inspect or survey the Vessel or instruct a duly authorised surveyor to carry out such survey on their behalf:-
   (a) to ascertain the condition of the Vessel and satisfy themselves that the Vessel is being properly repaired and maintained. The costs and fees for such inspection or survey shall be paid by the Owners unless the Vessel is found to require repairs or maintenance in order to achieve the condition so provided;
   (b) in dry-dock if the Charterers have not dry-docked Her in accordance with Clause 10(g). The costs and fees for such inspection or survey shall be paid by the Charterers; and
   (c) for any other commercial reason they consider necessary (provided it does not unduly interfere with the commercial operation of the Vessel). The costs and fees for such inspection and survey shall be paid by the Owners.
   All time used in respect of inspection, survey or repairs shall be for the Charterers' account and form part of the

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



PART II
"BARECON 2001" Standard Bareboat Charter

Charter Period. The Charterers shall also permit the Owners to inspect the Vessel's log books whenever requested and shall whenever required by the Owners furnish them with full information regarding any casualties or other accidents or damage to the Vessel.

9. Inventories, Oil and Stores
A complete inventory of the Vessel's entire equipment, outfit including spare parts, appliances and of all consumable stores on board the Vessel shall be made by the Charterers in conjunction with the Owners on delivery and again on redelivery of the Vessel. The Charterers and the Owners, respectively, shall at the time of delivery and redelivery take over and pay for all bunkers, lubricating oil, unbroached provisions, paints, ropes and other consumable stores (excluding spare parts) in the said Vessel at the then-current market prices at the ports of delivery and redelivery, respectively. The Charterers shall ensure that all spare parts listed in the inventory and used during the Charter Period are replaced at their expense prior to redelivery of the Vessel.

10. Maintenance and Operation
(a)(i) Maintenance and Repairs - During the Charter Period the Vessel shall be in the full possession and at the absolute disposal for all purposes of the Charterers and under their complete control in every respect. The Charterers shall maintain the Vessel, her machinery, boilers, appurtenances and spare parts in a good state of repair, in efficient operating condition and in accordance with good commercial maintenance practice and, except as provided for in Clause 14(l), if applicable, at their own expense they shall at all times keep the Vessel's Class fully up to date with the Classification Society indicated in Box 10 and maintain all other necessary certificates in force at all times.
(ii) New Class and Other Safety Requirements - In the event of any improvement, structural changes or new equipment becoming necessary for the continued operation of the Vessel by reason of new class requirements or by compulsory legislation costing (excluding the Charterers' loss of time) more than the percentage stated in Box 23, or if Box 23 is left blank, 5 per cent of the Vessel's insurance value as stated in Box 29, then the extent, if any, to which the rate of hire shall be varied and the ratio in which the cost of compliance shall be shared between the parties concerned in order to achieve a reasonable distribution thereof as between the Owners and the Charterers having regard, inter alia, to the length of the period remaining under this Charter shall, in the absence of agreement, be referred to the dispute resolution method agreed in Clause 30.
(iii) Financial Security - The Charterers shall maintain financial security or responsibility in respect of third party liabilities as required by any government, including federal, state or municipal or other division or authority thereof, to enable the Vessel, without penalty or charge, lawfully to enter, remain at, or leave any port, place, territorial or contiguous waters of any country, state or municipality in performance of this Charter without any delay. This obligation shall apply whether or not such requirements have been lawfully imposed by such government or division or authority thereof. The Charterers shall make and maintain all arrangements by bond or otherwise as may be necessary to satisfy such requirements at the Charterers' sole expense and the Charterers shall indemnify the Owners against all consequences whatsoever (including loss of time) for any failure or inability to do so.

(b) Operation of the Vessel - The Charterers shall at their own expense and by their own procurement man, victual, navigate, operate, supply, fuel and, whenever required, repair the Vessel during the Charter Period and they shall pay all charges and expenses of every kind and nature whatsoever incidental to their use and operation of the Vessel under this Charter, including annual flag State fees and any foreign general municipality and/or state taxes. The Master, officers and crew of the Vessel shall be the servants of the Charterers for all purposes whatsoever, even if for any reason appointed by the Owners.
Charterers shall comply with the regulations regarding officers and crew in force in the country of the Vessel's flag or any other applicable law.
(c) The Charterers shall keep the Owners and the mortgagee(s) advised of the intended employment, planned dry-docking and major repairs of the Vessel, as reasonably required.
(d) Flag and Name of Vessel – During the Charter Period, the Charterers shall have the liberty to paint the Vessel in their own colours, install and display their funnel insignia and fly their own house flag. The Charterers shall also have the liberty, with the Owners' consent, which shall not be unreasonably withheld, to change the flag and/or the name of the Vessel during the Charter Period. Painting and re-painting, instalment and re-instalment, registration and re-registration, if required by the Owners, shall be at the Charterers' expense and time.
(e) Changes to the Vessel – Subject to Clause 10(a)(ii), the Charterers shall make no structural changes in the Vessel or changes in the machinery, boilers, appurtenances or spare parts thereof without in each instance first securing the Owners' approval thereof. If the Owners so agree, the Charterers shall, if the Owners so require, restore the Vessel to its former condition before the termination of this Charter.
(f) Use of the Vessel's Outfit, Equipment and Appliances - The Charterers shall have the use of all outfit, equipment, and appliances on board the Vessel at the time of delivery, provided the same or their substantial equivalent shall be returned to the Owners on redelivery in the same good order and condition as when received, ordinary wear and tear excepted. The Charterers shall from time to time during the Charter Period replace such items of equipment as shall be so damaged or worn as to be unfit for use. The Charterers are to procure that all repairs to or replacement of any damaged, worn or lost parts or equipment be effected in such manner (both as regards workmanship and quality of materials) as not to diminish the value of the Vessel. The Charterers have the right to fit additional equipment at their expense and risk but the Charterers shall remove such equipment at the end of the period if requested by the Owners. Any equipment including radio equipment on hire on the Vessel at time of delivery shall be kept and maintained by the Charterers and the Charterers shall assume the obligations and liabilities of the Owners under any lease contracts in connection therewith and shall reimburse the Owners for all expenses incurred in connection therewith, also for any new equipment required in order to comply with radio regulations.
(g) Periodical Dry-Docking - The Charterers shall dry-dock the Vessel and clean and paint her underwater parts whenever the same may be necessary, but not less than once during the period stated in Box 19 or, if Box 19 has been left blank, every sixty (60) calendar months after delivery or such other period as may be required by the Classification Society or flag State.

11. Hire
(a) The Charterers shall pay hire due to the Owners punctually in accordance with the terms of this Charter

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



in respect of which time shall be of the essence. 293
(b) The Charterers shall pay to the Owners for the hire 294
of the Vessel a lump sum in the amount indicated in 295
Box 22 which shall be payable not later than every thirty 296
(30) running days in advance, the first lump sum being 297
payable on the date and hour of the Vessel's delivery to 298
the Charterers. Hire shall be paid continuously 299
throughout the Charter Period. 300
(c) Payment of hire shall be made in cash without 301
discount in the currency and in the manner indicated in 302
Box 25 and at the place mentioned in Box 26. 303
(d) Final payment of hire, if for a period of less than 304
thirty (30) running days, shall be calculated proportionally 305
according to the number of days and hours remaining 306
before redelivery and advance payment to be effected 307
accordingly. 308
(e) Should the Vessel be lost or missing, hire shall 309
cease from the date and time when she was lost or last 310
heard of. The date upon which the Vessel is to be treated 311
as lost or missing shall be ten (10) days after the Vessel 312
was last reported or when the Vessel is posted as 313
missing by Lloyd's, whichever occurs first. Any hire paid 314
in advance to be adjusted accordingly. 315
(f) Any delay in payment of hire shall entitle the 316
Owners to interest at the rate per annum as agreed 317
in Box 24. If Box 24 has not been filled in, the three months 318
interbank offered rate in London (LIBOR or its successor) 319
for the currency stated in Box 25, as quoted by the British 320
Bankers' Association (BBA) on the date when the hire 321
fell due, increased by 2 per cent., shall apply. 322
(g) Payment of interest due under sub-clause 11(f) 323
shall be made within seven (7) running days of the date 324
of the Owners' invoice specifying the amount payable 325
or, in the absence of an invoice, at the time of the next 326
hire payment date. 327

12. Mortgage 328
(only to apply if Box 28 has been appropriately filled in) 329
(a) The Owners warrant that they have not effected 330
any mortgage(s) of the Vessel and that they shall not 331
effect any mortgage(s) without the prior consent of the 332
Charterers, which shall not be unreasonably withheld. 333
(b) The Vessel chartered under this Charter is financed 334
by a mortgage according to the Financial Instrument. 335
The Charterers undertake to comply, and provide such 336
information and documents to enable the Owners to 337
comply, with all such instructions or directions in regard 338
to the employment, insurances, operation, repairs and 339
maintenance of the Vessel as laid down in the Financial 340
Instrument or as may be directed from time to time during 341
the currency of the Charter by the mortgagee(s) in 342
conformity with the Financial Instrument. The Charterers 343
confirm that, for this purpose, they have acquainted 344
themselves with all relevant terms, conditions and 345
provisions of the Financial Instrument and agree to 346
acknowledge this in writing in any form that may be 347
required by the mortgagee(s). The Owners warrant that 348
they have not effected any mortgage(s) other than stated 349
in Box 28 and that they shall not agree to any 350
amendment of the mortgage(s) referred to in Box 28 or 351
effect any other mortgage(s) without the prior consent 352
of the Charterers, which shall not be unreasonably 353
withheld. 354
(Optional, Clauses 12(a) and 12(b) are alternatives; 355
indicate alternative agreed in Box 28). 356

13. Insurance and Repairs 357
(a) During the Charter Period the Vessel shall be kept 358
insured by the Charterers at their expense against hull 359
and machinery, war and Protection and Indemnity risks 360
(and any risks against which it is compulsory to insure 361
for the operation of the Vessel, including maintaining 362
financial security in accordance with sub-clause 363
10(a)(iii) in such form as the Owners shall in writing 364
approve, which approval shall not be un-reasonably 365
withheld. Such insurances shall be arranged by the 366
Charterers to protect the interests of both the Owners 367
and the Charterers and the mortgagee(s) (if any), and 368
The Charterers shall be at liberty to protect under such 369
insurances the interests of any managers they may 370
appoint. Insurance policies shall cover the Owners and 371
the Charterers according to their respective interests. 372
Subject to the provisions of the Financial Instrument, if 373
any, and the approval of the Owners and the insurers, 374
the Charterers shall effect all insured repairs and shall 375
undertake settlement and reimbursement from the 376
insurers of all costs in connection with such repairs as 377
well as insured charges, expenses and liabilities to the 378
extent of coverage under the insurances herein provided 379
for. 380
The Charterers also to remain responsible for and to 381
effect repairs and settlement of costs and expenses 382
incurred thereby in respect of all other repairs not 383
covered by the insurances and/or not exceeding any 384
possible franchise(s) or deductibles provided for in the 385
insurances. 386
All time used for repairs under the provisions of sub- 387
clause 13(a) and for repairs of latent defects according 388
to Clause 3(c) above, including any deviation, shall be 389
for the Charterers' account. 390
(b) If the conditions of the above insurances permit 391
additional insurance to be placed by the parties, such 392
cover shall be limited to the amount for each party set 393
out in Box 30 and Box 31, respectively. The Owners or 394
the Charterers as the case may be shall immediately 395
furnish the other party with particulars of any additional 396
insurance effected, including copies of any cover notes 397
or policies and the written consent of the insurers of 398
any such required insurance in any case where the 399
consent of such insurers is necessary. 400
(c) The Charterers shall upon the request of the 401
Owners, provide information and promptly execute such 402
documents as may be required to enable the Owners to 403
comply with the insurance provisions of the Financial 404
Instrument. 405
(d) Subject to the provisions of the Financial Instru- 406
ment, if any, should the Vessel become an actual, 407
constructive, compromised or agreed total loss under 408
the insurances required under sub-clause 13(a), all 409
insurance payments for such loss shall be paid to the 410
Owners who shall distribute the moneys between the 411
Owners and the Charterers according to their respective 412
interests. The Charterers undertake to notify the Owners 413
and the mortgagee(s), if any, of any occurrences in 414
consequence of which the Vessel is likely to become a 415
total loss as defined in this Clause. 416
(e) The Owners shall upon the request of the 417
Charterers, promptly execute such documents as may 418
be required to enable the Charterers to abandon the 419
Vessel to insurers and claim a constructive total loss. 420
(f) For the purpose of insurance coverage against hull 421
and machinery and war risks under the provisions of 422
sub-clause 13(a), the value of the Vessel is the sum 423
indicated in Box 29. 424

14. Insurance, Repairs and Classification 425
(Optional, only to apply if expressly agreed and stated 426
in Box 29, in which event Clause 13 shall be considered 427
deleted). 428
(a) During the Charter Period the Vessel shall be kept 429
insured by the Owners at their expense against hull and 430
machinery and war risks under the form of policy or 431
policies attached hereto. The Owners and/or insurers 432
shall not have any right of recovery or subrogation 433
against the Charterers on account of loss of or any 434
damage to the Vessel or her machinery or appurt- 435
enances covered by such insurance, or on account of 436
payments made to discharge claims against or liabilities 437
of the Vessel or the Owners covered by such insurance. 438
Insurance policies shall cover the Owners and the 439

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



## PART II
## "BARECON 2001" Standard Bareboat Charter

Charterers according to their respective interests. 440
(b) During the Charter Period the Vessel shall be kept 441
insured by the Charterers at their expense against 442
Protection and Indemnity risks (and any risks against 443
which it is compulsory to insure for the operation of the 444
Vessel, including maintaining financial security in 445
accordance with sub-clause 10(a)(iii)) in such form as 446
the Owners shall in writing approve which approval shall 447
not be unreasonably withheld. 448
(c) In the event that any act or negligence of the 449
Charterers shall vitiate any of the insurance herein 450
provided, the Charterers shall pay to the Owners all 451
losses and indemnify the Owners against all claims and 452
demands which would otherwise have been covered by 453
such insurance. 454
(d) The Charterers shall, subject to the approval of the 455
Owners or Owners' Underwriters, effect all insured 456
repairs, and the Charterers shall undertake settlement 457
of all miscellaneous expenses in connection with such 458
repairs as well as all insured charges, expenses and 459
liabilities, to the extent of coverage under the insurances 460
provided for under the provisions of sub-clause 14(a). 461
The Charterers to be secured reimbursement through 462
the Owners' Underwriters for such expenditures upon 463
presentation of accounts. 464
(e) The Charterers to remain responsible for and to 465
effect repairs and settlement of costs and expenses 466
incurred thereby in respect of all other repairs not 467
covered by the insurances and/or not exceeding any 468
possible franchise(s) or deductibles provided for in the 469
insurances. 470
(f) All time used for repairs under the provisions of 471
sub-clauses 14(d) and 14(e) and for repairs of latent 472
defects according to Clause 3 above, including any 473
deviation, shall be for the Charterers' account and shall 474
form part of the Charter Period. 475
The Owners shall not be responsible for any expenses 476
as are incident to the use and operation of the Vessel 477
for such time as may be required to make such repairs. 478
(g) If the conditions of the above insurances permit 479
additional insurance to be placed by the parties such 480
cover shall be limited to the amount for each party set 481
out in Box 30 and Box 31, respectively. The Owners or 482
the Charterers as the case may be shall immediately 483
furnish the other party with particulars of any additional 484
insurance effected, including copies of any cover notes 485
or policies and the written consent of the insurers of 486
any such required insurance in any case where the 487
consent of such insurers is necessary. 488
(h) Should the Vessel become an actual, constructive, 489
compromised or agreed total loss under the insurances 490
required under sub-clause 14(a), all insurance payments 491
for such loss shall be paid to the Owners, who shall 492
distribute the moneys between themselves and the 493
Charterers according to their respective interests. 494
(i) If the Vessel becomes an actual, constructive, 495
compromised or agreed total loss under the insurances 496
arranged by the Owners in accordance with sub-clause 497
14(a), this Charter shall terminate as of the date of such 498
loss. 499
(j) The Charterers shall upon the request of the 500
Owners, promptly execute such documents as may be 501
required to enable the Owners to abandon the Vessel 502
to the insurers and claim a constructive total loss. 503
(k) For the purpose of insurance coverage against hull 504
and machinery and war risks under the provisions of 505
sub-clause 14(a), the value of the Vessel is the sum 506
indicated in Box 29. 507
(l) Notwithstanding anything contained in sub-clause 508
10(a), it is agreed that under the provisions of Clause 509
14, if applicable, the Owners shall keep the Vessel's 510
Class fully up to date with the Classification Society 511
indicated in Box 10 and maintain all other necessary 512
certificates in force at all times. 513

15. Redelivery 514
At the expiration of the Charter Period the Vessel shall 515
be redelivered by the Charterers to the Owners at a 516
safe and ice-free port or place as indicated in Box 16, in 517
such ready safe berth as the Owners may direct. The 518
Charterers shall give the Owners not less than thirty 519
(30) running days' preliminary notice of expected date, 520
range of ports of redelivery or port of place of redelivery 521
and not less than fourteen (14) running days' definite 522
notice of expected date and port or place of redelivery. 523
Any changes thereafter in the Vessel's position shall be 524
notified immediately to the Owners. 525
The Charterers warrant that they will not permit the 526
Vessel to commence a voyage (including any preceding 527
ballast voyage) which cannot reasonably be expected 528
to be completed in time to allow redelivery of the Vessel 529
within the Charter Period. Notwithstanding the above, 530
should the Charterers fail to redeliver the Vessel within 531
The Charter Period, the Charterers shall pay the daily 532
equivalent to the rate of hire stated in Box 22 plus 10 533
per cent. or to the market rate, whichever is the higher, 534
for the number of days by which the Charter Period is 535
exceeded. All other terms, conditions and provisions of 536
this Charter shall continue to apply. 537
Subject to the provisions of Clause 10, the Vessel shall 538
be redelivered to the Owners in the same or as good 539
structure, state, condition and class as that in which she 540
was delivered, fair wear and tear not affecting class 541
excepted. 542
The Vessel upon redelivery shall have her survey cycles 543
up to date and trading and class certificates valid for at 544
least the number of months agreed in Box 17. 545

16. Non-Lien 546
The Charterers will not suffer, nor permit to be continued, 547
any lien or encumbrance incurred by them or their 548
agents, which might have priority over the title and 549
interest of the Owners in the Vessel. The Charterers 550
further agree to fasten to the Vessel in a conspicuous 551
place and to keep so fastened during the Charter Period 552
a notice reading as follows: 553
"This Vessel is the property of (name of Owners). It is 554
under charter to (name of Charterers) and by the terms 555
of the Charter-Party neither the Charterers nor the 556
Master have any right, power or authority to create, incur 557
or permit to be imposed on the Vessel any lien 558
whatsoever." 559

17. Indemnity 560
(a) The Charterers shall indemnify the Owners against 561
any loss, damage or expense incurred by the Owners 562
arising out of or in relation to the operation of the Vessel 563
by the Charterers, and against any lien of whatsoever 564
nature arising out of an event occurring during the 565
Charter Period. If the Vessel be arrested or otherwise 566
detained by reason of claims or liens arising out of her 567
operation hereunder by the Charterers, the Charterers 568
shall at their own expense take all reasonable steps to 569
secure that within a reasonable time the Vessel is 570
released, including the provision of bail. 571
Without prejudice to the generality of the foregoing, the 572
Charterers agree to indemnify the Owners against all 573
consequences or liabilities arising from the Master, 574
officers or agents signing Bills of Lading or other 575
documents. 576
(b) If the Vessel be arrested or otherwise detained by 577
reason of a claim or claims against the Owners, the 578
Owners shall at their own expense take all reasonable 579
steps to secure that within a reasonable time the Vessel 580
is released, including the provision of bail. 581
In such circumstances the Owners shall indemnify the 582
Charterers against any loss, damage or expense 583
incurred by the Charterers (including hire paid under 584
this Charter) as a direct consequence of such arrest or 585
detention. 586

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

18. Lien 587
    The Owners to have a lien upon all cargoes, sub-hires 588
    and sub-freights belonging or due to the Charterers or 589
    any sub-charterers and any Bill of Lading freight for all 590
    claims under this Charter, and the Charterers to have a 591
    lien on the Vessel for all moneys paid in advance and 592
    not earned. 593

19. Salvage 594
    All salvage and towage performed by the Vessel shall 595
    be for the Charterers' benefit and the cost of repairing 596
    damage occasioned thereby shall be borne by the 597
    Charterers. 598

20. Wreck Removal 599
    In the event of the Vessel becoming a wreck or 600
    obstruction to navigation the Charterers shall indemnify 601
    the Owners against any sums whatsoever which the 602
    Owners shall become liable to pay and shall pay in 603
    consequence of the Vessel becoming a wreck or 604
    obstruction to navigation. 605

21. General Average 606
    The Owners shall not contribute to General Average. 607

22. Assignment, Sub-Charter and Sale 608
    (a) The Charterers shall not assign this Charter nor 609
    sub-charter the Vessel on a bareboat basis except with 610
    the prior consent in writing of the Owners, which shall 611
    not be unreasonably withheld, and subject to such terms 612
    and conditions as the Owners shall approve. 613
    (b) The Owners shall not sell the Vessel during the 614
    currency of this Charter except with the prior written 615
    consent of the Charterers, which shall not be unreason- 616
    ably withheld, and subject to the buyer accepting an 617
    assignment of this Charter. SEE ATTACHMENT 618
    "A"

23. Contracts of Carriage 619
    *) (a) The Charterers are to procure that all documents 620
    issued during the Charter Period evidencing the terms 621
    and conditions agreed in respect of carriage of goods 622
    shall contain a paramount clause incorporating any 623
    legislation relating to carrier's liability for cargo 624
    compulsorily applicable in the trade; if no such legislation 625
    exists, the documents shall incorporate the Hague-Visby 626
    Rules. The documents shall also contain the New Jason 627
    Clause and the Both-to-Blame Collision Clause. 628
    *) (b) The Charterers are to procure that all passenger 629
    tickets issued during the Charter Period for the carriage 630
    of passengers and their luggage under this Charter shall 631
    contain a paramount clause incorporating any legislation 632
    relating to carrier's liability for passengers and their 633
    luggage compulsorily applicable in the trade; if no such 634
    legislation exists, the passenger tickets shall incorporate 635
    the Athens Convention Relating to the Carriage of 636
    Passengers and their Luggage by Sea, 1974, and any 637
    protocol thereto. 638
    *) Delete as applicable. 639

24. Bank Guarantee 640
    (Optional, only to apply if Box 27 filled in) 641
    The Charterers undertake to furnish, before delivery of 642
    the Vessel, a first class bank guarantee or bond in the 643
    sum and at the place as indicated in Box 27 as guarantee 644
    for full performance of their obligations under this 645
    Charter. 646

25. Requisition/Acquisition 647
    (a) In the event of the Requisition for Hire of the Vessel 648
    by any governmental or other competent authority 649
    (hereinafter referred to as "Requisition for Hire") 650
    irrespective of the date during the Charter Period when 651
    "Requisition for Hire" may occur and irrespective of the 652
    length thereof and whether or not it be for an indefinite 653
    or a limited period of time, and irrespective of whether it 654
    may or will remain in force for the remainder of the 655
    Charter Period, this Charter shall not be deemed thereby 656
    or thereupon to be frustrated or otherwise terminated 657
    and the Charterers shall continue to pay the stipulated 658
    hire in the manner provided by this Charter until the time 659
    when the Charter would have terminated pursuant to 660
    any of the provisions hereof always provided however 661
    that in the event of "Requisition for Hire" any Requisition 662
    Hire or compensation received or receivable by the 663
    Owners shall be payable to the Charterers during the 664
    remainder of the Charter Period or the period of the 665
    "Requisition for Hire" whichever be the shorter. 666
    (b) In the event of the Owners being deprived of their 667
    ownership in the Vessel by any Compulsory Acquisition 668
    of the Vessel or requisition for title by any governmental 669
    or other competent authority (hereinafter referred to as 670
    "Compulsory Acquisition"), then, irrespective of the date 671
    during the Charter Period when "Compulsory Acqui- 672
    sition" may occur, this Charter shall be deemed 673
    terminated as of the date of such "Compulsory 674
    Acquisition". In such event Charter Hire to be considered 675
    as earned and to be paid up to the date and time of 676
    such "Compulsory Acquisition". 677

26. War 678
    (a) For the purpose of this Clause, the words 'War 679
    Risks' shall include any war (whether actual or 680
    threatened), act of war, civil war, hostilities, revolution, 681
    rebellion, civil commotion, warlike operations, the laying 682
    of mines (whether actual or reported), acts of piracy, 683
    acts of terrorists, acts of hostility or malicious damage, 684
    blockades (whether imposed against all vessels or 685
    imposed selectively against vessels of certain flags or 686
    ownership, or against certain cargoes or crews or 687
    otherwise howsoever), by any person, body, terrorist or 688
    political group, or the Government of any state 689
    whatsoever, which may be dangerous or are likely to be 690
    or to become dangerous to the Vessel, her cargo, crew 691
    or other persons on board the Vessel. 692
    (b) The Vessel, unless the written consent of the 693
    Owners be first obtained, shall not continue to or go 694
    through any port, place, area or zone (whether of land 695
    or sea), or any waterway or canal, where it reasonably 696
    appears that the Vessel, her cargo, crew or other 697
    persons on board the Vessel, in the reasonable 698
    judgement of the Owners, may be, or are likely to be, 699
    exposed to War Risks. Should the Vessel be within any 700
    such place as aforesaid, which only becomes danger- 701
    ous, or is likely to be or to become dangerous, after her 702
    entry into it, the Owners shall have the right to require 703
    the Vessel to leave such area. 704
    (c) The Vessel shall not load contraband cargo, or to 705
    pass through any blockade, whether such blockade be 706
    imposed on all vessels, or is imposed selectively in any 707
    way whatsoever against vessels of certain flags or 708
    ownership, or against certain cargoes or crews or 709
    otherwise howsoever, or to proceed to an area where 710
    she shall be subject, or is likely to be subject to 711
    a belligerent's right of search and/or confiscation. 712
    (d) If the insurers of the war risks insurance, when 713
    Clause 14 is applicable, should require payment of 714
    premiums and/or calls because, pursuant to the 715
    Charterers' orders, the Vessel is within, or is due to enter 716
    and remain within, any area or areas which are specified 717
    by such insurers as being subject to additional premiums 718
    because of War Risks, then such premiums and/or calls 719
    shall be reimbursed by the Charterers to the Owners at 720
    the same time as the next payment of hire is due. 721
    (e) The Charterers shall have the liberty: 722
    (i) to comply with all orders, directions, recommend- 723
    ations or advice as to departure, arrival, routes, 724
    sailing in convoy, ports of call, stoppages, 725
    destinations, discharge of cargo, delivery, or in any 726
    other way whatsoever, which are given by the 727
    Government of the Nation under whose flag the 728
    Vessel sails, or any other Government, body or 729
    group whatsoever acting with the power to compel 730

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



compliance with their orders or directions; 731
(ii) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance; 732–735
(iii) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement. 736–744

(f) In the event of outbreak of war (whether there be a declaration of war or not) (i) between any two or more of the following countries: the United States of America; Russia; the United Kingdom; France; and the People's Republic of China, (ii) between any two or more of the countries stated in Box 36, both the Owners and the Charterers shall have the right to cancel this Charter, whereupon the Charterers shall redeliver the Vessel to the Owners in accordance with Clause 15, if the Vessel has cargo on board after discharge thereof at destination, or if debarred under this Clause from reaching or entering it at a near, open and safe port as directed by the Owners, or if the Vessel has no cargo on board, at the port at which the Vessel then is or if at sea at a near, open and safe port as directed by the Owners. In all cases hire shall continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this Charter shall apply until redelivery. 745–763

27. **Commission**
The Owners to pay a commission at the rate indicated in Box 33 to the Brokers named in Box 33 on any hire paid under the Charter. If no rate is indicated in Box 33, the commission to be paid by the Owners shall cover the actual expenses of the Brokers and a reasonable fee for their work.
If the full hire is not paid owing to breach of the Charter by either of the parties the party liable therefor shall indemnify the Brokers against their loss of commission. Should the parties agree to cancel the Charter, the Owners shall indemnify the Brokers against any loss of commission but in such case the commission shall not exceed the brokerage on one year's hire. 764–777

28. **Termination**
(a) *Charterers' Default*
The Owners shall be entitled to withdraw the Vessel from the service of the Charterers and terminate the Charter with immediate effect by written notice to the Charterers if:
(i) the Charterers fail to pay hire in accordance with Clause 11. However, where there is a failure to make punctual payment of hire due to oversight, negligence, errors or omissions on the part of the Charterers or their bankers, the Owners shall give the Charterers written notice of the number of clear banking days stated in Box 34 (as recognised at the agreed place of payment) in which to rectify the failure, and when so rectified within such number of days following the Owners' notice, the payment shall stand as regular and punctual. Failure by the Charterers to pay hire within the number of days stated in Box 34 of their receiving the Owners' notice as provided herein, shall entitle the Owners to withdraw the Vessel from the service of the Charterers and terminate the Charter without further notice; 778–799
(ii) the Charterers fail to comply with the requirements of:
(1) Clause 6 (Trading Restrictions) 800
(2) Clause 13(a) (Insurance and Repairs) 801–802
provided that the Owners shall have the option, by written notice to the Charterers, to give the Charterers a specified number of days grace within which to rectify the failure without prejudice to the Owners' right to withdraw and terminate under this Clause if the Charterers fail to comply with such notice; 803–809
(iii) the Charterers fail to rectify any failure to comply with the requirements of sub-clause 10(a)(i) (Maintenance and Repairs) as soon as practically possible after the Owners have requested them in writing so to do and in any event so that the Vessel's insurance cover is not prejudiced. 810–815

(b) *Owners' Default*
If the Owners shall by any act or omission be in breach of their obligations under this Charter to the extent that the Charterers are deprived of the use of the Vessel and such breach continues for a period of fourteen (14) running days after written notice thereof has been given by the Charterers to the Owners, the Charterers shall be entitled to terminate this Charter with immediate effect by written notice to the Owners. 816–824

(c) *Loss of Vessel*
This Charter shall be deemed to be terminated if the Vessel becomes a total loss or is declared as a constructive or compromised or arranged total loss. For the purpose of this sub-clause, the Vessel shall not be deemed to be lost unless she has either become an actual total loss or agreement has been reached with her underwriters in respect of her constructive, compromised or arranged total loss or if such agreement with her underwriters is not reached it is adjudged by a competent tribunal that a constructive loss of the Vessel has occurred. 825–836

(d) Either party shall be entitled to terminate this Charter with immediate effect by written notice to the other party in the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of the other party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed, or if it suspends payment, ceases to carry on business or makes any special arrangement or composition with its creditors. 837–845

(e) The termination of this Charter shall be without prejudice to all rights accrued due between the parties prior to the date of termination and to any claim that either party might have. 846–849

29. **Repossession**
In the event of the termination of this Charter in accordance with the applicable provisions of Clause 28, the Owners shall have the right to repossess the Vessel from the Charterers at her current or next port of call, or at a port or place convenient to them without hindrance or interference by the Charterers, courts or local authorities. Pending physical repossession of the Vessel in accordance with this Clause 29, the Charterers shall hold the Vessel as gratuitous bailee only to the Owners. The Owners shall arrange for an authorised representative to board the Vessel as soon as reasonably practicable following the termination of the Charter. The Vessel shall be deemed to be repossessed by the Owners from the Charterers upon the boarding of the Vessel by the Owners' representative. All arrangements and expenses relating to the settling of wages, disembarkation and repatriation of the Charterers' Master, officers and crew shall be the sole responsibility of the Charterers. 850–869

30. **Dispute Resolution**
*) (a) This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to 870–876

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

the provisions of this Clause. 877
The arbitration shall be conducted in accordance with 878
the London Maritime Arbitrators Association (LMAA) 879
Terms current at the time when the arbitration proceed- 880
ings are commenced. 881
The reference shall be to three arbitrators. A party 882
wishing to refer a dispute to arbitration shall appoint its 883
arbitrator and send notice of such appointment in writing 884
to the other party requiring the other party to appoint its 885
own arbitrator within 14 calendar days of that notice and 886
stating that it will appoint its arbitrator as sole arbitrator 887
unless the other party appoints its own arbitrator and 888
gives notice that it has done so within the 14 days 889
specified. If the other party does not appoint its own 890
arbitrator and give notice that it has done so within the 891
14 days specified, the party referring a dispute to 892
arbitration may, without the requirement of any further 893
prior notice to the other party, appoint its arbitrator as 894
sole arbitrator and shall advise the other party 895
accordingly. The award of a sole arbitrator shall be 896
binding on both parties as if he had been appointed by 897
agreement. 898
Nothing herein shall prevent the parties agreeing in 899
writing to vary these provisions to provide for the 900
appointment of a sole arbitrator. 901
In cases where neither the claim nor any counterclaim 902
exceeds the sum of US$50,000 (or such other sum as 903
the parties may agree) the arbitration shall be conducted 904
in accordance with the LMAA Small Claims Procedure 905
current at the time when the arbitration proceedings are 906
commenced. 907

HOUSTON, TX *)
(b) This Contract shall be governed by and construed 908
in accordance with Title 9 of the United States Code 909
and the Maritime Law of the United States and any 910
dispute arising out of or in connection with this Contract 911
shall be referred to three persons at New York, one to 912
be appointed by each of the parties hereto, and the third 913
by the two so chosen; their decision or that of any two 914
of them shall be final, and for the purposes of enforcing 915
any award, judgement may be entered on an award by 916
any court of competent jurisdiction. The proceedings 917
shall be conducted in accordance with the rules of the 918
Society of Maritime Arbitrators, Inc. 919
In cases where neither the claim nor any counterclaim 920
exceeds the sum of US$50,000 (or such other sum as 921
the parties may agree) the arbitration shall be conducted 922
in accordance with the Shortened Arbitration Procedure 923
of the Society of Maritime Arbitrators, Inc. current at 924
the time when the arbitration proceedings are commenced. 925

*) (c) This Contract shall be governed by and construed 926
in accordance with the laws of the place mutually agreed 927
by the parties and any dispute arising out of or in 928
connection with this Contract shall be referred to 929
arbitration at a mutually agreed place, subject to the 930
procedures applicable there. 931

(d) Notwithstanding (a), (b) or (c) above, the parties 932
may agree at any time to refer to mediation any 933
difference and/or dispute arising out of or in connection 934
with this Contract. 935
In the case of a dispute in respect of which arbitration 936
has been commenced under (a), (b) or (c) above, the 937
following shall apply:- 938
(i) Either party may at any time and from time to time 939
elect to refer the dispute or part of the dispute to 940
mediation by service on the other party of a written 941
notice (the "Mediation Notice") calling on the other 942
party to agree to mediation. 943
(ii) The other party shall thereupon within 14 calendar 944
days of receipt of the Mediation Notice confirm that 945
they agree to mediation, in which case the parties 946
shall thereafter agree a mediator within a further 947
14 calendar days, failing which on the application 948
of either party a mediator will be appointed promptly 949
by the Arbitration Tribunal ("the Tribunal") or such 950
person as the Tribunal may designate for that 951
purpose. The mediation shall be conducted in such 952
place and in accordance with such procedure and 953
on such terms as the parties may agree or, in the 954
event of disagreement, as may be set by the 955
mediator. 956
(iii) If the other party does not agree to mediate, that 957
fact may be brought to the attention of the Tribunal 958
and may be taken into account by the Tribunal when 959
allocating the costs of the arbitration as between 960
the parties. 961
(iv) The mediation shall not affect the right of either 962
party to seek such relief or take such steps as it 963
considers necessary to protect its interest. 964
(v) Either party may advise the Tribunal that they have 965
agreed to mediation. The arbitration procedure shall 966
continue during the conduct of the mediation but 967
the Tribunal may take the mediation timetable into 968
account when setting the timetable for steps in the 969
arbitration. 970
(vi) Unless otherwise agreed or specified in the 971
mediation terms, each party shall bear its own costs 972
incurred in the mediation and the parties shall share 973
equally the mediator's costs and expenses. 974
(vii) The mediation process shall be without prejudice 975
and confidential and no information or documents 976
disclosed during it shall be revealed to the Tribunal 977
except to the extent that they are disclosable under 978
the law and procedure governing the arbitration. 979
(Note: The parties should be aware that the mediation 980
process may not necessarily interrupt time limits.) 981
(e) If Box 35 in Part I is not appropriately filled in, sub-clause 982
30(a) of this Clause shall apply. Sub-clause 30(d) shall 983
apply in all cases. 984
*) Sub-clauses 30(a), 30(b) and 30(c) are alternatives; 985
indicate alternative agreed in Box 35. 986

31. Notices 987
(a) Any notice to be given by either party to the other 988
party shall be in writing and may be sent by fax, telex, EMAIL 989
registered or recorded mail or by personal service. 990
(b) The address of the Parties for service of such 991
communication shall be as stated in Boxes 3 and 4 992
respectively. 993

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

Attachment "A" to be inserted at end of Cl. 22 of GO-Seatran Barecon 2001

Owner shall grant Charterer the Right of First Refusal to purchase the vessel at the same terms and conditions of any 3rd party offer to Owner, provided the 3rd party offer is accepted by Owner subject to the right of first refusal granted to Charterer.

ATTACHMENT B
FOR GIO-SEATRAN BARECON 2001



Wire/ACH Instructions



Please contact Erika Verret at the below information for additional information or questions. If you should need technical assistance or have questions that pertain to the bank, please call (337) 365-6677.

Sincerely,

*Erika Verret*

Erika Verret

SeaTran Marine, LLC
107 Hwy 90 West, New Iberia, LA 70560
office (985) 631-9004 xt 7476 - fax (985) 631-0404 - everret@seatranmarine.com
www.seatranmarine.com

Attachment C to SeaTran Marine and Guice Offshore Barecon 2001 on Mr Steven 10-15-17.

SeaTran Marine and Guice Offshore agree that Guice Offshore will hire certain SeaTran crew members currently working on the Mr. Steven to continue working on the vessel as Guice employees during the term of the Barecon charter. Guice agrees to not offer the crew members further employment with Guice when the Barecon ends and the Mr. Steven is returned to SeaTran.

SeaTran Marine, LLC

By: _____
  Charles Tizzard

Guice Offshore, LLC

By: _____
  Nathan Guice