# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA
### LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | * | **CASE NO. 18-51277** |
| | * | |
| **MR. STEVEN, L.L.C.** | * | **CHAPTER 11** |
| | * | |
| | * | **JUDGE JOHN W. KOLWE** |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## AFFIDAVIT OF CHARLES E. TIZZARD

**PARISH OF ORLEANS**

**STATE OF LOUISIANA**

**BEFORE ME,** the undersigned authority in and for said Parish and State, personally appeared:

### CHARLES E. TIZZARD

who declares and states:

1. I, Charles E. Tizzard, am over the age of eighteen, make this affidavit based on my personal knowledge, and respectfully submit this Affidavit in support of the *Opposition to Motion To Determine Property of the Estate and for Turnover of Property* filed on behalf of SeaTran Marine, LLC ("SeaTran") in the above-captioned case.

2. I serve as the Executive Vice President and Chief Financial Officer of SeaTran. As such, I am familiar with and have a working knowledge of the operations and finances of SeaTran, as well as SeaTran's affiliated companies, including those of Iberia Marine Services ("IMS"), Mr. Blake LLC, Mr. Ridge LLC, Lady Glenda LLC, Mr. Mason LLC, Mr. Row LLC, Lady Brandi LLC, Lady Eve LLC, and Mr. Steven LLC (excluding IMS, the "Debtors").



3. The Debtors each executed a vessel operating agreement with IMS, requiring IMS to operate the vessels owned by each Debtor.

4. Attached as **Exhibit 1** hereto is a true and correct copy of the Vessel Operating Agreement between IMS and SeaTran that I executed on behalf of SeaTran. That agreement appoints SeaTran to "manage, maintain books and records, operate, maintain, oversee and supervise the chartering, crewing, provisioning, maintenance and repair of" eight vessels, including the U.S.-flagged vessel Mr. Steven (collectively, the "Vessel"). The agreement also provides that "[a]ny and all charters or other contractual relationships entered into with respect to the use of the Vessel shall be in the name of SeaTran and shall be the sole property of SeaTran and the Owner shall not have any rights, title, or interest in and to any such charters or other contractual relationship or funds or charter-hire derived from same . . . ." Further, the Vessel Operating Agreement between SeaTran and IMS states that "[a]ll invoices issued by SeaTran to the charterers of the Vessel shall be owned by SeaTran," and "[p]ayment of all such invoices shall be made directly to SeaTran or to any location directed by SeaTran."

5. Attached as **Exhibit 2** hereto is a true and correct copy of the Brokerage Agreement that I executed on behalf of SeaTran with GOL, LLC.

6. Attached as **Exhibit 3** hereto is a true and correct copy of the Standard Bareboat Charter agreement that I executed on behalf of SeaTran with Guice Offshore, LLC for use of the Vessel, Mr. Steven.

2

7. I declare and affirm under the penalties of perjury that this Affidavit is true to the best of my information and belief.

_____
CHARLES E. TIZZARD

SWORN TO THIS 11th DAY
OF DECEMBER, 2018.

_____
NOTARY PUBLIC

Meredith Sue Grabill
Notary Public
State of Louisiana
Bar No. 35484
My commission is for life

3

# VESSEL OPERATING AGREEMENT

This Vessel Operating Agreement ("Agreement") is made effective as of July 1, 2014 (the "Effective Date") by and between **SeaTran Marine, LLC**, a Louisiana limited liability company, appearing herein through Charles Tizzard, its Chief Financial Officer (hereinafter referred to as "**SeaTran**"), and **Iberia Marine Service, LLC**, a Louisiana limited liability company (hereinafter referred to as "**Owner**"). (SeaTran and Owner hereinafter sometimes referred to generally as a "Party" or as "Parties.")

## W I T N E S S E T H:

**WHEREAS**, Owner is the owner or operator of the vessel or vessels identified on Exhibit "A" hereto (whether, one or more, singularly and collectively referred to as the "Vessel");

**WHEREAS**, Owner desires to enter this Agreement with SeaTran whereby SeaTran will manage and operate the Vessel, pursuant to the terms and conditions hereof; and

**WHEREAS**, SeaTran is willing to undertake the management and operation of the Vessel pursuant to the terms and conditions hereof.

**WHEREAS,** since July 1, 2014, the Parties have been operating pursuant to an oral agreement and/or understanding and now wish to memorialize this agreement in writing.

**NOW, THEREFORE**, for and in consideration of the premises and the mutual covenants and conditions hereinafter set forth, the parties agree as follows:

**ARTICLE 1. APPOINTMENT.** Owner hereby appoints SeaTran to manage, maintain books and records, operate, maintain, oversee and supervise the chartering, crewing, provisioning, maintenance and repair of the Vessel and SeaTran hereby accepts such appointment on the terms and conditions set forth herein. Owner agrees that its Vessel must be maintained in good operating condition at all times while under this Agreement, with some consideration given while the Vessel is in stacked status. SeaTran's relationship to Owner under the Agreement shall be that of an independent contractor, and nothing in the Agreement shall be construed to constitute a joint venture, partnership or other relationship other than one between an independent contractor (SeaTran) and its principal (Owner). It is agreed that SeaTran's employees and/or its subcontractors, who are assigned to perform work required under the Agreement, shall at all times be and remain employees/subcontractors of SeaTran. Unless otherwise agreed in writing by SeaTran, Owner agrees that SeaTran shall have the exclusive right to operate and manage all vessels owned, managed or operated by Owner.

**ARTICLE 2. TERM.** This Agreement shall commence effective as of 0001 hours on July 1, 2018 and shall continue in full force and effect for a period of one year (the "Initial Term"). The term of this Agreement shall automatically extend for successive one (1) year renewal periods

EXHIBIT
1

beyond the Initial Term unless written notice of the intent to terminate this Agreement is received by Owner from SeaTran or by SeaTran from Owner at least 90 days prior to the end of the initial term of the Agreement or any subsequent term. All of the original terms and conditions of this Agreement shall continue in full force and effect upon any extension of this Agreement, except as are modified by mutual written agreement of the Owner and SeaTran.

### ARTICLE 3.  SHARED OVERHEAD FEE.

In consideration for the management services provided by SeaTran pursuant to Article 4 of this Agreement, Owner shall pay to SeaTran a monthly fee (the "Shared Overhead Fee"). Owner shall pay a Shared Overhead Fee equal to Owner's pro-rata share of the total marketing, sales, administrative and overhead expenses of SeaTran. (the "Shared Overhead Expenses"). Shared Overhead Expenses shall include all indirect costs of operating and managing all of the vessels being operated by SeaTran, excluding all vessels that are either stacked or on a bareboat charter. All vessels managed by SeaTran that are either stacked or on a bareboat charter will be charged a fixed monthly fee (the "Stacked Fees"). The Stacked Fees will be applied against the Shared Overhead Expenses before the pro-rata share calculation is made. The Stacked Fees in effect as of the inception of this Agreement is $3,650 per month per vessel. The Stacked Fees rate is to be reviewed and set annually in the first calendar month of each year. If a new rate is not set, the existing rate will remain in effect. The parties agree the Stacked Fees are $1,500 per month per vessel effective January 1, 2018. Except as otherwise provided in this Agreement, Owner's pro-rata share of the Shared Overhead Expenses shall be calculated based on the total marketable length of Owner's Vessel divided by the total marketable vessel length of all vessels being operated by SeaTran.  By way of example, if Owner's Vessel is marketed as a 180' supply vessel and the total marketable length of all vessels being operated by SeaTran is 1,800', Owner will pay 10% of the Shared Overhead Expenses. . If an Owner fleet is less than five vessels, the Owner must change to a Shared Overhead Fee equal to 10% of the Vessels' revenues with a minimum Management Fee of $5,000.00 per vessel per month at the time the Owner fleet becomes less than five vessels, unless otherwise mutually agreed to by both parties. As of the effective date of this Agreement, both parties agree to waive the requirement to change the Shared Overhead Fee to 10% and the minimum Management Fee of $5,000.00 per vessel per month.

On a calendar year basis beginning on January 1, 2019, SeaTran shall prepare a budget for the Shared Overhead Expenses for such upcoming calendar year. This annual budget of Shared Overhead Expenses will be for information purposes only. Shared Overhead Expenses shall be billed monthly by SeaTran (based on an accrual basis) with Owner being invoiced for its Shared Overhead Fee by SeaTran no later than the twentieth (20) day of the following calendar month for its Shared Overhead Expenses incurred in the prior calendar month. Owner's Shared Overhead Fee shall be due and payable by Owner no later than the last business day of the month in which it is billed to Owner.

The Owner may have a minimum monthly payment to SeaTran for Owners Shared Overhead Fee as mutually agreed to by the SeaTran and Owner. This minimum monthly payment may be based on a fleet of vessels with common ownership interests or related parties.

In addition to the above fees for management services, Owner acknowledges that SeaTran has a Profit Sharing Plan for its management team and office staff. The plan is based on the earning of the Vessel. SeaTran will provide Owner a copy of the Profit Sharing Plan.

In the event Owner sells a Vessel, the Vessel shall be deemed sold effective the date the Bill of Sale is dated and executed, and the Owner is obligated to continue to pay the appropriate Fee for management services until the Vessel is deemed sold.

## ARTICLE 4. **MANAGEMENT SERVICES**

In consideration of Owner's payment of the Shared Overhead Fee, SeaTran shall provide the following services:

(a)     SeaTran shall use its best efforts (herein "best efforts" is defined to mean all commercially reasonable efforts by SeaTran to place the Vessel for work with responsible third parties and which are comparable to the efforts used by SeaTran to place vessels owned by its affiliated companies under charter) to obtain charters for the Vessel and to keep the Vessel under charter throughout the term of this Agreement. SeaTran shall be solely responsible and have the sole decision making authority for the solicitation, bidding, setting charter rates, selecting customers, and negotiation of charters. Any and all charters or other contractual relationships entered into with respect to the use of the Vessel shall be in the name of SeaTran and shall be the sole property of SeaTran and the Owner shall not have any rights, title, or interest in and to any such charters or other contractual relationships or funds or charter-hire derived from same; provided, however, that in the event SeaTran does not have a master service agreement or time charter agreement in place with the particular customer for an available job, SeaTran is hereby appointed as Owner's agent-in-fact and is authorized to enter into one or more work order(s) with the customer in Owner's name. It is the intent of the Parties that SeaTran shall eventually be the contracting party with all customers and the Parties shall work together to facilitate SeaTran's entering into a master service agreement or time charter agreement with such customers as expeditiously as possible. Revenues earned under customer charters entered into in the name of Owner will be deposited in a segregated account of SeaTran and administered in the same manner as customer charters entered into between SeaTran and the customer. However, the parties may mutually agree the Owner may enter a charter agreement directly with a customer and directly collect the charter hire. In this event, Owner agrees the Shared Overhead Fee shall be still due and payable to SeaTran.

(b) SeaTran agrees to use all reasonable efforts (herein "all reasonable efforts" is defined to mean all commercially reasonable efforts by SeaTran as a prudent operator to manage and operate the Vessel in a manner which is comparable to the manner in which SeaTran manages and operates vessels owned by SeaTran's affiliated companies) to manage and operate the Vessel within the terms, conditions and limitations of this Agreement and to comply with the terms and conditions of any time charter to which the Vessel is subject during the term hereof.

(c)     Owner acknowledges and agrees that SeaTran performs vessel management services for others and may be in competition with the Vessel and that SeaTran is under no

obligation to give any preferential treatment to the Vessel of Owner and that the Vessel may from time to time be idle while other vessels managed by SeaTran are chartered. SeaTran shall have the sole decision making authority for the movement of any Vessel owned by Owner, SeaTran, or other vessel owners on and off charters and replacing vessels on charters as needed in the overall marketing efforts of SeaTran with a reasonable explanation to Owner. SeaTran has established First In, First Out guidelines for the chartering of vessels. SeaTran shall provide Owner a copy of the First In, First Out guidelines. Owner acknowledges and recognizes that SeaTran does not represent or warrant that the Vessel will be chartered for any specific period or at any specific day rate during the term of this Agreement and that the market for offshore crewboats is cyclical in nature and that, by entering into this Agreement, Owner acknowledges that SeaTran has made no warranty, representation or guarantee of any kind regarding future utilization or day rates for Owner's Vessel. Owner further acknowledges that SeaTran may engage in brokering for charter other vessels outside of the vessels under management and operations by SeaTran; and that any broker fees generated shall be applied as a credit against the total marketing, sales, administrative, and overhead expenses of SeaTran before the allocation of the Shared Overhead Expenses is made as detailed in Article 3 or the broker fees may be retained in SeaTran if decided to do so by SeaTran corporate owners and/or managers decided in an owners meeting.

(d)     SeaTran shall maintain books and records sufficient to completely and properly account for all income and expenses applicable to the Vessel including, without limitation, all the charter hire, expenses, and Shared Overhead Fees.

(e)     SeaTran shall provide on each business day to the Owner via email or fax a daily report of the Vessel charter status, charter rate, Vessel location and incident report to include any Vessel mechanical problems, physical damage to the Vessel in such 24 hour period and any reports of injuries (the "Daily Vessel Status Report").

(f)     SeaTran shall also provide a monthly financial statement to Owner which shall reflect Vessel income and expenses for the calendar month, which shall be delivered to Owner no later than the last business day of the following month. Owner or its representative shall have the right upon reasonable advance notice to review and inspect SeaTran's records relating to the Vessel upon reasonable notice to SeaTran. Such review and inspection will be undertaken in a manner as to not unreasonably interfere with SeaTran's business. The parties acknowledge that Owner may incur certain operating expenses on a direct basis and outside of the SeaTran accounting system; and these expenses will not be included in the monthly financial statement produced and provided by SeaTran, unless the Owner provides information on the expenses incurred on a direct basis and requests SeaTran to include the expenses in the monthly financial statement produced by SeaTran.

(g)     Except as set forth herein to the contrary, SeaTran shall issue invoices to charterers of the Vessel in the name of SeaTran for charter hire and other amounts payable for use of the Vessel. Owner and SeaTran acknowledge and agree that:

(i)     All invoices issued by SeaTran to the charterers of the Vessel shall be owned by SeaTran, irrespective of whether the invoice for charter hire or related expenses

is issued in the name of SeaTran, its designee, or Owner (singularly, a "SeaTran Invoice" and collectively, the "SeaTran Invoices").

(ii)     SeaTran owns/charters/operates other vessels (herein "SeaTran's Vessels");

(iii)    SeaTran performs vessel management services with respect to vessels which are owned/chartered/operated by other parties including, without limitation, affiliates of SeaTran (herein "Managed Vessels");

(iv)    Invoices submitted by SeaTran to charterers for the use of the Vessel, SeaTran's Vessels, and Managed Vessels will be submitted in the name of SeaTran except in those instances when Owner is the contracting party with the customer in which case the invoice will be issued in Owner's name;

(v)     Invoices submitted by SeaTran to charterers for the hire of the Vessel may also include charges for the use of SeaTran's Vessels and/or the Managed Vessels;

(vi)    Payment of all such invoices shall be made directly to SeaTran or to any location directed by SeaTran; and

(vii)   From time to time, SeaTran may receive lump sum payments from charterers in satisfaction of one or more invoices and such lump sum payments may, in addition to including payment in satisfaction of charges for the use of the Vessel, also include payment in satisfaction of charges for the use of SeaTran's Vessels and/or the Managed Vessels. If and when requested, SeaTran agrees to send Owner copies of all invoices submitted to charterers, which include charges for the use of the Vessel. SeaTran agrees that all invoices submitted by SeaTran to charterers shall clearly identify each vessel covered thereby and shall clearly identify the charges allocable to the use of each such vessel.

(h)     SeaTran will be responsible for and agrees to use its best efforts to collect all SeaTran Invoices and other revenues earned from the operation of the Vessel from the third party customers. SeaTran shall also issue in the name of Owner, an invoice to be due by SeaTran for the total charter hire due from the third party customer (the "Owner Invoice"). SeaTran, subject to its right to offset any then outstanding Owner Shared Overhead Fee and Owner's Operating Expenses, will pay the Owner Invoice to Owner on the Friday (or next business day if Friday is a legal holiday) following SeaTran's receipt of payment of the corresponding SeaTran Invoice from the third party customer. SeaTran will have no liability whatsoever in the event any of the accounts receivable prove to be non-collectible and offers no warranties as to the collectability of such funds; its sole and only obligation being to exercise reasonable efforts to collect any outstanding accounts receivable, short of incurring legal fees and/or instituting litigation. In the event that legal services and/or proceedings are required to collect outstanding accounts receivable relating to the Vessel, all attorneys' fees and associated costs shall be for Owner's account.

(i)     If a SeaTran Invoice with respect to the Vessel has not been paid by the third party customer within 180 days of the invoice date, upon the written election of Owner, Owner shall

have the right to take over the collection of this SeaTran Invoice. In such event, SeaTran will assign over to Owner, without recourse or warranty of any kind, all of SeaTran's right, title and interest in the SeaTran Invoice and Owner shall have the right to directly pursue the collection of such invoice and SeaTran shall have no further responsibility whatsoever with respect to such invoice.

ARTICLE 5. **OWNER OPERATING EXPENSES.** SeaTran shall provide the following services for the account of and at the sole expense of Owner (the following, "Owner Operating Expense(s)"):

(a)     SeaTran shall furnish master(s) and crew (collectively, the "Crew") reasonably necessary to operate and maintain the Vessel in accordance with applicable law. SeaTran shall arrange for the payment of the wages and all associated expenses of the Crew (including, without limitation, wages, bonuses, incentives, employer contribution or match to any 401(k), profit sharing or similar plan, safety gear, certifications, training, physicals, drug screens, supplemental insurance, payroll taxes, employee benefits, maintenance and cure payments, end of voyage payments, insurance deductibles and insurance premiums). The Crew shall be employees of SeaTran. SeaTran shall have the sole decision making authority on all crewing issues, including hiring, terminating, and moving of crew members between vessels operated by SeaTran. SeaTran, at its discretion, may determine that certain fleet wide employee incentives are required to maintain the required vessel staffing; provided, however, that SeaTran agrees to notify Owner of all fleet wide planned incentives for crew members before any such incentives become effective. Owner will be charged for the actual cost attributed to the Vessel based upon the number of days the Vessel was crewed during the incentive accrual period.

(b)     SeaTran shall be responsible for the marketing of and obtaining charters for the Vessel. If these services are provided directly by SeaTran, the cost shall be included in the Shared Overhead Fee. If an outside broker is used, the cost or commission paid to such broker will be billed to the Vessel as an Owner Operating Expense. Owner shall have the right to arrange a charter of its own for the Vessel; provided, however, that any such charter shall be subject to the terms and conditions of this Agreement (including, without limitation, Owner's Shared Overhead Fee), chartered only to a financially responsible party, and treated just as if SeaTran had placed such charter for the Vessel.

(c)     SeaTran shall be responsible for transporting supplies and other necessaries to the Vessel as well as land transportation for the Crew of the Vessel. If these services are provided directly by SeaTran, the cost shall be calculated at a rate equal to the rate charged per mile to all other vessels owned or operated by SeaTran (currently $1.00 per mile) plus any expenses incurred if transported by a member of the operations staff. The per mile rate is to be reviewed and set annually in the first calendar month of each year. If a new rate is not set, the existing rate will remain in effect. If additional staff are required or an outside vendor used the cost will be billed to the vessel as an operating expense.

(d)     SeaTran shall maintain and preserve the Vessel in good condition, working order

and repair, ordinary wear and tear excepted, as necessary to retain all American Bureau of Shipping (if applicable) and Coast Guard certificates, FCC licenses, and all other certificates necessary to permit the operation of the Vessel in the manner contemplated hereunder. Owner shall pay, as an Owner Operating Expense, all costs associated with such upkeep and maintaining such certificates. Owner or its representative shall have the option to inspect the Vessel upon reasonable notice to SeaTran. Any such inspection shall be conducted in a manner as to not unreasonably interfere with SeaTran's management and operation of the Vessel. SeaTran shall have the sole decision making authority in the selection of all vendors in the operation of the Vessel. SeaTran shall have the sole decision making authority to shut down the Vessel if it determines the Vessel to be in unsatisfactory condition to market and operate.

(e) SeaTran shall moor and provide routine maintenance on the Vessel when not in service at the expense of the Owner.

(f) SeaTran shall procure and maintain in place during the term of this Agreement, the insurance coverage provided for in Article 7 hereof, subject to the terms of this Agreement.

(g) SeaTran shall have sole decision making authority for the repairs, vessel improvements, and capital expenditures on the Vessel; provided, however, that any capital expenditure that will upgrade or improve the Vessel and is estimated to cost more than $50,000, must receive the prior approval of Owner, which approval shall not be unreasonably withheld, conditioned or delayed. SeaTran shall notify Owner as soon as reasonably possible after becoming aware of a needed expenditure in excess of the $50,000 threshold.

(h) As soon as commercially possible after the Effective Date, SeaTran's logo, emblem or other identifying features selected by SeaTran shall be painted or otherwise placed or installed on the Vessel at the expense of the Owner; provided, however, it is understood that until SeaTran has entered into a master service agreement or time charter agreement with any customer for which the Vessel may be working, the Vessel may maintain Owner's current emblem, logo or other identifying features on the Vessel. When the Vessel is next due for painting, Owner and SeaTran shall discuss the advisability of painting the Vessel in a uniform color scheme with SeaTran's other vessels under its management so as to have a more easily recognizable and identifiable fleet of vessels to enhance SeaTran's marketing power and SeaTran's position in the offshore vessel industry in the Gulf of Mexico. Absent any agreement between SeaTran and Owner, Owner shall have the final decision making authority in determining which color scheme will be used on the Vessel.

(i) The Vessel will be required to be equipped with a fully operational and up to date telephone and data transmission system in order to permit SeaTran's operational personnel to communicate with and to track the location of the Vessel. Owner will be responsible for the cost to purchase, install and maintain such telephone and data transmission system and any the monthly usage fees incurred as an Owner Operating Expense.

(j) All purchase orders or invoices for Owner Operating Expenses shall be issued in the name of SeaTran.

(k)     At the outset of this Agreement, Owner will make a deposit of $75,000 for each vessel.

(l)     All Owner Operating Expenses incurred by SeaTran in connection with providing services to the Vessel or to Owner as described in this Article 5 or elsewhere in this Agreement shall be for the Owner's account and shall be reimbursed to SeaTran from the Vessel Deposit.

(m)     The Vessel Deposit shall be retained by SeaTran until all amounts due to SeaTran on the Vessel under this Agreement have been paid to SeaTran. Vessel Owner shall allow SeaTran to apply any deposit and unpaid accounts receivable to all amounts due to SeaTran under outstanding invoices in a final settlement.

(n)     In order to maintain the Vessel Deposit at the level set forth in paragraph (k) above, SeaTran shall invoice Owner twice monthly for the Owner Operating Expenses for such prior 15 day period.   Owner Operating Expenses shall be based on the accrual basis of accounting. SeaTran's twice monthly invoices shall be due and payable by Owner within Ten (10) business days of the invoice date. Should Owner fail to pay the invoice timely, SeaTran may place Owner in default of this Agreement (the "Default Notice) and if the unpaid invoice for Owner Operating Expenses is not paid in full by Owner within ten (10) days of its receipt of the Default Notice, SeaTran, in addition to any other rights it may have under this Agreement, at law or in equity, may terminate this Agreement.

(o)     In addition to the Owner Operating Expenses in the above section (n), SeaTran shall invoice the Owner on a monthly basis for the Vessel's pro rata portion of the All Vessels Coded Expenses (the "AVC Expenses"). These AVC Expenses are expenses that can't be determined to be billable to a particular vessel and generally include such items as training materials provided to vessels, crew training costs, hotel costs during crew training, and crew pay during training. These AVC Expenses are shared on a pro rata basis not considering the length of the vessel and only by the vessels in active status.

(p)     In addition to the Owner Operating Expenses in section (n) and the AVC Expenses in section (o), SeaTran shall invoice the Owner for any and all expenses incurred by SeaTran at Owner's request and agreed to be incurred by SeaTran that the Owner and SeaTran agree are items that shall be rebilled to the Owner as an Owner expense

**ARTICLE 6. <u>RESPONSIBILITIES OF OWNER.</u>** Notwithstanding anything above to the contrary, Owner shall, at all times, retain exclusive responsibility for the following matters:

(a)     Retain title to Vessel and its certification and endorsements to operate in coastwise trade of the United States;

(b)     Owner agrees to assist SeaTran with all paperwork and other action that may be required of Owner to keep the Vessel in compliance with all regulatory body requirements including the U.S. Coast Guard and, if applicable, the American Bureau of Shipping or other classification body.

(c)     Pay its own taxes (income and ad valorem taxes on Vessel) and other expenses that Owner may independently incur with respect to the Vessel, including any attorney's fees, accountant's fees and related expenses.

(d)     Pay when due all Owner Operating Expenses, whether billed directly to Owner or billed to SeaTran, as the agent of Owner.

(e)     Defend, indemnify and hold SeaTran and its affiliates harmless from any loss, liability or expense (including, without limitation, all attorneys' fees and costs incurred by SeaTran in enforcing this indemnity and in defending against such claim) as incurred arising out of or related to any claim brought by a contractor, vendor or supplier asserting non-payment of Owner's Expenses. The foregoing defense and indemnity obligations with respect to any such unpaid Owner's Expenses incurred in accordance with and during the term of this Agreement shall survive the termination or expiration of this Agreement.

## ARTICLE 7. INSURANCE.

(a)     Subject to Article 7(e), SeaTran shall carry the following insurance coverages during the term of this Agreement:

(i)     Hull and Machinery insurance against all marine risks (including, without limitation, riots, civil commotion, strike and civil strife) with Owner and SeaTran as the loss payee as their interest may appear in an amount of not less the value Owner elects to insure the Vessel for unless otherwise limited by the insurer, with no more than a $50,000 deductible per occurrence.

It is in the interests of SeaTran and Owner to minimize the number of hull and machinery claims made with the insurer. Accordingly, with respect to any hull and machinery claim where the estimated cost of repairs to the Vessel is less than the greater of two times the applicable deductible or $100,000, SeaTran shall have the option of not making a claim with the insurer. In such event, the entire cost of repairs shall be deemed an Owner Operating Expense.

(ii)    Primary Protection and Indemnity and Marine Employer's Liability insurance including Jones Act coverage for the master and crew, collision, pollution, tower's and contractual liability, and such other risks normally covered by protection and indemnity policies, with a limit of not less than $1,000,000 per occurrence, with no more than a $25,000 base deductible per occurrence. In addition to the base deductible, this

insurance may include an annual aggregate deductible ("AAD"). The AAD shall be allocated to all vessels managed by SeaTran and included under the policy on a pro rata basis based on the number of crewmembers on the Vessel. Owner's allocable share of the AAD will be an Owner Operating Expense.

     (iii)    Cargo legal liability insurance with limits of no less than $1,000,000 per occurrence and a deductible of not more than $25,000.

     (iv)    Excess or bumbershoot liability to provide total coverage under the above-described policies of $25,000,000 per occurrence.

     (v)    Owner, SeaTran and its affiliated companies, shall be named as insureds under the foregoing policies with underwriters waiving all rights of subrogation in their favor.

    (b)    In addition to the foregoing insurance coverage, SeaTran shall carry the following insurance coverage during the term of this Agreement:

     (i)    Worker's compensation insurance for SeaTran's office personnel in compliance with the laws of all states where SeaTran conducts operations (to include, where applicable, coverage under the Federal Longshore and Harbor Worker's Act) in an amount equal to the full statutory limits, with a deductible no more than $25,000 per occurrence.

     (ii)    Automobile liability insurance in an amount of not less than $1,000,000 per occurrence for bodily injury and property damage liability. Said insurance shall also name, cover and protect Owner to the extent of SeaTran's indemnity obligations under this Agreement.

     (iii)    Commercial general liability insurance covering third party bodily injury and property damage liability and contractual indemnity liability in an amount of not less than $1,000,000 combined single limit. Such policy shall include coverage for personal injury, cross liability, contractual liability, broad form property damage and other risks customarily covered by comprehensive general liability policies, with no more than a $25,000 deductible per occurrence.

     (iv)    Notwithstanding anything herein to the contrary, the premium for the commercial general liability insurance shall be charged to the Vessel on a pro-rata basis based on the respective crewmember payrolls of SeaTran's owned/affiliated or other managed vessels and such portion shall be billed to Owner as an Owner Operating Expense on a monthly basis.

     (v)    Excess or bumbershoot liability to provide total coverage under the above-described policies of $25,000,000 per occurrence.

    (c)    All policies of insurance described in Article 7(a) above shall: (i) be in a form and

with underwriters approved by Owner; (ii) be endorsed to waive subrogation against SeaTran, its affiliates, and any third parties designated by SeaTran; (iii) with respect to the coverage in Article 7(a)(i) above, name Owner, as loss payee; (iv) name Owner, SeaTran, their affiliates, and any third parties designated by SeaTran as additional assureds; (v) provide that they may not be altered, modified or canceled (including non-renewal) without thirty (30) days prior written notice having been furnished to SeaTran and Owner; (vi) provide that all deductibles under the aforesaid policies of insurance described in Article 7(a) above shall be for sole account of Owner; and (vi) provide that all deductibles under the aforesaid policies of insurance described in Article 7(b) above shall be for sole account of SeaTran. Owner has the right to request higher deductibles than those set forth in this Article 7 and SeaTran will use its best efforts to accommodate this request provided that Owner agrees, upon SeaTran's reasonable request, to furnish added security to ensure that any agreed higher deductibles will be met by Owner and provided further that such request does not adversely affect SeaTran's overall insurance program covering the Vessel and the other vessels being operated by SeaTran.

(d)     Upon execution of this Agreement and as may be reasonably requested by Owner thereafter, SeaTran shall deliver to Owner certificates of insurance reflecting all insurance policies and all renewals thereof during the term of this Agreement.

(e)     Owner's pro rata portion of the insurance premiums for the coverages in pargraphs 7(a) and 7(b)(iii) shall be deemedOwner Operating Expenses and billed monthly.  The insurance in paragraphs 7(b)(i) and (ii)  shall be for SeaTran's account and be included as part of the Shared Overhead Fee.

### ARTICLE 8.  FIRST OPPORTUNITY TO PURCHASE AND RIGHT OF FIRST REFUSAL, AND BROKERAGE SERVICES.

(a)     Owner shall provide all entities with vessels operated by SeaTran the first option to purchase the Vessel in the event Owner decides to sell the Vessel or sell an interest in the Vessel during the term of this Agreement.  Owner and SeaTran acknowledge that during the course of this Agreement, Owner may receive offers for the purchase of the Vessel.  Owner hereby grants all entities with vessels operated by SeaTran the right to match any offer to Purchase the Vessel that may be received by Owner from a third party that Owner is willing to accept (herein an "Acceptable Purchase Offer") under the same terms and conditions as the Acceptable Purchase Offer made to Owner.  Owner shall provide SeaTran the first option to bareboat charter the Vessel in the event Owner decides to bareboat charter the Vessel during the term of this Agreement.

(b)     In the event Owner elects to sell the Vessel during the term of this Agreement, Owner agrees to appoint SeaTran as its exclusive sales broker for such sale.  In the event of a sale that is arranged by SeaTran with no outside broker, SeaTran may receive a brokerage commission equal to the lesser of 1% of the gross sales price or $50,000; or in an amount mutually agreed to by SeaTran and Owner. In the event of a sale of the Vessel by Owner to a buyer identified by SeaTran (including any affiliated party of such buyer) within twelve (12) months of the Owner's termination of this Agreement, the brokerage commission shall be due and paid to SeaTran out of the sale proceeds Any brokerage commission due to SeaTran  shall be paid to SeaTran at or prior to the closing. In the event of a sale that is arranged by an outside broker, SeaTran will assist in

completing the sale with no brokerage commission due to SeaTran. .

## ARTICLE 9. TERMINATION OF AGREEMENT.

(a)      **Initial Term and Renewal Terms**.  This Agreement shall continue for an Initial Term and for subsequent renewal terms as provided in Article 2 and may be terminated by either party without penalty as provided in Article 2.

(b)      **Termination on Material Breach**.  In the event of a material breach by a Party hereto of any of the terms or provisions of this Agreement and the failure to correct or remedy the breach within ten (10) days after receipt of written notice of such breach, the other Party shall have the right to terminate this Agreement.  A material breach under this Agreement includes, but is not limited to, the failure of a Party to pay any amount due to the other Party under this Agreement or a Party's insolvency or filing of bankruptcy proceedings.

(c)      **Sale of Vessel**.  In the event the Vessel is sold to a third party, SeaTran may elect to continue this Agreement in in full force and effect with respect to the Vessel until the termination date provided for in Article 2.  In the event SeaTran elects not to continue this Agreement with the new owner, Owner shall pay the Termination Fee (as defined below) in accordance with the provisions below.

(d)      **Early Termination**.  At any time after the Initial Term, Owner may elect to terminate this Agreement (i) by providing 90 days prior written notice to SeaTran and paying an amount equal to three months of the Shared Overhead Fee (the "Termination Fee") or (ii) by giving less than 90 days prior written notice and paying the Termination Fee plus an amount equal to 10% of the average daily gross revenues of the Vessel (based on the three (3) calendar months prior to such written notice of termination) multiplied by the number of days the Vessel was prematurely terminated (the "Early Exit Fee).  By way of example, if Owner terminates this Agreement and removes the Vessel forty-five (45) days earlier than the ninety (90) days required hereunder and the average daily gross revenues of the Vessel in the prior three (3) month period was $5,000 per day, the Early Exit Fee will be $22,500 (45 days x $5,000.00/day x 10%).  The Termination Fee and Early Exit Fee shall be payable on or before the effective date of the termination of this Agreement and, in all events, prior to the Vessel being returned to Owner.

(e)      **Termination During Initial Term; Liquidated Damages**.  If Owner materially breaches this Agreement during the Initial Term or terminates this Agreement during the Initial Term for a reason other than SeaTran's material breach, then Owner shall pay to SeaTran, as liquidated damages and not as a penalty, $100,000.00.

(f)      **Vessel Under Charter at Termination**.  If the Vessel is under charter to a third party on the date termination of this Agreement becomes effective, this Agreement shall continue in full force and effect until the expiration of such charter or the replacement of the Vessel by SeaTran with a suitable replacement vessel of SeaTran's choosing, whichever occurs first.  If this Agreement is terminated for any reason other than a material breach by SeaTran (which is not timely cured following written notice thereof from Owner) and the Vessel continues to work for the same customer (or resumes work for such customer within ninety (90) days of cancellation),

SeaTran shall be entitled to receive and Owner shall pay SeaTran a 5% commission of the gross revenues received by Owner so long as the Vessel remains in service of the same customer. It is understood and agreed that an interruption in service of less than thirty (30) consecutive days of the Vessel with this same customer shall be deemed a continuation of the work and Owner shall remain obligated to pay SeaTran the 5% commission due hereunder.

     (g)   **Storage of Vessel After Termination**. In the event the Vessel is stored at SeaTran's facility after the termination of this Agreement, Owner shall pay a daily storage fee at SeaTran's then existing rate until the Vessel is removed from SeaTran's facility. If SeaTran does not have a vessel storage facility, SeaTran, on Owner's behalf, will contract with either an affiliated company or a third party vendor to store the Vessel at Owner's risk, in which case the Owner shall be directly responsible to such party for the payment of storage fees.

     (h)   **SeaTran Property**. Upon termination of this Agreement, Owner shall, within thirty (30) days of such termination, remove SeaTran's symbols, insignias and color scheme from the Vessel. On or before the effective date of termination of this Agreement, Owner shall return to SeaTran all software and hardware related to the safety, maintenance, operations and communications systems and programs that are SeaTran's proprietary property and agrees not to use or allow any other person to use any such software or hardware following termination of this Agreement.

     **ARTICLE 10.**  **NO HIRE OF SEATRAN'S VESSEL CREW.**  Owner acknowledges that the Vessel's Crew and/or land based support personnel are employees of SeaTran or SeaTran's affiliated companies and in which SeaTran (or its affiliate) has made a substantial investment in education and training. In no event shall Owner solicit for hire or permit any successor owner, manager or operator of the Vessel to solicit for hire or hire any of the Vessel's Crew or any land based support personnel of SeaTran or SeaTran's affiliated companies during the Term or within twelve (12) months after either the sale of the Vessel or the termination or expiration of this Agreement without the prior consent of SeaTran. In the event Owner or any successor owner, manager or operator of the Vessel hires any of the Vessel Crew in violation of this Article 9, Owner shall pay SeaTran the sum of $25,000 for each crew member (other than a captain) and the sum of $100,000 for any managerial or supervisory personnel (including a Vessel captain) hired by Owner or any successor owner, manager or operator of the Vessel, as liquidated damages, and not as a penalty.

     **ARTICLE 11.** **INDEMNITY AND RISK OF LOSS.**  Owner assumes all responsibility for and agrees to protect, defend, indemnify and hold SeaTran, its affiliates, employees, agents, underwriters, and those third parties contractually designated by SeaTran harmless from and against all demands, claims, damages, expenses, attorneys' fees and costs in enforcing this provision, suits or judgments, claims for indemnity or contribution for bodily injury or death or property damage or loss (including but not limited to loss of or damage to the Vessel) as incurred arising out of or related to the ownership, operation, management, repair, maintenance, or use of the Vessel, even if the such loss or damage is caused, in whole or in part, by the negligence of SeaTran, the unseaworthiness of the Vessel, strict liability or any other theory of fault imposed or sought to be imposed upon SeaTran. This indemnity and risk of loss provision shall not apply to

loss or damage shown to have been caused by SeaTran's willful and intentional misconduct. This indemnity and risk of loss provision shall survive the termination of this Agreement, regardless of the reason or cause of such termination; provided, however, that this provision shall only apply to events or circumstances arising under and during the term of this Agreement.

ARTICLE 12. **MISCELLANEOUS PROVISIONS.**

(a)    In the event of an accident involving the Vessel or Vessel Crew, SeaTran shall promptly notify Owner of such accident as soon as reasonably possible.

(b)    In the event the Vessel comes on or off charter, SeaTran shall notify Owner as soon as reasonably possible.

(c)    Owner's Vessel shall receive preferential treatment as to any potential charters over a vessel subchartered or brokered by SeaTran. This preferential treatment does not apply to other SeaTran managed vessel or SeaTran or SeaTran affiliate owned vessels, which vessels, along with Owner's Vessel, shall receive equal treatment with respect to any charters, subject to customer requirements and availability. Without limiting the foregoing, SeaTran will normally charter the Vessel in accordance with a "first in and first out" policy providing the Vessel meets the requirements of the customer and such Vessel is crewed and ready to go to work. SeaTran shall maintain a list of all vessels under its management listed by type of service (crewboat, supply boat, etc.), marketed length and showing the off charter dates (the "Priority List") which will be available to Owner on request. The Vessel and other vessels under management by SeaTran shall remain on the Priority List so long as such vessels are crewed and available for work. A vessel expected to be out of service for less than thirty (30) days including temporary unavailability as a result of a vessel undergoing a regulatory drydocking and inspection shall retain its position on the Priority List for work opportunities even if such vessel(s) is not available when an opportunity for work arose as a result of such temporary unavailability and such work opportunity had to be assigned to another vessel.

ARTICLE 13. **NOTICES.**  Any notice or other communication by either party to the other shall be in writing, and shall be deemed to have been duly given if either delivered personally or mailed, postage prepaid, certified mail, addressed as follows:

SeaTran:                                   Owner:

SeaTran Marine, LLC                        Iberia Marine Service, LLC
Attn:  Charles Tizzard, CFO                Attn: Steve JMiguez
107 Highway 90 West                        107 Highway 90 West
New Iberia, LA  70560                      New Iberia, LA 70560

ARTICLE 14. **ASSIGNMENT.**  This Agreement is personal in nature and may not be assigned, sold, pledged or otherwise transferred by either party without the prior written consent of the other party; provided, however, that SeaTran shall have the right without the consent of

Owner to assign this Agreement to any of its subsidiaries or affiliates. This Agreement shall be binding upon and inure solely to the benefit of each party and their respective successors and assigns, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other person any right except as expressly provided herein.

**ARTICLE 15. <u>APPLICABLE LAW AND FORUM SELECTION</u>.** This Agreement shall be deemed to be a contract made under the maritime and admiralty laws of the United States and shall be construed and interpreted in accordance with said laws. To the extent that the maritime and admiralty laws of the United States are not applicable to any issue pertaining to the construction or interpretation of this Agreement, the law of the State of Louisiana (exclusive of such state's choice of law rules) shall apply. In the event of any claim or dispute between the parties relating to or arising out of this Agreement or the performance hereunder (whether based in contract, tort or other theory of law), the parties agree to the exclusive jurisdiction and venue of the United States District Court for the Eastern District of Louisiana or any state or federal court in any other jurisdiction in which the Vessel described in this Agreement is located for the resolution of such claim or dispute. If for any reason subject matter jurisdiction does not exist in federal district court, the parties agree that such claim or dispute shall be resolved exclusively in the State Judicial Court for the Parish of Iberia, State of Louisiana.

**ARTICLE 16. <u>INTEREST</u>.** Any sums that are due to SeaTran by Owner pursuant to the terms and provisions of this Agreement, including, but not limited to, the Shared Overhead Fee and/or Owner Operating Expenses that are not reimbursed to SeaTran within the time period specified in this Agreement, or, if a time period for payment thereof is not specified for herein, within ten (10) days of invoicing to Owner by SeaTran, shall bear interest at the rate of 1.5% per month until paid, and Owner agrees to pay such interest promptly at the end of each month as invoiced. In the event SeaTran fails to remit monies owed to Owner within the time period specified in the Agreement, SeaTran shall pay interest at the rate of 1.5% per month on such amounts until paid by SeaTran.

**ARTICLE 17. <u>MARITIME LIEN AND SECURITY INTEREST OF SEATRAN</u>.** Owner acknowledges and recognizes that SeaTran, during the course of operation of the Vessel, will incur costs or charges owed or due by Owner, including, but not limited to, the Shared Overhead Fees, Owner Operating Expenses and, if applicable, a Termination Fee. Without limiting any of its other rights granted in this Agreement or under applicable law, Owner acknowledges that SeaTran is relying on the credit of the Vessel to secure payment of such sums and shall have a maritime lien on the Vessel to secure the payment of all such amounts and that SeaTran's maritime lien arises at the time of such advances and irrespective of whether there are accounts receivable due or to become due to Owner with respect to the Vessel. If requested by Owner, SeaTran will enter into a subordination agreement with Owner's lender(s) that will subordinate SeaTran's maritime lien for necessaries and arising pursuant to this Agreement to the lien of any preferred ship mortgage(s) in favor of Owner's lenders.

**ARTICLE 18. <u>ATTORNEYS' FEES AND EXPENSES</u>.** If either Party engages an attorney to enforce its rights under this Agreement and/or institutes litigation to enforce such rights, the losing Party (as determined by the court) shall pay all attorneys' fees and expenses, court costs, costs of vessel arrest and seizure incurred by the other Party.

**ARTICLE 19.  MULTIPLE COUNTERPARTS.**  This Agreement may be executed in multiple originals and multiple counterparts on different dates and in different places, but which when taken together shall constitute one and the same Agreement.

**ARTICLE 20.  ENTIRE AGREEMENT.**  This Agreement contains the entire agreement of the Parties hereto pertaining to the management and operation of the Vessel and supersedes any and all prior understandings and agreements with respect to this matter, whether given orally or in writing. This Agreement may not be modified or supplemented except by express written agreement signed by both parties hereto. Any waiver or any obligation of either party hereto shall not be construed as a continuing waiver of any such obligation under any provision hereof, or as a waiver of any other obligation.  Each party and each Guarantor as hereinafter defined) acknowledges that it has had a full opportunity to review this Agreement, and to have it reviewed by counsel of its choosing, before executing it, and the language in all parts of this Agreement shall be construed as a whole in accordance with its fair meaning, not for or against any party, and without regard to any statute or rule which provides for the language of an agreement to be construed against the drafter.  Section headings in this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**ARTICLE 21.  WAIVER OF CONSEQUENTIAL DAMAGES.**  EXCEPT AS SET FORTH IN THIS AGREEMENT TO THE CONTRARY, UNDER NO CIRCUMSTANCES SHALL SEATRAN OR OWNER BE LIABLE TO THE OTHER OR ANY PERSON CLAIMING THROUGH THE OTHER, WHETHER IN CONTRACT, TORT OR OTHERWISE, FOR ANY LOSS OF PROFITS, LOSS OF USE OF EQUIPMENT, OR INDIRECT, DELAY, INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, OR FOR ANY PAYMENT RELATED TO OR AS A RESULT OF SUCH LOSSES OR DAMAGES ARISING OUT OF OR OTHERWISE RELATED TO THIS AGREEMENT OR THE ENFORCEMENT OF ANY RIGHT OR REMEDY PROVIDED HEREIN OR AT LAW, WHETHER OR NOT ADVISED OF THE POSSIBILITY OF SUCH LOSSES AND WITHOUT REGARD TO ANY DETERMINATION THAT ANY REMEDY SPECIFIED IN THIS AGREEMENT FAILS ITS ESSENTIAL PURPOSE.  THE FOREGOING WAIVER DOES NOT LIMIT OWNER'S INDEMNITY OBLIGATIONS TO SEATRAN WITH RESPECT TO ANY CLAIM FOR LOSS OF PROFITS, LOSS OF USE OF EQUIPMENT, OR INDIRECT, DELAY, INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES MADE AGAINST SEATRAN BY ANY UNRELATED THIRD PARTY.

**ARTICLE 22.  EFFECTIVE DATE.**  The Effective Date of this Agreement is July 1, 2014.

**ARTICLE 23. INTERVENTION.**    NOW TO THESE PRESENT COMES MR BLAKE, LLC, MR RIDGE, LLC, LADY GLENDA, LLC, MR MASON, LLC, MR ROW, LLC, LADY BRANDI, LLC, LADY EVE, LLC, AND MR STEVEN, LLC (EACH A VESSEL OWNING ENTITY) AND INTERVENES AND ASSERTS THAT THEY ARE EACH A PARTY TO AN AGREEMENT WITH IBERIA MARINE SERVICE, LLC AND EACH

VESSEL OWNING ENTITY ACKNOWLEDGES THAT IT HAS REVIEWED THE AGREEMENT AND AGREES TO BE BOUND BY THE SAME. EACH VESSEL OWNING ENTITY FURTHER AGREES THAT IT'S AGREEMENT WITH IBERIA MARINE SERVICE, LLC AND THE AGREEMENT ARE BACK TO BACK AGREEMENTS AND EACH VESSEL OWNING ENTITY AGREES TO THE SHARED OVERHEAD FEE PROVISION OF THE AGREEMENT.

*[Signature page follows]*

**SEATRAN MARINE, LLC**

By:

Name: Charles Tizzard

Its: Chief Financial Officer

Date: 10-2-18

**IBERIA MARINE SERVICE, LLC**

By:

Name: Steve J Miguez

Its: Manager

Date: 10-2-18

**MR BLAKE, LLC**

By:

Name: Steve J Miguez

Its: Manager

Date: 10-2-18

**MR RIDGE, LLC**

By:

Name: Steve J Miguez

Its: Manager

Date: 10-2-18

**LADY GLENDA, LLC**

By:

Name: Steve J Miguez

Its: Manager

Date: 10-2-18

**MR MASON, LLC**

By: _____

Name: Steve J Miguez

Its:    Manager

Date: _10 - 2 - 18_

**MR ROW, LLC**

By: _____

Name: Steve J Miguez

Its:    Manager

Date: _10 - 2 - 18_

**LADY BRANDI, LLC**

By: _____

Name: Steve J Miguez

Its:    Manager

Date: _10 - 2 - 18_

**LADY EVE, LLC**

By: _____

Name: Steve J Miguez

Its:    Manager

Date: _10 - 2 - 18_

**MR STEVEN, LLC**

By: _____

Name: Steve J Miguez

Its:    Manager

Date: _10 - 2 - 18_

# EXHIBIT A

| VESSEL NAME/<br>OFFICIAL NO. | MARKETED LENGTH* OF<br>VESSEL |
|---|---|
| **MR STEVEN**<br>1249191 | **205'** |
| **MR BLAKE**<br>1043540 | **150'** |
| **MR RIDGE**<br>1050072 | **150'** |
| **LADY GLENDA**<br>1067915 | **150'** |
| **LADY EVE**<br>1197834 | **172'** |
| **MR ROW**<br>1107942 | **165'** |
| **MR MASON**<br>1057140 | **165'** |
| **LADY BRANDI**<br>1092471 | **165'** |

\*     Marketed length is subject to adjustment from time-to-time based on the mutual agreement of Owner and SeaTran.

BROKERAGE AGREEMENT

This Brokerage Agreement is entered into between GOL, LLC (hereinafter "Broker") and SeaTran Marine, LLC(hereinafter "Operator").

WHEREAS, Broker and Operator separately are in the business of providing crewed vessels for marine transportation in support of oil and gas exploration and production;

WHEREAS, from time to time in situations of excess demand for vessels or otherwise, Broker is also in the business of acting as a boat broker between various charterers of vessels and the operators of such vessels;

WHEREAS, to obtain additional work for Operator's vessels, Operator wishes to establish a relationship by which Broker can serve as a boat broker for Operator's vessels; and

NOW, THEREFORE, Broker and Operator, each in consideration of the promises and agreements of the other, mutually agree as follows:

1.  Appointment of Broker

Operator hereby appoints Broker as Operator's agent for obtaining charters for Operator's vessels. Nothing in this agreement shall be construed as being an exclusive appointment, and Broker will act for Operator on a job-by-job basis and not as the exclusive broker for Operator.

2.  Duties

A.  At such time as Broker obtains a proposed charter for a vessel, Broker shall provide to Operator all necessary information it receives from the prospective Charterer, and Operator shall have the right to accept or reject the charter so offered.

If Operator orally agrees to accept a job offered by Broker, Broker is hereby authorized by Operator to sign, as agent on behalf of Operator, a Charter, Work Order or similar agreement, should same be required by the Charterer.

A "Work Order Confirmation" in the form attached hereto shall be executed by the parties setting forth the details of each particular job. However, if the parties do not to execute a "Work Order Confirmation," this Brokerage Agreement shall nevertheless apply to and govern all jobs involving Broker and Operator.

It is also understood that the Charterer may require that a Master Time Charter or similar charter (hereinafter "Time Charter") be in place between Broker and Charterer, and that the charter of Operator's vessel will be controlled by said Time Charter. Operator agrees that all



EXHIBIT

tabbies®  2

obligations under the Time Charter, including defense and indemnity provisions and insurance requirements, shall become the obligations solely of Operator, not Broker. If the Charterer makes demand to enforce such obligations on Broker or Broker's insurers, Operator agrees to respond to Charterer's demand, to perform said obligations, and to defend and indemnify Broker and its insurers from such demands.

3.   <u>Brokerage Fee</u>

Operator agrees to pay Broker a fee of ___ percent (___%) of the daily charter hire per day per vessel for each day a vessel is working under a charter provided by Broker, it being understood that Broker is acting as the broker for the vessels and is not the Charterer.

4.   <u>Charter Hire</u>

The agreed daily rate for charter hire will be paid as follows:

A.   Operator consents to the Charterer paying the charter hire to Broker in such instances where the Charterer will do so. Invoicing by Broker to the Charterer will be on a per-job basis and according to the requirements of the Charterer.

B.   Broker will use reasonable efforts to obtain from the Charterer provisions for payment within a reasonable time.

C.   Broker will remit net charter hire (charter hire less Broker's fee) to Operator within fifteen (15) business days after receipt of such charter hire from the Charterer. It shall be sufficient that such remittance be placed in the mail within the time allowed above. In the event charter hire is paid directly to Operator from the Charterer, Operator shall remit broker's fee to Broker within the same fifteen (15) day period.

D.   Under no circumstances shall Broker be responsible to Operator for the Charterer's non-payment of charter hire. Broker agrees to undertake all reasonable efforts to collect charter hire from the Charterer. Operator retains the right to act on its own behalf in order to collect unpaid invoices directly from the Charterer.

5.   <u>Indemnities and Insurance</u>

Operator agrees to release, defend and indemnify Broker, its parent, subsidiary and affiliated companies, and all of their servants, directors, officers, members, employees and insurers (hereinafter collectively referred to as "Broker, et al.") from and against all claims, demands, and causes of action of every kind and character brought against Broker, et al., for injury to, illness of, or death of any persons, for pollution, clean-up or pollution-related damages and expenses, and for damage to or loss of any property, (including but not limited to costs of litigation and attorneys fees), arising directly or indirectly out of, incident to, and/or in any way connected with the work and/or services to be performed under this Brokerage Agreement,



-2-

and/or pursuant to any Charter, Work Order or other agreement negotiated and/or bound pursuant to this Brokerage Agreement (including vessel loading, unloading, ingress and egress), without limit and without regard to the cause or causes thereof, including the sole or concurrent negligence of Broker, et al., and/or the unseaworthiness (pre-existing or otherwise) of any vessel.

If both Operator and Broker owe release, defense and/or indemnity to Charterer for the same risks (through this or any other agreement), Operator will fulfill Operator's said obligations to Charterer without Operator or Operator's insurers seeking sharing, recoupment or other recovery from Broker or Broker's insurers.

Operator agrees to maintain adequate liability and contractual liability insurance covering the above set forth risks and the above set forth defense and indemnity obligations, and further agrees that Broker, et al, and Charterer ( if and as required by the Time Charter), will be named as additional insureds with waivers of subrogation on all of Operator's insurance policies, with said additional insureds' coverage primary as respects any other coverages available to Broker, et al, and Charterer (if and as required by the Time Charter), and Charterer, and with all deductibles and premiums solely the responsibility of Operator. Operator shall provide to Broker current Certificates of Insurance reflecting the insurance coverage and provisions required by this Brokerage Agreement; however, neither Operator's failure to provide current Certificates of Insurance nor Broker's failure to object to any provisions thereof shall relieve Operator of any obligations or waive any of Broker's rights.

6.     Applicable Law

This Brokerage Agreement shall be governed, interpreted and controlled by the General Maritime Laws of the United States of America.

This Brokerage Agreement supersedes all existing and prior agreements between the parties with respect to the marine transportation and vessel broker activities involved herein, and is executed by authorized representatives of the parties in duplicate on the dates indicated below.

BROKER: GOL, LLC

By:     _____

Title:  Logistics Coordinator

Date:   6/1/2016

OPERATOR: SeaTran Marine, LLC

By:     _____

Title:  Charles Fitzgerald
        Exec. V.P.

Date:   6-1-16

99739949/23458-1

-3-

(WORKING COPY — watermark)

| 1. Shipbroker | BIMCO STANDARD BAREBOAT CHARTER |
| --- | --- |
| N/A | CODE NAME: "BARECON 2001" PART I |

| 2. Place and date |
| --- |
| MADISONVILLE, LA |

| 3. Owners/Place of business (Cl. 1) | 4. Bareboat Charterers/Place of business (Cl. 1) |
| --- | --- |
| SEATRAN MARINE LLC<br>107 HWY 90 W<br>NEW IBERIA, LA 70560 | GUICE OFFSHORE LLC<br>P.O. BOX 1698<br>MANDEVILLE, LA 70470 |

| 5. Vessel's name, call sign and flag (Cl. 1 and 3) | |
| --- | --- |
| MR. STEVEN<br>OFFICIAL NO. 1249191<br>US FLAG CREWBOAT | |

| 6. Type of Vessel | 7. GT/NT |
| --- | --- |
| 205 FT. DPS-2 HSC CREWBOAT<br>ABS CLASS | 96 UG / 496 ITC |

| 8. When/Where built | 9. Total DWT (abt.) in metric tons on summer freeboard |
| --- | --- |
| GULFCRAFT SHIPYARD<br>NOVEMBER 2014 | 502.07 LT |

| 10. Classification Society (Cl. 3) | 11. Date of last special survey by the Vessel's classification society |
| --- | --- |
| ABS | MARCH 9, 2017 |

| 12. Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 3) |
| --- |
| CLASS / REGULATORY CERTS GOOD THROUGH COMPLETION OF INITIAL<br>1 YR. BAREBOAT TERM (NO D.D. REQUIRED) |

| 13. Port or Place of delivery (Cl. 3) | 14. Time for delivery (Cl. 4) | 15. Cancelling date (Cl. 5) |
| --- | --- | --- |
| MUTUALLY AGREED U.S. GOM PORT | OCT 15, 2017 | OCT 15, 2017 |

| 16. Port or Place of redelivery (Cl. 15) | 17. No. of months' validity of trading and class certificates upon redelivery (Cl. 15) |
| --- | --- |
| MUTUALLY AGREED US GOM PORT | N/A |

| 18. Running days' notice if other than stated in Cl. 4 | 19. Frequency of dry-docking (Cl. 10(g)) |
| --- | --- |
| AS STATED IN CL. 4 | AS PER CLASS |

| 20. Trading limits (Cl. 6) |
| --- |
| US GOM, US EAST COAST, CARIBBEAN WATERS |

| 21. Charter period (Cl. 2) | 22. Charter hire (Cl. 11) |
| --- | --- |
| 1 YEAR (365 DAYS) | $ 3,300.00 PER DAY |

| 23. New class and other safety requirements (state percentage of Vessel's insurance value acc. to Box 29/Cl. 10(a)(ii)) |
| --- |
| N/A |

| 24. Rate of interest payable acc. to Cl. 11 (f) and, if applicable, acc. to PART IV | 25. Currency and method of payment (Cl. 11) |
| --- | --- |
| AS STATED IN CL. 11(f) | US DOLLARS $<br>60 DAYS IN ARREARS |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

First issued by The Baltic and International Maritime Council (BIMCO), Copenhagen in 1974 as "Barecon A" and "Barecon B". Revised and amalgamated 1989. Revised 2001.

Adopted by the Documentary Committee of The Japan Shipping Exchange, Inc., Tokyo in 2002

Printed and sold by Fr. G. Knudtzons Bogtrykkeri A/S, Copenhagen. Issued November 2001

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen



EXHIBIT 3

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expenses as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**"BARECON 2001" STANDARD BAREBOAT CHARTER**  PART I

| | |
|---|---|
| **26. Place of payment; also state beneficiary and bank account (Cl. 11)**<br>SEE ATTACHMENT "B" FOR WIRE INSTRUCTIONS | **27. Bank guarantee/bond (sum and place) (Cl. 24) (optional)**<br>N/A |
| **28. Mortgage(s), if any (state whether 12(a) or (b) applies; if 12(b) applies state date(s) of Financial Instrument and name of Mortgagee(s)/Place of business) (Cl. 12)**<br>As per Cl. 12.(b) | **29. Insurance (hull and machinery and war risks) (state value acc. to Cl. 13(f) or, if applicable, acc. to Cl. 14 (applies))**<br>$18,500,000 oo |
| **30. Additional insurance cover, if any, for Owners' account limited to (Cl. 13(b))**<br>N/A | **31. Additional insurance cover, if any, for Charterers' account limited to (Cl. 13(b)) or, if applicable, (Cl. 14(h))**<br>INNOCENT OWNERS AND BREACH OF WARRANTY COVER |
| **32. Latent defects (only to be filled in if period other than stated in Cl. 3)**<br>As Per Cl. 3 | **33. Brokerage commission and to whom payable (Cl. 27)**<br>N/A |
| **34. Grace period (state number of clear banking days) (Cl. 28)**<br>30 Days | **35. Dispute Resolution (state 30(a), 30(b) or 30(c); if 30(c) agreed Place of Arbitration must be stated) (Cl. 30)**<br>Houston, TX |
| **36. War cancellation (indicate countries agreed) (Cl. 26(f))**<br>N/A | |
| **37. Newbuilding Vessel (indicate with "yes" or "no" whether PART III applies) (optional)**<br>N/A | |
| **38. Name and place of Builders (only to be filled in if PART III applies)**<br>N/A | |
| **39. Vessel's Yard Building No. (only to be filled in if PART III applies)**<br>N/A | **40. Date of Building Contract (only to be filled in if PART III applies)**<br>N/A |
| **41. Liquidated damages and costs shall accrue to (state party) acc. to (Cl.1)**<br>a) N/A<br>b) N/A<br>c) | |
| **42. Hire/Purchase agreement (indicate with "yes" or "no" whether PART V applies) (optional)**<br>N/A | **43. Bareboat Charter Registry (indicate with "yes" or "no" whether PART V applies) (optional)**<br>N/A |
| **44. Flag and Country of the Bareboat Charter Registry (only to be filled in if PART V applies)**<br>N/A | **45. Country of the Underlying Registry (only to be filled in if PART V applies)**<br>N/A |
| **46. Number of additional clauses covering special provisions, if agreed**<br>N/A | |

PREAMBLE - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and only form part of this Charter if expressly agreed and stated in Boxes 37, 42 and 43. If PART III and/or PART IV and/or PART V apply, it is further agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| Charles Threard, Exec. V.P. | Nathan Guida, Member |

# PART II
## "BARECON 2001" Standard Bareboat Charter

**1. Definitions** — 1
In this Charter, the following terms shall have the — 2
meanings hereby assigned to them: — 3
"The Owners" shall mean the party identified in Box 3; — 4
"The Charterers" shall mean the party identified in Box 4; — 5
"The Vessel" shall mean the vessel named in Box 5 and — 6
with particulars as stated in Boxes 6 to 12. — 7
"Financial Instrument" means the mortgage, deed of — 8
covenant or other such financial security instrument as — 9
annexed to this Charter and stated in Box 28. — 10

**2. Charter Period** — 11
In consideration of the hire detailed in Box 22, — 12
the Owners have agreed to let and the Charterers have — 13
agreed to hire the Vessel for the period stated in Box 21 — 14
("The Charter Period"). — 15

**3. Delivery** — 16
(not applicable when Part III applies, as indicated in Box 37) — 17
(a)    The Owners shall before and at the time of delivery — 18
exercise due diligence to make the Vessel seaworthy — 19
And in every respect ready in hull, machinery and — 20
equipment for service under this Charter. — 21
The Vessel shall be delivered by the Owners and taken — 22
over by the Charterers at the port or place indicated in — 23
Box 13 in such ready safe berth as the Charterers may — 24
direct. — 25
(b)    The Vessel shall be properly documented on — 26
delivery in accordance with the laws of the flag State — 27
indicated in Box 5 and the requirements of the — 28
classification society stated in Box 10. The Vessel upon — 29
delivery shall have her survey cycles up to date and — 30
trading and class certificates valid for at least the number — 31
of months agreed in Box 12. — 32
(c)    The delivery of the Vessel by the Owners and the — 33
taking over of the Vessel by the Charterers shall — 34
constitute a full performance by the Owners of all the — 35
Owners' obligations under this Clause 3, and thereafter — 36
the Charterers shall not be entitled to make or assert — 37
any claim against the Owners on account of any — 38
conditions, representations or warranties expressed or — 39
implied with respect to the Vessel but the Owners shall — 40
be liable for the cost of but not the time for repairs or — 41
renewals occasioned by latent defects in the Vessel, — 42
her machinery or appurtenances, existing at the time of — 43
delivery under this Charter, provided such defects have — 44
manifested themselves within twelve (12) months after — 45
delivery unless otherwise provided in Box 32. — 46

**4. Time for Delivery** — 47
(not applicable when Part III applies, as indicated in Box 37) — 48
The Vessel shall not be delivered before the date — 49
indicated in Box 14 without the Charterers' consent and — 50
the Owners shall exercise due diligence to deliver the — 51
Vessel not later than the date indicated in Box 15. — 52
Unless otherwise agreed in Box 16, the Owners shall — 53
give the Charterers not less than thirty (30) running days' — 54
preliminary and not less than fourteen (14) running days' — 55
definite notice of the date on which the Vessel is — 56
expected to be ready for delivery. — 57
The Owners shall keep the Charterers closely advised — 58
of possible changes in the Vessel's position. — 59

**5. Cancelling** — 60
(not applicable when Part III applies, as indicated in Box 37) — 61
(a)    Should the Vessel not be delivered latest by the — 62
cancelling date indicated in Box 15, the Charterers shall — 63
have the option of cancelling this Charter by giving the — 64
Owners notice of cancellation within thirty-six (36) — 65
running hours after the cancelling date stated in Box — 66
15, failing which this Charter shall remain in full force — 67
and effect. — 68
(b)    If it appears that the Vessel will be delayed beyond — 69
the cancelling date, the Owners may, as soon as they — 70
are in a position to state with reasonable certainty the — 71
day on which the Vessel should be ready, give notice — 72

thereof to the Charterers asking whether they will — 73
exercise their option of cancelling, and the option must — 74
then be declared within one hundred and sixty-eight — 75
(168) running hours of the receipt by the Charterers of — 76
such notice or within thirty-six (36) running hours after — 77
the cancelling date, whichever is the earlier. If the — 78
Charterers do not then exercise their option of cancelling, — 79
the seventh day after the readiness date stated in the — 80
Owners' notice shall be substituted for the cancelling — 81
date indicated in Box 15 for the purpose of this Clause 5. — 82
(c)    Cancellation under this Clause 5 shall be without — 83
prejudice to any claim the Charterers may otherwise — 84
have on the Owners under this Charter. — 85

**6. Trading Restrictions** — 86
The Vessel shall be employed in lawful trades for the — 87
carriage of suitable lawful merchandise within the trading — 88
limits indicated in Box 20. — 89
The Charterers undertake not to employ the Vessel or — 90
suffer the Vessel to be employed otherwise than in — 91
conformity with the terms of the contracts of insurance — 92
(including any warranties expressed or implied therein) — 93
without first obtaining the consent of the insurers to such — 94
employment and complying with such requirements as — 95
to extra premium or otherwise as the insurers may — 96
prescribe. — 97
The Charterers also undertake not to employ the Vessel — 98
or suffer her employment in any trade or business which — 99
is forbidden by the law of any country to which the Vessel — 100
may sail or is otherwise illicit or in carrying illicit or — 101
prohibited goods or in any manner whatsoever which — 102
may render her liable to condemnation, destruction, — 103
seizure or confiscation. — 104
Notwithstanding any other provisions contained in this — 105
Charter it is agreed that nuclear fuels or radioactive — 106
products or waste are specifically excluded from the — 107
cargo permitted to be loaded or carried under this — 108
Charter. This exclusion does not apply to radio-isotopes — 109
used or intended to be used for any industrial, — 110
commercial, agricultural, medical or scientific purposes — 111
provided the Owners' prior approval has been obtained — 112
to loading thereof. — 113

**7. Surveys on Delivery and Redelivery** — 114
(not applicable when Part III applies, as indicated in Box 37) — 115
The Owners and Charterers shall each appoint — 116
surveyors for the purpose of determining and agreeing — 117
in writing the condition of the Vessel at the time of — 118
delivery and redelivery hereunder. The Owners shall — 119
bear all expenses of the On-hire Survey including loss — 120
of time, if any, and the Charterers shall bear all expenses — 121
of the Off-hire Survey including loss of time, if any, at — 122
the daily equivalent to the rate of hire or pro rata thereof. — 123

**8. Inspection** — 124
The Owners shall have the right at any time after giving — 125
reasonable notice to the Charterers to inspect or survey — 126
the Vessel or instruct a duly authorised surveyor to carry — 127
out such survey on their behalf:- — 128
(a)    to ascertain the condition of the Vessel and satisfy — 129
themselves that the Vessel is being properly repaired — 130
and maintained. The costs and fees for such inspection — 131
or survey shall be paid by the Owners unless the Vessel — 132
is found to require repairs or maintenance in order to — 133
achieve the condition so provided; — 134
(b)    in dry-dock if the Charterers have not dry-docked — 135
Her in accordance with Clause 10(g). The costs and fees — 136
for such inspection or survey shall be paid by the — 137
Charterers; and — 138
(c)    for any other commercial reason they consider — 139
necessary (provided it does not unduly interfere with — 140
the commercial operation of the Vessel). The costs and — 141
fees for such inspection and survey shall be paid by the — 142
Owners. — 143
All time used in respect of inspection, survey or repairs — 144
shall be for the Charterers' account and form part of the — 145



This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

Charter Period. 146
The Charterers shall also permit the Owners to inspect 147
the Vessel's log books whenever requested and shall 148
whenever required by the Owners furnish them with full 149
information regarding any casualties or other accidents 150
or damage to the Vessel. 151

**9.** **Inventories, Oil and Stores** 152
A complete inventory of the Vessel's entire equipment, 153
outfit including spare parts, appliances and of all 154
consumable stores on board the Vessel shall be made 155
by the Charterers in conjunction with the Owners on 156
delivery and again on redelivery of the Vessel. The 157
Charterers and the Owners, respectively, shall at the 158
time of delivery and redelivery take over and pay for all 159
bunkers, lubricating oil, unbreached provisions, paints, 160
ropes and other consumable stores (excluding spare 161
parts) in the said Vessel at the then current market prices 162
at the ports of delivery and redelivery, respectively. The 163
Charterers shall ensure that all spare parts listed in the 164
inventory and used during the Charter Period are 165
replaced at their expense prior to redelivery of the 166
Vessel. 167

**10.** **Maintenance and Operation** 168
(a)(i) Maintenance and Repairs - During the Charter 169
Period the Vessel shall be in the full possession 170
and at the absolute disposal for all purposes of the 171
Charterers and under their complete control in 172
every respect. The Charterers shall maintain the 173
Vessel, her machinery, boilers, appurtenances and 174
spare parts in a good state of repair, in efficient 175
operating condition and in accordance with good 176
commercial maintenance practice and, except as 177
provided for in Clause 14(l), at their 178
own expense they shall at all times keep the 179
Vessel's Class fully up to date with the Classification 180
Society indicated in Box 10 and maintain all other 181
necessary certificates in force at all times. 182

(ii) New Class and Other Safety Requirements - In the 183
event of any improvement, structural changes or 184
new equipment becoming necessary for the 185
continued operation of the Vessel because of new 186
class requirements or by compulsory legislation 187
costing (excluding the Charterers' loss of time) 188
more than the percentage stated in Box 23, or if 189
Box 23 is left blank, 5 per cent of the Vessel's 190
insurance value as stated in Box 29, then the 191
extent, if any, to which the rate of hire shall be varied 192
and the ratio in which the cost of compliance shall 193
be shared between the parties concerned in order 194
to achieve a reasonable distribution thereof as 195
between the Owners and the Charterers having 196
regard, inter alia, to the length of the period 197
remaining under this Charter shall, in the absence 198
of agreement, be referred to the dispute resolution 199
method agreed in Clause 30. 200

(iii) Financial Security - The Charterers shall maintain 201
financial security or responsibility in respect of third 202
party liabilities as required by any government, 203
including federal, state or municipal or other division 204
or authority thereof, to enable the Vessel, without 205
penalty or charge, lawfully to enter, remain at, or 206
leave any port, place, territorial or contiguous 207
waters of any country, state or municipality in 208
performance of this Charter without any delay. This 209
obligation shall apply whether or not such 210
requirements have been lawfully imposed by such 211
government or division or authority thereof. 212
The Charterers shall make and maintain all arrange- 213
ments by bond or otherwise as may be necessary to 214
satisfy such requirements at the Charterers' sole 215
expense and the Charterers shall indemnify the Owners 216
against all consequences whatsoever (including loss of 217
time) for any failure or inability to do so. 218

(b) Operation of the Vessel - The Charterers shall at 219
their own expense and by their own procurement man, 220
victual, navigate, operate, supply, fuel and, whenever 221
required, repair the Vessel during the Charter Period 222
and they shall pay all charges and expenses of every 223
kind and nature whatsoever incidental to their use and 224
operation of the Vessel under this Charter, including 225
annual flag State fees and any foreign general 226
municipality and/or state taxes. The Master, officers 227
and crew of the Vessel shall be the servants of the Charterers 228
for all purposes whatsoever, even if for any reason 229
appointed by the Owners. 230
Charterers shall comply with the regulations regarding 231
officers and crew in force in the country of the Vessel's 232
flag or any other applicable law. 233
(c) The Charterers shall keep the Owners and the 234
mortgagee(s) advised of the intended employment, 235
planned dry-docking and major repairs of the Vessel, 236
as reasonably required. 237
(d) Flag and Name of Vessel - During the Charter 238
Period, the Charterers shall have the liberty to paint the 239
Vessel in their own colours, install and display their 240
funnel insignia and fly their own house flag. The 241
Charterers shall also have the liberty, with the Owners' 242
consent, which shall not be unreasonably withheld, to 243
change the flag and/or the name of the Vessel during 244
the Charter Period. Painting and re-painting, instalment 245
and re-instalment, registration and re-registration, if 246
required by the Owners, shall be at the Charterers' 247
expense and time. 248
(e) Changes to the Vessel - Subject to Clause 10(a)(ii), 249
the Charterers shall make no structural changes in the 250
Vessel or changes in the machinery, boilers, appurten- 251
ances or spare parts thereof without in each instance 252
first securing the Owners' approval thereof. If the Owners 253
so agree, the Charterers shall, if the Owners so require, 254
restore the Vessel to its former condition before the 255
termination of this Charter. 256
(f) Use of the Vessel's Outfit, Equipment and 257
Appliances - The Charterers shall have the use of all 258
outfit, equipment, and appliances on board the Vessel 259
at the time of delivery, provided the same or their 260
substantial equivalent shall be returned to the Owners 261
on redelivery in the same good order and condition as 262
when received, ordinary wear and tear excepted. The 263
Charterers shall from time to time during the Charter 264
Period replace such items of equipment as shall be so 265
damaged or worn as to be unfit for use. The Charterers 266
are to procure that all repairs to or replacement of any 267
damaged, worn or lost parts or equipment be effected 268
in such manner (both as regards workmanship and 269
quality of materials) as not to diminish the value of the 270
Vessel. The Charterers have the right to fit additional 271
equipment at their expense and risk but the Charterers 272
shall remove such equipment at the end of the period if 273
requested by the Owners. Any equipment including radio 274
equipment on hire on the Vessel at time of delivery shall 275
be kept and maintained by the Charterers and the 276
Charterers shall assume the obligations and liabilities 277
of the Owners under any lease contracts in connection 278
therewith and shall reimburse the Owners for all 279
expenses incurred in connection therewith, also for any 280
new equipment required in order to comply with radio 281
regulations. 282
(g) Periodical Dry-Docking - The Charterers shall dry- 283
dock the Vessel and clean and paint her underwater 284
parts whenever the same may be necessary, but not 285
less than once during the period stated in Box 19 or, if 286
Box 19 has been left blank, every sixty (60) calendar 287
months after delivery or such other period as may be 288
required by the Classification Society or flag State. 289

**11.** **Hire** 290
(a) The Charterers shall pay hire due to the Owners 291
punctually in accordance with the terms of this Charter 292



This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

in respect of which time shall be of the essence. 203
(b)   The Charterers shall pay to the Owners for the hire 204
of the Vessel a lump sum in the amount indicated in 205
*Box 22* which shall be payable not later than every thirty 206
(30) running days in advance, the first lump sum being 297
payable on the date and hour of the Vessel's delivery to 298
the Charterers. Hire shall be paid continuously 299
throughout the Charter Period. 300
(c)   Payment of hire shall be made in cash without 301
discount in the currency and in the manner indicated in 302
*Box 25* and at the place mentioned in *Box 26*. 303
(d)   Final payment of hire, if for a period of less than 304
thirty (30) running days, shall be calculated proportionally 305
according to the number of days and hours remaining 306
before redelivery and advance payment to be effected 307
accordingly. 308
(e)   Should the Vessel be lost or missing, hire shall 309
cease from the date and time when she was lost or last 310
heard of. The date upon which the Vessel is to be treated 311
as lost or missing shall be ten (10) days after the Vessel 312
was last reported or when the Vessel is posted as 313
missing by Lloyd's, whichever occurs first. Any hire paid 314
in advance to be adjusted accordingly. 315
(f)   Any delay in payment of hire shall entitle the 316
Owners to interest at the rate per annum as agreed 317
in *Box 24*. If *Box 24* has not been filled in, the three months 318
interbank offered rate in London (LIBOR or its successor) 319
for the currency stated in *Box 25*, as quoted by the British 320
Bankers' Association (BBA) on the date when the hire 321
fell due, increased by 2 per cent., shall apply. 322
(g)   Payment of interest due under sub-clause 11(f) 323
shall be made within seven (7) running days of the date 324
of the Owners' invoice specifying the amount payable 325
or, in the absence of an invoice, at the time of the next 326
hire payment date. 327

12.   Mortgage 328
(only to apply if *Box 28* has been appropriately filled in) 329
*)  (a)   The Owners warrant that they have not effected 330
any mortgage(s) of the Vessel and that they shall not 331
effect any mortgage(s) without the prior consent of the 332
Charterers, which shall not be unreasonably withheld. 333
*)  (b)   The Vessel chartered under this Charter is financed 334
by a mortgage according to the Financial Instrument. 335
The Charterers undertake to comply, and provide such 336
information and documents to enable the Owners to 337
comply, with all such instructions or directions in regard 338
to the employment, insurances, operation, repairs and 339
maintenance of the Vessel as laid down in the Financial 340
Instrument or as may be directed from time to time during 341
the currency of the Charter by the mortgagee(s) in 342
conformity with the Financial Instrument. The Charterers 343
confirm that, for this purpose, they have acquainted 344
themselves with all relevant terms, conditions and 345
provisions of the Financial Instrument and agree to 346
acknowledge this in writing in any form that may be 347
required by the mortgagee(s). The Owners warrant that 348
they have not effected any mortgage(s) other than stated 349
in *Box 28* and that they shall not agree to any 350
amendment of the mortgage(s) referred to in *Box 28* or 351
effect any other mortgage(s) without the prior consent 352
of the Charterers, which shall not be unreasonably 353
withheld. 354
*)  (Optional, Clauses 12(a) and 12(b) are alternatives; 355
indicate alternative agreed in *Box 28*). 356

13.   Insurance and Repairs 357
(a)   During the Charter Period the Vessel shall be kept 358
insured by the Charterers at their expense against hull 359
and machinery, war and Protection and Indemnity risks 360
(and any risks against which it is compulsory to insure 361
for the operation of the Vessel, including maintaining 362
financial security in accordance with sub-clause 363
10(a)(iii)) in such form as the Owners shall in writing 364
approve, which approval shall not be un-reasonably 365

withhold. Such insurances shall be arranged by the 366
Charterers to protect the interests of both the Owners 367
and the Charterers and the mortgagee(s) (if any), and 368
The Charterers shall be at liberty to protect under such 369
insurances the interests of any managers they may 370
appoint. Insurance policies shall cover the Owners and 371
the Charterers according to their respective interests. 372
Subject to the provisions of the Financial Instrument, if 373
any, and the approval of the Owners and the insurers, 374
the Charterers shall effect all insured repairs and shall 375
undertake settlement and reimbursement from the 376
insurers of all costs in connection with such repairs as 377
well as insured charges, expenses and liabilities to the 378
extent of coverage under the insurances herein provided 379
for. 380
The Charterers also to remain responsible for and to 381
effect repairs and settlement of costs and expenses 382
incurred thereby in respect of all other repairs not 383
covered by the insurances and/or not exceeding any 384
possible franchise(s) or deductibles provided for in the 385
insurances. 386
All time used for repairs under the provisions of sub- 387
clause 13(a) and for repairs of latent defects according 388
to Clause 3(iii) above, including any deviation, shall be 389
for the Charterers' account. 390
(b)   If the conditions of the above insurances permit 391
additional insurance to be placed by the parties, such 392
cover shall be limited to the amount for each party set 393
out in *Box 30* and *Box 31*, respectively. The Owners or 394
the Charterers as the case may be shall immediately 395
furnish the other party with particulars of any additional 396
insurance effected, including copies of any cover notes 397
or policies and the written consent of the insurers of 398
any such required insurance in any case where the 399
consent of such insurers is necessary. 400
(c)   The Charterers shall upon the request of the 401
Owners, provide information and promptly execute such 402
documents as may be required to enable the Owners to 403
comply with the Insurance provisions of the Financial 404
Instrument. 405
(d)   Subject to the provisions of the Financial Instru- 406
ment, if any, should the Vessel become an actual, 407
constructive, compromised or agreed total loss under 408
the insurances required under sub-clause 13(a), all 409
insurance payments for such loss shall be paid to the 410
Owners who shall distribute the moneys between the 411
Owners and the Charterers according to their respective 412
interests. The Charterers undertake to notify the Owners 413
and the mortgagee(s), if any, of any occurrences in 414
consequence of which the Vessel is likely to become a 415
total loss as defined in this Clause. 416
(e)   The Owners shall upon the request of the 417
Charterers, promptly execute such documents as may 418
be required to enable the Charterers to abandon the 419
Vessel to insurers and claim a constructive total loss. 420
(f)   For the purpose of insurance coverage against hull 421
and machinery and war risks under the provisions of 422
sub-clause 13(a), the value of the Vessel is the sum 423
indicated in *Box 29*. 424

14.   Insurance, Repairs and Classification 425
(Optional, only to apply if expressly agreed and stated 426
in *Box 29*, in which event Clause 13 shall be considered 427
deleted). 428
(a)   During the Charter Period the Vessel shall be kept 429
insured by the Owners at their expense against hull and 430
machinery and war risks under the form of policy or 431
policies attached hereto. The Owners and/or insurers 432
shall not have any right of recovery or subrogation 433
against the Charterers on account of loss of or any 434
damage to the Vessel or her machinery or appurt- 435
enances covered by such insurance, or on account of 436
payments made to discharge claims against or liabilities 437
of the Vessel or the Owners covered by such insurance. 438
Insurance policies shall cover the Owners and the 439

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



Charterers according to their respective interests. 440
(b)  During the Charter Period the Vessel shall be kept 441
insured by the Charterers at their expense against 442
Protection and Indemnity risks (and any risks against 443
which it is compulsory to insure for the operation of the 444
Vessel, including maintaining financial security in 445
accordance with sub-clause 10(a)(iii)) in such form as 446
the Owners shall in writing approve which approval shall 447
not be unreasonably withheld. 448
(c)  In the event that any act or negligence of the 449
Charterers shall vitiate any of the insurance herein 450
provided, the Charterers shall pay to the Owners all 451
losses and indemnify the Owners against all claims and 452
demands which would otherwise have been covered by 453
such insurance. 454
(d)  The Charterers shall, subject to the approval of the 455
Owners or Owners' Underwriters, effect all insured 456
repairs, and the Charterers shall undertake settlement 457
of all miscellaneous expenses in connection with such 458
repairs as well as all insured charges, expenses and 459
liabilities, to the extent of coverage under the insurances 460
provided for under the provisions of sub-clause 14(a). 461
The Charterers to be secured reimbursement through 462
the Owners' Underwriters for such expenditures upon 463
presentation of accounts. 464
(e)  The Charterers to remain responsible for and to 465
effect repairs and settlement of costs and expenses 466
incurred thereby in respect of all other repairs not 467
covered by the insurances and/or not exceeding any 468
possible franchise(s) or deductibles provided for in the 469
insurances. 470
(f)  All time used for repairs under the provisions of 471
sub-clauses 14(d) and 14(e) and for repairs of latent 472
defects according to Clause 3 above, including any 473
deviation, shall be for the Charterers' account and shall 474
form part of the Charter Period. 475
The Owners shall not be responsible for any expenses 476
as are incident to the use and operation of the Vessel 477
for such time as may be required to make such repairs. 478
(g)  If the conditions of the above insurances permit 479
additional insurance to be placed by the parties such 480
cover shall be limited to the amount for each party set 481
out in Box 30 and Box 31, respectively. The Owners or 482
the Charterers as the case may be shall immediately 483
furnish the other party with particulars of any additional 484
insurance affected, including copies of any cover notes 485
or policies and the written consent of the Insurers of 486
any such required insurance in any case where the 487
consent of such insurers is necessary. 488
(h)  Should the Vessel become an actual, constructive, 489
compromised or agreed total loss under the insurances 490
required under sub-clause 14(a), all insurance payments 491
for such loss shall be paid to the Owners, who shall 492
distribute the moneys between the Owners and the 493
Charterers according to their respective interests. 494
(i)  If the Vessel becomes an actual, constructive, 495
compromised or agreed total loss under the insurances 496
arranged by the Owners in accordance with sub-clause 497
14(a), this Charter shall terminate as of the date of such 498
loss. 499
(j)  The Charterers shall upon the request of the 500
Owners, promptly execute such documents as may be 501
required to enable the Owners to abandon the Vessel 502
to the insurers and claim a constructive total loss. 503
(k)  For the purpose of insurance coverage against hull 504
and machinery and war risks under the provisions of 505
sub-clause 14(a), the value of the Vessel is the sum 506
indicated in Box 29. 507
(l)  Notwithstanding anything contained in sub-clause 508
10(a), it is agreed that under the provisions of Clause 509
14, if applicable, the Owners shall keep the Vessel's 510
Class fully up to date with the Classification Society 511
indicated in Box 10 and maintain all other necessary 512
certificates in force at all times. 513

**15.  Redelivery** 514
At the expiration of the Charter Period the Vessel shall 515
be redelivered by the Charterers to the Owners at a 516
safe and ice-free port or place as indicated in Box 16, in 517
such ready safe berth as the Owners may direct. The 518
Charterers shall give the Owners not less than thirty 519
(30) running days' preliminary notice of expected date, 520
range of ports of redelivery or port or place of redelivery 521
and not less than fourteen (14) running days' definite 522
notice of expected date and port or place of redelivery. 523
Any changes thereafter in the Vessel's position shall be 524
notified immediately to the Owners. 525
The Charterers warrant that they will not permit the 526
Vessel to commence a voyage (including any preceding 527
ballast voyage) which cannot reasonably be expected 528
to be completed in time to allow redelivery of the Vessel 529
within the Charter Period. Notwithstanding the above, 530
should the Charterers fail to redeliver the Vessel within 531
The Charter Period, the Charterers shall pay the daily 532
equivalent to the rate of hire stated in Box 22 plus 10 533
per cent. or to the market rate, whichever is the higher, 534
for the number of days by which the Charter Period is 535
exceeded. All other terms, conditions and provisions of 536
this Charter shall continue to apply. 537
Subject to the provisions of Clause 10, the Vessel shall 538
be redelivered to the Owners in the same or as good 539
structure, state, condition and class as that in which she 540
was delivered, fair wear and tear not affecting class 541
excepted. 542
The Vessel upon redelivery shall have her survey cycles 543
up to date and trading and class certificates valid for at 544
least the number of months agreed in Box 17. 545

**16.  Non-Lien** 546
The Charterers will not suffer, nor permit to be continued, 547
any lien or encumbrance incurred by them or their 548
agents, which might have priority over the title and 549
interest of the Owners in the Vessel. The Charterers 550
further agree to fasten to the Vessel in a conspicuous 551
place and to keep so fastened during the Charter Period 552
a notice reading as follows: 553
"This Vessel is the property of (name of Owners). It is 554
under charter to (name of Charterers) and by the terms 555
of the Charter Party neither the Charterers nor the 556
Master have any right, power or authority to create, incur 557
or permit to be imposed on the Vessel any lien 558
whatsoever." 559

**17.  Indemnity** 560
(a)  The Charterers shall indemnify the Owners against 561
any loss, damage or expense incurred by the Owners 562
arising out of or in relation to the operation of the Vessel 563
by the Charterers, and against any lien of whatsoever 564
nature arising out of an event occurring during the 565
Charter Period. If the Vessel be arrested or otherwise 566
detained by reason of claims or liens arising out of her 567
operation hereunder by the Charterers, the Charterers 568
shall at their own expense take all reasonable steps to 569
secure that within a reasonable time the Vessel is 570
released, including the provision of bail. 571
Without prejudice to the generality of the foregoing, the 572
Charterers agree to indemnify the Owners against all 573
consequences or liabilities arising from the Master, 574
officers or agents signing Bills of Lading or other 575
documents. 576
(b)  If the Vessel is arrested or otherwise detained by 577
reason of a claim or claims against the Owners, the 578
Owners shall at their own expense take all reasonable 579
steps to secure that within a reasonable time the Vessel 580
is released, including the provision of bail. 581
In such circumstances the Owners shall indemnify the 582
Charterers against any loss, damage or expense 583
incurred by the Charterers (including hire paid under 584
this Charter) as a direct consequence of such arrest or 585
detention. 586

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**18. Lien**    587
The Owners to have a lien upon all cargoes, sub-hires   588
and sub-freights belonging or due to the Charterers or   589
any sub-charterers and any Bill of Lading freight for all   590
claims under this Charter, and the Charterers to have a   591
lien on the Vessel for all moneys paid in advance and   592
not earned.   593

**19. Salvage**    594
All salvage and towage performed by the Vessel shall   595
be for the Charterers' benefit and the cost of repairing   596
damage occasioned thereby shall be borne by the   597
Charterers.   598

**20. Wreck Removal**    599
In the event of the Vessel becoming a wreck or   600
obstruction to navigation the Charterers shall indemnify   601
the Owners against any sums whatsoever which the   602
Owners shall become liable to pay and shall pay in   603
consequence of the Vessel becoming a wreck or   604
obstruction to navigation.   605

**21. General Average**    606
The Owners shall not contribute to General Average.   607

**22. Assignment, Sub-Charter and Sale**    608
(a) The Charterers shall not assign this Charter nor   609
sub-charter the Vessel on a bareboat basis except with   610
the prior consent in writing of the Owners, which shall   611
not be unreasonably withheld, and subject to such terms   612
and conditions as the Owners shall approve.   613
(b) The Owners shall not sell the Vessel during the   614
currency of this Charter except with the prior written   615
consent of the Charterers, which shall not be unreason-   616
ably withheld, and subject to the buyer accepting an   617
assignment of this Charter. *SEE ATTACHMENT*   618

**23. Contracts of Carriage**    619
*)   (a) The Charterers are to procure that all documents   620
issued during the Charter Period evidencing the terms   621
and conditions agreed in respect of carriage of goods   622
shall contain a paramount clause incorporating any   623
legislation relating to carrier's liability for cargo   624
compulsorily applicable in the trade; if no such legislation   625
exists, the documents shall incorporate the Hague-Visby   626
Rules. The documents shall also contain the New Jason   627
Clause and the Both-to-Blame Collision Clause.   628
*)   (b) The Charterers are to procure that all passenger   629
tickets issued during the Charter Period for the carriage   630
of passengers and their luggage under this Charter shall   631
contain a paramount clause incorporating any legislation   632
relating to carrier's liability for passengers and their   633
luggage compulsorily applicable in the trade; if no such   634
legislation exists, the passenger tickets shall incorporate   635
the Athens Convention Relating to the Carriage of   636
Passengers and their Luggage by Sea, 1974, and any   637
protocol thereto.   638
*)    Delete as applicable.   639

**24. Bank Guarantee**    640
*(Optional, only to apply if Box 27 filled in)*   641
The Charterers undertake to furnish, before delivery of   642
the Vessel, a first class bank guarantee or bond in the   643
sum and at the place as indicated in Box 27 as guarantee   644
for full performance of their obligations under this   645
Charter.   646

**25. Requisition/Acquisition**    647
(a) In the event of the Requisition for Hire of the Vessel   648
by any governmental or other competent authority   649
(hereinafter referred to as "Requisition for Hire")   650
irrespective of the date during the Charter Period when   651
"Requisition for Hire" may occur and irrespective of the   652
length thereof and whether or not it be for an indefinite   653
or a limited period of time, and irrespective of whether it   654
may or will remain in force for the remainder of the   655
Charter Period, this Charter shall not be deemed thereby   656

or thereupon to be frustrated or otherwise terminated   657
and the Charterers shall continue to pay the stipulated   658
hire in the manner provided by this Charter until the time   659
when the Charter would have terminated pursuant to   660
any of the provisions hereof always provided however   661
that in the event of "Requisition for Hire" any Requisition   662
Hire or compensation received or receivable by the   663
Owners shall be payable to the Charterers during the   664
remainder of the Charter Period or the period of the   665
"Requisition for Hire" whichever be the shorter.   666
(b) In the event of the Owners being deprived of their   667
ownership in the Vessel by any Compulsory Acquisition   668
of the Vessel or requisition for title by any governmental   669
or other competent authority (hereinafter referred to as   670
"Compulsory Acquisition"), then, irrespective of the date   671
during the Charter Period when "Compulsory Acqui-   672
sition" may occur, this Charter shall be deemed   673
terminated as of the date of such "Compulsory   674
Acquisition". In such event Charter Hire to be considered   675
as earned and to be paid up to the date and time of   676
such "Compulsory Acquisition".   677

**26. War**    678
(a) For the purpose of this Clause, the words "War   679
Risks" shall include any war (whether actual or   680
threatened) act of war, civil war, hostilities, revolution,   681
rebellion, civil commotion, warlike operations, the laying   682
of mines (whether actual or reported), acts of piracy,   683
acts of terrorists, acts of hostility or malicious damage,   684
blockades (whether imposed against all vessels or   685
imposed selectively against vessels of certain flags or   686
ownership, or against certain cargoes or crews or   687
otherwise howsoever), by any person, body, terrorist or   688
political group, or the Government of any state   689
whatsoever, which may be dangerous or are likely to be   690
or to become dangerous to the Vessel, her cargo, crew   691
or other persons on board the Vessel.   692
(b) The Vessel, unless the written consent of the   693
Owners be first obtained, shall not continue to or go   694
through any port, place, area or zone (whether of land   695
or sea), or any waterway or canal, where it reasonably   696
appears that the Vessel, her cargo, crew or other   697
persons on board the Vessel, in the reasonable   698
judgement of the Owners, may be, or are likely to be,   699
exposed to War Risks. Should the Vessel be within any   700
such place as aforesaid, which only becomes danger-   701
ous, or is likely to be or to become dangerous, after her   702
entry into it, the Owners shall have the right to require   703
the Vessel to leave such area.   704
(c) The Vessel shall not load contraband cargo, or to   705
pass through any blockade, whether such blockade be   706
imposed on all vessels, or is imposed selectively in any   707
way whatsoever against vessels of certain flags or   708
ownership, or against certain cargoes or crews or   709
otherwise howsoever, or to proceed to an area where   710
she shall be subject, or is likely to be subject to a   711
belligerent's right of search and/or confiscation.   712
(d) If the insurers of the war risks insurance, when   713
Clause 14 is applicable, should require payment of   714
premiums and/or calls because, pursuant to the   715
Charterers' orders, the Vessel is within, or is due to enter   716
and remain within, any area or areas which are specified   717
by such insurers as being subject to additional premiums   718
because of War Risks, then such premiums and/or calls   719
shall be reimbursed by the Charterers to the Owners at   720
the same time as the next payment of hire is due.   721
(e) The Charterers shall have the liberty:   722
(i)    to comply with all orders, directions, recommend-   723
ations or advice as to departure, arrival, routes,   724
sailing in convoy, ports of call, stoppages,   725
destinations, discharge of cargo, delivery, or in any   726
other way whatsoever, which are given by the   727
Government of the Nation under whose flag the   728
Vessel sails, or any other Government, body or   729
group whatsoever acting with the power to compel   730

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

compliance with their orders or directions; 731

(ii) to comply with the orders, directions or recom- 732
mendations of any war risks underwriters who have 733
the authority to give the same under the terms of 734
the war risks insurance; 735

(iii) to comply with the terms of any resolution of the 736
Security Council of the United Nations, any 737
directives of the European Community, the effective 738
orders of any other Supranational body which has 739
the right to issue and give the same, and with 740
national laws aimed at enforcing the same to which 741
the Owners are subject, and to obey the orders 742
and directions of those who are charged with their 743
enforcement. 744

(f) In the event of outbreak of war (whether there be a 745
declaration of war or not) (i) between any two or more 746
of the following countries: the United States of America; 747
Russia; the United Kingdom; France; and the People's 748
Republic of China, (ii) between any two or more of the 749
countries stated in Box 36, both the Owners and the 750
Charterers shall have the right to cancel this Charter, 751
whereupon the Charterers shall redeliver the Vessel to 752
the Owners in accordance with Clause 15, if the Vessel 753
has cargo on board after discharge thereof at 754
destination, or if debarred under this Clause from 755
reaching or entering it at a near, open and safe port as 756
directed by the Owners, or if the Vessel has no cargo 757
on board, at the port at which the Vessel then is or if at 758
sea at a near, open and safe port as directed by the 759
Owners. In all cases hire shall continue to be paid in 760
accordance with Clause 11 and except as aforesaid all 761
other provisions of this Charter shall apply until 762
redelivery. 763

27. **Commission** 764
The Owners to pay a commission at the rate indicated 765
in Box 33 to the Brokers named in Box 33 on any hire 766
paid under the Charter. If no rate is indicated in Box 33, 767
the commission to be paid by the Owners shall cover 768
the actual expenses of the Brokers and a reasonable 769
fee for their work. 770
If the full hire is not paid owing to breach of the Charter 771
by either of the parties the party liable therefor shall 772
indemnify the Brokers against their loss of commission. 773
Should the parties agree to cancel the Charter, the 774
Owners shall indemnify the Brokers against any loss of 775
commission but in such case the commission shall not 776
exceed the brokerage on one year's hire. 777

28. **Termination** 778
(a) **Charterers' Default** 779
The Owners shall be entitled to withdraw the Vessel from 780
the service of the Charterers and terminate the Charter 781
with immediate effect by written notice to the Charterers if: 782

(i) the Charterers fail to pay hire in accordance with 783
Clause 11. However, where there is a failure to 784
make punctual payment of hire due to oversight, 785
negligence, errors or omissions on the part of the 786
Charterers or their bankers, the Owners shall give 787
the Charterers written notice of the number of clear 788
banking days stated in Box 34 (as recognised at 789
the agreed place of payment) in which to rectify 790
the failure, and when so rectified within such 791
number of days following the Owners' notice, the 792
payment shall stand as regular and punctual. 793
Failure by the Charterers to pay hire within the 794
number of days stated in Box 34 of their receiving 795
the Owners' notice as provided herein, shall entitle 796
the Owners to withdraw the Vessel from the service 797
of the Charterers and terminate the Charter without 798
further notice; 799

(ii) the Charterers fail to comply with the requirements of: 800
(1) Clause 6 (Trading Restrictions) 801
(2) Clause 13(a) (Insurance and Repairs) 802
provided that the Owners shall have the option, by 803

written notice to the Charterers, to give the 804
Charterers a specified number of days grace within 805
which to rectify the failure without prejudice to the 806
Owners' right to withdraw and terminate under this 807
Clause if the Charterers fail to comply with such 808
notice; 809

(iii) the Charterers fail to rectify any failure to comply 810
with the requirements of sub-clause 10(a)(i) 811
(Maintenance and Repairs) as soon as practically 812
possible after the Owners have requested them in 813
writing so to do and in any event so that the Vessel's 814
insurance cover is not prejudiced. 815

(b) **Owners' Default** 816
If the Owners shall by any act or omission be in breach 817
of their obligations under this Charter to the extent that 818
the Charterers are deprived of the use of the Vessel 819
and such breach continues for a period of fourteen (14) 820
running days after written notice thereof has been given 821
by the Charterers to the Owners, the Charterers shall 822
be entitled to terminate this Charter with immediate effect 823
by written notice to the Owners. 824

(c) **Loss of Vessel** 825
This Charter shall be deemed to be terminated if the 826
Vessel becomes a total loss or is declared as a 827
constructive or compromised or arranged total loss. For 828
the purpose of this sub-clause, the Vessel shall not be 829
deemed to be lost unless she has either become an 830
actual total loss or agreement has been reached with 831
her underwriters in respect of her constructive, 832
compromised or arranged total loss or if such agreement 833
with her underwriters is not reached it is adjudged by a 834
competent tribunal that a constructive total loss of the 835
Vessel has occurred. 836

(d) Either party shall be entitled to terminate this 837
Charter with immediate effect by written notice to the 838
other party in the event of an order being made or 839
resolution passed for the winding up, dissolution, 840
liquidation or bankruptcy of the other party (otherwise 841
than for the purpose of reconstruction or amalgamation) 842
or if a receiver is appointed, or if it suspends payment, 843
ceases to carry on business or makes any special 844
arrangement or composition with its creditors. 845

(e) The termination of this Charter shall be without 846
prejudice to all rights accrued due between the parties 847
prior to the date of termination and to any claim that 848
either party might have. 849

29. **Repossession** 850
In the event of the termination of this Charter in 851
accordance with the applicable provisions of Clause 28, 852
the Owners shall have the right to repossess the Vessel 853
from the Charterers at her current or next port of call, or 854
at a port or place convenient to them without hindrance 855
or interference by the Charterers, courts or local 856
authorities. Pending physical repossession of the Vessel 857
in accordance with this Clause 29, the Charterers shall 858
hold the Vessel as gratuitous bailee only to the Owners. 859
The Owners shall arrange for an authorised represent- 860
ative to board the Vessel as soon as reasonably 861
practicable following the termination of the Charter. The 862
Vessel shall be deemed to be repossessed by the 863
Owners from the Charterers upon the boarding of the 864
Vessel by the Owners' representative. All arrangements 865
and expenses relating to the settling of wages, 866
disembarkation and repatriation of the Charterers' 867
Master, officers and crew shall be the sole responsibility 868
of the Charterers. 869

30. **Dispute Resolution** 870
*) (a) This Contract shall be governed by and construed 871
in accordance with English law and any dispute arising 872
out of or in connection with this Contract shall be referred 873
to arbitration in London in accordance with the Arbitration 874
Act 1996 or any statutory modification or re-enactment 875
thereof save to the extent necessary to give effect to 876



This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

the provisions of this Clause. 877
The arbitration shall be conducted in accordance with 878
the London Maritime Arbitrators Association (LMAA) 879
Terms current at the time when the arbitration proceed- 880
ings are commenced. 881
The reference shall be to three arbitrators. A party 882
wishing to refer a dispute to arbitration shall appoint its 883
arbitrator and send notice of such appointment in writing 884
to the other party requiring the other party to appoint its 885
own arbitrator within 14 calendar days of that notice and 886
stating that it will appoint its arbitrator as sole arbitrator 887
unless the other party appoints its own arbitrator and 888
gives notice that it has done so within the 14 days 889
specified. If the other party does not appoint its own 890
arbitrator and give notice that it has done so within the 891
14 days specified, the party referring a dispute to 892
arbitration may, without the requirement of any further 893
prior notice to the other party, appoint its arbitrator as 894
sole arbitrator and shall advise the other party 895
accordingly. The award of a sole arbitrator shall be 896
binding on both parties as if he had been appointed by 897
agreement. 898
Nothing herein shall prevent the parties agreeing in 899
writing to vary these provisions to provide for the 900
appointment of a sole arbitrator. 901
In cases where neither the claim nor any counterclaim 902
exceeds the sum of US$50,000 (or such other sum as 903
the parties may agree) the arbitration shall be conducted 904
in accordance with the LMAA Small Claims Procedure 905
current at the time when the arbitration proceedings are 906
commenced. 907

HOUSTON,TX *) (b) This Contract shall be governed by and construed 908
in accordance with Title 9 of the United States Code 909
and the Maritime Law of the United States and any 910
dispute arising out of or in connection with this Contract 911
shall be referred to three persons at New York, one to 912
be appointed by each of the parties hereto, and the third 913
by the two so chosen; their decision or that of any two 914
of them shall be final, and for the purposes of enforcing 915
any award, judgement may be entered on an award by 916
any court of competent jurisdiction. The proceedings 917
shall be conducted in accordance with the rules of the 918
Society of Maritime Arbitrators, Inc. 919
In cases where neither the claim nor any counterclaim 920
exceeds the sum of US$50,000 (or such other sum as 921
the parties may agree) the arbitration shall be conducted 922
in accordance with the Shortened Arbitration Procedure 923
of the Society of Maritime Arbitrators, Inc. current at 924
the time when the arbitration proceedings are commenced. 925
*) (c) This Contract shall be governed by and construed 926
in accordance with the laws of the place mutually agreed 927
by the parties and any dispute arising out of or in 928
connection with this Contract shall be referred to 929
arbitration at a mutually agreed place, subject to the 930
procedures applicable there. 931
(d) Notwithstanding (a), (b) or (c) above, the parties 932
may agree at any time to refer to mediation any 933
difference and/or dispute arising out of or in connection 934
with this Contract. 935
In the case of a dispute in respect of which arbitration 936
has been commenced under (a), (b) or (c) above, the 937
following shall apply:- 938
 (i)  Either party may at any time and from time to time 939
elect to refer the dispute or part of the dispute to 940
mediation by service on the other party of a written 941
notice (the "Mediation Notice") calling on the other 942
party to agree to mediation. 943
 (ii)  The other party shall thereupon within 14 calendar 944
days of receipt of the Mediation Notice confirm that 945
they agree to mediation, in which case the parties 946
shall thereafter agree a mediator within a further 947
14 calendar days, failing which on the application 948
of either party a mediator will be appointed promptly 949
by the Arbitration Tribunal ("the Tribunal") or such 950
person as the Tribunal may designate for that 951

purpose. The mediation shall be conducted in such 952
place and in accordance with such procedure and 953
on such terms as the parties may agree or, in the 954
event of disagreement, as may be set by the 955
mediator. 956
 (iii)  If the other party does not agree to mediate, that 957
fact may be brought to the attention of the Tribunal 958
and may be taken into account by the Tribunal when 959
allocating the costs of the arbitration as between 960
the parties. 961
 (iv)  The mediation shall not affect the right of either 962
party to seek such relief or take such steps as it 963
considers necessary to protect its interest. 964
 (v)  Either party may advise the Tribunal that they have 965
agreed to mediation. The arbitration procedure shall 966
continue during the conduct of the mediation but 967
the Tribunal may take the mediation timetable into 968
account when setting the timetable for steps in the 969
arbitration. 970
 (vi)  Unless otherwise agreed or specified in the 971
mediation terms, each party shall bear its own costs 972
incurred in the mediation and the parties shall share 973
equally the mediator's costs and expenses. 974
 (vii)  The mediation process shall be without prejudice 975
and confidential and no information or documents 976
disclosed during it shall be revealed to the Tribunal 977
except to the extent that they are disclosable under 978
the law and procedure governing the arbitration. 979
    (Note: The parties should be aware that the mediation 980
process may not necessarily interrupt time limits.) 981
(e)  If Box 35 in Part I is not appropriately filled in, sub-clause 982
30(a) of this Clause shall apply. Sub-clause 30(d) shall 983
apply in all cases. 984
Sub-clauses 30(a), 30(b) and 30(c) are alternatives; 985
indicate alternative agreed in Box 35. 986

**31.  Notices** 987
(a)  Any notice to be given by either party to the other 988
party shall be in writing and may be sent by fax, telex, 989   EMAIL
registered or recorded mail or by personal service. 990
(b)  The address of the Parties for service of such 991
communication shall be as stated in Boxes 3 and 4 992
respectively. 993

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



Attachment "A" to be inserted at end of Cl. 22 of GO-Seatran Barecon 2001

Owner shall grant Charterer the Right of First Refusal to purchase the vessel at the same terms and conditions of any 3rd party offer to Owner, provided the 3rd party offer is accepted by Owner subject to the right of first refusal granted to Charterer.

ATTACHMENT B
FOR GRO - SEATRAN BARECON 2001



*SeaTran*

**Wire/ACH Instructions**

FNBB (First National Banker's Bank)
7813 Office Park Blvd
Baton Rouge, LA 70898-0579
ABA: 065403370
SWIFT: FRNAUS44

Beneficiary Bank:
Community First Bank
1101 E Admiral Doyle Drive
New Iberia, LA 70560
ABA: 065205329

Final Credit:
SeaTran Marine, LLC
Account: 1045411

Please contact Erika Verret at the below information for additional information or questions. If you should need technical assistance or have questions that pertain to the bank, please call (337) 365-6677.

Sincerely,

*Erika Verret*

Erika Verret

SeaTran Marine, LLC
107 Hwy 90 West, New Iberia, LA 70560
office (985) 631-9004 xt 7476 – fax (985) 631-0404 – everret@seatranmarine.com
www.seatranmarine.com

Attachment C to SeaTran Marine and Guice Offshore Barecon 2001 on Mr Steven 10-15-17.

SeaTran Marine and Guice Offshore agree that Guice Offshore will hire certain SeaTran crew members currently working on the Mr. Steven to continue working on the vessel as Guice employees during the term of the Barecon charter. Guice agrees to not offer the crew members further employment with Guice when the Barecon ends and the Mr. Steven is returned to SeaTran.

SeaTran Marine, LLC

By: _____
        Charles Tizzard

Guice Offshore, LLC

By: _____
        Nathan Guice