| | |
|---|---|
| 1. Shipbroker<br>N/A | **BIMCO STANDARD BAREBOAT CHARTER**<br>**CODE NAME: "BARECON 2001"** PART I |
| | 2. Place and date<br>MADISONVILLE, LA |
| 3. Owners/Place of business (Cl. 1)<br>SEATRAN MARINE LLC.<br>107 HWY 90 W<br>NEW IBERIA, LA 70560 | 4. Bareboat Charterers/Place of business (Cl. 1)<br>GUICE OFFSHORE LLC<br>P.O. BOX 1698<br>MANDEVILLE, LA 70470 |
| 5. Vessel's name, call sign and flag (Cl. 3 and 9)<br>MR. STEVEN<br>OFFICIAL NO. 1249191<br>US FLAG CREWBOAT | |
| 6. Type of Vessel<br>205 FT. DPS-2 HSC CREWBOAT<br>ABS CLASS | 7. GT/NT<br>96 US / 496 ITC |
| 8. When/Where built<br>GULFCRAFT SHIPYARD<br>NOVEMBER 2014 | 9. Total DWT (abt.) in metric tons on summer freeboard<br>502.07 LT |
| 10. Classification Society (Cl. 3)<br>ABS | 11. Date of last special survey by the Vessel's classification society<br>MARCH 9, 2017 |
| 12. Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 3)<br>CLASS / REGULATORY CERTS GOOD THROUGH COMPLETION OF INITIAL 1 YR. BAREBOAT TERM (NO D.D. REQUIRED) | |
| 13. Port or Place of delivery (Cl. 3)<br>MUTUALLY AGREED U.S. GOM PORT | 14. Time for delivery (Cl. 4)<br>OCT 15, 2017 | 15. Cancelling date (Cl. 5)<br>OCT 15, 2017 |
| 16. Port or Place of redelivery (Cl. 15)<br>MUTUALLY AGREED US GOM PORT | 17. No. of months' validity of trading and class certificates upon redelivery (Cl. 15)<br>N/A |
| 18. Running days' notice if other than stated in Cl. 4<br>AS STATED IN CL. 4 | 19. Frequency of dry-docking (Cl. 10(g))<br>AS PER CLASS |
| 20. Trading limits (Cl. 6)<br>US GOM, US EAST COAST, CARIBBEAN WATERS | |
| 21. Charter period (Cl. 2)<br>1 YEAR (365 DAYS) | 22. Charter hire (Cl. 11)<br>████ PER DAY |
| 23. New class and other safety requirements (state percentage of Vessel's insurance value acc. to Box 29)(Cl. 10(a)(ii))<br>N/A | |
| 24. Rate of interest payable acc. to Cl. 11 and, if applicable, acc. to PART IV<br>AS STATED IN CL. 11(F) | 25. Currency and method of payment (Cl. 11)<br>US DOLLARS $<br>60 DAYS IN ARREARS |





EXHIBIT C

GOtoSBNDoc000121

"BARECON 2001" STANDARD BAREBOAT CHARTER — PART I

| 26. Place of payment; also state beneficiary and bank account (Cl. 11) | 27. Bank guarantee/bond (sum and place) (Cl. 24) (optional) |
|---|---|
| SEE ATTACHMENT "B" FOR WIRE INSTRUCTIONS | N/A |
| 28. Mortgage(s), if any (state whether 12(a) or (b) applies; if 12(b) applies state date of Financial Instrument and name of Mortgagee(s)/Place of business) (Cl. 12) | 29. Insurance (hull and machinery and war risks) (state value acc. to Cl. 13(f) or, if applicable, acc. to Cl. 14(k)) (also state if Cl. 14 applies) |
| AS PER CL. 12(b) | $15,500,000.00 |
| 30. Additional insurance cover, if any, for Owners' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g)) | 31. Additional insurance cover, if any, for Charterers' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g)) |
| N/A | BREACH OF WARRANTY AND INNOCENT OWNERS COVERAGE |
| 32. Latent defects (only to be filled in if period other than stated in Cl. 3) | 33. Brokerage commission and to whom payable (Cl. 27) |
| AS PER CL. 3 | N/A |
| 34. Grace period (state number of clear banking days) (Cl. 28) | 35. Dispute Resolution (state 30(a), 30(b) or 30(c); if 30(c) agreed Place of Arbitration must be stated (Cl. 30)) |
| 30 DAYS | HOUSTON, TX |
| 36. War cancellation (indicate countries agreed) (Cl. 26(f)) | |
| N/A | |
| 37. Newbuilding Vessel (indicate with "yes" or "no" whether PART III applies) (optional) | 38. Name and place of Builders (only to be filled in if PART III applies) |
| N/A | N/A |
| 39. Vessel's Yard Building No. (only to be filled in if PART III applies) | 40. Date of Building Contract (only to be filled in if PART III applies) |
| | N/A |
| 41. Liquidated damages and costs shall accrue to (state party acc. to Cl. 1) a) b) N/A c) | |
| 42. Hire/Purchase agreement (indicate with "yes" or "no" whether PART IV applies) (optional) | 43. Bareboat Charter Registry (indicate with "yes" or "no" whether PART V applies) (optional) |
| N/A | N/A |
| 44. Flag and Country of the Bareboat Charter Registry (only to be filled in if PART V applies) | 45. Country of the Underlying Registry (only to be filled in if PART V applies) |
| N/A | N/A |
| 46. Number of additional clauses covering special provisions, if agreed | |
| N/A | |

PREAMBLE - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and only form part of this Charter if expressly agreed and stated in Boxes 37, 42 and 43. If PART III and/or PART IV and/or PART V apply, it is further agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

Signature (Owners): Charles Tizzard, Exec. V.P.

Signature (Charterers): Nathan Guice, Member

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

GOtoSBNDoc000122

18-51277 - #101-3 File 12/17/18 Enter 12/17/18 10:13:10 Exhibit C - BIMCO Charter Agmt. between Guice and SeaTran Pg 2 of 14

## MUTUAL CONFIDENTIALITY AGREEMENT

This Mutual Confidentiality Agreement is dated this the 22 of August 2017, by and between Guice Offshore, LLC and SeaTran Marine, LLC ( each of whom shall be hereinafter referred to as "Disclosing Party" or "Receiving Party" or collectively as the "Parties", as appropriate).

WHEREAS, the Parties wish to disclose and examine certain confidential and proprietary information for the purpose of discussing and evaluating a possible business arrangement between the Parties (such activities hereinafter referred to as the "Explorations");

WHEREAS, the Parties mutually agree that the disclosure of such confidential and proprietary information may be required for the Explorations to proceed; and

WHEREAS, the Parties have executed this Confidentiality Agreement in order to better set forth their duties and responsibilities with respect to maintaining the confidentiality of the Explorations.

NOW THEREFORE, for Ten Dollars and No/100 Cents ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties do agree to the following, to-wit:

### Confidential Information and Materials

(a) "Confidential Information" shall mean any nonpublic information, oral or written (in any form), that Disclosing party specifically marks and designates, either orally or in writing, as confidential or which, under the circumstances surrounding the disclosure, ought to be treated as confidential. "Confidential Information" includes, but is not limited to, product schematics or drawings, descriptive material, specifications, sales and customer information, trade secrets, software, financial documents, data compilations, Disclosing Party's business policies or practices, information received from others that Disclosing Party is obligated to treat as confidential, any proprietary or intellectual property, or any other materials and information of a confidential nature.

(b) "Confidential Information" shall not include any materials or information which the Receiving Party shows: (i) is at the time of disclosure generally known by or available to the public or which becomes so known or available thereafter through no fault of the Receiving Party; or (ii) is legally known to the Receiving Party at the time of disclosure; or (iii) is furnished by the Disclosing Party to third parties without restriction; or (iv) is furnished to the Receiving Party by a third party who legally obtained said information and the right to disclose it; or (v) is developed independently without reference to the Confidential Information by the Receiving Party where the Receiving Party can document such independent development.

(c) "Confidential Materials" shall mean all tangible materials containing Confidential Information including, but not limited to, drawings, schematics, written or printed documents, computer discs, tapes, and compact discs whether machine or user readable.

### Restrictions

(a) Receiving Party shall not disclose any Confidential Information to third parties for a period of five (5) years following the termination of its relationship with Disclosing Party. However, the Receiving Party may disclose Confidential Information in accordance with judicial or other governmental order, provided Receiving Party shall give Disclosing Party reasonable prior notice to such disclosure and shall comply with any applicable protective order or equivalent.

(b) Receiving Party shall not use or duplicate any Confidential Information, except as necessary to conduct Explorations, and shall keep confidential and not disclose any



GOtoSBNDoc000123

18-51277 - #101-3  File 12/17/18  Enter 12/17/18 10:13:10  Exhibit C - BIMCO Charter Agmt. between Guice and SeaTran Pg 3 of 14

Confidential Information to anyone, unless the Disclosing Party has previously and expressly consented to such use, duplication, or disclosure in writing. However, each Receiving Party may disclose such Confidential Information to those employees or consultants of the Receiving Party whose knowledge is necessary to conduct the Explorations, provided that all such employees or consultants are advised of their obligations to protect the Disclosing Party's interest, which obligations shall be identical to the Receiving Party's under this Agreement.

(c) Without limiting the foregoing, the Parties agree to protect the other Party's Confidential Information with at least the same degree of care as it exercises to protect its own highly confidential information of like character, but in no event less than reasonable care. The Parties shall be responsible for any breach of the confidentiality provisions of this Agreement by any person to whom Confidential Information may be disclosed by the Receiving Party.

(d) Receiving Party shall not use any Confidential Information other than for purposes of Explorations or as otherwise expressly authorized by the Disclosing Party.

(e) Confidential Information and Confidential Materials may be disclosed, reproduced, summarized, or distributed only in pursuance of the Receiving Party's business relationship with the Disclosing Party, and only as otherwise provided herein.

## Rights and Remedies

(a) Receiving Party shall notify Disclosing Party immediately upon discovery of any unauthorized use or disclosure of Confidential Information or Confidential Materials, or any other breach of this Agreement by Receiving Party, and will cooperate with Disclosing Party in every reasonable way to help Disclosing Party regain possession of the Confidential Information and/or Confidential Materials and prevent further unauthorized use or disclosure.

(b) Receiving Party shall return all originals, copies, reproductions and summaries of Confidential Information and/or Confidential Materials then in Receiving Party's possession or control at Disclosing Party's request or, at Disclosing Party's option, certify destruction of the same.

(c) Receiving Party acknowledges that monetary damages may not be a sufficient remedy for damages resulting from the unauthorized disclosure of Confidential Information and that Disclosing Party shall be entitled, without waiving any other rights or remedies, to seek such injunctive or equitable relief as may be deemed proper by a court of competent jurisdiction.

(d) Disclosing Party may visit Receiving Party's premises, with reasonable prior notice and during normal business hours, to review Receiving Party's compliance with the terms of this Agreement.

## Miscellaneous

(a) All Confidential Information and Confidential Materials are and shall remain the sole and exclusive property of Disclosing Party. By disclosing information to Receiving Party, Disclosing Party does not grant nay express or implied right to Receiving Party in, to or under Disclosing Party patents, copyrights, trademarks, or trade secrets. Furthermore, Receiving Party does not hereby obtain any license in or to Confidential Information or Confidential Materials of Disclosing Party.

(b) All Confidential Information and Confidential Materials are provided "AS IS" and Disclosing Party makes no warranties, either express or implied, regarding the accuracy or reliability of such information or materials. Disclosing Party will not be liable for any expenses or losses incurred or any action undertaken by Receiving Party as a result of the receipt of Confidential Information or Confidential Materials. The entire risk arising out



GOtoSBNDoc000124

18-51277 - #101-3   File 12/17/18   Enter 12/17/18 10:13:10   Exhibit C - BIMCO Charter Agmt. between Guice and SeaTran   Pg 4 of 14

of the use of the Confidential Information an Confidential Materials remains with Receiving Party. The Parties represent that entering into this Agreement will not conflict with any material agreement already entered into by such Parties.

(c) This Agreement shall not be modified except in writing signed by both Parties hereto. The Parties may not transfer or otherwise assign its rights, duties or obligations under this Agreement to any other person or entity, in whole or in part, without the prior written consent of the other Party. Any such assignment or transfer shall be void.

(d) No waiver of any provisions of this Agreement shall be effective unless agreed to in writing by the Party against whom such waiver is sought to be enforced. Waiver of any default or breach hereunder shall not constitute a waiver of any other default or breach whether similar or otherwise. Failure of either Party to enforce any provision of this Agreement shall not constitute waiver of such provision or any other provisions of this Agreement.

(e) This Agreement constitutes the entire Agreement between the Parties with respect to the subject matter hereof.

(f) If any action at law or in equity is necessary to enforce or interpret the rights arising out of or relating to this Agreement, the prevailing Party shall be entitled to recover reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which it may be entitled.

(g) This Agreement shall be construed and controlled by the laws of the State of Mississippi.

(h) If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect. Should any obligations of this Agreement be found illegal, invalid or unenforceable as being too broad with respect to the duration, scope or subject matter thereof, such obligations shall be deemed and construed to be reduced to the maximum duration, scope or subject matter allowable by law.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement by their duly authorized representatives as of the date set forth above.

GUICE OFFSHORE, LLC

By: _____
Its: Member/Owner

SEATRAN MARINE, LLC
Company

By: _____
Charles B. Tizzard
Its: Exec. V.P.

GOtoSBNDoc000125

18-51277 - #101-3  File 12/17/18  Enter 12/17/18 10:13:10  Exhibit C - BIMCO Charter Agmt. between Guice and SeaTran Pg 5 of 14

## PART II
## "BARECON 2001" Standard Bareboat Charter

1. **Definitions**
   In this Charter, the following terms shall have the meanings hereby assigned to them:
   "The Owners" shall mean the party identified in Box 3;
   "The Charterers" shall mean the party identified in Box 4;
   "The Vessel" shall mean the vessel named in Box 5 and with particulars as stated in Boxes 6 to 12.
   "Financial Instrument" means the mortgage, deed of covenant or other such financial security instrument as annexed to this Charter and stated in Box 28.

2. **Charter Period**
   In consideration of the hire detailed in Box 22, the Owners have agreed to let and the Charterers have agreed to hire the Vessel for the period stated in Box 21 ("The Charter Period").

3. **Delivery**
   (not applicable when Part III applies, as indicated in Box 37)
   (a) The Owners shall before and at the time of delivery exercise due diligence to make the Vessel seaworthy And in every respect ready in hull, machinery and equipment for service under this Charter.
   The Vessel shall be delivered by the Owners and taken over by the Charterers at the port or place indicated in Box 13 in such ready safe berth as the Charterers may direct.
   (b) The Vessel shall be properly documented on delivery in accordance with the laws of the flag State indicated in Box 5 and the requirements of Box 10. The Vessel upon delivery shall have her survey cycles up to date and trading and class certificates valid for at least the number of months agreed in Box 12.
   (c) The delivery of the Vessel by the Owners and the taking over of the Vessel by the Charterers shall constitute a full performance by the Owners of all the Owners' obligations under this Clause 3, and thereafter the Charterers shall not be entitled to make or assert any claim against the Owners on account of any conditions, representations or warranties expressed or implied with respect to the Vessel but the Owners shall be liable for the cost of but not the time for repairs or renewals occasioned by latent defects in the Vessel, her machinery or appurtenances, existing at the time of delivery under this Charter, provided such defects have manifested themselves within twelve (12) months after delivery unless otherwise provided in Box 32.

4. **Time for Delivery**
   (not applicable when Part III applies, as indicated in Box 37)
   The Vessel shall not be delivered before the date indicated in Box 14 without the Charterers' consent and the Owners shall exercise due diligence to deliver the Vessel not later than the date indicated in Box 15.
   Unless otherwise agreed in Box 16, the Owners shall give the Charterers not less than thirty (30) running days' preliminary and not less than fourteen (14) running days' definite notice of the date on which the Vessel is expected to be ready for delivery.
   The Owners shall keep the Charterers closely advised of possible changes in the Vessel's position.

5. **Cancelling**
   (not applicable when Part III applies, as indicated in Box 37)
   (a) Should the Vessel not be delivered latest by the cancelling date indicated in Box 15, the Charterers shall have the option of cancelling this Charter by giving the Owners notice of cancellation within thirty-six (36) running hours after the cancelling date stated in Box 15, failing which this Charter shall remain in full force and effect.
   (b) If it appears that the Vessel will be delayed beyond the cancelling date, the Owners may, as soon as they are in a position to state with reasonable certainty the day on which the Vessel should be ready, give notice thereof to the Charterers asking whether they will exercise their option of cancelling, and the option must then be declared within one hundred and sixty-eight (168) running hours of the receipt by the Charterers of such notice or within thirty-six (36) running hours after the cancelling date, whichever is the earlier. If the Charterers do not then exercise their option of cancelling, the seventh day after the readiness date stated in the Owners' notice shall be substituted for the cancelling date indicated in Box 15 for the purpose of this Clause 5.
   (c) Cancellation under this Clause 5 shall be without prejudice to any claim the Charterers may otherwise have on the Owners under this Charter.

6. **Trading Restrictions**
   The Vessel shall be employed in lawful trades for the carriage of suitable lawful merchandise within the trading limits indicated in Box 20.
   The Charterers undertake not to employ the Vessel or suffer the Vessel to be employed otherwise than in conformity with the terms of the contracts of insurance (including any warranties expressed or implied therein) without first obtaining the consent of the insurers to such employment and complying with such requirements as to extra premium or otherwise as the insurers may prescribe.
   The Charterers also undertake not to employ the Vessel or suffer her employment in any trade or business which is forbidden by the law of any country to which the Vessel may sail or is otherwise illicit or in carrying illicit or prohibited goods or in any manner whatsoever which may render her liable to condemnation, destruction, seizure or confiscation.
   Notwithstanding any other provisions contained in this Charter it is agreed that nuclear fuels or radioactive products or waste are specifically excluded from the cargo permitted to be loaded or carried under this Charter. This exclusion does not apply to radio-isotopes used or intended to be used for any industrial, commercial, agricultural, medical or scientific purposes provided the Owners' prior approval has been obtained to loading thereof.

7. **Surveys on Delivery and Redelivery**
   (not applicable when Part III applies, as indicated in Box 37)
   The Owners and Charterers shall each appoint surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at the time of delivery and redelivery hereunder. The Owners shall bear all expenses of the On-hire Survey ~~including loss of time, if any~~, and the Charterers shall bear all expenses of the Off-hire Survey ~~including loss of time, if any, at the daily equivalent to the rate of hire or pro rata thereof~~.
   \* EXCLUDE LOSS OF TIME

8. **Inspection**
   The Owners shall have the right ~~at any time~~ after giving reasonable notice to the Charterers to inspect or survey the Vessel or instruct a duly authorised surveyor to carry out such survey on their behalf:-
   (a) to ascertain the condition of the Vessel and satisfy themselves that the Vessel is being properly repaired and maintained. The costs and fees for such inspection or survey shall be paid by the Owners unless the Vessel is found to require repairs or maintenance in order to achieve the condition so provided;
   (b) in dry-dock if the Charterers have not dry-docked Her in accordance with Clause 10(g). The costs and fees for such inspection or survey shall be paid by the Charterers; and
   (c) for any other commercial reason they consider necessary (provided it does not unduly interfere with the commercial operation of the Vessel). The costs and fees for such inspection and survey shall be paid by the Owners.
   All time used in respect of inspection, survey or repairs shall be for the Charterers' account and form part of the

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

18-51277 - #101-3 File 12/17/18 Enter 12/17/18 10:13:10 Exhibit C - BIMCO Charter Agmt. between Guice and SeaTran Pg 6 of 14

GOtoSBNDoc000126

PART II
"BARECON 2001" Standard Bareboat Charter

Charter Period.
The Charterers shall also permit the Owners to inspect the Vessel's log books whenever requested and shall whenever required by the Owners furnish them with full information regarding any casualties or other accidents or damage to the Vessel.

9. Inventories, Oil and Stores
A complete inventory of the Vessel's entire equipment, outfit including spare parts, appliances and of all consumable stores on board the Vessel shall be made by the Charterers in conjunction with the Owners on delivery and again on redelivery of the Vessel. The Charterers and the Owners, respectively, shall at the time of delivery and redelivery take over and pay for all bunkers, lubricating oil, unbroached provisions, paints, ropes and other consumable stores (excluding spare parts) in the said Vessel at the then current market prices at the ports of delivery and redelivery, respectively. The Charterers shall ensure that all spare parts listed in the inventory and used during the Charter Period are replaced at their expense prior to redelivery of the Vessel.

10. Maintenance and Operation
(a)(i) Maintenance and Repairs - During the Charter Period the Vessel shall be in the full possession and at the absolute disposal for all purposes of the Charterers and under their complete control in every respect. The Charterers shall maintain the Vessel, her machinery, boilers, appurtenances and spare parts in a good state of repair, in efficient operating condition and in accordance with good commercial maintenance practice and, except as provided for in Clause 14(l), if applicable, at their own expense they shall at all times keep the Vessel's Class fully up to date with the Classification Society indicated in Box 10 and maintain all other necessary certificates in force at all times.
(ii) New Class and Other Safety Requirements - In the event of any improvement, structural changes or new equipment becoming necessary for the continued operation of the Vessel by reason of new class requirements or by compulsory legislation costing (excluding the Charterers' loss of time) more than the percentage stated in Box 23, or if Box 23 is left blank, 5 per cent of the Vessel's insurance value as stated in Box 29, then the extent, if any, to which the rate of hire shall be varied and the ratio in which the cost of compliance shall be shared between the parties concerned in order to achieve a reasonable distribution thereof as between the Owners and the Charterers having regard, inter alia, to the length of the period remaining under this Charter shall, in the absence of agreement, be referred to the dispute resolution method agreed in Clause 30.
(iii) Financial Security - The Charterers shall maintain financial security or responsibility in respect of third party liabilities as required by any government, including federal, state or municipal or other division or authority thereof, to enable the Vessel, without penalty or charge, lawfully to enter, remain at, or leave any port, place, territorial or contiguous waters of any country, state or municipality in performance of this Charter without any delay. This obligation shall apply whether or not such requirements have been lawfully imposed by such government or division or authority thereof.
The Charterers shall make and maintain all arrangements by bond or otherwise as may be necessary to satisfy such requirements at the Charterers' sole expense and the Charterers shall indemnify the Owners against all consequences whatsoever (including loss of time) for any failure or inability to do so.

(b) Operation of the Vessel - The Charterers shall at their own expense and by their own procurement man, victual, navigate, operate, supply, fuel and, whenever required, repair the Vessel during the Charter Period and they shall pay all charges and expenses of every kind and nature whatsoever incidental to their use and operation of the Vessel under this Charter, including annual flag State fees and any foreign general municipality and/or state taxes. The Master, officers and crew of the Vessel shall be the servants of the Charterers for all purposes whatsoever, even if for any reason appointed by the Owners.
Charterers shall comply with the regulations regarding officers and crew in force in the country of the Vessel's flag or any other applicable law.
(c) The Charterers shall keep the Owners and the mortgagee(s) advised of the intended employment, planned dry-docking and major repairs of the Vessel, as reasonably required.
(d) Flag and Name of Vessel – During the Charter Period, the Charterers shall have the liberty to paint the Vessel in their own colours, install and display their funnel insignia and fly their own house flag. The Charterers shall also have the liberty, with the Owners' consent, which shall not be unreasonably withheld, to change the flag and/or the name of the Vessel during the Charter Period. Painting and re-painting, instalment and re-instalment, registration and re-registration, if required by the Owners, shall be at the Charterers' expense and time.
(e) Changes to the Vessel – Subject to Clause 10(a)(ii), the Charterers shall make no structural changes in the Vessel or changes in the machinery, boilers, appurtenances or spare parts thereof without in each instance first securing the Owners' approval thereof. If the Owners so agree, the Charterers shall, if the Owners so require, restore the Vessel to its former condition before the termination of this Charter.
(f) Use of the Vessel's Outfit, Equipment and Appliances - The Charterers shall have the use of all outfit, equipment, and appliances on board the Vessel at the time of delivery, provided the same or their substantial equivalent shall be returned to the Owners on redelivery in the same good order and condition as when received, ordinary wear and tear excepted. The Charterers shall from time to time during the Charter Period replace such items of equipment as shall be so damaged or worn as to be unfit for use. The Charterers are to procure that all repairs to or replacement of any damaged, worn or lost parts or equipment be effected in such manner (both as regards workmanship and quality of materials) as not to diminish the value of the Vessel. The Charterers have the right to fit additional equipment at their expense and risk but the Charterers shall remove such equipment at the end of the period if requested by the Owners. Any equipment including radio equipment on hire on the Vessel at time of delivery shall be kept and maintained by the Charterers and the Charterers shall assume the obligations and liabilities of the Owners under any lease contracts in connection therewith and shall reimburse the Owners for all expenses incurred in connection therewith, also for any new equipment required in order to comply with radio regulations.
(g) Periodical Dry-Docking - The Charterers shall dry-dock the Vessel and clean and paint her underwater parts whenever the same may be necessary, but not less than once during the period stated in Box 19 or, if Box 19 has been left blank, every sixty (60) calendar months after delivery or such other period as may be required by the Classification Society or flag State.

11. Hire
(a) The Charterers shall pay hire due to the Owners punctually in accordance with the terms of this Charter

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

18-51277 - #101-3  File 12/17/18  Enter 12/17/18 10:13:10  Exhibit C - BIMCO Charter Agmt. between Guice and SeaTran Pg 7 of 14

GOtoSBNDoc000127

in respect of which time shall be of the essence. 293
(b) The Charterers shall pay to the Owners for the hire 294
of the Vessel a lump sum in the amount indicated in 295
Box 22 which shall be payable not later than every thirty 296
(30) running days in advance, the first lump sum being 297
payable on the date and hour of the Vessel's delivery to 298
the Charterers. Hire shall be paid continuously 299
throughout the Charter Period 300
(c) Payment of hire shall be made in cash without 301
discount in the currency and in the manner indicated in 302
Box 25 and at the place mentioned in Box 26. 303
(d) Final payment of hire, if for a period of less than 304
thirty (30) running days, shall be calculated proportionally 305
according to the number of days and hours remaining 306
before redelivery and advance payment to be effected 307
accordingly. 308
(e) Should the Vessel be lost or missing, hire shall 309
cease from the date and time when she was lost or last 310
heard of. The date upon which the Vessel is to be treated 311
as lost or missing shall be ten (10) days after the Vessel 312
was last reported or when the Vessel is posted as 313
missing by Lloyd's, whichever occurs first. Any hire paid 314
in advance to be adjusted accordingly. 315
(f) Any delay in payment of hire shall entitle the 316
Owners to interest at the rate per annum as agreed 317
in Box 24. If Box 24 has not been filled in, the three months 318
Interbank offered rate in London (LIBOR or its successor) 319
for the currency stated in Box 25, as quoted by the British 320
Bankers' Association (BBA) on the date when the hire 321
fell due, increased by 2 per cent., shall apply. 322
(g) Payment of interest due under sub-clause 11(f) 323
shall be made within seven (7) running days of the date 324
of the Owners' invoice specifying the amount payable 325
or, in the absence of an invoice, at the time of the next 326
hire payment date. 327

12. Mortgage 328
(only to apply if Box 28 has been appropriately filled in) 329
*) (a) The Owners warrant that they have not effected 330
any mortgage(s) of the Vessel and that they shall not 331
effect any mortgage(s) without the prior consent of the 332
Charterers, which shall not be unreasonably withheld. 333
*) (b) The Vessel chartered under this Charter is financed 334
by a mortgage according to the Financial Instrument. 335
The Charterers undertake to comply, and provide such 336
information and documents to enable the Owners to 337
comply, with all such instructions or directions in regard 338
to the employment, insurances, operation, repairs and 339
maintenance of the Vessel as laid down in the Financial 340
Instrument or as may be directed from time to time during 341
the currency of the Charter by the mortgagee(s) in 342
conformity with the Financial Instrument. The Charterers 343
confirm that, for this purpose, they have acquainted 344
themselves with all relevant terms, conditions and 345
provisions of the Financial Instrument and agree to 346
acknowledge this in writing in any form that may be 347
required by the mortgagee(s). The Owners warrant that 348
they have not effected any mortgage(s) other than stated 349
in Box 28 and that they shall not agree to any 350
amendment of the mortgage(s) referred to in Box 28 or 351
effect any other mortgage(s) without the prior consent 352
of the Charterers, which shall not be unreasonably 353
withheld. 354
*) (Optional, Clauses 12(a) and 12(b) are alternatives; 355
indicate alternative agreed in Box 28). 356

13. Insurance and Repairs 357
(a) During the Charter Period the Vessel shall be kept 358
insured by the Charterers at their expense against hull 359
and machinery, war and Protection and Indemnity risks 360
(and any risks against which it is compulsory to insure 361
for the operation of the Vessel, including maintaining 362
financial security in accordance with sub-clause 363
10(a)(iii)) in such form as the Owners shall in writing 364
approve, which approval shall not be un-reasonably 365

withheld. Such insurances shall be arranged by the 366
Charterers to protect the interests of both the Owners 367
and the Charterers and the mortgagee(s) (if any), and 368
The Charterers shall be at liberty to protect under such 369
insurances the interests of any managers they may 370
appoint. Insurance policies shall cover the Owners and 371
the Charterers according to their respective interests. 372
Subject to the provisions of the Financial Instrument, if 373
any, and the approval of the Owners and the insurers, 374
the Charterers shall effect all insured repairs and shall 375
undertake settlement and reimbursement from the 376
insurers of all costs in connection with such repairs as 377
well as insured charges, expenses and liabilities to the 378
extent of coverage under the insurances herein provided 379
for. 380
The Charterers also to remain responsible for and to 381
effect repairs and settlement of costs and expenses 382
incurred thereby in respect of all other repairs not 383
covered by the insurances and/or not exceeding any 384
possible franchise(s) or deductibles provided for in the 385
insurances. 386
All time used for repairs under the provisions of sub- 387
clause 13(a) and for repairs of latent defects according 388
to Clause 3(c) above, including any deviation, shall be 389
for the Charterers' account. 390
(b) If the conditions of the above insurances permit 391
additional insurance to be placed by the parties, such 392
cover shall be limited to the amount for each party set 393
out in Box 30 and Box 31, respectively. The Owners or 394
the Charterers as the case may be shall immediately 395
furnish the other party with particulars of any additional 396
insurance effected, including copies of any cover notes 397
or policies and the written consent of the insurers of 398
any such required insurance in any case where the 399
consent of such insurers is necessary. 400
(c) The Charterers shall upon the request of the 401
Owners, provide information and promptly execute such 402
documents as may be required to enable the Owners to 403
comply with the insurance provisions of the Financial 404
Instrument. 405
(d) Subject to the provisions of the Financial Instru- 406
ment, if any, should the Vessel become an actual, 407
constructive, compromised or agreed total loss under 408
the insurances required under sub-clause 13(a), all 409
insurance payments for such loss shall be paid to the 410
Owners who shall distribute the moneys between the 411
Owners and the Charterers according to their respective 412
interests. The Charterers undertake to notify the Owners 413
and the mortgagee(s), if any, of any occurrences in 414
consequence of which the Vessel is likely to become a 415
total loss as defined in this Clause. 416
(e) The Owners shall upon the request of the 417
Charterers, promptly execute such documents as may 418
be required to enable the Charterers to abandon the 419
Vessel to insurers and claim a constructive total loss. 420
(f) For the purpose of insurance coverage against hull 421
and machinery and war risks under the provisions of 422
sub-clause 13(a), the value of the Vessel is the sum 423
indicated in Box 29. 424

14. Insurance, Repairs and Classification 425
(Optional, only to apply if expressly agreed and stated 426
in Box 29, in which event Clause 13 shall be considered 427
deleted). 428
(a) During the Charter Period the Vessel shall be kept 429
insured by the Owners at their expense against hull and 430
machinery and war risks under the form of policy or 431
policies attached hereto. The Owners and/or insurers 432
shall not have any right of recovery or subrogation 433
against the Charterers on account of loss of or any 434
damage to the Vessel or her machinery or appurt- 435
enances covered by such insurance, or on account of 436
payments made to discharge claims against or liabilities 437
of the Vessel or the Owners covered by such insurance. 438
Insurance policies shall cover the Owners and the 439

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



GOtoSBNDoc000128

18-51277 - #101-3  File 12/17/18  Enter 12/17/18 10:13:10  Exhibit C - BIMCO Charter Agmt. between Guice and SeaTran Pg 8 of 14

Charterers according to their respective interests. 440
(b) During the Charter Period the Vessel shall be kept 441
insured by the Charterers at their expense against 442
Protection and Indemnity risks (and any risks against 443
which it is compulsory to insure for the operation of the 444
Vessel, including maintaining financial security in 445
accordance with sub-clause 10(a)(iii)) in such form as 446
the Owners shall in writing approve which approval shall 447
not be unreasonably withheld. 448
(c) In the event that any act or negligence of the 449
Charterers shall vitiate any of the insurance herein 450
provided, the Charterers shall pay to the Owners all 451
losses and indemnify the Owners against all claims and 452
demands which would otherwise have been covered by 453
such insurance. 454
(d) The Charterers shall, subject to the approval of the 455
Owners or Owners' Underwriters, effect all insured 456
repairs, and the Charterers shall undertake settlement 457
of all miscellaneous expenses in connection with such 458
repairs as well as all insured charges, expenses and 459
liabilities, to the extent of coverage under the insurances 460
provided for under the provisions of sub-clause 14(a). 461
The Charterers to be secured reimbursement through 462
the Owners' Underwriters for such expenditures upon 463
presentation of accounts. 464
(e) The Charterers to remain responsible for and to 465
effect repairs and settlement of costs and expenses 466
incurred thereby in respect of all other repairs not 467
covered by the insurances and/or not exceeding any 468
possible franchise(s) or deductibles provided for in the 469
insurances. 470
(f) All time used for repairs under the provisions of 471
sub-clauses 14(d) and 14(e) and for repairs of latent 472
defects according to Clause 3 above, including any 473
deviation, shall be for the Charterers' account and shall 474
form part of the Charter Period. 475
The Owners shall not be responsible for any expenses 476
as are incident to the use and operation of the Vessel 477
for such time as may be required to make such repairs. 478
(g) If the conditions of the above insurances permit 479
additional insurance to be placed by the parties such 480
cover shall be limited to the amount for each party set 481
out in Box 30 and Box 31, respectively. The Owners or 482
the Charterers as the case may be, shall immediately 483
furnish the other party with particulars of any additional 484
insurance effected, including copies of any cover notes 485
or policies and the written consent of the insurers of 486
any such required insurance in any case where the 487
consent of such insurers is necessary. 488
(h) Should the Vessel become an actual, constructive, 489
compromised or agreed total loss under the insurances 490
required under sub-clause 14(a), all insurance payments 491
for such loss shall be paid to the Owners, who shall 492
distribute the moneys between themselves and the 493
Charterers according to their respective interests. 494
(i) If the Vessel becomes an actual, constructive, 495
compromised or agreed total loss under the insurances 496
arranged by the Owners in accordance with sub-clause 497
14(a), this Charter shall terminate as of the date of such 498
loss. 499
(j) The Charterers shall upon the request of the 500
Owners, promptly execute such documents as may be 501
required to enable the Owners to abandon the Vessel 502
to the insurers and claim a constructive total loss. 503
(k) For the purpose of insurance coverage against hull 504
and machinery and war risks under the provisions of 505
sub-clause 14(a), the value of the Vessel is the sum 506
indicated in Box 29. 507
(l) Notwithstanding anything contained in sub-clause 508
10(a), it is agreed that under the provisions of Clause 509
14, if applicable, the Owners shall keep the Vessel's 510
Class fully up to date with the Classification Society 511
indicated in Box 10 and maintain all other necessary 512
certificates in force at all times. 513

15. Redelivery 514
At the expiration of the Charter Period the Vessel shall 515
be redelivered by the Charterers to the Owners at a 516
safe and ice-free port or place as indicated in Box 16, in 517
such ready safe berth as the Owners may direct. The 518
Charterers shall give the Owners not less than thirty 519
(30) running days' preliminary notice of expected date, 520
range of ports of redelivery or port or place of redelivery 521
and not less than fourteen (14) running days' definite 522
notice of expected date and port or place of redelivery. 523
Any changes thereafter in the Vessel's position shall be 524
notified immediately to the Owners. 525
The Charterers warrant that they will not permit the 526
Vessel to commence a voyage (including any preceding 527
ballast voyage) which cannot reasonably be expected 528
to be completed in time to allow redelivery of the Vessel 529
within the Charter Period. Notwithstanding the above, 530
should the Charterers fail to redeliver the Vessel within 531
The Charter Period, the Charterers shall pay the daily 532
equivalent to the rate of hire stated in Box 22 plus 10 533
per cent ~~or to the market rate, whichever is the higher~~, 534
for the number of days by which the Charter Period is 535
exceeded. All other terms, conditions and provisions of 536
this Charter shall continue to apply. 537
Subject to the provisions of Clause 10, the Vessel shall 538
be redelivered to the Owners in the same or as good 539
structure, state, condition and class as that in which she 540
was delivered, fair wear and tear not affecting class 541
excepted. 542
The Vessel upon redelivery shall have her survey cycles 543
up to date and trading and class certificates valid for at 544
least the number of months agreed in Box 17. 545

16. Non-Lien 546
The Charterers will not suffer, nor permit to be continued, 547
any lien or encumbrance incurred by them or their 548
agents, which might have priority over the title and 549
interest of the Owners in the Vessel. ~~The Charterers 550
further agree to fasten to the Vessel in a conspicuous 551
place and to keep so fastened during the Charter Period 552
a notice reading as follows:~~ 553
~~"This Vessel is the property of (name of Owners). It is 554
under charter to (name of Charterers) and by the terms 555
of the Charter Party neither the Charterers nor the 556
Master have any right, power or authority to create, incur 557
or permit to be imposed on the Vessel any lien 558
whatsoever."~~ 559

17. Indemnity 560
(a) The Charterers shall indemnify the Owners against 561
any loss, damage or expense incurred by the Owners 562
arising out of or in relation to the operation of the Vessel 563
by the Charterers, and against any lien of whatsoever 564
nature arising out of an event occurring during the 565
Charter Period. If the Vessel be arrested or otherwise 566
detained by reason of claims or liens arising out of her 567
operation hereunder by the Charterers, the Charterers 568
shall at their own expense take all reasonable steps to 569
secure that within a reasonable time the Vessel is 570
released, including the provision of bail. 571
Without prejudice to the generality of the foregoing, the 572
Charterers agree to indemnify the Owners against all 573
consequences or liabilities arising from the Master, 574
officers or agents signing Bills of Lading or other 575
documents. 576
(b) If the Vessel be arrested or otherwise detained by 577
reason of a claim or claims against the Owners, the 578
Owners shall at their own expense take all reasonable 579
steps to secure that within a reasonable time the Vessel 580
is released, including the provision of bail. 581
In such circumstances the Owners shall indemnify the 582
Charterers against any loss, damage or expense 583
incurred by the Charterers (including hire paid under 584
this Charter) as a direct consequence of such arrest or 585
detention. 586



This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

18-51277 - #101-3  File 12/17/18  Enter 12/17/18 10:13:10  Exhibit C - BIMCO Charter Agmt. between Guice and SeaTran Pg 9 of 14

GOtoSBNDoc000129

## PART II
## "BARECON 2001" Standard Bareboat Charter

| | |
|---|---|
| 18. **Lien** | 587 |
| The Owners to have a lien upon all cargoes, sub-hires and sub-freights belonging or due to the Charterers or any sub-charterers and any Bill of Lading freight for all claims under this Charter, and the Charterers to have a lien on the Vessel for all moneys paid in advance and not earned. | 588-593 |
| 19. **Salvage** | 594 |
| All salvage and towage performed by the Vessel shall be for the Charterers' benefit and the cost of repairing damage occasioned thereby shall be borne by the Charterers. | 595-598 |
| 20. **Wreck Removal** | 599 |
| In the event of the Vessel becoming a wreck or obstruction to navigation the Charterers shall indemnify the Owners against any sums whatsoever which the Owners shall become liable to pay and shall pay in consequence of the Vessel becoming a wreck or obstruction to navigation. | 600-605 |
| 21. **General Average** | 606 |
| The Owners shall not contribute to General Average. | 607 |
| 22. **Assignment, Sub-Charter and Sale** | 608 |
| (a) The Charterers shall not assign this Charter nor sub-charter the Vessel on a bareboat basis except with the prior consent in writing of the Owners, which shall not be unreasonably withheld, and subject to such terms and conditions as the Owners shall approve. | 609-613 |
| (b) The Owners shall not sell the Vessel during the currency of this Charter except with the prior written consent of the Charterers, which shall not be unreasonably withheld, and subject to the buyer accepting an assignment of this Charter. SEE ATTACHMENT "A" | 614-618 |
| 23. **Contracts of Carriage** | 619 |
| *) (a) The Charterers are to procure that all documents issued during the Charter Period evidencing the terms and conditions agreed in respect of carriage of goods shall contain a paramount clause incorporating any legislation relating to carrier's liability for cargo compulsorily applicable in the trade; if no such legislation exists, the documents shall incorporate the Hague-Visby Rules. The documents shall also contain the New Jason Clause and the Both-to-Blame Collision Clause. | 620-628 |
| *) (b) The Charterers are to procure that all passenger tickets issued during the Charter Period for the carriage of passengers and their luggage under this Charter shall contain a paramount clause incorporating any legislation relating to carrier's liability for passengers and their luggage compulsorily applicable in the trade; if no such legislation exists, the passenger tickets shall incorporate the Athens Convention Relating to the Carriage of Passengers and their Luggage by Sea, 1974, and any protocol thereto. | 629-638 |
| *) Delete as applicable. | 639 |
| 24. **Bank Guarantee** | 640 |
| ~~(Optional, only to apply if Box 27 filled in)~~ | 641 |
| ~~The Charterers undertake to furnish, before delivery of the Vessel, a first class bank guarantee or bond in the sum and at the place as indicated in Box 27 as guarantee for full performance of their obligations under this Charter.~~ | 642-646 |
| 25. **Requisition/Acquisition** | 647 |
| (a) In the event of the Requisition for Hire of the Vessel by any governmental or other competent authority (hereinafter referred to as "Requisition for Hire") irrespective of the date during the Charter Period when "Requisition for Hire" may occur and irrespective of the length thereof and whether or not it be for an indefinite or a limited period of time, and irrespective of whether it may or will remain in force for the remainder of the Charter Period, this Charter shall not be deemed thereby or thereupon to be frustrated or otherwise terminated and the Charterers shall continue to pay the stipulated hire in the manner provided by this Charter until the time when the Charter would have terminated pursuant to any of the provisions hereof always provided however that in the event of "Requisition for Hire" any Requisition Hire or compensation received or receivable by the Owners shall be payable to the Charterers during the remainder of the Charter Period or the period of the "Requisition for Hire" whichever be the shorter. | 648-666 |
| (b) In the event of the Owners being deprived of their ownership in the Vessel by any Compulsory Acquisition of the Vessel or requisition for title by any governmental or other competent authority (hereinafter referred to as "Compulsory Acquisition"), then, irrespective of the date during the Charter Period when "Compulsory Acquisition" may occur, this Charter shall be deemed terminated as of the date of such "Compulsory Acquisition". In such event Charter Hire to be considered as earned and to be paid up to the date and time of such "Compulsory Acquisition". | 667-677 |
| 26. **War** | 678 |
| (a) For the purpose of this Clause, the words "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel. | 679-692 |
| (b) The Vessel, unless the written consent of the Owners be first obtained, shall not continue to or go through any port, place, area or zone (whether of land or sea), or any waterway or canal, where it reasonably appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, the Owners shall have the right to require the Vessel to leave such area. | 693-704 |
| (c) The Vessel shall not load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation. | 705-712 |
| (d) If the insurers of the war risks insurance, when Clause 14 is applicable, should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such insurers as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due. | 713-721 |
| (e) The Charterers shall have the liberty: | 722 |
| (i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or any other Government, body or group whatsoever acting with the power to compel | 723-730 |

Handwritten annotations: "NG VR" (next to clause 23), "NG VR" (next to clause 24)
This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



18-51277 - #101-3  File 12/17/18  Enter 12/17/18 10:13:10  Exhibit C - BIMCO Charter Agmt. between Guice and SeaTran Pg 10 of 14

GOtoSBNDoc000130

compliance with their orders or directions; 731
(ii) to comply with the orders, directions or recom- 732
mendations of any war risks underwriters who have 733
the authority to give the same under the terms of 734
the war risks insurance; 735
(iii) to comply with the terms of any resolution of the 736
Security Council of the United Nations, any 737
directives of the European Community, the effective 738
orders of any other Supranational body which has 739
the right to issue and give the same, and with 740
national laws aimed at enforcing the same to which 741
the Owners are subject, and to obey the orders 742
and directions of those who are charged with their 743
enforcement. 744
(f) In the event of outbreak of war (whether there be a 745
declaration of war or not) (i) between any two or more 746
of the following countries: the United States of America, 747
Russia; the United Kingdom; France; and the People's 748
Republic of China, (ii) between any two or more of the 749
countries stated in Box 36, both the Owners and the 750
Charterers shall have the right to cancel this Charter, 751
whereupon the Charterers shall redeliver the Vessel to 752
the Owners in accordance with Clause 15. If the Vessel 753
has cargo on board after discharge thereof at 754
destination, or if debarred under this Clause from 755
reaching or entering it at a near, open and safe port as 756
directed by the Owners, or if the Vessel has no cargo 757
on board, at the port at which the Vessel then is or if at 758
sea at a near, open and safe port as directed by the 759
Owners. In all cases hire shall continue to be paid in 760
accordance with Clause 11 and except as aforesaid all 761
other provisions of this Charter shall apply until 762
redelivery. 763

27. Commission 764
The Owners to pay a commission at the rate indicated 765
in Box 33 to the Brokers named in Box 33 on any hire 766
paid under the Charter. If no rate is indicated in Box 33, 767
the commission to be paid by the Owners shall cover 768
the actual expenses of the Brokers and a reasonable 769
fee for their work. 770
If the full hire is not paid owing to breach of the Charter 771
by either of the parties the party liable therefor shall 772
indemnify the Brokers against their loss of commission. 773
Should the parties agree to cancel the Charter, the 774
Owners shall indemnify the Brokers against any loss of 775
commission but in such case the commission shall not 776
exceed the brokerage on one year's hire. 777

28. Termination 778
(a) Charterers' Default 779
The Owners shall be entitled to withdraw the Vessel from 780
the service of the Charterers and terminate the Charter 781
with immediate effect by written notice to the Charterers if: 782
(i) the Charterers fail to pay hire in accordance with 783
Clause 11. However, where there is a failure to 784
make punctual payment of hire due to oversight, 785
negligence, errors or omissions on the part of the 786
Charterers or their bankers, the Owners shall give 787
the Charterers written notice of the number of clear 788
banking days stated in Box 34 (as recognised at 789
the agreed place of payment) in which to rectify 790
the failure, and when so rectified within such 791
number of days following the Owners' notice, the 792
payment shall stand as regular and punctual. 793
Failure by the Charterers to pay hire within the 794
number of days stated in Box 34 of their receiving 795
the Owners' notice as provided herein, shall entitle 796
the Owners to withdraw the Vessel from the service 797
of the Charterers and terminate the Charter without 798
further notice; 799
(ii) the Charterers fail to comply with the requirements of: 800
(1) Clause 6 (Trading Restrictions) 801
(2) Clause 13(a) (Insurance and Repairs) 802
provided that the Owners shall have the option, by 803

written notice to the Charterers, to give the 804
Charterers a specified number of days grace within 805
which to rectify the failure without prejudice to the 806
Owners' right to withdraw and terminate under this 807
Clause if the Charterers fail to comply with such 808
notice; 809
(iii) the Charterers fail to rectify any failure to comply 810
with the requirements of sub-clause 10(a)(i) 811
(Maintenance and Repairs) as soon as practically 812
possible after the Owners have requested them in 813
writing so to do and in any event so that the Vessel's 814
insurance cover is not prejudiced. 815
(b) Owners' Default 816
If the Owners shall by any act or omission be in breach 817
of their obligations under this Charter to the extent that 818
the Charterers are deprived of the use of the Vessel 819
and such breach continues for a period of fourteen (14) 820
running days after written notice thereof has been given 821
by the Charterers to the Owners, the Charterers shall 822
be entitled to terminate this Charter with immediate effect 823
by written notice to the Owners. 824
(c) Loss of Vessel 825
This Charter shall be deemed to be terminated if the 826
Vessel becomes a total loss or is declared as a 827
constructive or compromised or arranged total loss. For 828
the purpose of this sub-clause, the Vessel shall not be 829
deemed to be lost unless she has either become an 830
actual total loss or agreement has been reached with 831
her underwriters in respect of her constructive, 832
compromised or arranged total loss or if such agreement 833
with her underwriters is not reached it is adjudged by a 834
competent tribunal that a constructive loss of the Vessel 835
has occurred. 836
(d) Either party shall be entitled to terminate this 837
Charter with immediate effect by written notice to the 838
other party in the event of an order being made or 839
resolution passed for the winding up, dissolution, 840
liquidation or bankruptcy of the other party (otherwise 841
than for the purpose of reconstruction or amalgamation) 842
or if a receiver is appointed, or if it suspends payment, 843
ceases to carry on business or makes any special 844
arrangement or composition with its creditors. 845
(e) The termination of this Charter shall be without 846
prejudice to all rights accrued due between the parties 847
prior to the date of termination and to any claim that 848
either party might have. 849

29. Repossession 850
In the event of the termination of this Charter in 851
accordance with the applicable provisions of Clause 28, 852
the Owners shall have the right to repossess the Vessel 853
from the Charterers at her current or next port of call, or 854
at a port or place convenient to them without hindrance 855
or interference by the Charterers, courts or local 856
authorities. Pending physical repossession of the Vessel 857
in accordance with this Clause 29, the Charterers shall 858
hold the Vessel as gratuitous bailee only to the Owners. 859
The Owners shall arrange for an authorised represent- 860
ative to board the Vessel as soon as reasonably 861
practicable following the termination of the Charter. The 862
Vessel shall be deemed to be repossessed by the 863
Owners from the Charterers upon the boarding of the 864
Vessel by the Owners' representative. All arrangements 865
and expenses relating to the settling of wages, 866
disembarkation and repatriation of the Charterers' 867
Master, officers and crew shall be the sole responsibility 868
of the Charterers. 869

30. Dispute Resolution 870
*) (a) This Contract shall be governed by and construed 871
in accordance with English law and any dispute arising 872
out of or in connection with this Contract shall be referred 873
to arbitration in London in accordance with the Arbitration 874
Act 1996 or any statutory modification or re-enactment 875
thereof save to the extent necessary to give effect to 876



This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

GOtoSBNDoc000131

18-51277 - #101-3 File 12/17/18 Enter 12/17/18 10:13:10 Exhibit C - BIMCO Charter Agmt. between Guice and SeaTran Pg 11 of 14

## PART II
## "BARECON 2001" Standard Bareboat Charter

the provisions of this Clause. 877
The arbitration shall be conducted in accordance with 878
the London Maritime Arbitrators Association (LMAA) 879
Terms current at the time when the arbitration proceed- 880
ings are commenced. 881
The reference shall be to three arbitrators. A party 882
wishing to refer a dispute to arbitration shall appoint its 883
arbitrator and send notice of such appointment in writing 884
to the other party requiring the other party to appoint its 885
own arbitrator within 14 calendar days of that notice and 886
stating that it will appoint its arbitrator as sole arbitrator 887
unless the other party appoints its own arbitrator and 888
gives notice that it has done so within the 14 days 889
specified. If the other party does not appoint its own 890
arbitrator and give notice that it has done so within the 891
14 days specified, the party referring a dispute to 892
arbitration may, without the requirement of any further 893
prior notice to the other party, appoint its arbitrator as 894
sole arbitrator and shall advise the other party 895
accordingly. The award of a sole arbitrator shall be 896
binding on both parties as if he had been appointed by 897
agreement. 898
Nothing herein shall prevent the parties agreeing in 899
writing to vary these provisions to provide for the 900
appointment of a sole arbitrator. 901
In cases where neither the claim nor any counterclaim 902
exceeds the sum of US$50,000 (or such other sum as 903
the parties may agree) the arbitration shall be conducted 904
in accordance with the LMAA Small Claims Procedure 905
current at the time when the arbitration proceedings are 906
commenced. 907

HOUSTON, TX *) (b) This Contract shall be governed by and construed 908
in accordance with Title 9 of the United States Code 909
and the Maritime Law of the United States and any 910
dispute arising out of or in connection with this Contract 911
shall be referred to three persons at ~~New York~~ one to 912
be appointed by each of the parties hereto, and the third 913
by the two so chosen; their decision or that of any two 914
of them shall be final, and for the purposes of enforcing 915
any award, judgement may be entered on an award by 916
any court of competent jurisdiction. The proceedings 917
shall be conducted in accordance with the rules of the 918
Society of Maritime Arbitrators, Inc. 919
In cases where neither the claim nor any counterclaim 920
exceeds the sum of US$50,000 (or such other sum as 921
the parties may agree) the arbitration shall be conducted 922
in accordance with the Shortened Arbitration Procedure 923
of the Society of Maritime Arbitrators, Inc. current at 924
the time when the arbitration proceedings are commenced. 925

*) (c) This Contract shall be governed and construed 926
in accordance with the laws of the place mutually agreed 927
by the parties and any dispute arising out of or in 928
connection with this Contract shall be referred to 929
arbitration at a mutually agreed place, subject to the 930
procedures applicable there. 931

(d) Notwithstanding (a), (b) or (c) above, the parties 932
may agree at any time to refer to mediation any 933
difference and/or dispute arising out of or in connection 934
with this Contract. 935
In the case of a dispute in respect of which arbitration 936
has been commenced under (a), (b) or (c) above, the 937
following shall apply:- 938
(i) Either party may at any time and from time to time 939
elect to refer the dispute or part of the dispute to 940
mediation by service on the other party of a written 941
notice (the "Mediation Notice") calling on the other 942
party to agree to mediation. 943
(ii) The other party shall thereupon within 14 calendar 944
days of receipt of the Mediation Notice confirm that 945
they agree to mediation, in which case the parties 946
shall thereafter agree a mediator within a further 947
14 calendar days, failing which on the application 948
of either party a mediator will be appointed promptly 949
by the Arbitration Tribunal ("the Tribunal") or such 950
person as the Tribunal may designate for that 951

purpose. The mediation shall be conducted in such 952
place and in accordance with such procedure and 953
on such terms as the parties may agree or, in the 954
event of disagreement, as may be set by the 955
mediator. 956
(iii) If the other party does not agree to mediate, that 957
fact may be brought to the attention of the Tribunal 958
and may be taken into account by the Tribunal when 959
allocating the costs of the arbitration as between 960
the parties. 961
(iv) The mediation shall not affect the right of either 962
party to seek such relief or take such steps as it 963
considers necessary to protect its interest. 964
(v) Either party may advise the Tribunal that they have 965
agreed to mediation. The arbitration procedure shall 966
continue during the conduct of the mediation but 967
the Tribunal may take the mediation timetable into 968
account when setting the timetable for steps in the 969
arbitration. 970
(vi) Unless otherwise agreed or specified in the 971
mediation terms, each party shall bear its own costs 972
incurred in the mediation and the parties shall share 973
equally the mediator's costs and expenses. 974
(vii) The mediation process shall be without prejudice 975
and confidential and no information or documents 976
disclosed during it shall be revealed to the Tribunal 977
except to the extent that they are disclosable under 978
the law and procedure governing the arbitration. 979
(Note: The parties should be aware that the mediation 980
process may not necessarily interrupt time limits.) 981
(e) If Box 35 in Part I is not appropriately filled in, sub-clause 982
30(a) of this Clause shall apply. Sub-clause 30(d) shall 983
apply in all cases. 984
*) Sub-clauses 30(a), 30(b) and 30(c) are alternatives; 985
indicate alternative agreed in Box 35. 986

31. Notices 987
(a) Any notice to be given by either party to the other 988
party shall be in writing and may be sent by ~~fax, telex,~~ EMAIL 989
registered or recorded mail or by personal service. 990
(b) The address of the Parties for service of such 991
communication shall be as stated in Boxes 3 and 4 992
respectively. 993

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



GOtoSBNDoc000132

18-51277 - #101-3 File 12/17/18 Enter 12/17/18 10:13:10 Exhibit C - BIMCO Charter Agmt. between Guice and SeaTran Pg 12 of 14

Attachment "A" to be inserted at end of Cl. 22 of GO-Seatran Barecon 2001

Owner shall grant Charterer the Right of First Refusal to purchase the vessel at the same terms and conditions of any 3rd party offer to Owner, provided the 3rd party offer is accepted by Owner subject to the right of first refusal granted to Charterer.

GOtoSBNDoc000133

18-51277 - #101-3  File 12/17/18  Enter 12/17/18 10:13:10  Exhibit C - BIMCO Charter Agmt. between Guice and SeaTran Pg 13 of 14

ATTACHMENT B
FOR GO-SEATRAN BARECON 2001



SeaTran

Wire/ACH Instructions

FNBB (First National Banker's Bank)
7813 Office Park Blvd
Baton Rouge, LA 70898-0579
ABA: ███████
SWIFT: ███████

Beneficiary Bank:
Community First Bank
1101 E Admiral Doyle Drive
New Iberia, LA 70560
ABA: 065205329

Final Credit:
SeaTran Marine, LLC
Account: 1045411

Please contact Erika Verret at the below information for additional information or questions. If you should need technical assistance or have questions that pertain to the bank, please call (337) 365-6677.

Sincerely,

*Erika Verret*

Erika Verret

SeaTran Marine, LLC
107 Hwy 90 West, New Iberia, LA 70560
office (985) 631-9804 xt 7476 - fax (985) 631-0404 - everret@seatranmarine.com
www.seatranmarine.com