# UNITED STATES BANKRUPTCY COURT

## WESTERN DISTRICT OF LOUISIANA

### LAFAYETTE

| | | |
|---|---|---|
| IN RE: | * | |
| MR. STEVEN, L.L.C., | * | Case No. 18-51277 |
| DEBTOR. | * | Lafayette, Louisiana |
| | | November 27, 2018 |

* * * * * * * * * * *

**HEARING ON MOTIONS,**
**BEFORE THE HONORABLE JOHN W. KOLWE,**
**UNITED STATES BANKRPUTCY JUDGE**

<u>APPEARANCES</u>:

For the Debtor:                Heller, Draper, Patrick,
 Horn & Manthey, LLC
BY:  DOUGLAS S. DRAPER, ESQ.
650 Poydras Street
Suite 2500
New Orleans, Louisiana 70130

For Steven Miguez and        Lugenbuhl, Wheaton, Peck,
Seatran Marine, LLC:         Rankin & Hubbard
BY:  STEWART F. PECK, ESQ.
601 Poydras Street
Suite 2775
New Orleans, Louisiana 70130

For SBN V FNBC LLC:           Carver Darden
BY:  DAVID F. WAGUESPACK, ESQ.
BY:  PETER J. SEGRIST, ESQ.
1100 Poydras Street
Suite 3100
New Orleans, Louisiana 70163

APPEARANCES (CONT'D.):


For SpaceX:                 Phelps Dunbar, LLP
                           BY:  RICHARD MONTAGUE, ESQ.
                           Post Office Box 16114
                           Jackson, Mississippi 39236

For Guice Offshore, LLC:    Ottinger Hebert, LLC
                           BY:  WILLIAM KAUFMAN, ESQ.
                           1313 West Pinhook Road
                           Post Office Drawer 52606
                           Lafayette, Louisiana 70505


For U.S. Trustee:           Office of U.S. Trustee
                           BY:  GAIL B. McCULLOCH, ESQ.
                           300 Fannin Street
                           Suite 3196
                           Shreveport, Louisiana 71101

Court Audio Operator:       Tonya M. Griffith, E.C.R.O.

TRANSCRIPTIONIST:           Sherryl Robinson
                           3704 Chadwood Drive
                           Harvey, Louisiana 70058
                           (504) 348-3704

Proceedings recorded by electronic sound recording, transcript

produced by transcription service.

1                    **P R O C E E D I N G S**

2                   (Tuesday, November 27, 2018)

3                      (Court is in Session)

4                    *    *    *    *    *

5          **APPLICATION TO EMPLOY ROBIN B. CHEATHAM AND**

6              **THE LAW FIRM OF ADAMS AND REESE,**

7                 **MOTION FOR 2004 EXAMINATION.**

8                    *    *    *    *    *

9          THE COURT:  You may proceed.

10         THE CLERK:  Case Number 18-51277, *Mr. Steven, L.L.C.*

11  This is the Application to Employ Robin Cheatham and the Law

12  Firm of Adams and Reese and Motion for 2004 Exam.

13         May I have appearances?

14         MR. PECK:  May it please the Court, Your Honor,

15  Stewart Peck for Steven Miguez and Seatran Marine.

16         MR. DRAPER:  Douglas Draper.  We haven't filed our

17  application yet.  I will be the replacement counsel for

18  Mr. Cheatham and putative counsel for the other Debtors that

19  are --

20         THE COURT:  Right, for all of the new cases that

21  are either involved or are coming.

22         MR. DRAPER:  The fleets, yes.

23         THE COURT:  Right.

24         MR. WAGUESPACK:  Good morning Your Honor, David

25  Waguespack with Peter Segrist for SBN V FNBC, LLC, which I

1  will refer to as SBN.

2  THE COURT:  Okay.  Very good, thank you.

3  MR. WAGUESPACK:  Thank you Your Honor.

4  THE COURT:  Okay.

5  MR. WAGUESPACK:  Your Honor, SBN filed the Motion

6  for 2004 Exam in this case, which I'll say it's a simple case,

7  yet a strange case.

8  THE COURT:  Before we get going, let me find out --

9  MR. MONTAGUE:  We still have appearances.

10  MR. WAGUESPACK:  Oh, I'm sorry.

11  THE COURT:  We've got one more appearance.

12  MR. WAGUESPACK:  I thought everybody had --

13  THE COURT:  And also, I need to let -- I haven't

14  signed an order on it, but I also had a Motion to Continue

15  the 2004 exam, correct?

16  MR. MONTAGUE:  Yes.

17  MR. KAUFMAN:  Yes.

18  MR. MONTAGUE:  We still have two appearances, Your

19  Honor.

20  THE COURT:  And I'm, going to deem that issue

21  before me also.

22  MR. WAGUESPACK:  Okay.

23  THE COURT:  The continuance -- the Motion to

24  Continue, given the factors that have arisen in this case.

25  Well, let me get -- let's get everybody on the

```
 1   record before you start arguing.

 2              MR. WAGUESPACK:  Okay.

 3              MR. MONTAGUE:  Your Honor, Richard Montague from

 4   the Jackson, Mississippi office of Phelps Dunbar.  I have a

 5   Pro Hac Vice motion pending, and I am here representing

 6   SpaceX.

 7              THE COURT:  Thank you.

 8              MR. KAUFMAN:  Your Honor, William Kaufman on behalf

 9   of Guice Offshore.

10              THE COURT:  Okay.

11              MS. McCULLOCH:  Gail McCulloch for the U.S.

12   Trustee.

13              THE COURT:  Okay.  So, should we take up first the

14   Motion to Continue?

15              MR. DRAPER:  Your Honor, Douglas Draper on behalf

16   of what I'll refer to is the fleet.

17              I filed a Motion to Continue.  I'm not objecting

18   that there shouldn't be a 2004 exam.  My whole issue is when

19   it takes place.  I haven't filed the schedules for the other

20   cases.  I've looked at the Mr. Steven's schedules and I think

21   those need to be amended.  I think from a very real point of

22   view, from just my understanding of the cases; getting the

23   schedules in and then taking the 2004 exam of my clients is

24   the proper way to go forward with.  It's the most

25   expeditious.  I'm prepared, the schedules are there for people
```

1    to look at without me guessing as to what is going on in the

2    case.

3          And all I'm really talking about is I'm not saying

4    no 2004 exam, it's a question of when.  And that's --

5          THE COURT:  So --

6          MR. DRAPER:  That's really the --

7          THE COURT:  What we could actually do today, if

8    nothing else, is establish a date.  I don't know when you're

9    going to have all of your schedules in, but we can schedule

10   some time period if we're going to do this for after all of

11   the schedules get filed in all the related cases, and --

12         MR. WAGUESPACK:  Your Honor, I think there is some

13   urgency with respect to the Mr. Steven's and I will address

14   that if it's okay, in the Motion for 2004.

15         In short, we have been after this information well

16   before the petition date.  And it's information that's

17   directly related to a vessel which we see no contractual link

18   despite many requests and pre-petition subpoenas between the

19   Debtor and the end user of the vessel.

20         The one document that we have is a charter agreement

21   between a non-Debtor entity that is controlled by Mr. Miguez,

22   who owns the Debtor and --

23         THE COURT:  And so, it's not long if these are

24   coming in, right?

25         MR. WAGUESPACK:  It's not one of the entities

1  that's coming in to bankruptcy.  And an entity called Guice

2  Offshore, who is represented by counsel who we do not think

3  is related to Mr. Miguez, who I believe has some sort of

4  charter agreement with SpaceX, who is also here today.

5         Our concern in a nutshell is this contractual gap

6  which has been a mystery despite many requests between the

7  Debtor and the end user, and why the Debtor doesn't have the

8  money, and my client who tried to get the money from the use

9  of the vessel before the petition; what has happened to the

10  vessel.  The charter agreement that we do have expired on

11  October 15th, 2018, so we don't know what's going on with the

12  vessel.

13         And this is also a case where literally the day

14  they filed bankruptcy, there's two different dates in the

15  schedules, but the schedules reflect that on the date they

16  filed bankruptcy, and then on September 20th, this Debtor

17  transferred $2.7 million to another related entity.

18         And so, we're very concerned, first with just the

19  number of delays, both pre-petition and post-petition with us

20  getting basic information in what seems like a simple case,

21  but a case where we think that basic information about our

22  collateral, we're concerned about the movement of funds

23  between these related entities and --

24         THE COURT:  And again, none of these related

25  entities are the ones that Mr. Draper is now representing?

1          MR. DRAPER: Your Honor, this --

2          MR. WAGUESPACK: Correct. The --

3          THE COURT: Wait, let me let him finish. I'm going

4 to give you a chance.

5          MR. DRAPER: Okay.

6          MR. WAGUESPACK: According to the schedules, Iberia

7 Marine was the recipient of $2.7 million. It is an obligor

8 on our note, but it is not one of the entities that's filed

9 bankruptcy.

10          The other non-Debtor related entity is Seatran,

11 which is, we believe, is controlled by Mr. Miguez. It has

12 the charter agreement with Guice Offshore, who then has a

13 charter agreement with SpaceX, but we're missing the link

14 between the Debtor who owns the vessel, our collateral that

15 we have a mortgage on, and whatever related entities.

16          And it seems as though -- I mean this is a case

17 frankly that's strange in the sense that the Debtor had $2.7

18 million right before filing. It hasn't paid us since

19 September of 2017. It hasn't paid anything. We offered a

20 forbearance. They just chose to file bankruptcy. It's a case

21 where there has been no effort to pay us, despite having the

22 money.

23          It's a case where Guice Offshore is collecting the

24 money that they owe for the charter of the vessel in their

25 attorney's account, because when we demanded that money

1  pursuant to our mortgage and the UCC account debtor rules;

2  they got a letter from the same attorney that was representing

3  the Debtor saying:  These other related entities have an

4  interest in these funds and you can't disburse it.

5          THE COURT:  Uh-huh.

6          MR. WAGUESPACK:  So, to just stay that issue, they

7  just held the money.  So, the Debtor is getting no money for

8  the use of its vessel.  My client hasn't received a penny,

9  and they haven't made any payments on the debt since July of

10  2017.  It's a vessel, okay, so it's moving around.

11          We want some basic information.  We've tried to get

12  it for a very long time.  It always seems like there's some

13  other reason --

14          THE COURT:  All right.

15          MR. WAGUESPACK:  -- why they can't give it to us.

16          THE COURT:  Let me hear from Mr. Draper.

17          MR. DRAPER:  Your Honor, two -- a few things.

18  Number one:  There is a matter before the Court that

19  Mr. Cheatham filed that's up, I think, now for December 18th.

20  Any discovery in connection with that and Mr. Waguespack's

21  claim for the money, quite frankly, has to be done -- can't

22  be done in a 2004 examination.  It has to be done in

23  discovery with respect to the issues between Mr. Peck's client

24  and what happens and how that is.  And Mr. Peck will address

25  that.

1          In connection with the $2 million-seven that

2 Mr. Waguespack is talking about.  Ms. McCulloch, who does an

3 excellent job and I think is probably the best U.S. Trustee on

4 earth --

5      (Laughter.)

6          -- raised that question with me.  And what I had

7 the client do is pull up the checks.  And Mr. Waguespack, what

8 you'll see is on -- they swapped checks.  What happened is

9 they cleared out the account.

10          Iberia Marine wrote a check to Mr. Steven giving

11 him its money, and then Mr. Steven wrote a check back to

12 Iberia Marine, in order to take care of the due to's and due

13 from's between the entities.  There's not $2.7 million going

14 out from this Debtor.  There's two checks that went back and

15 forth.

16          And Mr. Waguespack now has that information, it has

17 been dealt with.  There is no preference that took place.

18 There's a contemporaneous exchange on the same day.

19          I will make -- this money is not going anywhere.

20 The boat is not going anywhere, let's do this.  I just came

21 in, Mr. Waguespack, and I need to understand what's going on.

22 I know the Mr. Steven schedules have to be amended.  They'll

23 have an opportunity to ask some questions upstairs at the 341

24 to the extent they're proper for a 341.

25          And you have a contested matter set for December

1    18th.  We have discovery with respect to Mr. Waguespack.

2    Quite frankly, his client -- not his client, the bank that's

3    set this thing that he borrowed the loans from knew exactly

4    what was going on, how it was going on and how these entities

5    were set up.

6              And Mr. Waguespack has either not looked at it,

7    they don't have it, or they've chosen to ignore it.  But we

8    will be sending him discovery so that we can address those

9    issues.  You have a heavily contested matter with respect to

10   the two issues he's talking about.

11             And I'll let Mr. Peck address that, off.

12             THE COURT:  Mr. Peck.

13             MR. PECK:  Your Honor, Stewart Peck for Seatran and

14   Miguez.  We don't have a problem with discovery here.  We have

15   a problem with 2004 here.  And the problem they have here is

16   the money belongs to Seatran.  Seatran's has the charter with

17   Guice Offshore.  That money is being held up.

18             They subpoenaed this.  They subpoenaed Guice

19   Offshore.  This confidential information about the charter

20   rate and all got to the press.  We have a real problem.  We

21   didn't protective order this case.  SpaceX has filed for a

22   protective order.  We need protections here on confidential

23   business information that our competitors can hold up, that

24   are really harmless, okay?

25             We have a contested matter on the 18th.  On a

1  contested matter discovery happens on a contested matter, not

2  through a 2004.  A 2004 is improper here.  In fact, we're

3  going to give them the information and they're going to find

4  out what they should have known, because they bought this

5  loan for the bank.  The bank knew all along what the

6  structure is.  And the structure is they have no rights to

7  this money.

8       Now, whether they want to file a motion for added

9  protection or whatever, that's another matter, but --

10      THE COURT:  Well, I hear what you're saying but I

11 mean, that's part of the issue I guess.  I'm not certain

12 what's coming up before me on the 18th.

13      MR. PECK:  The 18th is who has a right to that

14 money, that --

15      MR. DRAPER:  Mr. Cheatham filed a motion that was

16 set for today, I think, that the Court continued on its own

17 to determine whether that was property of the estate.

18      THE COURT:  That's --

19      MR. WAGUESPACK:  That's the contested matter that

20 we were talking about.

21      MR. DRAPER:  That's the contested matter.

22      MR. WAGUESPACK:  We're sorry, Judge.

23      THE COURT:  That is right, because I -- that's

24 right, because I do recall briefly reviewing that, and that

25 was one of the issues that we had at the telephone conference,

1  I guess we discussed that.

2          And so, I guess my question, Mr. Waguespack, I mean

3  it sounds like what we're talking about really are issues

4  related to, you know, to your 2004.  I mean it sounds like

5  it's more of an issue related to, you know, your client's

6  ability to collect their debt, as opposed to just broad 2004

7  issues or not.

8          MR. WAGUESPACK:  Well Your Honor, you can look at

9  the -- well, a couple of things.  One is we've drifted beyond

10  the motion to expedite into the merits, and I do --

11          THE COURT:  No, I understand.

12          MR. WAGUESPACK:  -- I do want to -- if you're going

13  to address the merits with that --

14          THE COURT:  Well --

15          MR. WAGUESPACK:  -- I certainly want you to.  I do

16  want to go carefully.  There's certain statements that have

17  been made today on the record that didn't appear in any of the

18  pleadings, things about oral -- things that I assume are oral,

19  because they're not in any of the bank documents about the

20  bank not having the right to the proceeds from their mortgaged

21  vessel; that's just beyond me.

22          THE COURT:  But that's --

23          MR. WAGUESPACK:  But if that's the case --

24          THE COURT:  But those are really issues that I've

25  got to decide though at a later --

1          MR. WAGUESPACK:  Well --

2          MR. DRAPER:  Right.

3          THE COURT:  -- date.

4          MR. DRAPER:  That's correct.

5          MR. WAGUESPACK:  Agreed.  But Your Honor, this

6    motion for 2004 was filed well before this turnover motion

7    that was filed by the Debtor.  This has been pending for some

8    time, and it is to the core of the case.  This is the Debtor's

9    single asset, and simply what is the contractual rate between

10   the Debtor and its vessel?  And so why the resistance?

11         And the other questions in areas that we've sought

12   documentations; they're there.  It's typical 2004 stuff,

13   financial statements, appraisals, and so forth.

14         The objections that are being made today are not

15   objections that were contained -- well, not all of them, some

16   of them are -- that were contained in the pleadings.  And I'd

17   like to address the objections that were contained in the

18   pleadings; and then if you hear all of this and you decide to

19   continue it, that's fine.  But I think it's important to

20   address the specific objections that were made to the 2004,

21   because they're fairly narrow.  And then we can go from

22   there.

23         THE COURT:  That's fine.  I mean, honestly, before

24   we go there, I mean I saw some utility to continuing the 2004

25   exam to a point here Mr. Draper could get up to speed.  I

1   mean I don't know where Mr. Draper was in this process.  I

2   know it has a -- and just for the record I signed the order

3   allowing Mr. Cheatham to withdraw and I knew just -- I knew

4   that Mr. Draper or someone was going to be coming in for

5   Mr. Cheatham in this case.  So I've got all of that.

6           But to allow him to get up to speed in this case as

7   well as in all the other cases that seem to be related cases

8   to the Mr. Steven, and maybe they don't have any intercompany

9   relationships like I was initially thinking on your issue,

10  because I wasn't certain.  So, I see some utility to

11  continuing the 2004 exam to -- I mean, I'm not hearing they

12  don't want to do the 2004 exam, but I --

13          And I hear what -- but then I doubt this money is

14  going anywhere, from the representations that are being made.

15          MR. PECK:  And Your Honor, we just got the case

16  too.

17          MR. WAGUESPACK:  Well, Your Honor --

18          MR. PECK:  We just got appointed into the case last

19  week.  We're new to the case and so we're getting our arms

20  also around it also.  We've looked at enough stuff that we're

21  comfortable about going forward.

22          But this is an important issue.  And what's really

23  important is the need for a protective order and

24  confidentiality in all of this.

25          THE COURT:  This goes to the merits though, right,

1  about -- that you want to address?

2           MR. WAGUESPACK:  That's right Your Honor.  And about

3  the delay, look, we've unfortunately had to file the objection

4  to Mr. Cheatham's employment application, but that was a long

5  time ago.

6           He didn't withdraw until very recently.  Now, I

7  don't know when Mr. Draper became involved in the case.  He

8  still hasn't filed a motion to enroll.  I'd like to have him

9  represent to the court when he became involved in the case, if

10  that's his reason for delay, because Mr. Cheatham, I believe,

11  knew about these conflicts a long time ago.  And I thought

12  they were very obvious and required him to withdraw much

13  sooner than now.

14          And Your Honor, keep in mind that if you read our

15  opposition of the other motions to continue; this is on the

16  heels of some very artful pre-petition delay maneuvers which,

17  you know, included the Adams and Reese firm signing on as co-

18  counsel, Mr. Miguez's son, as an attorney who was in the

19  State Legislature and knew some statute to get a delay of the

20  pre-petition simple suit on a guarantee for months and

21  months.

22          That pre-petition suit on the simple guarantee was

23  filed in January.  We finally had a motion for summary

24  judgment on December 5th, simple suit on the guarantee.  And

25  Mr. Peck removed it to federal court to blow up our hearing

1  on the motion for summary judgment.

2      So, it's a long pattern of delay.  We're here now,

3  this case has been filed on October 3rd.  We don't know where

4  and contractually how our boat ended up in the hands of

5  SpaceX.  We don't know if it's insured, don't know what it's

6  worth.  It's really a two -- if you look at the schedules,

7  there's no other creditors.  It's us.  And there's one

8  insider creditor.

9      The checks that he just handed me today; all I know

10  is the schedules show $2.7 million going out on the day of

11  the bankruptcy.  So I don't -- you know, I don't know what

12  this is.  I don't know what they're doing.  We have a lot of

13  questions and we want the documents.  They've known about

14  this document request and the request for a 2004.

15      The Debtor, who has counsel, Mr. Miguez's son who

16  enrolled in the state court case, so they've known about

17  this. Pulling these documents up would have -- hoped would

18  have started a long time ago, because they only objected to

19  very -- a couple or three specific requests on the basis of

20  confidentiality.  That was it.  That was the Debtor's

21  objection, which was filed and -- and I thought you were, you

22  know, you continued it at their request once.

23      But here we are asking for another continuance to

24  get us just the most basic information that a creditor is

25  entitled to, that frankly, we shouldn't even have to file a

1  motion for 2004.  It's unfortunate that we have to file a

2  motion for 2004 to get things that they are contractually

3  obligated to provide like financial statements and why has

4  this person got your boat?  And why haven't you paid us our

5  -- nothing, and you have all of this money in your account,

6  yet you haven't paid us since July of 2017?

7        I mean you know, this isn't complicated stuff.

8  This is a simple case with strange facts with a Debtor who,

9  for whatever reason, doesn't want to pay anything or work out

10  anything, and yet has some mysterious contract with somebody

11  where the boat ends up in the hands of SpaceX, and now I'm

12  here today with my clients coming in, Your Honor, and we've

13  got a couple of objections based on confidentiality, I'd like

14  to address those.

15        And that's it.  I mean the objections don't raise

16  very many issues.  Let's get them resolved and then, you know,

17  we'll try to schedule the deposition and the document

18  production in a way that is convenient.

19        THE COURT:  All right.  Let me hear -- let me hear

20  you on the -- it's what the objections were filed by,

21  Mr. Peck.

22        MR. PECK:  Yeah, they were filed by me, Your Honor.

23  And you know, I just came in this case, and this history

24  about what happened to the non-Debtor; how many times have I

25  heard secured creditors aren't represented Debtors?  This

1  complaint how, you know, that's the whole process is to give

2  time.

3        There's more than just one -- just one vessel

4  company.  Seven others went in, so it's much more complex

5  than Mr. Waguespack makes -- leads on, Your Honor.

6        And we're willing to --

7        THE COURT:  Well, we are dealing here with just the

8  Mr. Steven, right?

9        MR. PECK:  We are dealing with Mr. Steven here, but

10  there -- but he wanted discovery on all of the other companies

11  and all of the other transactions, so it's far more than a one

12  boat deal, Your Honor.  And we -- I represent Seatran, that

13  operates all of the vessels and other non-Debtor, non-Miguez

14  vessels.  There's more involved in here.  It's a company that

15  has other ownership.  It's not controlled by Mr. Miguez as

16  representative.  There are other owners that have nothing to

17  do with these cases, Your Honor.

18        And so, we're willing to go forward with the 2004.

19  We raised specific objections.  You can't use it to build

20  with a pending state action we removed.  That's not allowed to

21  do, to do discovery against Mr. Miguez, guarantee and all.

22  He can't use that for collecting of his debt, and we also

23  have the confidentiality.

24        This was pretty -- we didn't say, "Don't take the

25  2004, but we just want it -- we want it within certain

1   restrictions of it as a true 2004, not to go on a fishing

2   expedition against a non-debtor to collect its debt for a

3   pending proceeding."

4          And also, on very extremely confidential

5   information, where you have other parties coming in here very

6   upset about this information getting out, and some of it has

7   already got out to the press.  The press wrote some articles

8   about this company.  So this is much more than some simple

9   Mr. Waguespack, one bet Debtor, one debt, that's it.

10          It's much more complicated, Your Honor.  If there's

11  a conflict of structures, there are a lot of conflicts that

12  Mr. Draper and I have to work through.  I can't help it that

13  we just got in a week or two ago, two weeks ago.  We're

14  getting our arms around it   I worked with Mr. Waguespack in

15  the past.  He knows we'll work with him, but I have to

16  protect my clients here.  It's much more complicated than he

17  lets on, Your Honor.

18          THE COURT:  Okay.

19          MR. WAGUESPACK:  Your Honor, if I could just

20  address the specific objections it may be quicker than --

21          THE COURT:  All right.

22          MR. WAGUESPACK:  If you still want to continue it

23  after I address them, then --

24          THE COURT:  Let me just hear everything --

25          MR. WAGUESPACK:  Okay.

```
 1              THE COURT:  And then I'm going to decide what I'm
 2   going to do.
 3              MR. WAGUESPACK:  Okay.  Thank you, Your Honor.
 4              THE COURT:  All right.
 5              MR. WAGUESPACK:  So Your Honor, you've heard some
 6   of my background, but I want to put it in picture for you.
 7   The reason I said this case was a simple case, yet a strange
 8   case is with respect to simple, it truly is a case with one
 9   creditor, if you look at the schedules, that's not an
10   insider, that's us.  There's one other insider creditor.
11              We're owed north of $23 million.  We have a
12   mortgage on the only asset they have --
13              THE COURT:  Now, you're talking about --
14              MR. WAGUESPACK:  -- which is a vessel.
15              THE COURT:  -- only Mr. Steven?
16              MR. WAGUESPACK:  The --
17              THE COURT:  Only one creditor as to Mr. Steven?
18              MR. WAGUESPACK:  Yes, as to Mr. Steven's.  That's
19   the only case that's before you right now.
20              THE COURT:  That's correct.
21              MR. WAGUESPACK:  That's today.
22              THE COURT:  I just want to make sure that we're not
23   ballooning this into all of the other cases.
24              MR. WAGUESPACK:  That's correct, Your Honor.
25              As I said, there was no effort to pay.  The last
```

1  payment, July of 2017, no requests for forbearance.  My

2  forbearance offer was refused.  The pre-petition subpoenas

3  resulted in the Guice-Seatran charter agreement being

4  produced, and that was produced without any confidentiality

5  on notice to the Debtors who didn't object.  And that document

6  showed that the charter agreement expired on October 15th,

7  2018.

8            Our efforts to obtain the agreement between the

9  Debtor, the owner of the vessel and the end user were for

10  naught, despite many requests.

11            So, the key and a big question is:  What is -- what

12  does the Debtor have?  It owns a vessel, but it's not

13  receiving the income.  And we've talked before about the $2.7

14  million that the schedules show were transferred right out

15  before the case was filed.

16            Your Honor, the information if you look at it in

17  our 2004, it's the information you would expect to see in a

18  request for 2004.  The Debtor's objection objected to three

19  requests based on confidentiality, and that's all.

20            One was Request Number 4, which asked for the

21  charter agreements, the broker agreements and the management

22  agreements relating to the vessel.

23            Request Number 8, documents relating to the

24  Debtor's ownership interest and any of the Debtor's related

25  entities.

1          And Request Number 10, the financial statements,

2    income statements, and statements of cash flows for the

3    Debtor and those entities in which the Debtor has an

4    ownership interest.  That's Request Number 10.

5          The objection, the only objection, was based on

6    confidentiality.  With respect to the charter agreements they

7    say that the charter rates are closely guarded business

8    secrets.

9          With respect to the agreements with related

10   companies, they call those agreements proprietary.

11         And with respect to the financial statements, they

12   just say that those financial statements should be protected

13   from discovery.

14         The Debtor, under the very cases that they cited in

15   their opposition has the burden to demonstrate to this Court

16   why specific information is sensitive or proprietary.  That's

17   their burden of proof.

18         With respect to the charter agreements, that

19   document, the charter agreement between Seatran and Guice was

20   produced without objection prior to the filing.

21         What we're missing are the links.  There's no

22   authority anywhere that says that public pricing or pricing

23   through a third party is confidential.  The case they cite,

24   the Barney's (phonetic) case is related to pricing formula,

25   how the debtor arrives at pricing, the internal calculations,

1   not the pricing based on the amounts that it receives from

2   third parties.  That can't be confidential in a bankruptcy

3   case, Your Honor.  So, it's going to be required in a plan

4   and in the monthly operating reports, what the Debtor

5   receives for its vessel.

6          Secondly --

7          THE COURT:  So you're not asking them -- you're

8   just asking them to provide the documentation on what they

9   received and not how they arrived at the pricing?

10          MR. WAGUESPACK:  I'm not at this point asking for

11   how they arrived at pricing.  I'm asking for the agreements

12   relating to the vessel that shows what's being obtained for

13   the vessel.

14          Secondly, Your Honor, contractual agreements and

15   contracts with related entities; how can those be proprietary?

16   There's no explanation in the opposition as to why those are

17   proprietary, and there's certainly no authority for financial

18   statements being protected from discovery in a bankruptcy

19   case.  I can't imagine such a thing.

20          In fact, they're required to file with their monthly

21   operating reports, financial statements.  It's going to be

22   required for a plan.  How can financial statements be

23   proprietary?

24          Your Honor, I think when you look at that

25   opposition and what they're claiming and just read it, I

1    don't see how you can read that and say:  This was just filed

2    at the latest thing.  I mean this is not -- these aren't real

3    arguments.

4         The case that they cite, the Anthracite (phonetic)

5    case, in their own brief says:  Inherent -- and they're

6    seeking protection under 107(b) -- Inherent in the language

7    of 107(b) is a requirement that the party requesting the

8    extraordinary relief provide the Court with specific factual

9    and legal authority demonstrating that a particular document

10   at issue is properly classified as confidential.  That's just

11   not here.

12        So, let me address next, that's the Debtor's

13   objection.  The Miguez and Seatran objection repeats the

14   confidentiality objection.  And you heard Mr. Peck talk about

15   some document that we -- I think he's talking about the

16   charter agreement that was produced by Guice getting into the

17   media.  I don't know how or what he's talking about, but that

18   document was produced prior to the filing, so it's out.  It's

19   not public.  I mean it's already public.

20        And that was produced to us without a protective

21   order.  There is no protective order with respect to that

22   document that I'm aware of.

23        Your Honor, the other argument that they're making

24   is that -- and this is the only other argument in their

25   objection that was filed -- is that Rule 2004 is being used

1   as a pretext for discovery in the suit that we have against

2   Mr. Miguez on his guarantee.

3           That was the suit that Mr. Peck removed from state

4   court to federal district court in the Eastern District of

5   Louisiana just before our motion for summary judgment.  We

6   now have rescheduled that motion for summary judgment in

7   federal court.

8           Your Honor, I filed the motion for summary

9   judgment.  I don't need any discovery, okay?  It's a suit on

10  a guarantee.  It's about as simple a suit as can be.  There

11  was -- and I've looked at their affirmative defenses and none

12  of them made any sense or raised a real defense.  So, I don't

13  need discovery in that case.  That's not what this is about.

14  So, that's that.

15          The SpaceX objection which I talked to Mr. Montague

16  yesterday and assured him -- I think his concern is that they

17  have proprietary information, whatever they do, on the boat

18  itself and he was concerned we wanted to get an inspection

19  of the boat.  And I told him that's not what this 2004 aims

20  to do.  If' he's got any specific documents -- we didn't

21  issue discovery to SpaceX, but if he's got any documents in

22  the hands of the Debtor or the related entities that have

23  their confidential information, to let me know what specific

24  documents those are, and we would try to address that.

25          But I don't -- we don't -- we're not looking to get

1  on the boat and take pictures of SpaceX's proprietary

2  information.  At some point we may need to get access to the

3  vessels, but we don't need that now.  That's not part of this

4  2004.

5          Your Honor, this -- and I'll just tell you, it's a

6  case that's -- it is a strange case.  It's not complicated,

7  but it's strange in the sense that there's just a terrible

8  reluctance to tell the creditor, who you owe $23 million to,

9  what's going on, just basic information about what's going

10  on.  And we're entitled to that, and we're entitled to it

11  sooner than later, particularly with an asset like this boat

12  that's being used offshore to collect things that fall from

13  the sky in a big net.  If you go online, you'll actually see

14  it.  That's our collateral.  That's how we expect to get

15  repaid.

16          Thank you Your Honor.

17          THE COURT:  Thank you Mr. Waguespack.

18          MR. DRAPER:  Your Honor, let me address what's

19  going on with this.  I am new to this.  And let's sort of

20  address what's going on.

21          I came in, two days later Mr. Waguespack seized the

22  LADY EVE.  On a Friday, basically I had to put together the

23  bankruptcy very quickly.  Unfortunately, that became a fire

24  drill to get the U.S. Marshal off the vessel.

25          In addition at that time Mr. Waguespack advised me

1 that:  Look, you know, you better put the other boats in,

2 otherwise we're going to start seizing other boats.

3          So, we have been, since my firm has been involved in

4 this on a fire drill to get the other companies in, I've

5 looked at the schedules for the Mr. Steven.  I can tell you

6 there is more than one creditor.  The schedules are not

7 correct in that regard.  And quite frankly, I don't know what

8 happened beforehand, and what the relationship was with

9 Mr. Cheatham or who did what and when; all I'm asking for --

10 and I again, I have no objection for a 2004 examination for

11 issues that a 2004 examination issues.

12          I have no objection to giving him documentation for

13 legitimate discovery requests in connection with a contested

14 matter that's coming up.  It's just a matter of let me see

15 the documents first, before I go to a 2004 examination this

16 afternoon.  And that's just unfair.  And what Mr. Cheatham

17 knew or what happened before, or what he tried to get from --

18 is irrelevant to this bankruptcy.

19          Quite frankly, we only have a few cases here, but I

20 gather most cases that come before you -- as a matter of fact,

21 I would guess 100 percent of the cases that come before you

22 involve people who haven't paid their creditors.

23          And so the aghast that they haven't, or somebody

24 has turned down what was a proposal that may have been

25 reasonable, may have not, I don't know.  But again, this is

1  -- he's right.  This is not complex in terms of what we do

2  on a daily basis.  But there's a due diligence that I have to

3  do.  There's a -- again, I just don't know enough.  I'm more

4  than willing to do this on some sort of expedited basis to

5  get him what's 2004 legitimate information, also get him what

6  is --

7          THE COURT:  You need it for the --

8          MR. WAGUESPACK:  -- legitimate information for a

9  contested matter --

10         THE COURT:  -- contested matter.

11         MR. WAGUESPACK:  And quite frankly, I have

12  discovery to go to Mr. Waguespack as it is mentioned that we

13  didn't see it in the bank log.  I want to know what's in the

14  bank log, because I can tell you FNBC knew how these things

15  were structured and has known since 2014.

16         And so, if he's going to get up here and say we

17  didn't know, I want to see what they looked at and who looked

18  at it.  And because I think that there are big issues.  I am

19  willing to do discovery on an expedited basis.  I'm not

20  willing to do discovery when I know very little.  And that's

21  all that I'm really saying to the Court.

22         MR. PECK:  Your Honor, I know people are here, but

23  just one last thing.  We're willing to do discovery, but

24  we're not saying not to.

25         But I don't understand the reluctance to get a

1 protective order.  This is important confidential -- we -- I

2 don't know what we talked about, but what the Debtor cited in

3 the brief, we cited 107.  We cited Barney's.  We cited a lot

4 of cases, and we have a right to get a -- we think with this

5 type of confidential information, we can get a protective

6 order, okay?

7          I mean there's more -- I think with examination you

8 get into all sorts of things about pricing or not -- just not

9 the price, but the words behind it.  I've got to protect that,

10 Your Honor.

11          I don't see a reason why we shouldn't get a

12 protective order?

13          THE COURT:  Thank you Mr. Peck.

14          MR. MONTAGUE:  Your Honor, very quickly on behalf

15 of SpaceX.

16          I don't sense that there's much controversy over

17 protecting the confidential information of SpaceX.  I don't

18 think we have any financial information to contribute.  I

19 just want to make sure that any order that is entered

20 approving a 2004 examination contains language that provides

21 for a protocol so that we can review documents to make sure

22 that the documents don't have the protective information --

23 protected information or privileged information in them.

24          Because our confidential information is not just

25 limited to what's on the boat.  There could be documentation,

1  computer code, various other things that could be proprietary

2  and trade secrets that need to be protected.

3         But otherwise, we don't oppose the 2004 examination

4  going forward.

5         THE COURT:  Thank you.

6         MR. MONTAGUE:  And I would encourage you to look at

7  the internet to see the picture of this vessel.  It's very

8  interesting.

9         THE COURT:  Okay.

10        MR. KAUFMAN:  Your Honor, William Kaufman on behalf

11  of Guice Offshore.

12        THE COURT:  Uh-huh.

13        MR. KAUFMAN:  We just echo and adopt those comments

14  and requests regarding the ability to I guess review and

15  ensure that the appropriate information that needs to be

16  protected is protected.

17        THE COURT:  All right.

18        MR. WAGUESPACK:  Your Honor?

19        THE COURT:  Mr. Waguespack?

20        MR. WAGUESPACK:  Your Honor, just a brief reply.

21        Again, there has been no identification of what

22  information they consider confidential, other than pricing,

23  which I've addressed.

24        So, in order to get a protective order, you know,

25  and they're used -- look, I've been in cases where protective

1  orders are used to obstruct and delay, because you know,

2  you've got to file a motion to file things under seal and

3  then the provisions that were requested ask for you not to be

4  able to use it in any related proceeding.  It gets -- I need

5  to understand, and they've failed to articulate what's

6  confidential.

7       Now, SpaceX and their stuff, I get that.  But as

8  far as this Debtor and the related entities and the contracts

9  they have for the boat, which is you know, what's

10  confidential?  There's nothing confidential about that.  It

11  should be opened up, the light of day should shine in so that

12  we -- and if there are other creditors that aren't listed in

13  the schedules, so that the light of day and all of the

14  creditors can see what's going on.

15       I think protective orders in bankruptcy cases are

16  -- should be hesitantly entered, and I think when you look at

17  the cases, including the ones that they cite, they provide

18  that and they require a showing.  Identify what it is that

19  you think is confidential and establish why and how it should

20  be protected.  And that has just not been done.

21       THE COURT:  Well, isn't one of the issues there,

22  and I know that Mr. Cheatham has been in this case, but he's

23  not anymore; but isn't one of the issues I've got a lot of

24  new lawyers here, that still need time to go and identify and

25  see if there is in fact confidential?  I mean, isn't that one

1    of the issues that we're dealing with here?

2            I hear what you're saying.  You haven't made a

3    showing, but I've got lawyers who have gotten involved I

4    don't know how recently, but let's say within the last month.

5    Then if Mr. Draper is telling me and Mr. Peck are telling me

6    -- Mr. Peck is telling me real strongly that he thinks he's

7    got confidential information at issue here.  He hasn't

8    identified it, but he's also telling me he's just gotten

9    involved in the case.

10           I mean, I guess that's the issue I'm having now,

11   Mr. Waguespack, is that I've got new lawyers in the case, new

12   issues, but I don't think anyone is arguing you're not

13   entitled to your 2004 exam, it's just a matter of timing and

14   then dealing with the objections on the confidentiality.

15           Because I mean I don't -- the only issues I see

16   that are relevant objections is if there are confidential

17   issues.  You're telling me there's not.  Mr. Peck is telling

18   me that there is.  And I understand and we're find on

19   SpaceX's issues.  And I'm assuming we're fine on Guice, based

20   on Mr. Kaufman's --

21           MR. WAGUESPACK:  Yeah.  I'm not sure -- again,

22   there has been no identification of those issues.  If -- to

23   try to resolve this, Your Honor, you know, I'm relying on

24   what the Debtor objected to and what they put in their

25   objection.  It's new counsel but I don't think they get to,

1   you know, start over.  I think they should hopefully inherit

2   the work that was done before.

3           THE COURT:  Well, and I'm not --

4           MR. WAGUESPACK:  And again, we're talking about the

5   lease of a boat.  It's a lease of a boat.  It's just like a

6   house, you know, that somebody leased.  So, we're talking

7   about the lease of the house.

8           And if there's something, you know, this is not a

9   -- if there's some other -- if he can explain to me why is a

10  new counsel that's gotten involved or there's other stuff out

11  there that he needs to look at, that's fine.  But I don't

12  want to come back and have him say:  Oh, the lease for the

13  house is confidential and we can't give that to you.  And

14  I'll just have to come back here again.

15          But I think, look, with Mr. Draper and his timing,

16  you know, tell me when you can produce the documents.  Your

17  client has been knowing about the request.  Tell me when you

18  can sit down for a 2004.  I think that should happen as soon

19  as possible.  But give me dates and a time, but we'll work

20  with that.

21          THE COURT:  Well Mr. Draper, wouldn't you think that

22  those should all take place before our hearing on December

23  18th?

24          MR. DRAPER:  I have no objection to that.  And just

25  so you're aware --

1          THE COURT:  You realize we're talking -- December

2   18th is three weeks.

3          MR. DRAPER:  Right.  I have, Your Honor, quite

4   frankly I have -- I have seven schedules to do for December

5   14th.  December 18th is also I think the 341s for the other

6   boats.

7          I'll have all of that in.  To the extent that

8   Mr. Waguespack needs information as to financial information,

9   I just want to see it, Your Honor, the schedules.  I have to

10  redo the Mr. Steven schedules anyway, so I have to get in

11  there and do it.  I have no problem with that.

12         I would also like to let the Court know there's

13  specific information I'm going to ask from Mr. Waguespack and

14  I hope before the 18th he comes forward with the bank files

15  and things of that ilk so we can see this argument that they

16  didn't know.

17         THE COURT:  Okay.

18         MR. DRAPER:  I mean that's fine.

19         MR. WAGUESPACK:  Your Honor, again, about a request

20  with a list of documents.  If you can give me a date that

21  they can produce them buy and a date for the deposition

22  before the 18th, we're done.

23         MR. DRAPER:  That's why I will --

24         MR. WAGUESPACK:  That's all we're --

25         MR. DRAPER:  I will sit down -- I will sit down.

1          MR. WAGUESPACK:  David, what's destroyed now?

2          MR. DRAPER:  I will talk with my client as to when

3   we can get things.  I will get dates and I will give it to

4   them before the 18th.

5          MR. WAGUESPACK:  All right.

6          MR. DRAPER:  I'm fine with that.

7          MR. WAGUESPACK:  How could they not have come to

8   this hearing with that information?

9          THE COURT:  Well --

10         MR. WAGUESPACK:  I mean, can we take a break --

11         THE COURT:  Here's what I'm going to do.

12         MR. WAGUESPACK:  -- and have them talk to their --

13         THE COURT:  It's about -- it's about 25 minutes to

14  noon.  I'm taking about a ten minute break or longer if

15  necessary, for you two guys to get together and come back and

16  tell me what is going to be an agreeable date, so that we can

17  get the date set for the documents.

18         And if we still need to deal with confidential

19  information, I'll deal with the confidential information, but

20  I'm hoping that the parties can also spend the next fifteen

21  minutes sitting down and talking about these issues so we can

22  have some parameters to this.

23         And it sounds like I've got some pretty big issues

24  coming up on December 18th that's going to require some

25  discovery from the parties.  Let's get this resolved now, and

1   if I've got to decide it, I'll decide it when I come back in

2   about fifteen minutes.

3           MR. DRAPER:  Thank you very much, Your Honor.

4           THE COURT:  Thank you.

5           MR. DRAPER:  Thank you, Your Honor.

6           THE COURT:  We'll be in recess.

7           MS. McCULLOCH:  Your Honor, may I approach?

8           THE COURT:  Yes.

9           MS. McCULLOCH:  On an unrelated matter.

10          **(Recess from 11:38 a.m. to 12:19 p.m.)**

11          THE COURT:  Okay, and we'll be back on the record

12  on the *Mr. Steven* matter.

13          MR. DRAPER:  Your Honor, I think we've worked our

14  way through some things.  I have agreed to produce

15  documentation related to the Mr. Steven, only, by Friday.

16          THE CLERK:  Excuse me.  Okay.

17          MR. DRAPER:  And then have Mr. Steven sit for both

18  a deposition and a 2004, the afternoon -- I think it's

19  December 11th?

20          MR. WAGUESPACK:  Correct.

21          MR. DRAPER:  At our office.

22          We have one issue, and let me --

23          MR. WAGUESPACK:  Your Honor, before I get to that,

24  I would like for there -- it's a little bit more detailed

25  than what Mr. Draper said, so I'd like to just go through

 1  each of the document requests and how we have resolved it.

 2  I tried to narrow it to make it easier for them to produce

 3  it.

 4          THE COURT:  Let's go ahead and build a record, so

 5  if you've got a dispute later we've got a record.

 6          MR. DRAPER:  That's fine.

 7          THE COURT:  Okay.

 8          MR. DRAPER:  Let me go through what I have.

 9          MR. WAGUESPACK:  On request --

10          MR. DRAPER:  For Item Number 1, which deals with --

11          MR. WAGUESPACK:  I've got it written down if you

12  want, Your Honor.

13          MR. DRAPER:  So do I.

14          Any documents evidencing or relating to any

15  transfers of assets by the Debtor since October 1, 2015:

16          What we will produce is the bank statements since

17  October 1, 2015 and any transfer over $10,000.

18          Two:  Any and all appraisals, inspections, surveys

19  or other reports relating to -- and this would be the

20  Mr. Steven.

21          Is there a -- is this temporal?  Is there a time

22  period for this?

23          MR. WAGUESPACK:  No.  But we agreed to limit it to

24  the Mr. Steven's.

25          MR. DRAPER:  Okay.  So if I have, let's say the

1  Mr. Steven is ten years old, you want a ten year old survey

2  or inspection?

3          MR. WAGUESPACK:  Well --

4          MR. DRAPER:  Why don't we do three years?

5          MR. WAGUESPACK:  Your Honor, it could be relevant if

6  it was older than that.  We had made an agreement before and I

7  don't want to go back and re --

8          MR. DRAPER:  I didn't realize it.

9          MR. WAGUESPACK:  What we had agreed to do is just

10  limit it to Mr. Steven.

11          MR. DRAPER:  I didn't realize the non-temporal

12  matter of it, but --

13          MR. WAGUESPACK:  These boats aren't that old.  I

14  think they were built in 20 -- fairly recently, so I don't

15  expect that they have ten year old appraisals.

16          MR. DRAPER:  Well, we have limited it to three

17  years.  I mean, let's --

18          THE COURT:  Well, why don't we limit it to five

19  years?

20          MR. DRAPER:  That's fine.

21          THE COURT:  And if it becomes an issue,

22  Mr. Waguespack, we can -- I mean if they are fairly new

23  boats --

24          MR. WAGUESPACK:  That's fine, Your Honor.

25          THE COURT:  I would assume when a financial was

1  taken, there probably were appraisals or there could have

2  been appraisals or something done at that point.

3          MR. WAGUESPACK:  Five years is fine.

4          THE COURT:  Okay, five years.

5          MR. DRAPER:  Any and all documents evidencing

6  transfers of funds --

7          MR. WAGUESPACK:  Your Honor, are we -- before we

8  leave Number 2; SpaceX had requested that those appraisals be

9  subject to their review.  And if they have an issue, they'll

10 raise it, but they had asked for that, and I agreed to that.

11         MR. PECK:  They're worried about condition surveys,

12 Judge, looking into specs of the boat that may be proprietary,

13 so they asked to look at that first.

14         MR. WAGUESPACK:  And I agreed to make Number 2

15 subject to SpaceX --

16         THE COURT:  Well, it sounds like we've got an

17 agreement on that, that that's --

18         MR. WAGUESPACK:  Yes.

19         THE COURT:  All right.  So SpaceX -- so, as long as

20 we all understand that SpaceX's rights will be protected.

21         MR. WAGUESPACK:  Correct.

22         THE COURT:  Okay.

23         MR. DRAPER:  Any and all transfers of funds

24 among -- again, this was just Mr. Steven -- out to another

25 party.

1      I'm fine with October 1st, 2015.  And there's no

2 limitation on dollars, so whatever was transferred out.

3      Any and all agreements among, without limitation,

4 charter agreements, broker agreements, servicing agreements,

5 management agreements.

6      I have no problem producing those, again with let's

7 use a five year period to the extent if we have them.  But I

8 do have one big issue.  I do not want to disclose day rates in

9 any way, shape or form.  I think they should be subject to a

10 confidentiality agreement and here's the reason why:

11      If I go out and contract with Stewart Peck to -- or

12 had a contract with him a year ago to rent a vessel for $50,

13 and that's now out in the marketplace, somebody can look at

14 it.  I don't mind giving him gross dollars.  I don't mind

15 giving him the information as long as it's subject to a

16 confidentiality.

17      I have one other issue with that, just so the Court

18 is aware.  Mr. Waguespack, as the Court may know, represents

19 an entity that purchased boat -- a ton of loans from the

20 FNBC.

21      THE COURT:  From a failed bank.

22      MR. DRAPER:  From a failed bank.

23      THE COURT:  Right.

24      MR. DRAPER:  I don't know what clients they have.

25 I think whether they have other boat companies that are there,

1  I see no reason why my day rates and how I run my pricing

2  should not be subject to a confidentiality.  There's no reason

3  on God's earth why they shouldn't agree to it, that --  I mean,

4  published -- you know, they may have for some --

5          THE COURT:  I don't have -- well, you're not

6  objecting to producing it; you just want it subject to a

7  protective order?

8          MR. DRAPER:  Exactly.

9          THE COURT:  Mr. Waguespack?

10         MR. WAGUESPACK:  Your Honor, these agreements are

11 core to the estate, and they are just -- the law is against

12 him on this.  There's cases directly on point, the pricing

13 formula, how they develop pricing.  But what you market, what

14 you lease your property for, what you lease your boat for --

15         MR. DRAPER:  Your Honor --

16         THE COURT:  Let me let Mr. Waguespack finish,

17 please.

18         MR. WAGUESPACK:  -- what you get in as income, the

19 pricing information is just not confidential.  It's not a --

20         THE COURT:  Well, but it wouldn't be something that

21 -- if it's not confidential, is it something that in a

22 competitor's hands would hurt the competitiveness of the

23 Debtor, if someone knows their pricing structure?

24         MR. WAGUESPACK:  Look, everybody -- boats and day

25 rates, it's everybody knows what they are.  It's so

1   common.

2          But in a bankruptcy case, they just haven't

3   supported -- the case that they cited, the Barney's case I

4   believe that it was; is it says what the pricing formula is,

5   how you arrive at the pricing.

6          But once you lease your property, you're a debtor

7   in bankruptcy.  So Your Honor, they just -- I don't think the

8   law is with them on that, and if they can cite a case that

9   deals -- I mean this is not something novel in bankruptcy.

10  You know, is pricing confidential?  They just haven't cited

11  any law to that, and I don't believe it is.

12         THE COURT:  Mr. Walsh (phonetic), will you pull me

13  that case out?

14         MR. PECK:  What --

15         THE COURT:  What I'll do, I've got the agreement to

16  produce it, I just need to make a decision if it needs to be

17  produced under a protective order.

18         MR. PECK:  Yes, Judge --

19         MR. DRAPER:  Now Judge, just one question --

20         MR. PECK:  I cited -- I cited a case.  He talks

21  about the Debtor's thing.  I cited In Re: Northstar.  It's --

22  let me quote it:  Such commercial information as defined is

23  that information that would cause an unfair advantage to

24  competitors for providing them information as to the

25  commercial operations of the debtor.

1      <u>In Re: Northstar</u> says a bankruptcy court is

2   required to seal documentary information filed in court does

3   not rise to the level of a trade secret, but is so critical to

4   the operations the entity is seeking to protect or that a

5   disclosure will unfairly benefit that entity's competitors.

6          If people find out our day rate, and they will come

7   in and try to undercut us, Your Honor.  My client told me

8   that and I know that.  I represent a lot of boat companies.

9          THE COURT:  Yes.

10         MR. WAGUESPACK:  Look, if there was a case that

11  said that pricing was confidential and could be protected by

12  a protective order, I'm sure they would have cited it.

13         THE COURT:  Well, what's the harm --

14         MR. WAGUESPACK:  That's not what it is though.

15         THE COURT:  What is the harm if it is subject to a

16  protective order?

17         MR. WAGUESPACK:  The --

18         THE COURT:  And if you get in, it's subject to a

19  protective order, what -- well, how are you being affected by

20  this?

21         MR. DRAPER:  Right.

22         MR. WAGUESPACK:  The problem is and what was

23  presented to us by prior counsel in the protective order is

24  one, is an onerous process where we have to file a motion to

25  file it under seal.

1        So, we're going to have a motion to file under seal

2 and you're going to have to grant it, then it's going to have

3 to -- you're going to have to make a determination as to

4 whether it's protected or not.

5        The other limitation that's common in these

6 protective orders, which is just -- look, we already have the

7 charter agreement, okay, so we already know it was produced

8 before without any confidentiality.

9        THE COURT:  Well, that's not subject to

10 confidential.

11        MR. WAGUESPACK:  Yes.

12        THE COURT:  It is produced.

13        MR. WAGUESPACK:  That one is already out there.

14        THE COURT:  Right.

15        MR. WAGUESPACK:  And we already know what the day

16 rate is, it was attached to one of our briefs.

17        The other thing that's in these protective orders

18 is that it's limited to this case.  Well, I don't know what's

19 in these things and I don't know what other cases are -- so,

20 it's putting, you know, it's putting burdens on me and how I

21 use the document filing pleadings, and it's just -- I just

22 don't see it's confidential.

23        If they, you know, I just -- if there was law that

24 supported their position --

25        THE COURT:  Well, I was thinking maybe you could

1  say that.

2           MR. WAGUESPACK:  Yes.

3           THE COURT:  But I've got in the agreement that you're

4  going to produce it and I just need to decide if it needs to be

5  produced, subject to a protective order.

6           MR. DRAPER:  Right.

7           MR. WAGUESPACK:  Correct.

8           MR. DRAPER:  And again, I don't understand what the

9  harm is.  If it harms me, it doesn't harm him.  I'm not asking

10  him to file a motion.

11          MR. PECK:  Right.

12          MR. DRAPER:  I'm just saying it appears I'm giving

13  it to you and it's confidential.  You can't use it anywhere

14  else.

15          MR. PECK:  Right.

16          MR. DRAPER:  And you can't disclose it.  That's it.

17  And it's that simple.

18          THE COURT:  And if he --

19          MR. DRAPER:  He's making up some --

20          THE COURT:  If he wants to use it in a briefing

21  here, he would just file it under seal.

22          MR. DRAPER:  Right.

23          MR. PECK:  Right.

24          THE COURT:  Without having to file a motion.

25          MR. PECK:  Right.

1           MR. DRAPER:  Exactly.

2           THE COURT:  He would just automatically file it

3    under seal.

4           MR. DRAPER:  That's it.

5           MR. PECK:  Right.

6           MR. DRAPER:  That's fine.

7           MR. PECK:  We're not making anything more than

8    that.  He's talking about some -- I didn't prepare any

9    complicated protective order agreement with you.

10          MR. WAGUESPACK:  It was --

11          MR. PECK:  I just need to -- that was some other

12   counsel.  At least -- you're putting up a straw net.

13          MR. WAGUESPACK:  No, it was the Debtor's --

14          MR. PECK:  I mean I'm talking about if he can list

15   how --

16          MR. WAGUESPACK:  It was the Debtor's counsel.

17          MR. PECK:  Okay.  But I'm Seatran.

18          THE COURT:  Well --

19          MR. PECK:  And I want this confidential.  The

20   charter is with my client, not the Debtor.

21          I cited cases that were on point.  You're talking

22   about the Debtor.  I need that protective -- I haven't given

23   you any protective order or agreement.  I'll make it

24   reasonable.  You know that, David.  I've got to protect

25   that.

1          MR. WAGUESPACK:  Your Honor, again, I just -- the

2     cases they cite did not support that pricing information

3     was --

4          THE COURT:  I'm going to take a look at it.

5     Mr. Walsh is going to pull me the case that Mr. --

6          MR. WAGUESPACK:  If I'm wrong on that, the --

7          THE COURT:  -- on the Northstar case and -- and

8     I'll look at both of them, Barney and the Northstar case.

9          THE LAW CLERK:  Yes, sir.  Page 7.

10          MR. WAGUESPACK:  I mean certainly there's times

11     when there's confidential commercial information, but to get

12     a plan --

13          THE COURT:  Well, I do --

14          MR. WAGUESPACK:  I mean how do you get the case out

15     of bankruptcy if you don't know what the boats --

16          Here is the other issue, frankly, that's going

17     to --

18          THE COURT:  I mean you've also got -- I mean these

19     are Chapter 11 cases and you want to make sure we're not

20     doing anything that's going to expose the Debtor to their

21     competitors to come in and essentially quell their ability to

22     operate --

23          MR. WAGUESPACK:  Right.

24          THE COURT:  -- as a Chapter -- as a Debtor-in-

25     Possession.

1          MR. WAGUESPACK:  Right.

2          THE COURT:  I mean I understand that side of it,

3   too.  I understand what you're saying, Mr. Waguespack.  I'm

4   not discounting what you're saying, but I do see the other side

5   of this.

6          You've already got a Debtor-in-Possession who --

7   the competitor is going to be using that against them.  Then

8   if we disclose all -- and I do see some -- something to the

9   argument that if we have to make them disclose all of their

10  internal

11  -- how they price their day rates and so forth, then

12  everybody is going to come in and undercut them and say:  You

13  know, we can beat that price and you don't have to deal with

14  the Debtor-in-Possession.

15          I mean, I see the issues here.  I'm going to look

16  at the cases.  I'm going to look at the two cases here and

17  I'll -- you will have my decision when I have it.  I just

18  need to look at the cases on that.

19          Let's keep going.

20          MR. DRAPER:  Okay.  Tax returns, just so the Court

21  is aware; this is a -- these are -- disregard -- it's a

22  disregard tax entity, so it's --

23          MR. WAGUESPACK:  But the agreement was on five and

24  six.  I don't know if that's the case or not, but the

25  agreement on Numbers 5 and 6, Number 5 being any and all

1  federal tax returns filed by the Debtor; and Number 6 being

2  any and all tax returns filed by the entities owned by the

3  Debtor.

4      We agreed to limit that from January 1, 2015,

5  forward.

6      MR. DRAPER:  And --

7      MR. WAGUESPACK:  If there are none, there are none.

8  But that's the --

9      MR. DRAPER:  Right.  There are none.  There are none

10 so that's --

11     THE COURT:  Well, but then if we've got that

12 agreement that if there are none --

13     MR. DRAPER:  That's fine.

14     THE COURT:  -- then you will disclose that to

15 him.

16     MR. DRAPER:  And then, any and all agreements by or

17 among these entities.  Again, this is Mr. Steven and some

18 other entities, not the -- it's not like the LADY EVE and the

19 MISTER SMITH at this time.

20     MR. WAGUESPACK:  We agree to limit it to the

21 Mr. Steven.

22     THE COURT:  Okay.

23     MR. WAGUESPACK:  At this time.

24     THE COURT:  Well, we're just dealing with this

25 then?

1          MR. DRAPER:  Yes.

2          MR. PECK:  Is that Number 7?  Is that Number 7?

3          MR. DRAPER:  Yes.

4          MR. PECK:  Because Number 7 has the same

5    confidentiality.

6          MR. DRAPER:  Yes, Number 7 has the same

7    confidentiality issue.

8          MR. PECK:  Right.  Numbers 4 and 7 have the

9    confidentiality issue, Your Honor.

10          THE COURT:  Okay.

11          MR. WAGUESPACK:  And this again would be what

12    they're seeking confidentiality on would be agreements

13    between Mr. Steven, L.L.C. the Debtor in bankruptcy and

14    related entities.

15          And so -- or why would that be confidential?  That

16    seems like something that the creditors would all want to

17    know?

18          THE COURT:  No, I don't see that one quite as

19    clearly as I see the one maybe on Number 4.

20          MR. PECK:  Well that -- they can devise the pricing

21    information from the original.  I'm Seatran and Miguez.

22    That's a Debtor issue.

23          My concern is by finding that, they can back into

24    what the day rate is.

25          MR. DRAPER:  Your Honor, basically anything that

1 addresses -- again, I have no problem disclosing it to them.

2 All I'm asking is that it be confidential and that it not be

3 disclosed.

4 And I'm very concerned in terms of the depth of

5 their portfolio that they've bought. I don't know who they're

6 working with, and I don't want -- and he has not articulated

7 any legitimate reason why he's unwilling to keep something

8 confidential, other than it may be inconvenient,  and we can

9 deal with the inconvenience.

10 MR. PECK:  And they have other vessel companies, I

11 would -- in their fleet. I don't know why they would want to

12 use it. Why? What is the problem with keeping it

13 confidential?

14 And what really bothers me is the more they fight

15 on it, the more I think it's going to be used against us to

16 undercut us. That's what worries me.

17 THE COURT:  All right. I've got the

18 confidentiality. I'll give you all a decision on that.

19 MR. DRAPER:  Okay.

20 THE COURT:  Let's go through the rest of this.

21 MR. DRAPER:  The next one, ownership interest of the

22 Debtor, whether direct or indirect.

23 I would --

24 MR. WAGUESPACK:  I think on Numbers 8, 9 and 10 you

25 agreed.

1          MR. DRAPER:  It's --

2          MR. WAGUESPACK:  My notes say you agreed to produce

3  those --

4          MR. DRAPER:  Well, I have no problem --

5          MR. WAGUESPACK:  -- to the extent that they exist.

6          MR. DRAPER:  What does "indirect" mean, just out of

7  curiosity?

8          MR. WAGUESPACK:  Well, that -- I don't want to --

9  are we reopening this?

10          MR. DRAPER:  No, I'm not.  I'm not reopening it.

11          MR. WAGUESPACK:  So --

12          MR. DRAPER:  I'll produce it.

13          MR. WAGUESPACK:  The request says any and all

14  documents relating to any ownership interests of the Debtor,

15  whether direct or indirect, and any more of the related

16  parties.

17          So I want to know what entities the Debtor owns --

18          MR. DRAPER:  That's fine.

19          MR. WAGUESPACK:  -- any --

20          MR. DRAPER:  I have no problem --

21          MR. WAGUESPACK:  -- whether direct or indirect, you

22  know, if there's some --

23          MR. DRAPER:  I'm just making sure that we're not

24  dealing with attribution issues.  That's all I'm -- that's

25  all I'm addressing.

1          That -- the word "indirect" is imprecise.  If I own

2   it, I will disclose it and I will give it to you.

3          MR. WAGUESPACK:  I don't know what an attribution

4   issue is, but we'll --

5          MR. DRAPER:  It's a tax term.

6          MR. WAGUESPACK:  -- get him to tell me what it

7   is.

8          THE COURT:  Well, if we've got to have a motion to

9   compel we'll -- but it sounds like I've got -- like you've

10  got agreements on most of this.

11         I need to review these cases, and if you all want

12  to wait around, I'll tell you, but --

13         Mr. Kaufman, do you have something to add?

14         MR. KAUFMAN:  I do, very briefly, Your Honor.

15         I think on Numbers 4 and 7, which are the two that

16  have confidentiality issues; we had requested that before

17  anything is produced with Guice Offshore that we just get

18  an opportunity to review it, and we'll quickly comment on

19  it.

20         THE COURT:  Is that agreeable to the parties?

21         MR. WAGUESPACK:  Yeah.  I mean if -- are they

22  concerned about a charter agreement?  What is the issue?

23         MR. KAUFMAN:  Right.  Particularly, potentially the

24  -- some of the same pricing issues.

25         THE COURT:  Between Mr. Steven -- between the Debtor

1  and Guice?

2       MR. KAUFMAN:  Or Seatran -- I'm sorry, excuse me,

3  Seatran and Guice.

4       THE COURT:  Seatran.

5       MR. WAGUESPACK:  Well yeah, now that one is a

6  little different than the SpaceX issue.  SpaceX clearly, I

7  understand the proprietary.

8       THE COURT:  Well --

9       MR. WAGUESPACK:  But this one is, I think the same

10 issue that you're about to look at.

11      MR. KAUFMAN:  Well --

12      THE COURT:  Yes, this is -- you're talking -- your

13 issue is not -- I understand.  Your issue is totally different

14 with the coding, you know.  But you've got other -- what I

15 view as proprietary, the SpaceX issues that you're concerned

16 with.  I think we all agree on that.

17      Yours is not that.  Yours is more on the long --

18 you're in the same boat as Mr. Peck's client.

19      MR. KAUFMAN:  I am.  But also I do have some

20 concerns, because we do have confidentiality obligations to

21 SpaceX.

22      THE COURT:  Okay.

23      MR. KAUFMAN:  So, I don't believe we've provided

24 anything to Mr. Steven that would run afoul of that

25 confidentiality.  But out of an abundance of caution --

1      MR. MONTAGUE:  SpaceX is in privity of contract

2  with Guice, and so they have a lot of our information,

3  subject to a confidentiality agreement.  So that's the

4  concern about that.

5      MR. WAGUESPACK:  Your Honor, I have no problem

6  reserving their rights to review them.  And if they want to

7  come in with an emergency motion, that's fine.  I assume they

8  wouldn't do it on the same basis that you're about to rule on,

9  so, that's fine.

10      THE COURT:  Right.

11      MR. MONTAGUE:  Right.

12      THE COURT:  Okay.

13      MR. KAUFMAN:  Thank you, Your Honor.

14      THE COURT:  All right, thank you.

15      MR. MONTAGUE:  And I have one other concern that

16  we had previously discussed, and that is I'm not sure if

17  someone may have mentioned it, but that is appraisal

18  information may have reference to some of the technology

19  issues, so we --

20      MR. WAGUESPACK:  I mentioned that.

21      MR. MONTAGUE:  Okay.

22      UNIDENTIFIED SPEAKER:  You're talking about the

23  surveys, having inspections at issue.

24      MR. MONTAGUE:  Okay.  So we just want to have an

25  opportunity to review that before it's --

1          THE COURT:  And Mr. Waguespack, you're fully aware

2     that the appraisals and the surveys may have issues that

3     involve SpaceX also; so before that would be produced, you'll

4     want to make sure it doesn't have any of their proprietary

5     information.

6          MR. WAGUESPACK:  That's fine.

7          THE COURT:  Okay.

8          MR. MONTAGUE:  Thank you Your Honor.

9          MR. WAGUESPACK:  Thank you Your Honor.

10         THE COURT:  Okay.  The next question is:  You know,

11    are we going to just have our record be the documentation of

12    the agreement, or is someone going to --

13         MR. WAGUESPACK:  Well --

14         THE COURT:  We're going to go with what you have on

15    the record and hopefully, you guys can work everything out

16    from here.

17         And I'm going to give you a ruling.

18         MR. DRAPER:  Okay.

19         THE COURT:  I'm going to have to take another break

20    to review these cases.

21         MR. DRAPER:  That's fine.

22         THE COURT:  But I'm going to give you a ruling

23    today on that.

24         MR. WAGUESPACK:  That's fine.

25         THE COURT:  Okay.  All right.  Thank you gentlemen.

1          MR. WAGUESPACK:   Thank you Judge.

2          THE COURT:   Thank you for working that out.

3      (All Counsel respond, "Thank you Your Honor.")

4          THE COURT:   Thank you.

5                         *    *    *    *    *

6                    (Hearing is Concluded)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

       I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.

**S/Sherryl P. Robinson**          **_12/18/18_**
**Sherryl P. Robinson**           **Date**