

| 1. Shipbroker | BIMCO STANDARD BAREBOAT CHARTER<br>CODE NAME: "BARECON 2001"<br>PART I |
|---|---|
| N/A | 2. Place and date<br>MADISONVILLE, LA |

| 3. Owners/Place of business (Cl. 1) | 4. Bareboat Charterers/Place of business (Cl. 1) |
|---|---|
| SEATRAN MARINE LLC<br>107 HWY 90 W<br>NEW IBERIA, LA 70560 | GUICE OFFSHORE LLC<br>P.O. BOX 1698<br>MANDEVILLE, LA 70470 |

| 5. Vessel's name, Call sign and flag (Cl. 1 and 3) |
|---|
| MR. STEVEN<br>OFFICIAL NO. 1249191<br>US FLAG CREWBOAT |

| 6. Type of Vessel | 7. GT/NT |
|---|---|
| 205 FT. DPS-2 HSC CREWBOAT<br>ABS CLASS | 96 US / 496 ITC |

| 8. When/Where built | 9. Total DWT (abt.) in metric tons on summer freeboard |
|---|---|
| GULFCRAFT SHIPYARD<br>NOVEMBER 2014 | 502.07 LT |

| 10. Classification Society (Cl. 9 & 4) | 11. Date of last special survey by the Vessel's classification society |
|---|---|
| ABS | MARCH 9, 2017 |

| 12. Further particulars of Vessel (also state minimum number of months' validity of class certificates agreed acc. to Cl. 3) |
|---|
| CLASS / REGULATORY CERTS GOOD THROUGH COMPLETION OF INITIAL<br>1 YR. BAREBOAT TERM (NO D.D. REQUIRED) |

| 13. Port or Place of delivery (Cl. 3) | 14. Time for delivery (Cl. 4) | 15. Cancelling date (Cl. 5) |
|---|---|---|
| MUTUALLY AGREED U.S. GOM PORT | OCT 15, 2017 | OCT 15, 2017 |

| 16. Port or Place of redelivery (Cl. 15) | 17. No. of months' validity of trading and class certificates<br>upon redelivery (Cl. 15) |
|---|---|
| MUTUALLY AGREED US GOM PORT | N/A |

| 18. Running days' notice if other than stated in Cl. 4 | 19. Frequency of dry-docking (Cl. 10(g)) |
|---|---|
| AS STATED IN CL 4 | AS PER CLASS |

| 20. Trading limits (Cl. 6) |
|---|
| US GOM, US EAST COAST, CARIBBEAN WATERS |

| 21. Charter period (Cl. 2) | 22. Charter hire (Cl. 11) |
|---|---|
| 1 YEAR (365 DAYS) | ▓▓▓▓▓▓ PER DAY |

| 23. New class and other safety requirements (state percentage of Vessel's insurance value acc. to Box 29) (Cl. 10(a)(ii)) |
|---|
| N/A |

| 24. Rate of interest payable acc. to Cl. 11(f) and, if applicable, acc. to PART IV | 25. Currency and method of payment (Cl. 11) |
|---|---|
| AS STATED IN CL. 11(f) | US DOLLARS $<br>60 DAYS IN ARREARS |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of this original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



1051277<br>
mr. Steven LLC

EXHIBIT<br>
SBN #14<br>
12/18/18



| 26. Place of payment; also state beneficiary and bank account (Cl. 11) | 27. Bank guarantee/bond (sum and place) (Cl. 24) (optional) |
|---|---|
| SEE ATTACHMENT "B" FOR WIRE INSTRUCTIONS | N/A |

| 28. Mortgage(s), if any, state whether 11.2(a) or (b) applies; if 11(b) applies state date of Financial Instrument and name of Mortgagee(s)/Place of business) (Cl. 12) | 29. Insurance (hull and machinery and war risks) (state value acc. to Cl.13(f) or, if applicable, acc. to Cl. 14(k)) (also state if Cl. 14 applies) |
|---|---|
| AS PER Cl. 12 (b) | $15,500,000 |

| 30. Additional insurance cover, if any, for Owners' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g)) | 31. Additional insurance cover, if any, for Charterers' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g)) |
|---|---|
| N/A | BREACH OF WARRANTY AND INNOCENT OWNERS COVERAGE |

| 32. Latent defects (only to be filled in if period other than stated in Cl. 3) | 33. Brokerage commission and to whom payable (Cl. 27) |
|---|---|
| AS PER Cl. 3 | N/A |

| 34. Grace period (state number of clear banking days) (Cl. 28) | 35. Dispute Resolution (state 28(a), 28(b) or 28(c); if 28(c) agreed Place of Arbitration must be stated (Cl. 30) |
|---|---|
| 30 DAYS | HOUSTON, TX |

| 36. War cancellation (indicate countries agreed) (Cl. 26) |
|---|
| N/A |

| 37. Newbuilding Vessel (indicate with "yes" or "no" whether PART III applies) (optional) | 38. Name and place of Builders (only to be filled in if PART III applies) |
|---|---|
| N/A | N/A |

| 39. Vessel's Yard Building No. (only to be filled in if PART III applies) | 40. Date of Building Contract (only to be filled in if PART III applies) |
|---|---|
| | N/A |

| 41. Liquidated damages and costs shall accrue to (state party) (Cl. 1) a) b) | |
|---|---|
| N/A | |

| 42. Hire/Purchase agreement (indicate with "yes" or "no" whether PART IV applies) (optional) | 43. Bareboat Charter Registry (indicate with "yes" or "no" whether PART V applies) (optional) |
|---|---|
| N/A | N/A |

| 44. Flag and Country of the Bareboat Charter Registry (only to be filled in if PART V applies) | 45. Country of the Underlying Registry (only to be filled in if PART V applies) |
|---|---|
| N/A | N/A |

| 46. Number of additional clauses covering special provisions, if agreed |
|---|
| N/A |

PREAMBLE - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and shall only form part of this Charter if expressly agreed and stated in Boxes 37, 42 and 43. If PART III and/or PART IV and/or PART V apply, it is further agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| *[signature]* | *[signature]* |
| Charles Tizzard, Exec. V.P. | Nathan Guild, Member |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document a mark in the Clause visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and the computer generated document.

## MUTUAL CONFIDENTIALITY AGREEMENT

This Mutual Confidentiality Agreement is dated this the 22 of August 2017, by and between Guice Offshore, LLC and SeaTran Marine, LLC ( each of whom shall be hereinafter referred to as "Disclosing Party" or "Receiving Party" or collectively as the "Parties", as appropriate).

WHEREAS, the Parties wish to disclose and examine certain confidential and proprietary information for the purpose of discussing and evaluating a possible business arrangement between the Parties (such activities hereinafter referred to as the "Explorations");

WHEREAS, the Parties mutually agree that the disclosure of such confidential and proprietary information may be required for the Explorations to proceed; and

WHEREAS, the Parties have executed this Confidentiality Agreement in order to better set forth their duties and responsibilities with respect to maintaining the confidentiality of the Explorations.

NOW THEREFORE, for Ten Dollars and No/100 Cents ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties do agree to the following, to-wit:

### Confidential Information and Materials

(a) "Confidential Information" shall mean any nonpublic information, oral or written (in any form), that Disclosing party specifically marks and designates, either orally or in writing, as confidential or which, under the circumstances surrounding the disclosure, ought to be treated as confidential. "Confidential Information" includes, but is not limited to, product schematics or drawings, descriptive material, specifications, sales and customer information, trade secrets, software, financial documents, data compilations, Disclosing Party's business policies or practices, information received from others that Disclosing Party is obligated to treat as confidential, any proprietary or intellectual property, or any other materials and information of a confidential nature.

(b) "Confidential Information" shall not include any materials or information which the Receiving Party shows: (i) is at the time of disclosure generally known by or available to the public or which becomes so known or available thereafter through no fault of the Receiving Party; or (ii) is legally known to the Receiving Party at the time of disclosure; or (iii) is furnished by the Disclosing Party to third parties without restriction; or (iv) is furnished to the Receiving Party by a third party who legally obtained said information and the right to disclose it; or (v) is developed independently without reference to the Confidential Information by the Receiving Party where the Receiving Party can document such independent development.

(c) "Confidential Materials" shall mean all tangible materials containing Confidential Information including, but not limited to, drawings, schematics, written or printed documents, computer discs, tapes, and compact discs whether machine or user readable.

### Restrictions

(a) Receiving Party shall not disclose any Confidential Information to third parties for a period of five (5) years following the termination of its relationship with Disclosing Party. However, the Receiving Party may disclose Confidential Information in accordance with judicial or other governmental order, provided Receiving Party shall give Disclosing Party reasonable prior notice to such disclosure and shall comply with any applicable protective order or equivalent.

(b) Receiving Party shall not use or duplicate any Confidential Information, except as necessary to conduct Explorations, and shall keep confidential and not disclose any



GOtoSBNDoc000123

Confidential Information to anyone, unless the Disclosing Party has previously and expressly consented to such use, duplication, or disclosure in writing. However, each Receiving Party may disclose such Confidential Information to those employees or consultants of the Receiving Party whose knowledge is necessary to conduct the Explorations, provided that all such employees or consultants are advised of their obligations to protect the Disclosing Party's interest, which obligations shall be identical to the Receiving Party's under this Agreement.

(c) Without limiting the foregoing, the Parties agree to protect the other Party's Confidential Information with at least the same degree of care as it exercises to protect its own highly confidential information of like character, but in no event less than reasonable care. The Parties shall be responsible for any breach of the confidentiality provisions of this Agreement by any person to whom Confidential Information may be disclosed by the Receiving Party.

(d) Receiving Party shall not use any Confidential Information other than for purposes of Explorations or as otherwise expressly authorized by the Disclosing Party.

(e) Confidential Information and Confidential Materials may be disclosed, reproduced, summarized, or distributed only in pursuance of the Receiving Party's business relationship with the Disclosing Party, and only as otherwise provided herein.

## Rights and Remedies

(a) Receiving Party shall notify Disclosing Party immediately upon discovery of any unauthorized use or disclosure of Confidential Information or Confidential Materials, or any other breach of this Agreement by Receiving Party, and will cooperate with Disclosing Party in every reasonable way to help Disclosing Party regain possession of the Confidential Information and/or Confidential Materials and prevent further unauthorized use or disclosure.

(b) Receiving Party shall return all originals, copies, reproductions and summaries of Confidential Information and/or Confidential Materials then in Receiving Party's possession or control at Disclosing Party's request or, at Disclosing Party's option, certify destruction of the same.

(c) Receiving Party acknowledges that monetary damages may not be a sufficient remedy for damages resulting from the unauthorized disclosure of Confidential Information and that Disclosing Party shall be entitled, without waiving any other rights or remedies, to seek such injunctive or equitable relief as may be deemed proper by a court of competent jurisdiction.

(d) Disclosing Party may visit Receiving Party's premises, with reasonable prior notice and during normal business hours, to review Receiving Party's compliance with the terms of this Agreement.

## Miscellaneous

(a) All Confidential Information and Confidential Materials are and shall remain the sole and exclusive property of Disclosing Party. By disclosing information to Receiving Party, Disclosing Party does not grant any express or implied right to Receiving Party in, to or under Disclosing Party patents, copyrights, trademarks, or trade secrets. Furthermore, Receiving Party does not hereby obtain any license in or to Confidential Information or Confidential Materials of Disclosing Party.

(b) All Confidential Information and Confidential Materials are provided "AS IS" and Disclosing Party makes no warranties, either express or implied, regarding the accuracy or reliability of such information or materials. Disclosing Party will not be liable for any expenses or losses incurred or any action undertaken by Receiving Party as a result of the receipt of Confidential Information or Confidential Materials. The entire risk arising out

GOtoSBNDoc000124

of the use of the Confidential Information an Confidential Materials remains with Receiving Party. The Parties represent that entering into this Agreement will not conflict with any material agreement already entered into by such Parties.

(c) This Agreement shall not be modified except in writing signed by both Parties hereto. The Parties may not transfer or otherwise assign its rights, duties or obligations under this Agreement to any other person or entity, in whole or in part, without the prior written consent of the other Party. Any such assignment or transfer shall be void.

(d) No waiver of any provisions of this Agreement shall be effective unless agreed to in writing by the Party against whom such waiver is sought to be enforced. Waiver of any default or breach hereunder shall not constitute a waiver of any other default or breach whether similar or otherwise. Failure of either Party to enforce any provision of this Agreement shall not constitute waiver of such provision or any other provisions of this Agreement.

(e) This Agreement constitutes the entire Agreement between the Parties with respect to the subject matter hereof.

(f) If any action at law or in equity is necessary to enforce or interpret the rights arising out of or relating to this Agreement, the prevailing Party shall be entitled to recover reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which it may be entitled.

(g) This Agreement shall be construed and controlled by the laws of the State of Mississippi.

(h) If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect. Should any obligations of this Agreement be found illegal, invalid or unenforceable as being too broad with respect to the duration, scope or subject matter thereof, such obligations shall be deemed and construed to be reduced to the maximum duration, scope or subject matter allowable by law.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement by their duly authorized representatives as of the date set forth above.

GUICE OFFSHORE, LLC

By: _____

Its: _Member / Owner_

SEATRAN MARINE, LLC
Company

By: _____

Its: _Exec V P._

GOtoSBNDoc000125

## PART II
## "BARECON 2001" Standard Bareboat Charter

**1. Definitions**
In this Charter, the following terms shall have the meanings hereby assigned to them:
"*The Owners*" shall mean the party identified in Box 3;
"*The Charterers*" shall mean the party identified in Box 4;
"*The Vessel*" shall mean the vessel named in Box 5 and with particulars as stated in Boxes 6 to 12.
"*Financial Instrument*" means the mortgage, deed of covenant or other such financial security instrument as annexed to this Charter and stated in Box 28.

**2. Charter Period**
In consideration of the hire detailed in Box 22, the Owners have agreed to let and the Charterers have agreed to hire the Vessel for the period stated in Box 21 ("The Charter Period").

**3. Delivery**
*(not applicable when Part III applies, as indicated in Box 37)*
(a) The Owners shall before and at the time of delivery exercise due diligence to make the Vessel seaworthy and in every respect ready in hull, machinery and equipment for service under this Charter.
The Vessel shall be delivered by the Owners and taken over by the Charterers at the port or place indicated in Box 17 in such ready safe berth as the Charterers may direct.
(b) The Vessel shall be properly documented on delivery in accordance with the laws of the flag State indicated in Box 5 and the requirements of the classification society stated in Box 10. The Vessel upon delivery shall have her survey cycles up to date and trading and class certificates valid for at least the number of months agreed in Box 12.
(c) The delivery of the Vessel by the Owners and the taking over of the Vessel by the Charterers shall constitute a full performance by the Owners of all the Owners' obligations under this Clause 3, and thereafter the Charterers shall not be entitled to make or assert any claim against the Owners on account of any conditions, representations or warranties expressed or implied with respect to the Vessel but the Owners shall be liable for the cost of but not the time for repairs or renewals occasioned by latent defects in the Vessel, her machinery or appurtenances, existing at the time of delivery under this Charter, provided such defects have manifested themselves within twelve (12) months after delivery unless otherwise provided in Box 32.

**4. Time for Delivery**
*(not applicable when Part III applies, as indicated in Box 37)*
The Vessel shall not be delivered before the date indicated in Box 14 without the Charterers' consent and the Owners shall exercise due diligence to deliver the Vessel not later than the date indicated in Box 15.
Unless otherwise agreed in Box 18, the Owners shall give the Charterers not less than thirty (30) running days' preliminary and not less than fourteen (14) running days' definite notice of the date on which the Vessel is expected to be ready for delivery.
The Owners shall keep the Charterers closely advised of possible changes in the Vessel's position.

**5. Cancelling**
*(not applicable when Part III applies, as indicated in Box 37)*
(a) Should the Vessel not be delivered latest by the cancelling date indicated in Box 15, the Charterers shall have the option of cancelling this Charter by giving the Owners notice of cancellation within thirty-six (36) running hours after the cancelling date stated in Box 15, failing which this Charter shall remain in full force and effect.
(b) If it appears that the Vessel will be delayed beyond the cancelling date, the Owners may, as soon as they are in a position to state with reasonable certainty the day on which the Vessel should be ready, give notice thereof to the Charterers asking whether they will exercise their option of cancelling, and the option must then be declared within one hundred and sixty-eight (168) running hours of the receipt by the Charterers of such notice or within thirty-six (36) running hours after the cancelling date, whichever is the earlier. If the Charterers do not then exercise their option of cancelling, the seventh day after the readiness date stated in the Owners' notice shall be substituted for the cancelling date indicated in Box 15 for the purpose of this Clause 5.
(c) Cancellation under this Clause 5 shall be without prejudice to any claim the Charterers may otherwise have on the Owners under this Charter.

**6. Trading Restrictions**
The Vessel shall be employed in lawful trades for the carriage of suitable lawful merchandise within the trading limits indicated in Box 20.
The Charterers undertake not to employ the Vessel or suffer the Vessel to be employed otherwise than in conformity with the terms of the contracts of insurance (including any warranties expressed or implied therein) without first obtaining the consent of the insurers to such employment and complying with such requirements as to extra premium or otherwise as the insurers may prescribe.
The Charterers also undertake not to employ the Vessel or suffer her employment in any trade or business which is forbidden by the law of any country to which the Vessel may sail or is otherwise illicit or in carrying illicit or prohibited goods or in any manner whatsoever which may render her liable to condemnation, destruction, seizure or confiscation.
Notwithstanding any other provisions contained in this Charter it is agreed that nuclear fuels or radioactive products or waste are specifically excluded from the cargo permitted to be loaded or carried under this Charter. This exclusion does not apply to radio-isotopes used or intended to be used for any industrial, commercial, agricultural, medical or scientific purposes provided the Owners' prior approval has been obtained to loading thereof.

**7. Surveys on Delivery and Redelivery**
*(not applicable when Part III applies, as indicated in Box 37)*
The Owners and Charterers shall each appoint surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at the time of delivery and redelivery hereunder. The Owners shall bear all expenses of the On-hire Survey ~~including loss of time, if any,~~ and the Charterers shall bear all expenses of the Off-hire Survey ~~including loss of time, if any, at the daily equivalent to the rate of hire or pro rata thereof.~~
*EXCLUDE LOSS OF TIME

**8. Inspection**
The Owners shall have the right ~~at any time~~ after giving reasonable notice to the Charterers to inspect or survey the Vessel or instruct a duly authorised surveyor to carry out such survey on their behalf:-
(a) to ascertain the condition of the Vessel and satisfy themselves that the Vessel is being properly repaired and maintained. The costs and fees for such inspection or survey shall be paid by the Owners unless the Vessel is found to require repairs or maintenance in order to achieve the condition so provided;
(b) in dry-dock if the Charterers have not dry-docked her in accordance with Clause 10(g). The costs and fees for such inspection or survey shall be paid by the Charterers; and
(c) for any other commercial reason they consider necessary (provided it does not unduly interfere with the commercial operation of the Vessel). The costs and fees for such inspection and survey shall be paid by the Owners.
All time used in respect of inspection, survey or repairs shall be for the Charterers' account and form part of the

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"BARECON 2001" Standard Bareboat Charter

Charter Period.                                                          146
The Charterers shall also permit the Owners to inspect                   147
the Vessel's log books whenever requested and shall                      148
whenever required the Owners furnish them with full                      149
information regarding any casualties or other accidents                  150
or damage to the Vessel                                                  151

9.   Inventories, Oil and Stores                                         152
     A complete inventory of the Vessel's entire equipment,              153
     outfit including spare parts, appliances and of all                 154
     consumable stores on board the Vessel shall be made                 155
     by the Charterers in conjunction with the Owners on                 156
     delivery and again on redelivery of the Vessel. The                 157
     Charterers and the Owners respectively, shall at the                158
     time of delivery and redelivery take over and pay for all           159
     bunkers, lubricating oil, unbreached provisions, paints,            160
     ropes and other consumable stores (excluding spare                  161
     parts) in the said Vessel at the then current market prices,        162
     at the ports of delivery and redelivery, respectively. The          163
     Charterers shall ensure that all spare parts listed in the          164
     inventory and used during the Charter Period are                    165
     replaced at their expense prior to redelivery of the                166
     Vessel.                                                             167

10.  Maintenance and Operation                                           168
     (a)(i) Maintenance and Repairs – During the Charter                 169
           Period the Vessel shall be in the full possession             170
           and at the absolute disposal for all purposes of the          171
           Charterers and under their complete control in                172
           every respect. The Charterers shall maintain the             173
           Vessel, her machinery, boilers, appurtenances and             174
           spare parts in a good state of repair, in efficient           175
           operating condition and in accordance with good              176
           commercial maintenance practice and, except as else-          177
           provided for in Clause 14(l), if applicable, at their         178
           own expense they shall at all times keep the                 179
           Vessel's Class fully up to date with the Classification       180
           Society indicated in Box 10 and maintain all other            181
           necessary certificates in force at all times.                 182
     (ii)  New Class and Other Safety Requirements – In the              183
           event of any Improvement, structural changes or               184
           new equipment becoming necessary for the                      185
           continued operation of the Vessel by reason of new            186
           class requirements or by compulsory legislation               187
           costing (excluding the Charterers' loss of time)              188
           more than the percentage stated in Box 23, or if              189
           Box 23 is left blank, 5 per cent of the Vessel's              190
           Insurance value as stated in Box 29, then the                 191
           extent, if any, to which the rate of hire shall be varied     192
           and the ratio in which the cost of compliance shall           193
           be shared between the parties concerned in order              194
           to achieve a reasonable distribution thereof as               195
           between the Owners and the Charterers having                  196
           regard, inter alia, to the length of the period               197
           remaining under this Charter shall, in the absence            198
           of agreement, be referred to the dispute resolution           199
           method agreed in Clause 31.                                   200
     (iii) Financial Security – The Charterers shall maintain            201
           financial security or responsibility in respect of third      202
           party liabilities as required by any government,              203
           including federal, state or municipal or other division       204
           or authority thereof, to enable the Vessel, without           205
           penalty or charge, lawfully to enter, remain in, or           206
           leave any port, place, territorial or contiguous              207
           waters of any country, state or municipality in               208
           performance of this Charter without any delay. This           209
           obligation shall apply whether or not such                   210
           requirements have been lawfully imposed by such               211
           government or division or authority thereof.                  212
           The Charterers shall make and maintain all arrange-           213
           ments by bond or otherwise as may be necessary to             214
           satisfy such requirements at the Charterers' sole             215
           expense and the Charterers shall indemnify the Owners         216
           against all consequences whatsoever (including loss of        217
           time) for any failure or inability to do so.                  218

(b)  Operation of the Vessel – The Charterers shall at                   219
     their own expense and by their own procurement their,               220
     victual, navigate, operate, supply, fuel and, whenever              221
     required, repair the Vessel during the Charter Period               222
     and they shall pay all charges and expenses of every                223
     kind and nature whatsoever incidental to their use and              224
     operation of the Vessel under this Charter, including               225
     annual flag State fees and any foreign general                     226
     municipality and/or state taxes. The Master, officers              227
     and crew of the Vessel shall be the servants of the Charterers      228
     for all purposes whatsoever, even if for any reason                 229
     appointed by the Owners.                                           230
     Charterers shall comply with the regulations regarding             231
     officers and crew in force in any country of the Vessel's          232
     flag or any other applicable law.                                  233
(c)  The Charterers shall keep the Owners and the                       234
     mortgagee(s) advised of the intended employment,                   235
     planned dry docking and major repairs of the Vessel,               236
     as reasonably required.                                            237
(d)  Flag and Name of Vessel – During the Charter                       238
     Period, the Charterers shall have the liberty to paint the         239
     Vessel in their own colours, install and display their             240
     funnel insignia and fly their own house flag. The                  241
     Charterers shall also have the liberty, with the Owners'           242
     consent, which shall not be unreasonably withheld, to              243
     change the flag and/or the name of the Vessel during              244
     the Charter Period. Painting and re-painting, instatement          245
     and re-instatement, registration and re-registration, if          246
     required by the Owners, shall be at the Charterers'                247
     expense and time.                                                  248
(e)  Changes to the Vessel – Subject to Clause 10(a)(ii),               249
     the Charterers shall make no structural changes in the            250
     Vessel or changes in the machinery, boilers, appurten-            251
     ances or spare parts thereof without in each instance             252
     first securing the Owners' approval thereof. If the Owners         253
     so agree, the Charterers shall, if the Owners so require,          254
     restore the Vessel to its former condition before the             255
     termination of this Charter.                                       256
(f)  Use of the Vessel's Outfit, Equipment and                          257
     Appliances – The Charterers shall have the use of all              258
     outfit, equipment, and appliances on board the Vessel             259
     at the time of delivery, provided the same or their               260
     substantial equivalent shall be returned to the Owners            261
     on redelivery in the same good order and condition as             262
     when received, ordinary wear and tear excepted. The               263
     Charterers shall from time to time during the Charter             264
     Period replace such items of equipment as shall be so             265
     damaged or worn as to be unfit for use. The Charterers            266
     are to procure that all repairs to or replacement of any          267
     damaged, worn or lost parts or equipment be effected              268
     in such manner (both as regards workmanship and                   269
     quality of materials) as not to diminish the value of the         270
     Vessel. The Charterers have the right to fit additional           271
     equipment at their expense and risk but the Charterers            272
     shall remove such equipment at the end of the period if           273
     requested by the Owners. Any equipment including radio            274
     equipment on hire on the Vessel at time of delivery shall         275
     be kept and maintained by the Charterers and the                  276
     Charterers shall assume the obligations and liabilities           277
     of the Owners under any lease contracts in connection             278
     therewith and shall reimburse the Owners for all                   279
     expenses incurred in connection therewith, also for any           280
     new equipment required in order to comply with radio              281
     regulations.                                                      282
(g)  Periodical Dry-Docking – The Charterers shall dry-                 283
     dock the Vessel and clean and paint her underwater                284
     parts whenever the same may be necessary, but not                 285
     less than once during the period stated in Box 19 or              286
     if Box 19 has been left blank, every sixty (60) calendar          287
     months after delivery or such other period as may be             288
     required by the Classification Society or flag State.             289

11.  Hire                                                               290
     (a)  The Charterers shall pay hire due to the Owners               291
          punctually in accordance with the terms of this Charter      292



This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

GOtoSBNDoc000127

in respect of which time shall be of the essence.

(b)    The Charterers shall pay to the Owners, for the hire of the Vessel a lump sum in the amount indicated in *Box 22* which shall be payable not later than every thirty (20) running days in advance commencing on the day and hour of the Vessel's delivery to the Charterers. Hire shall be paid continuously throughout the Charter Period.

(c)    Payment of hire shall be made in cash without discount in the currency and in the manner indicated in *Box 25* and at the place mentioned in *Box 25*.

(d)    Final payment of hire, if for a period of less than thirty (30) running days, shall be calculated proportionally according to the number of days and hours remaining before redelivery and advance payment to be effected accordingly.

(e)    Should the Vessel be lost or missing, hire shall cease from the date and time when she was lost or last heard of. The date upon which the Vessel is to be deemed as lost or missing shall be ten (10) days after the Vessel was last reported or when the Vessel is posted as missing by Lloyd's, whichever occurs first. Any hire paid in advance to be adjusted accordingly.

(f)    Any delay in payment of hire shall entitle the Owners to interest at the rate per annum as agreed in *Box 24*. If no such rate has been filed in, the three months interbank offered rate in London (LIBOR or its successor) for the currency stated in *Box 25*, as quoted by the British Bankers' Association (BBA) on the date when the hire fell due, increased by 2 per cent., shall apply.

(g)    Payment of interest due under sub-clause 11(f) shall be made within seven (7) running days of the date of the Owners' invoice specifying the amount payable or, in the absence of an invoice, at the time of the next hire payment due.

## 12.    Mortgage

(only to apply if *Box 28* has been appropriately filled in)

(a)    The Owners warrant that they have not effected any mortgage(s) of the Vessel and that they shall not effect any mortgage(s) without the prior consent of the Charterers, which shall not be unreasonably withheld.

(b)    The Vessel chartered under this Charter is financed by a mortgage according to the Financial Instrument. The Charterers undertake to comply, and provide such information and documents to enable the Owners to comply, with all such instructions or directions in regard to the employment, insurances, operation, repairs and maintenance of the Vessel as laid down in the Financial Instrument or as may be directed from time to time during the currency of the Charter by the mortgagee(s) in conformity with the Financial Instrument. The Charterers confirm that, for this purpose, they have acquainted themselves with all relevant terms, conditions and provisions of the Financial Instrument and agree to acknowledge this in writing in any form that may be required by the mortgagee(s). The Owners warrant that they have not effected any mortgage(s) other than stated in *Box 28* and that they shall not agree to any amendment of the mortgage(s) referred to in *Box 28* or effect any other mortgage(s) without the prior consent of the Charterers, which shall not be unreasonably withheld.

(Optional, *Clauses 12(a)* and *12(b)* are alternatives; indicate alternative agreed in *Box 28*).

## 13.    Insurance and Repairs

(a)    During the Charter Period the Vessel shall be kept insured by the Charterers at their expense against hull and machinery, war and Protection and Indemnity risks (and any risks against which it is compulsory to insure for the operation of the Vessel, including maintaining financial security in accordance with sub-clause 10(a)(vii)) in such form as the Owners shall in writing approve, which approval shall not be unreasonably

withheld. Such insurances shall be arranged by the Charterers to protect the interests of both the Owners and the Charterers and the mortgagee(s) (if any), and the Charterers shall be at liberty to protect under such insurances the interests of any managers they may appoint. Insurance policies shall cover the Owners and the Charterers according to their respective interests. Subject to the provisions of the Financial Instrument, if any, and the approval of the Owners and the insurers, the Charterers shall effect all insured repairs and shall undertake settlement and reimbursement from the insurers of all costs in connection with such repairs as well as insured charges, expenses and liabilities to the extent of coverage under the insurances herein provided for.

The Charterers also to remain responsible for and to effect repairs and settlement of costs and expenses incurred thereby in respect of all other repairs not covered by the insurances and/or not exceeding any possible franchise(s) or deductibles provided for in the insurances.

All time used for repairs under the provisions of sub-clause 13(a) and for repairs of latent defects according to *Clause 3(c)* above, including any deviation, shall be for the Charterers' account.

(b)    If the jurisdiction of the above insurances permit additional insurance to be placed by the parties, such cover shall be limited to the amount for each party set out in *Box 30* and *Box 31*, respectively. The Owners or the Charterers as the case may be shall immediately furnish the other party with particulars of any additional insurance effected, including copies of any cover notes or policies and the written consent of the insurers of any such required insurance in any case where the consent of such insurers is necessary.

(c)    The Charterers shall upon the request of the Owners, provide information and promptly execute such documents as may be required to enable the Owners to comply with the insurance provisions of the Financial Instrument.

(d)    Subject to the provisions of the Financial Instrument, if any, should the Vessel become an actual, constructive, compromised or agreed total loss under the insurances required under sub-clause 13(a), all insurance payments for such loss shall be paid to the Owners who shall distribute the moneys between the Owners and the Charterers according to their respective interests. The Charterers undertake to notify the Owners and the mortgagee(s), if any, of any occurrences in consequence of which the Vessel is likely to become a total loss as defined in this Clause.

(e)    The Owners shall upon the request of the Charterers, promptly execute such documents as may be required to enable the Charterers to abandon the Vessel to insurers and claim a constructive total loss.

(f)    For the purpose of insurance coverage against hull and machinery and war risks under the provisions of sub-clause 13(a), the value of the Vessel is the sum indicated in *Box 29*.

## 14.    Insurance, Repairs and Classification

(Optional, only to apply if expressly agreed and stated in *Box 29*, in which event *Clause 13* shall be considered deleted).

(a)    During the Charter Period the Vessel shall be kept insured by the Owners at their expense against hull and machinery and war risks under the form of policy or policies attached hereto. The Owners and/or insurers shall not have any right of recovery or subrogation against the Charterers on account of loss of or any damage to the Vessel or her machinery or equipment covered by such insurance, or on account of payments made to discharge claims against or liabilities of the Vessel or the Owners covered by such insurance. Insurance policies shall cover the Owners and the



This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document, which can be clearly visible, are that of the original BIMCO approved document must apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

Charterers according to their respective interests.  440
(b)  During the Charter Period the Vessel shall be kept  441
insured by the Charterers at their expense against  442
Protection and Indemnity risks (and any risks against  443
which it is compulsory to insure for the operation of the  444
Vessel, including maintaining financial security in  445
accordance with sub-clause 10(a)(i)) in such form as  446
the Owners shall in writing approve which approval shall  447
not be unreasonably withheld.  448
(c)  In the event that any act or negligence of the  449
Charterers shall vitiate any of the insurance herein  450
provided, the Charterers shall pay to the Owners all  451
losses and indemnify the Owners against all claims and  452
demands which would otherwise have been covered by  453
such insurance.  454
(d)  The Charterers shall, subject to the approval of the  455
Owners or Owners' Underwriters, effect all insured  456
repairs, and the Charterers shall undertake settlement  457
of all miscellaneous expenses in connection with such  458
repairs as well as all survival charges, surveyors and  459
liabilities, to the extent of coverage under the insurances  460
provided for under the provisions of sub-clause 14(a).  461
The Charterers to be secured reimbursement through  462
the Owners' Underwriters for such expenditure upon  463
presentation of accounts.  464
(e)  The Charterers to remain responsible for and to  465
effect repairs and settlement of costs and expenses  466
incurred thereby in respect of all other repairs not  467
covered by the insurances and/or not exceeding any  468
possible franchise(s) or deductions provided for in the  469
insurances.  470
(f)  All time used for repairs under the provisions of  471
sub-clauses 14(d) and 14(e) and for repairs of latent  472
defects according to Clause 3 above, including any  473
deviation, shall be for the Charterers' account and shall  474
form part of the Charter Period.  475
The Owners shall not be responsible for any expenses  476
as are incident in the use and operation of the Vessel  477
for such time as may be required to make such repairs.  478
(g)  If the conditions of the above insurances permit  479
additional insurance to be placed by (ii)(agents such  480
cover shall be limited to the amount for each party set  481
out in Box 31 and Box 31, respectively. The Owners or  482
the Charterers as the case may be shall immediately  483
furnish the other party with particulars of any additional  484
insurance effected, including copy/copies of any cover notes  485
or policies and the written consent of the insurers of  486
any such required insurance in any case where the  487
consent of such insurers is necessary.  488
(h)  Should the Vessel become an actual, constructive,  489
compromised or agreed total loss under the insurances  490
required under sub-clause 14(a) all insurance payments  491
for such loss shall be paid to the Owners, who shall  492
distribute the moneys between the Owners and the  493
Charterers according to their respective interests.  494
(i)  If the Vessel becomes an actual, constructive,  495
compromised or agreed total loss under the insurances  496
arranged by the Owners in accordance with sub-clause  497
14(a), this Charter shall terminate as of the date of such  498
loss.  499
(j)  The Charterers shall upon the request of the  500
Owners, promptly execute such documents as may be  501
required to enable the Owners to abandon the Vessel  502
to insurers and claim a constructive total loss.  503
(k)  For the purpose of insurance cover against hull  504
and machinery and war risks under the provisions of  505
sub-clause 14(a), the value of the Vessel is the sum  506
indicated in Box 29.  507
(l)  Notwithstanding anything contained in sub-clause  508
10(a), it is agreed that under the provisions of Clause  509
14, if applicable, the Owners shall keep the Vessel's  510
Class fully up to date with the Classification Society  511
indicated in Box 10 and maintain all other necessary  512
certificates in force at all times.  513

15.  **Redelivery**  514
At the expiration of the Charter Period the Vessel shall  515
be redelivered by the Charterers to the Owners at a  516
safe and ice-free port or place as indicated in Box 16, in  517
such ready safe berth as the Charterers shall direct. The  518
Charterers shall give the Owners not less than thirty  519
(30) running days' preliminary notice of expected date,  520
range of ports of redelivery or port or place of redelivery  521
and not less than fourteen (14) running days' definite  522
notice of expected date and port or place of redelivery.  523
Any changes thereafter in the Vessel's position shall be  524
notified immediately to the Owners.  525
The Charterers warrant that they will not permit the  526
Vessel to commence a voyage (including any proceeding  527
in ballast voyage) which cannot reasonably be expected  528
to be completed in time for such redelivery of the Vessel  529
within the Charter Period. Notwithstanding the above,  530
should the Charterers fail to redeliver the Vessel within  531
the Charter Period, the Charterers shall pay the daily  532
equivalent to the rate stated in Box 22 plus 10  533
per cent. or to the market rate, whichever is the higher,  534
for the number of days by which the Charter Period is  535
exceeded. All other terms, conditions and provisions of  536
this Charter shall continue to apply.  537
Subject to the provisions of Clause 10, the Vessel shall  538
be redelivered to the Owners in the same or as good  539
structure, state, condition and class as that in which  540
she was delivered, fair wear and tear not affecting class  541
excepted.  542
The Vessel upon redelivery shall have her survey cycles  543
up to date and trading and class certificates valid for at  544
least the number of months agreed in Box 17.  545

16.  **Non-Lien**  546
The Charterers will not suffer, nor permit to be continued,  547
any lien or encumbrance incurred by them or their  548
agents, which might have priority over the title and  549
interest of the Owners in the Vessel. The Charterers  550
further agree to fasten to the Vessel in a conspicuous  551
place and to keep so fastened during the Charter Period  552
a notice reading as follows:  553
"This Vessel is the property of (name of Owners). It is  554
under charter to (name of Charterers) and by the terms  555
of the Charter Party neither the Charterers nor the  556
Master have any right, power or authority to create, incur  557
or permit to be imposed on the Vessel any lien  558
whatsoever."  559

17.  **Indemnity**  560
(a)  The Charterers shall indemnify the Owners against  561
any loss, damage or expense incurred by the Owners  562
arising out of or in relation to the operation of the Vessel  563
by the Charterers, and against any lien of whatsoever  564
nature arising out of an event occurring during the  565
Charter Period. If the Vessel be arrested or otherwise  566
detained by reason of claims or liens arising out of her  567
operation hereunder by the Charterers, the Charterers  568
shall at their own expense take all reasonable steps to  569
secure that within a reasonable time the Vessel is  570
released, including the provision of bail.  571
Without prejudice to the generality of the foregoing, the  572
Charterers agree to indemnify the Owners against all  573
consequences or liabilities arising from the Master,  574
officers or agents signing Bills of Lading or other  575
documents.  576
(b)  If the Vessel be arrested or otherwise detained by  577
reason of a claim or claims against the Owners, the  578
Owners shall at their own expense take all reasonable  579
steps to secure that within a reasonable time the Vessel  580
is released, including the provision of bail.  581
In such circumstances the Owners shall indemnify the  582
Charterers against any loss, damage or expense  583
incurred by the Charterers (including hire paid under  584
this Charter) as a direct consequence of such arrest or  585
detention.  586

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification made to this standard form, such change must be clearly highlighted. The text of the approved BIMCO document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

18. Lien
The Owners to have a lien upon all cargoes, sub-hires
and sub-freights belonging or due to the Charterers or
any sub-charterers and any Bill of Lading freight for all
claims under this Charter, and the Charterers to have a
lien on the Vessel for all moneys paid in advance and
not earned.

19. Salvage
All salvage and towage performed by the Vessel shall
be for the Charterers' benefit and the cost of repairing
damage occasioned thereby shall be borne by the
Charterers.

20. Wreck Removal
In the event of the Vessel becoming a wreck or
obstruction to navigation the Charterers shall indemnify
the Owners against any sums whatsoever which the
Owners shall become liable to pay and shall pay in
consequence of the Vessel becoming a wreck or
obstruction to navigation.

21. General Average
The Owners shall not contribute to General Average.

22. Assignment, Sub-Charter and Sale
(a) The Charterers shall not assign this Charter nor
sub-charter the Vessel on a bareboat basis except with
the prior consent in writing of the Owners, which shall
not be unreasonably withheld, and subject to such terms
and conditions as the Owners shall approve.
(b) The Owners shall not sell the Vessel during the
currency of this Charter except with the prior written
consent of the Charterers, which shall not be unreason-
ably withheld, and subject to the buyer accepting an
assignment of this Charter. *See Article*

23. Contracts of Carriage
(a) The Charterers are to procure that all documents
issued during the Charter Period evidencing the terms
and conditions agreed in respect of carriage of goods
shall contain a paramount clause incorporating any
legislation relating to carrier's liability for cargo
compulsorily applicable in the trade; if no such legislation
exists, the documents shall incorporate the Hague-Visby
Rules. The documents shall also contain the New Jason
Clause and the Both-to-Blame Collision Clause.
(b) The Charterers are to procure that all passenger
tickets issued during the Charter Period for the carriage
of passengers and their luggage under this Charter shall
contain a paramount clause incorporating any legislation
relating to carrier's liability for passengers and their
luggage compulsorily applicable in the trade; if no such
legislation exists, the passenger tickets shall incorporate
the Athens Convention Relating to the Carriage of
Passengers and their Luggage by Sea, 1974, and any
protocol thereto.
*Delete as applicable.

24. Bank Guarantee
(Optional, only applicable if Box 27 filled in)
The Charterers undertake to furnish, before delivery of
the Vessel, a first class bank guarantee or bond in the
sum and at the place as indicated in Box 27 as guarantee
for full performance of their obligations under this
Charter.

25. Requisition/Acquisition
(a) In the event of the Requisition for Hire of the Vessel
by any government or other competent authority
(hereinafter referred to as "Requisition for Hire")
irrespective of the date during the Charter Period when
"Requisition for Hire" may occur and irrespective of the
length thereof and whether or not it be for an indefinite
or a limited period of time, and irrespective of whether it
may or shall remain in force for the remainder of the
Charter Period, this Charter shall not be deemed thereby

or thereupon to be frustrated or otherwise terminated
and the Charterers shall continue to pay the stipulated
hire in the manner provided by this Charter until the time
when the Charter would have terminated pursuant to
any of the provisions hereof always provided however
that in the event of "Requisition for Hire" any Requisition
Hire or compensation received or receivable by the
Owners shall be payable to the Charterers during the
remainder of the Charter Period or the period of the
"Requisition for Hire" whichever be the shorter.
(b) In the event of the Owners being deprived of their
ownership in the Vessel by any Compulsory Acquisition
of the Vessel or requisition for title by any governmental
or other competent authority (hereinafter referred to as
"Compulsory Acquisition"), then, irrespective of the date
during the Charter Period when "Compulsory Acqui-
sition" may occur, this Charter shall be deemed
terminated as of the date of such "Compulsory
Acquisition". In such event Charter Hire to be considered
as earned and to be paid up to the date and time of
such "Compulsory Acquisition".

26. War
(a). For the purpose of this Clause, the words "War
Risks" shall include any war (whether actual or
threatened), act of war, civil war, hostilities, revolution,
rebellion, civil commotion, warlike operations, the laying
of mines (whether actual or reported), acts of piracy,
acts of terrorists, acts of hostility or malicious damage,
blockades (whether imposed against all vessels or
imposed selectively against vessels of certain flags or
ownership, or against certain cargoes or crews or
otherwise howsoever), by any person, body, terrorist or
political group, or the Government of any state
whatsoever, which may be dangerous or are likely to be
or to become dangerous to the Vessel, her cargo, crew
or other persons on board the Vessel.
(b) The Vessel, unless the written consent of the
Owners be first obtained, shall not continue to or go
through any port, place, area or zone (whether of land
or sea), or any waterway or canal, where it reasonably
appears that the Vessel, her cargo, crew or other
persons on board the Vessel, in the reasonable
judgement of the Owners, may be, or are likely to be,
exposed to War Risks. Should the Vessel be within any
such place as aforesaid, which only becomes danger-
ous, or is likely to be or to become dangerous, after her
entry into it, the Owners shall have the right to require
the Vessel to leave such area.
(c) The Vessel shall not load contraband cargo, or to
pass through any blockade, whether such blockade be
imposed on all vessels, or is imposed selectively in any
way whatsoever against vessels of certain flags or
ownership, or against certain cargoes or crews or
otherwise howsoever, or is proceeded to an area where
she shall be subject, or is likely to be subject to
a belligerent's right of search and/or confiscation.
(d) If the insurers of the war risks insurance, when
Clause 14 is applicable, should require payment of
premiums and/or calls because, pursuant to the
Charterers' orders, the Vessel is within, or is due to enter
and remain within, any area or areas which are specified
by such insurers as being subject to additional premiums
because of War Risks, then such premiums and/or calls
shall be reimbursed by the Charterers to the Owners at
the same time as the next payment of hire is due.
(e) The Charterers shall have the liberty:
(i) to comply with all orders, directions, recommend-
ations or advice as to departure, arrival, routes,
sailing in convoy, ports of call, stoppages,
destinations, discharge of cargo, delivery, or in any
other way whatsoever, which are given by the
Government of the Nation under whose flag the
Vessel sails, or any other Government, body or
group whatsoever acting with the power to compel

This document is a computer-generated copy of the original BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

18-51277 - #112-18  File 12/18/18  Enter 12/26/18 10:19:17  Claims Attachment sbn 14-16
Pg 10 of 17

compliance with their orders or directions; 731
(ii) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risk insurance; 732 733 734 735 736

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement; 737 738 739 740 741 742 743 744

(f) In the event of outbreak of war (whether there be a declaration of war or not) (i) between any two or more of the following countries: the United States of America, Russia; the United Kingdom, France; and the People's Republic of China, (ii) between any two or more of the countries stated in Box 36, both the Owners and the Charterers shall have the right to cancel this Charter, whereupon the Charterers shall redeliver the Vessel to the Owners in accordance with Clause 15, if the Vessel has cargo on board after discharge thereof at destination, or if debarred under this Clause from reaching or entering it at a near, open and safe port as directed by the Owners, or if the Vessel has no cargo on board, at the port at which the Vessel then is or if at sea at a near, open and safe port as directed by the Owners. In all cases hire shall continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of the Charter shall apply until redelivery. 745 746 747 748 749 750 751 752 753 754 755 756 757 758 759 760 761 762 763

**27. Commission** 764
The Owners to pay a commission at the rate indicated in Box 33 to the Brokers named in Box 33, on any hire paid under the Charter. If no hire is earned to be paid under the Charter, the commission on the estimated amount of hire and extended period of this Charter. 765 766 767 768 769 770

If the full hire is not paid owing to breach of the Charter by either of the parties the party liable therefor shall indemnify the Brokers against their loss of commission. 771 772 773

Should the parties agree to cancel the Charter, the Owners shall indemnify the Brokers against any loss of commission but in such case the commission shall not exceed the brokerage on one year's hire. 774 775 776 777

**28. Termination** 778

(a) Charterers' Default 779
The Owners shall be entitled to withdraw the Vessel from the service of the Charterers and terminate the Charter with immediate effect by written notice to the Charterers if: 780 781 782

(i) the Charterers fail to pay hire in accordance with Clause 11. However, where there is a failure to make punctual payment of hire due to oversight, negligence, errors or omissions on the part of the Charterers or their bankers, the Owners shall give the Charterers written notice of the number of clear banking days stated in Box 34 (as recognised at the agreed place of payment) in which to rectify the failure, and when so rectified within such number of days following the Owners' notice, the payment shall stand as regular and punctual. Failure by the Charterers to pay hire within the number of days stated in Box 34 of their receiving the Owners' notice as provided herein, shall entitle the Owners to withdraw the Vessel from the service of the Charterers and terminate the Charter without further notice. 783 784 785 786 787 788 789 790 791 792 793 794 795 796 797 798 799

(ii) the Charterers fail to comply with the requirements of: 800
(1) Clause 6 (Trading Restrictions) 801
(2) Clause 13(a) (Insurance and Repairs) 802
provided that the Owners shall have the option, by 803

written notice to the Charterers, to give the Charterers a specified number of days grace within which to rectify the failure without prejudice to the Owners' right to withdraw and terminate under this Clause if the Charterers fail to comply with such notice; 804 805 806 807 808 809

(iii) the Charterers fail to rectify any failure to comply with the requirements of sub-clause 10(a)(i) (Maintenance and Repairs) as soon as practicably possible after the Owners have requested them in writing so to do and in any event so that the Vessel's insurance cover is not prejudiced. 810 811 812 813 814 815 816

(b) Owners Default 817
If the Owners shall by any act or omission be in breach of their obligations under this Charter to the extent that the Charterers are deprived of the use of the Vessel and such breach continues for a period of fourteen (14) running days after written notice thereof has been given by the Charterers to the Owners, the Charterers shall be entitled to terminate this Charter with immediate effect by written notice to the Owners. 818 819 820 821 822 823 824 825

(c) Loss of Vessel 826
This Charter shall be deemed to be terminated if the Vessel becomes a total loss or is declared as a constructive or compromised or arranged total loss. For the purpose of this sub-clause, the Vessel shall not be deemed to be lost unless she has either become an actual total loss or agreement has been reached with her underwriters in respect of her constructive, compromised or arranged total loss or if such agreement with her underwriters is not reached it is adjudged by a competent tribunal that a constructive loss of the Vessel has occurred. 827 828 829 830 831 832 833 834 835 836

(d) Either party may be entitled to terminate this Charter with immediate effect by written notice to the other party in the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of the other party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed, or if it suspends payment, ceases to carry on business or makes any special arrangement or composition with its creditors. 837 838 839 840 841 842 843 844 845

(e) The termination of this Charter shall be without prejudice to all rights accrued due between the parties prior to the date of termination and to any claim that either party might have. 846 847 848 849

**29. Repossession** 850
In the event of the termination of this Charter in accordance with the applicable provisions of Clause 28, the Owners shall have the right to repossess the Vessel from the Charterers at her current or next port of call, or at a port or place convenient to them without hindrance or interference by the Charterers, courts or local authorities. Pending physical repossession of the Vessel in accordance with this Clause 29, the Charterers shall hold the Vessel as gratuitous bailee only to the Owners. The Owners shall arrange for an authorised representative to board the Vessel as soon as reasonably practicable following the termination of the Charter. The Vessel shall be deemed to be repossessed by the Owners from the Charterers upon the boarding of the Vessel by the Owners' representative. All arrangements and expenses relating to the settling of wages, disembarkation and repatriation of the Charterers' Master, officers and crew shall be the sole responsibility of the Charterers. 851 852 853 854 855 856 857 858 859 860 861 862 863 864 865 866 867 868 869

**30. Dispute Resolution** 870
(a) This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to 871 872 873 874 875

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification being made to the pre-printed text of this document, which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assume no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

GOtoSBNDoc000131

the provisions of this Clause.  877
The arbitration shall be conducted in accordance with  878
the London Maritime Arbitrators Association (LMAA)  879
Terms current at the time when the arbitration proceed-  880
ings are commenced.  881
The reference shall be to three arbitrators. A party  882
wishing to refer a dispute to arbitration shall appoint its  883
arbitrator and send notice of such appointment in writing  884
to the other party requiring the other party to appoint its  885
own arbitrator within 14 calendar days of that notice and  886
stating that it will appoint its arbitrator as sole arbitrator  887
unless the other party appoints its own arbitrator and  888
gives notice that it has done so within the 14 days  889
specified. If the other party does not appoint its own  890
arbitrator and give notice that it has done so within the  891
14 days specified, the party referring a dispute to  892
arbitration may, without the requirement of any further  893
prior notice to the other party, appoint its arbitrator as  894
sole arbitrator and shall advise the other party  895
accordingly. The award of a sole arbitrator shall be  896
binding on both parties as if the had been appointed by  897
agreement.  898
Nothing herein shall prevent the parties agreeing in  899
writing to vary these provisions to provide for the  900
appointment of a sole arbitrator.  901
In cases where neither the claim nor any counterclaim  902
exceeds the sum of US$50,000 (or such other sum as  903
the parties may agree) the arbitration shall be conducted  904
in accordance with the LMAA Small Claims Procedure  905
current at the time when the arbitration proceedings are  906
commenced.  907

(b) This Contract shall be governed by and construed  909
in accordance with Title 9 of the United States Code  910
and the Maritime Law of the United States and any  911
dispute arising out of or in connection with this Contract  912
shall be referred to three persons at New York one to  913
be appointed by each of the parties hereto, and the third  914
by the two so chosen; their decision or that of any two  915
of them shall be final, and for the purposes of enforcing  916
any award, judgement may be entered on an award by  917
any court of competent jurisdiction. The proceedings  918
shall be conducted in accordance with the rules of the  919
Society of Maritime Arbitrators, Inc.  920
In cases where neither the claim nor any counterclaim  921
exceeds the sum of US$50,000 (or such other sum as  922
the parties may agree) the arbitration shall be conducted  923
in accordance with the Shortened Arbitration Procedure  924
of the Society of Maritime Arbitrators, Inc. current at  925
the time when the arbitration proceedings are commenced.  926
(c) This Contract shall be governed by and construed  927
in accordance with the laws of the place mutually agreed  928
by the parties and any dispute arising out of or in  929
connection with this Contract shall be referred to  930
arbitration at a mutually agreed place, subject to the  931
procedures applicable there.  932
(d) Notwithstanding (a), (b) or (c) above, the parties  933
may agree at any time to refer to mediation any  934
difference and/or dispute arising out of or in connection  935
with this Contract.  936
In the case of a dispute in respect of which arbitration  937
has been commenced under (a), (b) or (c) above, the  938
following shall apply:-  939
(i)   Either party may at any time and from time to time  940
elect to refer the dispute or part of the dispute to  941
mediation by service on the other party of a written  942
notice (the "Mediation Notice") calling on the other  943
party to agree to mediation.  944
(ii)  The other party shall thereupon within 14 calendar  945
days of receipt of the Mediation Notice confirm that  946
they agree to mediation, in which case the parties  947
shall thereafter agree a mediator within a further  948
14 calendar days, failing which on the application  949
of either party a mediator will be appointed promptly  950
by the Arbitration Tribunal ("the Tribunal") or such  951
person as the Tribunal may designate for that  952

purpose. The mediation shall be conducted in such  952
place and in accordance with such procedure and  953
on such terms as the parties may agree or, in the  954
event of disagreement, as may be set by the  955
mediator.  956
(iii) If the other party does not agree to mediate, that  957
fact may be brought to the attention of the Tribunal  958
and may be taken into account by the Tribunal when  959
allocating the costs of the arbitration as between  960
the parties.  961
(iv)  The mediation shall not affect the right of either  962
party to seek such relief or take such steps as it  963
considers necessary to protect its interest.  964
(v)   Either party may advise the Tribunal that they have  965
agreed to mediation. The arbitration procedure shall  966
continue during the conduct of the mediation but  967
the Tribunal may take the mediation timetable into  968
account when setting the timetable for steps in the  969
arbitration.  970
(vi)  Unless otherwise agreed or specified in the  971
mediation terms, each party shall bear its own costs  972
incurred in the mediation and the parties shall share  973
equally the mediator's costs and expenses.  974
(vii) The mediation process shall be without prejudice  975
and confidential and no information or documents  976
disclosed during it shall be revealed to the Tribunal  977
except to the extent that they are disclosable under  978
the law and procedure governing the arbitration.  979
(Note: The parties should be aware that the mediation  980
process may not necessarily interrupt time limits.)  981
(e) If Box 35 in Part I is not appropriately filled in, sub-clause  982
30(a) of this Clause shall apply. This Clause 30(b) shall  983
apply in all cases.  984
Sub-clauses 30(a), 30(b) and 30(c) are alternatives;  985
indicate alternative agreed in Box 35.  986

**31.  Notices**  987
(a)  Any notice to be given by either party to the other  988
party shall be in writing and may be sent by fax, telex,  989
registered or recorded mail or by personal service.  990
(b)  The address of the Parties for service of such  991
communication shall be as stated in Boxes 3 and 4  992
respectively.  993

HOUSTON, TX



Attachment "A" to be inserted at end of Cl. 22 of GO-Seatran Barecon 2001

Owner shall grant Charterer the Right of First Refusal to purchase the vessel at the same terms and conditions of any 3rd party offer to Owner, provided the 3rd party offer is accepted by Owner subject to the right of first refusal granted to Charterer.

GOtoSBNDoc000133

ATTACHMENT B
FOR GIO - SEATRANS BAREBOW 2001



**SeaTran**

Wire/ACH Instructions

FNBB (First National Banker's Bank)
7813 Office Park Blvd
Baton Rouge, LA 70898-0579
ABA: ███████
SWIFT: ███████

Beneficiary Bank:
Community First Bank
1101 E Admiral Doyle Drive
New Iberia, LA 70560
ABA: 065205372

Final Credit:
SeaTran Marine, LLC
Account: 1045411

Please contact Erika Verret at the below information for additional information or questions. If you should need technical assistance or have questions that pertain to the bank, please call (337) 365-6677.

Sincerely,

*Erika Verret*

Erika Verret

SeaTran Marine, LLC
107 Hwy 90 West, New Iberia, LA 70560
office (985) 631-0404 st 7476 · fax (985) 631-0404 · everret@seatranmarine.com
www.seatranmarine.com

6 NG

GOtoSBNDoc000134

**Nathan Guice**

| | |
|---|---|
| **From:** | Charlie Tizzard <ctizzard@seatranmarine.com> |
| **Sent:** | Friday, August 25, 2017 3:44 PM |
| **To:** | Nathan Guice; Billy Guice |
| **Cc:** | BLAKE MIGUEZ |
| **Subject:** | FW: Draft for submittal to Seatran |
| **Attachments:** | MR STEVEN barecon 2001 draft.pdf; ATT00001.htm; 2752-yam-17-barecon_2001.pdf; ATT00002.htm |

| | |
|---|---|
| **Follow Up Flag:** | Flag for follow up |
| **Flag Status:** | Completed |

Nathan,

Per our conversation earlier today concerning the bareboat charter of the Mr. Steven, I have reviewed the Barecon as marked up by Billy; and I don't see any major issues in the terms and conditions. Some of the terms I would like to clarify are as follows:

1. Boxes 14 and 15. – These dates will be changed for a October15, 2017 commencement of the bareboat.
2. Box 26. – I will provide the wire instructions for the SeaTran account at our bank in New Iberia as soon as I receive the instructions from my accounting department.
3. Box 28. – It should state "12(b) applies".
4. Box 29. - $15,500,000.00 USD.
5. Box 31. – It should state "Breach of Warranty and Innocent Owner coverage". This would clarify the language in section 13.a of the Barecon.
6. Section 12. – I believe you advised Blake that Billy's addition to get the bank to confirm that no loan will be called... can be deleted.
7. Section 22. – Billy's right of first refusal language can be added, however, we want to extend the statement to include "and the third party offer is accepted by the Owner subject to the right of first refusal granted to the Charterer."
8. All other changes to the Barecon by Billy are acceptable to SeaTran.

We agree we need to get the CAD drawings from Gulf Craft and repair the hull bottom paint.

Please advise if any additional information is needed at this time.

Thanks.

Charles E. Tizzard
Executive Vice President and
Chief Financial Officer



*SeaTran*

SeaTran Marine, LLC
107 Highway 90 West
New Iberia, LA 70560
Direct Line: 985 509 7475

1

18.51277
mr. Steven LLC

PRISCAD—Bayonne, N. J.

**EXHIBIT**

SBN #15
12/18/18

Office: 985 631 9004
Cell: 337 201 1912 or 985 519 6794
ctizzard@seatranmarine.com
www.seatranmarine.com


From: Nathan Guice [mailto:nathan.guice@guiceoffshore.com]
Sent: Thursday, June 29, 2017 9:11 PM
To: Charlie Tizzard <ctizzard@seatranmarine.com>; Blake Miguez <blake@miguezcompanies.com>
Subject: Fwd: Draft for submittal to Seatran

See below and attached from Billy.  We will get a typed cleaner version soon.

Nathan Guice
Guice Offshore


Begin forwarded message:

> From: "Billy Guice" <billy.guice@guiceoffshore.com>
> To: "Nathan Guice" <nathan.guice@guiceoffshore.com>
> Cc: "Asa Moss" <asa.moss@guiceoffshore.com>
> Subject: Draft for submittal to Seatran
>
> Nathan,
>
> Please provide Seatran with the attached draft to get the ball rolling.  Also attached is a clean copy so they can compare against my edits.  (Still trying to locate a Word copy and I have also started process to sign onto Bimco contract purchase site but it takes 24 hours).
>
> The boxes with yellow highlighter should be completed by Seatran.
>
> Regards,
>
> Billy Guice
>
> Guice Offshore LLC
> PO Box 4863
> Biloxi, MS 39535
> C: 832-922-1353
> www.guiceoffshore.com

2

From: Nathan Guice
Date: Oct 12, 2018, 8:21 AM -0500
To: Blake Miguez (bmiguez@seatranmarine.com)
Subject: Mr Steven

As discussed, we agree to extend the Mr. Steven bareboat contract on a month-to-month basis for the foreseeable future.  Same terms and conditions apply.


Thanks,


Nathan Guice

*Guice Offshore, LLC*

*Mob: 504 273 3874*

*Off: 985 801 4051*

1

18-51277
mr. Steven. LLC



EXHIBIT

SBN #16
12/18/18