UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE – OPELOUSAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| MR. STEVEN, LLC | § | CASE NO. 18-51277 |
| | § | |
| DEBTOR.[1] | § | |
| | § | |

*************************************************************************

## POST-HEARING OMNIBUS OPPOSITION TO MOTION FOR RELIEF FROM AUTOMATIC STAY AND MOTION TO DETERMINE PROPERTY OF THE ESTATE AND FOR TURNOVER OF PROPERTY

COME NOW Steve J. Miguez ("Miguez") and SeaTran Marine, LLC ("SeaTran"), through undersigned counsel, and submit Post-Hearing Oppositions to SBN V FNBC's ("SBN") Lift-Stay Motion, [ECF Doc. 60], and the Debtor's Turnover Motion, [ECF Doc. 29]. For the reasons identified in the initial Oppositions to the Motions, the evidence and testimony presented at the December 18 hearing, and for the reasons listed below, both Motions should be denied as (i) SBN has failed to carry its burden required under 11 U.S.C. § 362(d) for this Court to terminate the automatic stay as to the M/V MR. STEVEN and (ii) the Debtor and SBN have failed to demonstrate that either has a legal or equitable interest in the proceeds of a bareboat charter between SeaTran and Guice Offshore, LLC ("Guice"). Predictably, SBN has presented no competent evidence to support its attorneys' arguments and constant stream of pejoratives to impugn the Debtors, Miguez, and SeaTran.

---

[1] Pursuant to this Court's December 21, 2018 Order, the Debtor's case has been procedurally consolidated and is being jointly administered with the following affiliated Debtors: Lady Eve, L.L.C. (18-51488), Lady Brandi, L.L.C. (18-51517), Lady Glenda, L.L.C. (18-51518), Mr. Blake, L.L.C. (18-51519), Mr. Mason, L.L.C. (18-51521), Mr. Ridge, L.L.C. (18-51522), and Mr. Row, L.L.C. (18-51523) (collectively, the "Debtors"). [ECF Doc. 109].

1

## LAW & ARGUMENT

I. **The Lift-Stay Motion Should Be Denied as SBN Failed To Meet Its Burden**

Under § 362(d), SBN must either show "cause" to lift the automatic stay (§ 362(d)(1)) <u>or</u> that the debtor has no equity in the M/V MR. STEVEN <u>and</u> that the vessel is not necessary to an effective reorganization (§362(d)(2)). SBN can show neither.

**A. SBN Failed To Show "Cause" To Lift the Automatic Stay**

SBN asks this Court to terminate the automatic stay as to the M/V MR. STEVEN, the primary asset of the Debtor, for "cause" under § 362(d)(1) primarily on the basis of the Debtor's **prepetition** defaults under the Note and Mortgage. But those allegations, without more, are generally insufficient to constitute "cause" to lift the stay. *See, e.g.*, *In re Morrow*, 495 B.R. 378, 384 (Bankr. N.D. Ill. 2013) (citing *In re Moore*, 450 B.R. 849, 852 (Bankr. N.D. Ill. 2011)). As an initial matter, the Debtor has offered SBN adequate protection in the amount of $25,000 per month to compensate SBN for the use of the M/V MR. STEVEN. "What constitutes cause under section 362(d)(1) other than lack of adequate protection has been developed on a case-by-case basis." *Id*. As explained by the *Morrow* court:

> The nature of relief from stay litigation is not, in many instances, what it appears to be. To the uninitiated (and perhaps to some well versed in bankruptcy practice), it may appear that stay litigation is about the debtor's performance of its non-bankruptcy legal obligations. For example, it is not uncommon for parties to discuss how many months of default a debtor may have incurred regarding its mortgage payments when the court is asked to grant relief from stay to the applicable lender. This is, however, a mostly mistaken appearance.

*Id*. The *Morrow* court continued:

> [T]he litigation is instead about the relationship between the movant, the movant's collateral and the bankruptcy estate. It is not an adjudication as to whether the debtor is or is not in default, or whether the creditor is or is not entitled to repossess its collateral. Merely having defaulted on a payment obligation is not enough, especially a prepetition one, given that in chapter 13, at least, a debtor is authorized to cure certain defaults through its plan.

2

*Id*. at 384–85 (internal quotations and citations omitted). Like in a chapter 13, the Debtor here in chapter 11 is also permitted to cure prepetition defaults through its plan. *See* 11 U.S.C. § 1123(a)(5)(G). What cases like *Morrow* make clear "is something that should be tautological: Any analysis of grounds for relief from stay must begin with the statute itself." *Id*. (citing *In re Moore*, 450 B.R. at 852). And SBN falls well short of meeting its burden under § 362(d)(1).

SBN does not cite a lack of adequate protection to lift the stay, but relies solely on the Debtor's "bad faith" prepetition monetary defaults as justification to lift the stay. But most courts reject motions for relief from stay predicated solely on grounds of a prepetition payment default. *See id*. at 386; *In re Capodanno*, 83 B.R. 285, 288 (Bankr. E.D. Pa. 1988); *In re Tashjian*, 72 B.R. 968, 974 (Bankr. E.D. Pa. 1987). Indeed, "it must be recalled that poor prepetition payment histories are systematic of most debtors and hence this factor is, in itself, of very limited relevance." *In re Tashjian*, 72 B.R. at 974. "Permitting relief based solely on prepetition grounds would be antithetical to the breathing spell that is, in some instances, so desperately needed by the debtors." *In re Morrow*, 495 B.R. at 386.

SBN also accuses the Debtor of prepetition non-monetary defaults of mortgage covenants to justify lifting the stay. But it is not enough for SBN to simply assert that there is "cause" for the automatic stay to be vacated because the Debtor is alleged to have failed to notify FNBC pursuant to a particular mortgage covenant of the fact that the M/V MR. STEVEN was being chartered and put to use (a fact FNBC was well aware of) or that the Vessel may have been modified for purposes of a specific charter without FNBC's consent.[2] To the extent that SBN's

---

[2] Indeed, as discussed below, the July 2014 Vessel Operating Agreement between SeaTran and Iberia Marine Service, LLC ("IMS"), giving SeaTran the exclusive right to charter the M/V MR. STEVEN was binding and in effect well before the Debtor granted FNBC a ship mortgage on the M/V MR. STEVEN in September 2015, meaning that no default under the ship mortgage could have occurred—the Vessel was already chartered to IMS and then to SeaTran.

3

argument has any force at all, it pales in the face of the fact that FNBC accepted years of payments from the Debtor under the Note. *See, e.g.*, *In re Allston*, 206 B.R. 297, 299 (Bankr. E.D.N.Y. 1997).

But "[e]ven if the Court found that cause existed to lift the automatic stay, the balance of hardships strongly favors maintaining the automatic stay." *In re Velo Holdings Inc.*, 475 B.R. 367, 390 (Bankr. S.D.N.Y. 2012). As in *In re Velo Holdings*, termination of the stay here as to the M/V MR. STEVEN, the sole asset of the Debtor, "would significantly impede [the Debtor's] ability to restructure, if not eliminate the possibility of a successful reorganization entirely, while severely impairing creditor recoveries." *Id*. As discussed below, lifting the stay on the M/V MR. STEVEN would also create a hardship on the Debtors' entire enterprise, as each Vessel owned by the Debtors is needed to generate income for the whole. Per his testimony, Miguez has already put $2.6 million of his own funds into the Debtors' organization in the last 1 to 1.5 years, and is poised to fund a plan that would pay creditors 100%, but the enterprise needs every Vessel generating income for the Plan to be viable.

SBN loosely bandies about the term "bad faith" as "cause" to lift the stay, but, as stated in Miguez's initial Opposition, the Fifth Circuit cautioned against the talismanic reference to the *Little Creek* factors and instead advised that "determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities." *In re Little Creek*, 779 F.2d 1068, 1072 (5th Cir. 1986). Indeed, in *Little Creek*, the Fifth Circuit held that "[r]esort to the protection of the bankruptcy laws is not proper under these circumstances because there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation, except according to the debtor's 'terminal euphoria.'" *Id.* at 1073. As discussed

4

below, the Debtor here is operating as a going concern and is absolutely in the position to successfully reorganize. Because SBN has failed to show any evidence constituting "cause" under § 362(d)(1), the Lift-Stay Motion should be denied.[3]

**B. The Evidence Shows That the M/V MR. STEVEN Is Necessary to the Debtor's Effective Reorganization**

At the December 18 hearing, the Debtor and Plan Proponents adduced testimony and documents that established a reasonable prospect of reorganization for the Debtors. Mr. Tizzard, Chief Financial Officer for SeaTran, presented pro forma projections for 2019 through 2023, providing to pay SBN's claim in full at 5% or the *Till* rate using the amortization schedule set forth in the FNBC/SBN financing documents. *See* Debtor's **Exhibit 7** (filed under seal). Also introduced as competent evidence at the hearing was an executed Plan Support Agreement for the Debtors setting forth the terms of a future plan and firm commitment of financial support for the proposed plan from SeaTran, Miguez, and Iberia Crewboat & Marine Service, LLC ("Iberia Crewboat") specifically as to any shortfall of the $100,000 per month that SBN would be paid under a confirmed Plan. *See* **Exhibit 8**.

As the record from the hearing revealed, Iberia Crewboat and Miguez have almost $4

---

[3] In the absence of competent evidence showing "cause," SBN has gotten out over its skis with its unfounded allegations and is merely left with empty pejoratives in an attempt to impugn the Debtors, Miguez, and SeaTran. SBN continues to beat the drum alleging a "scam" whereby it claims the Debtor fraudulently transferred $2.7 million from its account to Iberia Marine Service, LLC on the eve of filing. The reality, revealed in sworn testimony and competent documentary evidence before the U.S. Trustee at the November 27 § 341 hearing and at the December 18 hearing on this matter, is that the Debtor had only a few dollars in its account just prior to the transfer. The fact is that $2.7 million was contemporaneously exchanged between Mr. Steven, LLC and Iberia Marine Service, LLC to reconcile the books and records (due to's/due from's) of each entity—as has been the course of dealing between the parties for years. And the United States Trustee, having reviewed copies of the checks themselves, appears to be satisfied with the Debtor's explanation of the contemporaneous exchanges. And not only has the United States Trustee reviewed copies of the checks evidencing the contemporaneous exchange, but SBN has reviewed the checks at the § 341 hearing as well.
    SBN also hangs its hat on "delays" in SBN's ability to prosecute its Guaranty Action against Miguez that was recently transferred to this Court as a related matter to the Debtor's case as "evidence" of bad faith warranting termination of the stay. But procedural maneuvering is not improper—SBN has cited no case law supporting its position that delays against a guarantor could be considered bad faith on the part of a Debtor in the context of a lift-stay motion. What became obvious at the November 18 hearing was that SBN chose to sue Miguez personally rather than instituting foreclosure proceedings on its collateral, so any "delays" it may have suffered were the result of its own making.

million in Capital Construction Fund accounts established under the U.S. Maritime Administration whereby the funds can be applied to cover a shortfall (if needed) in making post-confirmation monthly principal payments to SBN; the balance of such funds could be applied (if necessary) to the principal owed on the balloon payment. SeaTran and Miguez also committed to deposit $1.25 million into a fund to be utilized for any interest shortfall during the term of the SBN's restructured debt. The executed Plan Support Agreement is a firm, binding commitment, subject to normal conditions precedent, such as the filing of a joint plan of reorganization, confirmation of the proposed Plan, no material adverse changes, and obtaining a final Confirmation Order of this Court.

The M/V MR. STEVEN, as well as each of the other Vessels owned by the Debtors, is vital to a successful reorganization, as the Vessels are the income-producing backbone of the enterprise. Indeed, the M/V MR. STEVEN alone can produce $100,000 per month, and, as the sole asset of the Debtor, it is indispensable to the Debtor's reorganization as well as the health of the entire organization of affiliated Debtors.[4]

There are non-affiliated trade creditors who will be separately classified and who can serve as an accepting class. SBN is proposed to be paid in full and, therefore, the Plan as set forth in the Plan Support Agreement is confirmable. Although confirmation is not before this Court at this juncture, this Court can nevertheless conclude based on the evidence presented at the hearing that the Debtor has a reasonable prospect of reorganization and that the M/V MR. STEVEN is necessary to that effective reorganization.

---

[4] As testified to by Mr. Tizzard, the Debtors function as a group, with working vessels supporting others having slow periods due to repairs or other downtime. As an example, Mr. Tizzard testified that SeaTran spent hundreds of thousands of dollars to outfit and prepare the M/V MR. STEVEN for the Charter and, in the years prior to the Charter, that Vessel lost substantial revenue. But all of those costs and expenses were covered by revenues from the other Vessels in the group. At this point, the M/V MR. STEVEN has been and continues to be under Charter and is able to pull its weight and generate revenue for the group.

SBN has failed to meet its burden under §§ 362(d)(1) or (2) to justify termination of the automatic stay. Therefore, Miguez respectfully requests this Court deny the Lift-Stay Motion

## II. The Turnover Motion Should Be Denied as the Debtor Has No Legal or Equitable Interest in the Proceeds of the Charter Between SeaTran and Guice

The unrefuted evidence at the December 18 hearing reflected the facts that (i) the M/V MR. STEVEN owned by the Debtor (as well as the Vessels owned by each of the affiliated Debtors) are operated by Iberia Marine Service, LLC ("IMS") (owned by Miguez) via separate vessel operating agreements and (ii) IMS, a 50% owner of SeaTran, in turn, contracts with SeaTran to operate the Vessels (the "Vessel Operating Agreement"). On or about October 15, 2017, SeaTran and Guice executed a BIMCO Standard Bareboat Charter (the "Charter"), providing for the chartering of the M/V MR. STEVEN for one year, which continues at this time on a month-to-month basis. *See* **Exhibits 6 & 9**.

The unrefuted evidence also revealed that the business model described above had been orally agreed to on July 1, 2014 and the terms performed by all of the parties since that date. *See* **Exhibit 2**. The unrefuted evidence also showed that the business structure was explained in great detail to FNBC in 2015 as a condition of lending. *See* **Exhibit 3**. Under intense cross examination, Mr. Tizzard unfailingly testified that FNBC was told and knew that SeaTran would be chartering the Vessels and would own the receivables pursuant to the terms of the Vessel Operating Agreement. *See* **Exhibits 3 & 4** (§ 4(a)). Those receivables would be paid to IMS under the oral vessel operating agreement—**but only after setoff of expenses incurred by SeaTran though the chartering of the Vessels.** *See* Ex. 4 (arts. 4(h) & 5). As Mr. Tizzard testified, in light of those conversations with FNBC, FNBC requested that SeaTran guarantee the obligations owed to FNBC and grant a security interest in its receivables, but SeaTran refused that request because it also operated and chartered vessels on behalf of owners other than IMS

7

and would not risk encumbering those receivables. Finally, the unrefuted testimony of Mr. Tizzard revealed that such a business structure is standard in the marine industry.

It is the proceeds of the Charter between SeaTran and Guice for the chartering of the M/V MR. STEVEN—at this time totaling approximately $900,000—that the Debtor (and derivatively, SBN) ask this Court to recognize as property of the estate.[5] In support of the Turnover Motion, SBN alleges—without evidence or basis—that the Vessel Operating Agreement between IMS and SeaTran was executed nefariously on the eve of the Debtor's bankruptcy filing to somehow circumvent SBN's rights as the purchaser of the FNBC Note. Nothing could be further from the truth, as the parties had entered into a binding oral contract in July 2014 and continued to perform under that binding oral contract until October 2018, when the parties elected to memorialize the oral contract in a written contract at the request of Capt. Elliott's Party Boats, LLC d/b/a Texas Crewboats ("Texas Crewboats"), the other 50% owner in SeaTran and unaffiliated with IMS. *See* **Exhibit 5**. As shown by the unrefuted evidence presented at the hearing, the parties had circulated drafts of a vessel operating agreement beginning on or about August 29, 2018. *See id.*

Under Louisiana law, "[a] verbal contract of lease, complete in itself, independent of any writing, and unaccompanied by an intention to have the same reduced to writing, as perfecting it, is an enforceable contract." *Waldhauser v. Adams Hats, Inc.*, 20 So. 2d 423, 426 (La. 1944). An oral contract over $500 "must be proved by at least one witness and other corroborating circumstances." LA. CIV. CODE art. 1846. "Only general corroboration is required [and] [i]t is not necessary that plaintiff offer independent proof of every detail." *Peter Vicari Gen. Contractor, Inc. v. St. Pierre*, 02-250 (La. App. 5 Cir. 10/16/02), 831 So. 2d 296, 301. "[T]he

---

[5] To the extent that the Turnover Motion also seeks turnover of those proceeds, as SeaTran stated in its initial Opposition, the Turnover Motion must be denied until the Debtor utilizes the proper legal procedure under Bankruptcy Rule 7001(1).

party asserting a verbal contract has the burden to prove the contract [and] may serve as his own witness." *Precision Consultants, LLC v. Hurricane Legal Ctr*., LLC No. 2012-CA-1906, 2013 WL 3367645, at *3 (La. App. 1 Cir. July 1, 2013) (citation omitted). SeaTran has clearly satisfied its burden.

The unrefuted testimony of Mr. Tizzard at the December 18 hearing, coupled with the facts adduced that (i) in July 2014, IMS, Texas Crewboats, and Comar (then-member of SeaTran) each contributed an initial funding into SeaTran and an additional $75,000 per vessel operated by SeaTran, as well as two months of projected SG & A amounts, as required under the draft vessel operating agreement to fund expenses associated with the chartering of the Vessels (including the M/V MR. STEVEN), *see* **Exhibit 1**, and (ii) SeaTran and IMS have continued to perform pursuant to the terms of that oral agreement, corroborates the existence of the oral vessel operating agreement, *see* **Exhibits 2 & 4**. The words and actions of IMS and SeaTran since July 2014 show the intent of the parties to be bound by the oral vessel operating agreement. *See Precision Consultants, LLC*, 2013 WL 3367645, at *5 (citing *Riverside/Terra Corp. v. K & W Agric. Servs., Inc*., 540 So. 2d 456 (La. App. 1 Cir.)). SBN has cited no case law and has presented no competent evidence to refute the fact that SeaTran and IMS bound themselves back in July 2014 to the business model memorialized by the October 2018 Vessel Operating Agreement.

More importantly, SBN presented no evidence that it, as successor to FNBC, has a security interest in SeaTran's receivables that would entitle it to the proceeds from the Charter between SeaTran and Guice. It has presented no authenticated and perfected security agreement over SeaTran's receivables. SBN purchased the interests of FNBC. FNBC held the Note and was granted a mortgage on each of the Vessels, including the M/V MR. STEVEN, by the

9

Debtors and IMS, who are the obligors on the Note—**but SBN's purchase of the Note and Mortgages did not include a security interest on SeaTran's receivables**.[6] SeaTran is not an obligor on the Note and never granted a security interests in its receivables, although it was asked to do so by FNBC. Further, assuming arguendo the Debtor may have rights in proceeds of the IMS/SeaTran Vessel Operating Agreement, it has no rights in the SeaTran/Guice Charter. A security interest in proceeds and other collateral can attach only when the Debtor has rights in that collateral. *See* LA. REV. STAT. § 10:9-203(a) & (b); § 10:9-102(a)(12) (defining "collateral"); *see also Jojo's 10 Rest., LLC v. Devin Props., LLC (In re Jojo's Rest., LLC)*, 455 B.R. 321, 327–28 (Bankr. D. Mass. 2011) (finding that entity had no security interest in physical assets for failure and inability to produce authenticated security agreement, nor did it have a security interest in a license as the debtor had no rights in the license to grant a security interest).[7]

SBN has not demonstrated that it or the Debtor has any legal or equitable interests in the proceeds of the Charter between SeaTran and Guice; therefore, SeaTran respectfully asks this Court to deny the Turnover Motion, as the Charter proceeds are not property of the estate.

## CONCLUSION

For the reasons set forth above as well as the reasons identified in the initial Oppositions to the Motions, Miguez and SeaTran respectfully request that this Court DENY the Lift-Stay Motion and the Turnover Motion in their entireties.

---

[6] The D'oenche Duhme doctrine, a banking rule that prevents a borrower or guarantor from making secret agreements with an insolvent or failed bank when a federal government insurer is attempting to collect a loan, does not create or allow SBN to obtain a security interest in SeaTran's receivables generated by the Charter with Guice.

[7] Even if SBN somehow had a security interest in the account generated by the Charter, SeaTran is owed its incurred expenses associated with chartering the Vessels under the terms of the Vessel Operating Agreement. *See* LA. REV. STAT. § 10:9-404; *see also* Ex. 4. SeaTran is willing and contractually obligated to send monies generated through chartering of the Vessels to IMS, but SeaTran also has the contractual and statutory right to recoup all expenses owed by IMS before remitting the balance to it.

Respectfully submitted,

| | |
|---|---|
| **LUGENBUHL, WHEATON, PECK, RANKIN & HUBBARD, A LAW CORPORATION** |  /s/ Stewart F. Peck<br>STEWART F. PECK (LA #10403)<br>BENJAMIN W. KADDEN (LA #29927)<br>MEREDITH S. GRABILL (LA #35484)<br>601 Poydras Street, Suite 2775<br>New Orleans, LA 70130<br>Telephone: (504) 568-1990<br>Facsimile: (504) 310-9195<br>E-mail: speck@lawla.com; bkadden@lawla.com; mgrabill@lawla.com<br><br>*Counsel for Steve J. Miguez and SeaTran Marine, LLC* |

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was served upon the parties that receive electronic notice via the Court's ECF Filing System on this 28th day of December 2018 and by U.S. Mail on all parties listed on the attached mailing matrix.

 /s/ Stewart F. Peck

11