UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE - OPELOUSAS DIVISION

IN RE:                    *        CASE NO. 18-51277

MR. STEVEN, L.L.C.        *        CHAPTER 11

    Debtor                *

OMNIBUS OPPOSITION TO MOTION FOR RELIEF FROM AUTOMATIC STAY
PURSUANT TO 11 U.S.C. § 362(d) FOR ECF NOS. 126, 128 and 130

Now into Court, through undersigned counsel, comes Mr. Mason LLC, Mr. Row LLC and Lady Brandi L.L.C. ("Debtors"), who file this Omnibus Opposition to three *Motions for Relief from Automatic Stay Pursuant to 11 U.S.C. § 362(d)* ("Motions") [Dkt. Nos. 126, 128 and 130] filed by SBN V FNBC LLC ("SBN") seeking to lift the automatic stay on the assets owned by the Debtors. In opposition, Debtors assert that the stay should not be lifted due to the following:

1.      The Debtors and the entities whose cases were jointly administered with the Debtors [Dkt. No. 109] (collectively "Filing Entities") have a Joint Plan of Reorganization ("Joint Plan") that will be filed prior to the hearing on the Motions. The Joint Plan is feasible and will pay the allowed secured claim of SBN in full through a combination of operating revenue, capital contributions or loans made by Steven Miguez and Capital Construction Funds. The fact that the Filing Entities can and will file a Joint Plan that has a reasonable prospect of confirmation means that the property subject to the SBN lien is necessary for an effective reorganization.

2.      Cause does not exist to lift the automatic stay inasmuch as the Debtors did not file their Chapter 11 in bad faith. The Debtors are not seeking to delay or defeat creditors but, rather, are using the bankruptcy process to effect a speedy, efficient reorganization that will restructure that Note (defined herein) and pay all creditors in full (including SBN). The elements asserted by

{00366014-17}

1

SBN as bad faith are not sufficient cause to lift the automatic stay in light of the fact that the Debtors are moving swiftly to confirm a Joint Plan within the exclusive period afforded a Debtor under the Bankruptcy Code.

## BACKGROUND

3. On September 28, 2015, First NBC Bank (the "FNBC") made a loan of $23,500,000.00 to the Filing Entities and Iberia Marine ("Note"). Each of the Filing Entities owns a vessel used in the oil and gas industry. Each entity is a co-maker on a single note, as opposed to a guarantor of another entity's debt and each entity, with the exception of Iberia Marine, purported to grant to the FNBC a preferred ship mortgage on the vessel it owns in the amount of the Note. Each of the Filing Entities listed above have filed for relief under Chapter 11 of the United States Bankruptcy Code. Each of the co-makers of the Note are affiliates of one another, as such term is defined under the Bankruptcy Code.

4. Prior to the execution of the Note and the granting of the preferred ship mortgages that secured the Note, Iberia Marine, SeaTran Marine, LLC ("SeaTran") and the Filing Entities entered into an oral agreement for the joint marketing and operation of the vessels owned by each entity. The structure of the agreement and the economics of the agreement were made available to the FNBC prior to its making the loan. In fact, in the course of the negotiation of the loan terms, the FNBC requested a guaranty from SeaTran and an assignment of its accounts and the requests were denied. The FNBC elected to make the loan based upon the structure that existed with only the Filing Entities and Iberia Marine as co-makers and the security provided by the assets of those entities.

5. In connection with the making of the loan, this Court has already heard uncontroverted testimony that the FNBC relied upon the assets and cash flow of all the co-makers

{00366014-17}

2

of the Note to provide collateral and a payment stream for the servicing of the loan. The cash flow generated from all the vessels owned by the jointly administered Debtors served as the source of payment for the Note. The FNBC recognized, by relying on the fleets' revenue, that at different points in time some vessels would be working and generating revenue while others would be stacked and not generating revenue.

6. The FNBC also knew that SeaTran would charter the vessels owned by the Filing Entities.

7. In April of 2017, the FNBC was taken over by the FDIC. Its loan portfolio was split into packages and sold. The package that contained the Note was sold to SBN at a substantial discount to the face amount of the loans contained in the package.

8. After the failure of the FNBC, representatives of the Filing Entities met with FDIC agents and, in fact, an attempt was made to make some payment on the Note.

9. At some point after, upon obtaining the Note, SBN advised the makers of the Note that it wanted payment in full and would not restructure the Note. Offers made to restructure the Note were met with silence on the part of SBN.

10. In October of 2018, the oral agreement and course of dealing that existed between the Filing Entities, Iberia Marine and Sea Tran that predated the execution of the Note and was known to FNBC was reduced to writing.

11. The Debtors filed for relief pursuant to Chapter 11 on November 21, 2018. At the time each Chapter 11 was filed, no suit was pending against the Debtors, however the Debtors were told by counsel for SBN to either file for relief or SBN would commence foreclosure actions against the Debtors.

12. The Filing Entities availed themselves of the Bankruptcy Code provisions that allow for a restructure of existing debt provided the restructure meets the requirements of 11 U.S.C. § 1129 (b)(2)(a) against a lender that is unwilling to negotiate a term payout and who wants immediate payment on its debt. Chapter 11 was designed to allow Debtors an opportunity to restructure the terms of their debt when such Debtors were unable to meet the original terms of the loan or could not make payment due to a downturn in the market in which they operated.

**FILING ENTITIES WILL SHORTLY FILE A JOINT PLAN OF REORGANIZATION THAT PAYS ALL CREDITORS IN FULL**

13. The Filing Entities will file, prior to the hearing on the Motions, a Joint Plan of Reorganization that pays in full over time the claim of SBN represented by the Note. The filing of the Plan will be well within the exclusive period afforded a Debtor.

14. The Joint Plan will be funded by the operations of the vessels owned by the Filing Entities, capital contributions or loans made by Steven Miguez and Capital Construction Funds that are held in the name of Iberia Crewboat & Marine Services, L.L.C. and Steven Miguez, individually. Steve Miguez and Capital Construction Funds will be used to backstop the payments proposed under the Joint Plan.

15. The Capital Construction Fund Program is a program that helps owners and operators of U.S. flag vessels. It was created by the Merchant Marine Act of 1936, as amended (46 U.S.C. § 1177) and is administered by the U. S. Department of Transportation Maritime Administration ("Marad"). It is a program that allows owners and operators to segregate funds tax-free under Section 7518. It is similar to a corporate 401(k). The funds can be used to make principal payments on loans secured by U.S. Flag Vessels. The Filing Entities have access to over $4,000,000.00 of Capital Construction Funds available to backstop any plan and assure SBN that it will be paid in full over the life of the plan.

16. SBN, in its Motions, has gone to great lengths to assert that the Debtors have filed their Chapter 11 petitions in bad faith. The problem with the argument is that there cannot be bad faith where the proposed plan will pay the secured creditor in full and satisfy the requirements of 11 U.S.C. § 1129. See *In re Fay Associates,* 225 B.R. 1 (Bankr. D.C. 1998). The Filing Entities have an honest intention to reorganize their financial affairs in accordance with the policies underlying the Bankruptcy Code. See *In re Setzer,* 47 B.R. 340 (Bankr. E.D. N.Y. 1985).

17. The cases interpreting the 11 U.S.C. § 362(d)(3) requirement "necessary for an effective reorganization" have a sliding scale with respect to what a debtor must show with respect to a proposed plan. In *In re Holly's, Inc.*, 140 B.R. 643, 700, 701 and 702 (Bankr. W.D. Mich. 1993), the test for reasonable possibility of reorganization early in the exclusive period is "plausible" (*Id.* at 701) and towards the end of the exclusive period the test is "probable" (*Id.* at 702). See also *In re Gunnison Center Apartments, LP*, 320 B.R. 391, 402 (Bank. D. Colo. 2008).

18. The Joint Plan that will be filed by the Filing Entities has the capital to ensure feasibility through the Capital Construction Funding and the financial assets of Steven Miguez. The facts in the cases where Chapter 11 filings have been dismissed for bad faith are distinguishable because those debtors did not possess the resources or the access to a rainy fund that these Debtors possess. In this case, the access to capital by the Debtors and the feasibility of the Joint Plan are significantly greater than either plausible or probable.

19. The Bankruptcy Code has no requirement that, in order to confirm a plan, a debtor must have employees, have an operating business, as opposed to an income generating asset and a large unsecured creditor non-insider class. The 5th Circuit in *In Re Village at Camp Bowie I, LP* 710 F. 3d 239, 246 (5th Cir. 2013), expressly rejected a materiality test for purposes of 11 U.S.C. § 1129 (a)(10). The Court stated:

> "But this logic sets the cart before the horse, resting on the unsupported assumption that Congress intended Section 1129(a)(10) to implicitly mandate a materiality requirement."

The fact that the unsecured creditor class may be small in comparison to the SBN claim does not mean that a small unsecured creditor class cannot satisfy the requirements for plan confirmation contained in 11 U.S.C. § 1129(a)(10).

20. The Filing Entities have already presented to the court pro-formas to show that, with the use of assets of Steven Miguez, the Capital Construction Funds and the operations of the vessels, the Filing Entities will have a "successful reorganization within a reasonable time" and that the Chapter 11 petitions of the Filing Entities were not filed to clog the Court's docket with visionary or impractical schemes for reorganization.

21. This Court, in determining whether good faith exists, must look on the "totality of the circumstances in light of the Bankruptcy Code's purpose to provide Debtor with a fresh start." See *In Re Sun Country Development Inc.,* 764 F. 2d 406, 408 (5th Cir. 1985). As the 6th Circuit stated *In Re Caklwell*, 851 F. 2d 852, 860 (6th Cir. 1988), the totality of the circumstances test means exactly what it says: It exacts an examination of all the facts in order to determine the bona fides of the debtor. The Supreme Court has emphasized that to support a finding of bad faith, the debtors' conduct must be atypical and the case must be extraordinary. See *Marrama v Citizens Bank of Massachusetts,* 549 U.S. 365, 374 n11 (2007).

22. The Chapter 11 cases filed by the Filing Entities were filed with the intended purpose of restructuring the debt of the Filing Entities such that they would survive a temporary downturn in a market or an economy. The clear motivation of the Filing Entities as evidenced by the Joint Plan that will be filed and the financial resources that will be committed to making the
{00366014-17}

Joint Plan work is a desire to rehabilitate temporarily distressed entities and protect against a lender that is unwilling to accept anything other than immediate payment in full.

23. In this case, the actions of the Filing Entities in seeking to pay the secured lender in full pursuant to restructured terms with the availability of the Capital Construction Funds and personal assets of Steven Miguez falls within the essence of the Bankruptcy Code goals. The Bankruptcy Code, and specifically Section 1129(b)(2)(a), were written to allow debtors to restructure existing debt when faced with an intransient lender.

24. SBN in support of its bad faith argument asserts that the Debtors have no employees and the Bankruptcy petitions were filed on the eve of foreclosure. The Code does not prohibit a financially distressed entity that has no employees from filing a Chapter 11 and confirming a plan. Cases such as *In re Gremlin,* 547 B.R. 196, 198 (Bankr. E.D. 2016) and *In re Omni Lion's Run L.P.,* 578 B.R. 394 (Bankr W.D. Tex. 2017) have held that filing on the eve of foreclosure is not by itself indicative of bad faith. In *In re Gremillion,* 547 B.R. 196, 200 (Bankr. E.D. La. 2016), the Court did not make a finding of bad faith in what was essentially a dispute over terms between a debtor and a single creditor. The real test is whether a debtor is moving forward in good faith to pursue a confirmable plan.

**VESSELS' LACK OF USE IS NOT DETERMINATIVE
OTHER FACTORS EXIST TO KEEP THE STAY IN PLACE**

25. To obtain relief from stay under 11 U.S.C. § 362(d)(2) the Court must determine that the property at issue is not necessary for the debtor to effectively reorganize its debts. "Property is necessary for an effective reorganization whenever it is necessary either in the operation of the business or in a plan, to further the interests of the estate through rehabilitation or liquidation." *Id.* (internal quotations and citations omitted). But the necessity of the property is only important to the extent that it exists simultaneously with a reasonable possibility of

7

18-51277 - #137  File 02/04/19  Enter 02/04/19 15:31:55  Main Document  Pg 7 of 11

reorganization. See *United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 375 (1988) (describing the appropriate standard as that of a "reasonable possibility of successful reorganization within a reasonable time").

26. Various cases set forth different standards relative to what a debtor must show and the standards applied by the Courts in determining whether property is necessary for an effective reorganization of the debtor. The bottom line to the jurisprudence revolves around 1) can the debtor propose a timely plan; 2) does the plan demonstrate some feasibility beyond mere "speculation, conjecture and unrealistic projections of future performance"; *In re Canal Place Ltd Partnership*, 921 F. 2d 569 (5th Cir. 1991); and 3) is the plan capable of confirmation.

27. While each of the Debtors owns a single vessel and as such the vessel is the sole income-producing asset of the pertinent Debtor, the revenue from all of the Filing Entities' vessels together will be used to fund the Joint Plan along with the Capital Construction Funds and the Miguez contribution. In December of 2018, in connection with the Mr. Steven stay lift hearing, the Court heard uncontroverted evidence proving the Filings Entities' ability to reorganize and the crucial role that each vessel in the enterprise plays in the reorganization plan. The use of the revenue from the group of vessels as opposed to a single vessel was the source of repayment for the FNBC in its underwriting process. Evidence will be introduced to show the going-concern value of the Filing Entities is in part based upon the continued operation of all of the vessels.

28. The three vessels subject to the SBN Motions are: 1) 165' vessels powered by standard Caterpillar engines; 2) with a primary market in the oil-and-gas industry in the U.S. Gulf; 3) were purchased in late 2010 from Tidewater but required extensive repair; 4) each vessel required maintenance costs to the tune of approximately $3.7 Million to refurbish and bring the

vessel into good operating condition; and 5) prior to the slowdown in the oil and gas industry, the vessels still produced an average monthly EBITDA of $27,000 (2011) and $37,000 (2012).

29. The pro-forma projections for the entire fleet of vessels securing the SBN debt under an improved market scenario reflect that the vessels will produce an average of between $45,000 and $55,000 monthly EBITDA starting as early as 2020. Currently outstanding is a bid for the use of the M/V MR. MASON on a government charter scheduled to start later this year with a client that chartered vessels through SeaTran last year on a similar bid proposal.

30. The vessels owned by the Debtors, while not under Charter for the past few years due to the economic downturn, are nevertheless necessary to maintain a competitive fleet in the marketplace. The vessels subject to the stay lift at issue here are needed (i) to hold the charters of vessels which are taken out of service for U.S. Coast Guard certifications and maintenance; (ii) to fill the needs for last-minute or spot charter opportunities when other vessels are placed on term charters; (iii) to obtain term charters themselves; and (iv) to ensure that the fleet can provide a "one-stop shop" for the maritime needs of its customers. Recent publications predict that work in the oil patch serviced by these vessels will be greater in 2019 than it has been for the past three years. A comparison of the oil spot price between 2016 and today reveals a significant increase in oil pricing which will result in an increase in work for the vessels at issue herein. These vessels are worth more to the going-concern value of the entire enterprise than the amount any of the vessels would receive if liquidated in this market right now. If sold today, the vessels are basically worth only their scrap value.

31. The cost of maintaining the vessels in the fleet is minimal and the pay-down brought about by a forced liquidation of the vessels would not materially alter the payment due SBN under the Joint Plan. Time will not erode the value of the vessels below what they are worth

in today's depressed market. The cost to maintain the vessels is $1,500.00 per month, per vessel, plus the adequate protection offered herein. Both amounts will be funded by the DIP Loan which is inferior in rank to the SBN secured claim. The risk and costs to the fleet and SBN are minimal in light of the future earning capacity and future market value of the vessels and the role that the vessels play in the operation of the fleet.

32. The Bankruptcy Code does not require SBN to vote in favor of the Joint Plan for it to be confirmed. The Code does not require that a secured creditor vote to accept a plan for the plan to be confirmed. If this were the case, 11 U.S.C. §§ 1129(a)(8) and 1129(b)(2)(a) would not be in the Bankruptcy Code. SBN is being paid "at least the value of its collateral "at a "Till rate" of interest under a feasible well-funded plan.

## ADEQUATE PROTECTION

33. The Debtors recognize that a legitimate argument can be made that the value of their vessels is depreciating over time. No issue exists that the vessels are not being maintained or that they are under insured. To address the perceived reduction in value due to use, the Debtors propose to make monthly adequate protection payments to SBN. The payments will be based upon the following formula: the difference between the value of the vessel today and the terminal value of the vessel divided by the useful life of the vessel and then divided by twelve and then further reduced based upon a factor since the vessels owned by the Debtors are stacked and not in use. Evidence will be introduced to show the vessels are being maintained and tested on a regular basis.

## CONCLUSION

The Court should deny the SBN Motions, due to the fact that cause for the lifting of the automatic stay does not exist and the property subject to the SBN loan is necessary for an effective reorganization of the Debtors.

February 4, 2019

/s/ *Douglas S. Draper*
Douglas S. Draper, LA Bar No. 5073
Leslie A. Collins, LA Bar No. 14891
Greta M. Brouphy, LA Bar No. 26216
HELLER, DRAPER, PATRICK, HORN
  & MANTHEY, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130-6103
Office: 504 299-3300/Fax: 504 299-3399
E-mail: ddraper@hellerdraper.com
E-mail: lcollins@hellerdraper.com
E-mail: gbrouphy@hellerdraper.com

*Counsel for the Debtors*