# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE – OPELOUSAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| MR. STEVEN, LLC | § | CASE NO. 18-51277 |
| | § | |
| DEBTOR.[1] | § | |
| | § | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## OMNIBUS OPPOSITION TO MOTIONS FOR RELIEF FROM AUTOMATIC STAY
### [Relates to ECF Nos. 126, 128 & 130]

COME NOW Steve J. Miguez ("Miguez") and SeaTran Marine, LLC ("SeaTran"), through undersigned counsel, who join the Oppositions filed by the Debtor, and submit this Omnibus Opposition (the "Opposition") to three motions (collectively, the "Motion"),[2] [ECF Docs. 126, 128 & 130], for relief from the automatic stay pursuant to 11 U.S.C. § 362(d) filed by SBN V FNBC's ("SBN") pertaining to the M/V MR. MASON, the M/V LADY BRANDI, and the M/V MR. ROW (collectively, the "Vessels"). The Motion should be denied as it (i) fails to show sufficient "cause" for lifting the stay under 11 U.S.C. § 362(d)(1) and (ii) the Vessels, over which SBN seeks stay relief, are necessary for an effective reorganization for which there is reasonable likelihood of success. In support of the Opposition, Miguez and SeaTran state as

---

[1]     Pursuant to this Court's December 21, 2018 Order, the Debtor's case has been procedurally consolidated and is being jointly administered with the following affiliated Debtors: Lady Eve, L.L.C. (18-51488), Lady Brandi, L.L.C. (18-51517), Lady Glenda, L.L.C. (18-51518), Mr. Blake, L.L.C. (18-51519), Mr. Mason, L.L.C. (18-51521), Mr. Ridge, L.L.C. (18-51522), and Mr. Row, L.L.C. (18-51523) (collectively, the "Debtors"). [ECF Doc. 109].

[2]     The three motions filed by SBN are identical in all respects, but for the changing of the name of the Debtor's asset for which SBN seeks to terminate the automatic stay. These motions are also largely duplicative of SBN's motion to lift the automatic stay on the M/V MR. STEVEN, [ECF Doc. 60], upon which this Court conducted an evidentiary hearing on December 18, 2018. Because the motions overlap with one another, Miguez and SeaTran incorporate here the arguments and evidence provided at that hearing as well as in their post-hearing omnibus opposition to the motion to lift the stay on the M/V MR. STEVEN, [ECF Doc. 115].

follows:

This Court is very familiar with the background facts of this case; therefore Miguez and SeaTran move directly to their argument.

## LAW & ARGUMENT

1. The Motion should be denied as SBN has not satisfied its burden of showing cause to lift the automatic stay, and furthermore, the property over which SBN seeks relief is necessary to an effective organization of which there is a reasonable probability.

### A. The Motion for Relief Should Be Denied to the Extent That It Asserts the Bankruptcy Case Was Filed in Bad Faith.

2. As commentators have noted "the concept of bad faith filing should be used sparingly to deny bankruptcy relief to statutorily eligible debtors only in extraordinary circumstances." 3 COLLIER'S ON BANKRUPTCY ¶ 362.07[7][a]. The Fifth Circuit announced the governing test for a finding of bad faith in *In re Little Creek*, 779 F.2d 1068 (5th Cir. 1986). Although SBN has cited the factors noted therein, SBN did not include the Fifth Circuit's crucial statement regarding the state of affairs designed to be rooted out as "bad faith" by reference to such factors: "Resort to the protection of the bankruptcy laws is not proper under these circumstances **because there is no going concern to preserve**, there are no employees to protect, and there is no hope of rehabilitation, except according to the debtor's 'terminal euphoria.'" *Id.* at 1073 (emphasis added).

3. Furthermore, the Fifth Circuit cautioned against the talismanic reference to the *Little Creek* factors and instead advised that "determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities." *Id.* at 1072. Accordingly, bankruptcy courts in the Fifth Circuit have stated that "the oft-cited laundry list of factors is not

always relevant or dispositive on the facts of a given case . . . ." *See In re Briggs-Cockerham, L.L.C.*, Case No. 10-34222, 2010 WL 4866874, at * 5 (Bankr. N.D. Tex., Nov. 23, 2010); *see also In re Mirant Corp.*, No. 03-46590, 2005 WL 2148362, at *3 (Bankr. N.D. Tex. Jan. 26, 2015) (stating that "more useful to the court are cases that have adopted a 'valid bankruptcy purpose' test to determine good faith").

4.      SBN recited various individual *Little Creek* factors as indicative of the Debtor's bad faith, alleging that (1) each of the Vessels is that Debtor's sole asset and each are not presently working; (2) each of the Debtors filed bankruptcy "simply to stop a foreclosure proceeding";[3] (3) SBN is the main non-insider creditor of the Debtor, making this essentially a two-party dispute;[4] (4) each of the Debtors has no ongoing operations; (5) each of the Debtors cannot possibly reorganize; and (6) no payment has been made on the debt owed to SBN since July 2017.[5] *See* Motion, ¶ 25.

5.      But each of those allegations is either unsupported by the facts of this case or are

---

[3]      The fact is that SBN initiated no foreclosure proceedings on any of the Vessels at issue in the Motion prior to filing for chapter 11.  Nevertheless, bankruptcy courts have routinely found that the filing of a bankruptcy petition on the eve of foreclosure, even in single asset cases, is not by itself indicative of bad faith.  *See In re Omni Lion's Run, L.P.*, 578 B.R. 394, 394 (Bankr. W.D. Tex. 2017) (finding that "automatic stay could not be lifted based on chapter 11 debtors' alleged bad faith in filing for bankruptcy relief on eve of foreclosure of apartment complexes that were their sole assets"); *In re Gremlin*, 547 B.R. 196, 198 (Bankr. E.D. La. 2016) ("[T]his charge is hardly exceptional. Virtually every debtor files bankruptcy to prevent the immediate collection of debt . . . .   Without more, [the creditor] has merely stated the obvious.").

[4]      Even accepting *arguendo* that each of the Debtors' cases is essentially a two-party dispute between SBN and each Debtor—which they is not—this fact alone is also insufficient by itself to support a finding of bad faith.  *See In re Gremillion*, 547 B.R. 196, 200 (Bankr. E.D. La. 2016) (finding challenge of bankruptcy case as two-party dispute insufficient to support bad faith filing dismissal of case).

[5]      Most courts reject motions for relief from stay predicated on grounds of a prepetition payment default.  *See, e.g.*, *In re Morrow*, 495 B.R. 378, 386 (Bankr. N.D. Ill. 2013); *In re Capodanno*, 83 B.R. 285, 288 (Bankr. E.D. Pa. 1988); *In re Tashjian*, 72 B.R. 968, 974 (Bankr. E.D. Pa. 1987).  Indeed, "it must be recalled that poor pre-petition payment histories are systematic of most debtors and hence this factor is, in itself, of very limited relevance."  *In re Tashjian*, 72 B.R. at 974.  "Permitting relief based solely on prepetition grounds would be antithetical to the breathing spell that is, in some instances, so desperately needed by the debtors."  *In re Morrow*, 495 B.R. at 386.

insufficient in and of themselves to warrant a finding of bad faith filing—and, more importantly, ignores the reality of the Debtors' business operations:   that each of these vessel-owning, affiliated Debtors work together to operate as an enterprise.   Indeed, as evidenced by the executed binding Term Sheet introduced as evidence at the December 18, 2018 hearing on SBN's motion to lift the stay on another vessel belonging to the Debtor Mr. Steven, LLC, *see* ECF Doc. 112-8, **all of the affiliated Debtors together** plan to propose a single plan of reorganization which would pay creditors 100%.   That Plan will protect the entire enterprise's going-concern value and, thus, the enterprise is pursuing the primary purpose of bankruptcy protection.   The fact that a 100% Plan is being proposed itself undercuts SBN's ability to show "cause" or bad faith.   *See, e.g*., *Town of Hempstead Emps. Fed. Credit Union v. Wicks*, 215 B.R. 316, 321 (E.D.N.Y. 1997) (finding that creditor failed to make an initial showing of cause to lift the automatic stay in part because the debtors proposed a plan of reorganization that provided for payment in full to all creditors).

6.      Consistent with those principles, bankruptcy courts in the Fifth Circuit have declined to find evidence of bad-faith filing in single-asset cases filed on the eve of foreclosure where sources of income appearing to provide a reasonable prospect of reorganization were available to the debtor.   For example, in *In re Omni Lion's Run, L.P.*, the bankruptcy court made particular note of the Debtor's demonstration of progress in formulating a plan to pay lenders and the infusion of capital into the debtor's business: "The financial realities . . . do not indicate that the Debtors are attempting to take unfair advantage of the breathing room the automatic stay provides, but rather are pouring money into the properties and preparing plans."   578 B.R. 394, 398 (Bankr. W.D. Tex. 2017).   As set forth more fully below, the Debtors have made a sufficient demonstration that they are currently pursuing a legitimate bankruptcy goal of reorganization, for

4

which they have made a showing of reasonable likelihood, indicating that the Debtors did not file the bankruptcy petition in bad faith.

7.     For those reasons, the Motion should be denied insofar as it relies on an argument of bad faith.

**B.  This Court Should Not Grant Relief from Stay Pursuant to 11 U.S.C. § 362(d)(2) as the Vessels Are Necessary for an Effective Reorganization.**

8.     "Relief from stay under 11 U.S.C. § 362(d)(2) is a two-part test, consisting of evidence that the debtor does not have equity in the property **and** that the property is not necessary for the debtor to effectively reorganize its debts." *In re Panther Mountain Land Dev.*, LLC, 438 B.R. 169, 180 (Bankr. E.D. Ark. 2010) (citing 11 U.S.C. § 362(d)(2)) (emphasis added).  Accordingly, the failure to establish either element of the conjunctive test is sufficient to defeat a motion for relief under 11 U.S.C. § 362.

9.     To determine whether property is necessary for an effective reorganization, the court must analyze the two intermingled concepts of necessity and effective reorganization. "Property is necessary for an effective reorganization whenever it is necessary either in the operation of the business or in a plan, to further the interests of the estate through rehabilitation or liquidation." *Id.* (internal quotations and citations omitted).  But the necessity of the property is only important to the extent that it exists simultaneously with a reasonable possibility of reorganization. *See United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 375 (1988) (describing the appropriate standard as that of a "reasonable possibility of successful reorganization within a reasonable time").

10.     "A determination as to what is 'necessary for an effective reorganization' inherently involves an intense factual analysis, requiring evidence as to the debtor's intent, the anticipated integration of the property at issue in the production of future income and the nature

and extent of the property involved." *In re Scott*, 121 B.R. 605, 608 (Bankr. E.D. Okla. 1990).

11.     It has been established that each of the Vessels is the sole income-producing asset of the pertinent affiliated Debtor, but that all of the affiliated Debtors together propose to fund the reorganization plan in part from revenue produced from the operation of the all of the vessels owned by each affiliated Debtor, including the Vessels that are at issue here.  Evidence has already been introduced to this Court at the December 18, 2018 evidentiary hearing proving the affiliated Debtors' ability to reorganize and crucial role that each vessel in the enterprise play in reorganization.[6]  As is shown further through the Affidavit of Charles E. Tizzard ("Tizzard Aff."), sworn to on February 4, 2019 (attached hereto as **Exhibit A**), and will be shown at the evidentiary hearing on this matter, because the going-concern value of the affiliated Debtors' enterprise depends entirely on the continued operation of **all** of the vessels, the Vessels at issue here are essential to an effective reorganization, even if not currently under charter right now.

12.     The three Vessels are 165' vessels powered by standard Caterpillar engines; their primary market is the oil-and-gas industry in the U.S. Gulf, but they are also marketable in other offshore oil markets, such as Mexico, Trinidad, and West Africa.  *See* Tizzard Aff. ¶ 3.  They are also of use in other industries including ferry services and U.S. Navy projects.  *See* Tizzard Aff. ¶ 3.  The Vessels were purchased in late 2010 and early 2011 from Tidewater, but required extensive repair and maintenance costs to the tune of approximately $3.7 million each to acquire

---

[6]     As the record from the December 18, 2018 hearing revealed, Iberia Crewboat and Miguez have almost $4 million in Capital Construction Fund accounts established under the U.S. Maritime Administration whereby the funds can be applied to cover a shortfall (if needed) in making post-confirmation monthly principal payments to SBN; the balance of such funds could be applied (if necessary) to the principal owed on the balloon payment. SeaTran and Miguez also committed to deposit $1.25 million into a fund to be utilized for any interest shortfall during the term of the SBN's restructured debt. The executed Plan Support Agreement is a firm, binding commitment, subject to normal conditions precedent, such as the filing of a joint plan of reorganization, confirmation of the proposed Plan, no material adverse changes, and obtaining a final Confirmation Order of this Court.

and refurbish the Vessels and bring the Vessels into good operating condition. *See* Tizzard Aff. ¶ 4. Even so, the Vessels still produced an average monthly EBITDA of $27,000 in 2011 and $37,000 in 2012. *See* Tizzard Aff. ¶ 4. Had the Vessels incurred only average repair and maintenance costs, the Vessels would have produced an average month EBITDA of $47,000 in 2011 and $54,000 in 2012. *See* Tizzard Aff. ¶ 4.

13.     Based on projections for the entire fleet of vessels securing the SBN debt under an improved market scenario, the Vessels will produce an average of between $45,000 and $55,000 monthly EBITDA starting in as early as 2020. *See* Tizzard Aff. ¶ 5. In fact, the M/V MR. MASON has been offered in a bid on a government charter scheduled to start later this year with a client that chartered vessels through SeaTran last year, so it is possible that the M/V MR. MASON could be activated by Summer 2019. *See* Tizzard Aff. ¶ 5.

14.     Even though the Vessels are not currently under charter, they are nevertheless necessary to the entire enterprise's successful reorganization. *See* Tizzard Aff. ¶ 6. Via various vessel operating agreements, SeaTran has a total fleet of eighteen crewboats available to charter. *See* Tizzard Aff. ¶ 6. Each vessel, including the Vessels at issue here, is needed (i) to hold the charters of vessels which are taken out of service for U.S. Coast Guard certifications and maintenance, (ii) to fill the needs for last-minute or spot charters charter opportunities when other vessels are placed on term charters, and (iii) to obtain term charters themselves, all to ensure that the fleet can provide a "one-stop shop" for the maritime needs of its customers. *See* Tizzard Aff. ¶ 6. With two of SeaTran's fleet having been place on term charters, such as passenger ferries, outside of the oil-and-gas industry in 2018, and two additional vessels being awarded charters as passenger ferries outside the oil-and-gas industry with start dates in 2019, and others having been recently chartered by the U.S. Navy, the Vessels here will be needed to

7

handle the regular oil-field customer base. *See* Tizzard Aff. ¶ 6.

15.     These Vessels are worth more to the going-concern value of the affiliated Debtors' entire enterprise then the amount any of the Vessels would receive if liquidated in this market right now. *See* Tizzard Aff. ¶ 7. Due to the depressed market conditions over the last few years, an immediate liquidation of the Vessels in their out-of-service condition would likely realize only $400,000 each, which is equal to the estimated scrap value for each. *See* Tizzard Aff. ¶ 7.[7]

16.     With an improved market and the Vessels being returned to active status, the values that the Vessels could easily return to $4 million to $5 million each, based on the fact that they are all aluminum-hulled crewboats, which can survive market downturns and still retain great value when the market rebounds, as an aluminum hull does not deteriorate as does a steel hull. *See* Tizzard Aff. ¶ 8. A recent market search to locate a 65' crewboat for a potential buyer client of SeaTran showed that many 65' crewboats built in the 1960s and 1970s were still U.S. Coast Guard-certified and in service. *See* Tizzard Aff. ¶ 8. The prices offered for those aluminum-hulled vessels were at much more than 100% of the original cost when they were built. *See* Tizzard Aff. ¶ 8.

17.     Not only would a rushed liquidation of the Vessels give miniscule value to SBN, given the amount of the debt owed by the affiliated Debtors, it would significantly harm the going-concern value of the entire enterprise and all other creditors of the affiliated Debtors. *See* Tizzard Aff. ¶ 9.

18.     Further, the cost of maintaining the Vessels in the affiliated Debtors' fleet is

---

[7]     Recently, Seacor Marine sold to various buyers six similar crewboats all built between 2003 and 2007 and obtained $400,000 to $500,000 for each vessel. And those vessels were newer than the Vessels here, which were built between 1997 and 2000. *See* Tizzard Aff. ¶ 7. Upon information and belief, Seacor Marine is a financially sound, willing seller, unlike the Debtors would be here. *See* Tizzard Aff. ¶ 7.

8

minimal.  The Vessels are being maintained by SeaTran for a monthly fee of $1500 each and their cost to insure the Vessels is $1500 per month each.  *See* Tizzard Aff. ¶ 10.  No storage fees are being charged by the dock owned by an affiliated company.  Those costs are minimal in light of the future earning capacity and future market value on the Vessels and the role that the Vessels play in the operation of the affiliated Debtors' enterprise.  *See* Tizzard Aff. ¶ 10.  In fact, with (i) the way that SeaTran allocates management fees among the vessels, (ii) the overhead costs that SeaTran applies *pro rata* across vessels, and (iii) the fact that the Vessels can be returned to active status with virtually no increase in total overhead costs, the Vessels need to remain in the fleet to assist the other vessels in the fleet (including those financed by SBN) in maintaining lower operating costs and achieving greater monthly EBITDA.  *See* Tizzard Aff. ¶ 10.

19.     Clearly, the Vessels are necessary to reorganization.  SBN attempts to refute that showing by threatening not to vote to confirm a plan proposed by the Debtor.  *See* Motion, ¶ 35. At the December 18 hearing, the Debtor and Plan Proponents adduced testimony and documents that established a reasonable prospect of reorganization for the Debtors.  Mr. Tizzard, Chief Financial Officer for SeaTran, presented *pro forma* projections for 2019 through 2023, providing to pay SBN's claim in full at 5% or the *Till* rate using the amortization schedule set forth in the FNBC/SBN financing documents.  *See* ECF Doc. 112-7 (filed under seal).  Also introduced as competent evidence at the hearing was the executed Plan Term Sheet for the Debtors setting forth the terms of a future plan and firm commitment of financial support for the proposed plan from SeaTran, Miguez, and Iberia Crewboat & Marine Service, LLC specifically as to any shortfall of the $100,000 per month that SBN would be paid under a confirmed Plan.  *See* ECF Doc. 112-8.  Moreover, there will be an impaired unsecured class of creditors that will most

likely vote for the Plan. The Debtor has made and continues to make a sufficient showing at this stage that there is a substantial probability of consummating a plan. SBN's consent to the plan described by the Debtor or lack thereof, is, at best, premature at this time, and in no way rebuts the Debtor's showing of a reasonable likelihood of a successful reorganization or that the Vessels are necessary to that reorganization.

## CONCLUSION

For the reasons set forth above, Miguez and SeaTran respectfully request that this Court DENY the Motion in its entirety.

Respectfully submitted,

**LUGENBUHL, WHEATON, PECK, RANKIN & HUBBARD, A LAW CORPORATION**

_/s/ Stewart F. Peck_
STEWART F. PECK (LA #10403)
BENJAMIN W. KADDEN (LA #29927)
MEREDITH S. GRABILL (LA #35484)
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone: (504) 568-1990
Facsimile: (504) 310-9195
E-mail: speck@lawla.com; bkadden@lawla.com; mgrabill@lawla.com

_Counsel for Steve J. Miguez and SeaTran Marine, LLC_

10

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was served upon the parties that receive electronic notice via the Court's ECF Filing System on this 4th day of February, 2019.

*/s/ Stewart F. Peck*