| | | |
|---|---|---|
| IN RE: | * | **CASE NO. 18-51277** |
| | * | |
| **MR. STEVEN, L.L.C.,** | * | **CHAPTER 11** |
| | * | |
| **DEBTOR.**[1] | * | **JUDGE JOHN W. KOLWE** |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## AFFIDAVIT OF CHARLES E. TIZZARD

**PARISH OF ORLEANS**

**STATE OF LOUISIANA**

**BEFORE ME,** the undersigned authority in and for said Parish and State, personally appeared:

### CHARLES E. TIZZARD

who declares and states:

1.      I, Charles E. Tizzard, am over the age of eighteen, make this affidavit based on my personal knowledge, and respectfully submit this Affidavit in support of the *Omnibus Opposition to Motions for Relief from Automatic Stay* filed on behalf of Steve J. Miguez and SeaTran Marine, LLC ("SeaTran") in the above-captioned case.

2.      I serve as the Executive Vice President and Chief Financial Officer of SeaTran. As such, I am familiar with and have a working knowledge of the operations and finances of SeaTran, as well as SeaTran's affiliated companies, including those of Iberia Marine Services

---

[1]      Pursuant to this Court's December 21, 2018 Order, the Debtor's case has been procedurally consolidated and is being jointly administered with the following affiliated Debtors: Lady Eve, L.L.C. (18-51488), Lady Brandi, L.L.C. (18-51517), Lady Glenda, L.L.C. (18-51518), Mr. Blake, L.L.C. (18-51519), Mr. Mason, L.L.C. (18-51521), Mr. Ridge, L.L.C. (18-51522), and Mr. Row, L.L.C. (18-51523) (collectively, the "Debtors"). [ECF Doc. 109].

("IMS"), Mr. Blake LLC, Mr. Ridge LLC, Lady Glenda LLC, Mr. Mason LLC, Mr. Row LLC, Lady Brandi LLC, Lady Eve LLC, and Mr. Steven LLC (excluding IMS, the "Debtors").

3.      The three Vessels[2] for which the Motion seeks to lift the automatic stay are 165' vessels powered by standard Caterpillar engines; their primary market is the oil-and-gas industry in the U.S. Gulf, but they are also marketable in other offshore oil markets, such as Mexico, Trinidad, and West Africa. They are also of use in other industries including ferry services and U.S. Navy projects.

4.      The Vessels were purchased in late 2010 and early 2011 from Tidewater, but required extensive repair and maintenance costs to the tune of approximately $3.7 million each to acquire and refurbish the Vessels and bring the Vessels into good operating condition. Even so, the Vessels still produced an average monthly EBITDA of $27,000 in 2011 and $37,000 in 2012. Had the Vessels incurred only average repair and maintenance costs, the Vessels would have produced an average month EBITDA of $47,000 in 2011 and $54,000 in 2012.

5.      Based on projections for the entire fleet of vessels securing the SBN debt under an improved market scenario, the Vessels will produce an average of between $45,000 and $55,000 monthly EBITDA starting in as early as 2020. In fact, the M/V MR. MASON has been offered in a bid on a government charter scheduled to start later this year with a client that chartered vessels through SeaTran last year, so it is possible that the M/V MR. MASON could be activated by Summer 2019.

6.      Even though the Vessels are not currently under charter, they are nevertheless necessary to the entire enterprise's successful reorganization. Via various vessel operating agreements, SeaTran has a total fleet of eighteen crewboats available to charter. Each vessel,

---

[2]      Capitalized terms not otherwise defined are given the meanings ascribed to them in the Omnibus Opposition to Motions for Relief from Automatic Stay.

including the Vessels at issue here, is needed (i) to hold the charters of vessels which are taken out of service for U.S. Coast Guard certifications and maintenance, (ii) to fill the needs for last-minute or spot charters charter opportunities when other vessels are placed on term charters, and (iii) to obtain term charters themselves, to ensure that the fleet can provide a "one-stop shop" for the maritime needs of its customers. With two of SeaTran's fleet having been place on term charters, such as passenger ferries, outside of the oil-and-gas industry in 2018, and two additional vessels being awarded charters as passenger ferries outside the oil-and-gas industry with start dates in 2019, and others having been recently chartered by the U.S. Navy, the Vessels here will be needed to handle the regular oil-field customer base.

7. The Vessels are worth more to the going-concern value of the affiliated Debtors' entire enterprise then the amount any of the Vessels would receive if liquidated in this market right now. Due to the depressed market conditions over the last few years, an immediate liquidation of the Vessels in their out-of-service condition would likely realize only $400,000 each, which is equal to the estimated scrap value for each. My opinion is based on recent sales by Seacor Marine of six similar crewboats built between 2003 and 2007 to various buyers, whereby Seacor obtained between $400,000 and $500,000 for each vessel. All of the Vessels here are older than Seacor's vessels, having been built between 1997 and 2000, and, unlike the Debtors, to my knowledge, Seacor is a financially sound, willing seller.

8. With an improved market and the Vessels being returned to active status, the values that the Vessels could easily return to $4 million to $5 million each, based on the fact that they are all aluminum-hulled crewboats, which can survive market downturns and still retain great value when the market rebounds, as an aluminum hull does not deteriorate as does a steel hull. A recent market search to locate a 65' crewboat for a potential buyer client of SeaTran

3

showed that many 65' crewboats built in the 1960s and 1970s were still U.S. Coast Guard-certified and in service. The prices offered for those aluminum-hulled vessels were at much more than 100% of the original cost when they were built.

9.      Not only would a rushed liquidation of the Vessels give miniscule value to SBN, given the amount of the debt owed by the affiliated Debtors, it would significantly harm the going-concern value of the entire enterprise and all other creditors of the affiliated Debtors.

10.      The cost of maintaining the Vessels in the affiliated Debtors' fleet is minimal. The Vessels are being maintained by SeaTran for a monthly fee of $1500 each and their cost to insure the Vessels is $1500 per month each. No storage fees are being charged by the dock owned by an affiliated company. Those costs are minimal in light of the future earning capacity and future market value on the Vessels and the role that the Vessels play in the operation of the affiliated Debtors' enterprise. In fact, with (i) the way that SeaTran allocates management fees among the vessels, (ii) the overhead costs that SeaTran applies *pro rata* across vessels, and (iii) the fact that the Vessels can be returned to active status with virtually no increase in total overhead costs, the Vessels need to remain in the fleet to assist the other vessels in the fleet (including those financed by SBN) in maintaining lower operating costs and achieving greater monthly EBITDA.

11.      I declare and affirm under the penalties of perjury that this Affidavit is true to the best of my information and belief.

_____
CHARLES E. TIZZARD

SWORN TO THIS 4TH DAY
OF FEBRUARY, 2019.

_____
NOTARY PUBLIC

BENJAMIN W. KADDEN
NOTARY PUBLIC
My Commission Expires at Death
LA BAR No. 29927/ Notary No. 83546

4



