UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE

| | | |
|---|---|---|
| IN RE: | * | |
| | * | Lead |
| MR. STEVEN, L.L.C., | * | Case No. 18-51277 |
| | * | |
| DEBTOR. | * | Chapter 11 |
| | * | |
| * * * * * * * * * * | * | |
| | * | Adversary |
| MR. STEVEN, L.L.C., ET AL, | * | Case No. 18-05043 |
| | * | |
| Plaintiffs, | * | |
| v. | * | |
| | * | |
| SBN V FNBC LLC, | * | Lafayette, Louisiana |
| | * | December 18, 2018 |
| Defendant. | * | |
| * * * * * * * * * * | * | |

HEARING ON MOTIONS,
BEFORE THE HONORABLE JOHN W. KOLWE,
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:              Heller, Draper, Patrick,
                              Horn & Manthey, LLC
                             BY:  DOUGLAS S. DRAPER, ESQ.
                             650 Poydras Street
                             Suite 2500
                             New Orleans, Louisiana 70130

For Seatran Marine, LLC      Lugenbuhl, Wheaton, Peck,
and Steven Miguez:            Rankin & Hubbard
                             BY:  STEWART F. PECK, ESQ.
                             601 Poydras Street
                             Suite 2775
                             New Orleans, Louisiana 70130

APPEARANCES (CONT'D.):


For SBN V FNBC LLC:          Carver Darden Koretzky Tessier
                              Finn Blossman & Areaux, LLC
                             BY:  DAVID F. WAGUESPACK, ESQ.
                             BY:  PETER J. SEGRIST, ESQ.
                             Energy Centre
                             1100 Poydras Street
                             Suite 3100
                             New Orleans, Louisiana 70163

For SpaceX:                  Phelps Dunbar, LLP
                             BY:  RICHARD MONTAGUE, ESQ.
                             Post Office Box 16114
                             Jackson, Mississippi 39236

For Guice Offshore, LLC:     Ottinger Hebert, LLC
                             BY:  WILLIAM KAUFMAN, ESQ.
                             1313 West Pinhook Road
                             Post Office Drawer 52606
                             Lafayette, Louisiana 70505

                             Rushing & Guice, PLLC
                             BY:  R. SCOTT WELLS, ESQ.
                             Post Office Box 1925
                             Biloxi, Mississippi 39533

For U.S. Trustee:            Office of U.S. Trustee
                             BY:  GAIL B. McCULLOCH, ESQ.
                             300 Fannin Street
                             Suite 3196
                             Shreveport, Louisiana 71101

Court Audio Operator:        Tonya M. Griffith, E.C.R.O.

TRANSCRIPTIONIST:            Sherryl Robinson
                             3704 Chadwood Drive
                             Harvey, Louisiana 70058
                             (504) 348-3704



Proceedings recorded by electronic sound recording, transcript

produced by transcription service.

# I N D E X

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Mark Kilcoin | 35 | 60,75 | 87 | -- |
| Charles Tizzard | 105 | 155,219 | 223 | -- |
| Blake Miguez | 245 | -- | -- | -- |
| Ryan Landry | 247 | 248 | -- | -- |
| Andrew Minster | 255 | 257 | -- | -- |
| Voir Dire    254 | | | | |
| Steven Miguez | 271 | 275 | -- | -- |

| SBN EXHIBITS: | Marked | Received |
|---|---|---|
| No. 1  Promissory Note dated 9/28/15 for $22,500,000 | 36 | 36 |
| No. 2  Endorsement and Allonge to Promissory Note effective 10/18/17 | 37 | 37 |
| No. 3  Preferred Ship Mortgage dated 9/28/15 and recorded with NVDC on 10/7/15 | 39 | 39 |
| No. 4  Abstract of the Vessel from National Vessel Documentation Center | 39 | 39 |
| No. 5  UCC-1 Financing Statement filed 10/9/15 at No. 26-349272 | 39 | 39 |
| No. 6  Letter from Sher Garner to Guice Offshore dated 4/2/18 | 47 | 47 |
| No. 7  Letter from Adams and Reese dated 4/9/18 | 48 | 48 |

**I N D E X**
**(Continued)**

SBN EXHIBITS (Cont'd.):

| | Marked | Received |
|---|---|---|
| No. 8  Letter from Guice dated 4/12/18 | 49 | 49 |
| No. 9  Letter from Sher Garner to Seatran dated 4/11/18 | 49 | 49 |
| No. 10 *Verified Complaint in Rem for Foreclosure of Preferred Ship Mortgage* in the USDC for Central District of CA, Case No. 2:18-cv-08492-RSWL-RAO | 51 | 51 |
| No. 11 Debtor's Schedules | 96 | 96 |
| No. 12 SpaceX Limited Opposition to Motion for Rule 2004 Exam **JUDICIAL NOTICE TAKEN ON No. 12** | 97 | 97 |
| No. 13 Letter dated 10/18/17 from SBN | 91 | 96 |
| No. 14 Guice Charter | 108 | 111 |
| No. 15 E-mail dated 8/25/17 | 116 | 117 |
| No. 16 E-mail dated 10/12/18 | 124 | 124 |
| No. 17 Vessel Operating Agreement executed 10/2/18 | 130 | 130 |

SEATRAN/DEBTOR EXHIBITS:

| | Marked | Received |
|---|---|---|
| No. 1  Vessel Operating Agreement effective 6/1/2014 | 164 | 164 |
| No. 2  Series of e-mails dated 7/2/14 in globo | 177 | 177 |
| No. 3  E-mail dated 6/23/15 | 182 | 188 |
| No. 4  Vessel Operating Agreement effective 7/1/2014 | 191 | 191 |

**I N D E X**
**(Continued)**

SEATRAN/DEBTOR EXHIBITS (Cont'd.):        Marked        Received

No. 5   Series of e-mails dated 8/29/18        193                193

No. 6   BIMCO Standard Bareboat Charter        196                197

No. 7   Summit Vessels Budget        208                208
        **UNDERSEAL**

No. 8   Plan Summary        208                208

No. 9   E-mail dated 10/12/18        245                245

No. 10  UBS Bank Account Statements (3)        248                250

No. 11  CV of Andrew Minster        255                255

No. 12  Certificate of Insurance        297                297

1                  **P R O C E E D I N G S**

2                  (Tuesday, December 18, 2018)

3                      (Court is in Session)

4                      *    *    *    *    *

5              **MOTIONS FOR JOINT ADMINISTRATION,**

6              **HEARING ON ORDER TO SHOW CAUSE,**

7          **MOTION TO DETERMINE PROPERTY OF THE ESTATE,**

8              **MOTION FOR TURNOVER OF PROPERTY,**

9              **MOTION FOR RELIEF FROM STAY.**

10                     *    *    *    *    *

11           THE COURT:  You may proceed.

12           THE CLERK:  We have *Mr. Steven, L.L.C., et al, v.*

13   *SBN V FNBC LLC*.  Hearing on Order to Show Cause.

14           Then we have as well, Mr. Steven, L.L.C., Case

15   Number 18-51277, Motion to Determine Property of the Estate

16   and Motion for Turnover of Property, Motion for Relief from

17   Stay and we have a Motion for Joint Administration to be held

18   along with *Lady Eve L.L.C., 18-51488, Lady Brandi L.L.C.,*

19   *18-51517, Lady Glenda L.L.C., 18-51518, Mr. Blake L.L.C.,*

20   *18-51519, Mr. Mason L.L.C., 18-51521, Mr. Ridge L.L.C.,*

21   *18-51522, and Mr. Row L.L.C., 18-51523.*

22           May I have appearances?

23           MS. McCULLOCH:  Gail McCulloch for the U.S.

24   Trustee.

25           MR. DRAPER:  Douglas Draper for the Debtors, Your

1  Honor.

2          THE COURT:  All right.

3          MR. WAGUESPACK:  Good morning Your Honor, David

4  Waguespack and Peter Segrist for SBN V FNBC LLC.

5          THE COURT:  Good morning Mr. Waguespack.

6          MR. PECK:  Good morning Your Honor, Stewart Peck

7  for Seatran and Steven Miguez.

8          MR. WELLS:  Good morning Your Honor, I'm Scott Wells

9  for Guice Offshore, and Will Kaufman is here for Guice

10  Offshore also.

11          THE COURT:  Mr. Wells, thank you.

12          MR. MONTAGUE:  Good morning Your Honor, Richard

13  Montague here for SpaceX.

14          THE COURT:  All right.  We had you come back from

15  Mississippi again?

16          MR. MONTAGUE:  Yes, sir.

17          THE COURT:  Okay.

18          MR. MONTAGUE:  Thank you.

19          THE COURT:  All right.  Mr. Draper, it's my

20  understanding that the parties would like to have a status

21  conference --

22          MR. DRAPER:  Yes, there's --

23          THE COURT:  -- in chambers?

24          MR. DRAPER:  There's a lot that's going on and I

25  think that if we had a status conference we could sort of

1  organize it in a better fashion than just sort of taking

2  things up ad hoc.

3          And then, I think just for purposes of the record,

4  there's a Motion -- I don't think there's any objection to

5  the Joint Administration Motion.

6          THE COURT:  I don't think there is.  This is --

7          MR. WAGUESPACK:  As long as it's purely joint

8  administration.

9          THE COURT:  Right.  As long as it's not -- we're

10 not consolidating the cases, it would only be for joint

11 administration.

12         MR. DRAPER:  It's joint administration.  And just

13 for -- I filed my application to employ in Mr. Steven, but it

14 covers all the other cases.  So, and I think you have the

15 disclosure for all of them too, right?

16         MS. McCULLOCH:  Yes -- (inaudible; not speaking near

17 a microphone).

18         MR. DRAPER:  No, I thought --

19         THE COURT:  Ms. McCulloch, do you want to speak to

20 the -- I think what they're -- there's no objection to the

21 joint administration motions.

22         MS. McCULLOCH:  That's correct, Your Honor.  The

23 U.S. Trustee does not object to a joint administration.

24         THE COURT:  Okay.  So we can do away with those,

25 and the Court will grant the Motion to joint the

1  administrators.

2          Within the *Mr. Steven* case?

3          MR. DRAPER:  Yes.

4          THE COURT:  That would be the lead case?

5          MR. DRAPER:  Yes.

6          THE COURT:  Okay.  We'll grant that motion.

7          MR. WAGUESPACK:  All right.

8          THE COURT:  And then we'll take the other issues up

9  in a status conference.

10         MR. DRAPER:  Right, thank you.

11         MR. WAGUESPACK:  Thank you.

12         THE COURT:  We'll be in recess until then.

13     **(Recess from 11:05 a.m. to 11:38 a.m.)**

14         THE COURT:  Okay.  There's a couple of matters

15 before we proceed with the hearing on the Motion to Lift

16 Stay and on the Motion to Use -- I want to make sure I get

17 them right -- the Motion to Determine Property of the

18 Estate.

19         On the hearing on the Order to Show Cause, that was

20 on a preliminary injunction.  That is not going forward

21 today.  That will be re-noticed for a hearing at a later date,

22 but the TRO is no longer -- it will be dissolved in that

23 matter.

24         And then on the Motion for Relief from Stay, during

25 our in chambers conference there was a suggestion made that

1  perhaps today would be a preliminary hearing.  And I want to

2  read from our local Rule 4001-1(e):

3       Procedures for motions timely controverted:  If the

4  motion is timely and properly controverted, which it is in

5  this case, the initial hearing will in most cases be a final

6  hearing.  The parties, unless they agree otherwise prior to

7  the hearing, should be prepared to proceed to a final hearing

8  of the issue.  The Court will ordinarily set a time later on

9  the same motion day when the merits shall be heard, but the

10  Court may set the case for final hearing at a later date, in

11  its discretion, and in the interest of justice.

12       And if I was going to do that, there would be

13  certain things we could do on a preliminary hearing.  But

14  it's my understanding in this case that there has been no

15  discussion between the parties that this hearing would be a

16  preliminary hearing as opposed to the final hearing on the

17  Motion to Lift Stay.

18       And the Court wasn't made aware that this may --

19  that the parties may want to take this up on a preliminary

20  matter.  So in the -- and it has also been -- the Court has

21  been notified that we have all of the witnesses here today to

22  move forward both for the movant in this case, SBN, as well

23  as the Debtor have their witnesses here prepared to go

24  forward.

25       Given that the Court is going to conduct this as

1    the final hearing today, and we're going to proceed as though

2    this is a final hearing on the Motion to Lift Stay.

3         Mr. Waguespack, this is your motion -- and I want

4    to make clear also that we're taking up both the Motion to

5    Determine Property of the Estate as well as the Motion for

6    Relief from Stay together, and that the evidence taken on

7    that will be considered on both of those motion.

8         MR. WAGUESPACK:  That's correct.  Thank you Your

9    Honor.

10         THE COURT:  Thank you.

11         Mr. Waguespack will begin.  You can start your

12    case.

13         MR. WAGUESPACK:  Thank you Your Honor.

14         If I could start with just a little oral argument

15    and then I'll call my witnesses.

16         Your Honor, as you know we filed a reply

17    supplemental memo yesterday, that reflected on all of the

18    discovery that had been done over the last week.  There are

19    two bases for that the stay should be lifted in this case:

20    Cause and also that the Debtor lacks equity in the property,

21    and it's not necessary for an effective reorganization.

22         With respect to cause, we have the Fifth Circuit

23    Case in Little Creek that has a number of factors, all of

24    those are present here, and I'll address those in a minute.

25    But before we get there, there's also what I consider to be

1 really an outrageous legal position that is blocking this

2 case.  And it's not only a position that Your Honor can make

3 a determination on, but it's an indicia really of the bad

4 faith of this Debtor.  And it has put my client in a

5 position where its collateral is at risk.  And let me explain

6 that.

7          This Debtor granted a mortgage on its sole asset,

8 the Mr. Steven, it's a vessel.  In that mortgage, and we've

9 quoted the provisions in our brief, there's provision after

10 provision that makes it clear that the Debtor is the sole

11 owner of all of the rights relating to the vessel:  The rights

12 to charter, the rights to receive payments on account of the

13 charter, the vessel itself, and it literally goes on and on

14 and on for page after page.

15          You know, I remember as a litigator, a commercial

16 litigator, you know, you see these mortgages and you often

17 wonder why all of these provisions are in there.  Now I know,

18 because I've never quite had a legal position taken like I've

19 seen in this case.

20          But all of those provisions I see are in there, so

21 that the Debtor can't do what it is purported to do in this

22 case, which is effectively transfer all of the rights to the

23 vessel to another related entity that's not an obligor on the

24 debt, and purports the over-control of the asset in that

25 other related entity, purports to control through assigned

1    ownership of the charter and the payments to this other

2    entity, and then puts that entity in bankruptcy and says:

3    We'll you know, the Debtor doesn't really have any cash

4    collateral.  The Debtor doesn't own these payments, it's

5    Seatran, this other related entity.

6            THE COURT:  And all of these transfers occurred

7    after the mortgage was in place?

8            MR. WAGUESPACK:  No.  Now what their position is,

9    and we'll address this in the evidence, is that the mortgage,

10   the loan documents, there's nothing at all that in any way

11   limits the mortgage to this purported -- what I'm going to

12   call the Vessel Operating Agreement.

13           And the document was signed the day before they

14   filed bankruptcy.  Their argument was:  Well, this was an

15   oral agreement that proceeded that.  And the bank knew it

16   based on this e-mail.  And we attached the e-mail to our

17   brief.  It's of course inadmissible.  You can't change a loan

18   document.  They changed the mortgage.  The mortgage was

19   signed after this e-mail.  It states all of the things that

20   it states.  But the e-mail itself, this says that you now

21   we've got this management company that operates the vessels.

22           And 100 percent of the proceeds are paid to the

23   vessel owners.  I don't even understand what the e-mail is

24   supposed to do to change the reality.  And of course, the

25   e-mail is not in the bank's files.  But if it exists, and

1  it's admissible, which it's not because of 6/11/22 and the

2  D'Oench Duhme Doctrine and the parole evidence rule and the

3  mortgage documents speak for themselves and those are the

4  only documents pertaining to it.

5      But even if you were to consider, it doesn't say

6  anything other than this is a manager of the vessels, this

7  entity is going to manage the vessels and 100 percent of the

8  proceeds are going to be sent down to the vessel owners.

9      So, Your Honor that is the argument.  And the fact

10  that they find the Vessel Operating Agreement the day before

11  filing bankruptcy speaks volumes.  I mean literally, October

12  2nd, this is after the vessel foreclosure was filed, they

13  signed this document.

14      And it's not only the control of the vessel and all

15  of the payments and the assignment of the rights of the

16  charter.  It's also, you know, things like a lien, an

17  encumbrance on the vessel, clearly violative of the mortgage,

18  a right of first refusal clearly violative of the mortgage.

19      All of these provisions waiving damages by the

20  Debtor in favor of Seatran.  The Debtor believes, believe it

21  or not, indemnifies Seatran, even though Seatran is the one

22  controlling the vessel?  The Debtor indemnifies Seatran in

23  this document?  There's not one thing in this document that

24  benefits the Debtor.  And yet they signed it the day before

25  they filed bankruptcy in favor of Seatran, this non-debtor

1  that's not obligated on the note.

2         Your Honor, the charter agreement that we attached

3  to the brief, it was dated and expired in October 15th of this

4  year.  The charter is between Seatran and a company called

5  Guice, and then Guice apparently charters the boat to SpaceX.

6  Even the charter agreement recognizes the mortgage.  There's

7  a specific box that we referenced in the brief where the

8  mortgage is referenced and the parallel clause in the charter

9  agreement provides that the parties will abide by the

10 mortgage.

11        So again, I cannot believe I'm arguing this.  I

12 cannot believe I am arguing the most basic principles of

13 mortgage law that when you mortgage something to a bank to

14 obtain an enormous loan of $23 million, that you can't then

15 transfer the rights related to the thing that you mortgaged,

16 that you mortgaged, that you gave to your lender.  You can't

17 transfer those rights to another related entity that's not an

18 obligor on the loan in order to defeat aspects of the

19 mortgage, and yet, that's what we have.

20        And to make matters even worse, the collateral is

21 now literally being used by SpaceX to catch hot pieces of

22 rocket that might fall from the sky in a giant net.  I can't

23 really fathom a more dangerous mission than that.

24        And yet, as we stand here today, there is no

25 effective charter on this boat.  The charter expired on

1  October 15th.  The Debtor -- they've never come into this

2  court to ask for Court approval to extend the charter.  There

3  is literally an e-mail from somebody with Seatran -- no,

4  somebody with Guice, somebody at Seatran just says, you know,

5  we'll extend the charter month to month.  But this Court

6  hasn't approved that.  The boat owner needs to -- it's in

7  bankruptcy now.  That needs to be brought before the Court.

8          And what we have here is from an insurance

9  perspective what is in my client's view, an alarming

10  situation.  The insurable interest in this boat is not

11  legally there.  An insurance company may very well take the

12  position that because the party who has obtained the

13  insurance does not have an insurable interest in the boat,

14  because they don't have an effective agreement that's legally

15  recognized under the law to possess the boat; there is no

16  insurable -- they very well may take the position, and I

17  don't want to say anything on the record that would prejudice

18  my client nor even the Debtor's rights to collect payment,

19  but it's a major issue.

20          I spent about an hour in my office yesterday

21  talking with an expert in my office that does nothing but

22  vessel insurance mortgage coverage work, and it's a major

23  issue.

24          The other major issue if you look at the face of

25  the charter, it has what they call a trading range.  The

1    trading range is listed as Gulf of Mexico, the Caribbean, and
2    the east coast.  But the boat is on the west coast, again,
3    another major concern.

4            To the extent that they would have extended this
5    charter by this e-mail, the original charter doesn't even
6    list the west coast; a major problem from an insurance
7    perspective.  And we also have concerns and we don't have the
8    policy, but we have concerns whether or not the insurer was
9    on notice of the type of mission that this vessel would be
10   undergoing.  Typically, catching hot rockets from the sky
11   might be the sort of thing that you would need special
12   coverage for, and I don't know if that's in place.

13           Your Honor, you probably read about the litigation
14   tactics that have been employed.  And again, this is another
15   indicia of bad faith.  In the state court suit against
16   Mr. Miguez they enrolled Blake Miguez, the son of Steve
17   Miguez, the guarantor who is not a practicing lawyer, but he
18   is a state legislator.

19           And he used some statute I've never heard about,
20   that says that if you're a state legislator and you're an
21   attorney, you can get an extension.  So they used that to get
22   three extensions, even though Adams and Reese was representing
23   Mr. Miguez in that suit, a very big qualified firm, Blake
24   Miguez enrolled and then extended that -- the time to answer
25   for some six months.

1    We finally get the summary judgment teed up in

2  state court and they remove it.  They remove it based on it

3  being a core matter.  Well, it's not a core matter.  Of course

4  it's not a core matter.

5    They then -- the case gets removed.  It gets

6  stalled again.  We lose our hearing date.  We resubmit the

7  hearing, all the summary judgment in federal court.  They try

8  to get that continued.  Judge Feldman says no.  They didn't

9  come in and get the TRO here.  It's just one thing after

10  another.

11    You remember the last hearing when we were talking

12  about discovery and all of the confidentiality of the day

13  rates.  They filed the charter with the day rates as an

14  attachment to their opposition to the Motion for Turnover.

15  There was nothing confidential in any of that.  But it did

16  delay us from finding out about the true status of this boat,

17  which is that there's not an effective charter in place until

18  now.

19    Your Honor, my client has lost all confidence and

20  trust in this Debtor, and he just wants to foreclose on its

21  collateral.  If you look at the Little Creek factors, going

22  back to the original Little Creek factors, again they're all

23  here.  One by one, the Fifth Circuit:  The Debtor has one

24  asset, that's the case here.  The secured creditor's lien

25  encumbers the asset, that's here.  There are generally no

1   employees except for the principals.  Here, this Debtor has

2   no employees.  It only has one officer and that's Mr. Steve

3   Miguez.

4           Little or no cash flow, here the Debtor has no cash

5   flow.  It's all intercepted.  If you look at the bank

6   statements, they rarely get money deposited into their account

7   that doesn't immediately get yanked back up to a non-Debtor.

8   Few if any unsecured creditors whose claims are relatively

9   small.  In this case, there were -- there was just one

10   unsecured -- there was just one creditor other than an

11   insider, SBN.

12           Until yesterday evening after all the depositions

13   were taken, they filed amended schedules to list three other

14   creditors.  But the collective claims are like $15,000.  So,

15   one of them is Adams and Reese, by the way, who prepared the

16   original schedules and didn't list themselves as a creditor.

17           The next Little Creek factor, the property has

18   usually been posted for foreclosure, and the bankruptcy was

19   filed to stop the foreclosure.  That's the case here.

20           This is a single asset case with a single non-

21   insider creditor, my client.  Your Honor, the mission of this

22   vessel is about as dangerous a mission as you can imagine,

23   and from a purely Little Creek factor perspective, a bad faith

24   perspective.  I literally cannot envision a stronger case to

25   lift the stay for cause than this one.

1          So then we get to the next part, as if that weren't

2     enough.  And that is that this Debtor lacks equity in the

3     vessel and it's not necessary for an effective reorganization.

4     The Debtor lists the boat on its schedules as worth $12

5     million.  Our debt is north of $23 million.  Clearly, there's

6     no equity in the boat.  And we cited the cases, Your Honor,

7     including the McManus case from the Fifth Circuit that you

8     can't look to non-debtor collateral to establish that there's

9     equity in the vessel for purposes of 362.

10          And from a factual standpoint, they didn't even

11    argue to the contrary.  They did argue one case which had

12    nothing to do with the issue, I think that was a mistake.

13    The other case was a case, as we explained in our brief,

14    citing and relying upon the McCredle (phonetic) case that the

15    Fifth Circuit specifically said it didn't agree with.

16          So there's no equity in the boat when you look at

17    the next prong, which is whether or not it's necessary for an

18    effective reorganization.  Can the Debtor confirm a plan?

19    And in numerous cases it said you know, if the Debtor can't

20    confirm a plan, the property is not necessary for an effective

21    reorganization.

22          Under 1129(a)(10), they have to have an impaired

23    non-insider class accept the plan.  And they can't.  My

24    client will not accept the plan.  This is the Greystone case

25    and the Timbers case.  They are not going to accept the plan,

1  so they're not going to be able to get that non-insider

2  class.  I guess the thought was when they amended the

3  schedules to add all of these -- I shouldn't say all of these

4  new creditors, there's two or three new creditors.

5          Even with that, our deficiency claim would swamp

6  the unsecured class.  That's the Timbers case.  You can't

7  gerrymander a class to get an accepted impaired class under

8  1129(a)(10).

9          So, under both prongs of 362, this case and the

10  automatic stay should be lifted.

11          Your Honor, I would call -- I don't know if you

12  want to hear oral argument from them first?

13          THE COURT:  Let me hear the oral argument and then

14  we'll proceed with the evidence.

15          MR. WAGUESPACK:  Thank you, Your Honor.

16          MR. PECK:  Your Honor, I have to respond.

17          It's great that he stands up here.  He's very good

18  counsel, and stands up here and testifies.  But what you've

19  got to have is hear the evidence.  He's got to put on --

20  we're going to put on evidence, Your Honor.  We're going to

21  put on evidence to belie what he's saying.

22          We have witnesses here.  We're going to explain the

23  whole thing to him, and he just goes on and on, slimes the

24  Debtor, slimes my client, says horrible things about us when

25  we're going to just put on evidence so the Court will hear

1  the evidence and see the documents and hear the testimony.

2  And that's what -- not what he says, it's what we're going to

3  put on, Your Honor.

4          Now, there's a group of vessels -- this is not one

5  vessel.  They all operate together.  I guess I've done a lot

6  of marine finance in my days, Judge, but this is the way it

7  works:  You know, if you go have your deal with a broker, he

8  brokers the vessel.  And the broker goes to the oil company.

9  And the broker -- all the broker's agreement says those

10 receivables that the oil company owes that broker all belong

11 to that broker.

12         Even though your vessel is mortgaged and you're

13 going through an agent or broker that owns it, they're doing

14 back to back charters, okay?  You don't have -- your

15 mortgagee has no claim against the oil company.

16         What you do in a marine finance transaction, I have

17 some clients right now.  What my bank says:  Okay, I want an

18 assignment of charter hire down over there against the oil

19 company, because I don't have any right to that -- that leg

20 of it.  That's what they don't have.  They didn't do that.

21         They have no UCC.  They -- I know marine financing,

22 he's talking about mortgage and all this.  They have no legal

23 claim to those monies, none whatsoever under the law.

24         Now, they're not a party to these documents.

25 They're acting like:  Oh well, we just made all this up.

1   This is the way that the parties were set up as a three

2   ownership structure where all of these boats were going to

3   come together with three owners, Comar -- you'll hear Seatran

4   and Texas Crewboats, and that's how they were going to do

5   it.

6           They were going to put all of their boats together,

7   they were going to operate under a Vessel Management

8   Agreement, which is very standard in the industry.  And this

9   is done well before this mortgage came into existence, okay?

10          And they can talk about D'Oench Duhme.  They knew

11  about this.  We explained this transaction to them.

12          And they said, "Well, we want a guarantee of

13  Seatran, the manager."

14          And we said, "No, because it's not owned just by

15  the Miguez family.  It's owned by some other people."

16          And they said, "We want a security agreement against

17  that."

18          We said, "No."

19          They went forward with that, with that knowledge,

20  that bank did.

21          Now, this marine insurance issue, I don't know

22  where he got this from.  I mean we have certificates of

23  insurance with the bank is named and waived.  They have an

24  insurable interest.  They own the vessel.  I just don't get

25  this, okay?  I just -- I don't understand it.  Let him put on

1  an expert if there's a problem.  Instead of him testifying,

2  let's see some testimony and experts why this vessel is not

3  insured.  Not some lawyer getting up here and telling you

4  what it is.

5          I think that they have an insurable interest.  I do.

6  I got involved with this when I was in my marine finance

7  practice.

8          You know, he talks about the <u>Little Creek</u> factors.

9  Well, if you read the Fifth Circuit and <u>Little Creek</u>, it says

10 just don't take these factors, add them up and you win.  They

11 said don't look at that out of a vacuum.  You have to look at

12 everything.

13         And most cases say:  Is there a valid business

14 purpose?  Good faith equals a valid business purpose.  We

15 have a valid business purpose here.  We have a plan support

16 agreement which we signed yesterday, to pay 100 cents on the

17 dollar to his client.  And we have the support of the

18 guarantor and Seatran, all these companies, and we can do a

19 plan.  Mr. Draper can address that.

20         And we all know we need one accepting class.  And

21 we have other creditors other than themselves.  And just

22 because you have a two-party dispute it doesn't mean you

23 can't -- it's bad faith or you can't -- you have to lift the

24 stay.  We have an "other" class of non-insider claimants,

25 unsecured creditors, and they vote to accept the plan, we

1   have an accepting plan -- an accepting class.

2           We're paying them 100 cents on the dollar.  We're

3   going to put testimony on.  How are we going to do that?

4   We're going to put a testimony by the witness with a pro

5   forma.  We're going to put a plan support agreement in.

6   We're going to show how we can formulate a plan and get on

7   the other end.

8           But they don't want to do that.  They want to short

9   circumvent this.  This is the financial institution that

10  bought this debt from this bank for 23 cents on the dollar.

11  We understand -- we don't know if that's information to

12  believe.  But they bought it at a discount.

13          There's no question they can assert the full

14  amount.  I'm not saying that.  But they're looking for a

15  quick strike here, okay?  They want to just double their

16  money, sell the vessel for nothing, go against the guarantors,

17  liquidate every boat.

18          But the Bankruptcy Code doesn't provide that.  It

19  gives a party with a valid business purpose such as we have,

20  a right to formulate a plan of reorganization and we're going

21  to pay them 100 cents on the dollar.

22          I'm going to let Mr. Draper address that, but we --

23          THE COURT:  It does look like though when you look

24  at the -- just at the history of this, that there has been

25  quite a bit of delay.

1          MR. PECK:  I can't speak to that, Your Honor.  I

2     just got -- I got in the case -- and sometimes, there is

3     delay all the time.  If we got to punish every debtor that

4     delays when he goes to the last minute and then files and

5     frustrate the creditor, we would have nobody in bankruptcy,

6     okay?  This happens, okay?

7          People go after debtors.  Debtors try their hardest

8     to stop them from getting a judgment.  And then if we got in

9     here in bankruptcy, then we get punished for that; there

10    would be a lot of debtors in trouble, because a lot of debtors

11    file with two days before their house gets foreclosed upon.

12    They try to delay.  They can't conserve us.  I mean that's not

13    -- that's --

14         THE COURT:  I understand.  But there appears there

15    were some things going on right before the bankruptcy was

16    filed that just seems to be unusual.

17         MR. PECK:  Well, I can't -- I didn't -- we didn't do

18    any of that, Judge.  We got involved here.  Everything has

19    been on the up and up.  We've been working quickly on this.

20    We've put together a plan support agreement.  We're going to

21    move fast on this.

22         I don't know what happened ahead of time, but we

23    represented our client and we've done everything proper, and

24    we filed a good brief with Judge Feldman to convince him to

25    transfer it, based on related to.  And we filed our

1  (inaudible) for summary judgment.  We've -- I've hopped over

2  it, all over this.

3       I don't know about the delay part.  But since then,

4  like I said, you can't punish a debtors or parties if they're

5  trying to exercise all legal rights, or we wouldn't have a

6  lot of debtors in the bankruptcy court.  If we would -- if

7  every debtor that came here would get punished for that, we

8  wouldn't have that.  I know the Court can take that into

9  account, but that's -- people are debtors for that reason.

10  They are just trying to do their best.

11       Now, we have come up -- I'll let Mr. Draper address

12  this.  Again, the bad faith looking at Little Creek, you

13  don't look at every factor.  You look is there a valid

14  business purpose?  We're going to put forth a valid business

15  purpose here that will be formulated a bankruptcy, and come

16  out of here under the Bankruptcy Code.

17       And we're going to put on testimony.  We're going

18  to put on documents.  And we're not going to have lawyer

19  argument.  We're going to -- you're going to weigh the

20  evidence and hear the testimony and I just ask the Court just

21  to wait and hear that.

22       Mr. Draper?

23       THE COURT:  Thank you, Mr. Peck.

24       MR. DRAPER:  Your Honor?

25       THE COURT:  All right.

1          MR. DRAPER:  Let me address it because one thing,

2   and this goes to my request for a preliminary hearing today.

3   If you look at their motion, their motion is devoid of this

4   insurance issue.  They have an insurance certificate.

5          The adequate protection I'm willing to give on

6   insurance is I'm willing to insure the vessel.  If they have

7   an issue with the policy that's in place, or what's in place,

8   we can address that.  But it is not on the face of their

9   motion.  This is the first time I've had it -- I've seen it.

10  He may have said it, but quite frankly, I -- as adequate

11  protection, we will adequately insure the vessel.

12         And I don't know if they have an expert here today,

13  but to the extent that they do, that's a problem, and we have

14  an insurance certificate that we will introduce into the

15  record that Guice has provided to us.

16         Let me address a few things that I think:  Number

17  one is this D'Oench Duhme Doctrine.  The Court is aware of

18  that.  The D'Oench Duhme only takes away defenses with

19  respect to things.  It doesn't go to whether a security

20  interest is perfected.  It doesn't go to the bank knew about

21  it or what they bought into.

22         We have here, and you'll hear the testimony of

23  Charlie Tizzard, who ran Chrysler Credit, the boat version.

24  He has been with this company since 2014.  Not the Debtor,

25  but with Seatran.  And this structure has been in place well

before the mortgage.  It may not have been written, but it was in place and it was known to the bank.

Let's talk about the capability of this Debtor to reorganize.  First, let's talk about the economic underpinnings and then we'll talk about whether I can confirm a plan.

The economic underpinnings are two-fold.  Number one is ultimately we will have revenue from the vessel, this vessel, and others.  The issue with Seatran and how this money falls through will happen.  I don't need financing from -- I don't need cash collateral to get through this bankruptcy.  I will need the use of funds post-petition, and that's something that we -- post-confirmation, post effective date which I will have.

Number two, I can propose a joint plan.  Nothing stops me from taking one plan to cover all these boats.  They may not be substantively consolidated, but this Court is well aware that a single plan is possible.  The only legal issue that's in place, and I think the weight of authority is you look at -- you only need one accepting class across.

I think there's one case that says you need one accepting class in each case, but I think that's minority view. It has not been briefed, but I think we can give that to you.  So, I have the capability of confirming a plan.  All I need is in one class, or one case, an accepting impaired

1  class.

2          Let's address how the plan proposes to treat

3  Mr. Waguespack.  He is going to have no deficients, period,

4  end of story, under the joint plan.  We are going to pay his

5  claim in full, period, over a period of time with a till

6  interest rate with a normal amortization.  As a matter of

7  fact, the amortization we're using is the exact same

8  amortization that went for this loan.

9          So, a plan that is reasonably capable.  He can vote

10  against this plan all he wants.  I think we can cram it down.

11  I will have an accepting impaired class.  And again, if the

12  Court wants a brief on that legal issue, joint plans are

13  allowable.  I don't have to just file one plan for each case.

14          Two, the legal issue -- and I think a weight of

15  authority is that you look at the joint plans, and all you

16  need is one accepting impaired class.

17          And if you look at 1129(a)(10), the literal

18  language of it just says -- it basically says:  A class of

19  claims is impaired under the plan.  So, it looks to a

20  singular plan.

21          Now let's talk about the economic underpinnings.

22  This Debtor, and you'll hear evidence of it, has at its

23  disposal roughly -- these Debtors, and I'll talk about it in

24  general -- $4 million that's set aside in a reserve account.

25  That's under what's -- and it's cited in our brief, the CCF

1  funds.  And there will be some explanation as to what that

2  is.

3          That goes a long ways towards being able to confirm

4  a plan.  It goes a long way to feasibility.  And with

5  Mr. Miguez's backstopping, that goes -- that's a lot of money

6  to be able to make monthly payments that when you hear

7  Mr. Tizzard's testimony, the plan we were -- the support

8  agreement requires roughly $150,000 a month for this -- the

9  debt service payments.

10          THE COURT:  Let us begin.

11          MR. DRAPER:  What?  Excuse me.

12          And so, we have roughly $4 million available for us

13  to be able to backstop a plan.  So, that's all taken -- let's

14  talk about these delay issues:

15          Number one:  The issue Mr. Waguespack is talking

16  about is irrelevant with respect to the litigation against

17  Mr. Miguez.  That's a singular suit between his lender and

18  Mr. Miguez.  Mr. Miguez defended it -- these actions to move

19  it one way or the other.  That's -- he's dealing with the

20  guaranty.

21          I need Mr. Miguez to backstop my plan.  But by the

22  same token, it's not something this Debtor caused.  This

23  Debtor has to stand alone, separate and apart from Mr. Miguez.

24  And so that action, I think, should be totally ignored.  It's

25  quite frankly, irrelevant.

1          Next issue, the <u>Little Creek</u> factors.  Let's put it

2   aside.  Number one, you'll hear testimony of this, there's

3   nothing in the Bankruptcy Code that stops a debtor who

4   doesn't have employees from confirming a plan.  You wouldn't

5   have the single asset stuff put in the plan that says that

6   you have -- A, you have to have employees to confirm a

7   plan.

8          Two, I've given the Court in my brief, the Fifth

9   Circuit in <u>Gables</u> basically said:  Look, how many unsecured

10  creditors you have is not material.  There's no materiality

11  factor whatsoever in that.  And so that issue is really a

12  non-issue.  You can confirm a plan.

13         Three, gerrymandering, the Fifth Circuit as the

14  Court is very well aware in <u>Greystone</u> is it says:  Go find it,

15  and that goes to the good faith of the plan.  It doesn't go

16  to the ability to confirm a plan.

17         And quite frankly, I think when you pay a creditor

18  in full and propose to pay all creditors in full, it's a "but

19  for" for proposition on good faith.  It's not as if we're

20  attempting to cram anybody down.

21         And so that's what we have here.  We've moved very

22  quickly with respect to this.  A lot of this is complaining

23  for things that were in place beforehand, number one.  Number

24  two that are known and establish practices in the marine

25  industry.

1          For example, this issue of Seatran and Seatran

2     being a party to the charters for SpaceX and for Guice.  I

3     will tell you, Mr. Tizzard is going to testify to this.  Every

4     charter for this boat and for this group of boats has always

5     been through Seatran.  It's a normal marine practice.  It's

6     how they do it.  He did it when he was at Chrysler, and it's

7     -- there is no contrary evidence that you can put on.

8          So we're dealing with an industry norm that was

9     completely known to the bank, and they bought into it.  And

10    what you have here is an entity that, as Mr. Peck said, that

11    bought the note at a discount, doesn't like the idea of

12    reorganizations, doesn't want to have to be paid over time,

13    and that's their motivation.

14         And so, let him put on his evidence.  The Little

15    Creek factors, yes, we have no employees.  But it's -- that's

16    how marine industry functions.  You have single boats and you

17    have -- the Bankruptcy Code doesn't say it,

18         Two, yes, *Mr. Steven* was filed on the eve of a

19    foreclosure, but again, that -- the cases we've given you,

20    that's not -- people do that all the time.  It was not on the

21    eve of a sale, which is really the more prevalent case.  It

22    was on the eve of them taking actions and stopping the boats

23    from working.

24         Three, the use of the vessel.  My understanding is

25    if I'm doing something within the ordinary course, I don't

1  need court approval.  This vessel is leased.  The business of

2  this vessel is to be leased and operated by third parties.  I

3  don't need court approval for it.  And so, saying I didn't

4  come in here to do it, it's normal.

5          I mean that's what my business is.  I mean if I

6  was in the process -- in the business of leasing apartments,

7  do I have to come in and get court approval for every

8  apartment leased?  No.  That's my business, and my business

9  is leasing.

10          So let's sort of cut the wheat from the chaff and

11  slime of the Debtor from really what the real factors and

12  what's really going on here:  What was known, what are the

13  economics, and can this Debtor confirm a plan?  Because I

14  think the evidence will be overwhelming that it can, and I

15  would tell you that the CCF funds that we mentioned in our

16  brief are very, very capable of backstopping a plan and this

17  Debtor having enough money to do what it needs to do.

18          THE COURT:  Thank you Mr. Draper.

19          Okay Mr. Waguespack, call your first witness.

20          MR. WAGUESPACK:  Mr. Kilcoin.

21          Your Honor, may I approach with an exhibit list?

22          THE COURT:  You may.

23          THE CLERK:  If you will approach here.

24          THE WITNESS:  Where?

25          THE CLERK:  At the podium, yes.  Can you raise your

1  right hand?

2                    *    *    *    *    *

3              **MARK KILCOIN, WITNESS, SWORN**

4                    *    *    *    *    *

5         THE CLERK:  Thank you, sir.  Please have a seat in

6  the witness stand.

7              State your name and address for the record.

8         THE WITNESS:  Mark Kilcoin, that's K-I-L-C-O-I-N.

9  And 1700 Lincoln Street, Suite 2150, Denver, Colorado 80203.

10        THE CLERK:  Thank you, sir.

11                   *    *    *    *    *

12                   DIRECT EXAMINATION

13  BY MR. WAGUESPACK:

14  Q.   Mr. Kilcoin, are you familiar with the debt owed to SBN

15  by Mr. Steven, L.L.C.?

16  A.   Yes, sir.

17  Q.   Are you the authorized representative for SBN for this

18  debt that's owed by the Debtor?

19  A.   I am.

20  Q.   Are you the person with SBN that's responsible for the

21  debt owed by the Debtor?

22  A.   I'm responsible for management of the account, yes.

23  Q.   Are you the custodian of the loan files for this debt?

24  A.   Yes.

25  Q.   And that would include the FNBC loan files, correct?

1  A.    What we received from them, yes.

2  Q.    How is the debt of evidence?

3  A.    By note and other loan documents.

4  Q.    Could you turn to Exhibit 1 in the binder that's before

5  you?

6  A.    (Witness complies.)

7        Okay.

8  Q.    Is that a copy of the promissory note that evidences the

9  debt by SBN -- by Mr. Steven's and other entities to the

10 original lender, FNBC and now SBN?

11 A.    (Witness examines document.)

12       Yes, it is.

13            MR. WAGUESPACK:  Your Honor, I would offer and

14 introduce Exhibit 1.

15            THE COURT:  Is there any objection?

16            MR. DRAPER:  No objection.

17            THE COURT:  Okay.  It will be accepted into

18 evidence.

19 BY MR. WAGUESPACK:

20 Q.    How did SBN acquire the note?

21 A.    It was acquired October 18th, 2017 from the FDIC as

22 Receiver for First NBC Bank.

23 Q.    Could you turn to Exhibit 2 in the binder?

24 A.    (Witness complies.)

25 A.    Is that a copy of the endorsement and allonge that

| | |
|---|---|
| 1 | memorializes SBN's purchase of the Debtor's debt and the |
| 2 | related documents? |
| 3 | A.   (Witness examines document.) |
| 4 |     Yes, it is. |
| 5 |       MR. WAGUESPACK:  I would introduce Exhibit 2 into |
| 6 | the record. |
| 7 |       THE COURT:  Any objection? |
| 8 |       MR. DRAPER:  No objection, Your Honor. |
| 9 |       THE COURT:  Exhibit 2 is accepted into evidence. |
| 10 | BY MR. WAGUESPACK: |
| 11 | Q.   Is the note due and owing? |
| 12 | A.   Yes, it is. |
| 13 | Q.   When did the Debtor last pay -- make a payment on the |
| 14 | note? |
| 15 | A.   I believe it was late July of 2017. |
| 16 | Q.   What's the principle balance of the Debtor's debt to SBN |
| 17 | as of October 3rd, 2018? |
| 18 | A.   Just over $23 million -- or $22 million. |
| 19 | Q.   And what's the amount of accrued interest on the debt as |
| 20 | of October the 3rd, 2018? |
| 21 | A.   Just over a million-four. |
| 22 | Q.   Are you accruing interest at the default rate or the |
| 23 | contract rate? |
| 24 | A.   We have elected to discontinue it at this time at the |
| 25 | contract rate. |

1  Q.   Are there other amounts owed on the note?

2  A.   There are legal fees that we have up until now and

3  continue to accrue, and also I think there's a small late

4  charge of like 1,250 bucks.

5  Q.   Is it fair to say that the total amount of the debt to

6  SBN exceeds $23,500,000?

7  A.   That would be right.

8  Q.   Yes?

9  A.   Yes.

10  Q.   Does the Debtor have property that secures the SBN

11  claim?

12  A.   Yes.

13  Q.   And what is that property?

14  A.   There is a mortgage and security agreement on the

15  Mr. Steven.

16  Q.   Can we turn to Exhibit 3 in the binder?

17  A.   (Witness complies.)

18  Q.   And identify that document?

19       MR. DRAPER:  Your Honor, I have no objection to the

20  introduction of the document.

21       THE COURT:  What --

22       MR. DRAPER:  I have no objection to the

23  introduction of the document.

24       THE COURT:  Okay.

25       THE WITNESS:  Which tablet is that?  I'm sorry.

```
 1  BY MR. WAGUESPACK:

 2  Q.   Oh, it's Exhibit 3.

 3          THE COURT:  Is that only -- Mr. Draper, so I'm

 4  clear:  That's only to Exhibit 3, or to all of the exhibits?

 5          MR. DRAPER:  I have no objection to Exhibit 4.

 6          THE CLERK:  Mr. Draper?

 7          MR. DRAPER:  I'm sorry.

 8          THE CLERK:  Can you speak into a mike, please?

 9          MR. DRAPER:  Just for --

10          MR. WAGUESPACK:  It may just be easier for me just

11  to go forward and I'll --

12          MR. PECK:  No, I think the -- I would just --

13          MR. WAGUESPACK:  Okay.

14          MR. PECK:  I would just go -- say we'd stipulate

15  it.

16          MR. DRAPER:  Yes.  Your Honor, I have no problem

17  with Exhibits 1, 2, 3, 4 and 5.

18          MR. WAGUESPACK:  Okay.

19          THE COURT:  And we'll accept all of those into

20  evidence, Mr. Waguespack, if you'll continue.

21          MR. WAGUESPACK:  Thank you, Judge.

22  BY MR. WAGUESPACK:

23  Q.   So we've got the preferred ship mortgage there as Number

24  3, correct, Mr. Kilcoin?

25  A.   (Witness examines document.)
```

1      Yes.

2  Q.   And then we have the abstract that we obtained from the

3  National Vessel Documentation Center is Exhibit 4?

4  A.   (Witness examines document.)

5  Q.   Correct?

6  A.   Yes, it's an abstract, uh-huh.

7  Q.   And that shows that the SBN mortgage is first and prior

8  on the vessel?

9  A.   Yes.

10 Q.   And does the mortgage attached to the Mr. Steven and all

11 earnings, issues, revenues, accounts, assets --

12           MR. DRAPER:  Your Honor, Counsel is asking the

13 witness --

14 BY MR. WAGUESPACK:

15 Q.   -- payments, income and profits derived from the use or

16 operation of the vessel?

17           THE COURT:  Let him finish the question.

18           MR. DRAPER:  I object to the form of the question.

19 Counsel is asking for a legal opinion from this witness.  The

20 document speaks for itself.

21           THE COURT:  I think he's -- well, he's asking what

22 the document says.

23           MR. WAGUESPACK:  I'm asking his understanding.  I'll

24 ask it as his understanding.

25           MR. DRAPER:  Again, I --

```
 1   BY MR. WAGUESPACK:

 2   Q.   Mr. Kilcoin, is your understanding --

 3            MR. DRAPER:  Again, I --

 4            THE COURT:  I'm going to overrule the objection.  I

 5   mean I hear him.  I'm not asking -- I don't hear him asking

 6   for his legal opinion.  He's just asking him:  What does the

 7   document provide?

 8            THE WITNESS:  Can you ask the question again?

 9            THE COURT:  And I will agree that it says what it

10   says.

11            MR. WAGUESPACK:  It says what it says.

12            THE COURT:  But I'll allow you to --

13            MR. WAGUESPACK:  I'm not going to spend a long time

14   on this.  I'm just generally setting the --

15            THE COURT:  Right.

16   BY MR. WAGUESPACK:

17   Q.   Mr. Kilcoin, the mortgage attaches to the Mr. Steven, the

18   vessel, and all earnings, issues, revenues, accounts, assets,

19   payments, income and profits derived from the use or operation

20   of the Mr. Steven.

21        Is that your understanding?

22   A.   Yes, that's my understanding.

23   Q.   And SBN also recorded a UCC-1 financing statement,

24   correct?

25   A.   Yes, it --
```

1  Q.   And that was by the owner of the vessel?

2  A.   First NBC, yeah.

3          MR. DRAPER:  Your Honor, again, let me object to the

4  form of the question.  The document, if you'll look at it,

5  appears to be a document that was recorded by First National

6  Bank of Commerce -- First National Bank.  It doesn't appear to

7  be an SBN document.

8          MR. WAGUESPACK:  And Your Honor, just to cut this

9  off, when I say "SBN" I mean SBN as the successor to FNBC.  I

10 think we established that they bought the note.

11         MR. DRAPER:  Well, I understand --

12         THE COURT:  Well, I've got an allonge that says they

13 bought the note.

14         MR. DRAPER:  Right.  But the question was:  Did they

15 record it?

16         The answer is no, they took a pre-existing

17 recordation.

18         But they bought a right to that.  That's all I'm --

19         THE COURT:  I don't know if I quite understand your

20 objection.  I think you're actually asking me -- you're making

21 a legal argument, what the effect is now, this UCC --

22         MR. DRAPER:  Right.

23         THE COURT:  -- on them having bought it?

24         MR. DRAPER:  Right.

25         THE COURT:  And that -- I don't see any problem

1    with the questioning here though.

2              MR. DRAPER:  Okay.

3              THE COURT:  Mr. Waguespack, please continue.

4              MR. WAGUESPACK:  All right.

5    BY MR. WAGUESPACK:

6    Q.   And that's the copy of the UCC-1 that's on record

7    relating to the Mr. Steven and the proceeds and other rights

8    relating to the Mr. Steven's, correct?

9    A.   Right.  With the attached exhibit, yes.

10   Q.   Okay.  And that's Exhibit A that's attached to the

11   UCC-1?

12   A.   Correct.

13   Q.   And what is generally your understanding of the scope of

14   the mortgage?

15   A.   The mortgage is extremely broad.  It attaches a security

16   interest in the vessel and all proceeds and other rights that

17   the vessel may have.

18   Q.   And do you understand that the Debtor made certain

19   representations in the mortgage?

20   A.   Yes.

21   Q.   And what is your understanding with respect to the

22   general nature of those representations?

23   A.   Well, they are the owner of the vessel, that they have

24   not assigned the rights to the -- any conceivable rights to

25   anyone else.  That is it provides for security agreements

1  against all proceeds and charters and income and profits,

2  that type of thing.

3  Q.   Did the mortgagor also agree that the lender could

4  directly receive the proceeds derived from the vessel?

5  A.   Yes, at their election, yes.

6  Q.   At the election of the lender?

7  A.   Right.

8  Q.   Did the Debtor in your view breach the representations

9  made in the mortgage?

10 A.   In my view, yes.

11 Q.   And why would you say that?

12 A.   Well, they effectively assigned all of these rights to

13 Seatran, is my understanding that they're doing.

14 Q.   And has that position essentially deprived you as the

15 lender from receiving the proceeds from the vessel?

16         MR. PECK:  Objection, Your Honor.  I don't think he

17 -- I don't think he set up a foundation about this assignment

18 of Seatran's, and this is just speculation thus far.  He is --

19 but where is the document?  But he's assuming facts not in

20 evidence.

21         MR. WAGUESPACK:  I'll walk him through it.

22         THE COURT:  Sustained.  If you'll lay the

23 foundation, please --

24         MR. WAGUESPACK:  Sure.

25         THE COURT:  -- Mr. Waguespack.

```
 1              MR. WAGUESPACK:  Sure.

 2    BY MR. WAGUESPACK:

 3    Q.   Prior to filing bankruptcy, did SBN seek to directly

 4    collect the proceeds from its collateral, the Mr. Steven?

 5    A.   Yes, we tried to, yes.

 6    Q.   And if you can, turn to Exhibit 6 in the binder.

 7    A.   (Witness complies.)

 8    Q.   Do you recognize that letter?

 9    A.   (Witness examines document.)

10         Yes.

11    Q.   And can you tell the Court what that letter is?

12    A.   It was a --

13              MR. DRAPER:  Your Honor, let me object to the

14    question if he intends to introduce the letter.  This letter

15    does not show that Mr. Kilcoin either received the letter or

16    is copied on the letter.

17              MR. WAGUESPACK:  Well, if you'd let him testify

18    he'd explain that it's his lawyer and he had him send the

19    letter.

20              MR. DRAPER:  But -- okay, he can say he had his

21    lawyer send the letter.  He cannot introduce this letter

22    because it's not --

23              THE COURT:  He hasn't asked me to introduce the

24    letter yet though, Mr. Draper.

25              MR. DRAPER:  Okay.
```

1    THE COURT:  He is simply asking him some questions

2  about identifying this letter.  When we get to the point

3  where he's trying to do that, I'll entertain your objection.

4    MR. DRAPER:  Thank you.

5  BY MR. WAGUESPACK:

6  Q.   Mr. Kilcoin --

7  A.   Once again?

8  Q.   We'll try it again.

9    Is that a copy of the letter that you asked your lawyer

10 to send to Guice Offshore to try to directly receive the

11 proceeds from the vessel?

12 A.   Yes, it is, back in April 2nd of 2018, yes.

13 Q.   And in response to that letter did Guice send you any of

14 the payments that were being derived from the vessel?

15 A.   No, we have not received any payments.

16    MR. WAGUESPACK:  Your Honor, I would offer and

17 introduce Exhibit 6, the document, and I'll --

18    Let me ask -- I'll ask him a couple more questions.

19 BY MR. WAGUESPACK:

20 Q.   Did you have your lawyer send the document that we've

21 marked as Exhibit 6?

22 A.   Yes, I did.

23 Q.   And does the document marked as Exhibit 6 comprise the

24 business records of SBN?

25 A.   Yes, it is.

1  Q.   And it's specifically in connection with the loan that

2  has been made, and that is now held by SBN that was made to

3  the  Debtor, Mr. Steven?

4  A.   That's correct.

5         MR. WAGUESPACK:  Your Honor, I'd offer and introduce

6  Exhibit 6.

7         THE COURT:  Mr. Draper?

8         MR. DRAPER:  No objection.

9         THE COURT:  We'll accept Exhibit 6.

10  BY MR. WAGUESPACK:

11  Q.   What happened after the letter that was marked as

12  Exhibit 6 to cause Guice not to send the payments?

13  A.   They received -- my understanding is they received a

14  letter from Adams and Reese, who I believe at the time was

15  representing Mr. Miguez, Seatran, the Debtor, saying:  That's

16  not correct.  Don't send them the money.

17  Q.   And is that letter marked as Exhibit 7 there in the

18  binder?

19  A.   (Witness examines document.)

20       Yes, that's the April 9th, 2018 letter.

21  Q.   And is that letter sent to your lawyers that were

22  handling that matter for you at the time?

23  A.   Yes.

24  Q.   And is the letter that we've marked as Exhibit 7 a

25  business record of SBN that's kept in the loan file?

```
1   A.   That's correct.

2   Q.   And that's kept in the ordinary course and regular course

3   of your business?

4   A.   Yes, it is.

5            MR. WAGUESPACK:  Your Honor, I'd offer and introduce

6   Exhibit 7 into the record.

7            THE COURT:  Any objection?

8            MR. DRAPER:  No objection.

9            THE COURT:  It will be accepted.

10  BY MR. WAGUESPACK:

11  Q.   Mr. Kilcoin, did Guice respond to the demand letter in

12  writing that was issued to them to direct the proceeds from

13  the vessel to SBN?

14  A.   Their -- a law firm did, Rushing & Guice did, yeah.

15  Q.   And is that a copy of the letter there at Exhibit 8 that

16  that firm sent?

17  A.   (Witness examines document.)

18       Yes, it is.

19  Q.   And you received this letter?

20  A.   Well, our attorneys did and they forwarded it to me,

21  yes.

22  Q.   And is this also in the loan file that's kept in the

23  regular course of SBN's business?

24  A.   Yes, it is.

25            MR. WAGUESPACK:  Your Honor, I'd offer and
```

```
 1  introduce Exhibit 8.

 2           MR. DRAPER:  No objection.

 3           THE COURT:  It will be accepted into evidence.

 4  BY MR. WAGUESPACK:

 5  Q.   And has Guice been holding the funds from the charter of

 6  the Mr. Steven's ever since April of this year?

 7  A.   That's my understanding.

 8  Q.   Did SBN also issue a notice letter to Seatran to try to

 9  collect the proceeds from the Mr. Steven?

10  A.   Yes.

11  Q.   And is that letter there in the binder at Exhibit 9?

12  A.   (Witness examines document.)

13       Yes, it is.

14  Q.   And again, this is a letter that's kept in the business

15  records of SBN?

16  A.   That's correct.  I would have received it from our

17  lawyers, yes.

18           MR. WAGUESPACK:  Your Honor, if I could offer and

19  introduce Exhibit 9.

20           THE COURT:  It will be accepted.

21  BY MR. WAGUESPACK:

22  Q.   Did SBN try to get the Debtor, Mr. Steven, L.L.C. to

23  release the funds being held by Guice?

24  A.   Yes, we asked them to.  And said that in exchange for

25  doing that, we'll give you a short term forbearance while we
```

1   work things out.

2   Q.   And did they -- were they willing to do that?

3   A.   No, it has not been done.

4   Q.   Did SBN finally have to foreclose on the Mr. Steven?

5   A.   Yes.

6   Q.   And when did they foreclose on the Mr. Steven?

7   A.   Well, we didn't foreclose, we initiated foreclosure on

8   October 2nd, I believe it was.

9   Q.   And that was a year after you had purchased the debt

10  from the FDIC, correct?

11  A.   Just about a year, yes.

12  Q.   So you didn't immediately go to foreclose on the vessel,

13  did you?

14  A.   No.  It was always our hope that things would work

15  itself out.

16  Q.   And in fact, this was filed on October -- if you could,

17  look at Exhibit 10.

18  A.   (Witness complies.)

19  Q.   That's a copy of the complaint.  That wasn't filed until

20  October 2nd, 2018, correct?

21  A.   (Witness examines document.)

22       That's correct.

23  Q.   And that was a number of months after April of 2018 when

24  your payments were being held by Guice, correct?

25  A.   Say that again?  For how long?

1  Q.   You waited until October of 2018 to file the suit and

2  your payments from the vessel were blocked with Guice in April

3  of 2018, correct?

4  A.   Correct.

5  Q.   Now after you filed that foreclosure --

6        MR. WAGUESPACK:  And Your Honor, if I could offer

7  and introduce Exhibit 10 into the record.

8        THE COURT:  Exhibit 10 will be accepted into

9  evidence.

10  BY MR. WAGUESPACK:

11  Q.   Was a warrant issued for the arrest of the vessel?

12  A.   I believe so, yes.

13  Q.   And do you know when that happened?

14  A.   I think it was right away, on the 2nd or the 3rd of

15  October.

16  Q.   And what happened then?

17  A.   The Mr. Steven, L.L.C. filed bankruptcy to stay the

18  foreclosure.

19  Q.   What is your understanding of who is in current custody

20  of the vessel?

21  A.   It's either Guice or SpaceX or SpaceX directing Guice

22  Offshore -- directing Guice Offshore, so it's one of those

23  folks.

24  Q.   And how do you have this understanding?

25  A.   Mostly from the -- from social media, and media reports

1  about the Mr. Steven, and also the SpaceX filings that have

2  been filed in this court.

3  Q.   Is the Debtor providing you any reports on the vessel?

4  A.   No, I have never received anything from them on that.

5  Q.   Does the Debtor -- does the vessel, from what you can

6  tell in these media reports, appear to have been altered?

7  A.   The what been altered?

8  Q.   Does the vessel appear to have been altered?

9  A.   Yeah, I would say so.  I'm not a --

10         MR. DRAPER:  Let me object to the question.

11 There's no foundation that he knew how the vessel looked

12 before --

13         THE WITNESS:  (Laughter.)

14         MR. DRAPER:  -- he bought the note.

15         THE WITNESS:  (Laughter.)

16         MR. DRAPER:  Asking if it's altered presupposes

17 that things are -- that he has personal knowledge.

18         THE WITNESS:  (Laughter.)

19         THE COURT:  I'll sustain that objection,

20 Mr. Waguespack.

21         MR. WAGUESPACK:  Yes, sir.

22 BY MR. WAGUESPACK:

23 Q.   Mr. Kilcoin, do you have photos in the file that showed

24 the vessel before anything -- at the time of the mortgage?

25 A.   Yeah, there's photos out there in the -- everywhere.

1  Q.   And compare that to what you've seen in -- on the

2  internet?

3          MR. DRAPER:  Objection.  Where are the photos?

4  Object, Your Honor.  I don't know what he's talking about

5  here.

6          MR. WAGUESPACK:  He can testify as to what he's

7  seen.

8          THE CLERK:  We need you -- I need you all at the

9  mikes, please.

10         THE COURT:  Yes we need -- let me hear your

11 objections on the record.

12         MR. DRAPER:  Your Honor, two things:  Number one,

13 there's nothing that this witness is an marine expert.

14         Number two, we have never seen the photos.  We

15 don't have the photos.  And so it's --

16         MR. WAGUESPACK:  I don't understand the objection.

17 There's no rule that says I have to have the photos.

18         THE COURT:  He's just asking him simply if he had a

19 photo, had seen it, and --

20         MR. WAGUESPACK:  And --

21         THE COURT:  -- and does he -- has he seen -- I

22 think he's testified he's seen pictures on social media of

23 what the vessel may look like now.

24         MR. DRAPER:  Well, two things:  Number one, what

25 social media is, is truly there's no -- objection to the

1    hearsay rule.  I mean there's no exception for social

2    media.

3            He hasn't seen the vessel personally, and so what

4    pictures -- we don't know whether it has been photo shopped,

5    what he has looked at, how he's looked at it, what he has

6    been done -- what has been done.

7            And so, you know, this witness has no foundation to

8    make that determination, and we don't know the time frame.

9    When were the adjustments to the vessel done?  Beforehand,

10   after?  He has no personal knowledge of this.

11           MR. PECK:  You have hearsay, Your Honor, it's the

12   proof of the truth of the matter stated therein.  We don't

13   have -- we can't cross-examine him.  We don't know what

14   photos he has looked at.  So, this is hearsay.

15           MR. WAGUESPACK:  Your Honor, and I'll just respond,

16   but the file is filled with.  Obviously, when you get a

17   mortgage you've got all sorts of reports on the condition of

18   the vessel.  And so, he's certainly able to testify as to

19   what the contents of the file are that depict what the vessel

20   is like at the time it's mortgaged versus what it is now.

21           THE COURT:  Have these files been provided to the

22   opposing counsel?

23           MR. WAGUESPACK:  We would certainly provide them.

24   They have never asked for them.  I asked -- they brought it

25   up and I said:  Issue me a discovery request with exactly

1   what you want, and we'd be happy to do that.

2           I did that at the hearing -- at the last hearing

3   with Mr. Peck.

4           MR. PECK:  No.  No, you didn't.

5           MR. WAGUESPACK:  They never asked for them.

6           MR. PECK:  No, you didn't.

7           We haven't gotten anything, Judge.

8           MR. WAGUESPACK:  No, I did.  You asked me --

9           And I said I'd be happy to give it to you.  Tell me

10  what you want.  Send me a request.

11          MR. PECK:  Your Honor --

12          MR. WAGUESPACK:  There's no secrets as to what has

13  been done to the vessel.

14          MR. DRAPER:  Well --

15          MR. WAGUESPACK:  I don't even know why they're

16  trying to --

17          THE COURT:  I think the -- it wasn't testimony, but

18  I know that I had argument from SpaceX on issues involving

19  alterations, because they had -- they had issues concerning

20  protective -- protection of their business secrets.

21          MR. DRAPER:  The question is when were the

22  alterations done, and what were the alterations?  Are they

23  removable or not?

24          This witness can't testify to any of that and

25  whether they're permanently affixed or attached.  And so this

1   witness has no capability with respect to that.

2           MR. PECK:  They're trying to get us that we're

3   violating the mortgage, Your Honor.  And we can't see what

4   was before or after.  He's saying I've looked at stuff on the

5   internet, which we don't have in front of us.

6           And so it's hearsay and it's not -- it's not

7   probative of anything.

8           MR. DRAPER:  Uh-huh.

9           MR. PECK:  So I mean it could be -- there could

10  be --

11          THE COURT:  Mr. Waguespack, I'm going to -- you

12  know, this may be something that you can get to on your

13  cross-examination, but I think I'm going to sustain the

14  objection here.

15          MR. WAGUESPACK:  Okay.

16  BY MR. WAGUESPACK:

17  Q.   Did the lender consent to any alteration of the vessel?

18  A.   We've never been asked to consent to any.

19  Q.   Did the lender ever consent to a charter of the vessel?

20          MR. DRAPER:  Your Honor, let me object to the form

21  of the question.  Because the truth is, they have only been

22  the lender since a certain date.

23          MR. WAGUESPACK:  This is not an objection to the

24  question?

25          MR. DRAPER:  Well, it is an objection to this --

1    the foundation of the question is he has only been in place

2    for a certain period of time.

3            And so, if the question can be:  Did they ever ask

4    him about what was known beforehand or by who is a completely

5    different issue.

6            THE COURT:  I will sustain that.  I mean I think

7    that's fair and to what the time period he has been involved,

8    Mr. Waguespack.

9            MR. WAGUESPACK:  I'll break it up.

10            THE COURT:  But other than that, I don't have a

11    problem with this question.

12            MR. WAGUESPACK:  Okay.

13    BY MR. WAGUESPACK:

14    Q.   Mr. Kilcoin, since you've been involved in this loan

15    which was October of 2017?

16    A.   Correct.

17    Q.   Has anybody asked the lender to consent to an alteration

18    of the vessel?

19    A.   No.

20    Q.   And is there anything in the loan files that indicated

21    that the lender consented to an alteration of the vessel?

22    A.   No.

23    Q.   And with respect to the charter, did SBN consent to a

24    charter of the Mr. Steven?

25    A.   No.

1  Q.   Did, according to the loan files; was there a consent in

2  the loan files of the charter?

3  A.   No.

4  Q.   And do you have an understanding as to the current

5  status of the vessel?

6  A.   The vessel, to my understanding, is on the west coast of

7  the United States.  It's -- I believe that it was under

8  charter.  The charter terminated on October 15th of 2018.  I

9  heard that there was an e-mail -- I haven't seen it -- that

10 the charter has been extended.  But I don't know anything

11 more than that about the status of the vessel.

12 Q.   Since the filing of bankruptcy, has the lender consented

13 to an extension of the charter?

14 A.   It hasn't asked the Court or us for an extension.

15 Q.   Do you consider there to be an effective charter on the

16 vessel as of today?

17       MR. PECK:  Object to the form of the question.

18 That's a legal question.  Do you think this man is going to

19 opine on the legality, whether it's an effective charter or

20 not?  I think that's -- objection.

21       THE COURT:  I think, Mr. Peck, I'm going to

22 overrule that objection.  I think he's just asking does he

23 know if there's a charter on the boat at all, and I think

24 that's a factual question.

25       MR. PECK:  Okay.  Thank you.

1    BY MR. WAGUESPACK:

2    Q.    Okay.

3    A.    The question is:  Do I know that there's a charter on

4    the boat?

5        No, I do not.

6    Q.    Does this concern you?

7    A.    Yeah, I think any lender would be extremely concerned

8    about the status of a charter, a status of the vessel,

9    absolutely.

10   Q.    And what is it about the charter -- were there

11   provisions in the charter that would provide a lender

12   comfort?

13   A.    Yes, absolutely, there's all kinds of, you know, repairs,

14   maintenance, who is in control of it, the insurance, the

15   insurability of it, the location of it, all of that is

16   vitally important to a lender and to an owner.

17   Q.    Does SBN have confidence in the Debtor's management?

18   A.    You know, when we took this loan over, we always come

19   into it with an open mind, but this Debtor has not made

20   payments to us.  They have delayed everything that they can

21   delay.  They even enlisted their son to delay court

22   proceedings, as an attorney.  They have not shown a propensity

23   to want to make payments to us.

24       They have come up with a scheme to keep the -- to

25   circumvent the mortgage.  I'd like to have confidence in them,

1　but I don't.

2　Q.　Are you aware of a Vessel Operating Agreement that was

3　allegedly signed on October 2nd, 2018?

4　A.　I was made aware of it I think last week or so.

5　Q.　Was that agreement contained in the bank's file?

6　A.　No.

7　Q.　Was there any draft of that agreement in the bank's

8　files?

9　A.　No.

10　Q.　Was there any reference to that sort of an agreement in

11　the bank's files, as an agreement that contains the terms

12　that are contained in that October 2nd, 2018 document?

13　A.　There's no agreement in the file, or no discussion of an

14　agreement.

15　　　　　　MR. WAGUESPACK:　Thank you.

16　　　　　　I don't have anything further for Mr. Kilcoin.

17　　　　　　THE COURT:　Thank you Mr. Waguespack.

18　　　　　　Cross, Mr. Peck?

19　　　　　　MR. PECK:　Yes, Your Honor, just a few.

20　　　　　　THE COURT:　All right.

21　　　　　　　　　　　*　　*　　*　　*　　*

22　　　　　　　　　　CROSS-EXAMINATION

23　BY MR. PECK:

24　Q.　Isn't it true that SBN bought this note, this $22 million

25　note at a substantial discount?

1  A.   I don't know what the term "substantial" means.

2  Q.   Okay.

3  A.   But we bought it at a discount.

4          MR. WAGUESPACK:  I'm going to object as to

5  relevance.

6  BY MR. PECK:

7  Q.   Isn't it true that you bought it less than 25 percent --

8          THE COURT:  Wait, wait.  We've got an objection

9  now.

10         Mr. Waguespack?

11         MR. WAGUESPACK:  Object as to relevance.  It has no

12 relevance.

13         MR. PECK:  It goes to the motive behind them about

14 how they bought it at a discount and they want to flip this

15 loan.  That's not --

16         MR. WAGUESPACK:  Well --

17         MR. PECK:  I think it's -- you're talking about my

18 motive -- our motive, so I want to talk and get into their

19 motive.

20         MR. WAGUESPACK:  Well first of all, Your Honor,

21 there's no conceivable relevance to the amount that we paid

22 versus the amount that's owed.  What is relevant is the amount

23 that's owed.

24         With respect to flipping the loan, there's no

25 foundation for that.  It's also not relevant.  But first of

```
1   all, they waited a year to foreclose without getting any

2   payments since July of 2017, so it's totally -- the evidence

3   is totally contrary.  There's no foundation.

4           But moreover, it's completely irrelevant to the

5   issues before the Court on the Motion to Lift Stay.  The

6   lender's motive in trying to enforce its rights is not a

7   relevant issue.  They can ask him about it, but it's not a

8   relevant issue.  The amount that they -- none of that is

9   relevant.

10          What's relevant is the Debtor's motives and what

11  they have done, and how they're --

12          MR. PECK:  Well, if you --

13          THE COURT:  I'm going to sustain the objection,

14  Mr. Peck.  I don't know that I see it.  I mean we're here,

15  you know.  They've bought the debt, we know that has taken

16  place.  They're not the original -- I mean it was taken by

17  FNBC.  Whatever happened to the bank happened, and they now

18  own the debt.  I don't necessarily see the relevance of that

19  question.

20          MR. PECK:  Well, that's the Court's ruling.  I

21  understand they can enforce the full amount.  They're just

22  describing all sorts of motives and how they've been good and

23  they've tried to work with people and stuff.  And I just -- I

24  think that's important to go behind that.  That's what I'm

25  trying to look at, go behind it.
```

1         Not the fact -- they could -- I know it's the law.

2   They can enforce the full amount no matter what they bought

3   it at.  But if they start ascribing this motion to say:  Oh,

4   we tried to work with them.  We're trying to do this and

5   that.  Let's find -- let's find out the true intent there.

6   That's what the purpose of my question is, Your Honor.

7         They brought it -- they brought this at issue,

8   about how they've been so patient and wonderful.

9         MR. WAGUESPACK:  Are you done?

10         Your Honor, if I could -- I didn't -- the only

11   reason I brought that up at all, it wasn't even in my original

12   outline, is he made an oral argument, this notion that we

13   tried to flip the loan, which is just again mind-numbing.

14         MR. PECK:  You've been --

15         MR. WAGUESPACK:  But it's not -- it's not relevant

16   and I don't understand why -- the lender's motives are clear.

17   They're trying to enforce their collateral and that's why they

18   filed the Motion to Lift Stay.

19         Beyond that, a simple notion before the Court, you

20   know, we can spend a lot of time going down this trail.  It

21   has no relevance to any of the factors or any of the issues

22   before the Court.

23         THE COURT:  I don't -- I'm going to sustain the

24   objection, Mr. Peck.  I understand -- I understand what

25   you're trying to do.  I mean, frankly, I'm here to look in

1   the light of the Fifth Circuit case law on whether or not

2   they're entitled to have the stay lifted here, period, and

3   that's really what I'm here to consider.

4            MR. PECK:  Okay.

5            THE COURT:  And so I'm going to sustain the

6   objection.

7   BY MR. PECK:

8   Q.  Isn't it true that FNBC -- and you bought the FNBC loan

9   package, correct?

10   A.  (No response.)

11   Q.  On the Mr. Steven, correct?

12   A.  Our entity did.  I --

13   Q.  Your entity, SBN?

14   A.  Yeah, yeah.

15   Q.  Okay.

16   A.  Not me.  (Laughter.)

17   Q.  Okay.  Isn't it true there's not a UCC filed against

18   Seatran?

19   A.  Regarding this loan?

20   Q.  Yes.

21   A.  That's correct, yes.

22   Q.  Isn't it true that you don't have a security interest --

23   a personal -- a guaranty, a corporate guaranty from Seatran

24   on this loan, correct?

25   A.  That's correct.

1  Q.   Isn't it true you don't have a security interest filed

2  on this loan against Seatran -- signed by Seatran, correct?

3  A.   That's correct.

4  Q.   Isn't it true you have not filed a UCC-1, because you

5  can't file a UCC-1.  But you haven't filed a UCC-1 against

6  Seatran on any of its accounts receivables or any of its

7  assets, correct?

8  A.   That's correct.

9  Q.   Okay.  Isn't it true there hasn't been an assignment of

10 charter hire, an actual separate -- do you do any marine

11 finance, sir?

12 A.   I'm sorry, I was --

13 Q.   Okay, let me ask you this:  Do you have any expertise in

14 marine finance?

15 A.   I've been in this business for 32 years.  I've done

16 marine loans.  I've -- most of it has been on the special

17 asset, we'll call it, level.  So yes, I'm --

18 Q.   All right.  Do you --

19 A.   I don't know what you'd determine to be an expert.

20 Q.   Okay.  Well let me ask you this:  Through your

21 experience, you've seen assignments of charter hires, separate

22 documents called -- in a marine finance transaction, where

23 there's an assignment of charter hire, right?

24 A.   (No response.)

25 Q.   Have you seen that?

1  A.    Yes.

2  Q.    Okay.  And you've seen separate documents of a marine

3  finance transaction where there's this -- the assignment of

4  insurance and the insurance proceeds, have you not?

5  A.    Yes.

6  Q.    Separate and apart from UCCs, right?

7  A.    Yes.

8  Q.    Okay.  Isn't it true this loan package did not have any

9  assignment of charter hire, a separate document, or the

10  assignment of insurance?

11  A.    Ask your question again.

12  Q.    Okay.  Isn't it true --

13  A.    In this package?  You said this package, right?

14  Q.    Okay.  Isn't it true that the loan package you bought on

15  the Mr. Steven, this --

16  A.    You're talking specifically the Mr. Steven?

17  Q.    This one here --

18  A.    Yeah, okay.

19  Q.    Okay.

20  A.    That's what I wanted --

21  Q.    -- does not have the assignment of charter hire?

22  A.    Yeah, if we're talking about the Mr. Steven's, right.

23  Q.    The Mr. Steven --

24  A.    That's correct.

25  Q.    It's a separate document.  It doesn't have one?

1   A.   No.  I was getting confused --

2   Q.   Okay.

3   A.   -- when you said the loan package.

4   Q.   Okay.

5   A.   The overall -- all of the loans.

6   Q.   Well, I apologize.

7   A.   Yeah.

8   Q.   You bought a group of loans?

9   A.   Right.

10  Q.   When I say "loan package" I'm talking about --

11  A.   This --

12  Q.   -- this one.

13  A.   I got you.

14  Q.   I know you have a few other marine loans.

15  A.   Right.

16  Q.   But this package does not have that, right?

17  A.   Correct.

18  Q.   Okay.  And there has been no assignment of insurance,

19  correct?

20  A.   Um --

21  Q.   In this one?

22  A.   No separate assignment.  I think the mortgage

23  contained --

24  Q.   All right.  But I'm saying a separate -- a document -- a

25  separate document of assignment of insurance?

```
1   A.   That's --

2   Q.   And that's --

3   A.   That's correct.

4   Q.   Okay.  And isn't it true there has been no specific

5   assignment of the Guice charter to -- to a lender in this

6   loan package for this loan?

7   A.   I believe the mortgage allows that --

8   Q.   Yeah.

9   A.   -- that the charter can't be assigned.

10  Q.   But there has been no assignment.  There's no specific

11  document that says --

12  A.   No one's --

13  Q.   Okay, right.

14  A.   Right.  No one has requested us to assign a charter.

15  Q.   Okay.

16  A.   And there hasn't been a separate assignment of charter.

17  Q.   All right.  Are you familiar with the marine industry,

18  sir?

19  A.   Yes, I am.

20  Q.   Are you -- you are?  You know that many vessel owners

21  work through brokers, do you not, vessel brokers?

22  A.   Sure they do.

23  Q.   And those vessel brokers have relationships with the oil

24  companies, correct?

25  A.   And a lot of different customers, yes.
```

1    Q.    Okay, a lot of different customers.

2    A.    Right.

3    Q.    Oil companies or other --

4    A.    Right.

5    Q.    -- offshore companies, right?

6    A.    Yes, space --

7    Q.    And --

8    A.    Space companies, space rocket companies.

9    Q.    Okay.  Well, I'm talking about -- let's talk about the

10   Gulf of Mexico out here, okay?

11   A.    (Laughter.)

12   Q.    Are you familiar -- are you familiar that a lot of

13   vessel owners in the oil patch, workboats -- workboats work

14   through vessel brokers?

15   A.    There's many ways of putting a boat to work out in the

16   Gulf.

17   Q.    But you know in certain instances they work for the

18   vessel brokers, correct?

19   A.    I don't know.  And the vessel brokers and charter from

20   the owners, right.

21   Q.    Yeah.

22   A.    Right.

23   Q.    The vessel brokers then charter --

24   A.    Right.

25   Q.    -- the vessel to --

```
1   A.   That's possible.

2   Q.   -- an oil company?

3   A.   That's possible.

4   Q.   Are you aware of that?

5   A.   Yeah.

6   Q.   You're aware of that?

7   A.   It's possible.  I don't know if I can point to any

8   specific example.

9   Q.   I'm just -- on your familiarity; do you understand?

10  A.   Yeah.

11  Q.   You're not familiar with the fact that an oil company

12  would enter into a charter with a broker?  And then the

13  broker would enter into a charter with a vessel?

14  A.   Yeah, I've never done that before.

15  Q.   Okay.

16  A.   But --

17            MR. WAGUESPACK:  Your Honor, I want to object to

18  relevance.  These documents and these other arrangements that

19  he's talking about are not this case, and so I'm not sure if I

20  understand the point or the relevance to this line of

21  questioning.

22            MR. PECK:  Well, I want to cross --

23            MR. WAGUESPACK:  I mean at the end of the day the

24  issue is:  Does the mortgage cover the charter and the charter

25  payments?
```

1          MR. PECK:  Yes.

2          MR. WAGUESPACK:  And it demonstrably does by its

3   language, so --

4          MR. PECK:  Okay, and --

5          THE COURT:  That's a legal question, right?

6          MR. WAGUESPACK:  Yeah.

7          THE COURT:  I mean that's --

8          MR. PECK:  That's a legal --

9          MR. WAGUESPACK:  So --

10         MR. PECK:  It's a legal question, Your Honor.  I'm

11  establishing the fact that they don't have that covered in

12  that part of the transaction.  And that's what I'm

13  establishing here.

14         They could say:  I've got a mortgage, but that

15  mortgage doesn't have a legal effect until like three people

16  down the road.  That mortgage doesn't say:  Oh, I can go

17  against Exxon and grab all the money I have from Exxon.  The

18  law doesn't allow that.

19         THE COURT:  Well, that's your -- that's a legal

20  argument.  So if you want to ask, I think I'm going to -- I'm

21  going to overrule the objection to the extent I'm going to

22  allow you to ask the question, what he knows what's -- and

23  this.

24         MR. PECK:  Right.

25         THE COURT:  I'll decide the relevance of --

```
1              MR. PECK:  Right.

2              THE COURT:  -- the -- whether -- if any, the meaning

3    of this means.

4              MR. PECK:  Uh-huh.

5              THE COURT:  And the fact that there's not these

6    documents.

7    BY MR. PECK:

8    Q.   And you did due diligence on these -- on the loans you

9    bought from --

10   A.   Didn't.

11   Q.   Did you -- did you, your firm --

12   A.   Our company did, yes.

13   Q.   Did your firm do due diligence --

14   A.   Yes, that's correct.

15   Q.   -- on the loans?

16   A.   Yes.

17   Q.   That you purchased?

18   A.   Yes.

19   Q.   There was a basket of loans, was there not?  And when I

20   say loan package, there were a number of loans?

21   A.   Yeah, I think that's safe to say I can't remember.  Your

22   next question is going to be how many and I don't know how

23   many.

24   Q.   Yes.  Well, did you conduct --

25   A.   But for more than one.
```

1    Q.    Excuse me.  Did you conduct the due diligence?  Did you

2    do the --

3    A.    No, I was not on that end of the transaction.

4    Q.    There were some other marine loans in this loan package

5    that you bought, other than the Sea -- this?

6    A.    A couple, yeah, a few.  Yeah.

7    Q.    Okay.  But you never looked at those documents on the

8    other loans?  You never took a look at those?

9    A.    Yes, I have.

10   Q.    Oh.  You saw some assignment of charter hires, did you

11   not, in those loan packages?

12   A.    In this particular one portfolio, I don't recall that,

13   no.

14   Q.    But you didn't do the actual looking at all of the

15   documents, did you?

16   A.    Well, I have all of those loans in our portfolio that we

17   have -- if that's what you're asking.  So I would have looked

18   at them, yes.

19   Q.    Okay.  Do you know what a bareboat charter is, sir?

20   A.    Yes.  Yes.

21   Q.    Okay.  Okay, what is it?

22   A.    It's effectively what you're purporting that Seatran --

23   I guess the best example, what Seatran is alleging chartered

24   the boat to Guice.

25   Q.    Okay.  And you've been -- you made some statement that

1    you waited a year to foreclose on this vessel, right?

2    A.    Almost a year, correct.

3    Q.    But isn't it true, pretty quickly after you got this

4    loan, you sued Mr. Miguez, did you not?

5    A.    Yeah, we met with the Miguez's in November, we talked to

6    them and no payments were made, no -- nothing happened, so we

7    sued Mr. Miguez, I think it was in January of 2018.

8    Q.    And the demand you made --

9    A.    What, twelve months ago?

10    Q.    You said there was no payment --

11    A.    I think it's almost twelve months ago, yeah.

12    Q.    Now, you said there was no payments made; but isn't it

13    true you demanded a payment of $23 million or whatever it

14    was, $22 million.  That's what you demanded from them,

15    right?

16    A.    That's correct.

17    Q.    Right.

18    A.    We filed suit for that amount --

19    Q.    Right.

20    A.    -- of the loan.

21    Q.    And so --

22    A.    Yes.

23    Q.    -- you demanded they pay you $23 million and then --

24    right?

25    A.    They were in default of the loan.

1  Q.   Right.

2  A.   And we were exercising our rights under the loan and the

3  guaranty, yes.

4  Q.   Right.  And you're surprised they didn't pay you the $23

5  million and they delayed, so that you said:  No payments were

6  made.

7       Well, you wanted $23 million, did you not?

8  A.   I think any lender wants to be repaid.

9  Q.   All right.

10 A.   Per the terms of the contract, and it wasn't being paid.

11 Q.   Okay.

12 A.   Is that what you're asking?  I'm not sure what you're

13 asking.

14 Q.   Okay.

15            MR. PECK:  No further questions, Your Honor.

16                      *    *    *    *    *

17                      CROSS-EXAMINATION

18 BY MR. DRAPER:

19 Q.   Hi.  I'm Douglas Draper and I represent the Debtor.

20 A.   Hi.

21 Q.   Let me ask some questions about your background.  You've

22 been in the workout business, correct?

23 A.   Yes.

24 Q.   For how long?

25 A.   Essentially since I've been out of college, I would

1  say.

2  Q.   And that --

3  A.   And the loan business, yeah.

4  Q.   What banks did you work at?

5  A.   It was a commercial bank in the -- Lincoln National Bank

6  was the name of it.

7  Q.   Where was it?

8  A.   In Indiana.

9  Q.   How long did you work for them?

10 A.   Approximately ten years.

11 Q.   And what other banks?

12 A.   I'm sorry?

13 Q.   What other banks?

14 A.   Then I went into this type of business in 1992, a

15 company called Diversified Financial.

16 Q.   Okay.  And that, you were basically a workout person for

17 them?

18 A.   Yes.

19 Q.   Okay.

20 A.   You know, the same thing I'm doing today with --

21 Q.   Where is Diversified Financial located?

22 A.   They were located across the country, offices here in

23 Louisiana -- yeah, in Louisiana and Massachusetts,

24 California, Indiana.  I'm missing some places, I'm sure,

25 Virginia.

1  Q.   Where did you work out of?

2  A.   I worked out of all of those, Texas, I worked out of all

3  of them, yeah.

4  Q.   So you had offices -- so you've moved around?

5  A.   Basically, I did.

6  Q.   Okay.

7  A.   Yeah, for a number of years.

8  Q.   Well so, let me ask you a question now:  Have you ever

9  originated a marine finance loan?

10 A.   Yes.

11 Q.   And with who and how much?

12 A.   With who -- I was with First City Financial at the time.

13 I can't remember the name of the company, you're going to ask

14 me the name of the company.  But we did a direct loan on a

15 tugboat company here in Louisiana.

16 Q.   Did you understand how -- was the tugboat a single asset

17 with a charter company?

18 A.   This was 20 something years ago.

19 Q.   You don't recall?

20 A.   My recollection, it was multiple tugboats.

21 Q.   Do you remember whether each tugboat was separately

22 incorporated?

23 A.   I can't recall, one way or another.

24 Q.   Are you aware that in fact the practice of having a

25 separate asset owning company and then having somebody to

1  operate it; is it a normal practice in this industry?

2  A.   I think that's a practice in a lot of industries, where

3  you have an owner and you have a --

4  Q.   I'm asking you about this one.

5  A.   -- a property management company.

6  Q.   I'm asking about this --

7       MR. WAGUESPACK:  Your Honor, if he could just

8  finish his answers before Mr. Draper --

9  BY MR. DRAPER:

10 Q.   I'm asking about this industry, specifically?

11      MR. WAGUESPACK:  If you would --

12      THE COURT:  If you'll let him finish the question,

13 Mr. Draper.

14      MR. DRAPER:  Okay.

15 BY MR. DRAPER:

16 Q.   This industry specifically.

17 A.   It doesn't surprise me.  That's right.

18 Q.   So the fact that this Debtor has no employees doesn't

19 surprise you?

20 A.   No.

21 Q.   Okay.  Now, you talked about the bank file for this

22 loan.  How big is the bank file for this loan?

23 A.   It's -- you mean -- I don't know how to characterize it.

24 It's electronic, like I have an electronic.  I don't know the

25 megabytes offhand, to tell you if I's a lot of paper.

1  Q.   Does it have any notes from the bank officers who

2  originated the loan?

3  A.   There is e-mail, correspondence, internal, there is

4  handwritten --

5  Q.   Uh-uh.

6  A.   I think there is handwritten notes.

7  Q.   Okay.

8  A.   I mean it contains a lot of different type of stuff.

9  Q.   And let me show you a series of e-mails.

10  A.   (Witness examines documents.)

11  Q.   Have you see those e-mails?

12  A.   There is e-mails like this in the file.  I can't sit

13  here today saying that I recall this.  I do recall seeing

14  this, but I can't remember what it's in.  From you or from

15  the file.

16  Q.   Okay.  So when you said it's not in the bank file, you

17  don't know whether that's me?

18  A.   It very well could be, I just can't remember.  I have

19  seen it, because through lawyer discovery stiff, I've seen

20  it.  But I can't remember if I saw it in the files, so I'm --

21  Q.   So you don't know --

22  A.   I'm happy to go back and look for it.

23  Q.   No, that's not my question.

24  A.   Okay.

25  Q.   My question really is:  You don't know the discussions

1  between the bank, FNBC and this Debtor, as to when this loan

2  was originated and the structure as to how this thing was set

3  up, and what the bank understood and what was anticipated

4  between the parties?

5  A.   I know what the result of all of those discussions were,

6  and that's the loan and the loan documents.  But I wasn't

7  present for any of those.  Obviously, I wasn't present for

8  any of those.  Obviously, I wasn't present.

9  Q.   And you don't know what was disclosed to the bank when

10  the loan that was made -- when the loan was made?

11  A.   (No response.)

12  Q.   There's no writing that you have that's in your files

13  that you can see, or that you have even looked at?

14  A.   Well, when you say "disclosed," you mean like the

15  representations and warranties in the --

16  Q.   That's not my question.  My question is:  The structure

17  as to how this was set up between the Debtor and Seatran and

18  Iberia Marine?

19  A.   This -- that's not in the loan documents, I don't

20  believe, is it?

21  Q.   That's not my question.

22       Is it in the file?

23  A.   Oh.  There is a reference to Seatran in there and the

24  role Seatran played, that they were acting as manager for --

25  for the company, right.

1   Q.   So when you bought this loan, you knew that Seatran was

2   involved in these transactions, and involved with this boat

3   and specifically the other seven or eight boats that I have

4   as Debtors?

5   A.   Yes.  And I spent a day with Mr. Blake Miguez and he

6   also disclosed that Seatran was the property or the manager

7   for it, yes.

8   Q.   Okay.  And so now let's talk about discussions.  In the

9   course of meeting with Mr. Miguez and others, there were

10  offers that were made to you, correct, in connection with

11  this debt?

12  A.   There was a -- after, yes, he called me up in December

13  and made a pennies on the dollar offer, I'll call it.

14  Q.   That's not my question.

15          MR. WAGUESPACK:  Your Honor, I'm going to object to

16  this line of questioning.  And it's typically negotiations --

17  I mean I'm not sure of the point, if there were negotiations

18  revolving their resolution of the debt, what would the

19  relevance of that?

20          MR. DRAPER:  Your Honor, there are two points to

21  this:  Number one, Mr. Waguespack has waxed on eloquently

22  that no payment has been made.  Mr. Peck has gotten testimony

23  that we wanted $23 million, we didn't want anything else.

24          I just want to establish for the Court that there

25  were discussions.  This was not a Debtor that was running

1    away, and they were trying to negotiate with them as to some

2    settlement.  It has to do with what your concern is of

3    motive.  It has to do with -- I'm not asking for the

4    settlement discussions.  I'm just asking for him to recognize

5    the fact that there were in fact discussions between the

6    parties as to payment.

7              MR. WAGUESPACK:  And look, if he wants to waive, I

8    mean usually those things are settlement.  I don't mind if he

9    wants to --

10             MR. DRAPER:  I'm not waiving it.

11             MR. WAGUESPACK:  If he -- but if he asks him the

12   question I want him to tell what was offered.

13             MR. DRAPER:  That's not my question.  And I'm not

14   going to --

15             MR. WAGUESPACK:  Yeah.  Well, I don't know you

16   can't do part if you --

17             MR. DRAPER:  Oh, I can.

18             MR. WAGUESPACK:  You're going to have to let him

19   answer -- or when I'm on redirect I'm going to ask him and

20   you're not going to be able to object as to what was

21   offered.

22             MR. DRAPER:  That's not -- I can object, and all

23   I'm trying to establish is they were just --

24             THE COURT:  Well --

25             MR. DRAPER:  They were discussions between the

1    parties.

2         THE COURT:  I'm going to overrule the objection.

3    And when the other comes up, Mr. Waguespack, we'll deal with

4    it then.

5         MR. WAGUESPACK:  Okay.

6         THE COURT:  You can ask a question.

7         MR. DRAPER:  Okay.

8    BY MR. DRAPER:

9    Q.   But there were discussions between parties as to offers

10   were made to you in connection with this debt?

11   A.   There were -- you could say there was a discussion,

12   there was a offer made.

13   Q.   Okay.  So this is not an entity or a group that has just

14   run away from you and just hid?

15   A.   It was very clear to me that they weren't going to make

16   payments to us, and they weren't going to pay the loan back,

17   yes.

18   Q.   When you say payments, they -- you wanted $23 million

19   basically immediately?

20   A.   We were in a discussion on how to repay the loan and

21   that never came up, sir.

22   Q.   Well, in fact --

23   A.   You know --

24   Q.   -- isn't it true that --

25   A.   Judge, I'm happy to talk about some of the discussions.

1  Q.    That's not what --

2  A.    It's hard for me to walk a --

3  Q.    That's --

4            THE COURT:  Ask your question.

5            MR. DRAPER:  I'm not asking for settlement

6  discussions and I haven't been.

7  BY MR. DRAPER:

8  Q.    Let me show you a letter.

9      (Pause.)

10           MR. DRAPER:  I'm sorry, I --

11           THE CLERK:  This is all one?

12           MR. DRAPER:  It's not a --

13     (Pause.)

14 BY MR. DRAPER:

15 Q.    In September of 2018, did your counsel in fact tell

16 Robin Cheatham and Mr. Miguez:  Look, give me the money at

17 Seatran and then I'll give you until December to sell the

18 boat?

19 A.    Mr. Waguespack asked me that question and I said,

20 "Yes."

21 Q.    Okay.

22           MR. DRAPER:  Can I have the e-mails that I gave

23 you?

24           UNIDENTIFIED SPEAKER:  Yes.

25           MR. PECK:  What exhibit number is that?

1          MR. DRAPER:  I'm not going to introduce an exhibit.

2          MR. PECK:  Okay.

3          MR. WAGUESPACK:  At this time.

4          MR. DRAPER:  Thank you.

5          MR. WAGUESPACK:  But that's --

6          MR. DRAPER:  One other question.

7    BY MR. DRAPER:

8    Q.   Did the bank -- did the debt gigabytes or whatever you

9    had of data in the bank file have in it Seatran charters to

10   third parties?

11   A.   I don't recall seeing those.

12   Q.   Did it have what are known as Master Charter Agreements?

13   A.   I don't remember seeing those.

14   Q.   Do you know how these boats operate with oil companies,

15   that in fact there were Master Charter Agreements between

16   Seatran and oil companies?

17   A.   Did -- are you saying that they were in effect?  I didn't

18   see them in the file.

19   Q.   But the file you have, let me ask this --

20   A.   Right.

21   Q.   -- is in fact --

22   A.   Now I'm not saying they're not in there.  I just don't

23   recall seeing them.

24   Q.   Right.  And these are Master Charter Agreements.  And

25   you have -- the file that you have has all the boats in it,

1  correct, not just the Mr. Steven?

2  A.   That would be correct, yeah.

3  Q.   And so did you see Master Charter Agreements for the --

4  for Seatran for the use of these vessels?  And I'm talking

5  about these vessels, the whole group of them.

6  A.   Yeah.  I don't recall seeing those.

7  Q.   Right.  Do you understand how those Master Charter

8  Agreements function in the industry?

9  A.   I believe that you were asking me that earlier, and I

10 think I have a general understanding, yes.

11 Q.   Okay.  And what's your general understanding?

12 A.   That that's how the boats are put out to work and

13 chartered, yeah.

14 Q.   And they're chartered through Seatran and the party to

15 the Master Charter Agreements of Seatran?

16 A.   And they -- our security interests would attach to

17 those.

18 Q.   And then --

19 A.   That's my understanding.

20 Q.   That's your understanding.  And but you have no note

21 signed by Seatran, correct?

22 A.   I think I -- if you asked that, I think I did, yeah.

23 Q.   You --

24 A.   They'd make --

25 Q.   You don't?

```
1   A.   No.

2   Q.   And you have no security agreement or UCC with respect

3   to Seatran?

4   A.   That's correct.

5   Q.   Okay.

6            MR. DRAPER:  I have nothing further.

7            THE COURT:  Thank you Mr. Draper.

8            Mr. Waguespack, redirect?

9            MR. WAGUESPACK:  Yes, Your Honor.

10                   *   *   *   *   *

11                   REDIRECT EXAMINATION

12  BY MR. WAGUESPACK:

13  Q.   Now prior to filing suit in January of 2018 against

14  Mr. Miguez, did SBN ask Mr. Miguez to send payments to it?

15  A.   Yeah, there was a demand at --

16  Q.   Could you turn at the very end of the binder and there's

17  a loose --

18            MR. WAGUESPACK:  Your Honor, I think it's in yours

19  as well.

20  BY MR. WAGUESPACK:

21  Q.   There is a letter dated October 18th, 2017.

22  A.   (Witness examines document.)

23  Q.   Do you see that?

24  A.   Yes.  We'd call that a hello letter, where to send your

25  payments, you know.
```

1  Q.   Okay.

2          MR. PECK:  Where is this?  What number is it?

3          MR. WAGUESPACK:  This is -- I think it's in the

4  back of this.

5          MR. PECK:  It's in the back?

6          MR. WAGUESPACK:  He's got it.  You're --

7          MR. PECK:  That's the back of what?  Is this your

8  exhibit book?

9          MR. WAGUESPACK:  Yes.

10          MR. PECK:  There could be anything in the back of

11  the book.

12  BY MR. WAGUESPACK:

13  Q.   And that's your signature on that letter?

14  A.   (Witness examines document.)

15          Yes, it is.

16          MR. WAGUESPACK:  Your Honor, do you have a copy of

17  that?

18          MR. DRAPER:  Wait.  Hold on a minute.

19          What number?  This is --

20          THE WITNESS:  It's like in the loose, back.

21          MR. PECK:  I don't have anything loose, back.

22          MR. WAGUESPACK:  Your Honor, I'd offer and

23  introduce Exhibit 13 into evidence.

24          THE COURT:  Just be sure that they've seen it

25  though, Mr. Waguespack.

1          MR. DRAPER:  Your Honor, let me object to the

2    letter.  It's to Iberia Marine.  It's not to Mr. Steven.

3          MR. WAGUESPACK:  It is to Steven Miguez.

4          THE WITNESS:  There is --

5          MR. DRAPER:  Well, I understand that, but --

6          THE WITNESS:  There's --

7          MR. DRAPER:  -- he is the recipient for --

8          MR. PECK:  This was all Iberia Marine.

9          MR. DRAPER:  It's all Iberia Marine.

10         MR. WAGUESPACK:  It says --

11         THE WITNESS:  I got one that says Lady Glenda.

12         MR. WAGUESPACK:  -- Steven Miguez in the --

13         THE WITNESS:  That's --

14         MR. WAGUESPACK:  Your Honor, the letter --

15         THE COURT:  Let --

16         MR. WAGUESPACK:  Can --

17         THE COURT:  I just want to make sure I'm looking

18   at the same -- I'm looking at a document that's addressed to

19   Mr. ROW, L.L.C.

20         MR. WAGUESPACK:  I've got these Iberia Marine

21   Services, I don't --

22         THE WITNESS:  And I've got Lady Glenda.

23         THE COURT:  I don't think we're -- I don't think --

24   Mr. Waguespack, I don't think any of us are looking at the

25   same document.

1          MR. WAGUESPACK:  Okay.

2          THE WITNESS:  We --

3          MR. PECK:  That's understandable.  I can do that

4     too.

5          MR. WAGUESPACK:  I got --

6          THE WITNESS:  If I could --

7          MR. PECK:  No problem guys.

8          MR. WAGUESPACK:  I got confused.

9          MR. PECK:  That's okay David, we understand.  That

10    happens.

11         THE WITNESS:  I was getting confused too.

12         MR. WAGUESPACK:  Next problem Your Honor.  Thank

13    you.  I should have asked if I can approach.

14         MR. DRAPER:  Could I see the letter?

15         THE COURT:  That's fine, you're -- that's fine

16    Mr. Waguespack.

17         MR. WAGUESPACK:  All right.

18         MR. PECK:  That's okay.  It's a lot of documents.

19         (Pause.)

20    BY MR. WAGUESPACK:

21    Q.   Actually, I think there are a number of letters there in

22    a package that I had.  I probably should give these back to

23    you, because there are a number of letters; one is to

24    Mr. Steve Miguez, one is to Lady Glenda, L.L.C., one is to

25    Mr. Row, and unfortunately, they were copied in a way that

1   they are separate.  But what I'd like to do is to pull all of

2   these together and attach them as Exhibit 13.

3          MR. DRAPER:  Well, to the extent there's one to

4   Mr. Steven, I don't have an issue.  But the one I see as to

5   Mr. Miguez who is a guarantor --

6          MR. WAGUESPACK:  Let me just put the one in to

7   Mr. Miguez, and that's fine

8          MR. DRAPER:  I don't see the relevancy.

9          MR. WAGUESPACK:  Well, the relevance is that

10  Mr. Peck brought up on cross, that we had precipitously

11  filed and demanded all $23 Million, and this letter --

12         THE COURT:  From the guarantor.

13         MR. WAGUESPACK:  -- was sent well before that.

14         THE COURT:  I mean I think that did come up on

15  Mr. Peck's cross-examination, that there was a demand made

16  for $23 ½ million directly only from the guarantors is my

17  recollection of what the testimony was.

18         MR. DRAPER:  Right.

19         MR. WAGUESPACK:  I'm just putting this into --

20         THE COURT:  I think he's just offering this as a

21  response to that.

22         All right, let me hear what your objection is?

23         MR. DRAPER:  My objection is I don't see the

24  relevancy of this to this Debtor.  And they could pursue a

25  guarantor -- they're pursuing a guarantor, but this -- that's

1   not -- that doesn't go to the <u>Little Creek</u> factors or

2   anything with respect to the stay-lift in connection with

3   this case.

4          THE COURT:  All right.  Then Mr. Peck's questioning

5   on the issues with the guarantor -- I'm going to allow it in

6   at this point.  I mean I think it's just going to go to the

7   weight of all of this, Mr. Draper.

8          MR. DRAPER:  That's --

9          THE COURT:  I mean the main issues I'm looking at,

10   and I think I've made this clear:  The main issues I'm

11   looking at on whether the stay could be lifted --

12          MR. WAGUESPACK:  Right.

13          THE COURT:  -- are the factors --

14          MR. DRAPER:  Right.

15          THE COURT:  -- given by the Fifth Circuit, by the

16   courts.  And I know we've delved into this.  I'm going to

17   allow it at this point, but I, you know, frankly all of this

18   seems a little extraneous to the issue I have before me.

19          MR. DRAPER:  I agree with that.

20          MR. PECK:  I agree.

21          THE COURT:  Mr. Waguespack, if you will continue.

22          MR. WAGUESPACK:  Yes, just a few other questions on

23   redirect, Your Honor.

24   BY MR. WAGUESPACK:

25   Q.   There was questions asked by Mr. Draper about settlement

1  negotiations.  Did the Debtor ever make -- offer to make

2  payments on the debt?

3  A.   You mean periodic payments?  No.  I think we talked

4  about -- we made -- I may have made that overture to them,

5  but they never talked about that to us.

6  Q.   And the only offer they made was to pay a percentage, I

7  don't want to get into the amounts, but a small percentage of

8  the total amount due?

9        MR. PECK:  I'm going to object --

10  BY MR. WAGUESPACK:

11  Q.   Or a percent -- let me just say a percentage --

12  A.   That's correct.

13  Q.   -- of the amount due?

14        MR. PECK:  Object to the "small" emphasis.

15  BY MR. WAGUESPACK:

16  Q.   A lump sum of the total?

17  A.   A substantial discount lump sum, yeah.

18  Q.   Okay.  And with respect to what was disclosed or not

19  disclosed in the loan files, was there anything in the files

20  that you saw that indicated that the Debtor had transferred

21  rights to their charters to Seatran?

22        MR. PECK:  Object to the form of the question, Your

23  Honor.  It's leading and also he said he saw --

24        MR. WAGUESPACK:  I'm following --

25        MR. PECK:  -- bankruptcy things.

1          MR. WAGUESPACK:  It's a redirect of what he --

2          MR. PECK:  And this calls for a -- it also calls

3   for a legal conclusion -- a legal conclusion about what --

4          THE COURT:  I think your legal conclusion goes to

5   the effect of whether this is not -- whether it was there or

6   not there.  And actually, Mr. Waguespack, I think he answered

7   the question that he reviewed the loan files, and he doesn't

8   recall seeing that in the loan files.

9          MR. WAGUESPACK:  Okay.

10         THE COURT:  That's what --

11         MR. WAGUESPACK:  Fair enough.

12         THE COURT:  I think that is already on the record.

13         MR. WAGUESPACK:  Okay.  Your Honor, that's all I

14   have for Mr. Kilcoin.

15         If I could call Mr. -- a couple of exhibits before

16   I get to Mr. Tizzard, who I'd like to call as a witness.

17         I'd like to introduce, Your Honor, the Debtor's

18   schedules; not the ones that were filed yesterday, but the

19   Debtor's original schedules in order to show the value that

20   was listed for the Mr. Steven, to show that there were no

21   other non-insider creditors listed, to show that there were

22   no employee indications of any employees, to show that there

23   was a single asset.  And that would be the purpose of

24   attaching the Debtor's schedules.

25         MR. DRAPER:  I think the Court can just take

1    Judicial Notice of the schedules that are filed and work off

2    of that.  And we -- and I think the Court should also take

3    Notice of the amended schedules that were filed.

4              MR. WAGUESPACK:  And Your Honor, the next exhibit

5    also just --

6              THE COURT:  Well, so -- let me --

7              MR. WAGUESPACK:  Oh, I'm sorry.

8              THE COURT:  Let me be clear with that.

9              MR. WAGUESPACK:  I'm sorry.

10             THE COURT:  And there's a couple of things I -- so

11   out of your exhibit book; let me just -- let's just take care

12   of that while we have this witness still here.

13             Your exhibit book I have everything admitted through

14   Exhibit 10.  Exhibit 11 and Exhibit 12; we haven't touched

15   those.  Those are not part of Mr. Kilcoin --

16             MR. WAGUESPACK:  Correct.

17             THE COURT:  I'm not sure if I said your name right?

18             THE WITNESS:  Kilcoin.

19             THE COURT:  -- Mr. Kilcoin's testimony.

20             MR. WAGUESPACK:  Yes.

21             THE COURT:  Am I correct?

22             MR. WAGUESPACK:  Yes.  Your Honor, that is correct.

23             THE COURT:  So at this point we have all of the --

24   Exhibits 1 through 10 are admitted, not 13.

25             MR. WAGUESPACK:  Um --

1          THE COURT:  The one that you had labeled, that
2     loose sheet of paper is --
3          MR. WAGUESPACK:  I was going to offer and introduce
4     Exhibit 13 into evidence, and I think we had said that was
5     okay?
6          THE COURT:  Is there any objection?  This is the
7     letter to Mr. Miguez.
8          MR. PECK:  No objection, Your Honor.
9          MR. DRAPER:  Your Honor, no objection.
10         THE COURT:  Okay.
11         MR. WAGUESPACK:  And then --
12         THE COURT:  Do you want to call that Exhibit 13,
13    anywhere?
14         MR. WAGUESPACK:  Yeah, let's call that Exhibit 13
15    just to keep them in order.
16         THE COURT:  Okay.
17         MR. WAGUESPACK:  And then Exhibit 11 would be the
18    schedules that are in the book at Exhibit 11.
19         THE COURT:  And so the Court will take notice of
20    these -- so your Number 11 are actually a copy of the
21    schedules that are filed in the record, the original
22    schedules; is that what you're telling me?
23         MR. WAGUESPACK:  Yes, Your Honor.
24         THE CLERK:  Exhibit 11, Your Honor?
25         THE COURT:  That will be Exhibit Number 11.

1           THE CLERK:  It's the original schedules.

2           MR. WAGUESPACK:  And then Exhibit Number 12 is the

3    limited objection filed by SpaceX, which is at Docket Number

4    69.

5           THE COURT:  Well, this is in the record, and we've

6    got that -- I mean that's the -- that was the Rule 2004

7    Exam.  And I mean I can take Judicial Notice -- you're asking

8    me to take Judicial Notice that they filed a response to the

9    2004?

10          MR. WAGUESPACK:  Yeah, Your Honor, and the

11   allegations that are in here about the mission of the vessel

12   and the alterations to the vessel, all described in this

13   objection.

14          MR. DRAPER:  The Court could --

15          THE COURT:  Well, there's a difference between

16   taking Judicial Notice and something being filed in the record

17   or whatever, and me taking notice of what may be --

18          I mean correct me if I'm wrong, Judicial Notice

19   has -- I mean I could take notice of the fact that it's

20   there.  But you're asking -- I think you're trying to ask me

21   to take -- to go beyond that and say that certain statements

22   made within that --

23          MR. DRAPER:  Right, exactly.

24          THE COURT:  -- are admitted.

25          MR. PECK:  And we object to that.

1          MR. DRAPER:  We object to that, Your Honor.

2          THE COURT:  And I'm not certain I can --

3          MR. DRAPER:  It's hearsay.

4          THE COURT:  I'm not certain I can do that, unless

5   you can make me an argument of how I -- I mean I think I can

6   take Judicial Notice of anything that's filed in this record,

7   but I don't think I can take Judicial Notice of something

8   that would be --

9          MR. WAGUESPACK:  Well --

10         THE COURT:  I'm going to have to go look at my book

11  on this.

12         MR. DRAPER:  It's hearsay.

13         MR. WAGUESPACK:  Yeah.

14         THE COURT:  But I think I'm --

15         MR. DRAPER:  It's hearsay with no exception.

16         MR. WAGUESPACK:  It's --

17         MR. PECK:  It's hearsay Your Honor.

18         MR. WAGUESPACK:  But the point of it is in that

19  pleading, which SpaceX filed; we're just simply putting it in

20  to show SpaceX's position in this case, which they set forth

21  in that paper.

22         THE COURT:  Well, that came up in the other one.

23  I mean I don't have a position they're concerned about their

24  -- protecting their trade secrets.

25         MR. WAGUESPACK:  But --

1          THE COURT:  I think that's what they were concerned

2     about.

3          MR. DRAPER:  Right.

4          THE COURT:  And that came up in another hearing,

5     and I -- it is -- I mean we could take notice that they've

6     got --

7          MR. WAGUESPACK:  It's --

8          THE COURT:  -- that they filed something and they

9     have an interest in this.  Now, to the extent of what -- I

10    think that's hearsay.  I think that's the correct

11    objection.

12         MR. PECK:  That's hearsay.

13         MR. DRAPER:  With no exception.

14         MR. PECK:  With no exception.

15         MR. WAGUESPACK:  Well, and I'm not offering

16    necessarily to prove the truth of those matters, except to

17    the extent that it affects my client's view of its risk

18    position.

19         MR. PECK:  I --

20         MR. WAGUESPACK:  I mean you have SpaceX who has

21    filed a pleading that talks about the mission of the vessel

22    and also it says that they've spent substantial time and

23    effort and capital modifying the vessel.  They've taken

24    those positions in writing, and signed by a lawyer in the

25    case.

1          MR. PECK:  (Laughter.)

2          MR. WAGUESPACK:  It's in the record.

3          MR. PECK:  It's --

4          MR. WAGUESPACK:  I'm not sure --

5          MR. PECK:  Judge --

6          MR. WAGUESPACK:  I don't -- I don't --

7          THE COURT:  Now, here's what I'm going to do on

8   this.

9          MR. WAGUESPACK:  It's just a pleading.

10          THE COURT:  I need to take a break anyway.  I'm

11   going to take a short recess.

12          Let me ask you guys this question --

13          MR. PECK:  Can we have lunch, Judge?

14          THE COURT:  It's about 1:00, and I haven't really

15   had anything to eat since about 6:00 this morning.

16          MR. PECK:  I had nothing.

17          THE COURT:  Can we take about an hour break?

18          MR. DRAPER:  Yes.

19          MR. PECK:  Yes.

20          THE COURT:  And I'll come back and address this,

21   because I think it's an important issue and I want to make

22   sure I'm right on this, on taking Judicial Notice of a

23   document, as compared -- as opposed to what is in that

24   document.

25          MR. PECK:  Right.

1          THE COURT:  And I want to make sure I'm right on

2    that.  I think I understand your objection.  And I'll give a

3    ruling on that when I come back.

4          MR. PECK:  Okay.

5          THE COURT:  And then we can proceed with the next

6    witnesses, which I'm sure that --

7          That's your witness, I mean that's your client,

8    your -- the Debtor's representative, correct?  Mr. Lizzard

9    or -- I'm not certain how to pronounce it.

10          MR. WAGUESPACK:  Tizzard, yes.

11          THE COURT:  Mr. Tizzard?

12          MR. PECK:  That's the one I was going to call,

13    Your Honor.  That's fine.

14          MR. DRAPER:  He was -- Mr. Peck -- Seatran was

15    going to call him, but he -- I mean he's going to call him

16    up.  He's here and he can call him.  I mean it's however he

17    wants to --

18          MR. PECK:  It's his --

19          THE COURT:  I'm just trying to figure out where

20    we're going when we get back.  So we're going to have at

21    least one more witness?

22          MR. WAGUESPACK:  On my side, yes.

23          THE COURT:  Oh your side.  And then --

24          MR. PECK:  Well, he's going to be my witness too,

25    so we go -- so we --

```
1              THE COURT:  All right.  So we'll have --

2              MR. PECK:  Sometimes --

3              THE COURT:  So we'll have one -- for sure one more

4    witness and --

5              MR. PECK:  And maybe two after that.

6              Right, Doug?

7              THE COURT:  Okay.

8              MR. DRAPER:  Yes.

9              MR. PECK:  We have a few more.  We have --

10             THE COURT:  Yes, I think if we take an hour break --

11             MR. DRAPER:  That's fine.

12             THE COURT:  That ought to -- is that going to be

13   enough time for the parties to run out and get something to

14   eat?

15             MR. DRAPER:  Yes.

16             MR. PECK:  Yes.

17             THE COURT:  We can take an hour and a half.

18             MR. PECK:  We're just going down the street,

19   because remember that café that has --

20             MR. DRAPER:  I want to go to the hot dog place.

21             THE COURT:  There are several places to eat.

22             MR. PECK:  We're not going to the hot dog place.

23             THE COURT:  There's -- you can go get a hot dog

24   across the street.

25             MR. PECK:  You can go, I'm not going there.  I'm
```

1  going down to the --

2         THE COURT:  But I need something to eat, so I'm

3  going to take -- I can get mine within an hour.

4         MR. WAGUESPACK:  We'll be back.

5         MR. DRAPER:  That's fine.

6         THE COURT:  But if you all can be back within the

7  hour we'll pick up at 2:10.

8         MR. PECK:  And Your Honor --

9         MR. DRAPER:  Thank you Judge.

10        MR. WAGUESPACK:  Thank you very much Your Honor.

11        MR. PECK:  Your Honor, the hearsay goes to -- it's

12  the hearsay, there's no exception.  And I can't cross-examine

13  all of that stuff.  This is lawyers making statements.  That

14  was my thing, I complained because it's --

15        THE COURT:  I've got the --

16        MR. PECK:  -- lawyers making statements.

17        THE COURT:  I've got the objection.

18        MR. PECK:  Lawyers making statements is not --

19        THE COURT:  I've got the objection, Mr. Peck.  I

20  understand and I'll be prepared to deal with that when we

21  come back.

22        We'll be in recess.  Thank you.

23        And you can step down.

24        THE WITNESS:  Thank you, sir.

25      (Witness is excused)

1      **(Lunch Recess from 1:11 p.m. to 2:42 p.m.)**

2              THE COURT:  And we'll be back on the record.

3              Mr. Waguespack.

4              MR. WAGUESPACK:  Thank you, Your Honor.

5              THE COURT:  And I had a chance to -- you know the

6      Court will take Judicial Notice that SpaceX filed a response

7      to the 2004 Exam, but only for the fact that they filed a

8      response.

9              MR. WAGUESPACK:  Thank you Your Honor.

10             THE COURT:  Thank you.

11             MR. WAGUESPACK:  I'll call Mr. Tizzard to the

12     stand.

13             THE WITNESS:  Tizzard.

14             MR. WAGUESPACK:  Or Tizzard, I'm sorry.

15             THE WITNESS:  Tizzard.

16             MR. WAGUESPACK:  Tizzard.

17             THE CLERK:  Please approach the podium, please.

18             THE WITNESS:  Excuse me, here?

19             THE CLERK:  Right here, yes.

20             Raise your right hand.

21                            *   *   *   *   *

22             **CHARLES E. TIZZARD, WITNESS, SWORN**

23                            *   *   *   *   *

24             THE CLERK:  Thank you, sir.  Please have a seat in

25     the witness stand.  State your name and address for the

1  record.

2        THE WITNESS:  Charles E. Tizzard.  That's

3  T-I-Z-Z-A-R-D.  And my address is 4801 Toby Lane, Metairie,

4  Louisiana.

5        THE CLERK:  Thank you, sir.

6                 *   *   *   *   *

7              DIRECT EXAMINATION

8  BY MR. WAGUESPACK:

9  Q.   Good afternoon Mr. Tizzard.

10       Are you employed by Mr. Steven, L.L.C.?

11  A.   No.

12  Q.   You don't have a contract with the Mr. Steven, L.L.C.,

13  the Debtor?

14  A.   I don't have a contract with them.

15  Q.   You don't receive any compensation from the Debtor?

16  A.   No.

17  Q.   And you're not an officer of the Debtor?

18  A.   No.

19  Q.   You were the witness that the Debtor put up as its

20  30(b)(6) representative, is that correct?

21  A.   Correct.

22  Q.   Now, my understanding when we talked in our deposition

23  the other day was that you said that the Debtor stopped

24  making payments to SBN because there was some confusion with

25  the FDIC, and nobody with the FDIC would talk to you; was that

1  your position?

2  A.   Yes.

3  Q.   And you also I think understood that Seatran -- I'm

4  sorry, that as an officer of Seatran, that the Debtor had

5  granted a mortgage on the vessel, the Mr. Steven, correct?

6  A.   Yes.

7  Q.   And did you understand that the terms of the mortgage

8  extended to charters?

9  A.   I didn't read the terms of the mortgage that Mr. Steven,

10  L.L.C. put on the vessel.

11  Q.   Okay.  Were you the party primarily responsible for

12  negotiating the terms of the loan documents and the mortgage

13  with the bank?

14  A.   Yes.

15  Q.   But you didn't have an opportunity to read the mortgage

16  before it was signed?

17  A.   When it came to executing the documents for the loan, all

18  we actually had was outside counsel involved that reviewed the

19  loans from the legal aspect, and I reviewed them from a

20  business aspect, without reading all of the fine print of the

21  mortgage.

22  Q.   Okay.  Did you understand that the mortgage extended the

23  charters?

24  A.   No.

25  Q.   Did you understand that the mortgage extended the

1  charter payments?

2  A.   No.

3  Q.   And did you understand that the mortgage extended the

4  payments derived from the vessel and other rights relating to

5  the vessel?

6  A.   No.

7  Q.   Did you understand that the -- in the mortgage that the

8  owner of the vessel made certain representations as to the

9  fact that it wouldn't transfer the vessel or the rights

10  relating to the vessel?

11  A.   No, I don't understand that issue.

12  Q.   Did the Debtor have counsel that assisted it, the Debtor

13  itself; not Seatran, but the Debtor itself have counsel that

14  assisted it with the loan from FNBC?

15  A.   Yes.

16  Q.   And you left those matters to that attorney, correct?

17  A.   Correct.

18  Q.   You're familiar with the charter agreement that was in

19  place between Guice and Seatran?

20  A.   Yes, I executed it on behalf of Seatran.

21       MR. WAGUESPACK:  Your Honor, if I could approach?

22       THE COURT:  You may.

23  BY MR. WAGUESPACK:

24  Q.   Mr. Tizzard, does this document look familiar?

25  A.   (Witness examines document.)

1    Yes.

2  Q.   And can you tell the Court what it is?

3  A.   It's a bareboat charter agreement between Seatran Marine

4  and Guice Offshore for the charter -- bareboat charter of a

5  vessel called the Mr. Steven.

6  Q.   And this charter expired on October 15th, 2018, correct?

7  A.   Correct.

8         MR. WAGUESPACK:  Your Honor, I'm going to mark the

9  Guice charter as Exhibit 14 and ask that it be introduced

10  into evidence.

11         MR. PECK:  The only objection that I have, Your

12  Honor, is maybe this is an old -- I can't read this that

13  well, the fine print.

14         I mean you can put it in as a charter, but I don't

15  -- is this legible, some of this?  I mean it's so -- if you

16  look at these pages, I just --

17         THE COURT:  It is difficult to read, Mr. Waguespack.

18  Do you have a clearer copy?

19         MR. WAGUESPACK:  Let me see --

20         MR. PECK:  I just -- I mean --

21         THE COURT:  The handwritten part is not difficult

22  to read, it's the printed part that's --

23         MR. PECK:  Right.  I just can't -- it just --

24         MR. WAGUESPACK:  Your Honor, we have a clearer copy

25  and rather than waste the Court's time with it, if it's okay

```
 1   if we supplement that later, if you have any --
 2            THE COURT:  Is there any objection to that?
 3            MR. PECK:  I don't have an objection to him
 4   supplementing --
 5            THE COURT:  That it be supplemented?
 6            MR. WAGUESPACK:  If you have -- I think you all --
 7   if you all have a copy --
 8            MR. PECK:  I have a copy.  We'll look at --
 9            MR. WAGUESPACK:  If you want to use your copy, I'm
10   fine with that.
11            THE COURT:  And you'll supplement the Court with
12   the other?
13            MR. WAGUESPACK:  Yeah.
14            THE COURT:  Because it is --
15            MR. WAGUESPACK:  We'll just go ahead and put his --
16   use his if that's okay?
17            MR. PECK:  I don't know if I have --
18            MR. WAGUESPACK:  We have all talked about it and
19   know it, so it's really just for you.
20            THE COURT:  I understand.  And I can read the
21   handwritten part, but I cannot read -- the words are blended
22   together, the letters are blended together on just about all
23   of the preprinted parts.
24            MR. WAGUESPACK:  Yes.
25            MR. PECK:  Is this one -- I think this might be a
```

1  little -- I think it's --

2          MR. DRAPER:  I can't read it --

3          MR. WAGUESPACK:  It is --

4          MR. PECK:  All right.

5          MR. WAGUESPACK:  It is definitely clearer.  So --

6          MR. PECK:  I was going to put it in with my evidence

7  for me, but if you want to --

8          MR. WAGUESPACK:  If you don't mind I'll take my

9  copy and just use --

10          MR. PECK:  I'm going to have him introduce this too.

11  We'll just put mine in when I introduce them, okay?

12          MR. WAGUESPACK:  Okay.

13          MR. PECK:  It's okay with you?

14          MR. WAGUESPACK:  Yes.

15          MR. PECK:  I was going to introduce these in

16  evidence.  I'll introduce mine.

17          MR. WAGUESPACK:  Okay.

18          MR. PECK:  And then you can use yours to --

19          THE COURT:  Can we call it Exhibit -- we don't have

20  any evidence from anyone except for Mr. Waguespack admitted.

21  Can we call this Exhibit 14 even when you use it so I can go

22  ahead and mark it and you'll know that I'm talking about

23  Exhibit 14?

24          MR. PECK:  Yes, yes.

25          And here's this -- why don't you use this one?  I

1  have more than one.

2          MR. WAGUESPACK:  Yeah, I'll use it.

3          MR. PECK:  Isn't that better to read than this one?

4          MR. WAGUESPACK:  If you can give me one --

5          MR. PECK:  Yeah.

6          MR. WAGUESPACK:  -- and I'll trade you the one for

7  Mr. Tizzard.

8          MR. PECK:  No, my pleasure.

9      (Pause.)

10          MR. PECK:  Yeah, this is a little better.  I don't

11  think the Court could have read this document.

12          See if that's better, Judge.

13          THE COURT:  Where's the other one?

14          THE CLERK:  All right.

15          MR. WAGUESPACK:  Thank you.

16          MR. PECK:  Is that better, Your Honor?

17          THE COURT:  This is -- this one is better, I can

18  read the words on the second page.

19          MR. PECK:  Okay.

20          THE COURT:  Yes, and it's clear.  Thank you.

21          So that will be Exhibit 14?

22          MR. WAGUESPACK:  This will be Exhibit 14, yes, Your

23  Honor.

24          THE COURT:  We will call this the Guice charter.

25          MR. PECK:  Okay.

BY MR. WAGUESPACK:

Q.   Mr. Tizzard, the Guice charter expired on October 15th, 2018, is that correct?

A.   Yes.

     I want to point out that the document you just handed me is different from the first one you handed me.  The first one has a confidentiality agreement in -- starting on Page 3 and then the copy you handed me just now doesn't.

Q.   Hmm.  My copy does.  I think that the one I gave you was Mr. Peck's version.  Mr. Peck's version does not have the confidentiality agreement perhaps.

A.   Okay.

Q.   But at any rate, the one I'm handing you is the one we're going to attach as Exhibit 14, because that's the one we can read, if that's okay?

          MR. PECK:  Does yours say working copy like mine does?

          MR. WAGUESPACK:  Yes.

          MR. PECK:  Okay.

          MR. WAGUESPACK:  Okay.

BY MR. WAGUESPACK:

Q.   So Mr. Tizzard, is it your testimony that the charter agreement that we marked as Exhibit 14 is no longer in effect, is that correct?

A.   Um --

1          MR. PECK:  Object to the form, Your Honor.  That

2     calls for a legal conclusion.

3          MR. WAGUESPACK:  I had asked him that during his

4     deposition and I don't -- that is a business issue.  Is it

5     still in effect or not, and from a --

6          MR. PECK:  But --

7          THE COURT:  I'm going to overrule the objection.

8          MR. PECK:  Well, we'll get to it.

9     BY MR. WAGUESPACK:

10    Q.   Mr. Tizzard, is that --

11         MR. PECK:  And note my objection, because I don't

12    feel comfortable -- there will be clarity when it comes later

13    on.

14         THE COURT:  Okay.  I'll note it, Mr. Peck.  Thank

15    you.

16    BY MR. WAGUESPACK:

17    Q.   Is that charter agreement still in effect?

18    A.   Based on an e-mail that I've seen between Blake Miguez

19    and Nathan Guice, they agreed to a continuation of the

20    charter.  This particular charter expired but they continued

21    -- they agreed to continue the charter on a month to month

22    basis under the same terms and conditions.

23    Q.   Well, do you remember at the time I took your deposition

24    just a few days ago, I asked you is this charter still in

25    effect?

1    And do you remember your response being no?

2 A.    Well, my answer is still no.

3 Q.    Okay.  And you'd agree with me, this --

4 A.    Yes.

5 Q.    -- charter agreement is no longer effect, correct?

6 A.    Correct.

7 Q.    Okay.  If you can, look at Box 28 on the second page of

8 the Guice charter.

9 A.    (Witness complies.)

10 Q.    Do you see that?

11 A.    (Witness examines document.)

12    Yes.

13 Q.    And what is the point of that box?  Isn't that to

14 disclose that there's a mortgage in place?

15 A.    Yes.

16 Q.    And when you put as per Clause 12(b), are you referring

17 to a specific provision in the rest of the charter,

18 correct?

19 A.    Correct.

20 Q.    And Clause 12(b), if you flip through to the rest of the

21 charter specifically references the charter and the parties

22 obligation to comply with the charter.

23    And he specifically references the mortgage and the

24 parties' obligation to comply with the mortgage, does it

25 not?

1          MR. PECK:  Object to the form Your Honor, only

2     because the document speaks for itself.

3          THE CLERK:  Mr. Peck, can you -- I'm sorry, can you

4     get to a microphone?

5          THE COURT:  Can you come to the microphone,

6     Mr. Peck?

7          MR. PECK:  I'm sorry.

8          THE COURT:  We're having trouble picking up your --

9          MR. PECK:  Okay, and I apologize, Your Honor.

10          I object because the document speaks for itself,

11    Your Honor.  And he's trying to import all kinds of meaning

12    to it.

13    BY MR. WAGUESPACK:

14    Q.  Mr. Tizzard --

15          THE COURT:  Well, I think all he's asking him --

16          Ask your question again?

17          MR. WAGUESPACK:  Yeah, I'll just ask it another

18    way.

19    BY MR. WAGUESPACK:

20    Q.  Mr. Tizzard, you would agree with me that this Clause

21    12(b) puts the parties on notice of the mortgage and the

22    parties are obligated to comply with the terms of the

23    mortgage, correct, as stated there in the paragraph?

24    A.  If the parties acknowledge that they both knew there was

25    a mortgage on the vessel.

1   Q.   Okay.  And then the rest of the clause goes on and says

2   what the parties' obligations are with respect to the

3   mortgage, correct?

4           MR. PECK:  Objection.  The document speaks for

5   itself, Your Honor.

6           THE WITNESS:  Right.

7           MR. WAGUESPACK:  Thank you.

8           MR. PECK:  He's not a lawyer.

9           THE COURT:  He can testify factually what the --

10  that  the document has a provision that says mortgages, and

11  we'll let it go there.

12          MR. PECK:  Okay.  Thank you Your Honor.

13  BY MR. WAGUESPACK:

14  Q.   Now, you specifically asked Guice to complete that box

15  and insert that Clause 12(b) was applicable, correct?

16  A.   No, I did not.

17  Q.   Okay.  Well, let me ask you to look at an e-mail that's

18  dated August 25th, 2017.

19  A.   (Witness complies.)

20  Q.   From you to Nathan Guice and Billy Guice.

21  A.   (Witness examines document.)

22  Q.   And ask if you recognize that document?

23  A.   Yes.

24  Q.   Is that your e-mail that you sent to them on August 25th,

25  2017?

1  A.   Yes.

2           MR. WAGUESPACK:  Your Honor, if I could attach and

3  mark this e-mail as Exhibit 15?

4           THE COURT:  We'll mark it.

5           Any objection?

6           MR. WAGUESPACK:  And offer it into evidence.

7           MR. PECK:  No objection, Your Honor.

8           THE COURT:  Okay.  The e-mail dated August 25th will

9  be Exhibit 15.

10  BY MR. WAGUESPACK:

11  Q.   And right there, Mr. Tizzard, right there on Number --

12  Item 3, you specifically stated with respect to Box 28, it

13  should state 12(b) applies; correct?

14  A.   Yes.

15  Q.   Okay.  And you did that to put Guice the charter party

16  on notice for the mortgage, right?

17  A.   I believe they had a prior statement in that box and I

18  modified their prior statement.

19  Q.   But my question simply was:  You told them that to put

20  them on notice of the mortgage, correct?

21  A.   Yes.

22  Q.   And SpaceX is currently using the vessel?

23  A.   Yes.

24  Q.   The Mr. Steven?

25  A.   Yes.

1  Q.   What?

2  A.   Yes.

3  Q.   Oh, I'm sorry.

4       And it is your understanding that SpaceX and Guice have

5  some form of an agreement?

6  A.   Yes.

7  Q.   And where has the vessel been operating?

8  A.   It has been stationed in Los Angeles, California.

9  Q.   That's on the West Coast?

10 A.   Yes.

11 Q.   And if you could, look at the Guice Charter; on the

12 first page.

13 A.   (Witness complies.)

14 Q.   It's Box Number 20 where it says "Trading limits," do

15 you see that

16 A.   (Witness examines document.)

17      Yes.

18 Q.   So what does USGOM stand for?

19 A.   U.S. Gulf of Mexico.

20 Q.   And what is U.S. East Coast?  That means the East Coast

21 of the United States?

22 A.   Yes.

23 Q.   And then Caribbean waters means the Caribbean, I assume,

24 correct?

25 A.   Correct.

1   Q.   It does not say the West Coast, correct?

2   A.   No.

3   Q.   And so the boat has been through most of the charter

4   stationed in Los Angeles?

5   A.   It started to charter stationed in Florida, and at some

6   point during the charter it was mobilized to the West Coast.

7   Q.   And over the recent months and currently, to your

8   understanding, is the vessel in Los Angeles?

9   A.   That's correct.

10  Q.   Okay.  And that would be outside of the trading limits

11  allowed by the charter?

12  A.   Yes.

13  Q.   Now this particular section of the charter references a

14  Clause 6, correct?

15  A.   (Witness examines document.)

16  Q.   Are you familiar with Clause 6 of the charter?

17  A.   No.

18  Q.   Well, if you can turn to Clause 6 in Part 2 of the

19  charter?

20  A.   (Witness complies.)

21  Q.   Do you see that?

22  A.   No, I don't --

23  Q.   Okay.  It's under training restrictions.

24  A.   (Witness examines document.)

25       Do you have the number?  I mean this bareboat -- Barecon

1  is -- each line is numbered.  Do you know what line you're

2  talking about for the Barecon?

3  Q.   Well, I'm talking about the whole section there, which

4  would be Clause 6.  It's that --

5       MR. PECK:  No, he's talking about the BIMCO, it has

6  the lines on the side so --

7       MR. WAGUESPACK:  Yeah.

8       MR. PECK:  These are different charters here.

9  There's two different charters.

10      MR. WAGUESPACK:  Right.

11      THE WITNESS:  Is it Line 200, 300, 400?

12  BY MR. WAGUESPACK:

13  Q.   Training restrictions, it should be right here

14  (indicating).

15  A.   Okay.

16  Q.   Yeah, right there (indicating).

17  A.   (Witness examines document.)

18  Q.   So Mr. Tizzard, do you see that?

19  A.   Yes.

20  Q.   So, are you familiar with this provision?

21  A.   I mean, somewhat.

22  Q.   But --

23  A.   I mean I've read through the charter and so I pretty

24  much understand it.

25  Q.   I mean your business is leasing boats and chartering

1  boats, right?

2  A.    Correct.

3  Q.    Okay.  So Clause 6 limits where the boat can go,

4  correct?

5  A.    Yes.

6  Q.    And then that ties in also to the insurance provision as

7  I understand the second part of this, correct?

8  A.    Well, it would require to make sure you have adequate

9  insurance on the boat.

10  Q.    Right.  But an insurance company wants to know where the

11  boat is going, correct?

12  A.    Yes.

13  Q.    You agree with that?

14  A.    Yes.

15  Q.    Okay.  And so they want to know what the risks are so

16  they can insure it properly?

17  A.    Correct.

18  Q.    So wouldn't it be important to have the proper training

19  restrictions set forth in a written agreement with the party

20  who is using the boat?

21  A.    I don't know if it would have to be a written agreement.

22  There could be a verbal agreement between the charterer and

23  the boat owner that the vessel was being relocated to a

24  different location, and both parties agree to the

25  relocation.

1  Q.   And does this document usually go to an insurance

2  company when they get asked for what's going on with the

3  vessel; this charter would go, wouldn't you think, to the

4  insurance company who is being asked to place insurance on

5  the vessel?

6  A.   Narine (phonetic) is the insurance for Seatran Marine,

7  and I never provide our insurance companies copies of any

8  master time charters or bareboat charters.

9  Q.   Do you know -- who is currently insuring the vessel?

10 A.   Guice Offshore.

11 Q.   Okay.  And unlike the vessels you're referring to, this

12 particular vessel is subject to a BIMCO bareboat charter,

13 which is a blue water charter, correct?

14 A.   That's the form of charter agreement we used, yes.

15 Q.   And that's because this is a blue water vessel,

16 correct?

17 A.   No, it's not a blue water vessel.

18 Q.   What is it?

19 A.   It's a brown water vessel.

20 Q.   Well, why did you use this form of charter?

21 A.   Billy Guice for some reason elected to use a BIMCO as

22 opposed to a bareboat charter agreement that I normally use,

23 and I didn't -- I wasn't objecting to it.  I mean I've read

24 through the BIMCO and the terms are all reasonable, so I

25 agreed to use the BIMCO.

1  Q.   You --

2  A.   Even though it's not the -- I mean the BIMCO normally

3  applies for international charters and charters of tankers

4  and those type things.  And I not really sure why Billy

5  wanted to use this, but because the terms and conditions were

6  acceptable, I agreed to use the BIMCO.

7  Q.   Your other vessels; they are all just used in the Gulf

8  of Mexico, right?

9  A.   No, that's not correct.

10 Q.   Where are your other -- your other vessels are not used

11 in the Gulf of Mexico?

12 A.   Most of them are, but not all of them.

13 Q.   Right.  And you, as you sit here today, don't know what

14 documents were provided to the insurance company by Guice or

15 SpaceX to place insurance on the vessel, correct?

16 A.   That's correct.

17 Q.   Is there a current agreement between the Debtor and

18 Guice, the Debtor being Mr. Steven, L.L.C. and Guice?

19 A.   Yes.

20 Q.   And what is that agreement?

21 A.   That they were going to continue the previous charter on

22 a month to month basis at the same charter hire rate.

23 Q.   And this is an agreement by the Debtor, Mr. Steven,

24 L.L.C.?

25 A.   (No response.)

1   Q.   Is that your testimony?

2   A.   Well no, that was actually between the President of

3   Seatran Marine and a representative of Guice Offshore.

4   Q.   And again, so my question whether or not the Debtor is a

5   party to any agreement that you just described; your answer

6   would be no?

7   A.   That's correct.

8   Q.   Okay.  And this agreement that you're referencing now, I

9   think you -- did you say it was a month to month agreement?

10  A.   Yes.

11  Q.   Is that documented in any way?

12  A.   In the form of an e-mail.

13          MR. WAGUESPACK:  Can I approach, Your Honor?

14          THE COURT:  You may.

15  BY MR. WAGUESPACK:

16  Q.   Mr. Tizzard, is this the e-mail you're referencing?

17  A.   (Witness examines document.)

18       Yes.

19  Q.   And it's an e-mail from Nathan Guice dated October 12th,

20  2018, to Blake Miguez?

21  A.   Correct.

22          MR. WAGUESPACK:  And Your Honor, if I could offer

23  and introduce this e-mail as Exhibit 16.

24          MR. PECK:  No objection, Your Honor.

25          THE COURT:  Okay.  It will be accepted.

1  BY MR. WAGUESPACK:

2  Q.   Mr. Tizzard, is it your testimony that this e-mail is

3  the only document that exists that is an agreement that

4  confers a charter or other right to Guice to use the vessel,

5  currently?

6  A.   To my --

7            MR. PECK:  Object to the form of the question, Your

8  Honor.  I mean the document speaks for itself.  He's been

9  asking --

10           MR. WAGUESPACK:  I'm asking if there's --

11           THE COURT:  All right.  What's your --

12           MR. WAGUESPACK:  -- anything else other than --

13           THE COURT:  Explain your objection precisely, to

14  me, Mr. Peck?

15           MR. PECK:  I think the document speaks for itself.

16  It says exactly what it is.  And he tries to start saying,

17  you know, putting some legal spin on it.  The document speaks

18  for itself, Your Honor.

19           MR. WAGUESPACK:  No, I'm asking him if there's

20  anything else other than this.

21           MR. PECK:  Oh, okay.  Well then, I don't have a

22  problem with that.

23           MR. WAGUESPACK:  All right, didn't I -- if I

24  didn't --

25           THE COURT:  I'm going to overrule the objection.

1          MR. PECK:  I don't have a problem with that.

2          MR. DRAPER:  Your Honor, let me note an objection.

3  The document says same terms and conditions apply.  So my

4  objection is -- (inaudible; not speaking near a microphone) --

5          THE CLERK:  Can you get to a podium, please?

6          MR. DRAPER:  Actually Your Honor, this objection

7  is to the form of the question.  This document ties back to

8  the BIMCO charter.  So that's the --

9          MR. WAGUESPACK:  This isn't a -- is this an

10  objection?  I'm just asking if there's anything else other

11  than the e-mail?

12          THE COURT:  I'm going to overrule the objection.

13          MR. DRAPER:  Okay.

14          THE COURT:  I mean he has already testified that

15  they could have verbal agreements anyway.

16          MR. DRAPER:  That's fine.

17          THE COURT:  I think that this is -- I'm going to

18  overrule the objection.

19          MR. PECK:  Okay.

20          THE COURT:  Please continue, Mr. Waguespack.

21  BY MR. WAGUESPACK:

22  Q.   So, is this the only written document that exists that

23  confers a right to use the vessel to Guice or as SpaceX or

24  anybody else, the vessel, the Mr. Steven's currently?

25  A.   To the best of my knowledge, it is, yes.

1  Q.   Okay.  Is there an oral agreement outside of this

2  e-mail that exists with respect to the right to use this

3  vessel by Guice or SpaceX?

4  A.   Not that I'm aware of.

5  Q.   The e-mail that we're looking at here, was this produced

6  prior to your deposition?

7  A.   I believe it was, yes.

8  Q.   Well, I'm going to represent to you it wasn't.  Do you

9  know -- do you have any idea why it wasn't produced to us

10 before the deposition?

11 A.   No.  No, I don't.

12 Q.   Do you remember me asking --

13 A.   I believe -- well, I presented a copy that someone

14 contended was folded over or whatever.  So then we got the

15 original from Blake Miguez and then provided it, and I'm not

16 sure about the timing of it.

17 Q.   Okay.  But no version of this was produced to me at or

18 prior to the deposition, correct?

19 A.   I don't know.

20 Q.   Do you know who the officers of the Debtor are?

21 A.   To the best of my knowledge, there are no officers.

22 Q.   And you understand that the charter agreement that we

23 were looking at, the Guice charter; it imposes a lot of

24 important requirements and obligations on the charter party,

25 correct?

1  A.    I'm sorry.  Would you repeat that?

2  Q.    The charter -- the Guice charter that we were looking

3  at before; it imposes a lot of important obligations on the

4  charter party, the party that's using the boat, correct?

5  A.    Yes.

6  Q.    It requires them to maintain the vessel, correct?

7  A.    Yes.

8  Q.    To maintain safety classification and equipment in good

9  state of repair, correct?

10 A.    Correct.

11 Q.    Post-financial security in certain circumstances,

12 correct?

13 A.    Yes.

14 Q.    Pay certain taxes?

15 A.    Yes.

16 Q.    Restore the vessel to the condition upon its return that

17 it existed --

18 A.    Yes.

19 Q.    -- at the beginning of the charter?

20 A.    Correct.

21 Q.    Repair the vessel?

22 A.    Yes.

23 Q.    It addresses distribution of insurance proceeds,

24 correct?

25 A.    I'm not familiar with that provision.

1   Q.   It keeps -- it requires that the vessel be kept free of

2   liens, correct?

3   A.   Yes.

4   Q.   It indemnifies the owner of the vessel, correct?

5   A.   Yes.

6   Q.   And it has important conditions about the return of the

7   vessel, correct?

8   A.   Correct.

9   Q.   And so right now, your testimony is the only written

10  document that we have relating to these important obligations

11  is this e-mail?

12  A.   That's correct.

13  Q.   There is no other agreement that you're familiar with

14  that relates to this vessel, other than this e-mail and its

15  current -- the current use of the vessel, other than this

16  e-mail, correct?

17  A.   Correct.

18  Q.   Are you familiar with a document called vessel operating

19  agreement that was signed on October 2nd, 2018?

20  A.   Yes.

21           MR. WAGUESPACK:  I think this is going to be

22  Exhibit 16, Your Honor.

23           THE COURT:  No.

24           THE CLERK:  Exhibit 17.

25           THE COURT:  That's going to be Exhibit 17.

1          THE CLERK:  Yes, Exhibit 17.

2          MR. WAGUESPACK:  Exhibit 17, thank you.

3          THE CLERK:  Okay.

4    BY MR. WAGUESPACK:

5    Q.   Mr. Tizzard, you've seen this agreement before, correct?

6    A.   (Witness examines document.)

7          Yes.

8    Q.   And there was no negotiation of this document before

9    it's signed, was there?

10   A.   (Witness examines document.)

11        There was some negotiations or some review of the

12   documents and some changes made prior to its execution and

13   before we got the final version of it.

14   Q.   Do you remember me asking you in your deposition:  So

15   there was no negotiation of this contract at all?

16        And your response was, "No"?

17   A.   Well I meant the -- that's what I said, there wasn't

18   really negotiations.  We just reviewed it.  I reviewed it in

19   conjunction with Blake Miguez and to determine if we needed

20   to make any changes to it.  And if there were, they were very

21   minimal.

22   Q.   Were there any attorneys involved?

23   A.   Yes, the attorneys from Adams and Reese.

24   Q.   And I believe it was your testimony that they

25   represented Mr. Steven, L.L.C., is that correct?

```
1   A.    As one of the parties that they were representing,

2   yes.

3   Q.    Who else were they representing?

4   A.    At the time they were representing a whole group of

5   companies.

6   Q.    Were they also representing Seatran?

7   A.    Yes.

8   Q.    Now you remember you told me during your deposition that

9   Seatran didn't have a lawyer; do you remember that?

10  A.    No, I don't.

11  Q.    Okay.  But today as you sit here today, your testimony

12  would be that Adams and Reese was representing both Seatran

13  and Mr. Steven with -- in connection with this document, the

14  vessel operating agreement; is that your testimony?

15  A.    Yeah.  I mean I never really focused on them.  I mean we

16  talked to them with the whole group of companies and never

17  really sat down and identified specifically which entities

18  they might have been representing or not representing.  I

19  mean it was just a general discussion with all of the

20  entities.

21  Q.    Did Mr. Cheatham ask for any provisions of the vessel

22  operating agreement to be changed?

23  A.    They suggested that we insert a provision, an

24  intervention where each of the vessel owning L.L.C.'s

25  intervened and acknowledged the agreement.
```

1  Q.   Is that the very last section of this agreement?

2  A.   Yes.

3  Q.   Okay.  And as I read this, and tell me your

4  understanding:  Mr. Steven, the Debtor, intervenes and

5  assumes all of the obligations of the agreement, correct, as

6  an intervenor party?

7  A.   Yeah, it became a party to the agreement.

8  Q.   Well, it doesn't -- you would agree with me, it doesn't

9  say that they're a party to the agreement, it just says they

10 acknowledge it and they agree to be bound by the agreement,

11 correct?

12 A.   Yes.

13 Q.   But they're not actually a party where the few things

14 that Seatran is responsible for doing for Mr. Steven; they're

15 actually not entitled to enforce those provisions, correct,

16 as they are just an intervenor?

17 A.   That's a legal question that I'm not sure of.

18 Q.   Fair enough.

19     Can you confirm for me that this document, that -- and

20 let me ask you to turn to the signature pages.

21 A.   (Witness complies.)

22 Q.   It's got the date of October 2nd, 2018.

23 A.   (Witness examines document.)

24 Q.   And I had asked you during your deposition if you may

25 recall if you were sure that that document was signed on

1  October 2nd, 2018?

2  A.    (No response.)

3  Q.    Do you remember that?

4  A.    Yes.

5  Q.    And as you sit here today, can you tell me that you're

6  sure that that document was signed on October 2nd, 2018 and

7  maybe not October 3rd or October 4th, or some other date other

8  than October 2nd, 2018?

9  A.    No, it was signed on the date that I put by my name.

10  Q.    I think your testimony, if you recall, I will ask you

11  again:  That you said it happened when it happened.  Do you

12  remember that?

13  A.    No, no.

14        MR. PECK:  Your Honor, if he's going to impeach

15  him --

16        THE WITNESS:  That's, you know --

17        MR. PECK:  Your Honor, I'm going to object.  If

18  you're going to impeach him with the deposition, let's see

19  the deposition.  Show it to him.

20        MR. WAGUESPACK:  I have it right here.

21        MR. PECK:  Okay.  I mean but you're -- you know,

22  usually you have a witness --

23        THE COURT:  Mr. Waguespack, why don't we just be

24  precise.  If you've got it, let's get the -- if you're

25  seeking to impeach what he testified as -- his testimony here

1  based on what he said in the deposition.

2          MR. WAGUESPACK:  I'll do that Your Honor.  But I

3  think, I mean most of the -- in most cases these things

4  aren't that important.

5          MR. PECK:  It's not, but I mean you're saying stuff

6  that he doesn't know.

7          MR. WAGUESPACK:  Okay.

8          MR. PECK:  Let him see it.

9          MR. WAGUESPACK:  I'll show him.

10         THE WITNESS:  Now thankfully, you know, if I could

11 speak for a second.  That reference you just made about it

12 happened when it happened was not when we -- the date we

13 actually signed it.  Your question there, what I was

14 answering, is you were saying:  Well, you signed this thing

15 one day before the bankruptcy?

16         And I said:  We had been working on it for several

17 months at the request of Captain Elliott.

18         And we finally got to the point to where we were

19 ready to sign it on October the 2nd.  And you said, "Well,

20 that's just one day before he bankruptcy."

21         And I said, "Well, it happened when it happened,

22 We were working on it for two months and it just so happened

23 that we concluded it the day before and we signed it.  It

24 wasn't the way it was rushed in to sign it the day before the

25 bankruptcy was filed.

1          And that's where I was referring to it happened

2     when it happened because --

3     BY MR. WAGUESPACK:

4     Q.    Okay. Fair enough.

5     A.    -- that when we got to the point that we were ready to

6     execute it.

7     Q.    I understood your answer to be different, but let's not

8     belabor it.

9          So as you sit here today:  You can confirm that it was

10    signed on October 2nd, 2018?

11    A.    That is correct.

12    Q.    Okay.  And you would agree with me now that that was the

13    day before the Debtor filed bankruptcy?

14    A.    Yes.

15    Q.    So, it's your testimony that it was just a coincidence

16    that it was signed the day before?

17    A.    That's absolutely my testimony.

18    Q.    Okay.  So since Guice chartered the vessel beginning I

19    believe you said in September of 2017?

20    A.    The Guice charter?

21    Q.    Yeah.

22    A.    Of the Mr. Steven?

23    Q.    Correct.

24    A.    It was October -- what, October 15th of '17.

25    Q.    Correct.  Okay

1       So since that time Seatran has not had to market the

2  vessel, correct?

3  A.   No.

4  Q.   Nobody has had to market the vessel; nobody has had to

5  pay for insurance because Guice was supposed to be doing

6  that, correct?

7  A.   That's correct.

8  Q.   And arrange for repairs; that's not something Seatran is

9  doing, correct?

10  A.   Correct.

11  Q.   Now maintaining the vessel, that's not something that

12  Seatran or the Debtor for that matter is doing, correct?

13  A.   Correct.

14  Q.   And they're not providing a master or crew to the vessel

15  either the Debtor or Seatran, correct?

16  A.   No.

17  Q.   And they're not listed -- they're not doing -- if you

18  turn to the vessel operating agreement and it lists all the

19  things that Seatran is supposed to do; none of those things,

20  and this is if you would look on the vessel operating

21  agreement.

22  A.   (Witness complies.)

23  Q.   Do you see that?  That lists all of the management

24  services there in Article 4.

25  Q.   (Witness examines document.)

1    That's correct.

2  Q.   Seatran is not providing any of those services to this

3  vessel are they?

4  A.   Well, they're still responsible for it and they oversee

5  it, just like when we had to go to California during the

6  recertification of the boat.  We attended it, so we want to

7  make sure that Guice is doing everything they're supposed to

8  do.

9  Q.   And I think when I asked you this question during your

10 deposition, I asked you what if anything you've done, and I

11 think the recertification was the only thing you could

12 identify that you've done for the Mr. Steven other than the

13 recertification.

14    I mean the recertification -- you haven't done anything

15 else.  Guice or SpaceX is handling all of those other

16 services that are listed in the vessel operating agreement,

17 correct?

18 A.   That's correct.

19 Q.   And you would agree with me that under the agreement as

20 it's written, despite that, Mr. Steven, L.L.C. bears a

21 percentage that's larger than any other boat that's subject

22 to Seatran's control of overhead costs based upon the size of

23 the vessel, correct?

24 A.   No, that's incorrect.

25 Q.   Okay.  Explain -- now, I'm talking only about the

1  written terms of the agreement now, okay?  So under the

2  written terms of the agreement, how much in overhead costs

3  does Seatran bear as a percentage to the other owners of the

4  -- of folks that you are managing?

5  A.   It's a somewhat complex fee structure in that votes are

6  allocated a pro rata portion of the total overhead of Seatran

7  Marine, based on the length of the vessel.

8      And certain vessels are stacked and inactive.  They are

9  allocated a small monthly fee which is deducted from the

10  total and then the remaining balance is allocated on a pro

11  rata basis, based on the length of the vessels.

12  Q.   Now, is the vessel the Mr. Steven a stacked vessel?

13  A.   No.

14  Q.   Now, I think -- so there's nothing in this agreement

15  that treats the Mr. Steven's, the vessel as a stacked vessel,

16  correct?

17  A.   That's correct.

18  Q.   So under the terms of the agreement, its share of the

19  overhead of Seatran is based upon its percentage of the

20  length of its vessel versus the total length of all the

21  vessels in the fleet that you're operating, correct?

22  A.   That was the situation prior to going into the bareboat

23  charter.  Once we got into the bareboat charter and realized

24  that Seatran was not providing a lot of the day to day

25  functions, the owners of Seatran agreed to reduce the

1  management fee allocation for the Mr. Steven down to the

2  same level as -- that was being charged to stacked inactive

3  vessels.

4  Q.   And how much is that?

5  A.   Fifteen hundred dollars per month.

6  Q.   Okay.  And that's -- but you would agree with me, that's

7  not in the agreement that was signed on October 2nd, correct?

8  A.   That's correct.

9  Q.   Okay.  I think you also testified earlier, if not, I

10 want to ask you again:  The Debtor has no employees, to your

11 knowledge, correct?

12 A.   That's correct.

13 Q.   And it really has no business operations, correct?

14 A.   Correct.

15 Q.   Now, I understood your testimony in your deposition to

16 be that before this document was signed there was an oral

17 agreement in place that was similar to the vessel operating

18 agreement that we've marked as Exhibit 17, I believe, is that

19 correct?

20 A.   Yes.

21 Q.   And that agreement you contend was in place before the

22 mortgage was put on the vessel, is that correct?

23 A.   Yes.

24 Q.   Now, you never told FNBC of that agreement, did you?

25 A.   I told them the structure of the operations of the boats

1  were under a management agreement with Seatran Marine.

2  Q.   Right.  And you also told them that all of the money,

3  when the receivables are collected by Seatran, they are

4  funded 100 percent to the vessel owners; didn't you tell them

5  that as well?

6  A.   Yes.

7  Q.   And I believe there was also furnished to me a draft of

8  this vessel operating agreement that dates back to 2014,

9  correct?

10  A.   I didn't provide that to the bank.

11  Q.   But you provided it to -- somebody provided it to me

12  prior to our deposition and we discussed it; do you remember

13  that?

14  A.   Right.

15  Q.   Now that draft agreement, you would agree to me, it

16  wasn't provided to the bank, correct?

17  A.   Correct.

18  Q.   And that draft agreement was not signed by the owners of

19  Seatran, correct?

20  A.   No, it was never executed.

21  Q.   In fact, Comar, which was one of the owners of Seatran,

22  refused to sign it, correct?

23  A.   Well, they kept dragging their feet.  They never said

24  they refused.  They actually were implemental incoming up

25  with the final draft of it, and he agreed to it, and he said:

1  I'll get around to signing it.  And he kept delaying and

2  delaying.

3      And with all the parties of Seatran being Iberia Marine

4  Service, Comar Marine and Texas Crewboats, all agreed to the

5  agreement, and that all we had to do was sign it.  In fact,

6  they all put up their deposits into Seatran with the

7  understanding that we all agree that this is the document; we

8  just hadn't gotten around to signing it yet.

9  Q.  But didn't you --

10 A.  There's a document we're going to operate under.

11 Q.  There were -- Comar wasn't willing to sign the document.

12 The document was never finished, complete -- isn't that

13 right?

14 A.  They agreed to the final terms of it, but he never

15 signed it, and he kept dragging his feet on signing it.

16 Q.  Under the vessel operating agreement, is Seatran

17 supposed to track the locations of the vessels?

18 A.  Yes.

19 Q.  And have you been tracking the locations of vessels

20 since October 5th, 2017?

21 A.  Yes.

22 Q.  Until October 15th, 2018 have you followed the movement

23 of the vessel?

24 A.  I don't follow it every day, but I do periodically

25 follow it.

```
1   Q.   Aren't you supposed to provide reports as to the
2   location of the vessel on a daily basis?
3   A.   Yes.
4   Q.   And you haven't been doing that, have you?
5   A.   No.
6   Q.   With respect to the Mr. Steven?
7   A.   No.
8   Q.   Now we talked a little bit about how the money flows
9   from the charter of the Mr. Steven; do you remember that
10  discussion?
11  A.   Yes.
12  Q.   Okay.  So as I understand it, Guice pays for the charter
13  30 days for the period 60 days in arrears, correct?
14  A.   That's correct.
15  Q.   And that money -- and let's just assume for purposes of
16  our discussion, purely assumption, that that payment, that
17  monthly payment would be $100,000; is that fair?
18  A.   Yes.
19  Q.   Okay.  So the $100,000 gets paid by Guice to Seatran, is
20  that correct?
21  A.   It's Seatran's money at that point.
22  Q.   And then Seatran then takes that money, or is supposed
23  to take that money and pay the Debtor -- I'm sorry, pay
24  Iberia Marine $100,000, correct?
25  A.   Under certain conditions, yes.
```

1  Q.   Well, do you remember when we talked about this during

2  your deposition?

3       MR. WAGUESPACK:  Let me get to the point.

4       (Pause.)

5  BY MR. WAGUESPACK:

6  Q.   Let me just walk you through with exactly what we talked

7  about, okay?

8  A.   (No response.)

9       MR. DRAPER:  Let him look.

10       MR. PECK:  Let him look.  Let him read it too.

11       MR. WAGUESPACK:  Okay.

12       MR. PECK:  And then ask a question and let the

13  witness read it.  You keep on characterizing what is said.

14       MR. WAGUESPACK:  I'm going to read it exactly.

15  BY MR. WAGUESPACK:

16  Q.   Do you see here it says:

17       "Guice pays Seatran $100,000.  When the $100,000 gets to

18  Seatran, what does it do with it?  What does it do with the

19  funds?"

20       "MR. PECK:  Object to the form of the question."

21       "THE WITNESS:  It pays Iberia Marine Service $100,000."

22       Isn't that what you said?

23  A.   Yes.

24  Q.   Okay.  And then the next question:

25       "Okay.  Then what does Iberia Marine Service do with the

1   $100,000?"

2        "MR. PECK:  Object to the form of the question."

3        "THE WITNESS:  It pays Mr. Steven, L.L.C. $100,000,"

4   correct?

5   A.    Yes.

6   Q.    Okay.  And that -- you told me the truth during your

7   deposition, didn't you?

8   A.    Yes.

9   Q.    Now, under the vessel operating agreement, the one that

10  was signed on October 2nd, 2018; does the Debtor indemnify

11  Seatran?

12  A.    For certain things.

13  Q.    Is there any indemnification by Seatran in favor of the

14  Debtor?

15  A.    I don't really focus on that provision of the agreement

16  too often.

17  Q.    You would agree with me, there's no indemnification --

18  there's an extensive indemnification by the Debtor in favor

19  of Seatran, correct?

20  A.    Yes.

21  Q.    And there's no indemnification backed by Seatran of the

22  Debtor, correct?

23  A.    That was the negotiated terms.

24  Q.    And these negotiated terms vest the full control of this

25  vessel, all aspects of the vessel in Seatran, correct?

1  A.   Yes.

2  Q.   And despite the fact that Seatran has full control of

3  the vessel, the Debtor is indemnifying Seatran and Seatran is

4  not indemnifying the Debtor, correct?

5  A.   That's what the document says.

6  Q.   Seatran also obtained a right of first refusal in this

7  vessel operating agreement, correct?

8  A.   Correct.

9  Q.   Would you agree with me that this provision would impact

10 the Debtor's ability to market the vessel to others?

11 A.   It may.

12 Q.   And Seatran is appointed exclusive broker if the Debtor

13 decides to sell the vessel, correct?

14 A.   Yes.

15 Q.   Has Seatran ever actually closed on the sale of a vessel

16 that it has?

17 A.   I'm sorry.  Repeat that?

18 Q.   Has Seatran ever actually closed on the sale of a vessel

19 as a broker before?

20 A.   We had one boat that was sold, but Seatran didn't

21 function as the broker.

22 Q.   I'm saying where Seatran is the broker; has Seatran ever

23 closed on a sale as a broker before?

24 A.   No.

25 Q.   But yet, the Debtor has retained it as its exclusive

1  broker in the event it ever has to sell the vessel, correct?

2  A.   Yes.

3  Q.   And if the vessel is sold, the vessel operating agreement

4  has to remain in effect, correct?

5  A.   Yes.

6  Q.   And you would agree with me that this provision could

7  have an impact of decreasing the value of the vessel,

8  correct?

9  A.   It may.

10  Q.   And if there is an early termination of the vessel

11  operating agreement, there is a significant fee associated

12  with that, right?

13  A.   Correct.

14  Q.   And this could also potentially impact the value the

15  Debtor may obtain in a sale, correct?

16  A.   It may.

17  Q.   And Seatran is also granted a lien in that vessel

18  operating agreement, right?

19  A.   Yes.

20  Q.   And the Debtor waives its consequential and numerous

21  other forms of damage in the vessel operating agreement as

22  well, doesn't it?

23  A.   Right.

24  Q.   Who owns the vessel the Mr. Steven?

25  A.   Iberia Crewboat & Marine serves as L.L.C.

1  Q.   Did you ever tell FNBC that the money that was derived

2  from the Mr. Steven was owned by Seatran?

3  A.   Not in those -- I explained to them in detail how the

4  structure worked.

5  Q.   But they acted as a manager?

6  A.   They were the manager of the boat, yes.

7  Q.   Okay.  And that's what you told FNBC?

8  A.   Well, that's not exactly what I told them.  We had

9  meetings for hours and I explained the full structure of the

10  arrangements between Iberia Marine and Seatran and all of the

11  other owners.

12  Q.   But you never told them that the rights to the charter

13  payments and the money that was derived from the vessel would

14  belong to Seatran, correct?

15  A.   I explained the structure that Seatran was owned by a

16  number of companies.  I might have not specifically said

17  those words, but they had a full understanding of the

18  structure.

19  Q.   But did you tell them in any words that the money

20  derived from the vessel, and that the charters, the

21  agreements relating to the vessel would be owned by Seatran

22  and not by the Debtor, who was granting the mortgage on the

23  vessel?

24  A.   They understood it because they knew that Seatran had --

25  Q.   I didn't ask --

```
1            MR. PECK:  Let him finish his answer, Your Honor.

2   BY MR. WAGUESPACK:

3   Q.   I didn't ask if you understood it --

4            MR. PECK:  Let him finish --

5   BY MR. WAGUESPACK:

6   Q.   I asked what you said.

7            THE COURT:  All right.

8            MR. PECK:  Let him finish his answer.

9            MR. WAGUESPACK:  I asked a very direct question.

10           MR. PECK:  He cut him off, Your Honor.

11           MR. WAGUESPACK:  Well, that's because he's not

12  answering the question.

13           THE COURT:  Ask the question.

14           Then answer the question.

15           MR. WAGUESPACK:  Thank you.

16  BY MR. WAGUESPACK:

17  Q.   Did you tell them that the charter payment and the money

18  derived from the vessel would be owned by Seatran and not by

19  Mr. Steven, L.L.C., the entity that granted the mortgage?

20  A.   In a number of words, yes.

21  Q.   Okay.  Well --

22  A.   I mean, I don't remember the exact words.  I went and I

23  met with the people for two and three hours at a time with

24  flow charts and everything else, and explained how everything

25  worked in detail, and whether I can tell you verbatim what
```

1    words I told them to convey the structure, I can't tell you

2    right now.

3        But they -- we had extensive face to face meetings for

4    several hours, several times, and they had a full

5    understanding of how the whole structure worked.

6    Q.    And when you say "structure," I'm not talking about the

7    management relationship, I'm talking about the specific issue

8    about ownership of the proceeds and the ownership of the

9    charter payments, all of which were granted by Mr. Steven,

10   L.L.C. in the mortgage, but you didn't tell them that, did

11   you?

12   A.    They know -- they knew that all of the --

13   Q.    I'm not asking what they knew.

14            MR. PECK:  But Your Honor --

15            MR. WAGUESPACK:  I'm asking what you told them.

16            MR. PECK:  Objection.

17            THE COURT:  I'm going to overrule the objection,

18   because I mean this to me is a yes or no question.  Did you

19   -- what did you tell them?  He's asking you a question.  You

20   can answer that question yes or no.

21            THE WITNESS:  Okay.  I was trying to get to it to

22   tell him that they had -- they knew that all of the master

23   time charters were in the name of Seatran, and that Seatran

24   chartered the boats to the oil companies, and it was

25   Seatran's receivables when Seatran collected that money from

1   the oil companies.

2          They knew that.  They knew that Mr. Steven did not

3   have any -- the master time charters in place with the oil

4   companies, that all of those were in the name of Seatran.

5   And therefore, the receivables collected from the oil

6   companies paid to Seatran were owned by Seatran.

7   BY MR. WAGUESPACK:

8   Q.   And so again, the charter agreements -- I'm not talking

9   about whose name they're in or who arranged to confect them;

10  I'm talking about who owns them?  Who owns the rights to the

11  revenue derived from the boat?

12         Are you telling me you told the bank when you're trying

13  to get $23 and a half million that you're going to get a

14  vessel mortgage and all of these rights related to that

15  vessel, and you want $23 and a half million?  But the

16  charters and the rights to receive the money are going to be

17  owned by another entity that's not obligated on your debt.

18  Did you tell them that?

19  A.   Now --

20  Q.   You didn't tell them that, did you?

21  A.   Yes, I did.

22  Q.   No, you didn't.

23  A.   Yeah -- well, how are you telling me what I told them?

24  Q.   Because I've asked you five times and you wouldn't tell

25  me until just now.  That's the first time you told me that.

1  A.    Uh-uh.

2  Q.    And I don't -- and you didn't tell me that in your

3  deposition either, so.

4  A.    You didn't ask that question in my deposition.

5  Q.    Is there any loan document that you're familiar with,

6  you were the one that was arranging the loan from FNBC; is

7  that your testimony?

8  A.    Yes.

9  Q.    Is there any loan document signed by the bank and by the

10  Debtor or any other party related to this loan, that advises

11  FNBC or puts them on notice that somebody else other than

12  Mr. Steven, L.L.C. owns the vessel, owns the charter

13  agreements related to the vessel, and owns the profits, the

14  revenue, the charter payments and the other payments and

15  other rights relating to the vessel at any other entity other

16  than Mr. Steven, L.L.C. owns those rights?

17  A.    I'm not aware of a document.

18  Q.    Thank you.

19       Now, do you recall during your deposition when I asked

20  you specific questions about the weight of the fairings and

21  the heat of the fairings that the Mr. Steven is trying to

22  catch?  Do you remember that?

23  A.    I don't know, not exactly.

24  Q.    And I tried to get information -- well, I tried to get

25  other information about the boat, about the -- do you know

1   what the weight of those fairings are that are attempted to

2   be caught by the Mr. Steven?

3   A.   No.

4   Q.   Do you know what a fairing is?

5   A.   Yes.

6   Q.   What is it?

7   A.   It's a piece of the cone of a spaceship that protects it

8   from heat, I guess as the spaceship is going up, and then

9   it's like a shell that falls off at some point.

10  Q.   And what does the Mr. Steven's do, the boat?

11  A.   My understanding through you know, internet type

12  information, is that it attempts to collect that fairing, to

13  catch it.

14       MR. WAGUESPACK:  Your Honor, if you could give me

15  just a second.  I'm sorry.

16       (Pause.)

17  BY MR. WAGUESPACK:

18  Q.   Have you reviewed the insurance policy that's in place

19  for the vessel the Mr. Steven?

20  A.   No.

21  Q.   You haven't checked it to see if there's an exclusion

22  for trying to catch rocket pieces?

23  A.   I addressed that issue before the charter commenced.

24  Q.   With the insurance company?

25  A.   Yes.

1  Q.   Which insurance company is providing the insurance for

2  the vessel the Mr. Steven?

3  A.   Well, it's actually the insurance agent, Arthur J.

4  Gallagher.  Because we had concerns whether the intended use

5  of the vessel to do the function would potentially void the

6  insurance coverage.

7       So I consulted with Billy Guice and he in turn got Adam

8  McGinnis with Arthur J. Gallagher to confirm to me in writing

9  that they were fully aware of what services the vessel would

10 be doing and that it would not void our insurance coverage.

11 Q.   And when you say "what services the vessel would be

12 performing," you're talking about catching the rocket pieces

13 in the --

14 A.   That's correct.  The services they would be doing for

15 SpaceX.

16 Q.   And do you know if the insurance policy itself

17 reflects  a limitation or an exclusion for that type of an

18 activity?

19 A.   I never read the policy, but I can rely on their

20 insurance agent with their E&O coverage, that if he made that

21 statement, I'm relying on that.

22 Q.   And you obviously were concerned that the insurance

23 policy may not cover that type of risk, correct?

24 A.   That was an unusual type of service.  I wanted to make

25 sure, and we confirmed it and we got it in writing.

1 Q. Okay.  And what is the writing that you have?

2 A. I mean I'd have to go back and find the exact e-mail that

3 I received from the insurance agency.

4 Q. And when was the e-mail sent?

5 A. Prior to the commencement of the lease.

6 Q. This would have been fall --

7 A. In early October of '15.

8 Q. And it specifically says that the vessel will be covered

9 for risk associated with its mission of catching fairings and

10 rocket parts?

11 A. I'm not sure if that's the exact language, but they

12 understood the intended use of the vessel and that it would

13 be not excluded from the coverage.

14 Q. Have you contacted the insurance agent and let them know

15 that at this point the Debtor has not sought approval for any

16 continuation of the charter of the vessel the Mr. Steven,

17 with the Court?

18 A. No, I haven't consulted with the agent.

19 Q. Did you obtain lender consent for the charter?

20 A. No.

21 Q. Did you obtain lender consent to alter the vessel?

22 A. No.

23   MR. WAGUESPACK:  That's all I have, Your Honor.

24 Thank you.

25   THE COURT:  Thank you, Mr. Waguespack.

1                              *    *    *    *    *

2                              CROSS-EXAMINATION

3    BY MR. PECK:

4    Q.    Mr. Tizzard, I'm Stewart Peck and you know me.  I'm

5    representing Mr. Miguez and Seatran.

6          Let's -- well you know, I'm going to go back and clean

7    up some of this on some of your testimony, but let's get the

8    Court to know your qualifications here, okay?

9          What's your position with Seatran?

10   A.    Executive vice-president and Chief Financial Officer.

11   Q.    And tell the Court your experience when you got out of

12   school, and who you first went to work for?

13   A.    Well, it's a long story but I started in 1974 when I

14   graduated from college, I went to work for GE Capital in the

15   New Orleans office, primarily, it was a commercial lender,

16   primarily finance and -- involved in finance and offshore

17   oilfield service vessels.

18         And that was most of their portfolio.  I worked there

19   for five years, and then I transferred or went to work for

20   Chrysler Capital.  And I worked for Chrysler Capital for

21   fifteen years, doing the same type of financing.

22         Halfway through my employment with Chrysler Capital,

23   they had repossessed a dozen or so offshore oilfield service

24   vessels in the early '80s, and instead of selling them in a

25   depressed market, they set me up in a subsidiary of Chrysler

1    Capital called Marine Asset Management, that we were going

2    to retain ownership of these vessels and work them as we

3    could until the market improved.

4    Q.    And you went out -- and then went out for Chrysler --

5    A.    And then from that point --

6    Q.    -- and bought a bunch of vessels -- you bought a bunch

7    of distressed --

8    A.    At that point my manager from Chrysler Capital was

9    pretty aggressive and he told me to go out and buy other

10   vessels at distressed prices, to blend them in with the ones

11   we had repossessed, and then to continue working them.

12        As it turned out, the market started improving and we

13   were making a nice return on our investment, and they

14   actually allowed me to go out and buy 40 other vessels.  So

15   we built up a fleet of 50 vessels that Chrysler Capital

16   owned, and I was the vice-president and general manager and

17   ran that business for them.

18        And we never did operate the boats ourselves.

19   Q.    Who operated the boats for you?

20   A.    We contracted with outside entities, Trico Marine

21   Service, Comar Marine and Power Offshore, under management

22   and operating agreements to manage the vessels for us on a

23   day to day basis.

24        And the documents that we used is almost verbatim, the

25   same one that's involved in this case.  And it's -- the

1    lawyers at Chrysler Capital clearly understood that there

2    was a risk involved by the fact that under this agreement,

3    it says that --

4              MR. WAGUESPACK:  Your Honor, objection.  There has

5    been -- he's testifying as to what the lawyers at Chrysler

6    Capital understood.

7              MR. PECK:  Okay.

8              MR. WAGUESPACK:  That's hearsay.

9              THE COURT:  Sustained.

10             MR. PECK:  Okay.

11   BY MR. PECK:

12   Q.   With your understanding of the agreement, on whose

13   charters were the -- whose name were the charters when they

14   -- when the -- when Trico and Comar operated your --

15   A.   When Trico and Comar chartered the boats to the oil

16   companies, the charters were between Trico and the oil

17   company or Comar and the oil company.

18        And being the general manager of Chrysler Capital

19   Division, I knew that and I knew the risk associated with it,

20   and we understood that we had to know the companies and trust

21   them --

22             MR. WAGUESPACK:  Your Honor, I'm going to --

23             THE WITNESS:  -- because they were collecting our

24   money.

25             MR. PECK:  That's --

1          MR. WAGUESPACK:  I'm going to object as to

2    relevance.  We have a specific set of documents that are at

3    issue in this case.  He has not been tendered as an expert.

4    So with respect to his understandings of other matters that

5    preceded this one, I don't see the relevance.

6          MR. PECK:  This is extremely relevant.  This is --

7    we're going to go into how -- this is very typical in the

8    marine industry when you have a vessel operator using the

9    same agreement, and the understanding of it all, and whose

10   charters it is.  And it's extremely relevant, Your Honor.

11   And this is the basis for the kind of vessel operating

12   agreement that we had.

13         He's making a big deal that oh, this is something

14   unusual that they're trying to put this company in to defraud

15   us from our monies, when this is standard course of dealing.

16   And this man is very experienced in the industry how it

17   happened.

18         MR. WAGUESPACK:  First of all --

19         MR. PECK:  So I think it's very relevant.

20         MR. WAGUESPACK:  First of all I have not said

21   defrauded.

22         MR. PECK:  Then --

23         MR. WAGUESPACK:  I will say this:  You have not

24   tendered him as an expert.  He is a fact witness and you can

25   -- there is absolutely no relevance to his understanding and

1 dealings in other matters that have nothing to do with this

2 one.

3         MR. PECK:  It's the same agreement that they used

4 in the past.  If you want me to tender him as an expert, I

5 know how -- I know this man for a long time.  I know his

6 expertise and I'll be glad to tender him as an expert.

7         THE COURT:  Well, I'm trying to get to the

8 relevance.  I mean I see I've got some issues here, you know.

9 This may be a chance to direct a little bit.  You know, I'm

10 questioning in my mind, just so you know, you know, the

11 arrangement here when I've got a mortgage for Mr. Steven

12 given by Mr. Steven, L.L.C., who purports to own Mr. Steven.

13         But now I've got issues here where that doesn't

14 appear to be the case.  And you know, it seems, you know, it

15 just -- I'm having a hard time understanding how all of this

16 fits together; what was told to the bank, when.

17         MR. PECK:  Well --

18         THE COURT:  I've got a document that's signed the

19 day before bankruptcy that tries to be retroactive to five

20 years, four years earlier, however many years earlier that --

21 I don't know where all of this bears.

22         MR. PECK:  Okay.

23         THE COURT:  But to me the big issues here are those

24 issues.

25         MR. PECK:  Okay.

1    THE COURT:  And I'm not certain -- and I

2    understand you may have a lot of experience, but I want to

3    know what's going on here.

4    MR. PECK:  Okay.

5    THE COURT:  And why we did this.

6    MR. PECK:  And let me then move on and let me just

7    get where he is, and then I will walk you through in 2014,

8    how it was set up, all the e-mails to the bank, and I'll walk

9    you through all of those documents, Your Honor, and it will

10   -- I will put the story together.

11   THE COURT:  To me, that's the relevant part of

12   this.

13   MR. PECK:  Okay.

14   THE COURT:  That's -- I've got allegations here,

15   they're trying to lift the stay based on bad faith.

16   MR. PECK:  Okay.

17   THE COURT:  And that's, to me, is the issue that

18   I'm having to gauge here.

19   MR. PECK:  Okay, okay.  And let me then walk you

20   through.  Okay, let me get -- I may come back to this about

21   it's not -- it's a typical, but I want to get his experience

22   then I'll walk you through how this document evolved, okay?

23   Okay.

24   BY MR. PECK:

25   Q.    Now, just quickly, how many marine deals have you been

1  involved in, Mr. Tizzard?

2  A.   Again I'm, you know, during the GE days and the Chrysler

3  Capital days, we financed you know, hundreds of millions of

4  dollars worth of marine loans.  And then of course when I was

5  running their operating lease division, we went out and

6  acquired 40 vessels, and so I have experience there.

7        And then the whole fleet in 1993 was sold to Trico

8  Marine.  I went to work for Trico Marine, I was an officer

9  there.  Took the company public and I worked for Trico for

10  fifteen years.

11        And then I moved on to Comar Marine, I was the president

12  of Comar Marine for six years, until Comar merged with --

13  well, not merged, but joined up with Iberia Marine Service

14  and Texas Crewboats to form Seatran Marine in 2014.

15  Q.   Okay.

16  A.   And --

17  Q.   Why don't you tell -- let's break this down:  Who is

18  Seatran?  Can you explain to the Court how Seatran got formed

19  and what was the reason for it?

20  A.   The reason for the formation of Seatran is it's hard for

21  a small company that owns six or eight boats to gear up its

22  staff to be adequate to qualify to work for companies like

23  Exxon and Shell and those groups that are so demanding on

24  your safety records and your safety programs and your safety

25  manuals, and your crew training and everything.

1    So we came up with the concept of taking three small

2   companies and putting them together and to where each small

3   company had the overhead of a million dollars, but it was

4   still a small company.  By putting them together, we could

5   have a lot more qualified individuals on staff that could

6   take care of meeting the requirement of the big oil companies

7   at a reduced cost.

8    So by combining the three companies instead of each one

9   incurring a million dollars of overhead and having a somewhat

10   minimal staff, we combined them and the total overhead was

11   two million dollars, so each company had less overhead with

12   a lot better qualified staff of employees.

13    So that was the reason for joining three companies

14   together in to Seatran Marine.  It gave us a fleet of -- a

15   total fleet at the time of 32 crewboats, which made us one of

16   the largest crewboat operators in the Gulf.  And so, there

17   was a lot of advantages to combining the three small family

18   owned businesses into one larger company where the overhead

19   would even be less than what they were incurring, you know,

20   prior to the formation of Seatran.

21   Q.   And those three companies were who?

22   A.   Comar Marine, Iberia Marine Service and Texas Crewboats.

23   Q.   Iberia Marine is a Miguez company, correct?

24   A.   Correct.

25   Q.   And then Comar and Texas Crewboats are unaffiliated

1  separate companies, correct?

2  A.   And totally, yes.

3  Q.   Yes.  And then -- what type of arrangement was discussed

4  when it was going to be formed, and what was the ownership

5  percentage?

6  A.   Each company was to own one third of Seatran Marine.

7  Q.   And how were they going to be -- what kind of

8  arrangement was discussed about how to manage or how to put

9  these things together?

10  A.   I don't follow the question.

11  Q.   Okay.  If you -- was a vessel management agreement --

12  what kind of agreements were put together as to how Seatran

13  was going to manage these vessels?

14  A.   Well, we drafted the operating agreement for Seatran

15  Marine itself, and then we drafted a vessel operating

16  agreement that Seatran was going to enter with each vessel

17  owner.

18         MR. PECK:  Your Honor, I've marked Exhibit 1.  May

19  I approach, Your Honor?

20         THE COURT:  Yes.

21         Now we have already got -- we already have an

22  Exhibit 1.  And we can either call this Seatran 1 or we can

23  continue with the --

24         MR. DRAPER:  Let's call it Seatran 1, Your Honor.

25         THE COURT:  Okay.

1          MR. DRAPER:  And this is different documents.

2   BY MR. PECK:

3   Q.   What is this document --

4          THE COURT:  And we'll call this Seatran 1.

5          MR. PECK:  Thank you, Your Honor.

6          THE COURT:  All right.

7          MR. PECK:  Did I give you one?

8          THE CLERK:  What?

9          MR. PECK:  Did I give you one?

10         THE CLERK:  Yes, sir.

11         MR. PECK:  Okay.  I've marked this as 1.

12         THE CLERK:  Thank you.

13         MR. PECK:  Okay.

14  BY MR. PECK:

15  Q.   Tell the Court what the document is, Mr. Tizzard?

16  A.   (Witness examines document.)

17       It's a vessel operating agreement that Seatran was

18  working up to enter with each of the vessel owning entities

19  to manage their fleet.

20  Q.   Well, this is -- this says "KKJ Comments" at the top.

21  What is that?  Who is that?

22  A.   That's in reference to the law firm that was

23  representing Comar Marine and the drafting of this document.

24  Q.   And who is --

25  A.   It's King, Krebs & Jurgens.

1  Q.   Okay.  And who is Kean Miller?  What's that comment in

2  the right hand corner?

3  A.   Kean Miller, that's the law firm that was representing

4  Iberia Marine Service, an attorney Stephen Hanemann.

5  Q.   And you got this as a form of document used in marine

6  asset management?

7  A.   Yes, and also a Comar Marine.

8  Q.   Okay.  And I believe -- I don't mean to lead you, but

9  this document got into final form, everybody had put their

10 input and it was finalized?

11 A.   Yes, we had all the input.  Texas Crewboats didn't

12 really have any comments.  We gave it to them and they

13 accepted it without comments.  And we had the final comments

14 from Comar and from Iberia Marine.

15 Q.   Was it ever executed?

16 A.   No.

17 Q.   And why not?

18 A.   (No response.)

19 Q.   Is that what you told me about Comar dragging its feet?

20 A.   Yeah.  Comar, I mean we had it all drafted and ready to

21 execute and the owner of Comar kept dragging his feet on

22 signing it, and then kept coming up with other issues that

23 caused him to delay signing it.

24 Q.   Well, even though it wasn't signed, it requires deposits

25 made by the three companies.  Were deposits made?

1    A.    Yes.

2    Q.    Was money put up by the three companies to form Seatran?

3    A.    Yes.

4    Q.    Was Comar, Iberia and Texas Crewboats billed as if this

5    were in effect?

6    A.    Yes, I invoiced each one of them.  Said:  As per the

7    terms of the vessel operating agreement that we've all agreed

8    to, I'm requesting each group to put up their deposit money.

9          And they all put up substantial money.

10   Q.    And did you continue to start operating all of the --

11   everybody's vessels?

12   A.    We started operating everyone's vessels with the

13   understanding that this is the agreement we're operating

14   under, even though it wasn't executed.

15   Q.    Okay.  But did you do overhead allocations to all of

16   them and do calculations to them?

17   A.    Yes.

18   Q.    Did you bill them for the overhead?

19   A.    Yes.

20   Q.    Did all three of them pay you?

21   A.    Yes.

22   Q.    Did you also do the shared -- you did the management

23   fees for all three?

24   A.    (No response.)

25   Q.    As if this document were in effect?

1  A.  Yeah, per the terms of this document, that's how we

2  billed them for the overhead.

3  Q.  All right.  And --

4  A.  And they paid us.

5  Q.  And they all performed as if this document was in

6  effect?

7  A.  Correct.

8  Q.  Okay.  And all the charters that the vessels entered

9  into -- all the charters with third parties entered into;

10 they were Seatran charters?

11 A.  That's correct.

12 Q.  Okay.  Did Seatran's collect all the charter payments?

13 A.  Yes.

14 Q.  Now, the way it worked and you know, let's get to this

15 because it bothers me.

16     I think we showed you the vessel operating agreement.  I

17 don't know which one it was, but it was one of their

18 documents.  But well, let's just get to -- I want to clear

19 this up.

20     I want you to turn to Section -- Article 4H, okay?  And

21 it doesn't have a page number, but it's like the fifth page.

22 Let me show you and see if you can get to it.

23 A.  (Witness complies.)

24 Q.  Have you got it?

25 A.  Yeah, I see it.

1  Q.   Okay.  Now, it basically says:  Seatran will be

2  responsible for having to collect all the invoices.  And

3  Seatran will issue invoices name of owner, and that, correct,

4  and invoices are to be due to Seatran for the total charter

5  hire, right?

6  A.   Correct.

7  Q.   And in the next sentence it says:  Seatran, subject to

8  its right of offset, in the event of outstanding owner's

9  shared overhead fee in other words, operating expenses, will

10 pay the owner of invoice to owner on the Friday -- you know

11 except for business date Friday, following Seatran's receipt

12 of payment of the corresponding Seatran invoices, correct?

13 A.   Correct.

14 Q.   So all of the monies you collected, you would sent down

15 to Iberia Marine and then to the vessel owners, right?

16 A.   Correct.

17 Q.   That would go to Iberia Marine, Texas Crewboats, right?

18 A.   Yes.

19 Q.   So your testimony is all of the receivables would go

20 down, correct?

21 A.   Yes.

22 Q.   And that's true with your testimony earlier, right?

23 A.   Correct.

24 Q.   But also, you would issue expense, overhead expense

25 allocation and management fees.  You would send them an

1  invoice -- you would bill them for that, right?

2  A.   We would bill them for their overhead allocation and the

3  operating costs on their vessels.

4  Q.   And they were supposed to pay all the expenses up to

5  you, right?

6  A.   Correct.

7  Q.   So it's true what you said, it was all the receivables

8  will go down, except you have a right under this agreement to

9  offset if they don't pay you, right?

10         MR. WAGUESPACK:  Your Honor, he's going -- I've

11  been trying to be patient, but he's leading the witness.

12         MR. PECK:  Okay.

13         MR. WAGUESPACK:  I think he's treating his own

14  witness as a hostile witness.

15         MR. PECK:  No, I'm not.

16         MR. WAGUESPACK:  But he's leading him --

17         MR. PECK:  Okay.  But I will try --

18         MR. WAGUESPACK:  -- to the point where I --

19         MR. PECK:  I will try not to lead --

20         MR. WAGUESPACK:  -- where I'm --

21         MR. PECK:  -- Your Honor.

22         THE COURT:  I'll sustain it.  I'll sustain the

23  objection.

24         MR. PECK:  I'm trying to move through it quickly,

25  Your Honor.

1          THE COURT:  I understand.

2          MR. PECK:  But I'm --

3          THE COURT:  And I appreciate that.

4    BY MR. PECK:

5    Q.   What rights did -- if monies weren't paid by the vessel

6    owners for expenses you sent, what rights if any did Seatran

7    have?

8    A.   They had the right to offset, to withhold the

9    receivables that it collected and not pay them down to the

10   boat owning entities.

11   Q.   And you said -- I know it's not leading -- but your

12   prior testimony when he was pressing you about payment all

13   the receivables down, you said with exceptions, did you

14   not?

15   A.   Yes.

16          MR. WAGUESPACK:  Your Honor, that's --

17   BY MR. PECK:

18   Q.   What if any were --

19          MR. WAGUESPACK:  I object.  That's not what he

20   said.

21          MR. PECK:  Yes, he did.  He said:  We'll pay it all

22   with exceptions, and he --

23          MR. WAGUESPACK:  We went through it.

24          MR. PECK:  And he did.  And I'm showing you that's

25   exactly what --

1          THE COURT:  Let me hear Mr. Waguespack's

2     objection.

3          MR. WAGUESPACK:  He's leading him and he's

4     mischaracterizing his earlier testimony.  You can ask him

5     questions, but you can't lead him.  I think that's a

6     double objection.  He led him and he characterized his

7     testimony.

8          MR. PECK:  Your Honor --

9          THE COURT:  May I --

10          MR. PECK:  Your Honor, may I say:  He said, "Yes,

11     we pay it all with exception."

12          He used the word "exception."  And I'm just

13     pointing it out -- this out.  Was this exception -- now he

14     said that.  The transcript is going to say he said, "Yes, we

15     pay it all with exception."

16          MR. WAGUESPACK:  That's why I used the $100,000

17     amount, just so we could --

18          THE COURT:  The example I remember is this:  And

19     then, it's going back to the $100,000, that if it gets the

20     $100,000, it goes to Seatran, to Iberia Marine, then down to

21     Mr. Steven, is how I understood it.

22          MR. PECK:  He said it would all get paid with

23     exception.  And then he said 100, 100, 100, and I'm trying to

24     show there are -- that he was saying, "Well, that's not what

25     you testified."  He said with exception.  I'm trying to show

1    the exception, which is a right of settle.  Because it's

2    true exactly what he said.

3              THE COURT:  Well the --

4              MR. PECK:  $100,000 goes down.  But if you don't

5    pay the money up, we get no offset.

6              THE COURT:  That's a legal issue.

7              MR. PECK:  Okay.

8              THE COURT:  Of what this document provides from

9    the contract -- from the contractual standpoint of the

10   document.

11             MR. PECK:  Okay.

12             THE COURT:  You can ask him what his understanding

13   of the agreement was.  I've heard what Mr. Waguespack

14   elicited.

15             I'm going to overrule the objection, Mr. Waguespack.

16   I think Mr. Peck has an opportunity to have his witness

17   testify as to his understanding of the agreement just as he

18   did with you.

19             MR. PECK:  Yes.

20   BY MR. PECK:

21   Q.   Well, what is your understanding -- and use the $100,000

22   example; what is your understanding of how this works in

23   terms of sending the receivables down and paying expenses up?

24   How does it work?

25             MR. PECK:  I'm not leading.

1  BY MR. PECK:

2  Q.   Now just tell me how it works; what is your

3  understanding?

4  A.   Well, the oil company pays Seatran Marine.  Seatran

5  Marine pays Iberia Marine Service or Comar or Texas Crewboats,

6  and if they have all the entities below them, they pay the

7  money down to those entities.

8      At the same time Seatran invoices each of the companies

9  for their allocation of the overhead and their direct

10  operating expenses of their vessels, that they pay backup

11  through Iberia Marine Service to Seatran.

12      But there is a provision in here that there's a right to

13  offset that has Seatran Marine is collecting its receivables

14  from the oil companies.  It has the right, if they're not

15  collecting the money back up or if they're uncomfortable that

16  the money is going to come back up, Seatran can have the

17  right to offset and hold that money.

18  Q.   Okay.  I'm going to hand you a series of e-mails which I

19  have marked as Exhibit 2.

20          MR. PECK:  I think I have enough copies.  I don't

21  know if I have enough copies.  Okay.

22          THE CLERK:  I'll mark that.  Hand me a copy.

23          MR. PECK:  David, do you have --

24          Excuse me, Your Honor.

25      (Pause; attorney getting exhibit together.)

1          MR. PECK:  David, did you get this?

2  BY MR. PECK:

3  Q.   What is this document that's from you dated July 30th,

4  2014 to Blake Miguez and then --

5  A.   (Witness examines document.)

6       That was actually to Steve Miguez and I copied Blake.

7  Q.   Okay.  What are those documents?

8  A.   That's where Seatran was invoicing Iberia Marine Service

9  for certain operating costs that it had incurred on the

10  Iberia vessels, prior to July 1st of '15.

11  Q.   And who did you send that to?

12  A.   Steve Miguez.

13  Q.   Now --

14          MR. PECK:  I'm sorry, Your Honor, I just --

15  (inaudible; not speaking near the microphone.)

16  BY MR. PECK:

17  Q.   Did you -- who is that to?

18  A.   (Witness examines document.)

19       This is to Casey Cundieff.

20  Q.   Okay.  You wrote that -- you wrote an e-mail to Casey

21  Cundieff?

22          MR. PECK:  I apologize Your Honor.  When they made

23  -- replicated this, they didn't make -- there's no copies.

24  So, I mean I think Mr. Waguespack has it, but I apologize for

25  the different ones.  This is the --

1          THE COURT:  Who is Casey Cundieff?

2          THE WITNESS:  He's part of the management of Texas

3     Crewboats.

4     BY MR. PECK:

5     Q.   Okay.  And what was the purpose of this e-mail?

6     A.   To invoice -- to notify Texas Crewboats that Seatran was

7     invoicing them for certain -- or had invoiced them for

8     certain operating costs that Seatran incurred on Texas

9     Crewboat vessels.

10    Q.   Okay.  And then, there is one also to a -- who is this

11    to?

12    A.   (Witness examines document.)

13         MR. PECK:  We're going to group -- this is going to

14    be a group that we are just going to global all of these

15    documents --

16         THE COURT:  I have this one already.  It's in the

17    -- I've already got this in a batch that you had --

18         MR. PECK:  Okay.

19         (Pause; not speaking near the microphones and discussing

20    copies of the exhibit.)

21    BY MR. PECK:

22    Q.   Now, how many e-mails did you write, Mr. Tizzard,

23    regarding that --

24    A.   (Witness examines document.)

25         Three.

1  Q.   And what was the purpose again, of it?

2  A.   To invoice the boat owners for certain operating costs

3  that the management company incurred on their behalf.

4  Q.   Uh-huh.

5       MR. PECK:  And I don't know if I made extras, we'll

6  have to make copies.

7  BY MR. PECK:

8  Q.   What is this document here?  This is another e-mail.

9  A.   (Witness examines document.)

10 Q.   What is that e-mail?

11 A.   That was sent to all three companies.

12 Q.   And what was the -- what did you tell them in that

13 e-mail?

14 A.   I told them that per the Seatran operating agreement

15 and the vessel operating agreement, both effective July 14th

16 of -- July 1st of '14, that the owners of Seatran and the

17 vessel owners are required to make certain deposits and

18 payments to Seatran.

19 Q.   Okay.

20       MR. PECK:  Your Honor, if you want to make copies

21 of this --

22       THE COURT:  I've got this one.

23       MR. PECK:  This one has all -- with all of them.

24       THE COURT:  Okay.

25       MR. PECK:  Okay.

1    THE COURT:  It's dated July 2nd?

2    MR. WAGUESPACK:  Yeah, July the 2nd.

3    THE COURT:  To Blake Miguez?

4    MR. PECK:  Yeah.

5    THE COURT:  Glen H., C. Elliott Cundieff and S.

6  Miguez and Iberia Marine.  I think I've got it, Mr. Peck.

7    MR. PECK:  Okay.  I'm going to offer, file and

8  introduce that whole set of e-mails identified in globo as

9  Exhibit Number 2.

10    THE COURT:  Is there any objection?

11    MR. WAGUESPACK:  No, no objection.

12    THE COURT:  Thank you Mr. Waguespack.

13    This will be admitted as Seatran Exhibit 2.

14    (Pause; attorneys speaking about documents (inaudible)

15  not speaking near microphones.)

16    MR. PECK:  David, did you get this one?  I gave you

17  a copy.

18    Can I have it -- oh, Doug used that.  Can I -- Doug

19  you used --

20    MR. DRAPER:  Right.

21    MR. PECK:  Your Honor, this will be Exhibit 3,

22  marked Exhibit 3.  This is an e-mail from Mr. Tizzard with

23  the bank and Mr. Draper didn't put it into evidence.  I'm now

24  going to put it in evidence.

25    I think you have it up there.  I believe you do.

1   It's the Charlie Tizzard to Fred Beebe, Michelle Buisson.

2         MR. DRAPER:  I did not make it an exhibit.

3         MR. PECK:  It didn't make it in, but --

4         MR. DRAPER:  Yes.

5         THE COURT:  I think this was one that I've got.

6         MR. PECK:  It wasn't introduced into evidence, but

7   he -- he doesn't have his file.

8         THE COURT:  I've got a copy of it.

9         MR. PECK:  Good.

10        THE COURT:  It's got the star next to number two.

11        MR. PECK:  I didn't mess up on this one making

12   copies.  This one --

13        MR. DRAPER:  No, I made the mistake.

14        MR. PECK:  Okay.  No --

15        THE COURT:  So, is this Seatran -- is this going to

16   be marked Seatran 3?

17        MR. PECK:  This is Seatran's.

18   BY MR. PECK:

19   Q.   What is this, Mr. Tizzard?

20   A.   (Witness examines document.)

21   Q.   And let's start with the last page of this document.

22   What is that?

23   A.   That's a chart of the corporate structure of Seatran and

24   all of the related boat companies.

25   Q.   And that was attached to, I believe, on the two pages

1  before that, from you to Mr. Beebe and to Ms. Buisson.  Who

2  is Mr. Beebe and Michelle Buisson?

3  A.   They are the loan officers at First NBC that I

4  negotiated the loan with.

5  Q.   And you wrote an e-mail on May 21st, 2015 to them,

6  correct?

7  A.   Correct.

8  Q.   And what was the subject matter of that e-mail which has

9  the attachment of the structure to it?

10  A.   To explain the structure of Seatran.

11  Q.   Okay.

12  A.   And the related boat companies.

13  Q.   Okay.  And this is part of your explaining the entire

14  structure?

15  A.   Yes.  In fact, the chart that's attached, I had it on a

16  legal size paper and I brought copies of it when I met face

17  to face with Fred Beebe and Michelle.  We went through the

18  whole document, until they had an understanding of how

19  Seatran and the boat companies are structured.

20  Q.   And in the first page, what -- who is that?  That's the

21  one dated June 23 from you to Mr. Beebe and Ms. Buisson.

22  A.   (Witness examines document.)

23  Q.   What was this about?

24  A.   Just further explaining some of the issues of how the

25  Seatran was structured and what kind of money was put into

1  Seatran by the various boat companies to fund Seatran and

2  also to put on deposit money from each boat owning entity,

3  put a certain level of funds on deposit with Seatran, to show

4  how much Seatran had accumulated --

5  Q.   What --

6  A.   -- in operating capital.

7  Q.   Did Mr. Blake Miguez give a personal guaranty?

8  A.   No, he was requested but we said that wasn't available.

9  Q.   And that was Paragraph 1 that was covered in your first

10 page, correct?

11 A.   Right.

12 Q.   And what about Seatran's providing a corporate guaranty?

13 Was that provided?

14 A.   No, it was requested, but once I explained the structure

15 of Seatran and the various owners, they realized that it was

16 unreasonable to request it, so they backed off on their

17 request for the guaranty of Seatran.

18 Q.   Why was it unreasonable?

19 A.   Because you had two other owners that were unrelated.

20 Why would two other owners agree to let Seatran give its

21 corporate guaranty to Iberia Marine Service?

22 Q.   Okay.

23 A.   It didn't make any business sense at all.

24 Q.   What about providing a security interest in Seatran's

25 receivables?  Was that --

1    A.   That was also requested and for the same reason and we

2    refused it and they accepted to do the loan without it.

3    Q.   Now later on in the middle it says:  All vessel charters

4    are billed to the customers by Seatran.  When the receivables

5    are collected by Seatran, they are funded 100 percent to the

6    vessel owners.

7    A.   (Witness examines document.)

8    Q.   You said that, did you not?

9    A.   Yes.

10   Q.   And that's what -- what does the vessel operating

11   agreement provide?  Does that provide that?

12   A.   Yes.

13   Q.   But again, what rights does Seatran have if the

14   liabilities are not paid, going up to it?

15   A.   It gets the right to hold the receivables.

16   Q.   Okay.  And what about the deposits?  It says here that

17   Seatran relies on deposits.  What was that about?

18   A.   (No response.)

19   Q.   What was --

20   A.   Now, when Seatran commenced operations it was incurring

21   and paying crew payroll and insurance premiums and

22   maintenance and everything else to operate the boats, and it

23   needed a certain level of a deposit from each boat owner so

24   they could pay those expenses until -- I mean Seatran didn't

25   invoice the boat companies until after they incurred certain

1　expenses.

2　　　So the boat companies provided a certain level of

3　working capital to Seatran to operate their boats.

4　Q.　So when did you -- when were you discussing this loan

5　with FNBC?  What year?

6　A.　(No response.)

7　Q.　What year?

8　A.　What year?  2015.

9　Q.　And the Seatran operating agreement was in effect --

10　well, the way you operate Seatran was in effect since July

11　of 2014?

12　A.　July 1st of '14, yes.

13　Q.　And that was all the deposits made, all the billings,

14　all the --

15　A.　All of that was in effect and we were operating under

16　that structure for over a year.

17　Q.　Okay.  And that's what you explained to them?

18　A.　Yes.

19　　　　MR. PECK:  Now, so I want to offer, file and

20　introduce Exhibit 3 if I haven't done it already.  And I

21　think --

22　　　　THE COURT:  Do you have any objection,

23　Mr. Waguespack?

24　　　　MR. WAGUESPACK:  Your Honor, the objection would

25　be it's just precautionary that the document can't

1  contravene --

2        MR. PECK:  Can't what?

3        MR. WAGUESPACK:  -- the written loan documents.

4  It's inadmissible under 611.22.  It's inadmissible under

5  D'Oench Duhme.

6        If he wants to put it in to establish the good

7  faith, perhaps mistaken of the Debtor, I guess it can go in.

8  But it clearly can't -- it's not admissible for anything with

9  respect to the rights of the parties that are established by

10 the loan documents.

11        And that's not only under D'Oench Duhme, it's

12 611.22, which is the statute under Louisiana that requires

13 that all agreements between a bank and the borrower would be

14 not only in writing, but also signed and executed by the

15 parties.

16        MR. PECK:  That's fine, Your Honor.  But we have

17 here, this is what we have different.  D'Oench Duhme is

18 between Iberia, FDIC and all -- all the parties no obligors,

19 okay?  I got that.  And all of the things between obligors

20 under Louisiana law, we're talking about the Seatran-Guice,

21 the Seatran relationship and who owns it.  That's very

22 relevant.  You can't use that.

23        We're talking about you have no rights to that,

24 okay?  You have no UCC for that.  This is very important.

25 This bank literally did not take a UCC security agreement,

1   did not have Seatran enter into a guaranty, and that's very

2   relevant to the fact they don't have any rights to these

3   monies, and they passed on that.  That has nothing to do with

4   the --

5          THE COURT:  Here's how I see the issue.  The loan

6   documents are between whoever they are between.  I understand

7   this to be part of the bank's trying to get their

8   documentation together, but however they may have decided to

9   require the --

10         And you can correct me if I'm wrong, Mr. Waguespack.

11         But I see this as being that they went through this

12   process and then whatever -- or however they interpreted this,

13   the bank officers, they ultimately prepared a bank document,

14   you know, prepared the documents in this case to be signed

15   and they are what they are.

16         MR. WAGUESPACK:  The document really hurts them,

17   actually.

18         MR. PECK:  No --

19         MR. WAGUESPACK:  I mean that's the truth of the

20   matter, because they are making assurances to the bank:  You

21   don't need this because all the -- we're just a co-op, we're

22   just a manager.  All the money goes down to the vessel

23   owners.

24         So it's -- that's what's so maddening about the

25   document.

1          MR. PECK:  I think --

2          MR. WAGUESPACK:  So, if they want to -- I don't

3   mind it being in --

4          THE COURT:  Well, now you're arguing to me, and I'm

5   going to give you a chance to follow up with this.

6          MR. WAGUESPACK:  So, I don't mind it --

7          MR. PECK:  Okay.

8          THE COURT:  But for purposes of our evidence right

9   here --

10         MR. WAGUESPACK:  I don't mind it coming in if they

11  want to say that that's what he was thinking or whatever.

12  But what -- I just want to make clear on the record from an

13  evidentiary perspective, you can't contravene a loan

14  document.  It's -- you cannot establish the relationship

15  between my client and the mortgagor and its security

16  interest.  It cannot affect that.

17         So, to the extent that some --

18         THE COURT:  That's kind of how I see it.

19         MR. WAGUESPACK:  So --

20         THE COURT:  You know, I've got the loan documents

21  themselves.  I've got this kind of explaining why the bank

22  may have documented it the way they documented it.  But the

23  loan documents are the loan documents.

24         MR. PECK:  Right.

25         MR. DRAPER:  Your Honor, let me raise one other

1  thing.  What Mr. Waguespack fails to grasp also is I don't

2  think that D'Oench Duhme or the statute he cites either A,

3  grants the security interest or -- with respect to Seatran

4  assets, or if I didn't grant the security interest, it

5  doesn't supply the security interest.

6         And as this Court is well aware, it doesn't supply

7  confection issues either.  It doesn't -- the loan documents

8  are what they are.  They may be perfected.  They only attach

9  to what they attach to.

10        The second --

11        THE COURT:  We're not really arguing about that,

12  are we?

13        MR. WAGUESPACK:  No.

14        MR. DRAPER:  No.  Okay.

15        THE COURT:  Okay.  I'm not interpreting that way.

16  I've got loan documents that grant a security -- a mortgage

17  on Mr. Steven.  I've got UCCs given to FNBC by Mr. Steven.

18        MR. DRAPER:  Right.

19        THE COURT:  And I know what those documents -- this

20  is documentation that may go to why the bank did what they

21  did.

22        MR. PECK:  Right.

23        THE COURT:  You know, and that's -- I'll let you

24  parties argue that to me when we're finished here.  I'm not

25  admitting it to bury any loan document.

1          MR. WAGUESPACK:  Thank you Your Honor.

2          THE COURT:  I don't think you're asking me to do

3    that.

4          MR. PECK:  No.

5          THE COURT:  And I think that's what you want to

6    make sure I'm not doing, and that's my understanding --

7          MR. PECK:  We're not asking you to bury any loan

8    documents.  We're explaining why they didn't do that, and

9    they don't have it, okay?

10          THE COURT:  And I'm going to let the parties argue

11    about the legal significance of that, but I think I have

12    addressed --

13          MR. WAGUESPACK:  You have.  Thank you Your Honor.

14          THE COURT:  Your concern is that you don't want me

15    to say that this is somehow a --

16          MR. WAGUESPACK:  I don't --

17          THE COURT:  I mean, I used to be a bank's lawyer.

18    I kind of understand how this works, you know.  But I know

19    what this is meant to be, and I think I'm addressing you and

20    I think I'm addressing you, and I think we're all on the

21    same page.

22          MR. WAGUESPACK:  Thank you Your Honor.

23          THE COURT:  But I want to make sure everybody feels

24    like they are.

25          Mr. Draper?

1          MR. DRAPER:  One point:  This also goes to the

2    good faith of Mr. Steven in terms of how it operated and its

3    method of doing business, so.

4          THE COURT:  When we get finished here I'm going to

5    let everyone sum all of this up.

6          MR. DRAPER:  That's -- that's fine.

7          THE COURT:  And I understand that.

8          MR. PECK:  Your Honor --

9          THE COURT:  I'm going to let this come in as

10   Seatran Number 3.

11         MR. PECK:  And just what I said earlier:  Let

12   evidence and documents speak for themselves instead of --

13   (inaudible; not speaking near the microphone.)

14         I just -- I'm trying to walk through this --

15         THE COURT:  All right, Mr. Peck.

16         MR. PECK:  -- to show it was disclosed.

17         THE COURT:  Let's not be argumentative here.

18         MR. PECK:  Okay.  Yeah, I understand, Your Honor.

19         THE COURT:  Let's just get the facts on the record.

20         MR. PECK:  I understand.

21   BY MR. PECK:

22   Q.   Well during these meetings and all, what if anything did

23   you tell them about the structure of an arrangement and

24   arrangements done?

25   A.   The meetings with First NBC?

1   Q.   The meetings with First NBC.

2   A.   You're asking me what I explained as far as the

3   structure of --

4   Q.   Yeah, right.

5   A.   -- Seatran?

6   Q.   Right.

7   A.   I mean I had that chart, that corporate chart and we sat

8   down and went through the whole deal and explained that all

9   of the vessels operated under a vessel operating agreement,

10  and that the, you know, Seatran was the company that had all

11  the master time charters and Seatran was the company that

12  would invoice the oil companies and collect its money and pay

13  it down to the boat companies, and then invoice the boat

14  companies to pay back all of the operating expenses.

15  Q.   What if anything did you tell them about the flow of

16  funds?  Was that a part of the flow of funds you explained to

17  them?

18  A.   Yes.

19  Q.   Okay.  How many meetings did you have with them?

20  A.   At least three that lasted probably two hours each at

21  their office in Kenner --

22  Q.   How many phone --

23  A.   -- Louisiana.

24  Q.   How many phone conversations did you have with them?

25  A.   Well, numerous.  I mean you can see the process went

1  on.  Some of these e-mails are from early in the year and

2  the loan was finally concluded I think in October.  So, it

3  went on for several months.

4  Q.    Who is Ashton Ryan?

5  A.    He is the chairman of First NBC Bank.

6  Q.    Was he present at any meeting?

7  A.    Yes, he was in one meeting.

8  Q.    Okay.  And was it -- was the flow of funds discussed

9  with him, or not?

10  A.    I'm not sure if we discussed it in the meeting with

11  Ashton Ryan.

12  Q.   I believe the vessel operating agreement went in as, I

13  think, Number 14.

14          THE COURT:  Let me double check.

15          MR. PECK:  I'll offer and file and introduce it in

16  my case as Exhibit --

17          What am I at?  Four?

18          THE CLERK:  Exhibit 14 is the Guice charter.

19          THE COURT:  The vessel operating agreement --

20          MR. PECK:  That's the one that -- the ones that

21  I've dated October 2nd.

22          THE COURT:  Well, I've got -- I know which document

23  we're talking about.

24          MR. PECK:  All right.

25          THE COURT:  I'm trying to find my note where I

1  wrote down the --

2          MR. PECK:  I thought it was 14.

3  BY MR. PECK:

4  Q.   Mr. Tizzard, you have it in front of you, don't you?

5  A.   Which one?

6          THE COURT:  Exhibit 14 is the Guice charter.  That's

7  Exhibit 14.  I'm thinking it's Exhibit 16.

8          MR. PECK:  Well, it's Exhibit 16, the October --

9          THE COURT:  No, I'm sorry.  That's an e-mail

10  exchange also.  Exhibit 17 is the vessel operating agreement.

11          MR. PECK:  Okay.  I'm going to offer, file and

12  introduce it in my case as Exhibit 4.

13          THE COURT:  It's the same document?

14          MR. PECK:  The same document.

15          THE COURT:  Okay.

16  BY MR. PECK:

17  Q.   Comparing this exhibit to the one on October 2nd with the

18  unexecuted on July 1; what difference was there between those

19  two documents?

20  A.   (Witness examines document.)

21      There was minimal changes.

22  Q.   Okay.  Was this document the one that -- was this the

23  way the parties were operating for all of those couple of

24  years,  as if the 2014 was in effect?

25  A.   That's the one with KKR at the top?

1  Q.   Yes.

2  A.   Or KKJ?

3  Q.   Yes.

4  A.   Yes.

5  Q.   Okay.  Now, this document was executed on October 2nd.

6  What if anything had you been doing on this document prior to

7  that?

8  A.   Well, I first got a copy of it out of the one with the

9  KKJ version of it probably in late August, and I went through

10  it to make sure everything was still the way we wanted to do

11  things, and then I reviewed it with Blake.

12       And then, eventually sent it down to Adams and Reese for

13  their review, and that's when they injected the -- suggested

14  we put the intervention section in it to have each of the

15  vessel owning entities become a party or acknowledge the

16  agreement.

17  Q.   Now, whose idea was it to go forward with that vessel

18  operating agreement?  Why was it done?

19  A.   Well, in June or July Captain Elliott became aware of

20  some of the financial difficulties a portion of the Iberia

21  Marine fleet was getting into, and he suggested that it was

22  probably time -- because everybody got so busy after 2014

23  with Comar being part of the group and then they kept

24  fighting us on everything, and then they finally dropped out

25  and we had to settle with them.  And everybody was involved

1    in a whole bunch of stuff and we never got around to

2    actually executing the document.

3        And he thought with the financial difficulties some of

4    the Iberia boats was getting into, that it was probably time

5    that we go ahead and formally document the agreement that we

6    were operating under.

7    Q.    Who was Captain Elliott with?

8    A.    Texas Crewboats.

9    Q.    He was an owner --

10   A.    He was 50 percent owner of Seatran at the time.

11   Q.    That was the non-Miguez company?

12   A.    That's correct.

13   Q.    Okay.  Well, let me hand you a document I'm going to

14   mark as Exhibit 5.

15   A.    (Witness examines document.)

16   Q.    This is a series of e-mails.  Why don't you describe

17   this to the Court, what these e-mails are?

18            MR. WAGUESPACK:  Do you have a copy?

19            MR. PECK:  I'm sorry David.

20   BY MR. PECK:

21   Q.    Let's start with the first one.

22   A.    (Witness examines document.)

23   Q.    What is this?

24   A.    It's an e-mail to Blake Miguez with a copy of the vessel

25   operating agreement where he and I had met a day earlier, and

1   he suggested we put several small changes into the

2   agreement.  So I incorporated them and then produced a new

3   draft.

4   Q.   And go to the next to the last sentence, it talked about

5   prepare one for Texas Crewboat fleet.  What was that about?

6   A.   Well, once we came up with the final draft between Blake

7   and I, we were going to prepare one in the name of Texas

8   Crewboats and send it to Elliott Cundieff for him to review

9   and execute.

10  Q.   Was that in fact done?

11  A.   Yeah, I sent it off and he reviewed it.  I think he came

12  up with a couple of minor tweaks to the agreement, and then

13  he agreed to it.

14  Q.   Okay.  And the next e-mail of Exhibit 5, from you to

15  Blake; what's that about, about changes?

16  A.   (Witness examines document.)

17       Oh, that was only to where I had sent it to Blake one

18  time and I sent it a second time --

19  Q.   Okay.

20  A.   -- because I don't know if he could find the first

21  one --

22  Q.   Okay.

23  A.   -- when I had sent it over.

24  Q.   Well, the third page is to -- is that from you to

25  Elliott; what's that on September 11th?  What is that about?

1  A.   (Witness examines document.)

2       That's when I drafted up the agreement that we were

3  going to use for Texas Crewboats, I sent it over to Captain

4  Elliott --

5  Q.   What about --

6  A.   -- for him to review.

7  Q.   What about the rate of $1,500 for stacked vessels?  What

8  was that about?

9  A.   (Witness examines document.)

10      Well, in the -- when we first started the vessel

11 operating agreement in 2014, we set the fixed monthly fee for

12 stacked vessels at $3,650 and there was some discussions

13 whether that was excessive based on were they getting a fair

14 portion of the total overhead for stacked vessels or should

15 they pay less?

16      And at some point we agreed to reduce it -- or the

17 owners of Seatran agreed to reduce the fee for stacked

18 vessels down  to $1,500, and effective the 1st of 2018.

19 Q.   And then what --

20 A.   And that's at the time they also agreed that the

21 Mr. Steven should be treated as if it was a stacked vessel in

22 the same category since it was under a bareboat charter.

23 Q.   And what about the last e-mail?

24 A.   (Witness examines document.)

25 Q.   What's that one, from Exhibit 5?

1  A.   Yeah, that's when I sent Elliott a revised agreement

2  incorporating some small changes that he wanted to the

3  agreement.  That was on September 24th.

4  Q.   So it was sometime between mid to late August, prior to

5  October 2nd, that you were working on this document and

6  negotiating -- and working on it with the other party to

7  it?

8  A.   That's --

9  Q.   Texas Crewboats?

10 A.   That's correct.  And that's where my comment came from,

11 "It happened when it happened," is because we were working

12 on it for a couple of months and it so happened to come to a

13 conclusion on that date to allow us to execute it.

14 Q.   Okay.  And you signed the -- I don't need to go through

15 this.  You signed the bareboat charter, okay?

16 A.   Yes.

17         MR. PECK:  Your Honor, I'd offer the bareboat

18 charter in, but it has already been put in evidence.  All

19 right.

20         THE COURT:  It will be Seatran 6?

21         MR. PECK:  Yes.

22         THE COURT:  And that was previously Exhibit --

23         MR. PECK:  Yes.

24         THE COURT:  -- 14, I believe.

25         THE CLERK:  Guice?

1          MR. PECK:  If I could make that Exhibit 6, the

2    bareboat charter.

3          THE CLERK:  Guice?

4          MR. PECK:  And those were my better copies that I

5    gave you.

6          THE CLERK:  All right.

7          THE COURT:  And we'll have that as Exhibit 6,

8    Seatran Exhibit 6.

9          MR. PECK:  All right.

10         THE COURT:  And that's the one we called the Guice

11   bareboat charter, the Guice charter.

12         MR. PECK:  And then we have -- excuse me.

13   BY MR. PECK:

14   Q.   Next, I'm going to hand you a document that --

15        What is this document, sir?

16   A.   (Witness examines document.)

17   Q.   Is this -- you've seen this earlier, have you not?

18   A.   Yes.

19   Q.   And what is your understanding when it says "same terms

20   and conditions apply"?

21   A.   That all of the terms and conditions of the previously

22   executed BIMCO agreement --

23         MR. WAGUESPACK:  Your Honor, just an objection.

24   He's neither the sender nor the receiver of the e-mail.  I

25   would object as to the relevance.

1        THE COURT:  Well, they did word that as though
2   this is his e-mail.
3        MR. PECK:  I know.  But he was asked about it by
4   counsel.  He was cross-examined on this, from this document.
5   And I think he introduced it, so I mean, he can't have him --
6   and he was cross-examined on this document by --
7        MR. WAGUESPACK:  No, I simply asked him --
8        THE COURT:  But you -- but you asked him:  What did
9   you mean by this?  But he didn't prepare this document.
10       MR. WAGUESPACK:  I asked what his understanding
11  was.
12       THE COURT:  You asked the question --
13       MR. PECK:  Okay, okay.
14       THE COURT:  -- as though he prepared this document.
15  He did not prepare the document.
16       MR. PECK:  Okay, but let me just ask this --
17       THE COURT:  That's -- I think --
18       MR. PECK:  Okay, understood.
19  BY MR. PECK:
20  Q.   Have you see this before?
21  A.   (Witness examines document.)
22       Yes.
23  Q.   Was this part of the business records of Seatran?
24  A.   Yes.
25  Q.   Okay.  And are you a custodian of this record?

```
 1  A.    Yes.

 2  Q.    And were you involved in the extension of the charter?

 3  A.    No, that was handled between Nathan Guice and --

 4  Q.    Okay.

 5  A.    -- Blake Miguez.

 6         MR. PECK:  And we have Mr. Miguez here, Your Honor.

 7  We'll give it a -- I'll move on.

 8         THE COURT:  Anything further Mr. Peck?

 9         MR. PECK:  Yes, I have some more.

10  BY MR. PECK:

11  Q.    Now, of all of the -- well, Seatran's manages the

12  fleets.  Tell the Court what the MTC is, or master term

13  charter?  What are they?

14  A.    It's the agreement that's executed between a boat

15  company and an oil company that identifies all the general

16  terms and conditions of when a boat company is going to

17  charter a boat to the oil company.  And then you -- you put

18  that in place as a master agreement and then anytime you

19  charter a boat, then you just do an exhibit to it, and it

20  makes it a lot simpler, rather than having to execute a full

21  time charter each time you charter a boat to them.

22  Q.    Does each vessel have its own master time charter or

23  does Seatran?  Are they all in the name of Seatran?  How

24  does that work?

25  A.    They are all between Seatran and the customers.
```

1  Q.  How many master time charters are there?

2  A.  Right now about 70.

3  Q.  Now, there was a much debate made about the Mr. Steven

4  going on charter and not much was done.  But how much money

5  did Seatran have to put out prior to the vessel going on

6  charter?

7  A.  That was close to $300,000 in various engine servicing

8  and making sure the boat was in full tip-top condition before

9  we put it on charter with Guice.

10  Q.  And who -- and prior to that, what was Mr. Steven doing

11  before it went under the bareboat?

12  A.  It was available for charter in the market, and there

13  wasn't a very good market during 2016 and '17, so we worked

14  it as best we could.  But it generally lost money every

15  month after all the operating costs.

16  Q.  So prior to the bareboat, it was unprofitable for a

17  period?

18  A.  I think -- I looked at it for 2015 -- I mean for 2016

19  and 2017, up to the bareboat charter commencing and it might

20  have had about a half a million dollars operating loss --

21  Q.  Okay.

22  A.  -- for each of those periods.

23  Q.  So, but who supported that vessel in terms of the

24  $300,000 to get it outfitted and all its losses?  Where did

25  the money come from to do that?

1  A.   Well, we used the money from the other vessels that

2  were under Iberia Marine Service that Steve owned, and the

3  cash that Seatran had accumulated from the various deposits

4  and all, it was you know, helping support it.

5      And then, Steve Miguez had to inject quite a bit of cash

6  himself to keep the vessels going.

7  Q.   How much money personally do you know Mr. Miguez

8  injected into the companies to keep it -- to keep them

9  going?

10 A.   I don't have the exact amount, but I think in two

11 different injections, it probably totaled some two and a half

12 million dollars that he put in, his personal money, into the

13 boat company to help support the operations.

14 Q.   So the idea of having a fleet of boats, each boat

15 supports each other; is that -- what -- help, explain how

16 this works with the boats.

17 A.   No, with his portfolio, with his eight boats, some boats

18 do well, other ones are stacked, other ones might lose money

19 because they had excessive repair costs and we just operate

20 them basically as one, you know, one source of cash or lack

21 of cash.

22 Q.   What involvement have you had, Mr. Tizzard, personally

23 in the formulation of a plan of reorganization for the

24 Debtors?

25 A.   I've been involved a pretty good extent along with Blake

1   Miguez.

2   Q.    Okay.

3   A.    And Steve Miguez.

4   Q.    And have you worked up any projections for the Debtors

5   in terms of pro formas for a plan of reorganization?

6   A.    Yes.

7   Q.    Okay.

8           MR. PECK:  Are we on Exhibit 7?

9           THE CLERK:  Yes.  This will be Exhibit 7.

10          (Pause.)

11          MR. PECK:  Your Honor, due to the quick nature of

12   this trial, I've just got these pro formas.  I didn't have a

13   chance to copy them.

14          Would you have an extra copy of this?

15          MR. DRAPER:  Yes.  He has it in the second chair.

16          MR. PECK:  All right.  I need a second -- as

17   you can probably tell I'm taking very good notes of, you

18   know.

19          MR. WAGUESPACK:  I think I've seen this before.

20          MR. PECK:  Okay.  Have we got an extra one?  Okay.

21          Exhibit 7.

22   BY MR. PECK:

23   Q.    Tell the Court what these --

24          MR. PECK:  Excuse me.  Are you ready, Judge?

25          THE COURT:  Yes.

1  BY MR. PECK:

2  Q.   Tell the Court what these -- what this Exhibit 7 is.

3  A.   (Witness examines document.)

4       Based on the current charters of the different vessels

5  involved, and again, it's not just the Mr. Steven, it's all

6  eight boats that are involved on the Summit debt that are

7  owned by Steve Miguez.

8  Q.   These are all in Chapter 11?

9  A.   Right, all of them are going in.

10      So, we looked at it on a combined basis, all eight boats

11  including the three that are stacked.  And based on the cost

12  of living incurred over the last several years and the

13  current charters that we have for the boats, I came up with a

14  set of projections under different scenarios.

15      One is if -- if we continue with current market

16  conditions and current day rates and the expenses that we've

17  been incurring over the last few years, what level of

18  operating income would the eight boats produce on a combined

19  basis?

20      And then I also said:  Well, if we just reduce the

21  revenues by five percent off of the current market, what

22  would that look like?  And then different levels of an

23  improved market, to where the most optimistic projection

24  would be improved market three, and that would be kind of

25  back to the level of market conditions that we had back in

1  2013 and 2014.

2  Q.   What did you figure of the monthly payment to the Summit

3  was?

4  A.   Based on a 20 year amortization and five percent

5  interest, the payment would be $156,000 a month.

6  Q.   Okay.  Now you say in a conservative way, you know,

7  $127,000 or $105,000 a month.  How did the Debtors propose to

8  make up that shortfall?

9  A.   We have a plan support agreement where Steve Miguez and

10 Seatran combined would agree to inject over a million dollars

11 of cash to support any shortfalls from operations.  And then

12 we also have a DIP loan agreement from Steve Miguez and

13 Seatran where they would inject up to a million dollars to

14 help support the operations to make -- if you know, to make

15 up for any shortfall.  If the boats only produced $100,000 a

16 month, we'd have that cash to make up the balance of the

17 payment to make the full $156,000 payment.

18      But in a lot of cases, all you need is the slightest

19 improvement in the market and the boats would be able to

20 support the loan payments themselves.  We've actually put

21 together several attractive charters on some of these boats

22 in recent months, and it gives us a lot more confidence that

23 you know, we can make the payments.

24 Q.   I want to hand you a document that has been titled Plan

25 Support Agreement.

1  A.    (Witness complies.)

2  Q.    And have you take a look at that.

3  A.    (Witness examines document.)

4  Q.    What document -- describe this document to the Court.

5  A.    That is what you just referred to as a Plan Support

6  Agreement.

7  Q.    Uh-huh.

8  A.    Where Seatran and Steve Miguez jointly agreed to support

9  the reorganization plan.

10  Q.    Okay.  And you signed it -- did you sign this document?

11  A.    (Witness examines document.)

12        I signed it on behalf of Seatran Marine.

13  Q.    And who signed it on behalf of all of the Debtors?

14  A.    Steve Miguez as their manager.

15  Q.    And he signed it personally, as a plan sponsor?

16  A.    Yeah, he signed it as a plan sponsor also.

17  Q.    Now, it makes a mention of the CCF accounts.  Why don't

18  you explain that to the Court?  It makes a mention of that.

19  A.    Well --

20  Q.    What is a CCF account, the Capital Construction Funds?

21  A.    Under the U.S. Maritime Administration they established

22  a program, I guess 20 years ago that's similar to a 401K plan

23  that an individual would do, to where a boat company if they

24  sold a vessel or if they were making a lot of profits, they

25  could put the money into this special CCF account without

1  paying taxes on it, and then at some future date, if they go

2  build another vessel or if they have to make principle

3  payments on a loan, they could draw down from the CCF account

4  and make those payments without paying any penalty in taxes

5  and stuff.

6  Q.   And how do you describe that, Mr. Tizzard?  What do you

7  call it, a --

8  A.   Well, in fact I would say that it was similar to a 401K

9  plan.

10  Q.   Right.

11  A.   Yes.

12  Q.   And so, how much money do you understand that both --

13  who owns Iberia Crewboats?

14  A.   Steve Miguez.

15  Q.   And Iberia Crewboats is a party to this plan support

16  agreement, correct?

17  A.   Correct.

18  Q.   Now, how much -- your understanding; we have some

19  documents of this, but what's your -- and I'm getting someone

20  else to introduce it.  But tell the Court generally how much

21  you recall is in the Steve Miguez CCF fund account?

22  A.   He has approximately $2.2 million in his CCF account.

23  Q.   How about Iberia Crewboats?  How much do they have in

24  their account, approximately?

25  A.   About $1.6 million.

1  Q.   Okay.  And Iberia Marine has an account too, does it

2  not?

3  A.   Around five -- $5,000.

4  Q.   Okay.  And those funds can be used -- what's your

5  understanding as to the use of those funds for payment of

6  principle payments on a vessel?

7  A.   That's one of the uses of the funds without having to

8  pay any kind of penalties as you can make principle payments

9  under a loan.

10  Q.   What penalties would happen if we just took them out and

11  went to the casino or some creditor sees them and they came

12  out; what is your understanding of penalties there?

13  A.   I don't know the exact formulas, but I know it's pretty

14  severe in the amount of the penalty and the taxes you would

15  have to pay at the time.

16  Q.   Other than the CCF fund, what other financial support is

17  going to be provided by Seatran's Mr. Miguez under this plan

18  support agreement?

19  A.   They will deposit $250,000 -- between the two of them,

20  $250,000 when the plan is confirmed, and then put in

21  additional funds each year.

22  Q.   And two -- how much?  $200,000?

23  A.   Yeah, $200,000 per year.

24  Q.   So that's a million 250,000 dollar monies commitment,

25  correct?

1  A.   That they would inject and have sitting in a bank

2  account for use by these entities if needed.

3              MR. PECK:  And let me offer, file and introduce the

4  pro forma prepared by Mr. Tizzard as Exhibit 7.

5              And I believe the Plan Support Agreement is Exhibit

6  8.

7              THE COURT:  Any objection?

8              MR. WAGUESPACK:  I haven't seen them before today,

9  Your Honor, but that's fine.

10              MR. PECK:  We sent them to you last night.

11              THE COURT:  Well, we'll accept them as Exhibits 7

12  and 8.

13  BY MR. PECK:

14  Q.   And these documents were going to -- are the basis for

15  them to do a plan of reorganization for all the companies?

16  A.   That's correct.

17  Q.   And how will the claim of SBN be treated?  Are you going

18  to take --

19  A.   No, we're going to propose to pay them 100 cents on the

20  dollar of their money.

21  Q.   Okay.  Did you believe after joining these pro formas

22  and working on this; what did you believe -- and with the

23  plan support, what do you believe?  Well, can this be

24  accomplished or not?

25  A.   There's a very high probability based on -- I mean

1    recently, the market has improved over the last year, you

2    probably follow the market, to where in 2016 the price of oil

3    was at $26 a barrel and the market was really bad.

4        Over the last year the price of oil has been trading

5    around $70 a barrel and most of our customer base have --

6    they have a lot more cash to do projects.  And in addition to

7    the Mr. Steven being on this good charter with $100,000 a

8    month, we have three of the other vessels that are -- one

9    just commenced a yearlong guaranteed charter with a major oil

10   company, just didn't last two months.

11       Another one assumed a production job that's been in

12   effect for several years, that another vessel in the Seatran

13   fleet was on, but that vessel left and went to go do a

14   passenger service in Puerto Rico and it opened up the job,

15   this production job.  So we put one of Steve's boats on that

16   job, and the we have a third one that has been on a drilling

17   job that's projected to go on.

18       So we have four of the boats -- four of the eight boats

19   that have nice, steady jobs at this time.  And the three

20   stacked boats, we have their costs down less than $10,000 a

21   month on each boat, and really down to $5,000, which is just

22   their ST&A allocation and their port risk insurance, so we

23   have the -- the boats that are stacked, we have their costs

24   down to a bare minimum.

25       And with these four charters, if it holds together,

1   we're confident we can you know, make the payments, as long

2   as they give us, you know, a decent amortization to pay it.

3   Q.   And if there's a shortfall, what backup do you have?

4   What -- tell the Court again, I might have asked that

5   question.

6   A.   Well again, we'll have the commitments from the DIP

7   financing and the plan sponsor agreement, the cash that's

8   going to be injected there.

9   Q.   Does that include --

10   A.   To make up for any shortfalls.

11   Q.   Does that include the almost four million dollars in

12   capital construction funds?  Right, but that includes that

13   too, right?

14   A.   Yes.

15   Q.   And real quickly, because I know the -- a lot of boats

16   have been tied up.  Do you believe they're coming back to

17   service, or is it -- has the number of boats out there,

18   supply boats, been increasing or decreasing?

19   A.   (No response.)

20   Q.   That are documented vessels?

21   A.   As far as unstacking vessels and putting them into --

22   Q.   Yes.

23   A.   -- the active fleet?

24   Q.   Well no, the ones that -- how many working vessels are

25   there?  Has it gone up or down since the last few years?

1   A.   Oh, the number of working vessels has gone up.   In fact

2   we have been able to increase the day rates on one of the

3   vessels in this package.   We went to the existing customer

4   and got a $400 per day increase in the charter hire a couple

5   of months ago because the market had improved.

6   Q.   That's what I'm trying to talk about.   The whole entire

7   market --

8   A.   Yeah.

9   Q.   Are there more vessels or less vessels capable of

10  working out there to compete with you, since the last two

11  years?   Has it gone up or gone down, the numbers -- the

12  competitors out there?   Are they --

13  A.   Well, I mean some of the competitors have gone away.   I

14  mean they, you know, filed bankruptcy or stacked their fleet

15  and they don't have the cash to reactivate their fleet.   So,

16  it's a combination of improved activity and a reduction in

17  the number of available vessels to compete in the market.

18      I mean these are all aluminum hull crewboats from 135

19  foot to 205 foot, and the total fleet in the Gulf of Mexico

20  is probably 270 vessels, but it's diminishing all the time

21  with vessels being sold foreign or being stacked and

22  operators having to stack them, because they don't have money

23  to operate on.

24      So, the balance of demand and supply is correcting

25  itself.   It's something that I'm not -- I don't want to be

1   optimistic about it like we're in boom times, but it's --

2   the market has improved.

3           MR. PECK:  Let me consult with Mr. Draper.

4       (Pause.)

5           MR. PECK:  Just Your Honor, I want to clean up.  I

6   just remembered, I want to clean up some stuff, just as if we

7   were redirect, because on the cross with Mr. Tizzard, I had

8   some things I just wanted to clean up.

9   BY MR. PECK:

10  Q.   Now, with respect to where the vessel went from the Gulf

11  of Mexico then to Los Angeles; did the parties orally modify

12  to allow it to go to Los Angeles?  Did Guice come to you and

13  say:  Yeah, we can go to Los Angeles?

14  A.   I mean they advised us the boat was being relocated.

15  Q.   Did you have any problem with that?

16  A.   No.

17  Q.   Not to be cute, but Los Angeles does not create any more

18  risk with insurance problems, does it?

19  A.   No, it doesn't.

20  Q.   Okay.  So it's within the United States' waters, right?

21  A.   Correct.

22  Q.   And tell the Court what the boat is doing in Los Angeles,

23  as if it's really being --

24  A.   They --

25  Q.   Tell the Court what it's doing?

1   A.   It kind of sits at the dock most of the time.

2   Q.   Right.

3   A.   And the use on the machinery or any other system is very

4   minimal.  The don't -- I mean it runs out and runs sea trials

5   every now and then, but a typical crewboat in the Gulf of

6   Mexico would be working ten hours every day, putting hours on

7   the machinery and wear and tear on the boat.  Where the one

8   in Los Angeles you know, it on -- it sits at the dock most of

9   the time, so.

10  Q.   Well Mr. Waguespack thought it was at great risk, but

11  what kind of risk is it sitting at the dock?  What do you

12  understand the risks to the vessel right now?

13  A.   Yeah, I mean it's a minimal risk.  And they only go out

14  to attempt to catch a fairing maybe once every four or five

15  months or something.  I mean it's not like they out there

16  running around a lot.  I mean the boat primarily sits at the

17  dock.

18       MR. WAGUESPACK:  Your Honor, I'm going to object.

19  He testified earlier --

20       Well, never mind, strike that.

21   (Pause.)

22       MR. PECK:  I'm just checking my notes, Your Honor.

23  I'm almost done.

24   (Pause.)

25       MR. PECK:  Okay.  Mr. Tizzard, Mr. Draper may have

1  some questions.  I'm done now.

2      MR. DRAPER:  Your Honor, may we take a ten minute

3  break for two reasons:  One, I can consult with Mr. Peck so I

4  can figure out if I'm going to ask anything else.  And that

5  way we may --

6      THE COURT:  Do the parties agree to a ten minute

7  recess?

8      MR. WAGUESPACK:  That's fine Your Honor.

9      THE COURT:  We'll be in recess --

10     MR. DRAPER:  Thank you.

11     THE COURT:  -- for approximately ten minutes.

12     **(Recess from 4:50 p.m. to 5:07 p.m.)**

13     THE COURT:  You may proceed.

14     MR. DRAPER:  Mr. Waguespack, Mr. Peck and I are

15  second chairs.  Do you have a list of the documents and the

16  numbers that have been introduced, or could we go through

17  them so that --

18     MR. PECK:  Before we leave.

19     MR. DRAPER:  Before we leave.

20     MR. PECK:  Yes.

21     THE COURT:  Mr. Waguespack, do you want --

22     Are you just talking about Seatran's or are you

23  talking about all of the documents?

24     MR. DRAPER:  No, Seatran's.  Just Seatran's.

25     THE COURT:  Okay.

1          MR. DRAPER:  And just for the purposes of the

2     record, those are also part of the Debtor's record for the

3     stay-lift also.  We are trying both --

4          THE COURT:  Right.  This would be for both matters.

5     I think we're pretty clear on that.

6          MR. DRAPER:  Yes.

7          THE COURT:  And all of the evidence is on both of

8     the matters before --

9          MR. DRAPER:  And now, so I'm just saying the

10    Seatran exhibits are also Debtor exhibits.

11         THE COURT:  I'm sorry.  I understand what you're

12    saying.  I'm sorry.  I've got it.  It's getting a little

13    late, but I understand, Mr. Draper.  I'm sorry, yes.

14         MR. DRAPER:  No, that's okay.

15         THE COURT:  They are considered Seatran and Debtor

16    exhibits.  And I don't think there's any objection to that,

17    so that's --

18         MR. PECK:  Yeah, we're going to talk to you about

19    making sure we've got the list right.

20         THE COURT:  Okay.  I've Seatran Number 1 as the --

21    do you want me to go through it with my notes and I can be

22    corrected if I'm wrong?

23         MR. PECK:  Thank you Judge, just -- we're not --

24    we're horrible second chairs for each other, so we've got to

25    have some help here.

1          MR. DRAPER:  It's bad enough we have to --

2          THE COURT:  Seatran Number 1 is the vessel

3   operating agreement with the KKJ --

4          MR. PECK:  Yeah.

5          THE COURT:  -- initials on the top.

6          MR. PECK:  Yes, Your Honor.

7          THE COURT:  Seatran Number 2 is a series of

8   e-mails.  I think the very first one was dated July 30th.

9   You kind of gave them to me in batches, but I've got a fairly

10  extensive -- actually, the first one is labeled Number 2 and

11  it's dated July 2nd and I attached some of the other ones you

12  gave me to the rear of that.

13         MR. PECK:  Okay.  Thank you Your Honor.

14         THE COURT:  But there was a series of e-mails.  I

15  don't know if you identified them, and you know, we may want

16  to go through each one of them to make sure we've got every

17  one you had in this batch.

18         MR. PECK:  Okay.  We'll --

19         THE COURT:  But I have that as Exhibit Number --

20  Seatran Number 2.

21         MR. PECK:  Exhibit 3 should be the series of

22  e-mails.

23         THE COURT:  Seatran Number 3, let's see.

24         MR. PECK:  I think that's the e-mails for the bank.

25         THE COURT:  That's the one that --

1          MR. DRAPER:  Five pages with the last page being a
2    chart.

3          MR. PECK:  Is that what you --

4          MR. DRAPER:  It has the star on the first page.

5          THE COURT:  Actually, it's the one -- it's the one
6    that has the organizational exhibits.

7          MR. PECK:  Right, that's it.

8          MR. DRAPER:  That's it.

9          MR. PECK:  That's Exhibit 3.

10         THE COURT:  And did you say chart?  I thought you
11   said charter, I'm sorry.

12         MR. DRAPER:  I said --

13         THE COURT:  You said chart?

14         MR. DRAPER:  Yes.

15         THE COURT:  Okay, I'm sorry.

16         MR. PECK:  And then Exhibit 4 should be the vessel
17   operating agreement that was their document too?

18         THE COURT:  Yes, Exhibit Number 4 is also Exhibit
19   Number 17 for the movant.

20         MR. PECK:  And then we've got --

21         THE COURT:  Seatran Exhibit 5 is e-mail --

22         MR. PECK:  Yes, a series of e-mails to -- that was
23   the ones that were done on August 29th.  There's five.

24         THE COURT:  Let me make sure I've got my copy of
25   that.

1    (Pause.)

2         MR. PECK:  We apologize Your Honor.

3         THE COURT:  Yes, Seatran Number 5, I do have it.

4    It's labeled Seatran Number 5.  It's a series of e-mails with

5    the top one being dated August 29th.

6         MR. DRAPER:  Correct.

7         MR. PECK:  Exhibit 6 is the bareboat charter for --

8    (inaudible; not speaking near a microphone.)

9         THE COURT:  And which is Exhibit, I think, 16 --

10        THE CLERK:  Exhibit 14.

11        THE COURT:  Exhibit 14, I'm sorry.  It's Exhibit 14

12   for the movant.

13        MR. PECK:  And then the --

14        THE COURT:  And then Seatran Exhibit 7, I'm a

15   little sketchy on.

16        MR. PECK:  It's the pro forma.

17        THE COURT:  That's right.  It is the pro forma.

18        MR. PECK:  And then Exhibit 8 is the plan support

19   agreement.  Okay, that's -- we've got it.

20        Thank you Judge.

21        THE COURT:  And Seatran 8 is the plan support.

22   You're right.  Pro forma and the --

23        MR. PECK:  All right, thank you Judge.  That's

24   just -- thank you so much.

25        THE COURT:  Anything further?

```
1              MR. PECK:  Yes.

2              MR. DRAPER:  I've got --

3              THE COURT:  Do you have any questions?

4              MR. DRAPER:  I have questions.

5              THE COURT:  Okay Mr. Draper.

6              MR. DRAPER:  Okay, thank you.

7                          *    *    *    *    *

8                          CROSS-EXAMINATION

9   BY MR. DRAPER:

10  Q.   How many employees does Seatran have?

11  A.   Between the office staff and the crew members, 75 at

12  this time, probably 75 to 80.

13  Q.   Right.  Now, based on your experience in this business,

14  do most businesses operate with the boat being owned by a

15  single asset or a single company, they have a management

16  company that has the employees and incurs the costs and

17  things in connection with the boat?

18  A.   That was the structure we had at Comar.  Each boat was

19  owned in a special LLC -- a separate LLC.  I'm familiar with

20  other boat companies that have the same arrangements.

21  Q.   And so it's not an untoward arrangement?

22  A.   No, it's a pretty widely used arrangement.

23  Q.   Okay.  Now, you've met the SBN loan officer, correct?

24  A.   Yes.

25  Q.   When you met with him, did he ever tell you that he
```

1   didn't want the Mr. Steven on the charter that it's on?

2   A.   No.

3   Q.   Okay.  Last question:  Look at SBN's -- Seatran's Exhibit

4   3, which is the chart on the last page.

5   A.   (Witness complies.)

6   Q.   And if you look at the line between the Iberia Crewboat

7   boats and Iberia Marine.

8   A.   (Witness examines document.)

9   Q.   Is that meant to signify that Iberia Marine has the

10  right to operate and manage what goes on with respect to the

11  Iberia Crewboat boats?

12          MR. WAGUESPACK:  Objection Your Honor, leading.

13  BY MR. DRAPER:

14  Q.   Was that meant to -- okay.

15          THE COURT:  Can you rephrase the question, please,

16  Mr. Draper?

17          MR. DRAPER:  Yeah.

18  BY MR. DRAPER:

19  Q.   Does it indicate that the -- what does it indicate with

20  respect to the charter rights that Iberia Marine has,

21  vis-à-vis the Iberia Crewboat boats?

22  A.   (Witness examines document.)

23      I don't understand.  I'm sorry.

24  Q.   Okay.  What is it meant to signify in terms of the

25  relationship of the Iberia Crewboat boats to Iberia Marine

1  and its rights vis-à-vis those boats?

2  A.   Well, it indicates those boats --

3         MR. WAGUESPACK:  Can I object?  What specific part

4  is he -- can he read the language that he's directing him

5  to?

6         MR. DRAPER:  It's -- I've asked him to what is it

7  meant to signify.  It's the --

8         MR. WAGUESPACK:  What --

9         MR. DRAPER:  It's the line between Iberia Crewboat

10 and Iberia Marine.

11        MR. WAGUESPACK:  My copy, I can't read it.  Could

12 you read it, Douglas?

13        MR. DRAPER:  Well --

14        THE COURT:  Iberia Crewboat -- you're talking about

15 -- I think the objection is well founded, only because I'm

16 having a little bit difficulty, when you say the line

17 between.  I'm not certain what you mean by line.

18        MR. DRAPER:  There's a -- if you look at the flow

19 chart, it's a --

20        THE COURT:  So you're talking about the line where

21 it says Iberia Crewboat and it has a line that goes down to

22 Mr. Blake, Mr. --

23        MR. DRAPER:  Yes.

24        THE COURT:  -- Lady Glenda, Mr. Row, Mr. Mason --

25        MR. DRAPER:  Yes.

1          THE COURT:  -- all of those --

2          MR. DRAPER:  Yes.

3          THE COURT:  -- individuals?  Those eight boats?

4          MR. DRAPER:  Yes.

5          THE COURT:  Okay.

6    BY MR. DRAPER:

7    Q.   What is that meant to signify?

8    A.   That Iberia Marine Service was functioning as the

9    management company for each of those entities.

10   Q.   So it had the right to control what the boats did?

11   A.   Right.

12   Q.   All right.  And then the line going up goes from Iberia

13   Marine Service up to Seatran?

14   A.   In addition to one coming from Comar and one coming from

15   Texas Crewboats, indicating that Seatran operated each of

16   those three entities.

17   Q.   And this was known to the bank before the mortgage was

18   placed?

19   A.   Oh, they definitely had this chart and we reviewed it in

20   detail.

21   Q.   Okay.  One last question:

22        You were part of the negotiation in the loan with FNBC,

23   correct?

24   A.   Correct.

25   Q.   How many boats granted preferred ship mortgages to

1 | secure the $23 million debt?

2 | A.   Eight.

3 | Q.   And are those boats designated on the chart here?

4 | A.   Yes, they are under Iberia Crewboat and the Marine

5 | Service.

6 | Q.   So this is not one vessel with one mortgage securing

7 | this debt; this is eight vessels with eight mortgages, all

8 | of them -- all of them $23 million securing that debt?

9 | A.   That's correct.  There's eight vessels securing the $23

10 | million debt.

11 | Q.   All right.

12 |          MR. DRAPER:  I have --

13 |          Anything else, Stewart?

14 |          MR. PECK:  No.

15 |          MR. DRAPER:  I have nothing further.

16 |          THE COURT:  Thank you Mr. Draper.

17 |                    *   *   *   *   *

18 |                    REDIRECT EXAMINATION

19 | BY MR. WAGUESPACK:

20 | Q.   Mr. Tizzard, do you have the Seatran Exhibit Number 1

21 | there in front of you?

22 | A.   Was that the vessel agreement with the KKJ on top?

23 | Q.   Right, the draft one.

24 | A.   Yes.

25 | Q.   Now, that draft agreement wasn't provided to the bank,

1  was it?

2  A.    (Witness examines document.)

3       No.

4  Q.    And there was no attornment or subordination agreement

5  with the bank that related to the vessel operating agreement,

6  was there?

7  A.    No.

8  Q.    I think that you mentioned that there were other

9  partners in Seatran?

10  A.    Yes.

11  Q.    Did you tell those other partners' banks that the

12  mortgagor did not own the revenue from their vessels?

13  A.    Well, one of the entities in Seatran, which was Comar

14  Marine, didn't have any mortgages on its vessels.  The family

15  owned the vessels.

16       Now, Texas Crewboats, they had a bank that financed its

17  fleet, but I had no interaction with that bank at all, no

18  communication.  Their loan was in effect before Seatran was

19  formed, and I had no interaction with their bank at all.

20  Q.    Okay.  And I think your testimony was that Seatran has a

21  right to offset --

22  A.    Correct.

23  Q.    -- the monies that come in?

24  A.    Right.

25  Q.    And you would do that at the Seatran level?  You would

1   just offset the revenue that comes in against various

2   expenses?

3   A.   If there was an accumulation of unpaid expenses that

4   Seatran incurred operating owner's boats that wasn't paid and

5   the receivables came into Seatran; the contract provides that

6   we could not pay the receivables down because they owed us so

7   much money coming back up.

8   Q.   And you could do that without even having to come back

9   to court?  You could just do that at Seatran, because Seatran

10  is not in bankruptcy, right?

11  A.   Correct.

12  Q.   Okay.  And if you could, take a look at Seatran Number

13  2, which is the --

14  A.   (Witness complies.)

15      I'm not sure which document that is.

16  Q.   It's the -- an e-mail.  This was the one -- the one I

17  have the first page is an e-mail from you dated July 30th,

18  2014.

19  A.   (Witness examines document.)

20          THE COURT:  Is this the one that's addressed to

21  Mr. Miguez?

22          MR. WAGUESPACK:  It's --

23          THE COURT:  To Mr. Steve Miguez?

24          MR. WAGUESPACK:  Yes.

25          MR. PECK:  This is which one, David?  I'm sorry.

1          MR. WAGUESPACK:  This is the collection of e-mails

2    from July of 2014 from Mr. Tizzard to --

3          THE WITNESS:  July 30th of '14?

4    BY MR. WAGUESPACK:

5    Q.   Yes.  Yes, sir.

6    A.   Okay.

7    Q.   These e-mails, they all predate the mortgage by more

8    than a year, right?

9    A.   Yes.

10   Q.   And at this time, these e-mails were said the

11   Mr. Steven, L.L.C. owned the vessel Mr. Steven?

12   A.   No, it has not been delivered at that point.

13   Q.   And if you could, take a look at Seatran Number 3.

14   A.   (Witness complies.)

15        Okay.

16   Q.   Is this your e-mail dated June 23rd, 2015 to Fred Beebe

17   and Michelle Buisson?

18   A.   (Witness examines document.)

19        Okay.

20   Q.   There's nowhere in this e-mail where you tell FNBC that

21   Seatran had the right to hold the receivables, is there?

22   A.   No.

23   Q.   And in fact, you told the bank, didn't you -- did you

24   not, that all vessel charters were billed to the customers

25   by Seatran, when the receivables were collected by Seatran,

1    they are funded 100 percent to the vessel owners.  Didn't

2    you tell him that?

3    A.    Correct.

4    Q.    And you also told them that Seatran was just a co-op,

5    right?

6    A.    I don't know if I used the word "co-op," but I explained

7    the structure and the reason for setting up Seatran.

8    Q.    I saw "co-op" somewhere in here.

9          Yeah.  If you'd look in Number 2, one, two, three, four

10   -- "Seatran is basically a co-op.  It was not set up to make

11   a profit."

12         Do you see that?

13   A.    (Witness examines document.)

14         Right.  That's the verbiage I used to explain that

15   Seatran was not set up to make a profit, it would incur all

16   of its overhead and allocate it out to the boats with no

17   intention of making a profit.

18   Q.    You don't --

19   A.    Other than it had certain other areas they could make a

20   small profit, but the intent was that Seatran wasn't set up

21   to make a lot of money.  It was set up just to incur the

22   overhead and allocate it down to the boats and basically

23   break even at the end of the year.

24   Q.    Just a co-op, just the manager, correct?

25   A.    Yeah, management company.  They did have when I -- there

1  was other means of making money within Seatran, like if we

2  brokered somebody else's boat or sold the boat for somebody

3  else, it could make a certain level of income, but it wasn't

4  set up to be a big profit center.

5  Q.  And you didn't tell FNBC in this e-mail anywhere that

6  any of the rights relating to the vessel had been transferred

7  to Seatran, didn't you?

8  A.  I'm sorry, repeat that.

9  Q.  You didn't tell FNBC anywhere in this e-mail that any

10  rights relating to the vessel had been transferred to Seatran,

11  did you?

12  A.  Any of the rights?

13     No, not in that e-mail.

14  Q.  And you didn't say anything in this e-mail about a vessel

15  operating agreement, did you?

16  A.  Not in that e-mail.

17  Q.  Now, I think your testimony with respect to Seatran

18  Number 4 was that Seatran Number 4, which I think were

19  e-mails relating to drafts of the vessel operating agreement

20  from August of 2018; do you remember that?

21  A.  Yes, I have it.

22  Q.  So, in August of 2018, Seatran already had notice that a

23  lender, SBN, had directed that the charter payments, the

24  monies flowing from the vessel be sent to SBN, correct?

25  A.  Yes.

1  Q.   So you re-upped your attempt to finalize the agreement

2  after that notice, correct?

3  A.   Yes.

4  Q.   And you were trying to get that agreement in place in

5  order to support your argument that SBN was not entitled to

6  the vessel from the -- the revenue from the vessel, weren't

7  you?

8  A.   We were moving to get it in place at the request of

9  Captain Elliott, that he wanted the agreement formalized and

10 finalized.

11 Q.   And I think you said it was because of the financial

12 difficulties, correct?

13 A.   He was aware of Seatran -- of Iberia's situation.  Not

14 all of the details, but he was aware that you know, they

15 might have been squabbling with the lender.

16 Q.   Did you think that that agreement would help you with

17 your position with the lender that you owned the money that

18 was derived from the vessel?

19 A.   Um --

20 Q.   You being Seatran?

21 A.   I didn't look at it that way.  It's just when Captain

22 Elliott said we should finalize it, I worked to finalize it.

23 Q.   Now, your prior testimony was that the Mr. Steven was

24 treated as a stacked vessel -- I think you talked to Mr. Peck

25 about that, remember?

1    A.    It was from a SD&A allocation that we agreed to charge

2    the Mr. Steven the same fees that stacked vessels were being

3    charged.

4    Q.    And that's because there wasn't any real services that

5    were being provided with respect to the Mr. Steven by Seatran

6    or a much reduced level of service, correct?

7    A.    It was a reduced level.

8    Q.    But that is not in the vessel operating agreement that

9    was signed on October 2nd 2018 that the Mr. Steven would be

10   treated as a stacked vessel and only incur this $1,500 a

11   month overhead charge, correct?

12   A.    No, the owners verbally agreed that they would treat the

13   Mr. Steven as if it was a stacked vessel, for those reasons,

14   Q.    And did you get Texas Crewboats to agree to that?

15   A.    Yes.

16   Q.    But nothing in writing?

17   A.    No.

18   Q.    Why didn't you all put it in the agreement?  You were

19   signing an agreement.  Why wouldn't it be in there?

20   A.    I'd have to say it was an oversight.

21   Q.    Take a look at Seatran Number 6.

22   A.    (Witness complies.)

23   Q.    Which is the Guice charter?

24   A.    (Witness examines document.)

25   Q.    Is there any provision in that charter that provides for

1  an extension of the terms of the charter?

2  A.    (Witness examines document.)

3      I don't know of any, and I'd have to read the whole

4  charter to see if there is or not.

5  Q.    I couldn't find one.   I was wondering if you knew of

6  one?

7  A.    Off the top of my head, I don't really know.   I'd have

8  to read the agreement.

9  Q.    Now, I thought I heard you say that Seatran had decided

10  to use some of the money that Seatran had that it had gotten

11  from some of the boats on the Mr. Steven's, is that correct?

12  A.    Oh yeah, over the last few years.   We treated all of the

13  boats that were under the management of Iberia Marine Service

14  to Seatran that they functioned as a group rather than an

15  individual vessel.

16  Q.    So, under your version of the vessel operating agreement

17  that exists as of today, it would be your position that if

18  money came in on account of Mr. Steven's, you could use

19  that money to service other boats that are in the fleet,

20  correct?

21  A.    Right.   And for other boats we could use its cash to

22  help support the Mr. Steven if needed.

23  Q.    Okay.   So 100 percent of the revenue wouldn't go down to

24  Iberia Marine as you talked about earlier, is that --

25  A.    Well, it would if --

1  Q.   If you didn't decide to use the money?

2  A.   -- if there was any other offsets needed.  I mean if the

3  other boats were way behind, it wouldn't necessarily go all

4  the way down.

5  Q.   But in other words, you'd like to -- I think your

6  testimony is, and tell me if I'm wrong, that you can use

7  this money to use it for repairs on another boat, correct?

8  A.   To pay, yeah, the invoicing from another boat --

9  Q.   Okay.

10  A.   -- that had a repair.

11  Q.   Okay.  And you all are doing that right now, or you

12  would do it if you had the money coming into your coffers?

13  A.   The money from the Mr. Steven?

14  Q.   Correct.

15  A.   We'd have to assess the current position and we might do

16  it.

17  Q.   Under the agreement you have the right to do it?

18  A.   Yeah.  Yes.

19  Q.   So a lot of this vessel operating agreement, as I

20  understand it, and through what Mr. Peck walked you through,

21  is really to be able to use this one entity, Seatran, to be

22  able to share expenses and the costs and have money from one

23  vessel be able to support the other vessels, is that

24  fair?

25  A.   Well, the agreement to have one vessel share on the

1  other ones was in effect before Seatran, because Iberia

2  Marine Service had vessel operating agreements with the boats

3  in place already.  And when Seatran was formed, then it was

4  between Seatran and Iberia.

5  Q.  Could you look at the vessel budget that was marked as

6  Exhibit 7?

7  A.  (Witness complies.)

8     Okay.

9  Q.  Did you help prepare this?

10  A.  (Witness examines document.)

11     I prepared it myself.

12  Q.  The second page has the day rates for a bunch of the

13  vessels, right?

14  A.  Yes.

15  Q.  Is that confidential?

16  A.  It could be.  We're asking for a lot of day rates and so

17  forth to be kept confidential.

18  Q.  Well, this just came in to evidence and it's --

19          MR. PECK:  Your Honor, I'm glad he pointed that

20  out. Let's -- can we seal this document?  I just --

21          MR. WAGUESPACK:  (Laughter.)

22          MR. PECK:  I just -- I got -- what happened was I

23  got --

24          MR. WAGUESPACK:  It's not really confidential.

25          MR. PECK:  Right before court he gave it to me.

1          MR. WAGUESPACK:  It's --

2          MR. PECK:  He gave it to me right before court.

3          MR. WAGUESPACK:  It's not confidential.

4          MR. PECK:  And I didn't have a chance to --

5          THE COURT:  Mr. Peck, is this a document that has

6  already been disclosed somewhere?

7          Mr. Waguespack, I know you've mentioned that there

8  was no --

9          MR. WAGUESPACK:  My point is none of this is

10  confidential.  It just never was confidential.  They have

11  attached the bareboat charter in the record already with the

12  day rate.

13          MR. PECK:  Well, the bareboat charter you already

14  got through discovery, so everybody in the world got it.

15          MR. DRAPER:  Your Honor, there was an understanding

16  when we were before the Court that anything that showed day

17  rates would be confidential.

18          MR. PECK:  That's right.

19          MR. WAGUESPACK:  I don't mind it being

20  confidential.  My point, Your Honor, is that it's not

21  confidential.

22          MR. DRAPER:  Yes, it --

23          MR. PECK:  Well --

24          MR. WAGUESPACK:  Otherwise they would have asked

25  for it to be marked confidential.

1          MR. PECK:  Well, we understand that everything we

2     put on day rates, David, would be confidential.

3          MR. WAGUESPACK:  All right, well --

4          MR. PECK:  And so, I should have said it was under

5     seal.

6          MR. WAGUESPACK:  All right.

7          MR. PECK:  I thought that was our understanding.

8          THE COURT:  Well, here's what I'm going to do,

9     Mr. Waguespack:  I'm going to, for purposes of today, I'm

10    going to have it under seal.  But I'll give you a chance to

11    address the issue on whether or not this is -- number one, is

12    it?

13          If you want to do this:  Is it confidential?  If it

14    was ever confidential, has it now been lost because it has

15    been disclosed, other than here?  That's what --

16          So it's going to be -- what's the word I'm looking

17    for?

18          MR. DRAPER:  A waiver?

19          THE COURT:  What's that?

20          MR. DRAPER:  Whether there has been a waiver

21    from --

22          THE COURT:  Whether there has been a waiver.

23    Whether there has been a waiver or whether -- his argument is

24    he didn't think it has ever been confidential.

25          But I'm going to temporarily seal it until we have

1  a chance to look at that, because it hasn't been officially

2  filed into the record yet.

3          MR. DRAPER:  And --

4          THE COURT:  And my understanding, Mr. Waguespack,

5  was that perhaps this has been disclosed somewhere and it's

6  already in a filing in the record here?

7          MR. WAGUESPACK:  Yeah, they attached the bareboat

8  charter, Exhibit 3, to the turnover objection motion, and

9  it's got the day rate in it.

10         MR. DRAPER:  But that's only the Mr. Steven.

11         MR. WAGUESPACK:  But my larger point, quite frankly

12 Your Honor --

13         THE COURT:  I'm sorry.  I missed what you were

14 saying.

15         MR. WAGUESPACK:  I'm sorry.

16         THE COURT:  What were you going to -- I was --

17         MR. WAGUESPACK:  Just my point of this --

18         THE COURT:  I know we're both talking over each

19 other, so I wanted to make sure I'm listening to what you --

20         MR. WAGUESPACK:  Yeah.  My point of this is that we

21 were delayed getting 2004 discovery for a very long period of

22 time.  I think it was issued in October on the basis of

23 really the only objection was confidentiality and we had a

24 hearing, but it's not really confidential.

25         MR. DRAPER:  Well Your Honor --

 1          MR. WAGUESPACK:  That's fine.

 2          MR. DRAPER:  -- just to respond.  Quite frankly, the

 3  change and the delay was they filed a Motion to  Disqualify.

 4  They wanted Mr. Cheatham disqualified.  New counsel came in and

 5  had to come in and review what was going on, so --

 6          THE COURT:  Well, and that -- I am kind of --

 7  Mr. Waguespack, I realize this may go back to October, but a

 8  lot of this really started in the last month.

 9          MR. PECK:  Fair enough.

10          THE COURT:  In my opinion.  And I'm going to

11  temporarily seal this, but I'm going to give you an

12  opportunity to come in and convince me that it needs to be

13  unsealed.

14          But at this point we'll let the record show that

15  Exhibit Number 7 -- and it's really not necessarily the cover

16  page, but the attachment to Exhibit Number 7, which may have

17  disclosed estimated or maybe known day rates.  I'm not sure

18  what it has, because I haven't had a chance to decipher this

19  whole document yet.

20          It will be on a temporary basis, admitted under

21  seal until --

22          THE CLERK:  And that's Seatran's Number 7.

23          THE COURT:  This is Seatran Number 7, unless

24  otherwise ordered by the Court, it's under seal

25  today.

BY MR. WAGUESPACK:

Q.   Mr. Tizzard, I think your testimony was that you plan on putting the bank on a 20 year amortization at a five percent interest rate?

A.   Correct.

Q.   And so, and your view is the risks associated to the lender increased as a result of your legal position, that the Debtor, the mortgagor of the vessel doesn't have the charter rights or the right to receive the revenue from the vessel?

A.   Um -- yes.

Q.   And so five percent seems kind of low, doesn't it?

A.   Not to me.

Q.   It's lower than it is now, isn't it?

A.   I know that the current interest rate on the loan is five percent.

Q.   Right.  The Debtor could have been charged default interest, wouldn't you agree?

A.   Yes.

Q.   And that's 18 percent?

A.   Well --

Q.   And my client hasn't done that to you, has it?

A.   No, he's been charging -- well, he indicates he's been charging five percent.

Q.   Five and a quarter.

1      Your projections here; these are consolidated

2  projections?

3  A.    Of the eight vessels.

4  Q.    Okay.  So how many of the vessels are going to working

5  under your projections?

6  A.    Under the current market scenario, the five vessels that

7  are currently working and three vessels would remain stacked

8  throughout the period.

9  Q.    And what vessels would those be?

10  A.    The Row, Mason and Brandi.

11  Q.    Okay.  So those aren't part of your plan, correct?

12  A.    Well, they're part of the plan because they each incur

13  about $3,000 per month in expenses while being stacked.

14  Q.    They're a negative part of your plan?

15  A.    So that's $9,000 a month, so they are part of the plan.

16  Q.    That's -- and in a negative way?

17  A.    Yes.

18  Q.    Okay.  So with respect to the other vessels that are

19  working, what you want to do in your plan is pool all of the

20  revenue, continue to operate as you have been operating, have

21  Seatran direct all of that, decide how that's spent and then

22  some money ultimately gets down to other entities, is that

23  right?

24  A.    We'd continue with the same structure that we currently

25  have.

1  Q.   Did I kind of describe it correctly?

2  A.   I think so, yes.

3  Q.   Okay.  And you talked about these funds, the funds that

4  are set up, the $2.2 million and the $1.6 million; what are

5  the names of those?

6  A.   That's the Capital Construction Funds.

7  Q.   The Capital Construction Funds.  And those are available

8  to pay the principle payments on the debt?

9  A.   Yes.

10  Q.   And why weren't those funds used when the note wasn't in

11  default, to keep making payments?  Were those funds --

12  A.   At what point are you referring to?

13  Q.   When the note went in default in July of 2017, were

14  those Capital Construction Funds sitting there?

15  A.   Yes.

16  Q.   And couldn't you have used those funds to help make the

17  principle payments on the debt?

18  A.   Well, that was the period that the FDIC had the loan.

19  We tried to make a payment, they returned the payment to us.

20  No one called us, no one sent us an invoice.  We didn't know

21  who to pay or how much to pay.  So you know, we would have

22  been guessing as far as where to send the check and how much

23  to send, so.

24  Q.   Well, then in October of 2018 you got that letter from

25  Mr. Kilcoin, right?  Telling you about Summit Bridge

1  requiring the loan and giving you his contact information

2  and the place where to send the payments; do you remember

3  that?

4  A.    Right.

5  Q.    And so you could have sent the payments there, couldn't

6  you have?

7  A.    But again we, you know --

8  Q.    You didn't know how to --

9  A.    No, we didn't --

10  Q.    You didn't know --

11  A.    No, I mean, I was a lender for a number of years and I

12  actually would call the debtors and say:  You know, can you

13  pay me?  Can you pay me something?  Let's work out

14  something.

15      Nobody contacted us and requested a monthly payment.

16  Q.    And so you just stopped paying the note?

17  A.    (No response.)

18  Q.    Even though you had these millions of dollars in the

19  account that could have been used to pay the note, you just

20  didn't pay it, right?

21  A.    Because of the other issues, yes.

22  Q.    You don't think you could have just sent the payment to

23  the address you always sent it to every month?

24  A.    To what address?  The one --

25  Q.    At FNBC.  The FDIC was appointed as receiver for FNBC.

1  Why didn't you just keep sending the payments every month

2  like you had been?

3  A.   We sent one and it came back to us.

4  Q.   And why didn't you -- for what?  What reason?

5  A.   I think it was returned because they couldn't deliver it

6  to the First NBC.

7  Q.   And then you just gave up?

8  A.   There wasn't anyone there -- they kept changing the

9  offices at the FDIC.  The original people that we went and

10 met wasn't there any longer, and I believe they moved their

11 operations out of the First NBC building.

12 Q.   Other --

13 A.   They went silent for several months.

14 Q.   Under the plan, you're not proposing to pay SBN's loan

15 in full on the effective day of the plan, right?

16 A.   (No response.)

17 Q.   What you want to do is pay it out over time, with a 20

18 year amortization?

19 A.   That's correct.

20 Q.   Okay.  Now, I thought your testimony earlier when we

21 were talking that, was that you didn't really know where the

22 location of the boat was the Mr. Steven's, since the filing

23 of the bankruptcy; wasn't that right?

24 A.   I recently made an inquiry to confirm his current

25 location and when it might be relocated in the future.  And I

1    had known about it in previous periods that I would check

2    on, you know, a site called PortVision.  But I hadn't -- in

3    the last month or two I hadn't been following it real

4    close.

5    Q.   So when Mr. Peck was asking you about the boat being

6    tied up at the dock in Los Angeles, you really don't know that

7    for a fact, do you?

8    A.   Well, I know it was tied up, you know, for like through

9    the summer and into the fall when Steve Miguez went out to

10   visit the boat and talk to the crew and determine what kind

11   of operations it was in and h ow often it ran and everything,

12   and he reported back to me.

13       So, it wasn't real current information, but it was

14   what's been going on over the last six months or so.

15   Q.   And you're aware that the boat just recently went over

16   to the East Coast, didn't it?

17   A.   No, it didn't.

18   Q.   It didn't?

19   A.   No, it's still in Los Angeles.

20   Q.   Okay.  So it didn't go -- it wasn't in the Atlantic

21   trying to catch involvement in operations over there?

22   A.   No.

23   Q.   Okay.  It has always been on the west coast is your

24   testimony?

25   A.   Well, it was on -- it was in the Atlantic when we first

1  did the charter, and then it moved to the west coast and

2  it's still on the west boast.

3  Q.   Okay.

4       MR. WAGUESPACK:  That's all I have, Your Honor.

5  Thank you.

6       THE COURT:  Thank you Mr. Waguespack.

7       Mr. Tizzard, you are excused.  Thank you

8       THE WITNESS:  Thank you.

9  (Witness is excused)

10      THE COURT:  All right.

11      MR. DRAPER:  Your Honor, I'd like to call Blake

12 Miguez to the stand.

13      THE COURT:  Mr. Miguez?

14      THE CLERK:  Mr. Miguez, if you can approach the

15 podium and raise your right hand?

16      THE WITNESS:  (Complying.)

17                  *   *   *   *   *

18        **BLAKE MIGUEZ, DEBTOR'S WITNESS, SWORN**

19                  *   *   *   *   *

20      THE CLERK:  Thank you, sir.

21      Please have a seat in the witness stand.  State

22 your name and address for the record.

23      THE WITNESS:  My name is Blake Miguez.  My home

24 address is 4617 Highway 14, New Iberia, Louisiana 70560.

25      THE CLERK:  Thank you, sir.

```
 1                         *   *   *   *   *

 2                       DIRECT EXAMINATION

 3    BY MR. DRAPER:

 4    Q.   By whom are you employed?

 5    A.   I'm employed by Seatran Marine.

 6    Q.   And have you dealt with Nathan Guice with respect to the

 7    Mr. Steven?

 8    A.   Yes.

 9    Q.   Let me show you an e-mail dated October 12th, 2018.

10    A.   (Witness examines document.)

11    Q.   Is that an e-mail that you received?

12    A.   Yes.

13    Q.   And what do you understand the e-mail to be?

14    A.   The original bareboat agreement had -- determined the

15    original agreement ended sometime in October of this year.

16    This extended that agreement on a month to month basis for

17    all the same terms and conditions that was in the previous

18    agreement.

19    Q.   Right.

20              MR. DRAPER:  Your Honor, let me offer, introduce

21    and mark into evidence as Exhibit --

22              MR. PECK:  Nine.

23              MR. DRAPER:  -- Exhibit 9, the e-mail.

24              THE COURT:  Okay.  And we'll call this Seatran 9.

25    I know it's coming from --
```

1          MR. PECK:  The Debtor.

2          THE COURT:  -- the Debtor, but for --

3          MR. PECK:  Seatran slash Debtor 9.

4      (Pause.)

5          MR. DRAPER:  I have nothing further for this

6  witness, Your Honor.

7          THE COURT:  Thank you.

8          Mr. Waguespack?

9          MR. WAGUESPACK:  No questions, Your Honor.

10          THE COURT:  I'm sorry.  Mr. Peck, I overlooked

11  you.

12          MR. PECK:  No, I have no questions, Your Honor.

13          THE COURT:  Okay.  Thank you, Mr. Miguez.

14          THE WITNESS:  Thank you, Your Honor.

15      (Witness is excused)

16          MR. DRAPER:  I would call Ryan Landry.

17      (Pause.)

18          THE CLERK:  Wait.  You called someone?

19          MR. DRAPER:  Yes, Mr. Landry.

20          THE CLERK:  Oh, I'm sorry.

21                          *    *    *    *    *

22              **RYAN LANDRY, DEBTOR'S WITNESS, SWORN**

23                          *    *    *    *    *

24          THE CLERK:  Thank you.

25          Please have a seat in the witness stand.  State

1   your name and address for the record.

2           THE WITNESS:  Ryan Landry, located at 204 Wind

3   Haven Lane, Lafayette, Louisiana 70506.

4                   *   *   *   *   *

5                   DIRECT EXAMINATION

6   BY MR. DRAPER:

7   Q.   And Mr. Landry, are you employed by Seatran?

8   A.   Yes, I am.

9   Q.   Do you do work for Mr. Steven and Iberia Crewboats?

10  A.   Yes, I do.

11  Q.   And do you -- are you the custodian of various bank

12  statements that are received?

13  A.   Yes, I am.

14  Q.   Let me show you three bank statements from UBS and ask

15  if you could identify them?

16  A.   (Witness complies.)

17       Yes, sir.

18  Q.   What are these?

19  A.   (Witness examines document.)

20       These would be the bank statements from UBS for the

21  various Capital Construction Fund accounts that are

22  maintained by Iberia Crewboat, Iberia Marine and Steven J.

23  Miguez.

24  Q.   And how much is in the Iberia Crewboat bank account?

25  A.   That should be about a million-six, just a little bit

1   over.

2   Q.   How much is in the Steven Miguez account?

3   A.   Just over 2.6 million.

4   Q.   And the Iberia Marine account?

5   A.   Approximately 5,000.

6          MR. DRAPER:  Your Honor, let me offer, introduce

7   and file these into evidence as Exhibit Seatran 10/Debtor

8   10.

9          MR. WAGUESPACK:  No objection, Your Honor.

10         MR. DRAPER:  I have nothing further for this

11  witness.

12         THE COURT:  Any questions, Mr. Waguespack?

13                    *    *    *    *    *

14                    CROSS-EXAMINATION

15  BY MR. WAGUESPACK:

16  Q.   Mr. Landry, were you involved in the payment of the SBN

17  note?

18  A.   Was I involved in the payment --

19  Q.   Yes

20  A.   -- of the SBN note?

21  Q.   Before the note was sold to SBN and it was being paid

22  regularly; was that something that you were involved in?

23         MR. DRAPER:  Your Honor, this is outside the scope

24  of the direct examination.

25         MR. WAGUESPACK:  I'm going to ask him about why

1  these forms weren't used to pay the note.

2         MR. DRAPER:  Well, that's --

3         MR. WAGUESPACK:  So I'm just laying a foundation.

4         MR. DRAPER:  That was outside the scope.  This is

5  just as to what the account is.  He's asking if -- the

6  question is totally outside the scope of the direct --

7         MR. WAGUESPACK:  Well, in order for it to be

8  relevant, it needs to be able to be used to pay the debt, so

9  I'm trying to ask about that.  I mean that he's just trying

10  to --

11         MR. DRAPER:  His testimony is solely what's in the

12  account.

13         MR. WAGUESPACK:  Why is he afraid of this

14  testimony?

15         MR. DRAPER:  Okay --

16         THE COURT:  Well, wait, wait, wait, wait.

17         MR. DRAPER:  I'm allowed to object.

18         THE COURT:  He has simply testified, as far as I

19  know, as to his knowledge of these accounts and the amounts

20  in the accounts, and your question is directed to why weren't

21  these used?

22         I'm going to overrule the objection and allow the

23  questions.

24         MR. DRAPER:  Okay.

25  BY MR. WAGUESPACK:

1  Q.   Were you involved in the payment of the secured debt to

2  the lender?

3  A.   To First NBC Bank.

4  Q.   Okay.  And at that time these funds or some amount of

5  these funds were in these accounts?

6  A.   These funds were available in these accounts.  Some

7  matter of funds were available in these accounts.

8  Q.   Okay.  And you're aware that at some point the note

9  stopped being paid, correct?

10 A.   Sure, I'm aware.

11 Q.   And do you know why these funds weren't used?

12 A.   I'm not aware.

13 Q.   Okay.  In your view these funds would have been available

14 to make those payments?

15 A.   That's what I understand.

16        MR. WAGUESPACK:  Thank you, Your Honor.

17        THE COURT:  Thank you.

18        Anything further?

19        MR. DRAPER:  No.

20        THE COURT:  You can be excused.  Thank you.

21        THE WITNESS:  Thank you.

22     (Witness is excused)

23        THE COURT:  Just so we're clear, Exhibit Number 10

24 is admitted into evidence, Seatran/Debtor Exhibit 10.

25        MR. DRAPER:  I'd like to call Steve Miguez to the

1  stand.

2          THE COURT:  Mr. Miguez?

3          MR. DRAPER:  Your Honor, let me get the surveyor

4  out of here, so -- and then I'll put on Mr. Miguez.

5          THE COURT:  Okay.

6          Mr. Miguez?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  We're going to proceed with the

9  surveyor first.

10          THE CLERK:  You can approach the podium.

11          THE WITNESS:  Yes, ma'am.

12          THE CLERK:  And raise your right hand.

13                     *   *   *   *   *

14          **ANDREW MINSTER, DEBTOR'S WITNESS, SWORN**

15                     *   *   *   *   *

16          THE CLERK:  Thank you.

17          Have a seat in the witness stand and state your

18  name and address for the record.

19          MR. WAGUESPACK:  Your Honor, I have to object to

20  the testimony.  We had included in our 2004 request for

21  documents all appraisals of the vessel, and I was just

22  handed the Curriculum Vitae.  And I think what we're about to

23  hear from this witness is an appraisal of the vessel.

24          So, we would object on that basis.

25          MR. DRAPER:  That's not the case, Your Honor.

1  This witness is going to testify as to adequate protection

2  payments.  He has no written appraisal.

3          THE COURT:  That's actually a question I was going

4  to ask you, Mr. Waguespack, when we got somewhere along this

5  point. I mean I think you have the burden of showing that

6  this -- depending on where this goes, I know where you want

7  it to go, but if it doesn't go there, you would have also the

8  burden to show that you're not adequately protected, which

9  would require me to have some -- some evidence somewhere to

10 establish whether this particular vessel is depreciating as

11 it's sitting out there, I think.

12         And I think that's what Mr. Draper is now

13 attempting to address, am I correct?

14         MR. DRAPER:  Yes.

15         MR. WAGUESPACK:  As I understand Section 362(g) of

16 the Bankruptcy Code, the burden other than showing that

17 there's no equity in the vessel, it's on the debtor on all

18 other matters.  It's 362(g) --

19         THE COURT:  Then I'm going to allow this testimony

20 because I need testimony on whether or not the vessel -- on

21 the adequate protection issue that I think is before the

22 Court.

23         MR. WAGUESPACK:  Okay.

24         THE COURT:  And --

25         MR. WAGUESPACK:  And my objection, just for the

1  record, Your Honor, is that this information was subpoenaed

2  and it wasn't produced.  Thank you.

3       THE COURT:  And you can the appropriate motion on

4  that.

5       MR. WAGUESPACK:  Okay.

6       THE CLERK:  State your name, please?

7       THE WITNESS:  Andrew Minster.

8       THE CLERK:  Minster?

9       THE WITNESS:  It's 217 Southern Star, Slidell,

10  Louisiana 70458.

11       THE CLERK:  Thank you.

12       MR. DRAPER:  Your Honor, I'd like to tender the

13  witness as an expert.  Mr. Waguespack has his CV.

14       THE COURT:  Mr. Waguespack?

15       MR. WAGUESPACK:  I haven't really read it, but

16  I'll --

17       THE CLERK:  What's your first name?

18       THE WITNESS:  Andrew.

19       MR. WAGUESPACK:  If he -- I haven't heard any

20  evidence to support his expertise --

21       MR. DRAPER:  I'll put it on then.

22       MR. WAGUESPACK:  -- in valuing this type of

23  vessel.

24       THE COURT:  Just put on the evidence.

25       MR. DRAPER:  Okay.

* * * * *

VOIR DIRE EXAMINATION

BY MR. DRAPER:

Q. Let me show you your CV that I asked you to prepare.

A. Yes, sir.

Q. Can you tell the Court your background and how long you've been a surveyor?

A. (Witness examines document.)

I was a -- I attended the United States Merchant Marine Academy and served in the Merchant Marine for approximately five years, sailing on oceangoing vessels, oceangoing tugs. In 1996 I became a marine surveyor. I've been working as a marine surveyor ever since then. First, with McLarens Toplis, Toplis & Harding. They changed names several times, for about twelve years.

Q. Uh-huh.

A. And then I started working for Rivers & Gulf Marine Surveyors. And about eight years ago I was given the opportunity to purchase a company, and I'm now the owner and also principal surveyor at the company.

Q. Are you familiar with the Mr. Steven?

A. Yes, I am very familiar with the Mr. Steven.

Q. And how many -- have you surveyed many boats similar to the Mr. Steven?

A. Yes, that's primarily what we do. We service the

1 offshore market, supply boats, crewboats.  That's what we

2 do.

3 Q.   And did you arrive at a --

4        MR. WAGUESPACK:  Your Honor?

5        THE COURT:  I think Mr. Waguespack --

6        MR. WAGUESPACK:  I'm fine with him being an expert,

7 Your Honor.

8        MR. DRAPER:  Okay, I'll tender the --

9        THE COURT:  Mr. Waguespack has agreed --

10       MR. DRAPER:  -- tender the witness.

11       And let me introduce as Seatran/Debtor Exhibit 11,

12 the witness' CV.

13       THE COURT:  We'll have this as Seatran/Debtor

14 Exhibit 11.

15                    *   *   *   *   *

16                    **DIRECT EXAMINATION**

17 BY MR. DRAPER:

18 Q.   Have you calculated the monthly depreciation, if any, in

19 connection with this vessel?

20 A.   Yes, we have.

21 Q.   And can you tell the Court what you did and how you did

22 it?

23 A.   We -- I basically just kind of considered a cost approach

24 to the vessel of being the cost to build the vessel and then

25 using an economic useful life and depreciating over that time

1   period on a straight line depreciation. But back into that,

2   I add a residual value, because at the end of its economic

3   useful life it's not going to be worthless. It's going to

4   still have value.

5        So what we used for economic useful life for an aluminum

6   crewboat of this type is 40 years.

7   Q. And what did you use -- how do you determine the -- is

8   that the term terminal value?

9   A. Sure. The end value that is based on basically on a

10   percentage of the cost to build the vessel, since this is an

11   aluminum hull the percentage is usually a little bit higher

12   than it would be for say a steel hull vessel or other types

13   that work in the Gulf.

14   Q. And what did you use as the cost approach -- the cost

15   starting number for cost?

16   A. Sixteen million.

17   Q. And then well, your terminal value was what? What

18   percentage of the sixteen million?

19   A. About 20 percent.

20   Q. Okay. Taking all that math in effect; what did you come

21   up with as the monthly theoretic decline in value?

22   A. So, it's right around about $25,000 a month.

23        MR. DRAPER: I have nothing further for this

24   witness, Your Honor.

25        THE COURT: Mr. Waguespack?

1          Oh, I'm sorry.

2          MR. WAGUESPACK:  I don't have anything, Your Honor.

3          MR. SEGRIST:  I'll give Mr. Waguespack a break.

4                    *    *    *    *    *

5                    CROSS-EXAMINATION

6    BY MR. SEGRIST:

7    Q.   Good evening --

8          THE COURT:  Well, could you make your appearance

9    for the record, please?

10         MR. SEGRIST:  Peter Segrist for SBN, Judge.

11         THE COURT:  Thank you Mr. Segrist.

12   BY MR. SEGRIST:

13   Q.   Have you actually examined the Mr. Steven?

14   A.   Not -- I have.  We've done a survey on it back when it

15   was new and delivered.

16   Q.   When?  When was that?

17   A.   In 2015.

18   Q.   And at that time did you actually go aboard the

19   vessel?

20   A.   Yes.

21   Q.   You haven't been aboard the vessel since then?

22   A.   Uh -- I don't believe so.

23   Q.   Isn't it correct that a vessel loses most of its value

24   as soon as it's put into service?

25   A.   No.

1  Q.   That's not correct?

2  A.   No.  It's -- vessel valuations are completely different

3  from like an automobile, like it doesn't -- as soon as you

4  drive it out of the lot, the value does not drop.

5  Q.   But it doesn't appreciate, correct?

6  A.   It doesn't appreciate?

7  Q.   Yes, sir.

8  A.   In certain markets it could.

9  Q.   Now, it's not your testimony today that the

10  Mr. Steven --

11  A.   No.

12  Q.   -- appreciated after it was put into service?

13  A.   Correct.

14  Q.   Okay.  And since 2015 have you seen the vessel?

15  A.   I have seen the vessel.

16  Q.   Physically, not just in news reports?

17  A.   Uh -- not running, not recently.  If it was -- when I

18  see it -- when I saw it, it was around 2015, in that year.

19  Q.   What is your understanding of the modifications that

20  have been made to the vessel by SpaceX?

21  A.   I really don't have a firm grasp on it.  I know they've

22  kind of put some structure on it to form a net on -- to hold

23  the net up on it.

24  Q.   Is it your understanding that the modifications that

25  they've made to the vessel have been proprietary in nature?

1  A.    I don't know.

2  Q.    You don't know one way or another?

3  A.    No.

4  Q.    And you haven't seen or reviewed any type of list of the

5  modifications that SpaceX made to the vessel?

6  A.    No.

7  Q.    And so, you don't have any understanding with respect to

8  what these modifications would have done to the value of the

9  vessel, correct?

10  A.    Correct.

11  Q.    So, you understand that there's a -- the vessel has a

12  large net on it that's designed to catch fairings that fall

13  from the sky?

14  A.    Correct.

15  Q.    And is it fair to say that these types of modifications

16  would make the value for the vessel less valuable?

17  A.    Not necessarily, no.

18  Q.    You've been -- I apologize.  You've been appraising

19  vessels for how long?

20  A.    About 20 years.

21  Q.    How many vessels have you appraised that were

22  retrofitted with large nets to catch large metal objects that

23  fell from the sky?

24  A.    That's not -- I have never.

25  Q.    So it's fair to say that there is a relatively small

1  market for this type of vessel?

2  A.    True.

3  Q.    And you don't have any understanding or concept of what

4  it would take to remove the modifications that SpaceX has

5  made to this particular vessel?

6  A.    I would say if you -- if you made modifications, they

7  can easily be undone, and you'd have a perfectly serviceable

8  crewboat.

9  Q.    But you --

10  A.    I mean modifications are done to vessels all the time.

11  Equipments fitted in her deck looks like permanent equipment,

12  but I mean it's not difficult to remove.

13  Q.    Well, sitting here today, you don't have any

14  understanding of what those modifications are, correct?

15  A.    No.  I mean I've seen some photographs and I'm you know,

16  I have an idea in my head of what it is.

17  Q.    But since you don't know what they are, you don't have

18  any understanding of what they would cost to remove --

19  A.    No.

20  Q.    -- is that fair to say?

21  A.    I don't know what the cost would be involved.

22  Q.    Okay.  When vessels are sold, are they generally sold

23  while they're under charter?

24  A.    They can be.  I mean it's -- there's no set rule, I

25  wouldn't say, that you know, they're sold off charter or on

1  charter, or whatever.

2          MR. DRAPER:  Your Honor, I have got an objection.

3  I don't understand where this -- how this line of questioning

4  goes to the depreciation by the use of the vessel.  I just

5  fail to grasp what the relevancy of this is.

6          MR. SEGRIST:  Judge, I do think these questions go

7  to the witness' ability to properly value the vessel.  This

8  is by all accounts a very unique piece of equipment.

9          MR. DRAPER:  He's not valuing the vessel.  He's

10  determining a monthly depreciation by use.

11          MR. SEGRIST:  And if anything --

12          THE COURT:  Well --

13          MR. SEGRIST:  Judge, I think the witness is

14  demonstrating that he doesn't really have a full

15  understanding of what the vessel is being used for.  This

16  thing is out in the ocean catching space parts.

17          THE COURT:  I'm going to sustain the objection.  I

18  mean I -- you can go to the point on what we're here for, you

19  know, which I think you have asked the question:  How did the

20  modification impact that?  And he has answered the question,

21  he hadn't really considered that.

22          If you want to go further, that's fine.  But I don't

23  really want to go beyond what we have talked about here, and

24  that is:  What is the adequate protection that may be due if

25  the Court goes -- decides not to lift the stay and would

1   probably require adequate protection?

2           I mean that's the alternative relief that's being

3   requested here by SBN.  So that's the issue I wasn't to

4   address.  I mean it's getting late, we've been here a long

5   time.  I want to stick to the point.

6           MR. SEGRIST:  All right.  Thank you, Judge.

7           THE WITNESS:  When the vessel's not getting used

8   and abused like it would in the Gulf of Mexico, as a

9   crewboat.

10  BY MR. SEGRIST:

11  Q.   But it's catching -- it's catching fairings in the Gulf

12  of Mexico, is it not?

13  A.   It is.  My understanding is it's catching fairings in

14  the Pacific, but that has happened twice.  Whereas, you know,

15  they're putting -- it's not running offshore every day in the

16  Gulf of Mexico.

17  Q.   Are you familiar with the vessel operating agreement

18  that the vessel is currently covered by?

19          MR. DRAPER:  Your Honor, again, just --

20          THE WITNESS:  No.

21          MR. DRAPER:  -- the same objection, Your Honor.

22  This has --

23          THE COURT:  Tell me the relevance of this?  I mean

24  we're just -- we're trying to figure out what the

25  depreciation is on the vessel, so we can get to an adequate

1    protection amount.

2          What does the vessel operating agreement have to do

3    with it?

4          MR. SEGRIST:  Well, it has to do with -- it has to

5    do with specifically what the -- what that agreement does to

6    the value of the vessel and whether it's incumbent upon the

7    vessel, has resulted in substantial appreciation to the

8    vessel?

9          MR. WAGUESPACK:  I think it dramatically reduces

10   the value of the vessel.

11         MR. DRAPER:  Your Honor, do we have one counsel or

12   two counsels speaking?

13         MR. SEGRIST:  You all have two.

14         THE COURT:  Mr. Draper, give me your response to

15   discount --

16         MR. DRAPER:  My response --

17         THE COURT:  -- Mr. Segrist's objection.

18         MR. DRAPER:  My response to it is:  This vessel is

19   operating under a short period of time.  The vessel operating

20   agreement, quite frankly, as I understand leases under

21   Louisiana law, if there's a mortgage and they foreclose, the

22   vessel operating agreement goes away.

23         So, it has no impact on it and it -- the adequate

24   protection is designed for the use of the vessel.  What is

25   the diminution value to it that is used?  The use of the

1    vessel happens monthly over time.  The vessel operating

2    agreement preexisted that.

3            So all that can be calculated is the use of the

4    vessel over time.  That's it.

5            MR. SEGRIST:  Judge, we're -- the vessel is now

6    encumbered by a vessel operating agreement that grants a

7    right of first refusal that provides that any potential

8    purchaser of that vessel is going to be encumbered and

9    saddled with that vessel operating agreement in perpetuity.

10           THE COURT:  But your argument is that I shouldn't

11   be basing adequate protection on the actual depreciation of

12   the vehicle based on use.  You're arguing that I should base

13   the adequate protection based on a diminution in value that

14   is brought about by -- which Mr. Tizzard has already

15   testified to -- brought around -- brought about by the fact

16   that there are these restrictive covenants in that vessel

17   operating agreement.

18           MR. SEGRIST:  That's exactly right, Judge.

19           THE COURT:  All right.

20           MR. DRAPER:  Your Honor, let me make a comment

21   about that.  First of all, the right of first refusal, quite

22   frankly, is meaningless because we can't deliver good title

23   without their lien being satisfied.  So it doesn't do --

24           And secondly, it preexisted the filing.  So,

25   whatever right of first refusal in existence, the diminution

 1  in value, if it occurred then, occurred then, and not as a

 2  result of our use during the bankruptcy period.  That's what

 3  the test is.

 4          MR. SEGRIST:  Judge, they're saying that the Court

 5  shouldn't consider the right of first refusal because it

 6  violates the mortgage.  They're trying to take advantage of

 7  the fact that they executed --

 8          MR. DRAPER:  No, I'm not.

 9          MR. SEGRIST:  -- an agreement that violates the

10  very terms of the mortgage, because it's unenforceable

11  because it violates the terms of the mortgage.  That doesn't

12  change the fact that that VOA substantially devalues this

13  vessel.

14          MR. DRAPER:  There's no testimony that it does

15  that, and this witness is basically testifying as to the use

16  of the vessel.  That's it.

17          THE COURT:  I'm going to -- here's what -- I mean

18  he's testifying as to the value of the vehicle -- I'm sorry,

19  to the value of the vessel.  His knowledge of what this

20  agreement may do, you'd have to get that from somewhere --

21  from somewhere else.

22          I'm going to sustain the objection.

23          Ask him questions about his knowledge of

24  depreciation and value of the vehicle -- I'm sorry, the

25  vessel there.

1          MR. SEGRIST:  Okay.

2     BY MR. SEGRIST:

3     Q.   How do you calculate the depreciation of the

4     Mr. Steven?

5     A.    In this, I used the cost approach.  I took the cost of

6     the vessel to build and I divided that by the economic useful

7     life of 40 years, and then I -- and then back into that, I

8     add the residual value of 20 percent of that cost -- of the

9     cost to build, which is what it will have at the end of its

10    40 year useful -- economic useful life.

11    Q.   How do you determine an economic useful life of 40

12    years?

13    A.    It's based on conditions and research of Rivers & Gulf

14    as accumulated over the 30 plus years they've been in

15    business.

16    Q.   But you've never performed this approach on a vessel

17    that has been modified in the manner that the Mr. Steven has

18    been modified, is that correct?

19    A.    Not in that particular manner, no.  But we've, you know,

20    we've accumulated it on vessels that are modified in all

21    sorts of manners.  So I mean we have a database full of

22    vessels that are modified.

23         I mean there's no single vessel out there that is the

24    identical to the next one, so.

25    Q.   And if there were increased risks occasioned by a

1  vessel's activity such as performing the types of acts the

2  Mr. Steven is performing; that would necessarily have an

3  impact on the useful economic life of the vessel, is that

4  right?

5  A.    It could, correct.

6       But I'm not sure that the activity that it's engaging in

7  now necessarily is any more or less dangerous than what it

8  would normally do in the Gulf of Mexico, operating a

9  crewboat.  I mean, have you ever been out there in the middle

10  of the night trying to run a crew in at 30 knots?  There's a

11  lot of things out there that you can hit.

12  Q.    Is it fair to say you don't know one way or another

13  exactly what the vessel is doing?

14  A.    I mean I've been told what the vessel has been doing,

15  which is mainly sitting at the dock.  It has gone out twice

16  now to catch the perishing pieces of rocket.

17  Q.    You testified earlier that you had performed this on

18  many boats similar to the Mr. Steven.  Have you ever

19  performed this type of evaluation before?

20  A.    Yeah.  I mean we've done appraisals.  I don't what you

21  mean by "this type of evaluation".

22  Q.    Well, let me ask you this:  Does the cost of the vessel

23  or does the depreciation of the vessel -- does that change

24  over the course of that 40 year period?

25  A.    Does -- no, it doesn't change.  I mean, that's -- we

1  used a standard streamline depreciation method in this

2  particular case.

3      I mean you're asking me two different things.  I mean

4  you're asking me about appraisals, which is not what we're

5  talking about here, and we're talking about depreciation.  So

6  I mean, depreciation goes into figuring out an appraisal and

7  coming up with a bottom line as far as figures.

8          MR. SEGRIST:  One moment, Judge.

9      (Pause.)

10 BY MR. SEGRIST:

11 Q.   Have you ever calculated a monthly depreciation, per

12 month, for a marine vessel over the course of that 40 year

13 period?

14 A.   Don't normally do it on a monthly, normally do it on an

15 annual basis.  But I mean it's not a difficult calculation to

16 figure it out, annual versus monthly.

17 Q.   But the answer is no, you've never done it on a monthly

18 basis?

19 A.   No, I have.

20 Q.   You have?

21 A.   Yes.

22 Q.   And have you done that in a case where you've provided

23 expert testimony before?

24 A.   No.

25 Q.   And we talked a little bit earlier about changing the

1  value early in a vessel's life.  Is it -- it's correct to

2  say that a vessel will depreciate more -- earlier in its life

3  than later in its life, correct?

4  A.    (No response.)

5  Q.    As a general rule?

6  A.    It really depends on a lot of factors.  I mean --

7  Q.    What types of factors?  What --

8  A.    Like how well the vessel is being maintained, what kind

9  of service the vessel is in, where the vessel, you know, is

10 working.  I mean there's a whole bunch of factors that factor

11 in.  It's -- when we do a valuation on a vessel, we use

12 multiple approaches, you know.  We don't just use a cost

13 approach.  We use market approach.  We use economic approach.

14 So if you're in, you know, if you're in a cycle where you

15 know, the demand for the vessel services are down, and the

16 values go down as well.

17      But if you're in a cycle where the demand for the

18 services of the vessel is high, then the values go up and

19 therefore, you know, they don't depreciate.  They can

20 appreciate in fact, as a matter of fact.

21 Q.    You don't contend the Mr. Steven has -- that it

22 appreciated in the immediate years after it went into

23 service, do you?

24 A.    No.

25 Q.    Okay.

1          MR. SEGRIST:  That's all I have, Judge.

2          THE COURT:  Thank you.

3          Anything further?

4          MR. DRAPER:  I have nothing further.

5          THE COURT:  You're excused.  Thank you.

6          THE WITNESS:  Thank you.

7     (Witness is excused)

8          MR. DRAPER:  Thank you.

9          Can this witness go?

10         THE COURT:  Yes.

11         You're excused.

12         THE WITNESS:  Thank you.

13         THE COURT:  Thank you Mr. Minster.

14         MR. DRAPER:  Thanks for waiting.

15         THE WITNESS:  That's all right.

16         THE COURT:  Mr. Miguez now?  Is that who you're

17    calling?

18         MR. DRAPER:  May I go?

19         THE COURT:  What's that?  (Laughter.)  No, we're

20    going to finish.  You're calling Mr. Miguez?

21         MR. DRAPER:  Yes.

22         THE COURT:  Mr. Miguez, please.

23         THE CLERK:  Mr. Miguez, if you'll approach the

24    podium?

25         THE WITNESS:  (Complying.)

1          THE CLERK:  Can you raise your right hand?

2                    *   *   *   *   *

3          **STEVEN JOSEPH MIGUEZ, DEBTOR'S WITNESS, SWORN**

4                    *   *   *   *   *

5          THE CLERK:  Thank you, sir.

6          Have a seat in the witness stand.  State your name

7   and address for the record.

8          THE WITNESS:  Steven Joseph Miguez, 6403 Daspit

9   Road, New Iberia, 70563.

10          THE CLERK:  Thank you, sir.

11                    *   *   *   *   *

12                    DIRECT EXAMINATION

13  BY MR. DRAPER:

14  Q.   How long have you been in the boat business?

15  A.   Forty-four years.

16  Q.   Can you tell the Court how you got started in the boat

17  business?

18  A.   I talked my then girlfriend to talk her father into

19  letting her or cosigning her to buy a little 32 foot boat,

20  which I drove and I paid for it.  And we added another boat

21  on, because I didn't need his help anymore and we eventually

22  got married.  I've been adding boats on ever since.  I'll

23  buy/sell over the years and I'm currently where I'm at right

24  now.

25  Q.   Tell the Court about your knowledge in the boat business

1  and boats itself?

2  A.   Well, boats I know, okay?  I'll admit as far as the

3  bookwork on and all that, that just never was my expertise.

4  But I can tell you anything you want to know about a crewboat,

5  okay?

6       I've eventually done everything you can imagine to those

7  boats from welding on them to painting them.  I know the

8  engines, I know everything.  At one point in time, I really

9  believe that my in-laws had a shipyard and I built most of my

10  boats over there.  I actually think I could have stepped in

11  and done ran that shipyard and built those boats, I knew

12  them so well.

13  Q.   Like the proverbial soldier who is blindfolded and can

14  take his gun apart and put it together?

15  A.   That's pretty much, yeah.  Yeah, I'm --

16  Q.   And how would you describe the current boat market?

17  A.   Wait.  Say that again now?

18  Q.   Current boat market?

19  A.   It's poor.

20  Q.   You've been in this for 40 years.  How many cycles have

21  you been through?

22  A.   This is my fourth one, okay?  The '80s, not all of you

23  know what -- you don't want to be in business in the '80s.

24  You had '98 was another one.  And 2008 and then now you've

25  got 2015, all are low points in the market.

1   Q.    But you've survived?

2   A.    Oh yeah, I survived all of them.

3   Q.    Now, in connection with the current market, over the

4   last two years, how much money would you say you've funded

5   into the business to keep it afloat?

6   A.    I've been told $2.8 million.  I believe it and I don't

7   want to think about it.

8   Q.    Are there checks coming to you, or they're really just

9   going --

10  A.    No, I'm the opposite.  I'm sending checks in.

11  Q.    So you're feeding as opposed to eating?

12  A.    Correct.

13  Q.    Okay.  Now, does business today generate sufficient

14  funds to meet its obligations and its debt service payment

15  -- that's previous debt service payments under the FNBC

16  debt?

17  A.    You'd have to -- I've been told yes, but barely.

18  Q.    And but you've also had to fund in money over the time?

19  A.    Right, correct.  I've done the shortfalls.

20  Q.    Right.  Now, you've agreed to make a DIP loan to these

21  Debtors?

22  A.    Correct.

23  Q.    To the tune of a million dollars?

24  A.    Correct.

25  Q.    And that would help fund the bankruptcy as well as make

1  the adequate protection payments to SBN, if the Court orders

2  that?

3  A.   Correct.

4  Q.   So really, now you've also entered into a plan support

5  agreement?

6  A.   Correct.

7  Q.   Which is Exhibit --

8           THE CLERK:  Wait.  Wait, wait, wait, wait.

9           MR. DRAPER:  I think it's Exhibit 8.

10          THE CLERK:  Wait, wait, wait, wait, wait.

11          MR. PECK:  It's Exhibit 8, I think.

12          THE CLERK:  Wait, wait.

13          THE COURT:  I think it's Exhibit Number 8.

14      (Pause.)

15  BY MR. DRAPER:

16  Q.   That's your signature on the document?

17  A.   (Witness examines document.)

18      Yes.

19  Q.   You're willing to fund the -- in accordance with the

20  plan support agreement?

21  A.   Yes.

22  Q.   Who helped put together the numbers and the economics

23  of that?

24  A.   Charlie Tizzard.

25  Q.   Okay.  And you're relying on him with respect to his

1   calculations --

2   A.   Yeah.

3   Q.   -- and his experience in the business?

4   A.   Yes, I think he's highly capable of doing something like

5   that.

6   Q.   You've delegated a lot to him, correct?

7   A.   Correct.

8   Q.   Is that areas that you're comfortable with, or --

9   A.   Oh, no.  (Laughter.)  Are you kidding?

10  Q.   No.

11  A.   No.

12  Q.   All right.  Let me just --

13       (Pause.)

14          MR. DRAPER:  I have nothing further for this

15  witness.

16          THE COURT:  Thank you, Mr. Draper.

17          Mr. Waguespack?

18                      *   *   *   *   *

19                      CROSS-EXAMINATION

20  BY MR. WAGUESPACK:

21  Q.   Good evening Mr. Miguez.

22  A.   Yes.

23  Q.   You said that you were committed to make the DIP loan?

24  A.   Yes.

25  Q.   I'm looking at a DIP term sheet and I don't have the

1  full thing, I think I've just got this DIP --

2  A.   Are you referring to this (indicating), what I've just

3  received?

4          MR. DRAPER:  No, that's the plan support agreement.

5  BY MR. WAGUESPACK:

6  Q.   Do you remember signing something called the DIP?

7  A.   Yes.

8  Q.   DIP loan and term sheet?

9  A.   Yes.

10  Q.   And is it true that at the end of this term sheet it

11  says:  This term sheet is submitted for discussion purposes

12  only and describes the general --

13  A.   I'm sorry, but I can't hear you.

14  Q.   I'm going to try --

15          MR. PECK:  Your Honor --

16          THE WITNESS:  If you remember, I'm the guy that

17  can't hear.

18          MR. WAGUESPACK:  That's right.

19          MR. PECK:  Yes, I told them.

20          THE WITNESS:  If you come stand right here

21  (indicating), maybe I can hear you.

22          MR. WAGUESPACK:  Okay.

23          MR. PECK:  Your Honor, my client, the witness is

24  hard of hearing.  We've had this in the deposition.

25          THE COURT:  You're fine, Mr. Waguespack.

```
 1              MR. PECK:  He reads lips.

 2              THE COURT:  If you want to approach the witness and

 3    so we can --

 4              MR. WAGUESPACK:  Okay.

 5              MR. PECK:  Yeah, and so he reads lips.

 6              THE COURT:  -- so we can --

 7              THE WITNESS:  Yeah.

 8              MR. WAGUESPACK:  Okay.

 9              MR. PECK:  He reads lips, that's what I was just

10    going to say.

11              THE WITNESS:  Yeah, that would be better.

12              THE COURT:  Yeah, so we don't have a

13    communication --

14              THE WITNESS:  Right.

15              THE COURT:  I'm fine with you approaching the

16    witness.

17              MR. WAGUESPACK:  Okay.

18              THE COURT:  And you can question him right there,

19    Mr. Waguespack.

20              MR. WAGUESPACK:  Thank you.

21    BY MR. WAGUESPACK:

22    Q.   Mr. Miguez, do you remember this DIP loan term sheet

23    that you signed?

24    A.   (Witness examines document.)

25         Correct, yeah.
```

1  Q.   And does it say right here (indicating) before the

2  signature page -- and I'm going to stand here because I know

3  you need to read my lips.

4  A.   Uh-huh (affirmative response.)

5  Q.   This term sheet is submitted for discussion purposes

6  only and describes the general basis upon which the lender is

7  prepared to make the DIP loan to the borrowers.  This proposal

8  merely serves as an outline of certain material terms of the

9  DIP loan for discussion purposes only.

10       Actual terms and conditions upon which the loan may be

11  consummated are subject to change.  This term sheet does not

12  constitute an offer, agreement or commitment to lend and the

13  lender shall not be bound in any way whatsoever, until the

14  foregoing conditions are fulfilled.

15  A.   Uh-huh (affirmative response.)

16  Q.   Is that correct?

17  A.   Now in layman's terms.

18  Q.   Okay.

19  A.   I'm not --

20  Q.   You're really (inaudible), are you?

21  A.   No, no.

22  Q.   And the same thing for the plan support agreement;

23  you're not really committed yet, you're still --

24  A.   Well, no --

25  Q.   -- reviewing it?

```
1   A.   Well, no.  I'm there.

2            THE CLERK:  Do you want the document --

3            MR. WAGUESPACK:  It's different.

4            THE WITNESS:  Yeah, what you just read?  You know,

5   I --

6            THE COURT:  Well, the --

7            THE WITNESS:  You've got to put it in language

8   terms, that, right there.

9   BY MR. WAGUESPACK:

10  Q.   Well, as I read this, you're not really bound, not yet.

11           MR. PECK:  Which document are you talking about?

12  Excuse me.

13           THE COURT:  He's --

14           THE WITNESS:  It's --

15           THE COURT:  You're blending to the --

16           MR. PECK:  Yes.

17           THE COURT:  Do we have this one in evidence?  Is

18  that the one you just got?

19           MR. WAGUESPACK:  I just got this one.

20           THE COURT:  Okay.

21           MR. DRAPER:  Your Honor, we filed motions up for

22  January 8th before the Court.  And quite frankly, as a legal

23  matter, nobody is bound until the Court approves the DIP

24  loan.

25           MR. WAGUESPACK:  It's got a --
```

1          THE COURT:  That's what you're questioning him

2    about, what is coming up on January 8th, the DIP?

3          MR. DRAPER:  Yes.

4          MR. WAGUESPACK:  The DIP loan is the first thing he

5    said he was committed to.  And then he also said he was

6    committed to a plan term sheet, both of them don't really

7    have real commitments, as I read them.

8          But I'll let them speak for themselves if you --

9          MR. DRAPER:  Let's have -- let this --

10         THE COURT:  Well, we're going to be up on the DIP

11   loan.  I've heard what -- I heard what Mr. Miguez has said

12   that he's committed to making the DIP loan.

13         MR. DRAPER:  Right.

14         THE COURT:  I think that was his testimony.

15         You're reading from a document that's not really

16   before the Court at this point.  I understand your point,

17   Mr. Waguespack.

18         MR. WAGUESPACK:  That's fine.

19         THE COURT:  Do you have any further questioning for

20   Mr. Miguez?

21         MR. WAGUESPACK:  No.  I'm fine, Judge.  No further

22   questions.

23         THE COURT:  And because I mean I -- this document

24   is going to speak for itself.

25         MR. WAGUESPACK:  You've got it.

1          THE COURT:  I know it's signed but I know that

2   there's some language in here, and I need to -- honestly,

3   I've got a lot of information here that I've still got to

4   delve through that has been put before the Court.

5          Mr. Miguez, you can step down.  Thank you.

6          THE WITNESS:  You're welcome.

7     (Witness is excused)

8          MR. PECK:  Where's my plan support agreement?

9          THE COURT:  Mr. Draper, I'm assuming you didn't have

10  any further questions for Mr. Miguez?

11         MR. DRAPER:  I had no further questions.

12         THE COURT:  Okay.

13         MR. DRAPER:  Thank you.

14         MR. PECK:  Where's all my documents?  I gave you a

15  bunch of documents.

16     (Pause.)

17         THE CLERK:  No, no, no.

18         THE COURT:  Is there anything further, evidence

19  wise?

20         THE CLERK:  Your Honor, it's shutting down.

21         THE COURT:  We've got a computer problem so we're

22  going to have to wait a minute.

23         THE CLERK:  We're going to have to recess.

24         THE COURT:  Okay.  Court is going to be in recess.

25     (Pause.)

1        MR. DRAPER:  Are we -- we'd like to be done.

2        UNIDENTIFIED SPEAKER:  What?

3        MR. DRAPER:  Could we be done?

4        MR. PECK:  If you want to stipulate -- (inaudible;

5   not speaking near the microphone.)

6        THE COURT:  Well, let me take a recess.

7        MR. DRAPER:  Okay.

8        THE COURT:  And you all -- because we'll see if

9   this system is going to come back up, because if it's not

10  coming back up, we're going to have another issue.

11       MR. PECK:  Okay.

12       THE COURT:  And then on the other issues, if you

13  have a stipulation, that's fine.

14       MR. PECK:  Why don't we just wait?

15       THE COURT:  We can give you a chance to work that

16  out.

17       MR. DRAPER:  Okay.

18       THE COURT:  We'll be in recess.

19       **(Recess from 6:14 p.m. to 6:20 p.m.)**

20       THE COURT:  Okay gentlemen.

21       MR. DRAPER:  One point before we get to how we're

22  going to finish this.  We have made an offer of adequate

23  protection with respect to the $25,000 a month.  I know an

24  issue has been raised with insurance.  We have -- they have

25  an insurance certificate, there is insurance in place.  Our

1   adequate -- whatever adequate protection -- whatever --

2   included in our offer of adequate protection is adequately

3   insure the vessel.

4           To the extent that they feel as though the insurance

5   that we have is inadequate, we'll be more than happy to come

6   here and have a hearing before the Court and to have the

7   Court decide whether the insurance is adequate or not.

8           THE COURT:  Well --

9           MR. DRAPER:  We've been given a certificate that

10  shows they are a named party on that.

11          THE COURT:  Well, the issue I have on the insurance,

12  because really I see that as a -- that's the last issue we

13  have.  We don't have anything else to cover.

14          MR. DRAPER:  No.

15          THE COURT:  I mean I've got a lot of evidence here

16  that I've got to comb through, and I, you know -- and I've

17  got enough both on your primary basis which is whether or not

18  this case was filed in bad faith, I've got that.  And then

19  we've got the evidence now, the alternative grounds.  You

20  know, if I'm not going to go that way, except for the

21  insurance.

22          And I do have a concern on the insurance.  You

23  know, we know that -- I mean I've heard testimony here today

24  that at least from Mr. Tizzard that there is some writing

25  somewhere from an insurance broker and it says that we

```
1    believe the vessel is covered by insurance for his current

2    use in its current location.

3            But I need -- I think to have adequate protection,

4    I think there ought to be some -- but that ought to be --

5    that shouldn't be something when it should be up for debate.

6    We ought to know for certain that they've got insurance for

7    the usage that it's being put in and the location where it

8    is, and you know, I think that's something that we ought to

9    be able to iron out without having a further hearing on it,

10   frankly.

11           MR. DRAPER:  No.  No, I agree with that.

12           MR. WELLS:  My client is here, Your Honor, and he

13   can address this coverage if you'd like.  No one has asked

14   him to.

15           THE COURT:  And you --

16           MR. WELLS:  He's ready to testify about it.

17           MR. PECK:  He's representing Guice.

18           MR. WELLS:  With Guice Offshore.

19           THE COURT:  So you represent the insurer or the --

20           MR. WELLS:  No, sir.  To Guice Offshore.

21           MR. DRAPER:  He represents Guice.

22           THE COURT:  You represent Guice, I'm sorry.  I

23   apologize.

24           MR. WELLS:  Right.

25           THE COURT:  Guice.
```

1    MR. WELLS:  And he can add a little to the

2 insurance discussion, I believe, that may help resolve that

3 issue today.

4    THE COURT:  I mean -- but is it just to say that

5 we've got the -- He has been assured we have insurance

6 coverage, and for the uses that is in --

7    (Pause; no one is speaking near a microphone and everyone

8 is whispering.)

9    THE COURT:  Okay.

10    MR. GUICE:  All right.  Nathan Guice, Your Honor --

11    THE CLERK:  No, no.

12    THE COURT:  You need to come -- come approach,

13 please.

14    MR. GUICE:  (Complying.)

15    I'm sorry, I'm new at this.

16    THE COURT:  And you are -- and let me have your

17 appearance so we can just clear up who is on the record with

18 us now?  If you'll --

19    MR. WELLS:  Your Honor, I'm Scott Wells with Guice

20 Offshore, attorney for Guice Offshore.

21    And we have Mr. Nathan Guice with Guice Offshore

22 here as well.

23    THE COURT:  Okay.  So the issue now is insurance.

24    MR. GUICE:  Yes, sir.  Because of the scary nature

25 of what we do, not the actual nature, but it sounds a lot

1  worse than what happens.

2        We have explained in full detail to Arthur J.

3  Gallagher the insurance company as to what we'd be doing.

4  They have in turn talked to the underwriters and just for

5  everyone's information, Arthur J. Gallagher also insures

6  SpaceX for this service, which means everyone knows exactly

7  what's happening and we had Gallagher send an e-mail to

8  Seatran saying that they're fully aware of the operation.

9        They are not -- they can't elaborate in their

10  e-mail to what the operation is, because we're under a --

11        THE COURT:  Protective aura.

12        MR. GUICE:  -- non-disclosure.

13        THE COURT:  So you've got a non-disclosure

14  agreement?

15        MR. GUICE:  Yeah.  Yes, sir.

16        THE COURT:  Let me ask you this question:  Is

17  Mr. Steven an additional insured on the SpaceX policy?

18        MR. GUICE:  I don't know the answer.

19        MR. DRAPER:  We are -- I mean it says:  The

20  certificate of marine energy insurance shows certificate

21  holder, SBN, and it's assigned.  So they are designated as the

22  certificate holder.

23        MR. WAGUESPACK:  But Your Honor's point is

24  important, because it gets to that insurable interest issue.

25        MR. DRAPER:  Well --

1          MR. PECK:  How does it get the -- I don't get

2    that.

3          MR. DRAPER:  I don't get that.

4          MR. PECK:  I don't get that.  When you -- when a

5    certificate of insurance says -- it cites certificate holder,

6    SBN.

7          MR. GUICE:  Yes.

8          MR. PECK:  I mean you own the vessel, it's a loss --

9    I do marine insurance.

10         THE COURT:  Yeah, but my question was really since

11   SpaceX is the one who's contracted for this and they've got

12   the blanket insurance out there, and I think what I'm hearing

13   Mr. Guice say, and Mr. Guice isn't under oath, and we could

14   put him under oath.

15         But I -- and what he's saying though, and I don't

16   think anybody is going to dispute --

17         MR. GUICE:  We're insuring the boat, yes, as --

18         MR. PECK:  They insure the boats.  SpaceX has

19   another policy.

20         MR. GUICE:  They are insuring -- SpaceX is insuring

21   the operations.

22         MR. PECK:  Right.  But the boat is insured by the

23   -- it insures Guice Marine and it will have certificate

24   holder is SBN, and I'm sure there's a --

25         THE COURT:  So I know SBN is an additional insured

```
1   under --
2           MR. PECK:  Correct.
3           THE COURT:  -- that policy.  The question though
4   that has been raised is:  Does that policy cover this
5   location, this --
6           MR. GUICE:  The insurance companies and
7   underwriters are fully aware of where the vessel is and what
8   it does.
9           MR. WAGUESPACK:  Is there a way for us to get a
10  copy of the policy?  No?
11          THE COURT:  I mean you're an additional -- is that
12  an issue, Mr. Draper?
13          MR. DRAPER:  It's not an issue to me.  I don't know
14  whether it's --
15          MR. PECK:  It's not an issue.
16          THE COURT:  Mr. Peck?
17          MR. PECK:  I don't have an issue with that, Judge.
18          THE COURT:  Mr. Guice?
19          MR. GUICE:  No issue, sir.
20          THE COURT:  Okay now --
21          MR. WAGUESPACK:  That would be fine.
22          THE COURT:  I think that would be fair enough.  I
23  mean these who I have here is I -- I think it's a fair issue
24  on the insurance, as this isn't your typical use.  And I mean
25  I -- and it could be this is all covered, I don't know.  This
```

1  is sort of novel, but I think all of us in this room would

2  agree that this is sort of a novel issue.

3         And I wouldn't think that, Mr. Guice, that you all

4  would have the vessel out there uninsured.  I don't think

5  that's the -- that that would be the case, but I -- it's just

6  because this issue has come up and no one seems to know for

7  sure.

8         You've indicated that we've got Gallagher saying

9  it's insured, but we don't really have anything before the

10  Court that says that they're -- that they are -- in writing

11  where it says that they are aware of this use and that it is

12  covered.

13         I guess -- I think Mr. Tizzard testified that he

14  thinks that exists somewhere, but we haven't -- I don't have

15  that before me.

16         MR. PECK:  And if the Court would like,

17  there's a certificate of insurance that we could put into

18  evidence and name it SBN/Guice insured from A. Gallagher, a

19  certificate of marine energy insurance.  I mean this is a --

20  this is a pretty --

21         UNIDENTIFIED SPEAKER:  David, we can put that in.

22         UNIDENTIFIED SPEAKER:  You can't put that in.

23         MR. PECK:  Can't you put that in?  I mean that's --

24         THE COURT:  Do we want that into evidence?  I

25  mean --

1    MR. WAGUESPACK:  It's fine, Your Honor.  What my

2  insurance expert told me is he needs to look at the policy,

3  both on the insurable interest and --

4    THE COURT:  I think that's a fair -- I don't think

5  anyone -- I think we all want the vehicle --

6    MR. WAGUESPACK:  We --

7    THE COURT:  I'm sorry, I keep saying vehicle.

8    MR. PECK:  We want it insured, Judge.

9    THE COURT:  We all want the vessel insured.  I don't

10  think that's an issue.  I think the issue that I have is

11  because it has been raised here is:  Is it insured for this

12  use?

13    MR. PECK:  Okay.

14    THE COURT:  And I'm having a difficult time

15  answering that question based on the record I have before me

16  today.  And I'm not certain that we are --

17    MR. PECK:  Well, we'll get the e-mail in to

18  supplement the record, Your Honor.

19    THE COURT:  But I think -- I think it's fair for

20  Mr. Waguespack to make sure his collateral is insured.  If

21  there's an issue on this that would perhaps consider an

22  additional insurer that they ought to be able to see the

23  policy.  I don't see where there would be a problem with

24  that.

25    MR. PECK:  We can't speak to that because we're

1  not --

2        THE COURT:  Well, I know.  But I've got Mr. Guice

3  shaking his head yes, so he doesn't think that's going to

4  be --

5        MR. GUICE:  Yeah, we're going to get a -- we'll try

6  and get a copy of the insurance policy.  And there is e-mail

7  that says that they understand the intended use and the

8  vessel is fully insured.

9        THE COURT:  Yeah, but that -- I just don't -- I

10  know that's in the -- and I'm not --

11        MR. GUICE:  Right.

12        THE COURT:  I'm not discounting Mr. Tizzard's

13  testimony, because I know he has testified to that fact.  But

14  Mr. Waguespack still has concerns about that, and that was

15  one issue that I saw that was still remaining for our day

16  today.

17        But if we could have an agreement to get the policy

18  to Mr. Waguespack --

19        MR. PECK:  Do you want to put this in?

20        THE COURT:  If we want to admit the certificate

21  showing as an additional insured, we can do that.  I don't

22  have a problem with that.

23        MR. PECK:  Do you want to put this in?  Do you want

24  the certificate that we have right here, Judge (indicating),

25  into evidence?

1          THE COURT:  Is there any objection, Mr.

2    Waguespack?

3          MR. WAGUESPACK:  No.  If I could just have a copy?

4          MR. PECK:  And we'll supplement --

5          UNIDENTIFIED SPEAKER:  It's the same one?

6          THE COURT:  I mean you can supplement the record.

7          MR. PECK:  Okay.

8          THE COURT:  What I'm going to do, gentlemen, is I'm

9    going to -- I've got a full record on this on the Motion to

10   Lift Stay as well as the Motion to Use the Cash or for

11   Turnover of the Cash.  And I'm going to take that under

12   advisement.

13         We're coming back here on, I know on January 8th,

14   and I'll have a ruling by January 8th.

15         MR. DRAPER:  Your Honor, if we want to submit

16   something in writing to the Court, can we do that?

17         THE COURT:  Mr. Waguespack, where are you on that?

18         MR. WAGUESPACK:  I feel like it has been fully

19   briefed, but if you want additional briefs I'll --

20         THE COURT:  The only thing is if we're going to do

21   that, you know, by the time -- we're in the holidays guys.

22   You know, I'm not trying to make you guys work over Christmas

23   and spend your whole Christmas and New Year's break preparing

24   this.

25         I mean I've got fairly developed arguments I think

1  on both sides of the legal issues.  Now, what would be

2  helpful to the Court is if you could summarize the evidence

3  on how that fits together.

4           MR. PECK:  We --

5           MR. DRAPER:  We could do that.

6           MR. PECK:  We could do that, Judge, because of the

7  plan support and all of those documents coming in and weren't

8  before.  I mean yes, we need to summarize that, apply the law

9  to it about the prospect for reorganization for it.

10          THE COURT:  Well, but I think Mr. Waguespack then

11 -- this needs to be on a short -- I mean I --

12          MR. WAGUESPACK:  We're anxious to get, obviously,

13 to get the stay lifted, given what we've been through.  But

14 if Your Honor would like additional briefs or thinks that

15 would be helpful, then we'll certainly do that.

16          THE COURT:  All right.  Honestly, I don't know if

17 I need it.  I mean I've got -- I've got to comb through the

18 evidence.  But I mean, we're just talking three weeks.

19          MR. DRAPER:  I know.  Let me just make a few

20 points.  We're not going to give closing arguments.  I think

21 everybody here would like to get out.  There's certain things

22 I would like to alert the Court to as to what the evidence

23 shows or what it doesn't show.

24          Just give us a date we have to give you a brief,

25 and if we submit it, we submit it.

1          THE COURT:  I think it should come from

2   Mr. Waguespack first, because it was his motion.  So I --

3          MR. DRAPER:  Just to give him some perceived leg

4   up, I will be more than happy to have the brief come in

5   contemporaneous with each other.

6          THE COURT:  Is that --

7          MR. WAGUESPACK:  That's fine Your Honor.

8          THE COURT:  Then if we --

9          MR. PECK:  And we can limit the length too, Judge.

10  I'm not just --

11         THE COURT:  I'm going to say -- can we say no more

12  than ten pages?  Because you can refer to the --

13         MR. DRAPER:  Ten pages, fine.

14         THE COURT:  You can refer -- no more than ten

15  pages, you can refer to the exhibits.  I think you have a

16  list of all of the exhibits.  We've gone through that several

17  times.  We all know what the exhibits are.  We'll have them

18  in the record, shortly.

19         And so, I mean, but next week is Christmas.  And --

20         MR. DRAPER:  We understand that.  And you can make

21  it ever better.  I won't -- Mr. Peck and I will submit a

22  joint brief so you will only have two to look at.

23         THE COURT:  Can we say then Friday -- I'm giving

24  you plenty of time.  I'm going to give a little more than a

25  week, because we do have Christmas in here.  Could we say

1  Friday, and that's going to be the next Friday, which would

2  be the 28th?

3          MR. DRAPER:  That's fine.

4          MR. PECK:  Is that a lift-stay, because -- are we

5  going to do -- is that for both motions, or just the lift-

6  stay?

7          MR. DRAPER:  Both motions.

8          THE COURT:  It is for both motions, because I've

9  got them both.

10          MR. PECK:  Well, I want to do my own then, Douglas.

11          MR. DRAPER:  Okay.  You can do your own.

12          THE COURT:  Well --

13          MR. PECK:  Because I've got a dog in the fight on

14  that one.

15          THE COURT:  Just don't duplicate.

16          MR. DRAPER:  I'll try not to.

17          MR. PECK:  We will --

18          MR. DRAPER:  We tried today not to duplicate.

19          THE COURT:  Ten pages, no more than ten pages.

20          MR. PECK:  Okay.

21          THE COURT:  And I think I've got -- do I have --

22  I've got a calendar.

23          THE CLERK:  Yes.

24          THE COURT:  I want to make sure I'm giving them --

25          MR. PECK:  What are you looking at?

1          THE COURT:  Is it Friday -- is it Friday, December

2  the 28th?

3          THE CLERK:  Correct.  The Friday --

4          THE COURT:  The Friday after Christmas, December

5  28th.

6          MR. PECK:  Yeah, 26th, 27th, 28th.

7          THE CLERK:  Yes, sir.

8          THE COURT:  Okay.  Friday, December 28th,

9  contemporaneous briefs.

10          MR. PECK:  I need a copy --

11          THE COURT:  And if the parties run into any

12  problems --

13          MR. PECK:  You can do one of these.

14          THE COURT:  That's fine.

15          MR. MONTAGUE:  Your Honor, may I make a short

16  statement on behalf of SpaceX?

17          THE COURT:  Yes.

18          MR. MONTAGUE:  We just want the Court to know that

19  we are in favor of maintaining the status quo by providing

20  adequate protection instead of lifting the stay.

21          THE COURT:  Thank you.

22          MR. PECK:  Your Honor, I'm going to offer, file

23  into evidence, Exhibit 10, the certificate, so the Court will

24  have it in the record.

25          THE CLERK:  Wait.  Exhibit --

1          MR. PECK:  So, you said --

2          THE COURT:  So that is -- I think it's actually going

3    to be Exhibit 11.

4          MR. PECK:  It's the Debtor's --

5          THE CLERK:  No, it's Exhibit 12.

6          THE COURT:  Is it 10?

7          THE CLERK:  No.

8          THE COURT:  I'm sorry, it's 12.

9          MR. PECK:  Exhibit 12 is this?

10         THE COURT:  So it will be Seatran/Debtor Exhibit

11   12.

12         MR. PECK:  Was that Joint Seatran and Debtor?

13         THE CLERK:  Yes.

14         THE COURT:  Seatran --

15         MR. PECK:  Yeah, I'm sorry.

16         THE COURT:  -- and Debtor Exhibit 12.

17         MR. PECK:  I'm sorry.

18         THE COURT:  It will be the certificate of

19   insurance.

20         MR. PECK:  Mr. Draper needs to tell me what --

21         THE COURT:  And that will be our evidence

22   record.

23         Mr. Waguespack, do you -- is the 28th going to be a

24   problem for you?

25         MR. WAGUESPACK:  I --

1          THE COURT:  Honestly, I'd rather know now.

2          MR. WAGUESPACK:  I'll -- we'll do it, Your Honor.

3   That's fine.

4          THE COURT:  It will be helpful for me.  I've got

5   quite a bit of evidence here, so if I could have the parties

6   summarize where we are, it would be helpful to me in making a

7   decision, to leave it to ten --

8          MR. WAGUESPACK:  If I bleed over a little bit, over

9   the ten pages, given that I've got two different parties,

10  will you kill me?  I'll try not to, but --

11         THE COURT:  If you need more, alert us.

12         MR. WAGUESPACK:  Okay.

13         THE COURT:  All right.

14         MR. WAGUESPACK:  Thank you Judge.

15         THE COURT:  Okay.

16         MR. WELLS:  Your Honor, and before we leave, the

17  parties asked me to announce the amount we're holding in

18  trust at this point, in escrow.  And we received a payment

19  last week which puts our total at $904,009 in --

20         THE COURT:  Thank you.

21         MR. WELLS:  Okay.

22         THE COURT:  So we'll -- the representation is that

23  that is sitting in your escrow and that's on the current

24  charter, whatever that charter is, on Mr. Steven?

25         MR. WELLS:  Yes, sir.  The Guice/Seatran

```
 1  charter.
 2          THE COURT:  The Guice agreement, right, for the
 3  Mr. Steven.
 4          MR. WELLS:  Yes.
 5          THE COURT:  Okay.
 6          MR. WAGUESPACK:  Thank you Your Honor.
 7          THE COURT:  Anything further?
 8          Thank you for -- you know, I think it was important
 9  that we get through this today.  I know everybody thinks that
10  we came here and it was rushed, but you know, we came today.
11  I think it was important to do it, and I think counsel has
12  done a good job of presenting their cases.  I appreciate
13  that.
14          I wish everyone a Merry Christmas and Happy
15  Holidays.
16          MR. PECK:  Thank you Judge.
17          MR. WAGUESPACK:  Thank you.
18          THE COURT:  Thank you.
19          MR. PECK:  Merry Christmas Judge.
20          MR. DRAPER:  Thank you Your Honor.
21          MR. WAGUESPACK:  Thank you for staying late, Your
22  Honor.
23          THE COURT:  All right.
24          MR. WAGUESPACK:  Thank you very much.
25          MR. PECK:  And thank your staff for staying late,
```

1    Judge.

2            MR. WAGUESPACK:  Thank you all.

3            THE COURT:  We'll be adjourned.

4                        *    *    *    *    *

5                   (Hearing is Concluded)

# C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.

**S/Sherryl P. Robinson**                    **_2/21/19_**
**Sherryl P. Robinson**                            **Date**