UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE


| | | |
|---|---|---|
| IN RE: | * | Case No. 18-51277 |
| | * | |
| MR. STEVEN, L.L.C., | * | Chapter 11 |
| | * | |
| DEBTOR. | * | Lafayette, Louisiana |
| | * | February 26, 2019 |

  *  *  *  *  *  *  *  *  *  *  *


JUDGE'S ORAL RULING
ON MOTIONS FOR RELIEF FROM STAY,
BEFORE THE HONORABLE JOHN W. KOLWE,
UNITED STATES BANKRUPTCY JUDGE


<u>APPEARANCES</u>:


| | |
|---|---|
| For the Debtor: | Heller, Draper, Patrick, Horn & Manthey, LLC<br>BY:  DOUGLAS S. DRAPER, ESQ.<br>650 Poydras Street<br>Suite 2500<br>New Orleans, Louisiana 70130 |
| For Seatran Marine, LLC<br>and Steven Miguez: | Lugenbuhl, Wheaton, Peck, Rankin & Hubbard<br>BY:  STEWART F. PECK, ESQ.<br>601 Poydras Street<br>Suite 2775<br>New Orleans, Louisiana 70130 |
| For SBN V FNBC LLC: | Carver Darden Koretzky Tessier Finn Blossman & Areaux, LLC<br>BY:  DAVID F. WAGUESPACK, ESQ.<br>Energy Centre<br>1100 Poydras Street<br>Suite 3100<br>New Orleans, Louisiana 70163 |

APPEARANCES (CONT'D.):


For Guice Offshore, LLC:          Ottinger Hebert, LLC
                                  BY:  WILLIAM KAUFMAN, ESQ.
                                  1313 West Pinhook Road
                                  Post Office Drawer 52606
                                  Lafayette, Louisiana 70505


Court Audio Operator:             Tonya M. Griffith, E.C.R.O.


TRANSCRIPTIONIST:                 Sherryl Robinson
                                  3704 Chadwood Drive
                                  Harvey, Louisiana 70058
                                  (504) 348-3704


Proceedings recorded by electronic sound recording, transcript

produced by transcription service.

# I N D E X

|  | Page Number: |
|---|---|
| **Judge's Ruling** | **5** |

EXHIBITS:                                   <u>Marked</u>      <u>Received</u>

(None Offered at this Proceeding)

1              **P R O C E E D I N G S**

2              (Tuesday, February 26, 2019)

3              (Call to Order of the Court)

4                  *   *   *   *   *

5          **JUDGE'S ORAL RULING ON MOTIONS**

6              **FOR RELIEF FROM STAY.**

7                  *   *   *   *   *

8          THE COURT:  You may proceed.

9          THE CLERK:  On *Mr. Steven, L.L.C.,* Case Number

10   18-51277, we have four matters coming before the Court today

11   for Oral Ruling.  They are four Motions for Relief From

12   Stays.

13          May I please get the appearances?

14          MR. WAGUESPACK:  Good morning Your Honor, David

15   Waguespack on behalf of SBN V FNBC LLC.

16          THE COURT:  Good morning.

17          MR. PECK:  Good morning Your Honor, Steward Peck on

18   behalf of Steve Miguez and Seatran.

19          THE COURT:  Good morning Mr. Peck.

20          MR. DRAPER:  Douglas Draper on behalf of the

21   Debtor, Your Honor.

22          THE COURT:  Good morning Mr. Draper.

23          MR. KAUFMAN:  Your Honor, William Kaufman on behalf

24   of Guice Offshore.

25          THE COURT:  Thank you Mr. Kaufman.

1    Okay.  We'll get started again.  The Court has its

2 Ruling prepared.  It's going to take a few minutes, it's

3 almost -- let's start from the beginning:

4                    *    *    *    *    *

5                           **RULING**

6                    *    *    *    *    *

7    THE COURT:  This is the Ruling on SBN V FNBC's four

8 Motions for Relief from Automatic Stay in this matter.

9    Before the Court are the Motions for Relief from

10 the Automatic Stay filed in Mr. Steven, L.L.C., Lady Brandi,

11 L.L.C., Mr. Mason, L.L.C., and Mr. Row, L.L.C. bankruptcy

12 cases by secured creditor SBN V FNBC, LLC.  I'm going to

13 refer to it as SBN.

14    Each of the four Debtors opposes the motion filed

15 in its respective case.  Mr. Steven J. Miguez, manager of each

16 Debtor and Seatran Marine, LLC, an affiliate of each Debtor

17 also opposes each motion.

18    The Court conducted evidentiary hearings on these

19 matters.  The Court has considered the arguments of counsel,

20 the testimony of witnesses, the evidence adduced and the

21 applicable law and rules as follows:

22    First, for a bit of background, on October 3rd, 2018

23 Mr. Steven, L.L.C. filed a voluntary petition for relief

24 under Chapter 11 of the Bankruptcy Code.  That's Case Number

25 18-51277.  Lady Eve, L.L.C., Case Number 18-51488 filed on

1    November 16, 2018.  And Lady Brandi, L.L.C., Case Number

2    18-51517, Lady Glenda, L.L.C., Case Number 18-51518,

3    Mr. Blake, L.L.C., Case Number 18-51519, Mr. Mason, L.L.C.,

4    Case Number 18-51521, Mr. Ridge, L.L.C., Case Number 18-51522,

5    and Mr. Row, L.L.C., Case Number 18-51523 filed on November

6    21st, 2018.

7            These cases are being jointly administered in the

8    *Mr. Steven* case pursuant to court order date of December 21,

9    2018 -- that's ECF Document 109 -- but they have not been

10   substantively consolidated.

11           On October 31, 2018 Mr. Steven filed a Motion to

12   Determine Property of the estate and for turnover of property,

13   which seeks to turnover certain proceeds of a bareboat

14   charter of the Marine Vessel MR. STEVEN to Guice Offshore,

15   LLC.

16           Guice, Seatran and SBN filed responses and/or

17   objections to this motion.  On November 26th, 2018 SBN filed

18   a Motion for Relief from the Automatic Stay in the *Mr. Steven*

19   case.  The Debtor, Steven J. Miguez and Seatran objected to

20   this motion.

21           The Court conducted an evidentiary hearing on both

22   motions on December 18, 2018, at which I took testimony of

23   several witnesses.

24           At the completion of the hearing the parties

25   requested permission to file post-hearing briefs, which the

1  Court ordered to be filed on or before December 28th, 2018.

2  The Court then took the matters under advisement.

3        In the meantime, on January 17, 2019, SBN filed

4  three additional Motions for Relief from the Automatic Stay

5  in the *Mr. Mason, Lady Brandi,* and *Mr. Row* cases, which were

6  opposed by the Debtors Mr. Steven Miguez and Seatran.

7        Given the filing of the additional Motions for

8  Relief from Stay and other scheduling issues facing the

9  Court, the Court entered an order on January 25, 2019 --

10  that's ECF 132 -- denying SBN's Motion for Relief in the

11  *Mr. Steven* matter on an interim basis and granting adequate

12  protection of $25,000 per month retroactive to the date SBN

13  filed its motion.

14        This was a figure based on the evidence presented

15  by Mr. Steven at the December 18 hearing, which SBN failed

16  to rebut with contrary evidence, and setting a final hearing

17  on SBN's Motion for Relief in the *Mr. Steven* matter for

18  February 12, 2019 -- and that's ECF 132.

19        The Court took up all four Motions for Relief from

20  Stay and the Motion for Turnover on February 12th, 2019.

21  Certain additional documentary evidence was adduced and the

22  Court heard argument of counsel.

23        Following the hearing the Court concluded that the

24  Motion for Turnover should proceed as an adversary proceeding

25  under Federal Rule of Bankruptcy Procedure 7001, and thus

1  ordered Mr. Steven and Guice to file an appropriate adversary

2  proceeding to determine ownership of the proceeds of the

3  Guice charter of the Marine Vessel MR. STEVEN.

4          The Court then took all four Motions for Relief

5  from Stay under advisement for final ruling, and the stay was

6  extended till today's date.

7          The Court has carefully considered the testimony of

8  the witnesses, the evidence adduced and the record in this

9  matter and makes the following findings of fact and

10 conclusions of law.  To the extent any of the following

11 findings of fact compromise conclusions of law or mix finding

12 of fact and law, they should be considered as such.

13         Next, I want to go over the structure and

14 management of the Debtors and the assets of the Debtor:

15         Each Debtor is a single purpose limited liability

16 company that owns a single marine vessel that is used

17 primarily in the oil and gas operations in the Gulf of

18 Mexico.  Each Debtor is wholly owned by Iberia Crewboat and

19 Marine Services, LLC.  I'll refer to it as Iberia Crewboat.

20 And Mr. Steven J. Miguez serves as the manager of each

21 entity.

22         None of the Debtors directly conduct operations.

23 Instead, each Debtor entered into a vessel operating

24 agreement with a separate affiliate entity, Iberia Marine

25 Service, LLC, which I'll refer to as Iberia Marine.  And

1   Iberia Marine purports to operate and manage the vessel of

2   each Debtor.

3          The Debtors have never submitted the vessel

4   operating agreement between Iberia Marine and each Debtor to

5   the Court even though it is disclosed as an executory

6   contract of each Debtor in Schedule G of each of the cases.

7          Sometime in 2014 Iberia Marine, along with two

8   additional unaffiliated companies, Comar Marine, LLC and

9   Texas Crewboats, Inc. formed Seatran.

10         Blake Miguez, the son of Steven J. Miguez, was

11  appointed President and Chief Executive Officer of Seatran,

12  and he testified that he is currently employed by Seatran.

13         Charles Tizzard is Seatran's Executive Vice-

14  President and Chief Financial Officer.  According to

15  Mr. Tizzard, Seatran's primary purpose was to manage vessels

16  owned by Iberia Marine, Comar and Texas Crewboats, including

17  the vessels owned by the Debtors in this case.

18         And for reference on this, see the Seatran

19  organizational flowchart, which is Exhibit Number 3 from the

20  December 18, 2018 hearing.  It's ECF 112-3.

21         Mr. Tizzard testified that Comar has since

22  withdrawn from the company such that Seatran is now co-owned

23  equally by Iberia Marine and Texas Crewboats, and the only

24  vessels owned are under contract, and that those companies

25  are now being managed and operated by Seatran.

1    Seatran operates the vessels pursuant to a vessel

2  operating agreement, however, this agreement was not reduced

3  to writing until October 2nd, 2018, the day before Mr. Steven,

4  L.L.C. filed its bankruptcy petition, but purports to be made

5  effective July 1, 2014.

6    This agreement was -- actually, they filed that --

7  it was reduced to writing on October 2nd, 2018.  I want to

8  make sure I said the same -- the right date, but it wasn't

9  made effective until July 1, 2014.

10    This agreement was executed by Iberia Marine and

11  each Debtor also intervened in this agreement, agreeing to be

12  bound by its terms and agreeing that it is a, quote, "back to

13  back," closed quote, agreement to Iberia Marine's agreement

14  with the Debtors.

15    The vessel operating agreement is not identified in

16  the Debtor's bankruptcy schedules.  Mr. Tizzard testified

17  that the timing of the execution of this agreement was merely

18  coincidental, as according to him the parties had negotiated

19  the vessel operating agreement at the time Seatran was set up

20  in 2014, but its execution was overlooked.

21    Through Mr. Tizzard's testimony Seatran introduced

22  e-mails and a draft vessel operating agreement which

23  indicates Seatran was working on a quote, "form," closed

24  quote, vessel operating agreement to be executed by the

25  principal owners of Seatran at least as early as May 2014.

By e-mail dated May 27, 2014, Andrew Goodman of the Kean Miller Law Firm conveyed, quote, "comments," closed quote, and changes to the proposed agreement to Mr. Blake Miguez and Mr. Tizzard and noted that, quote, "It was a good pro Seatran form of agreement," closed quote. And there I'm quoting from Seatran Exhibit Number 2 from the December 18, 2018 hearing, which is a series of e-mails and attachments including the May 27, 2014 e-mail from Mr. Goodman to Mr. Blake Miguez.

Indeed on its face, the vessel operating agreement is an entirely one-sided document granting extraordinary protections to Seatran at the expense of the Debtors, guaranteeing that no matter what problems might arise under the contract, some other party, usually the Debtors, will suffer rather than Seatran.

Mr. Tizzard confirmed that the draft agreement was never executed and that the parties operated under an oral agreement until October 2, 2018, when the vessel operating agreement was finally executed.

The Court finds that notwithstanding the retroactive effective date placed in the written Seatran vessel operating agreement, to the extent Seatran was operating any of the marine vessels at issue in this case, it was doing so by oral agreement until October 2, 2018.

The Court observes that the executed vessel

1 operating agreement appoints Seatran, quote, "to manage,

2 maintain books and records, operate, maintain, oversee and

3 supervise the chartering, crewing, provisioning, maintenance

4 and repair of," closed quote, the vessels under the control

5 of Iberia Marine, including the Marine Vessels MR. STEVEN,

6 LADY BRANDI, MR. MASON, and MR. ROW.  And I'm quoting from

7 Seatran Number 4 and SBN Number 17 from the December 13

8 hearing.

9 　　　　　The agreement also provides that, quote, "Any and

10 all charters or other contractual relationships entered into

11 with respect to the use of the vessel shall be in the name of

12 Seatran and shall be the property of Seatran and the owner

13 shall not have any rights, title or interest in and to any

14 such charters or other contractual relationship or funds or

15 charter hire derived from the same," closed quote.  Again,

16 quoting from the vessel operating agreement.

17 　　　　　Additionally, the agreement states that, quote,

18 "All invoices issued by Seatran to the charterers of the

19 vessel shall be owned by Seatran," closed quote, and open

20 quote, "Payment of all such invoices shall be made directly

21 to Seatran or to any location directed by Seatran," closed

22 quote.  Again, those quotes come from the vessel operating

23 agreement.

24 　　　　　The agreement also provides that the owner is

25 responsible for, quote, "shared overhead fees, owner

1  operating expense and, if applicable, a termination fee,"

2  closed quote, and that to secure payment of these items

3  Seatran, open quote, "shall have a maritime lien on the

4  vessel to secure the payment of all such amounts," closed

5  quote.  Again, the quotes are coming from the vessel

6  operating agreement.  Mr. Steven J. Miguez executed the

7  agreement on behalf of Iberia Marine and each of the Debtors

8  as manager.

9       Finally, the Court noticed that Article 17 of the

10 vessel operating agreement provides if, quote, "If requested

11 by owner, Seatran will enter into a subordination agreement

12 with owner's lenders that will subordinate Seatran's maritime

13 lien for necessaries and arising pursuant to this agreement

14 to the lien of any preferred ship mortgages in favor of

15 owner's lenders, period," closed quote.  And that's also

16 coming from the vessel operating agreement.

17      And there, when I refer to owner, that's referring

18 to Iberia Marine and the Debtors.

19      Obviously, if the bank had known of the

20 arrangement, it would have demanded that Debtors and/or

21 Iberia Marine have exercised the right, i.e., giving

22 subordination from Seatran; but that would have been quite

23 impossible because a written VOA, the vessel operating

24 agreement, was not executed until just before the Debtors

25 filed for bankruptcy.

1          The effect of these agreements is that the vessel

2   owned by each Debtor is wholly managed and operated by at

3   least two non-Debtors, Seatran and Iberia Marine, and any

4   money earned by charter contracts or other uses of the

5   vessels has to pass through Seatran and Iberia Marine, which

6   take their cut.

7          Next, I want to discuss the loan:

8          In May 2015 the Debtors and Iberia Marine made a

9   request to First NBC Bank, which I'll refer to as FNBC, for a

10  loan to be used primarily to refinance the Debtors and Iberia

11  Marine's then existing debt with Capital One Bank NA.

12         In evaluating the loan request, FNBC requested

13  financial statements, tax returns, and charter information

14  with respect to Seatran, Comar, Texas Crewboats and Seatran.

15         In response, Mr. Tizzard informed FNBC in a June

16  23rd, 2015 e-mail message that, quote, "Seatran is basically

17  a co-op and was not set up to make a profit," closed quote.

18  And that's coming from Seatran Number 3, which is the e-mail

19  from Mr. Tizzard to FNBC.

20         Mr. Tizzard's e-mail continues by providing in

21  part, and this is quite an extensive quote:  So open quote,

22  "I think I need to better explain the structure of Seatran

23  Marine and the three companies that have Seatran manage their

24  vessels.  Seatran was set up in 2014 to serve as a management

25  company to market and operate the vessels owned by the three

1  separate crewboat companies, Comar Marine, Texas Crewboats,

2  and Iberia Marine.

3       "Other vessel owners may be added in the future.

4  Seatran is basically a co-op and was not set up to make a

5  profit.  All vessel charters are billed to the customers by

6  Seatran.  When the receivables are collected by Seatran, they

7  are refunded 100 percent to the vessel owners.  Seatran has

8  no obligation or involvement in the payment of any debt of

9  the various vessel owning entities, i.e., Iberia Marine,

10  Comar or Texas Marine.

11       "Based on the structure of Seatran, financial

12  statements, debt structure and charter information on Comar

13  Marine and Texas Crewboats shouldn't be needed by the bank,

14  and the owners of those companies won't make the information

15  available to provide to the bank."  Again, I'm quoting

16  from that e-mail from Mr. Tizzard to FNBC dated June 23rd,

17  2015.

18       At the hearing Mr. Tizzard again reiterated that

19  Seatran was nothing but a pass-through entity and that all

20  proceeds or charters entered by Seatran on behalf of the

21  vessel owner were to be passed down directly to the vessel

22  owner.

23       The Court finds that this explanation does not

24  quite match up with the facts.  And we show that Seatran

25  and/or Iberia Marine offset substantial sums of money from

1  income earned by the vessel charters, leaving very little

2  for the Debtors, which actually owned the vessels.

3       The Court also finds that what Mr. Tizzard told

4  the bank at the time did not include many of the most

5  relevant terms of the written vessel operating agreement,

6  which although not executed, was clearly in existence because

7  the evidence in this case includes a draft from -- that's

8  dated in May of 2014.

9       FNBC's loan file is part of the evidence in this

10  matter -- that's ECF 150.  A review of the bank analyst notes

11  in the file shows that the bank was not aware that Seatran

12  would own all receivables and related charters.  There are

13  references in the bank's file to Iberia Marine being the

14  entity that chartered the vessels serving as collateral.

15       Moreover, the bank's draft file does not contain

16  the draft vessel operating agreement, even though the

17  evidence shows that it existed more than a month before

18  Mr. Tizzard sent the June 23rd, 2015 e-mail referred to

19  above.

20       And Mr. Tizzard actually testified during the

21  hearing on cross-examination that he never provided a copy of

22  the vessel operating agreement, even in draft form, to the

23  bank.

24       And here, I want to focus on that section -- that

25  Article 17 of the vessel operating agreement, where it

1  provides that Seatran would provide -- would give a

2  subordination if requested.  You know, clearly if that had

3  -- if the FNBC was aware that that was going to be the case,

4  it just seems to the Court that FNBC, if they understood

5  this transaction, would have requested that subordination.

6        With that background, on September 28, 2015, FNBC

7  made a loan in the principle amount of $22,500,000 to

8  Mr. Steven, L.L.C, Lady Eve, L.L.C., Lady Brandi, L.L.C.,

9  Lady Glenda, L.L.C., Mr. Blake, L.L.C., Mr. Mason, L.L.C.,

10  Mr. Ridge, L.L.C. and Mr. Row, L.L.C., along with Iberia

11  Marine, collectively referred to as the borrowers.

12        The borrowers also executed a business loan

13  agreement with FNBC.  To secure the loan each borrower

14  granted a preferred ship mortgage covering the marine vessel

15  owned by such borrower, and each of the preferred ship

16  mortgages was filed with the National Vessel Documentation

17  Center.  And all of this evidence is in the record of this

18  matter.

19        Additionally, FNBC filed a UCC financing statement

20  with respect to each borrower and each marine vessel.  And

21  these are also in the record of this matter.

22        Each UCC financing statement indicated that FNBC

23  had a security interest in the named vessel, as well as all

24  accounts, equipment, general intangibles, inventory and

25  proceeds related in any way to such vessel.  As further

1  security for payment, FNBC also obtained a guaranty from

2  Mr. Steven J. Miguez for the full amount owed on the

3  promissory note.

4        Seatran however did not execute any security

5  agreements or a guaranty in favor of FNBC.  Mr. Tizzard

6  testified that what FNBC initially requested a guaranty and

7  a security agreement from Seatran, they decided against it

8  based primarily on Mr. Tizzard's representation of what the

9  arrangement between Seatran and Iberia Marine and the Debtors

10 was.

11        Under the terms of the promissory note the

12 borrowers were to make twelve monthly payments of interest

13 beginning October 28, 2015.  And beginning October 28, 2016,

14 the borrowers were to make 47 monthly principle and interest

15 payments of $149,396.47 in each payment, with a final payment

16 of all unpaid principle and interest in the amount of

17 $19,766,650.41 being due on September 28th, 2020.

18        In April 2017, FNBC was closed by the Louisiana

19 Office of Financial Institutions and the Federal Deposit

20 Insurance Corporation, better known as the FDIC, was named

21 receiver.

22        On October 18, 2017 SBN purchased the promissory

23 note and received an assignment of the note and the related

24 loan documents including each of the eight preferred ship

25 mortgages covering the vessel of each Debtor.  SBN was also

1    assigned a UCC financing statement on each Debtor and the

2    vessel -- and the vessels.

3           Now, it should be noted here that SBN objected to

4    Exhibits 1, 2 and 3 of Seatran and the testimony of

5    Mr. Tizzard, based on the D'Oench Duhme Doctrine, which

6    holds, quote, "that when a federally insured bank fails,

7    borrowers from the bank may not later defend against

8    collection efforts of a federal receiver by arguing that

9    they had an unrecorded agreement with the bank."

10          And that quote is coming from the Kilpatrick vs.

11   Riddle, 907 F.2d Reporter, Page 1523, quoting from Page

12   1526.  That's a Fifth Circuit 1990 case citing the U.S.

13   Supreme Court D'Oench Duhme case.  SBN also argued that under

14   the Louisiana Credit Agreement Statute, LA Revised Statute

15   Section 6:1121 et sequitur, which is similar to the D'Oench

16   Duhme Doctrine.

17          Well, under the D'Oench Duhme Doctrine, the

18   Louisiana Statute of the General Parol Evidence Rule, the

19   Court agrees that the evidence may not be used by any party

20   here to vary the terms of the written loan documents and in

21   other instruments between the parties.  The parties rights

22   and obligations under those documents will be determined

23   solely by the terms provided therein; and indeed, those

24   issues will be the focus of the turnover proceeding and other

25   matters before the Court.

1    The sole purpose for allowing this evidence in

2 this proceeding is in the evaluation and the determination by

3 the Court of whether cause exists to grant relief in the

4 automatic stay to SBN under Section 362(d)(1) of the Code.

5    The Court finds that had FNBC been aware of the

6 terms of the vessel operating agreement, particularly in the

7 form and in place -- that it was put in the form on the eve

8 of Mr. Steven's bankruptcy; at the time FNBC actually made

9 the loan, particularly those concerning ownership of the

10 charters and the accounts receivable, and the fact that a

11 subordination was required if requested by an owner, it

12 would have taken steps to obtain the subordination from

13 Seatran and/or had structured the loan differently.

14    With that background, well now -- the Court is

15 going to now move to discuss the pre-petition default and the

16 collection actions by SBN all before the filing of the

17 bankruptcy cases:

18    It is undisputed that the filing entities -- that's

19 each of the Debtors here -- and Iberia Marine defaulted in

20 making the payments due under a promissory note.  Neither the

21 filing entities nor Iberia Marine has made a payment on the

22 promissory note since July 31, 2017.

23    This led to a guaranty action against Mr. Steven J.

24 Miguez.  By a letter dated January 16, 2018, SBN made demand

25 for payment of the note on each filing entity, Iberia Marine

1    and the Guarantor Steven J. Miguez.

2           Thereafter, on February 6th, 2018 SBN filed suit

3    against Mr. Miguez in Louisiana State Court in Jefferson

4    Parish to enforce the guaranty agreement, which eventually

5    ended up in the Western District of Louisiana, which I'll

6    discuss in more detail later.

7           Next, there was demand made on Guice Offshore, LLC.

8    In October 2017 the vessel owned by Mr. Steven, L.L.C., the

9    Marine Vessel MR. STEVEN, was leased pursuant to a bareboat

10   charter to Guice Offshore, LLC.  I'll refer to Guice Offshore

11   as just simply Guice.

12          Upon learning of this charter, SBN made demand on

13   Guice to remit all payments due under the charter directed to

14   SBN.

15          And here, I'm looking at SBN Documents Number 6

16   and Number 7 that were admitted into evidence on December 18,

17   2018.

18          Miguez and Mr. Steven, L.L.C. responded to this

19   demand through counsel by notifying SBN that Guice executed

20   the charter with Seatran as owner, not Mr. Steven, L.L.C.,

21   the actual owner in fact of the vessel.  The letter continued

22   by informing SBN that because there is no privity of contract

23   between Guice and Mr. Steven, L.L.C., SBN's quote, "Efforts

24   to Effectuate Direct Payment from Guice Offshore, LLC as

25   inapplicable," closed quote.  Again, I'm quoting from SBN

1    Number 7 there, which was admitted into evidence on December

2    18th.

3            Guice through counsel also responded to the demand

4    by acknowledging the competing demands and informing both

5    SBN, Miguez and Mr. Steven that it would be escrow the

6    payments due under the charter, which was approximately

7    $3,300 per day, with the Law Firm of Rushing & Guice,

8    P.L.L.C.  This growing pool of money arising out of the

9    bareboat charter remains in escrow and is the subject of the

10   turnover proceeding.  And then finally, pre-petition an in

11   rem for closure preferred -- on the preferred ship mortgage

12   on the Marine Vessel MR. STEVEN was filed.

13           SBN discovered that Space Exploration Technologies

14   Corp., which I'll refer to as simply as SpaceX, has chartered

15   the Marine Vessel MR. STEVEN from Guice.  During a hearing on

16   the Motion for Relief from Stay it was disclosed that SpaceX

17   invested substantial time, effort and capital in designing

18   and modifying the Marine Vessel MR. STEVEN to recover rocket

19   fairings as they descend to earth following launches of the

20   SpaceX rockets.

21           Pursuant to the charter between SpaceX and Guice,

22   the Marine Vessel MR. STEVEN was relocated to the Pacific

23   Ocean off the coast of California.  On October 2nd, 2018 SBN

24   caused the verified complaint in rem for foreclosure of the

25   preferred ship mortgage on the Vessel MR. STEVEN to be filed

1    in the United States District Court for the Central District

2    of California.  And that's SBN Number 10 in the record.

3         Now we move to the bankruptcy.  On October 3rd, 2018

4    the day after SBN filed an in rem complaint in California and

5    the day after executing the Seatran vessel operating

6    agreement, Mr. Steven, L.L.C. filed its Chapter 11 case in

7    this Court.  Lady Eve filed on November 16 and the remaining

8    six Debtors filed on November 21st.

9         A brief consideration of the Debtor's bankruptcy

10   schedules and statement of financial affairs, particularly as

11   it relates to the four Debtors at issue in this case is

12   helpful.

13        With respect to Mr. Steven, the primary asset in

14   that case is the Marine Vessel MR. STEVEN.  It is valued in

15   the schedules at $12,614,459.61.  This value is described as

16   being the current value on the books, i.e., the fixed asset,

17   less depreciation.  The schedules also reflect a cash

18   receivable totaling $102,300 and an operating deposit of

19   $75,000 with Seatran.  The total asset value for the

20   schedules is at $12,834,012.86.

21        Based on the other information submitted by the

22   Debtors there's every reason to believe that the stated book

23   value exceeds the fair market value of the vessel.

24   Specifically, Exhibit 6, the disclosure statement is a

25   valuation survey of all the Debtor's vessels as Seatran

1   commissioned from Precision Marine Surveying, which I'm going

2   to refer to as Precision Marine Surveying.  That's ECF 141-6,

3   showing the current 30 day orderly liquidation values as of

4   February 1, 2019.

5           Based on the current market conditions and

6   comparable sales since 2019, the Precision Marine survey

7   advised that the current liquidation value of the Marine

8   Vessel MR. STEVEN is $5 million and that the total

9   liquidation value of all eight vessels is $10,050,000.

10          Moving on through the schedules, there is only one

11  secured creditor, that's SBN, and its debt is scheduled for

12  $23,438,218.26.  This debt is listed as disputed on the

13  schedules.

14          Also, there are only four unsecured creditors

15  listed on the amended schedules with claims totaling

16  $234,720.01, by far the largest unsecured debt, $223,187.32

17  is owed to an affiliate company, Iberia Marine.  Schedule G

18  also shows one executory contract with Iberia Operating

19  Service, LLC.

20          The statement of financial affairs shows that

21  Mr. Steven, L.L.C. made a transfer to its affiliate within

22  one year of filing, and that was to Iberia Marine Service,

23  LLC, totaling $2,772,100.54, with the transfers occurring on

24  September 7, 2018 and October 3, 2018.

25          During the hearing on December 18, 2018, counsel

argued that this was only an accounting entry and that no

funds were transferred.  No evidence has been submitted to

the Court concerning any substantial transfers made less than

one month prior to the Mr. Steven bankruptcy filing.

The Court will note that Mr. Tizzard testified that

Seatran would invoice Iberia Marine and the vessel entities

controlled by Iberia Marine for repair, maintenance and

operation of the vessels, including the Mr. Steven.

Seatran indicated for instance that it would like

to recoup substantial sums expended to modify the Mr. Steven

to participate in the Guice SpaceX charter, despite the fact

that no other -- that no one ever obtained the lender's

permission.  I don't know if this is what this amounts to,

but it just -- there's no explanation but it just looks

strange.

Next we'll move to the Lady Brandi.  The *Lady Brandi*

case was also -- is also a single asset case with the primary

asset being the Marine Vessel LADY BRANDI.  It's got a

schedule value of $1,694,451.77.  This value is described as

being the current value on the books, less depreciation.

The Precision Marine survey opines that the

liquidation value of the Marine Vessel LADY BRANDI is only

$550,000.  And there's also an operating deposit of $75,000

with Seatran.  The total asset value for the schedules is

$1,878,018.28.  The only secured creditor is SBN for the $23

1  million -- almost $23,500,000, which is also listed as

2  disputed.

3          There are several unsecured debts collectively

4  totaling $18,049.69, with the largest being the unsecured

5  debt of Iberia Marine of $13,217.69.

6          The other debts are owed to Alan's Handyman

7  Services, Kolder, Slaven & Company, which is an accounting

8  services firm, and Superior Electrical Service, LLC.

9          Schedule G also shows that the only executory

10 contract is being a vessel operating agreement with Iberia

11 Marine Service.

12         The statement of financial affairs also shows

13 transfers to insiders within one year of the filing to the

14 affiliate company Iberia Marine, which occurred on September

15 7, 2018 in an amount of $295,200.59, which was shown to be a

16 contemporaneous transaction.

17         It also shows transfers to another affiliate

18 company, Iberia Crewboat & Marine of $13,050.22 on January

19 23rd, 2018 and $1,914.33 on March 15, 2018.  Both of these

20 transfers were described as contemporaneous transactions, and

21 no evidence has been submitted to the Court to explain these

22 transfers.

23         Next we have Mr. Mason.  *Mr. Mason* case is a single

24 asset case with the single asset being the Marine Vessel

25 MR. MASON.  The book value of this asset per the schedules is

1   $1,892,943.34, which is the current value on the books, less

2   depreciation.  The Precision Marine survey also values this

3   vessel at $550,000.  There is also an operating deposit of

4   $75,000 with Seatran.

5          The only secured creditor is SBN for the amount of

6   $23,500,000, which is also listed as disputed.  There are

7   several unsecured debts collectively totaling $20,560.01.

8   The largest unsecured debt is $13,216.95; and like the

9   *Lady Brandi* case, it is owed to affiliate Iberia Marine

10  Services.

11         The other debts are owed to Alan's Handyman

12  Services, Kolder, Slaven & Company and Superior Electrical

13  Services, which are the same unsecured creditors listed in

14  the *Lady Brandi* case.  Schedule G also shows the only

15  executory contract as being the vessel operating agreement

16  with Iberia Marine.

17         The statement of financial affairs also shows

18  transfers to insiders within one year of the filing to the

19  affiliate company, Iberia Marine Service, LLC.  There were

20  two transfers in total, one on September 7th, 2018 for

21  $919,482.76 and one on March 15, 2018 in the amount of

22  $2,450.55.  These are shown to be contemporaneous

23  transactions.

24         It also notes another transfer to an affiliate

25  company, Iberia Crewboat & Marine Services, LLC for

1   $14,558.89 on January 23rd, 2018, which was also described as

2   being a contemporaneous transaction.

3        The Court notes that there is no evidence submitted

4   to explain these transfers.  These are large transfers for a

5   vessel that was essentially out of commission at the time.

6        Next we have the *Mr. Row* case, the Mr. Row asset.

7   In that case the single asset is the Marine Vessel MR. ROW.

8   The book value of that asset per the schedules is

9   $1,837,997.07, which is the current value on the books, less

10  depreciation.

11       The Precision Marine survey also values that vessel

12  at $550,000.  There is also an operating deposit of $75,000

13  with Seatran, and the only secured debt is that of SBN for

14  the nearly $23,500,000.

15       Again, there are several unsecured debts

16  collectively totaling $17,518.31.  The largest unsecured debt

17  is $13,217.69, and like in the other cases, it is owed to

18  affiliate Iberia Marine.  The other debts are owed to Alan's

19  Handyman Services, Kolder, Slaven and Superior Electrical,

20  which are the identical unsecured creditors listed on the

21  other cases.

22       And Schedule G also shows the executory contract

23  with Iberia Marine, which is the vessel operating agreement.

24       The statement of financial affairs also shows

25  intercompany transfers.  There were two transfers in total;

1    one on September 7 in the amount of $77,877.72 and one on

2    March 15 in the amount of $797.19, and both of those were

3    made to Iberia Marine.

4            And there was also a transfer to Iberia Crewboat &

5    Marine Services of $11,010.48 on January 23rd of 2018.  All

6    of these were described as being contemporaneous

7    transactions.

8            Then the bankruptcy case would -- the Court is

9    going to go in a little more detail on the Motion for

10   Turnover.  Herein, there are three primary matters that have

11   been -- well, there's actually three matters that been before

12   the Court:  The Motion for Turnover, the injunction

13   proceeding and the Motions to Lift Stay.  I'm going to talk

14   about first the Motion for Turnover:

15           And that was filed on October 3rd, 2018.  This

16   motion pertains to the escrow funds related to the Guice

17   charter of the Marine Vessel MR. STEVEN.  Mr. Steven contends

18   that some or all of these funds belong to Mr. Steven's

19   bankruptcy estate under 11 USC Section 541, and some or all

20   of the funds are cash collateral, which may not be used

21   absent an agreement or court order pursuant to Section

22   363(c)(2) of the Code.

23           Mr. Steven also stated that it planned to use some

24   or all of the funds in the administration of the

25   reorganization subject to compliance with 11 -- well

actually, let me just tell you:  Sections 361, 362, and 363 of the Code.

Thus Mr. Steven seeks turnover of the funds from Guice and for Guice to provide an accounting of same and for Guice to deposit the funds in the registry of the Court pending a determination of ownership.

Seatran objected to the Motion for Turnover on several grounds.  First, it contends that requests for the turnover of property of the estate must be an adversary proceeding under the Federal Rule of Bankruptcy Procedure 7001.

Second, Seatran contends that Mr. Steven has no legal or equitable interest in the proceeds being held by Guice, because Mr. Steven is not a party to the charter and is not a third party beneficiary of the charter agreement between Seatran and Guice.

Seatran notes that under the vessel operating agreement between Iberia Marine and Seatran, all charters and receivables from charters are owned by Seatran, not Iberia Marine or the vessel owning entity such as Mr. Steven.

Finally, Seatran contends no other party has a claim to the proceeds, because Seatran has not granted a security interest covering the Guice charter or the proceeds from that charter.

1        SBN filed a limited objection to the Motion for

2   Turnover.  SBN does not oppose placing of the proceeds of the

3   Guice charter into the registry of the Court; however, SBN

4   contends that the funds should be turned over to it in

5   accordance with the terms of the preferred ship mortgage,

6   granting SBN a security interest in all charters of the

7   Mr. Steven, and the proceeds derived therefrom.

8        Guice also responded to the Motion for Turnover

9   by seeking permission to deposit the funds into the registry

10  of the Court, pending a determination of the appropriate

11  owner.

12       The Court heard argument on this matter at the

13  hearing on December 18th, 2018 and I ruled on the motion on

14  February 12th, 2019.  The Court concluded that as a matter of

15  law, when a debtor seeks to turnover estate property from a

16  third party, an adversary proceeding is required.  See In Re:

17  Hensley, a Fifth Circuit 1998 case reported at 149 Federal

18  Reporter 3d, Page 1179.

19       Thus the Court ordered Mr. Steven and Guice to

20  prepare the appropriate proceedings to commence in the

21  adversary proceeding to address the issues concerning the

22  charter agreement between Seatran and Guice, and the proper

23  payee of the proceeds attributable to the charter for the

24  Marine Vessel MR. STEVEN.

25       Next, I'm going to discuss in more detail the

1  guaranty action and the injunction action.  In leading up to

2  filing of the Mr. Steven bankruptcy petition, SBN filed a

3  guaranty action against Mr. Miguez in the Louisiana State

4  Court as the Court has already noted.  After Mr. Steven had

5  filed for bankruptcy, but before the other entities had done

6  so, Mr. Miguez removed the guaranty action to the United

7  States District Court for the Eastern District of Louisiana

8  on November 15, 2018, asserting jurisdiction on the grounds

9  that the guaranty action related to Mr. Steven, L.L.C.'s

10  bankruptcy case already appeared in bankruptcy court for the

11  Western District of Louisiana.

12       On the same day he removed the guaranty action to the

13  Eastern District, Mr. Miguez moved to transfer it to the

14  Western District of Louisiana.

15       SBN then filed a Motion for Summary Judgment in the

16  Eastern District, which was set for submission on December 12,

17  2018.  On December 6th, 2018, Mr. Steven, L.L.C. and its co-

18  Debtors, who by that time had filed their own bankruptcy

19  petitions, filed an adversary complaint in this Court against

20  SBN -- I'm going to refer to that as the injunction action --

21  ultimately, seeking a permanent injunction forbidding SBN

22  from pursuing the guaranty action against Mr. Miguez, while

23  the bankruptcy case remained pending in this Court.

24       The same day the Debtors filed an ex parte Motion

25  for Temporary Restraining Order in this Court seeking to

1   enjoin any potential collection efforts arising from any

2   judgment and to remove guaranty action pending in the Eastern

3   District.

4         In the injunction action's complaint, the Motions

5   for Preliminary Injunction and the temporary restraining

6   order all filed the same day, and the associated exhibits

7   submitted in support, the Debtors argued that, "A temporary

8   restraining order was warranted as were ultimately a

9   preliminary and permanent injunction, because Mr. Miguez runs

10   the day-to-day operations of the business as a managing member

11   of the Debtors, and will be intimately involved in the

12   reorganization and is critical to its success."  And there

13   I'm quoting directly from the injunction action complaint,

14   Docket Number 18-05043, ECF Number 1, Page 9.

15         It went on to state, "But his participation in the

16   guaranty action would divert his attention and resources away

17   from the bankruptcy cases, jeopardizing their success."

18         The injunction action complaint was verified by

19   Mr. Miguez and three affidavits submitted in support of the

20   motions by Jerome F. Weber (phonetic), Charles E. Tizzard and

21   Craig O'Mearo (phonetic), which aver that Mr. Miguez's

22   involvement in the Debtor's business and his financial

23   support are critical to the success of the bankruptcy

24   case.

25         Based on these affidavits this Court granted the

1    temporary restraining order on December 10, 2018 prohibiting

2    SBN only from, quote, "engaging in any efforts to collect

3    against Miguez in the guaranty action," closed quote.

4         Setting the hearing on the preliminary injunction

5    for December 18, 2018, when SBN's Motion to Lift Stay as to

6    the Marine Vessel MR. STEVEN and the turnover motion were

7    already set for hearing, and ordering that the temporary

8    restraining order would expire at 5:00 p.m. on December 18,

9    2018.

10        Shortly thereafter, the Eastern District

11   transferred the guaranty action to the Western District in

12   part based on the temporary restraining order.  Only at the

13   beginning of the December 18 hearing did the Debtors inform

14   the Court that they would not be seeking a preliminary

15   injunction.

16        Furthermore, as the testimony at the hearing on the

17   other motions made clear, Mr. Steven J. Miguez was not so

18   intimately involved in the day-to-day operations such that

19   his participation in the guaranty action would represent a

20   material strain on the Debtor's operations.

21        Mr. Miguez testified, quote, "Boats I know.  I admit

22   the book work, that's not my area of expertise," closed

23   quote.

24        Indeed, the Court finds that based on the testimony

25   at the hearing, most of the day-to-day operations of the

1   vessels including both marketing, operations and accounting

2   are handled by others, most prominently Seatran's Mr. Charles

3   Tizzard.

4           In fact, Mr. Tizzard per Mr. Miguez was the

5   Debtor's 30(b)(6) representative in related litigation

6   despite the fact that Mr. Tizzard is not an officer or an

7   employee of any of the Debtors.

8           These facts materially differed from those

9   presented in the affidavits submitted in support of the

10  injunction action, and had they been submitted with the

11  Motion for the Temporary Restraining Order, would not have

12  supported the Temporary Restraining Order on the grounds

13  briefed by the Debtors.

14          To sum up, through a fairly complicated series of

15  legal proceedings, SBN's guaranty action is now pending

16  before this Court and there is no injunction of any kind in

17  place to prevent it from going forward against Mr. Miguez.

18          Then finally, we get to the Motions for Relief from

19  Stay:

20          SBN filed a Motion for Relief from the Automatic

21  Stay in the *Mr. Steven* case on November 26th, 2018 -- that's

22  ECF 60 -- thereby seeking to have the stay lifted on the

23  Marine Vessel MR. STEVEN.  As discussed in more detail below,

24  SBN argues that there are grounds to lift the stay under both

25  Section 361(d)(1) and (d)(2).

1          Under Section 361(d)(1) SBN argues that there is

2     caused based on the totality of the circumstances, including

3     Mr. Steven's actions.

4          Under Section 361(d)(2) SBN argues that the vessel

5     is not necessary for an effective reorganization, because SBN

6     will be able to block any plan proposed by Mr. Steven based

7     on the overwhelming amount of SBN's claim.

8          Mr. Steven, L.L.C. and its managing member,

9     Mr. Steven J. Miguez filed oppositions to this motion --

10    that's ECFs 97 and 98 -- argue that no cause to lift the stay

11    exists under Section 362(d)(1) because Mr. Steven filed a

12    bankruptcy petition in good faith and that no cause exists

13    under Section 362(d)(2) because it will be able to propose a

14    plan that can be approved over SBN's objection by at least

15    one impaired non-insider class.

16         The Court conducted a hearing on this motion on

17    December 18, 2018, at which it heard the testimony of several

18    witnesses including Mark Kilcorn, an SBN representative,

19    Charles Tizzard, Chief Financial Officer of Seatran, Blake

20    Miguez, President and Chief Executive Officer of Seatran, and

21    Steven Miguez for Mr. Steven.

22         Documentary evidence was also adduced.  Following

23    the hearing, the Court took the matter under advisement and

24    at the request of the parties ordered that they file -- that

25    they each file post-hearing briefs on or before December 28th,

1   2018.

2          On January 17, 2019 while the Mr. Steven motion

3   was under advisement, SBN filed three additional Motions for

4   Relief from the Automatic Stay in the Mr. Mason, Lady Brandi

5   and Mr. Row cases, which were opposed by the Debtors Steven

6   J. Miguez and Seatran.

7          These three motions were set for hearing on

8   February 12th, 2019.  Less than one week before the hearing on

9   February 7, all eight of the Debtors filed a joint Chapter 11

10  plan of reorganization which is ECF 140, and disclosure

11  statement with exhibits, ECF 141.

12         The plan and disclosure statement were filed one

13  week after the exclusivity period ended for Mr. Steven,

14  L.L.C., but within the exclusivity period for the other

15  Debtors.  The plan and disclosure statement, which the Court

16  will discuss shortly, and which are in evidence in this case,

17  finally fleshed out proposals that the Debtor had been

18  hinting at since the hearing on December 18th, 2018.

19         The hearing on the three Motions for Relief from

20  Stay largely relied on the evidence already presented at the

21  December 18th hearing, because SBN asserted largely the same

22  arguments.  The most notable difference is that the Marine

23  Vessels MR. MASON, LADY BRANDI, and MR. ROW are stacked,

24  i.e., they are not in use by anyone, and have not been for

25  years.

1          The Debtors claim that provided some work can be

2     done on the boats, which would of course cost money, perhaps

3     one or more of them could be put into use within the next

4     year.  They also claim that spare boats are necessary to

5     ensure continuous operations of the fleet.

6          But the Court finds that's not really the case

7     under the facts of this case, because Seatran includes in its

8     fleet the vessels of Texas Crewboats, which is an equal

9     member of Seatran with Iberia Marine.  And Mr. Tizzard says

10    that he has access to the Texas Crewboats if something were

11    to happen to any of the boats currently under management with

12    Seatran.

13         At the conclusion of the February 12th hearing the

14    Court took all four Motions for Relief from Stay under

15    advisement.

16         Before going into all of the legal basis for the

17    lift of stay, I want to take a few moments to look at the

18    Chapter 11 plan and the disclosure statement and some

19    valuation issues:

20         The Debtors joint plan, Chapter 11 plan, disclosure

21    statement and the exhibits thereto which are all included in

22    the record before the Court, set out the Debtors proposed

23    plan of reorganization.  As the Court will explain, because

24    its decision is based primarily on cause under Section

25    362(d)(1), rather than feasibility of the plan under

1  362(d)(2), the Court will not go into deep -- go too deep

2  into the mechanics of the plan and the disclosure statement,

3  but some of the high level structures pertinent to its

4  analysis.

5          While it was true that the plan proposed to pay 100

6  percent of the claims of all creditors including SBN's claim,

7  the plan proposes to do so through drastic restructuring of

8  the SBN debt, which goes beyond changes and repayments times

9  and interest rates, and a success will depend on two major

10  factors.

11          First, the Debtors are depending on the substantial

12  contributions to the plan sponsor, namely Seatran and

13  Mr. Steven J. Miguez or any respective designee.

14  Specifically, the plan calls for the contribution of cash in

15  an amount equal to $1,250,000 as well as an unspecified

16  further amount of capital construction funds held by Iberia

17  Crewboat and Steven J. Miguez.

18          Second, or more critically, the disclosure

19  statement states that, "The Debtors elected to seek Chapter 11

20  protection to provide them time to keep operating and survive

21  until market conditions improve in 2019 and 2020," closed

22  quote.

23          Indeed, the disclosure statement continues by

24  stating the Debtors believe that improved market conditions

25  as well as a backstop funding from the plan sponsor will

provide them with ability to satisfy his payment obligations under the plan.  In other words, the plan is, on its face, not viable without the support of both the non-Debtor third parties and market conditions improving in the offshore oil and gas industry.

Even with these substantial assumptions, the plan does not propose to pay SBN on anywhere near the original terms of the loan, which would have provided a final principle and interest balloon payment in 2020.  Instead, the plan proposes to pay the SBN debt on a 20 year amortization with a term of seven years providing for interest only payments until a final balloon payment on the seventh anniversary of the effective date.

In exchange for this restructuring, the Debtor has proposed to allow SBN to retain a first priority lien and security interest in and to the relevant collateral.  But the Debtor has also proposed to allow the reorganized debts, or more than likely Seatran -- the Debtors are more likely, Seatran, to market and sell the collateral, i.e., the vessels after the effective date, free and clear of any liens or claims of SBN provided that the net sales proceeds of such sales are tendered to SBN with the Debtors owing any deficiency to SBN.

The plan proposes to give SBN a right of first refusal with respect to any such sale expiring only seven

1  days after being notified but does not need them to provide

2  for a credit bid.  In the event that the sale of the

3  collateral does not satisfy the secured claim in full, the

4  plan proposes to pay the deficiency on a monthly basis,

5  amortized over the remaining life of the plan.  By

6  definition, that deficiency would be unsecured.

7       The plan also proposes to amend the SBN loan

8  documents to eliminate the requirement to obtain SBN's prior

9  written consent in order to lease or charter any vessel that

10 is collateral, giving the Debtor even greater rights than he

11 already had.

12      The Court notes that even though the Debtors were

13 already under the prior written consent clause -- or had the

14 prior written consent clause in the existing loan agreements,

15 neither Seatran, Iberia Marine or the Debtor obtained the

16 lender's consent prior to entering into the SpaceX/Guice

17 charter in relocating that vessel from the Gulf of Mexico to

18 the Pacific Coast, leading to one of the major disputes in

19 this case.

20      Presumably, these changes are being proposed to

21 make it clear that Seatran has the unfettered access to the

22 vessels and their revenues, something not so clearly allowed

23 under the current loan documents.

24      In short, although the plan seems to propose paying

25 SBN 100 percent of the secured claim, it does so through a

1  substantially inferior agreement that gives the lender even

2  less say and thus protection concerning how the collateral is

3  used.  Moreover, the success of the plan depends on the

4  highly uncertain hope that the offshore oil and gas market

5  will substantially improve, and even the Debtors own

6  disclosure statement does not believe that might happen

7  until late 2019 or sometime in 2020.

8         Finally, the disclosure statement attaches a few

9  exhibits, the most relevant of these which the Court will

10  discuss shortly are Exhibit 4, titled details on vessels and

11  utilization history, concerning the information on the

12  purchase price and utilization history of the eight Debtor

13  vessels; and Exhibit 6, which is the Precision Marine survey

14  that I've already mentioned.

15         The information said on these Debtor provided

16  documents when read in conjunction with the Debtor schedules

17  and other record evidence are highly instructive.

18         Now, the Court is going to move forward with the

19  analysis:

20         The above findings of fact set the stage for the

21  analysis of the central question under these four Motions for

22  Relief from the Automatic Stay.  The Court will set out the

23  additional specific findings of fact and conclusions of law

24  in the course of the analysis to follow:

25         The Court has jurisdiction pursuant to 28 USC

1    Section 1334 and 11 USC Section 1362.  This dispute is a

2    core proceeding under 28 USC 157(b)(2)(G).  SBN's Motions to

3    Lift the Automatic Stay are governed by 362(d) of the Code

4    which provides in relevant part:

5            On request of a party in interest and after notice

6    and a hearing, the Court shall grant relief from the stay

7    provided under Subsection A of this section, such as by

8    terminating, annulling, modifying or conditioning such

9    stay:

10           One, for cause including lack of adequate

11   protection of an interest in property of such party in

12   interest.

13           Two, with respect to a stay of an act against

14   property under Subsection A of this section, if, A, the

15   debtor does not have an equity in such property and B,

16   such property is not necessary to an effective

17   reorganization.

18           As to the burden of proof, Section 362(g) provides,

19   quote, "In any hearing under Subsection D or E of this

20   section concerning relief from the stay of any act under

21   Subsection A of this section, one, the party requesting such

22   relief has the burden of proof on the issue of the debtor's

23   equity and property, and two, the party opposing such relief

24   has the burden of proof on all other issues."

25           Accordingly, under Section 362(d) SBN has the

1  burden of proving only the equity issue.  The Debtors bear

2  the burden of proving everything else.

3        In this case it is undisputed that the Debtors lack

4  equity in the vessels, in this Court's opinion.  So under

5  362(d)(1) the Debtors have the burden of proving that there

6  is not cause to lift the stay, which in this case means

7  proving that they have filed these bankruptcy petitions in

8  good faith and that the stay should not be lifted as to the

9  four vessels at issue.

10        With respect to Section 362(d)(2) the Debtors have,

11  quote, "the burden to establish that the property is

12  necessary for an effective reorganization.  As a leading

13  bankruptcy treatise has stated, the reference to an effective

14  reorganization should require relief from the automatic stay

15  if there is no reasonable likelihood of reorganization due

16  to creditor dissent or feasibility considerations."  And

17  that's quoting from *2 Collier on Bankruptcy*, Paragraph

18  362-07.

19        So in this issue the debtor bears the risk of

20  non-persuasion.  And that whole quote comes from Re: Canal

21  Place LP, 921 F.2d 569.  That's a Fifth Circuit case from

22  1991.

23        In Canal Place, the Fifth Circuit adopted in full

24  the Bankruptcy Court's findings of fact and conclusions of

25  law and attached them to the one paragraph opinion

1   effectively making it the opinion of the Appellate Court.

2   When the Court quotes from or cites to the <u>Canal Place</u>

3   decision, it is from that adopted and reproduced Bankruptcy

4   Court opinion.

5         SBN's primary argument under Section 362(d)(2) is

6   that the plan is unconfirmable, because SBN's claim is

7   actually substantially unsecured, and when the claim is

8   properly classified between a secured claim and unsecured

9   claim, a substantial unsecured claim will allow it to block

10  any plan proposed by the Debtors under Section 1129(a)(10).

11  Indeed, the parties have focused a great deal on whether or

12  not SBN is in such a blocking position.

13        While the Court thinks it's almost certain that SBN

14  is in such a blocking position due to its apparent unsecured

15  position, the Court believes the plan is likely and feasible

16  for reasons beyond 1129(a)(10), because when any of these

17  issues are intertwined with the issue of cause, the Court

18  will first address the facts of this case that overwhelmingly

19  support lifting the stay for cause under 362(d)(1).

20        I'm going to look at the cause principles:

21        With respect to the lifting of stay under Section

22  362(d)(1), numerous courts have noted that cause is undefined

23  in the Code and lack of adequate protection is just one

24  example of cause.

25        Another example of cause is lack of good faith in

1 filing the bankruptcy petition and use of the bankruptcy

2 process, and this is a primary ground urged by SBN.  See

3 In Re: Laguna Associates Limited Partnership, 30 Federal

4 Reporter 3d. 734, Sixth Circuit 1994.  See also In Re:

5 Trident Associates Limited Partnership, 52 Federal Reporter

6 3d. Page 127, also a Sixth Circuit case from 1995.

7           And those cases are citing, among other cases,

8 In Re: Little Creek Development Company, 779 Federal

9 Reporter 2d. Page 1068, which is a Fifth Circuit 1986

10 decision.  The Bankruptcy Court has broad discretion to

11 determine whether cause exists looking to the totality of the

12 circumstances.

13           Although courts have weighed in on what might

14 constitute cause under particular circumstances, as in

15 Little Creek, which the Court will discuss shortly, there is

16 no real bright-line test in the analysis that is

17 fundamentally equitable.

18           As the Bankruptcy Court for the Southern District

19 of Texas put it in 2010 in In Re: WGMJR, Inc., 435 Bankruptcy

20 Reporter 423, quoting from Page 32, quote, "What constitutes

21 cause for the lifting of stay pursuant to Section 362(d)(1)

22 is not defined in the Bankruptcy Code.  Whether cause exists

23 must be determined on a case by case basis, based on an

24 examination of the totality of the circumstances."

25           There, the Bankruptcy Court is quoting from In Re:

1  <u>Reitnauer</u>, 152 Federal Reporter 3d. Page 341, quoting from

2  Page 343, Note 4 -- that's a Fifth Circuit case from 1998 --

3  and <u>In Re: Mendoza</u>, 111 F.3d Page 1264, Fifth Circuit opinion

4  from 1997.

5       Further, the Bankruptcy Court in <u>In Re: Haydel</u>

6  <u>Properties, LP</u>, which is reported at 2017 Westlaw 1155690 at

7  Page 3, the Bankruptcy Court for the Southern District of

8  Mississippi on March 27, 2017 expanded this a bit by stating,

9  quote, "The Bankruptcy Code does not precisely define cause

10  under Section 362(d)(1) and in the past the Fifth Circuit has

11  noted that this lack of definition affords flexibility to the

12  bankruptcy courts.  A lack of good faith may constitute

13  sufficient cause to provide relief from the automatic stay,"

14  relying upon <u>In Re: Little Creek Development</u>.

15       "The lack of good faith may include wrongdoing by

16  the debtor or its principals," again, quoting <u>In Re: Little</u>

17  <u>Creek</u>.

18       In <u>Canal Place</u>, for instance, although the court

19  primarily based its decision to lift the stay on 362(d)(2),

20  it also found that there was cause to lift the stay under

21  362(d)(1) stating, quote, "Finally, the court concludes that

22  the stay should be lifted for cause under 11 USC Section

23  362(d)(1) for the following reasons:  The structure of the

24  debtor is such that the court does not know with whom it is

25  dealing, and the debtor has refused to disclose the names of

1   its individual principal investors."

2           "This concern of the court's is only heightened

3   given that the debtor could not timely produce the

4   commitments to fund the letters of credit as directed by the

5   court.  Additionally, the court does not believe it is in the

6   best interest of creditors for the debtor to be operated by

7   an individual who has no ownership interest in it and

8   receives no compensation from the debtor for his

9   services."

10          "It is also clear that Mr. Rohlfs believes that he

11  owes a fiduciary duty to the individual investors in the

12  debtor, who he will not name, and the court concludes that

13  Mr. Rohlfs' first loyalty is to the clients of Dearborn, his

14  employer, rather than to the creditors of the debtor.

15  Combined with the manner in which the debtor dealt with the

16  Aetna tax escrow account at Chemical Bank, the admittedly

17  very soft market for office space in New Orleans, and the

18  fact that this debtor has always had losses since its

19  inception, the court concludes that cause exists to lift the

20  stay and to allow Aetna and Travelers to foreclose their

21  mortgages."

22          "In summary, this court's evaluation of the

23  debtor's financial conditions, motives for filing the Chapter

24  11 proceeding, and the local financial realities lead to a

25  finding of cause to lift the stay."  And that's a direct --

1   that's closed quote, and that's a direct quote from Canal

2   Place, 921 Federal Reporter 2d. and I'm quoting from Page

3   579.

4           From Canal Place it is clear that a few significant

5   factors in determining cause under Section 362(d)(1) are:

6           A, whether Debtor is effectively being controlled

7   by a person who had the best divided loyalties;

8           And B, the current market conditions.  The analysis

9   remains flexible.

10          In short, the bankruptcy court has substantial

11  leeway to decide whether there is cause to lift the stay

12  relying on the totality of the circumstances.  SBN did argue

13  this general rule in its primary Motion for Relief from the

14  Stay at ECF 60, Page 8 and its latest motions on the three

15  non-revenue generating boats.  But SBN's argument has

16  primarily been based on the Fifth Circuit's decision in

17  Little Creek, which identified a particular set of

18  circumstances which operates essentially as a bright-line

19  rule for similar cases -- in similar cases that the test for

20  cause under 361(d)(1) is as follows:

21          Quote, "Determining whether the debtor's filing for

22  relief is in good faith depends largely upon the bankruptcy

23  court's on the spot evaluation of the debtor's financial

24  condition, motives and the local financial realities.

25  Findings of fact of good faith and proceedings based on

1  Sections 352(d) or 1112(b) have been predicated on certain

2  recurring but non-exclusive patterns, and they are based on

3  a conglomerate of factors rather than on a single data."

4       "Several but not all of the following conditions

5  usually exist.  The debtor has one asset such as a tract of

6  undeveloped or developed real property.  The secured

7  creditor's liens encumber this tract.  There are generally

8  no employees except for the principals, little or no cash

9  flow and no available sources of income to sustain a plan of

10  reorganization, or to make adequate protection payments

11  pursuant to 11 USC Sections 361, 362(d)(1), 363(e) or

12  364(d)(1)."

13       "Typically, there are only a few if any unsecured

14  creditors whose claims are relatively small.  The property

15  has usually been posted for foreclosure based on arrearages

16  on the debt, and the debtor has been unsuccessful in

17  defending the actions against the foreclosure in state

18  court."

19       "Alternatively, the debtor and one creditor may

20  have proceeded to a standstill in state court litigation and

21  the debtor has lost or has been required to post a bond which

22  it cannot afford.  Bankruptcy offers the only possibility of

23  forestalling loss of the property.  There are sometimes

24  allegations of wrongdoing by the debtor or its principals."

25       "The new debtor syndrome in which a new -- in which

1  a one asset entity has been created or revitalized on the

2  eve of foreclosure to isolate the insolvent property and its

3  creditors exemplifies although it does not uniquely categorize

4  bad faith cases."

5        "Resort to the protection of the bankruptcy laws

6  is not proper under these circumstances because there is no

7  going concern to preserve, there are no employees to protect,

8  and there is no hope of rehabilitation except according to

9  the debtor's terminal euphoria.  Neither the bankruptcy

10  courts nor the creditors should be subject to the cost and

11  delays of a bankruptcy proceeding under such conditions,"

12  closed quote.  And the Court has been quoting from 77 --

13  from the Little Creek case, 779 Federal Reporter 2d. Pages

14  1072 to 1073.

15        It is important to note that although the presence

16  of all the Little Creek factors means that there is probably

17  cause to lift the stay under Section 362(d)(1), the absence

18  of one or more of the Little Creek factors does not

19  necessarily mean that cause is absent, as the Court has

20  already explained the determination of cause leads to the

21  totality of the circumstances.  With these standards in

22  mind, the Court will proceed to the analysis under

23  362(d)(1).

24        SBN argues that the facts at issue in these four

25  motions are virtually on all fours with Little Creek, and as

1    a result, this Court should reach the same result, finding a

2    lack of good faith and lifting the stay.  It is fruitful to

3    address each of the Little Creek factors to show just how

4    close a fit these cases are.

5           First, the Debtor has one asset such as a tract of

6    developed or undeveloped real property.  Here, each Debtor

7    owns only a single asset, a vessel, so this factor appears to

8    be satisfied.

9           Next, under Little Creek, the secured creditor's

10   liens encumber this tract.  Here, SBN has a security

11   interest fully covering each ship, so this factor is

12   satisfied.

13          Next, under Little Creek, there are generally no

14   employees except for the principals, little or no cash flow,

15   and no available sources of income to sustain a plan of

16   reorganization or to make adequate protection payments.

17   Again, this is essentially true especially with respect to

18   the three vessels other than the Marine Vessel MR. STEVEN

19   that are not generating income for anyone and not in some

20   time.

21          The Debtors do not operate or manage the vessels.

22   That is handled by Seatran and all the employees are at the

23   Seatran level.  In fact, Mr. Tizzard testified that he has 75

24   to 80 employees at his level, but there are none at the level

25   of the Debtors here.

1          Moreover, with respect to the Marine Vessel

2    MR. STEVEN, although it has been generating substantial gross

3    income, approximately $100,000 per month, for someone for

4    more than a year now, it is unclear where that money has gone,

5    if it has ever made it to Mr. Steven, L.L.C.

6          As already noted, most of these monies are being

7    claimed by Seatran under the terms of the vessel operating

8    agreement.  So while the MR. STEVEN appears to be generating

9    income, it's not certain that any of these monies are

10   actually flowing down to the Debtor, but they're being upheld

11   in the Seatran level of the structure.

12         Next, under Little Creek, typically there are only

13   a few if any unsecured creditors whose claims are relatively

14   small.  This factor is also satisfied.  SBN's claim dwarfs

15   the claims of the general unsecured creditors.  Furthermore,

16   as noted elsewhere based on the Debtor's disclosure statement

17   and the Precision Marine survey attached to it as Exhibit 6;

18   it appears SBN is substantially unsecured and that the

19   unsecured portion of its claim would far exceed the other

20   general unsecured claims.

21         The next Little Creek factor:  The property has

22   usually been posted for foreclosure because of the arrearages

23   on the debt and the debtor has been unsuccessful in defending

24   actions against the foreclosure in state court.

25         This factor is met with respect to the Marine

1 Vessel MR. STEVEN because SBN had already instituted an in

2 rem proceeding in California to foreclose on it.  It appears

3 that no such proceedings have been filed on the other three

4 boats at issue here.

5          The next factor is that the bankruptcy offers the

6 only possibility of forestalling loss of the property.

7          Based on the Debtor's finances and their failure to

8 pay anything on the underlying SBN debt since the Summer of

9 2017, this factor is also met.

10          Finally, under Little Creek, there are sometimes

11 allegations of wrongdoing by the debtor or its principals.

12 The New Debtor Syndrome in which one asset entity has been

13 created or revitalized on the eve of foreclosure to isolate

14 the insolvent property and its creditors exemplifies although

15 it does not uniquely categorize bad faith cases.  There were

16 allegations in this respect here, but that factor is not met

17 head-on.

18          In sum, even if only a possible test for cause were

19 the Little Creek factors, however, the Court would conclude

20 that cause exists to lift stay under Section 362(d)(1),

21 especially with respect to the three stacked boats that are

22 not producing revenue for anyone.

23          Although the Marine Vessel MR. STEVEN is producing

24 revenue, it is unclear whether any of that money will get

25 back to the Debtor from the Seatran and Iberia Marine before

1    SBN demanded payment from Guice.  We don't know where the

2    money is going, or the Court doesn't know where the money is

3    going.

4           The relationships among the Debtors, Iberia Marine

5    and Seatran are murky at best, but the arrangement seems to

6    have the effect of giving the Debtors much benefit, and the

7    Debtors failure to make any payment on SBN debt for nearly

8    two years certainly suggests that the Iberia Marine and

9    Seatran contracts are not particularly advantageous to the

10   Debtors.

11          That is especially true considering that SBN is

12   the Debtor's only secured creditor and the unsecured

13   creditors are few in number and have relatively small

14   claims.

15          You know, the question becomes:  Where has the

16   Debtors' money been going for all this time?

17          As the Court has already said, Section 362(d)(1)

18   goes well beyond simply the Little Creek factors and the

19   final Little Creek factor of allegations of bad faith hints

20   at this broader scope.

21          In this case there are numerous factors that cast

22   doubt on the Debtors willingness to use the bankruptcy

23   process in good faith.  For example, the Debtors have claimed

24   since the beginning that SBN was fully secured with their

25   schedules listing a total value of the vessels at

1    $30,388,578.31 against SBN's claim value in the schedules of

2    $23,438,218.26.  Under the schedules then SBN appears to be

3    over-secured by nearly $7 million.

4           However, these numbers appear to be grossly

5    inflated based on information supplied by the Debtors

6    themselves in two exhibits to the disclosure statement.  As a

7    forward to the disclosure statement, ECF 141-4 sets out

8    details on all eight vessels including the year purchased,

9    the condition, new or used, and the purchase price as well

10   as the utilization from 2014 to 2018.

11          The five newest vessels including the four at issue

12   in these motions all seem to have been depreciated on the

13   books at an annual rate of approximately six percent, and the

14   Debtors listed only these book values.  For the three oldest

15   vessels, however, MR. BLAKE, purchased new in '97 for

16   $1,500,000; MR. RIDGE, purchased new in '98 for $1,500,000;

17   and LADY GLENDA, purchased new in 1997 for $2,539,557.

18          The Debtors listed value is higher than the

19   original purchase price based on a June 2017 marine survey.

20   Somehow, those three boats, all at least 20 years old,

21   collectively nearly doubled in value with the Debtors now

22   valuing the MR. BLAKE, MR. RIDGE at $3,540,000 apiece in

23   their schedules, and the LADY GLENDA at $3,835,000 for a

24   total value of $10,915,000 just for those three oldest

25   boats.

1        Even without any further information, those

2   numbers look strange, but they look considerably worse

3   considering the Precision Marine survey attached as

4   Exhibit Number 6 to the Debtor's disclosure statement,

5   ECF 141-6.

6        In addition to assessing the current value of the

7   Debtor's eight vessels, the Precision Marine survey sets out

8   information on each one with sales of comparable vessels

9   from the past two years, all of which sold for much lower

10  than the Debtor's valuation and makes several observations

11  as assumptions that went into the ultimate valuation.

12       Of particular note is the following explanations on

13  Page 13 of the Precision Marine Survey's report that's in

14  evidence, quote:

15       "Our research has shown that the actual sales

16  process versus this process of offshore service vessels have

17  been trending downward in recent years.  Precision Marine

18  Surveying, LLC considers this approach to be an appropriate

19  method for the valuation of these vessels.  This approach

20  should be given consideration due to the current down trend

21  in the markets as a result of the depressed oil and gas

22  industry."

23       "In the event the price of oil increases, market

24  values will also increase.  The purpose of the report is to

25  determine today's 30 day orderly liquidation value.  In

1  regards to the income approach, it is a method for measuring

2  the present value of a marine asset's expected future

3  benefits usually via a discounted cash flow analysis.  It is

4  used only when sufficient historical data such as income

5  flows and related expenses are provided to the appraiser."

6          "We were not provided with any detailed financial

7  information with regards to cost, rates or other expenses and

8  accounting data with which to make any meaningful valuation,

9  although the majority of this class of vessels are out of

10  work and currently in layup status, which greatly devalues

11  the class of vessels."  Again, I'm quoting from ECF 141-6,

12  Page 13.

13          As to the three stacked boats, the Court notes that

14  it is impossible to value them based on any recent income as

15  they have not been under charter for many years.  It's

16  difficult to imagine any appropriate valuation other than

17  liquidation value for those three vessels.

18          As an aside the Court notes that the Precision

19  Marine Surveyor was commissioned by Seatran not the Debtors

20  and that Seatran as the operator and manager of all vessels

21  has in its possession all relevant financial information

22  regarding the vessels' utilization including costs, rates,

23  expenses and other accounting data which it could have

24  provided to Precision Marine.

25          After taking all of the above into account,

1    Precision Marine opined that the total current liquidation

2    value of all eight vessels as a group was only $10,050,000

3    with the MR. STEVEN valued at $5 million; the LADY EVE valued

4    at $1,750,000; and the remaining six vessels including the

5    other three vessels at issue in these motions at $550,000

6    apiece.

7            Not only are these values substantially less than

8    the Debtors represented in their schedules and at every other

9    point in this bankruptcy proceeding, but they are not even

10   worth as much as the Debtors claimed the three oldest boats

11   are worth in their schedules.

12           As the Precision Marine survey notes, the valuation

13   for this class of vessels is on a downward trend and that the

14   values can increase only if market conditions improve, which

15   is a complete unknown at this point.

16           In In Re: Conquest Offshore International Inc.,

17   that's reported at 73 Bankruptcy Reporter 171.  It's a

18   Southern District of Mississippi case from 1986.  The

19   bankruptcy court for the Southern District of Mississippi

20   confronting similar facts explained, quote:

21           "Under the scenario presented in this case, due to

22   the severely depressed economic conditions in the oil and gas

23   and related marine businesses, the fair market value the

24   court finds that would apply in a normal market, specifically

25   the $4,190,000 value given by Dufour, is not the proper

1  value.  From the facts presented here and from the present

2  state of the economy, the court finds and concludes that

3  there is no normal market for the Bold Conquest."  That was a

4  ship at issue in that case.

5       "This economy, in its depressed state, offers no

6  viable market for an arm's length transaction with the Bold

7  Conquest.  This is exemplified by the fact that all the

8  comparable sales taken into consideration by the appraisers

9  who utilized a comparable sales method were liquidations.

10  They were the only transactions available to use for

11  comparison.  These values must be taken as the best offer

12  where there is virtually no market for the collateral."

13       "As stated in In Re: America Kitchen Foods, Inc.,

14  9 C.B.C. 537," that's from the District of Maine, 1976,

15  quote, "the most commercially reasonable disposition

16  practicable in the circumstances should be the standard

17  universally applicable in all cases and at every phase of

18  each case."  Again, that entire quote comes from 73

19  Bankruptcy Reporter at Page 177.

20       The Court notes the Fifth Circuit has cited the

21  Conquest opinions reasoning with approval in In Re: Sutton,

22  904 Federal 2d. 327 at Page 330.  That's a Fifth Circuit case

23  from 1990.  And this Court finds those cases to be

24  compelling.

25       The Debtors have not amended those schedules to

1  take a new valuation into account and they have continued

2  to maintain the SBN is fully secured.  In fact, it appears

3  plain to the Court that SBN is substantially unsecured using

4  the Debtors' own exhibits attached to their disclosure

5  statement.

6         Even if the vessels are worth somewhat more than

7  their liquidation value, there is every reason to believe

8  that they are worth substantially less than the amount of

9  SBN's claim.  Furthermore, it would appear that the real

10  reason that the Debtors continue to list the higher asset

11  values in their schedules and offer to pay 100 percent of

12  SBN's secure claim in the proposed plan is to try to preclude

13  SBN from blocking the plan that is fundamentally unfavorable

14  to it, the only creditor with any substantial claim under

15  1129(a)(10).

16         Further, the currently low liquidation value of the

17  vessels compared to the amount of SBN's claim, the Debtors

18  plan seems designed to place all of the risk the bankruptcy

19  reorganization, of the failure of that reorganization at

20  SBN's feet.

21         If as the Debtors and Seatran hope market

22  conditions improve considerably over 2019 and 2020, the

23  Debtors own projections set out in Exhibit 5 to the

24  disclosure statement show that they do not anticipate being

25  able to meet even their monthly debt service of $158,277

1   until at least May of 2020, by which point they project a

2   cumulative shortfall of nearly $450,000.

3          The Debtors do not propose to be cumulatively

4   caught up with SBN debt until at least April of 2021.  This

5   leaves SBN exposed for more than two years even under the

6   Debtors factually unsupported rosy market projections.

7   Instead, more than six weeks after Mr. Tizzard's testimony

8   that the market is starting to turn around, it remains

9   severely depressed as the Precision Marine survey

10  commissioned by Seatran itself and submitted by the Debtors

11  shows.  There's simply no facts in the records to support

12  Mr. Tizzard's self-serving testimony that the market is now

13  or will soon be improving.

14         Perhaps most critically, the plan proposes to allow

15  the Debtors to sell the vessels at their own discretion at

16  any point during the plan, with SBN having only a seven day

17  right of first refusal.  And if any such sale should leave a

18  deficiency, SBN is stuck with nothing more than an unsecured

19  claim.

20         It seems fairly obvious that the Debtors would only

21  really sell the vessels if they were not profitable and thus

22  worth essentially only their liquidation value, which the

23  Precision Marine survey establishes is already low and

24  likely to fall if the market conditions continues in its

25  downward trend.

1          Considering that each Debtor only owns a single

2    vessel and that any such sale would be sure to leave SBN with

3    an unsecured deficiency and the Debtors without any remaining

4    business, the plan itself effectively contemplates leaving

5    SBN with nothing to show for its supposedly secure claim

6    against each Debtor, other than a worthless unsecured claim

7    and a defunct entity with no assets.

8          The Court entered its original (inaudible)

9    protection order in the *Mr. Steven* case, ordering Mr. Steven

10   to pay SBN $25,000 per month based largely on the asset

11   values set forth in Mr. Steven's bankruptcy schedules, any

12   amount that Mr. Steven's own witnesses put forth as adequate,

13   which SBN failed to challenge with competent proof.

14         Now, based on the Debtors own exhibits to the

15   disclosure statement, it is clear that the vessels are worth

16   substantially less than the Debtors had been claiming, and

17   that SBN is significantly under-secured.  Under these facts

18   the Court must conclude that SBN is not adequately protected

19   and that cause therefore exists to lift stay as to all four

20   vessels.

21         The Court has already concluded that there is

22   little -- that there is cause to lift the stay under Section

23   362(d)(1) under both the <u>Little Creek</u> analysis and lack of

24   adequate protection based on the Debtors' newly submitted

25   evaluation information.

1          But the Court also notes the existence of a number

2    of other factors suggesting that the Debtors and the non-

3    Debtor entities, Iberia Marine and Seatran, have used the

4    bankruptcy process to promote their interests of the non-

5    Debtor Seatran to the detriment of the Debtors in these

6    cases.

7          And these include the following:

8          First, the entire structure of the Debtors business

9    seems to be designed to keep money out of the hands of the

10   Debtors and in the hands of related non-Debtor entities like

11   Iberia Marine, but primarily Seatran.

12         The web of agreements is murky at best.  At worst,

13   the vessel operating agreement with Seatran seems to be

14   written solely to favor Seatran.

15         Next, as noted above, Mr. Steven's statement of

16   financial affairs shows that Mr. Steven engaged in transfers

17   totaling $2.7 million or almost $2.8 million with affiliates.

18   It's unclear what this amounts to, but based on the testimony

19   of Mr. Tizzard, he made claims on the witness stand that

20   there are a number of amounts that were owed that would flow

21   back up to Seatran.

22         And the Court is only scratching his head as to

23   whether or not these transfers relate to anything to do with

24   the Seatran transactions, particularly as it relates to

25   Mr. Steven and the Guice, SpaceX charter where Mr. Tizzard

1  indicated there were quite a few modifications made to the

2  vessel.

3          Next, SBN has preferred ship mortgage that should

4  give it extraordinary rights over the vessel and vessels and

5  revenue earned by the vessels, including charter agreements.

6  Yet the Debtors, Iberia Marine and Seatran entered into

7  agreements that seemed to directly contradict the mortgage

8  and prevent the Debtors and thus SBN from receiving money

9  that should be secured by it.

10         Next, the vessel operating agreement with Seatran

11 was not executed until the eve of bankruptcy but purports to

12 capture the intent of the parties going back to 2014.  The

13 circumstances surrounding the execution of the vessel

14 operating agreement and the fact that it favors Seatran so

15 heavily seems -- it creates problems for the Court.

16         In particular, Tizzard's testimony was not

17 credible regarding what he told FNBC during the negotiations

18 for the loan and concerning the circumstances surrounding the

19 drafting and execution of the vessel operating agreement.

20 This is further borne out by the fact that the executed

21 vessel operating agreement would require Seatran to

22 subordinate its rights under the vessel operating agreement

23 to a secured creditor if asked.

24         Certainly, if the written vessel operating

25 agreement had existed even in its verbal form or in draft

1    form at the time of the FNBC loan, and if Mr. Tizzard had

2    informed the bank of that provision, the bank would have

3    required a subordination.

4           The Court does not believe that Mr. Tizzard

5    actually informed the bank of the terms that would eventually

6    be included in the written vessel operating agreement in late

7    2018.

8           In a 2015 e-mail Mr. Tizzard represented to FNBC

9    representatives that Seatran was not out to make a profit,

10   and it was simply a pass-through entity returning money

11   earned back to the vessel owner.  Yet Seatran has acted in

12   this proceeding as anything but a mere pass-through entity,

13   planning to keep money from returning to the Debtors.

14          The vessel operating agreement signed on the eve of

15   bankruptcy certainly does not establish a mere pass-through

16   arrangement given that it provides Seatran with numerous

17   opportunities to extract costs and fees from the Debtors by

18   completely insulating Seatran from any harm from the

19   Debtors.

20          Next, as noted above, nothing can vary the terms

21   of the written agreements and the Court does not interpret

22   the testimony of Mr. Tizzard or anyone else to do so.  But

23   the Court knows that the above evidence shows that FNBC

24   appeared to believe Tizzard's representations in his 2015

25   e-mail that Seatran is merely a pass-through entity and that

1  any money earned from charters would quickly make its way

2  back to the vessel owners, i.e., the Debtors.

3          There is no evidence anywhere on the record that

4  FNBC had even an inkling of the Seatran favoring terms that

5  would eventually make it into the written vessel operating

6  agreement signed on the eve of bankruptcy, years after FNBC

7  had already loaned the money and indeed after FNBC had ceased

8  to exist.

9          The only record evidence dating from that time of

10  the loan simply does not support Mr. Tizzard's recent self-

11  serving testimony and the Court assigns little weight to his

12  testimony.

13         Next, even if it is eventually determined that the

14  Guice escrow money is owed to Seatran, Seatran has already

15  stated that the money will have to go to Iberia Marine

16  first, and that at any rate, Seatran intends to set off

17  unspecified amounts based on money Iberia Marine and/or

18  Mr. Steven allegedly owe it.

19         Furthermore, the Court has no idea what agreements

20  might exist between Iberia Marine a non-Debtor and the

21  Debtors, because the Debtors have not filed such an agreement

22  with the Court.

23         In short, it is unclear whether Seatran and/or

24  Iberia Marine intend any of the money to make its way back to

25  the Debtor, especially Mr. Steven, and if so, how much?

1        Not to belabor the point, but it's not a good sign

2    that the Mr. Steven, a vessel that has been earning $100,000

3    per month for someone since October 2017, essentially shows

4    no money in its bank account as of the date of the filing.

5        The opaque agreements among the Debtors, Iberia

6    Marine and especially Seatran seem to have been set up for

7    the benefit of everyone but the Debtors, the entities that

8    actually own the vessels and the Debtors' secured creditor,

9    SBN.

10        Next, none of the agreements among the Debtors,

11   Iberia Marine and Seatran look like they would have been

12   entered into at arm's length, and the arrangement can most

13   readily be explained by the overlapping ownership

14   interests.

15        This suggests more than anything that the Debtors

16   and their related companies are trying to keep as many assets

17   as possible free of the bankruptcy proceeding while enjoying

18   the bankruptcy's protections.  That is especially true of the

19   lopsided vessel operating agreement with Seatran executed on

20   the eve of bankruptcy.

21        Next, the Debtor, Seatran and Steven Miguez

22   individually had been less than forthcoming with the

23   bankruptcy court.  Most notably, Miguez obtained the TRO

24   concerning the Eastern District of Louisiana case of

25   SBN versus Miguez on the ground that the day-to-day -- that

his day-to-day involvement with the Debtor was so great that

he simply could not handle both the bankruptcy proceeding

and the Eastern District of Louisiana proceeding.

In fact, as the testimony at the December 18th

hearing clearly showed, Mr. Miguez has little involvement in

the Debtors' day-to-day affairs and his presence would not

have been required in any way.

And really, it's not Mr. Miguez that was -- that

provided the misleading information here. It's really

Mr. Tizzard. Well, Mr. Miguez stated and I think, honestly,

that he's not involved in the day-to-day operations as to the

books and the finances of the business. He stated -- he

indicated that Mr. Tizzard does, and Mr. Tizzard backed it up

in his testimony that he's the one that's operating and in

charge of all the books here.

And that he was the 30(b)(6) representative, so

really, there it's really the testimony of Mr. Tizzard that

just indicates that the TRO may not have been providently

granted.

Next, however the Court notes that although

Mr. Miguez verified the pleadings taking injunctive relief,

he did not submit an affidavit specifically stating that he

was quite involved in the day-to-day operations; Mr. Tizzard

knew better. He knew what his involvement was in the case as

I have already mentioned.                                    `

1          He works for Seatran, a non-Debtor company

2    seemingly fighting to keep the money out of the hands of SBN,

3    as well as the Debtors.  He has loyalty -- Mr. Tizzard has

4    loyalties to non-Debtor affiliate Iberia Marine, and to

5    Seatran and even to another company that's even further

6    removed from this, Texas Crewboats.  And that's all based on

7    his testimony in this proceeding.

8          Finally, or next, SBN has a preferred ship mortgage

9    which clearly entitles it to the vessel or any proceeds from

10   the vessel if a Seatran argues, SBN does not have a security

11   interest in any of Seatran's money even from a charter

12   contract on the Debtor's vessel, then SBN effectively has a

13   security interest over nothing but the vessel.

14         Why should the Court not lift the stay and give

15   SBN the only thing that it may be actually entitled to, which

16   is the vessel.

17         Finally, similar to Canal Place, the Court notes

18   that throughout this bankruptcy proceeding, the Debtors have

19   effectively been controlled by a non-Debtor third party,

20   Seatran, which although it shares common -- some common

21   ownership with the Debtors, operates with no fiduciary duty

22   to it.  Indeed, the Seatran vessel operating agreement is on

23   its face a one-sided contract written for Seatran's benefit,

24   not the Debtors'.

25         It is impossible to tell from the Seatran vessel

1    operating agreement how much Seatran might claim from any

2    funds brought in from the Debtors' charter agreement, and the

3    Debtors have never even submitted the Iberia agreement for

4    the Court.  Mr. Tizzard's testimony did not assist the Court

5    in clearing up this issue.

6            While the ownership of the Guice escrow is possibly

7    determined in a turnover proceeding, the fundamental point is

8    that Seatran has participated at every stage of this

9    bankruptcy proceeding as fully as the Debtors, yet has

10   clearly been acting throughout his -- throughout in his own

11   interests, not those of the Debtors.

12           While it is true that Seatran has offered to help

13   fund the proposed plan, the Court knows that Seatran is an

14   independent related entity half owned by Texas Crewboat, a

15   company with no overlapping ownership of the Debtors or its

16   affiliates.

17           And Mr. Tizzard testified that Seatran also owes

18   duties to Texas Crewboat.  The Court is unable to say

19   whether Seatran will be able to fill its substantial

20   commitment to the bankruptcy plan on this arrangement, but at

21   a minimum, Seatran has divided loyalties and apparent

22   conflicts of interest.

23           This Court, like the court in Canal Place, quote,

24   "does not believe it was in the best interest of creditors

25   for the debtor to be operated by an individual who has no

1  ownership interest in it and receives no compensation from

2  the debtor for his services," closed quote.  And that's

3  quoting from _Canal Place_, 921 Federal 2d. at Page 579.

4           And that's Mr. Tizzard's position on this case.

5  He is not paid by the Debtors.  He's not an employee of the

6  Debtors.  And really, he's really protecting his interests in

7  Seatran.

8           Moreover, just as in _Canal Place_, it is highly

9  relevant that the current market conditions are terrible.

10  And if they continue, there's no way that the Debtors' plan

11  can succeed even with the non-Debtor plan sponsor group

12  contributing.

13           Even in the Debtors' relatively rosy disclosure

14  statement, the best they can hope for is that the market

15  conditions improve by late 2019 or 2020, which is simply too

16  long a time frame considering the numerous other problems

17  with this case that the Court has discussed above.  And it

18  should be noted that there has really been no payment on

19  the principle in this case since the loan was taken in

20  2015.

21           Based on the totality of the circumstances the

22  Court concludes under Section 362(d)(1) that the stay should

23  be lifted as to all four of the vessels at issue for cause,

24  including lack of adequate protection of an interest and

25  property of such party in interest.

1        Now, the Court is going to look at 362(d)(2):

2    "The Court has already set out the basic considerations for

3    lifting the stay under 362(d)(2) above.  The Court reiterates

4    that there is no question that the Debtors' lack of equity in

5    the property at issue.  So the real question is whether the

6    Debtors have demonstrated that the vessels are in fact

7    necessary to an effective reorganization under 362(d)(2)(B),

8    which is only true if the proposed plan is feasible."

9        "As the Court already noted, the most relevant

10   statute here is 1129(a)(10) of the Code, which provides if a

11   class of claims is impaired under the plan, at least one

12   class of claims that is impaired under the plan has accepted

13   the plan, determined without including any acceptance of the

14   plan by any insider," closed quote.

15       Simply put, if SBN's claim is fully secured, then

16   the Debtors very small class of impaired unsecured creditors

17   will be able to vote in favor of the plan and cram down --

18   and cram SBN down, forcing SBN to accept these unfavorable

19   conditions.

20       If SBN's claim is under-secured, however, that is

21   if even a moderate percentage of its more than $23 million

22   claim is unsecured, then SBN will be able to dominate the

23   other paltry unsecured claims and prevent the Debtors from

24   confirming any plan.  Section 1129(a)(10) is not the only

25   basis for finding infeasibility, but it is the one that the

1  parties focused on.

2       It should be readily apparent from the analysis

3  that the Court has already set out in connection with cause

4  under 362(d)(1); the Court concludes that the proposed plan

5  is not feasible.  Most notably, the Court concludes that

6  based on the documents and information submitted by the

7  Debtors, SBN's claim is nowhere near the fully secured.  It

8  is undisputed that the market at issue is a terrible -- is in

9  a terrible state, and the liquidation value of the vessels at

10 present is worth less than half the amount of SBN's

11 supposedly secured claim.

12      Even if the vessels were somehow worth as a group

13 double the liquidation value put forward by Seatran's own

14 independent marine surveyors, SBN would still be under-

15 secured by more than two million dollars, enough to dwarf the

16 claims of all nine insider unsecured creditors combined; and

17 thus SBN could vote against any plan proposed by the

18 Debtors.

19      The Debtors either claim or imply that SBN is not

20 unsecured essentially on two grounds:  First, because the

21 vessels are actually worth at least the amount of SBN's

22 claim.

23      And second, because the Debtors proposed to pay

24 SBN's secured claim 100 percent under the plan.

25      The Court rejects the first argument, because it

1  finds that the vessels in fact could not be worth anywhere

2  near the value of SBN's claim under current market

3  conditions, based on the Debtors' own submissions to the

4  Court.  For the Debtors to claim otherwise, it just simply

5  does not apply.

6          The Court also rejects the Debtors second argument

7  that SBN's claim is secured, because the Debtors' propose to

8  pay 100 percent of it under the plan.  What determines

9  whether a claim is secured or unsecured is not the Debtors

10  willingness to pay what it's willing to pay it, but rather,

11  whether the creditor has a security interest in a valuable

12  asset on which it can foreclose if the Debtors do not pay

13  it.

14          This is not just a plan issue, but a fundamental

15  issue under Section 506(a) of the Code, which provides in

16  relevant part, quote:

17      "One, an allowed claim of a creditor secured by a lien

18  or property in which the estate has an interest, or that is

19  subject to set off under Section 553 of this title, is a

20  secured claim to the extent of value of such creditor's

21  interest and the estate's interest in such property, or to

22  the extent of the amount subject to set off, as the case may

23  be, and is an unsecured claim to the extent that the value

24  of such creditor's interest or the amount so subject to set

25  off is less than the amount of such allowed claim."

1        "Such value shall be determined in light of the

2    purpose of the evaluation or the end of proposed disposition

3    or use of such property, and in conjunction with any hearing

4    on such disposition or use on a plan of making such

5    creditor's interest."

6        In other words, the extent to which a creditor's

7    claim -- and that's the end of the quote, sorry.

8        In other words, the extent to which a creditor's

9    claim is secured and unsecured is determined by the value of

10    the property, not a Debtors willingness to pay.  Although a

11    secured creditor under Section 1111(b) of the Code may elect

12    under certain circumstances to treat the full claim as

13    secured, there is no suggestion that SBN would ever do so

14    here.

15        Instead, the only reason the Debtors want to treat

16    SBN's full claim as secure is to prevent SBN from having an

17    unsecured claim that would dominate its small class of non-

18    insider unsecured claims and thus preclude confirmation of

19    any Debtor proposed plan under Section 1129(a)(10) of the

20    Code.

21        Thus, the Court concludes that SBN is correct in

22    claiming that the plan isn't feasible under 1129(a)(10) and

23    that this defect would be an independent basis for lifting

24    the stay under 362(d)(2).  It is not only the problem with

25    the plan feasibility, however, and the Canal Place opinion

1  is once again instructed to have the bankruptcy court

2  reason, quote:

3        "Having carefully reviewed the plan and having

4  observed this entire proceeding, the court is convinced that

5  the implicit objective of the plan is to delay foreclosure by

6  Aetna and Travelers until the debtor can either sell Canal

7  Place or wait for the return of the favorable office and

8  retail market.  As such, the plan only benefits the partners

9  of the debtor and is detrimental to Aetna, Travelers and the

10 unsecured creditors.  Given the motives and consequence of

11 the proposed plan, the debtor has failed to carry its burden

12 of persuasion that there is a reasonable prospect for a

13 successful reorganization.  And in the court's opinion, the

14 plan is simply not feasible on its face."

15       That's quoted from 921 Federal Reporter 2d. at

16 Page 577, and it's from the Canal Place decision.

17       As this Court already noted in its cause analysis,

18 the Debtors' plan is explicitly intended to allow the Debtors

19 to hopefully wait out a market downfall that even in their

20 own best estimate will not arrive until -- or won't turn

21 around until the end of 2019 or 2020, and would not at any

22 rate represent immediate turnaround of fortunes for either

23 the Debtors or especially SBN.

24       In the meantime, especially if the market does not

25 turn around, and the Court reiterates that the Debtors have

1   presented no evidence that it will, only their hopes that it

2   will; SBN bears the full brunt of the risk of the bankruptcy

3   failing.  Should Debtors decide that the market will not

4   recover, it should simply decide to sell an unprofitable and

5   thus invaluable vessel.  SBN is expected to either exercise

6   its right of first refusal within seven days of a demand or

7   suffer an unsecured deficiency.

8        In short, SBN is not protected at all under the

9   plan should anything go wrong in the case.  But the Debtors

10  get to enjoy any upside if at some unknown future date the

11  market does improve.  As in Canal Place, the Debtors have

12  shown no reasonable prospect for reorganization, and in the

13  Court's opinion, the plan simply is not feasible on its

14  face.

15       The Court is especially troubled at the fact that

16  the Debtors in this case are effectively controlled by a non-

17  Debtor company, Seatran, whose loyalties are not solely to

18  the Debtors.  Said Seatran owes its allegiance to Iberia

19  Marine, a non-Debtor affiliate of the Debtors and to Texas

20  Crewboat, an entity otherwise completely unrelated to the

21  Debtors, and Seatran has shown every interest in protecting

22  its own interest and those of Iberia Marine and Texas

23  Crewboat rather than the Debtors themselves.  The Court will

24  not belabor this point further, but the behavior of Seatran

25  is bewildering at best.

1        The vessel operating agreement signed on the eve

2 of the bankruptcy and even the elements of the plan itself

3 seem designed more to protect Seatran than to benefit the

4 Debtors, and the Court still has not received -- has not

5 figured out the core relationship and then also that

6 relationship between Iberia Marine, Texas Crewboat and the

7 Debtors.

8        Including such (inaudible) information as how such

9 money exactly Seatran proposes to withhold or set off on the

10 money earned on the MR. STEVEN, Guice/SpaceX charter and on

11 what ground -- legal ground Seatran proposes to withhold --

12 hold it or set it off, the bankruptcy court in <u>Canal Place</u>

13 found similar factors sufficient to lift the stay,

14 quote:

15        "The bankruptcy code cannot be used to protect the

16 interests of the debtor's undisclosed principals.  It has

17 long been recognized that using the bankruptcy process to

18 promote individual interests in a manner not consistent with

19 the legislative purposes of the Bankruptcy Code is an abuse

20 of the jurisdiction of the bankruptcy courts."

21        "Because of the numerous elements of the Debtor's

22 proposed plan which benefit only the investors, this court

23 determines that the plan prejudices the rights of creditors,

24 while allowing only the debtors unidentified principals an

25 opportunity to salvage their investments.  As such, continuing

1    this case would benefit primarily the unidentified investors

2    and insiders and may therefore constitute an abuse of the

3    bankruptcy process."

4            Well here, the parties are not unidentified.  It

5    is primarily Seatran, and continuing this case is primary to

6    the benefit of Seatran, a non-Debtor, and not necessarily the

7    Debtors before the Court.

8            In sum the Court concludes that in addition to the

9    overwhelming facts supporting lifting the stay under

10   362(d)(1), there are also ample grounds for lifting the

11   stay under 362(d)(2), because the proposed plan isn't

12   feasible.

13           For the foregoing reasons, the Court will grant all

14   four Motions to Lift the Stay filed by SBN against the Marine

15   Vessel MR. STEVEN, the Marine Vessel MR. MASON, the Marine

16   Vessel LADY BRANDI, and the Marine Vessel MR. ROW; and that's

17   the decision of the Court.

18           MR. WAGUESPACK:  Thank you Your Honor.

19           THE COURT:  And on the order, Mr. Waguespack, can

20   you provide the orders for the Court, please?

21           MR. WAGUESPACK:  Yes, I will Your Honor.  Thank

22   you.

23           THE COURT:  Okay.  That leaves us with the argument

24   on the Motion for Summary Judgment, but before we take that

25   up, the Court is going to -- it's about 1:00.  Can we take

1  our lunch break?  The Court will take a lunch break and we'll

2  be back around 2:00.

3          Thank you.

4      (All Counsel respond, "Thank you Your Honor.")

5          THE COURT:  We'll be in recess.

6                      *   *   *   *   *

7              (Hearing is Concluded)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# **C E R T I F I C A T E**

       I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.

**S/Sherryl P. Robinson**                **_3/8/19_**
**Sherryl P. Robinson**                     **Date**