UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE


IN RE:                          *
                                *    Lead
MR. STEVEN, L.L.C.,             *    Case No. 18-51277
                                *
          DEBTOR.               *    Chapter 11
                                *
*  *  *  *  *  *  *  *  *  *     *
                                *    Adversary
MR. STEVEN, L.L.C., ET AL,      *    Case No. 18-05043
                                *
          Plaintiffs,           *
      v.                        *
                                *
SBN V FNBC LLC,                 *    Lafayette, Louisiana
                                *    February 12, 2019
          Defendant.            *
*  *  *  *  *  *  *  *  *  *     *

HEARING ON MOTIONS,
BEFORE THE HONORABLE JOHN W. KOLWE,
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:


For the Debtors:              Heller, Draper, Patrick,
                               Horn & Manthey, LLC
                              BY:  DOUGLAS S. DRAPER, ESQ.
                              650 Poydras Street
                              Suite 2500
                              New Orleans, Louisiana 70130

For Seatran Marine, LLC       Lugenbuhl, Wheaton, Peck,
and Steven Miguez:             Rankin & Hubbard
                              BY:  STEWART F. PECK, ESQ.
                              601 Poydras Street
                              Suite 2775
                              New Orleans, Louisiana 70130

APPEARANCES (CONT'D.):


For SBN V FNBC LLC:          Carver Darden Koretzky Tessier
                             Finn Blossman & Areaux, LLC
                             BY:  DAVID F. WAGUESPACK, ESQ.
                             BY:  PETER J. SEGRIST, ESQ.
                             Energy Centre
                             1100 Poydras Street
                             Suite 3100
                             New Orleans, Louisiana 70163

For SpaceX:                  Phelps Dunbar, LLP
                             BY:  RICHARD MONTAGUE, ESQ.
                             Post Office Box 16114
                             Jackson, Mississippi 39236

For Guice Offshore, LLC:     Ottinger Hebert, LLC
                             BY:  WILLIAM KAUFMAN, ESQ.
                             1313 West Pinhook Road
                             Post Office Drawer 52606
                             Lafayette, Louisiana 70505

                             Rushing & Guice, PLLC
                             BY:  R. SCOTT WELLS, ESQ.
                             Post Office Box 1925
                             Biloxi, Mississippi 39533

Court Audio Operator:        Tonya M. Griffith, E.C.R.O.

TRANSCRIPTIONIST:            Sherryl Robinson
                             3704 Chadwood Drive
                             Harvey, Louisiana 70058
                             (504) 348-3704

Proceedings recorded by electronic sound recording, transcript

produced by transcription service.

# I N D E X

| SBN EXHIBITS: | | Marked | Received |
|---|---|---|---|
| No. A | Promissory Note dated 9/28/15 for $22,500,000 | 17 | 17 |
| No. B | Business Loan Agreement dated 9/28/15 | 17 | 17 |
| No. C | Certified copy of the Mr. Mason LLC Mortgage recorded with the NVDC on 10/7/15 | 17 | 17 |
| No. D | Certified copy of the Lady Brandi LLC Mortgage recorded with the NVDC on 10/7/15 | 17 | 17 |
| No. E | Certified copy of the Mr. Row LLC Mortgage recorded with the NVDC on 10/7/15 | 17 | 17 |
| No. F | Certified copy of the UCC-1 financing statement for Mr. Mason LLC filed on 10/9/15 at No. 26-349269 | 17 | 17 |
| No. G | Certified copy of the UCC-1 financing statement for Lady Brandi LLC filed on 10/9/15 at No. 26-349265 | 17 | 17 |
| No. H | Certified copy of the UCC-1 financing statement for Mr. Row LLC filed on 10/9/15 at No. 26-349271 | 17 | 17 |
| No. I | Endorsement and Allonge to Promissory Note dated 10/18/17 | 17 | 17 |
| No. J | Certified copy of the Assignment of the Mr. Mason LLC Mortgage | 17 | 17 |
| No. K | Certified copy of the Assignment of the Lady Brandi LLC Mortgage | 17 | 17 |
| No. L | Certified copy of the Assignment of the Mr. Row LLC Mortgage | 17 | 17 |

**I N D E X**
(Continued)

SBN EXHIBITS:                                    Marked      Received

No. M   Certified copy of the UCC-3 for the       17          17
        assignment of the UCC-1 financing
        statement for Mr. Mason LLC

No. N   Certified copy of the UCC-3 for the       17          17
        assignment of the UCC-1 financing
        statement for Lady Brandi LLC

No. O   Certified copy of the UCC-3 for the       17          17
        assignment of the UCC-1 financing
        statement for Mr. Row LLC

No. P   Mr. Mason LLC Schedules filed             17          17
        12/14/18 in Case No. 18-51521

No. Q   Mr. Mason LLC Statement of Financial      17          17
        Affairs for non-individual filed
        12/14/18 in Case No. 18-51521

No. R   Mr. Mason LLC Monthly Operating           17          17
        Report for filing period 11/2018
        filed by Douglas Draper on behalf
        of Mr. Mason LLC filed 1/28/19 in
        Case No. 18-51521

No. S   Mr. Mason LLC Monthly Operating           17          17
        Report for filing period 12/2018
        filed by Douglas Draper on behalf
        of Mr. Mason LLC filed 1/28/19 in
        Case No. 18-51521

No. T   Lady Brandi LLC Schedules filed           17          17
        12/14/18 in Case No. 18-51517

No. U   Lady Brandi LLC Statement of              17          17
        Financial Affairs for non-individual
        filed 12/14/18 in Case No. 18-51517

No. V   Lady Brandi LLC Monthly Operating         17          17
        Report for filing period 11/2018
        filed by Douglas Draper on behalf
        of Lady Brandi LLC filed 1/29/19 in
        Case No. 18-51517

**I N D E X**
(Continued)

SBN EXHIBITS:                                    Marked      Received

No. W   Lady Brandi LLC Monthly Operating         17          17
        Report for filing period 12/2018
        filed by Douglas Draper on behalf
        of Lady Brandi LLC filed 1/29/19
        in Case No. 18-51517

No. X   Mr. Row LLC Schedules filed 12/14/18      17          17
        in Case No. 18-51523

No. Y   Mr. Row LLC Statement of Financial        17          17
        Affairs for non-individual filed
        12/14/18 in Case No. 18-51523

No. Z   Mr. Row LLC Monthly Operating Report      17          17
        for filing period 11/2018 filed by
        Douglas Draper on behalf of
        Mr. Row LLC filed 1/28/19 in
        Case No. 18-51523

No. AA  Mr. Row LLC Monthly Operating Report      17          17
        for filing period 12/2018 filed by
        Douglas Draper on behalf of
        Mr. Row LLC filed 1/28/19 in
        Case No. 18-51523

No. BB  **UNDER SEAL**                            17          17
        Summit Vessels Budget - Projections
        from April 2019 to December 2023
        **UNDER SEAL**

No. CC  Disclosure Statement for Chapter 11       17          17
        Joint Disclosure Statement to
        accompany the Joint Chapter 11 Plan
        of Reorganization of the Debtors filed
        by Douglas Draper on behalf of Lady
        Brandi LLC, Lady Eve LLC, Lady Glenda
        LLC, Mr. Blake LLC, Mr. Mason LLC,
        Mr. Ridge LLC, Mr. Row LLC, Mr. Steven
        LLC.

**I N D E X**
**(Continued)**

| SBN EXHIBITS: | Marked | Received |
|---|---|---|
| No CC Attachments: Exhibit #1 Joint Plan of (contd) Reorganization, #2 Disclosure Order, #3 Plan Sponsor Term Sheet, #4 Vessel Information, #5 Financial Projections, #6 Liquidation Analysis filed 2/7/19 in Case No. 18-51277 | | |

| SEATRAN EXHIBITS: | Marked | Received |
|---|---|---|
| No. 1 Loan Request Approval/Denial Iberia Marine Services 7/22/15 | 84 | 84 |

1          **P R O C E E D I N G S**

2                (Tuesday, February 12, 2019)

3                (Call to Order of the Court)

4                    *    *    *    *    *

5          **MOTION TO DISMISS ADVERSARY PROCEEDING,**

6             **MOTIONS FOR RELIEF FROM STAY,**

7        **MOTION TO DETERMINE PROPERTY OF THE ESTATE,**

8           **ORDER TO DEBTOR-IN-POSSESSION AND**

9              **SETTING STATUS CONFERENCE,**

10      **ORAL MOTION TO EXTEND AUTOMATIC STAY TWO WEEKS.**

11                   *    *    *    *    *

12          THE COURT:  Please be seated.

13          Okay, we're here on the *Mr. Steven, Lady Eve,* and I

14   think *Mr. Row* -- not *Lady Eve* -- *Mr. Steven*, final hearing on

15   a Motion to Lift Stay.  And then we have *Lady Brandi, Mr. Row*

16   and *Mr. Mason*, I believe are the cases we have before us.  We

17   have seven matters altogether.

18          Why don't we have appearances of counsel, and then

19   we'll see how we want to handle these.

20          MR. PECK:  Good afternoon Your Honor, Steward Peck

21   for Steve Miguez and Seatran.

22          MR. DRAPER:  Douglas Draper for the Debtors.

23          MR. WAGUESPACK:  Good afternoon Your Honor, David

24   Waguespack for SBN V FNBC LLC.

25          MR. SEGRIST:  Good morning Your Honor, Peter Segrist

1  for SBN.

2         THE COURT:  Okay.

3         MR. MONTAGUE:  Your Honor, Richard Montague for

4  SpaceX.

5         THE COURT:  Okay gentlemen, where do we want to

6  start?

7         MR. DRAPER:  Your Honor, my suggestion is we take

8  the Adversary Proceeding, the Motion to Dismiss, last.

9         THE COURT:  I would agree with that.

10         MR. DRAPER:  And then how we handled it before, my

11  own belief is I would do the stay-lifts then the Court's

12  ruling, unless you think the Court's ruling on Mr. Steven's

13  stay-lift is dispositive.  And then you have the Seatran, the

14  issue is whose right to the money.

15         I think that -- I think it's three buckets.

16         THE COURT:  Let's take the Motions for Relief from

17  Stay first, and then we'll proceed from that point.

18         And do we have a status conference today also?  I'm

19  not certain.

20         MR. DRAPER:  Yes.  But Gail's not going to --

21         THE COURT:  I have excused her.

22         MR. DRAPER:  Yes.

23         THE COURT:  I have reviewed her report.

24         Okay.  Let's begin with the Motions to Lift Stay.

25         MR. WAGUESPACK:  I think the first one that you had

1  was the Mr. Steven's Motion to Lift, which obviously will

2  help perhaps resolve the others.

3          THE COURT:  Well, that one -- I view this as the

4  final hearing on that.  I want to hear issues on the other

5  three, because it may bear on my decision on Mr. Steven.

6          MR. WAGUESPACK:  Fair enough.

7          THE COURT:  Okay.  If you begin Mr. Waguespack,

8  please.

9          MR. WAGUESPACK:  Your Honor, David Waguespack on

10 behalf of SBN.

11         We're here today, Your Honor, on the *Mr. Row,* the

12 *Lady Brandi* and the *Mr. Mason.*

13         The first thing I'd like to do, Your Honor, and I

14 think you had suggested this in our phone conference is to

15 incorporate the record from the December 18th hearing into

16 this record so that we don't have to duplicate that

17 evidence.

18         MR. DRAPER:  No problem.

19         THE COURT:  Any objection to that?

20         MR. PECK:  No, no objection to that.

21         MR. DRAPER:  No objection.

22         THE COURT:  That was my suggestion.  I don't want

23 to have to re-hear what we have already heard in that case,

24 so --

25         MR. PECK:  We do have, importantly -- excuse me,

1  Your Honor, Stewart Peck -- as far as the lift-stay for the

2  other three, we have since on Friday or late Friday, we

3  looked at it Monday, we got the bank's credit file, finally.

4  And that -- we're going to add to that.  That needs to be

5  introduced.  The Court needs to see that, it's very

6  important.

7              THE COURT:  Well, we'll let that come up when it

8  comes up.

9              MR. WAGUESPACK:  That's fine.

10              THE COURT:  But --

11              MR. PECK:  And that would be part of the *Mr. Steven*,

12  all of the other -- we just -- that's evidence that we're

13  going to put in today.  Okay.

14              THE COURT:  Let me let Mr. Waguespack finish his

15  argument.  So I guess what I'm hearing from the parties is I'm

16  going to have some additional -- or at least there's going to

17  be an attempt to present additional evidence --

18              MR. PECK:  Correct.

19              THE COURT:  -- to the Court today?

20              MR. PECK:  Yes, Your Honor.

21              THE COURT:  Okay.

22              MR. DRAPER:  And then the one other thing, just so

23  you're clear.  We've told Mr. Waguespack with respect to his

24  loan documents for the next -- for the three stay-lifts, it

25  has not -- we'll stipulate to the introduction of those, the

1   outstanding debt.  We'll stipulate to the introduction of

2   that right now for purposes of this hearing.

3         We may have objections at a later point as to how

4   it's calculated and stuff, but for purposes of the stay-lift

5   today it's fine.

6         THE COURT:  You are essentially stipulating to all

7   of the loan documents, the debt and so forth, we don't have

8   to get into that?

9         MR. DRAPER:  Right.

10        THE COURT:  Okay.  So that we're clear on the

11   record, insofar as the evidence that was adduced by the Court

12   on December 18th, that is going to be now part of the record

13   for the *Mr. Mason, Lady Brandi* and *Mr. Row* Motions to Lift

14   Stay.

15        MR. WAGUESPACK:  Your Honor, let me -- Mr. Segrist

16   is going to hand out our exhibit binders and I think we can

17   go through these just in light of the stipulation, I don't

18   think there will be any contest on any of the exhibits.  But

19   if I could just go through them?

20        THE COURT:  And do you have one for the Court?

21        MR. WAGUESPACK:  We do.

22        THE CLERK:  Do you have an extra one for the Clerk?

23        MR. SEGRIST:  We have an extra copy.

24        THE COURT:  Thank you.

25    (Pause.)

1          MR. WAGUESPACK:  Okay Your Honor.  I have to say

2   when I got these binders, my assistant who is fantastic,

3   labeled the exhibits by letters.  So I know some judges -- I

4   know Judge Brown whenever I label exhibits with letters gets

5   very angry.  So these are lettered rather than numbered, so

6   I'll go through them.  I didn't have the heart to ask her to

7   re-number them.

8          THE COURT:  I don't have a problem with the

9   letters.

10         MR. WAGUESPACK:  Okay.

11         THE COURT:  They are fine.

12         MR. WAGUESPACK:  Thank you Your Honor.

13         THE COURT:  Okay.

14         MR. WAGUESPACK:  I'm going to start with the

15  Exhibit A, which is the promissory note.

16         Exhibit -- I don't know if you want to go exhibit

17  by exhibit and offer and introduce --

18         THE COURT:  I know, I think what I've got from

19  Mr. Draper, he has indicated that all of these documents

20  essentially can be stipulated to and we can let those come

21  into evidence?

22         MR. DRAPER:  Let me walk through, just so we can --

23         MR. WAGUESPACK:  I'll just go one by one, Your

24  Honor.

25         THE COURT:  Okay.

1          MR. WAGUESPACK:  The first one is the --

2          THE COURT:  Let's go one by one.  If you have an

3    objection tell me, because my understanding is I'm not hearing

4    an objection, but maybe there's something in here you don't

5    know about?

6          MR. DRAPER:  Right.  That's --

7          THE COURT:  So let's just walk through them.

8          MR. WAGUESPACK:  Okay.  So Exhibit A is the

9    promissory note dated September 28th, 2015 in the original

10   principle amount of $22,500,000.

11         Exhibit B is the Business Loan Agreement dated

12   September 28th, 2015.

13         Exhibit C is the Mortgage by Mr. Mason LLC.

14         Exhibit D is the Mortgage by Lady Brandi LLC.

15         Exhibit E is the Mortgage by Mr. Row LLC.

16         Exhibit F is the UCC-1 financing statement for

17   Mr. Mason LLC.

18         Exhibit G is the UCC-1 financing statement for Lady

19   Brandi LLC.

20         Exhibit H is the UCC-1 financing statement for

21   Mr. Row LLC.

22         Exhibit I is the Endorsement and Allonge to the

23   Promissory Note dated October 18th, 2017.

24         Exhibit J is the Assignment of the Mr. Mason LLC

25   Mortgage to SBN.

1          Exhibit K is the Assignment of the Lady Brandi LLC

2   Mortgage to SBN.

3          Exhibit L is the Assignment of the Mr. Row LLC

4   Mortgage.

5          Exhibit M is the UCC-3 Assignment of the UCC-1 for

6   the Mr. Mason LLC.

7          Exhibit N is the UCC-3 Assignment of the UCC-1 for

8   the Lady Brandi LLC.

9          Exhibit O is the UCC-3 Assignment of the UCC-1

10  financing statement for Mr. Row LLC.

11          We then have as Exhibit P, the Mr. Mason LLC

12  Schedules that were filed in its case.

13          Exhibit Q is the Mr. Mason LLC Statement of Financial

14  Affairs.

15          Exhibit R is the Mr. Mason LLC Monthly Operating

16  Report for the period of November.

17          Exhibit S is the Mr. Mason LLC Monthly Operating

18  Report for December.

19          Exhibit T is the Lady Brandi LLC Schedules.

20          Exhibit U is the Lady Brandi LLC Statement of

21  Financial Affairs.

22          Exhibit V is the Lady Brandi LLC Monthly Operating

23  Report for November.

24          Exhibit W is the Lady Brandi LLC Monthly Operating

25  Report for December.

1          We then have the Mr. Row LLC Schedules, which is

2    Exhibit X.

3          Exhibit Y is the Mr. Row LLC Statement of Financial

4    Affairs.

5          Exhibit Z is the Mr. Row LLC Monthly Operating

6    Report for November.

7          Exhibit AA is the Mr. Row LLC Monthly Operating

8    Report for December.

9          Exhibit BB is the Summit Vessels Budget, which was

10   prepared by the Debtor for the period April 2019 to December

11   2023.

12         Exhibit CC is the Disclosure Statement with

13   attachments, including the Plan and other exhibits, which is

14   Exhibit CC.

15         THE COURT:  And then the Exhibits 1 through 6 would

16   be exhibits to the disclosure statement?

17         MR. DRAPER:  I don't know what BB is.

18         MR. WAGUESPACK:  Exactly, Your Honor.

19         MR. DRAPER:  What is BB --

20         MR. WAGUESPACK:  So with that, I would ask for

21   Exhibits A through CC to be admitted into evidence.

22         THE COURT:  Is there any objection, Mr. Draper?

23         MR. DRAPER:  Your Honor, I need to ask one question

24   about one of the exhibits so I can tell Your Honor.

25         The only exhibit I have at issue is really BB.

1          MR. SEGRIST:  Well Doug, that one might have been

2     the earlier one --

3          MR. DRAPER:  Right.

4          MR. SEGRIST:  -- not the one you got today.

5          MR. DRAPER:  Right.

6        (Pause.)

7          MR. WELLS:  Your Honor, if I may, while we're

8     pausing for a moment.  I was in the hallway, I apologize,

9     when you stepped into court.  But I would like to enter my

10    appearance for today.

11         I'm Scott Wells appearing for Guice Offshore.  And

12    Mr. Will Kaufman is here as well.

13         THE COURT:  Okay, thank you Mr. Wells.

14         MR. WELLS:  Thank you.

15         MR. WAGUESPACK:  And Your Honor, on Exhibit BB I'll

16    tell Mr. Draper:

17         That was actually one of your exhibits in the

18    December 18th hearing.

19         MR. DRAPER:  I know, I have --

20         MR. WAGUESPACK:  So, it is already in the record.

21         MR. DRAPER:  No, it's in there.

22         Your Honor, what I'd ask is that Exhibit BB that

23    was introduced into evidence, concealed because it has some

24    information with respect to day rates and things with respect

25    to these vessels.

1        THE COURT:  That was the one -- is that the same

2   one?

3        MR. WAGUESPACK:  Is that the one that was under --

4        THE COURT:  Because I know we have one under seal.

5        MR. DRAPER:  Yes.

6        MR. WAGUESPACK:  We have no problem with that.

7        THE COURT:  Okay.  So that we're clear, so Exhibit

8   -- so when I'm clear when I'm having to go back through this.

9   Exhibit BB is essentially in the documents that we had under

10  seal before in the December 18th, 2018 hearing?

11       MR. WAGUESPACK:  I believe that may be correct,

12  Your Honor.

13       THE COURT:  Okay.  Otherwise, with the stipulation

14  that there's no objection to admitting that in this

15  proceeding, and really there's a couple of documents that are

16  going to be duplicative, mainly the note and the business --

17  the promissory note and the business loan agreement.  Those

18  are the same as the ones I had in the 2018 -- in our December

19  18th hearing, right?

20       MR. WAGUESPACK:  That's correct.

21       MR. DRAPER:  Yes.

22       THE COURT:  And then the rest of them all relate to

23  these three additional boats, BB is the same one that we had

24  under seal, so if there's no objection with that being under

25  seal, all of these are admitted into evidence.

1          MR. WAGUESPACK:  That's correct, Your Honor.

2          And the other stipulation that we talked about

3  yesterday is that the debt amount, and this was established

4  at the last hearing, is approximately, for purposes of this

5  hearing, is 23 and a half million dollars.

6          THE COURT:  Okay.  So we've got that.  So we're not

7  arguing about what's owed.  We're not arguing about the

8  documents.  So, let's proceed.

9          MR. WAGUESPACK:  Your Honor, that is our evidentiary

10  record and I'd like to put it in perspective for the Court.

11  And again, I know you've heard a lot of that, a lot of

12  argument and evidence at the last hearing, and then even

13  subsequently in post-trial briefs.  So I'm going to try to

14  make this concise.

15          Your Honor, very quickly through the Little Creek

16  factors with respect to these Debtors, again, we have a Debtor

17  with one asset, and from Little Creek, the Debtor has one

18  asset.

19          From Little Creek, the secured creditor's liens

20  encumber the asset.  That's the case with respect to each of

21  these Debtors.

22          Three, there are generally no employees except for

23  the principals.  Here, there are no employees of any kind.

24          The fourth Little Creek factor, little or no cash

25  flow.  With respect to these Debtors, there's no cash flow at

1    all and there hasn't been for three years.

2            Four (sic), few if any unsecured creditors whose

3    claims are relatively small.  In each of these cases we

4    have just a few thousand dollars in non-insider unsecured

5    claims.

6            The next, the property has usually been posted for

7    foreclosure because of arrearages on the Debtor and the Debtor

8    has been unsuccessful in defending actions against the

9    foreclosures in state court.  As you read in the opposition,

10   they filed these cases to avoid foreclosure after we had

11   started the foreclosure on the Lady Eve.

12           Your Honor, I'm not going to go through all of the

13   details on the Vessel Operating Agreement, the verbal

14   agreement and then the written agreement, but I will just

15   refresh Your Honor's memory on it.  It's truly something that

16   I have never seen before.  It's a violation of repeated

17   representations and warranties in the mortgage.

18           It goes to the essence of the mortgage; the attempt

19   to transfer charter rights and charter interest to a non-

20   obligor, the misrepresentations that the mortgagor of those

21   rights owns those rights and wouldn't transfer them to

22   somebody else.  The granting of the lien, the right of first

23   refusal, and absolute and total control to a non-obligor, all

24   in repeated violation of the mortgage in a way that I've

25   never seen before, ever.

1          We have what I consider to be a subterfuge of the

2    mortgage in its most glaring terms.  It has created

3    conflicted management between what I'm going to call the

4    shadow debtor, Seatran, which exists outside of the purview

5    of this Court, is using our cash collateral, is doing it

6    without a budget, is doing it without Court supervision, is

7    not required to comply with the Code, is not filing monthly

8    operating reports, has objected to our getting discovery from

9    them.

10         We've talked about the litigation tactics.  I won't

11   go through all of that.  You know about all of that.

12         No payment since July of 2017.  No payment since

13   July of 2017, despite the fact that they have these -- now

14   say they have these capital construction forms that are

15   available.  Why didn't they just keep paying the note?  They

16   chose until the bank failed to stop paying the note, and it

17   was a tactic.

18         With respect to these three Debtors, we have vessels

19   that are stacked.  They're not having -- there's no income.

20   There hasn't been income in years.

21         With respect to the lack of equity, it's

22   uncontested.  The schedules show that the Mr. Row in the

23   schedules it has a value of a million-eight.  In the

24   disclosure statement it has a liquidation value of $550,000.

25         With respect to the Lady Brandi, in the schedules

1    it's a million-six.  In the disclosure statement it has a

2    liquidation value of $550,000.

3            The Mr. Mason is in the schedules for a million-

4    eight.  In the disclosure statement it's $550,000.

5            There's clearly no equity here.  And yes, you do

6    have to go case by case.  You can't collect all of the

7    collateral that's the McManus case.  Even if you did, based

8    on their values in their disclosure statement, it would be

9    for all of the collateral, $10,500,000.  But again, that's

10   not the standard in the Fifth Circuit.

11           The second prong of 362(d)(2) is:  Are these

12   particular vessels, the ones we're here about today,

13   necessary for an effective reorganization?

14           Here, you get to what I consider clear law.  Do we

15   have a blocking position?  And we clearly do.  We have a, as

16   to each Debtor, a large deficiency claim, by their own

17   admission.  They didn't address this.  We have now briefed

18   this and argued it several times.  They haven't addressed any

19   of the cases that we've cited on this.

20           And the Fifth Avenue case, the In Re:  State Street

21   case, the Washington Associates case, the United -- the Texas

22   versus Timbers case.  In fact, one of the cases they cited

23   for something else, which was not an argument I made, the

24   Briggs case actually eludes to this.

25           If you have a blocking position where they can't

1 confirm a plan without our consent as is the case here,

2 because they don't have an impaired accepting class. When

3 you look at the amount of unsecured debt they have in each of

4 the Debtors, even collectively as to the Debtors, which isn't

5 the standard; but you cannot confirm a plan without an

6 accepting impaired class, and they don't have one. They

7 haven't addressed that, and that's the law. We've got both

8 prongs of 362(d)(2), particularly as to these Debtors.

9 Even if for some reason, Your Honor, you were just

10 a little -- just say: Well, let's just hear what their plan

11 might be.

12 When you look at their projections, first of all,

13 it assumes that you're going to somehow find that the market

14 rate of interest until Till is five percent, and that somehow

15 you would find that actually, in this market, somebody would

16 lend at that, and that they would bid on a 20 year

17 amortization with a seven year term.

18 With this structure, with not even actually even --

19 with having this non-debtor out there that's got all the

20 rights and control, putting that aside, what do the actual

21 projections -- their own projections look like?

22 Well, right now their own projections say they

23 don't generate millions of operating cash, even to cash flow

24 that debt -- even to cash flow that debt. And to somehow

25 make a case, they've forecast in the last six months of 2019,

1    they're going to increase operating cash by 40 percent.

2             For the six month period after that, in the first

3    six months of 2020, it's going to go up 37 percent.  And in

4    the last six months of 2020 it's going to go up 30 percent.

5    And then it's just going to keep on going up.

6             These look like similar projections that were

7    provided to FNBC when they made this loan in 2015, shortly

8    after the bust, before there was the full recognition that

9    the market just is not coming back.

10            Your Honor, this is one of those cases, I've got to

11   tell you, it's one of those cases where I feel like it would

12   be a disservice for us not to somehow -- I don't know how I

13   can convince this Debtor to deal with reality.  You owe 23

14   and a half million dollars.  You've got to reduce that

15   debt.

16            I haven't filed a lift-stay as to all of the boats.

17   I don't -- I couldn't, okay?  I've got both prongs of

18   362(d)(2), I mean, and I think I've got as good a case for

19   bad faith and the Little Creek factors as I could imagine.  I

20   mean I literally couldn't dream up a situation that's worse

21   than this for a lender.  I can't even imagine.

22            THE COURT:  Is one difference those, at least to

23   the Mr. Steven, the fact that the boat is operating on the

24   Little Creek factors, and getting on these three?  From a

25   Mr. Steven -- I know your argument is it's a single asset,

1  there's no employees, you meet most of them, but isn't the

2  difference here that that boat is actually working and

3  generating -- I know it's not coming down to where it might

4  need to be, but isn't it working?  Is that a distinguishing

5  factor?

6          MR. WAGUESPACK:  It's working.  It's not generating

7  any cash from Mr. Steven, LLC, because it has been hung up.

8          THE COURT:  But it's just not an idle asset?

9          MR. WAGUESPACK:  That particular asset, you're

10  right, Your Honor.  That would be one Little Creek factor

11  that theoretically, it is generating revenue for a non-Debtor,

12  Seatran.

13          THE COURT:  I understand.

14          MR. WAGUESPACK:  Who does what with the money, I

15  don't know.

16          THE COURT:  I understand your position on that.  But

17  that's --

18          MR. WAGUESPACK:  But as to the Debtor, it's not

19  generating any money right now.  But you're right.  But you

20  don't pre -- it's kind of -- you know, I argued the 360.  I'm

21  a careful lawyer, so I argued both.  But 362(d)(2) is -- you

22  don't get past that any.

23          THE COURT:  I understand your position.

24          MR. WAGUESPACK:  So Your Honor, they've got to --

25  Your Honor, I'd like to tell them that you know, we -- you've

 1  got to see your asset that has a -- that clearly has a

 2  strategic buyer.  You've got to sell these assets that are

 3  costing you money to maintain and aren't making and revenue,

 4  and they aren't going to make any revenue unless something

 5  dramatically changes in the market.

 6            And then you've got a smaller company and this is

 7  what normally happens in bankruptcy.  People take a realistic

 8  view of where they are, and they make business decisions.

 9  And they don't just string out their creditor in hopes that

10  they're just going to lop off -- I don't think -- they just

11  want us to lop off tens of millions of dollars.  I don't know

12  what they want.

13            And so, this is a case where I think perhaps with a

14  smaller fleet, it's something that we would look at.  But

15  we've got the basis to lift the stay in these four cases, and

16  it's the right thing for the Debtors.  It is.  It's the right

17  thing for the Debtors.  It's the right thing for the lenders,

18  and it's the right thing for the Debtors, and it's required

19  by the Code.

20            Thank you, Your Honor.

21            THE COURT:  Thank you Mr. Waguespack.

22            MR. DRAPER:  Judge, can I make a few comments?  And

23  I know Mr. Peck has also in the terms of where we are.

24            THE COURT:  Well, I've got an objection -- I've got

25  an opposition by you and Mr. Peck and I'm going to let both

1    of you argue.

2              MR. DRAPER:  Okay.

3              MR. WAGUESPACK:  Your Honor, could I just make one

4    statement on that?  You know, I'm not -- I know you're not

5    going to keep them both from arguing.  But this is a Motion

6    to Lift Stay against the Debtor.  Seatran's standing -- no,

7    what it is.

8              THE COURT:  I'll note your objection.

9              MR. WAGUESPACK:  Thank you.

10             MR. DRAPER:  Your Honor, let me start with the plan

11   issue and unfortunately, I've learned to be a literalist.

12   Does the Court have a Code up there?  Because I think there

13   are things that Mr. Waguespack misses completely.

14             No, I don't need it.  I'm -- I know what it says.

15             Let's start with his deficiency claim.  He does not

16   have a deficiency claim in our plan.  He has paid in full 23

17   and a half million dollars, or whatever his debt is.

18             THE COURT:  But that's based on a lot of projections

19   and you know, I hear what you're saying.

20             MR. DRAPER:  And let's take that.  There is no

21   contrary evidence to our projections.  When we tried the

22   Mr. Steven, Mr. Waguespack had the capability to put somebody

23   up there to conflict -- or deal with Mr. Tizzard's testimony.

24   There's not one shred of evidence that Mr. Tizzard's

25   testimony is incorrect.

1          Mr. Waguespack, the last time I looked is a

2     lawyer.  He is not in the marine business, hasn't studied

3     the market, hasn't leased a vessel in his life.  Their

4     witness didn't testify to anything.  But -- and so, let's

5     take that.

6          Number 2, their argument about each case.  If you

7     look at 1129(a)(10), the language says plan -- it says

8     singular plan.  So these courts in every case allow joint

9     plans.  You've done it in your court.

10          So the question is:  Do I have to find an accepting

11    impaired class in each plan?  He only gets to vote once.

12          THE COURT:  Uh-huh.

13          MR. DRAPER:  That's all he ever gets to vote, and

14    he gets to vote it in his secured class.

15          And if you look at 1129(b)(2)(A), one little i, his

16    506(a) number, which is the fair market value of the

17    collateral, it's just a floor.  It's not a ceiling.  You have

18    to look at the language of 1129(b)(2)(A)(i), it says at least

19    an amount equal to the allowed amount of his claim, secure

20    claim.

21          If you look at the second sentence, a stream of

22    payments equal to at least an allowed amount of his claim.

23    So, the Code recognizes both joint plans and you can take a

24    secured creditor's claim --

25          THE COURT:  But what about this McManus decision

 1 | that Mr. Waguespack has cited?

 2 |       MR. DRAPER:  The McManus decision --

 3 |       THE COURT:  That the law in the Fifth Circuit says

 4 | -- I've got to look at these on a case -- on an individual

 5 | collateral by individual collateral --

 6 |       MR. DRAPER:  That's for equity.  That's for whether

 7 | there's equity in the estate.  That's not for plan purposes

 8 | and whether we can confirm a plan.

 9 |       McManus is just as to whether there's equity, and

10 | you deal with the 362(b)(2)(A).  You never -- I am focusing

11 | on:  Is the property necessary for an effective

12 | reorganization?  I'll concede there's no equity in each

13 | individual one.  But that does not mean I can't confirm a

14 | plan, period.

15 |       THE COURT:  But how are you going to confirm a plan

16 | if there's no equity and he has this deficiency balance?

17 |       MR. DRAPER:  Because he doesn't have a deficiency

18 | balance, that's the point I'm making.  We're treating him as

19 | fully secured and our projections show that we have it, and

20 | we have a reserve.  We have four point something million

21 | dollars that we can use to basically subsidize the Debtor,

22 | once the plan is confirmed.

23 |       Those monies as we've pointed out to the Court,

24 | again, there's no contrary evidence can be used to make

25 | principle payments.  Let's take the term of the loan.  The

1  term of the loan is the exact same term that the FNBC had.

2  The amortization is the same, the term of the loan is the

3  same.

4          His argument on _Till_ is just a wrong argument.  _Till_

5  basically says, as I understand it, you use a risk free rate

6  and you adjust it by two or three percent, one, two or three

7  percent.  You don't look and see can this Debtor get a loan

8  in the marketplace.  That's not what _Till_ says, that's not

9  what the Supreme Court says.  He's absolutely wrong on that

10  as a matter of law.

11          So, if you look at the record as it stands right

12  now, you have evidence of -- and you'll see it today --

13  evidence that we can confirm a plan.  We have projections

14  that show it.  Mr. Peck will address this and you'll see it.

15  The entire FNBC underwriting analysis shows they looked at

16  all of these as a singular group.

17          They didn't pick and choose and say Mr. Brandi (sic)

18  can do this, you know, Mr. Row can do this, Mr. Steven can do

19  this.  They looked at it as a unit and that's what we're

20  treating them as.  That's what the plan does, and they get

21  paid in full.

22          And again, as I'm saying to you, there is no

23  contrary evidence in the record on that, none.

24          Now, let's address the three stacked boats.  You'll

25  hear evidence today that one of the stacked boats, we are

1  readying to go out in the marketplace, and in fact have it on

2  power and we have people working on it, turning over the

3  engines and we have bids out, and we expect to have it in

4  service, in use in the third quarter of the year.

5         We're willing to make adequate protection payments.

6  The adequate protection payments come from Mr. Miguez,

7  through the DIP loan so it doesn't cost him a penny.

8         And the other two boats, you need reserve boats.

9  We'll have evidence today saying that every fleet needs these

10 boats so that if something comes out of service, you have

11 something to back it up.

12        So we're, again, what we're looking at is a unit, a

13 group of boats.  Their loan was made based upon that group of

14 boats.  It wasn't saying:  Oh, we'll look at the Mr. Steven

15 and we'll sign a note for this.  We'll look at this.

16        The underwriting analysis which you'll see today

17 clearly shows that this was viewed as a unit, not singulars.

18 And the Code recognizes joint plans, it always has.  The only

19 conflicting issue is whether I need an accepting impaired

20 class in each case.  And you have a merit (phonetic) decision

21 on one hand.  You have a Ninth Circuit decision on the other,

22 and this conflicting along that.

23        But the truth is we're going to get the votes in

24 the Unsecured Creditor class.  There's no -- and the Fifth

25 Circuit has said there's no materiality factor in an

1    unsecured class.  So he doesn't swamp anything.  He never

2    votes in that class.  The plan is constructed that way.  The

3    plan is constructed --

4          So the sole issue then is just feasibility.  And

5    again, as the record stands today, there is absolutely no

6    evidence of anything contrary to what we've put before the

7    Court.

8          THE COURT:  Mr. Peck?

9          MR. PECK:  May it please the Court, Your Honor,

10   Stewart Peck for Seatran and Mr. Steve Miguez, the core plan

11   sponsors and creditors of Seatran.

12         You know, the Court needs to give this Debtor a

13   chance.  We have filed a plan pretty shortly, we did it

14   pretty quickly, a plan for all of these companies.  And we --

15   it's about two months from whatever the, you know, you go

16   through the statutory time periods, and we're going to get

17   the confirmation, and we're going to have -- these are

18   confirmation issues brought up.

19         But we have put forth a reasonable plan,

20   confirmable plan that can be confirmed in a reasonable

21   amount of time.  That's what -- he takes the singular Little

22   Creek factors.  The Courts have looked at it and they said:

23   That's -- you just can't just add up the factors, one, two,

24   three, therefore you win.  They said you look at it, it's

25   been distilled down to make the essences.  How do you put

1   forth in a reasonable amount of time, the reasonable

2   prospects of a plan reorganization, which we have done.

3           And there are a lot of issues here that the Court

4   will need to decide.

5           THE COURT:  And there's a lot -- you know, one of

6   the issues when we get to your client, Seatran, you know, I

7   don't know what the issue has been, why the money is not

8   flowing down from Mr. Steven to the Debtor here.

9           MR. PECK:  It's tied up, Your Honor.  It's in --

10  we can't -- I pointed out to the Court last time, if we --

11  our agreement says we will pay it down to them.  When it's

12  all tied up in court, we can't do it.

13          But our management agreement says we pay it down,

14  they pay the expenses.  When we get the money we're going to

15  pay it down, Your Honor.  We're not going to hold it up.  But

16  the money is tied up in court, and --

17          THE COURT:  Then why is it tied up in court?  If

18  the money is going to flow down, why are we even having this

19  argument over the turnover of the funds?

20          MR. PECK:  But it -- well, there are monies that

21  are owed to Seatran because -- remember, Seatran is paying

22  all of the -- has been paying all of the expenses for them.

23  That's the (inaudible) of the management group.

24          And I'm going to get to one point that really had

25  bothered me --

1        THE COURT:  What does Iberia Marine Services fit

2   in all of this?

3        MR. PECK:  They are -- they were a predecessor that

4   was at one time was the operator.  Then Seatran was formed

5   with that --

6        THE COURT:  They were the operator when SBN's

7   predecessor, FNBC, took a security interest from IMS; then in

8   the meantime in all of this, they've gotten rid of IMS and

9   now inserted Seatran, who they don't have any security

10  agreement from.

11       MR. PECK:  There's that -- what happened was, and

12  what's really important Your Honor, and this is what really,

13  really bothers me.  I kept on telling the Court:  All you

14  heard is allegations by them.  There's no proof, there's no

15  proof.

16       Well finally, on Friday --

17       THE COURT:  Well, I'm speaking facts here.

18       MR. PECK:  Finally.  Finally, we got the credit

19  file, late Friday.  Finally, we got it.  Everything

20  Mr. Tizzard said, that was what he told FNBC is in this

21  credit file, okay?  It not only -- and this is quite -- you

22  know, they keep on saying stuff, unsupported.

23       I get the credit file.  They're saying that:  Oh,

24  you've been hiding this, all this subterfuge.  It's right

25  here.  They talk about Seatran.  They talk about the size of

1   Seatran's fleet and its ability to replace a vessel on short

2   notice, will provide the company with a stronger competitive

3   position.

4           They talk all about Seatran, how it manages the

5   vessels.  It talks about Seatran's management fees.  It talks

6   about they operate the fleet vessels under separate management

7   agreements in the report of 2015, attached to this -- attached

8   to this, which really got me upset.

9           THE COURT:  All I'm looking at is the paper I've

10  got in front of me.

11          MR. PECK:  Well, this is coming in.

12          THE COURT:  I've got a loan to SBN and I've got

13  everything I see in place that keeps all the money from going

14  to SBN, and the only thing they have is the boat.  How do I

15  protect them when all the money is locked up somewhere else

16  and it looks like that's been going on for a long time?

17          MR. PECK:  Well --

18          THE COURT:  What I don't see here, and let me just

19  speak frankly, is on the one hand they can't touch the money,

20  but on the other hand you don't want me to give them the

21  boat, and that's really all they have here.  Based on your

22  argument, they get nothing.

23          MR. PECK:  No --

24          THE COURT:  All the money goes somewhere.  That's

25  all -- and I know in your plan you're agreeing to now say:

1  Well, we'll give you something now.  We'll give you a

2  security interest now in what Seatran has.

3        But the way this thing is set up now, the only way

4  this creditor gets to bargain for a position that they

5  bargained for -- I don't care what those notes say -- is if

6  they get the boat.  Otherwise, they have nothing, because

7  you've sat here and told me from day one that they don't have

8  a security interest from Seatran, FNBC didn't take one.

9        At the time I thought IMS might have been the party

10  that's going to get the money, but now IMS isn't there, we've

11  got to go to Seatran, who is not a Debtor here, and seems to

12  be -- you know, I have Motions for TRO filed here, that

13  Mr. Miguez was the main party and the main person who was

14  important to this whole case.  That's not really true.  It's

15  Seatran and Mr. Tizzard.

16        I don't think Mr. Miguez -- his testimony here

17  earlier on December 18th, because he's not really involved in

18  the day-to-day business of this company.  He knows boats.  He

19  doesn't know the business, but they've got all this stuff

20  saying:  Oh, you can't do this because he's so critical to

21  this case.  I don't see that.

22        MR. PECK:  But Your Honor, first of all, there is a

23  management -- there is an agreement, it's always been

24  agreement.  In that agreement, and I tried to point out to

25  the Court, it says:  All of the receivables go from Seatran

1  down to the boat companies.  All the payables come up --

2            THE COURT:  But that's not happening.

3            MR. PECK:  Well, because the money is tied up.

4  When we -- if the money gets released, it will be after we've

5  paid the expenses they've been paying up there, because

6  remember, they're still paying stuff up there.  They're

7  paying stuff but they're not getting any income in.  Seatran

8  is paying expenses, okay?

9            When the money comes, we have to honor that

10 agreement.  That agreement is with the Debtors.  Those are

11 executory contracts with the Debtor, and we have to send the

12 money down.

13           Now, they owe us expenses going on up, we can

14 recoup that, it's against the right of setoff, but after we

15 let all of the expenses we've been paying, they come down,

16 and that's what's going to happen.

17           We're going to send -- the last time I was here I

18 told you:  Judge, we're not -- Seatran is not trying to keep

19 all of the money.  It's going to send the money down.  But I

20 can't send the money --

21           THE COURT:  I know you're saying that now, but you

22 filed papers there, particularly on the Motion on the

23 Turnover, that says the exact opposite of that.

24           MR. PECK:  I --

25           THE COURT:  That they can never touch the money, it

1   all goes to Seatran.

2          MR. PECK:  The money -- they don't have a security

3   interest in the money.  But Seatran is under obligation of

4   its agreement to send it down.  I cited that in my papers.

5          THE COURT:  This is the agreement that was signed

6   on the eve of bankruptcy.

7          MR. PECK:  No, this is an agreement that has been

8   around, that was even cited here talking about the agreement.

9   These -- this is an agreement that was talked about.  This is

10  an agreement that was in the Iberia Marine audits and

11  financial statements, which talks about the note that they

12  had, which says:  In the year end of 2014, given to the bank

13  in 2015, it said:

14          "Seatran Marine handles the rental vessels and

15  related business activity.  Accounts receivable due from

16  Seatran, $1,500,000 --" excuse me "-- $6,000,000."

17          It's all there that Seatran's collection receivables

18  owes them money, pays it down, and does the rentals of it.

19  It was never hidden.  There was no subterfuge with it.  But

20  if you read the agreement it says -- and Mr. Tizzard said --

21  he that from (inaudible) --

22          All the receivables go down and all the expenses go

23  up.  But if you don't pay my expenses, because Seatran is

24  paying all the money out, okay?  It collects the money, it's

25  the management company.  It sends the money down.  At the same

1  time it's paying the crews, it's paying repairs, it's paying

2  insurance.  You've got to pay them all the way up the

3  expenses.  And if you don't, we can net them out.  So if they

4  owe us money for all the stuff we've done in the past, we can

5  net that out.

6        But we have an obligation, contractually, to send

7  the money down once it's freed up by this Court.  We're just

8  not going to keep it all, and my brief never said that, Your

9  Honor, as I recall.  If we have a contractual obligation.

10  My brief said they don't have a security interest.

11  Mr. Tizzard told them that we the charters are on our

12  game.

13        The documents -- the bank recognizes that, that we

14  -- and all the financial information.  This wasn't hidden

15  from anybody.  It talks about the vessel operating agreement.

16  It talks about Seatran.  It talks about how it's run.  FNBC

17  knew about it.

18        But you're right.  We do have an obligation.  If

19  the money frees up, we will have to have some expenses --

20        THE COURT:  The way I look at it right now, the

21  only party who's not freeing up the money is Seatran.

22        MR. PECK:  Right.  Well, but Guice is holding it

23  up.  We have no right to the money.  I mean if you --

24        THE COURT:  The Debtor filed a Motion for Turnover

25  in this case, give us our money.  Seatran -- well first,

1  Mr. Miguez comes in.  I don't know why he's opposing that

2  since he's, I would assume, is supporting what the Debtor is

3  doing here.

4         But then Seatran comes in and joins and says:  Wait

5  a minute.  That's our money.  You can't have that money.

6         MR. PECK:  Well, the charter was with Seatran and

7  Guice, but however --

8         THE COURT:  I get all of that.

9         MR. PECK:  But once we collect the money, we owe a

10  debt.

11         THE COURT:  But I've had nothing but block, block,

12  block, the money can't come down.

13         MR. PECK:  But it will come down.  Contractually,

14  we have to send it down, Judge.  We have a contractual

15  obligation to send it down.  But right there when it comes to

16  -- there was no charter with the Debtor Mr. Steven.  It was

17  between Seatran and Guice.

18         The money comes to us, okay?  We send it down based

19  on our contractual obligations.  We have to pay it down, but

20  they owe us for all the expenses we had, okay?  Because

21  they're supposed to pay us expenses.  All the receivables we

22  collect, expenses they pay up.

23         Nobody says we're going to keep -- we can't keep it

24  all.  We have a contractual obligations to give it to them.

25  That's how we've always done it in the past, okay?

1  Mr. Tizzard said that, and the agreement says:  All

2  receivables are collected, come down.  All expenses you pay,

3  up.  But if you don't pay us we can set off.  That's the only

4  thing.  And I got that out of the testimony.

5          So if we collect the money, when we get the money,

6  we'll have an obligation to send it down, and we will pay it

7  down, Judge, or they can -- the Debtor can sue us.  You can

8  haul us into court for not paying it, because we have a

9  contractual obligation to pay it.

10          That's not -- but they don't have a security

11  interest.  Once it comes down, they could claim it's cash

12  collateral as a receivable if --

13          THE COURT:  I'm not certain you've got an interest.

14          MR. PECK:  Pardon?

15          THE COURT:  I'm not certain Seatran has an interest,

16  unless they can come in and prove to me they've got some kind

17  of --

18          MR. PECK:  Well, the charter was between --

19          THE COURT:  -- lien.

20          MR. PECK:  -- Seatran and --

21          THE COURT:  Or set off right under the Code.  I

22  don't know if it's --

23          MR. PECK:  Right, and so a set off right, a set off

24  right.

25          THE COURT:  I don't know if it's recoupment, set

1  off.

2          MR. PECK:  Set off, set off.

3          THE COURT:  I don't know what it is.

4          MR. PECK:  I didn't say we had a lien.  We have a

5  -- that money -- we're the manager, okay?  That money, we

6  charter it, we do receivables, as FNBC knew, which was

7  disclosed in our related transactions in all the financials

8  we have.  It's in here, that we do the chartering, okay?  And

9  we --

10          THE COURT:  What happened in June 2017 that stopped

11  all the money from flowing through and the payments coming --

12  coming in and debt service?

13          MR. PECK:  I think the bank made a note and said

14  it's our money and Guice didn't know what to do and it

15  just froze it.  It's over a million dollars just sitting

16  there.

17          THE COURT:  Well, what about all the other working

18  boats?

19          MR. DRAPER:  It's money that has been distributed

20  down --

21          MR. PECK:  The money has -- we've put money back

22  into those, but the boats that are working have been

23  distributed -- have come down to the accounts -- Seatran has

24  put the money down to those accounts for the boats working

25          THE COURT:  But you just ignored your debt service

1   and just -- and did that?

2         MR. DRAPER:  No --

3         THE COURT:  I'm talking about pre-bankruptcy.  I'm

4   talking about in 2017, June of 2017 --

5         MR. PECK:  Well --

6         THE COURT:  -- when all the payments to this

7   creditor stopped.

8         MR. PECK:  All right.  Well, we talked about that,

9   that we didn't know who to pay, Judge.  We were confused by

10   FDIC.  They sent a check back, we sent an interest check back

11   in.  We talked to SBN about it.  There was a lot of e-mails

12   where we were trying to work a deal out, and they weren't

13   paid.

14         And, but that's not a reason to lift the stay, the

15   courts say, but debtors don't pay a lot.  But right now

16   Judge, we pay adequate protection.  We paid adequate

17   protection to Mr. Steven, the Debtor has.  The money has come

18   down from the boats that are working into those accounts.

19   They have been, you know -- Seatran has sent the money down,

20   so they're in those accounts.  When Mr. Steven's money comes

21   to us, we'll send the money down to Mr. Steven.  They can

22   claim that as cash collateral, okay, in that instance for any

23   prepetition, as to prepetition charters.  Post-petition

24   charters are different.

25         But the fact that there's some subterfuge and we

1  made up these agreement, Judge, and this bank file shows that

2  everything was disclosed.  They talked about Mr. Tizzard

3  talking about it, and Mr. Miguez explaining it, and in here

4  they have a write up on it, where it's all explained to them,

5  where it even talks about what Seatran does --

6          THE COURT:  We've really already been through that.

7  I've got Mr. Tizzard's testimony.

8          MR. PECK:  Okay, but this --

9          THE COURT:  And I've got the charts.  I don't think

10 I need any --

11         MR. PECK:  -- this confirms -- I mean this this

12 corroborates what he said, that FNBC knew about it, and it

13 was all disclosed to them.  It wasn't hidden at the last

14 minute.  And the implication is that we're trying to hide

15 everything from them.  That's not the case at all.  And the

16 fact that we're not going to pay the money down, that's not

17 the case.

18         THE COURT:  What I see is a creditor over here, the

19 only thing they have is a ship, each one of these ships.

20 Since 2017, every effort has been put in place to make sure

21 the money stopped flowing down.  I don't -- you know, I don't

22 know, but a payment to the FDIC, that could have been

23 corrected somewhere down the line.  But no money made it to

24 this creditor.

25         All they really have, and the only protection that

1 I see they have is the ship, the way this thing is

2 structured.  You're right.  Maybe they disclosed it all to

3 FNBC and they were fine with it.  This paper has now been

4 sold to this particular creditor.

5          All they've got is a ship.  They don't have a

6 security interest from Seatran so they can't necessarily get

7 their hands on the money.  How are they protected?

8          MR. PECK:  Well, they're going to be protected

9 because they do -- they have the ships.  They have for

10 prepetition charters, they'll be cash collateral.  When the

11 money comes down they'll have those receivables we pledged to

12 them.  They'll claim that, okay?

13          And what they have is these Debtors are going to do

14 a plan with a plan sponsor, Mr. Miguez and Seatran and all,

15 where they're going to take CCF funds to backstop this thing

16 and pay them in full.  And that is going to happen within two

17 months, because we have a plan put up there; if we make the

18 confirmation rules, they'll start getting paid, okay?

19 They'll get paid.

20          If there's a shortfall, there's money to pay them.

21 It's going to -- that plan is feasible.  That's what's going

22 to happen.  Yes, sometimes there's delays, sometimes

23 prepetition debts don't get paid.  But we didn't wait a year

24 within, you know, within the last Debtors here within the

25 four months.  We have filed a plan disclosure statement.  We

1    are moving on this, and they're going to start getting

2    payments.

3            They're going to get adequate protection payments

4    and we're going to have to start making the payments.  And

5    we're going to pay them, and not only they're going to get it

6    from the vessel revenues, they're going to get it from

7    sources they didn't even have a lien against, the $4 million

8    CCF funds, the million point two --- $1,250,000 that

9    Mr. Miguez and Seatran is putting up.  There are going to be

10   plenty of funds to backstop this creditor.  They're going to

11   be paid in full.

12           All the Court has to do is wait a couple of months,

13   two months, to tee up all of these confirmation issues to see

14   -- and we have a confirmable plan, Judge.  And I agree with

15   Mr. Draper.  We're going to give them a Till rate and we're

16   going to give them an amortization schedule and we have

17   feasibility, because there's money to make this.  And we have

18   pro formas and we have projections by Mr. Tizzard who has

19   been in this industry a long time, and we have to prove

20   that.

21           And there's no other evidence before this Court.

22   The evidence before this Court is a feasible plan with

23   projections that haven't been controverted, with a backstop

24   where we show the CCF fund of $4 million is going to make up

25   the shortfall with the obligations of Mr. Miguez and Seatran

1    to come up with a million 250,000 dollars over five years.

2    That's how they're going to paid here, Judge.  That's a

3    better way to get paid than if they lift the stay on these

4    three vessels, which we need for an effective reorganization,

5    which are going to get absolutely little money in this market

6    right now, okay?

7            The Debtor will be harmed and all we have to do is

8    wait two months, Judge, two months and we're paying for --

9    the DIP loan is going to pay for the maintenance.  The DIP

10   loan is going to pay adequate protection to them.  The DIP

11   loan is -- they have -- nothing has come out of their

12   pocket.  All you have to do is wait two months, Judge.

13           And you heard testimony of why we need these three

14   vessels for our plan going forward.  Two months and they get

15   paid in full.  I can't help what happened in the past and why

16   they didn't get paid.  I wasn't in there.  But I know now that

17   we have serious people who are putting up serious money to

18   get these people paid.  And they got our attention, and if we

19   get the Mr. Steven's money the money will come down to Mr.

20   Steven, and we'll get that money.  That's the money or the

21   three vessels that we have in account right now, which Seatran

22   has paid down.

23           So that money the boat's operating has been given

24   to these Debtors.  And we're going to give the Mr. Steven's

25   money, but we can't have it with Guice -- there's over a

1   million dollars here. And we have SpaceX, one of the

2   payoffs.

3           THE COURT: Well, that's the money that Guice is

4   holding, it's just SpaceX money, right?

5           MR. PECK: That's -- right. Guice is holding a

6   million dollars. That's going to go down and they're going

7   to have the benefit of that money. It's going to be in the

8   account that's going to be used to amortize this debt, okay?

9   We're not going to just keep it. We can't keep it. We have

10   a contractual obligation to pay it down, Judge.

11           Well, they have an obligation to pay us --

12           THE COURT: Well, when I look at the monthly

13   operating reports that have been filed in this case, what

14   about all the other ones that show all the accounts

15   receivables from the individual boat companies to -- and this

16   might be a better question for Mr. Draper -- to Iberia Marine

17   Services?

18           I don't see anything involving Seatran. Where does

19   that fit in this?

20           MR. DRAPER: Iberia Marine Services, the way that

21   things work, and it's booked as Iberia Marine but it's really

22   Seatran paying out as to the expenses in connection with the

23   boat. So, it's sort of a flow through. You can ignore

24   Iberia Marine in essence as an entity. The work --

25           THE COURT: But it's one of the borrowers under the

1  note though, right?

2          MR. DRAPER:  It is one of the borrowers on the

3  note, but I mean, quite frankly, it has rights -- and part of

4  the vessel operating group, I agree with that.  But Seatran

5  is the charterer of them.

6          Mr. Peck -- and I understand the Court's reluctance

7  to look at it.  But you've raised a question, wait, Seatran

8  got put in after the FNBC loan was taken.  That's not the

9  case.

10          THE COURT:  Well, the thing that makes it really

11  strange here though, Mr. Draper, is the fact that we have a

12  written vessel operating agreement, regardless of how it

13  transpired, on the eve of bankruptcy.

14          MR. DRAPER:  We have a vessel operating agreement --

15          THE COURT:  That seems to be contrary to what

16  Mr. Tizzard said on the stand and what I saw in the docket as

17  they were presented to me on December 18th; and they can't

18  bury the loan documents.  SBN is quite right on that.

19          But what was presented was:  We won't take any

20  money on this.  It all flows straight down, and that's not

21  quite what's happened here.

22          MR. DRAPER:  Well, let me -- let's talk about what

23  has happened here.  Let's take the Mr. Steven.  Mr. Steven

24  money has been basically held up by Guice with two conflicting

25  people as to --

1          THE COURT:  Held up only because Seatran came in

2  and says:  That's our money.

3          MR. DRAPER:  You see, let's look at functionally

4  what happened though.  Seatran expended the money to get the

5  Mr. Steven ready for this charter.

6          THE COURT:  That was all done without the lender's

7  permission.

8          MR. PECK:  The lender -- well, let me put it this

9  way:  The lender was not at issue then.  The Seatran or the

10  SpaceX I think is October of 2017 when I write about that?

11          UNIDENTIFIED SPEAKER:  October of 2017.

12          MR. PECK:  October of 2017.  They bought the loan

13  in October of 2017.  All of the money had been expended to get

14  this ready for a chart that generates a lot of money.  And on

15  a go forward basis, if you want to do what's the correct

16  thing, my own belief us you reimburse Seatran for the

17  expenses it incurred and the money it spent to get this thing

18  ready for the chart.  The thing is right now it's a triple

19  net -- I used the term triple net -- it's --

20          THE COURT:  That's what it looks like to me is a

21  triple net.

22          MR. DRAPER:  Right.

23          THE COURT:  I agree.

24          MR. DRAPER:  But don't you also agree that Seatran

25  should be reimbursed for the money it spent to get this thing

1  ready to be chartered?

2  THE COURT:  I'm not necessarily disagreeing with

3  that.  And they may be entitled to that money, but they may

4  have to come in and prove they've got a setoff right under

5  the Code.

6  MR. DRAPER:  I agree with that.

7  THE COURT:  But --

8  MR. DRAPER:  I absolutely agree with that.

9  THE COURT:  Number one and Number two, it's

10  contrary to what he said on the stand and what the documents

11  say that was going to happen here, that the money was just

12  going to flow.  We're a pass-through entity.  We're not

13  taking anything off of this.

14  MR. DRAPER:  No --

15  THE COURT:  That was the representation that was

16  made.

17  MR. PECK:  But Judge, it's also -- the money has to

18  go up to pay all of these expenses, then passes it down.  If

19  they don't pay the expenses -- we pay all the money down, we

20  pay the payroll, we pay the insurance.  Seatran pays all these

21  expenses and the vessel -- the money comes down, they have an

22  obligation to pay, to reimburse them for it.

23  If they don't reimburse them for it they're going

24  to say:  Well, I'm going to take it out of the money you

25  have, because we spent all of that money.  That's how it is,

1  it's a pass-through, money comes down, but the pass-through,

2  the money, all the expenses comes up, other than management

3  fee.

4       And the problem is they spent all of this money to

5  get this Mr. Steven ready and they're owed money for it, and

6  they have a right to get that -- and the agreement says and

7  Mr. Tizzard said they have a right to, you know, set that

8  off, but the net money goes to Mr. Steven.

9       But you can't have all -- the company spent all --

10 Seatran spent all of this money to get it ready, a lot of

11 money in the shipyard.  I mean a lot of money went into

12 getting it ready for the SpaceX deal.  And then they should

13 at least get reimbursed for that when it sends it down.

14      And it's true, the agreement says all the money

15 comes down but all the expenses come up.  If they don't pay

16 all the expenses up, any creditor would say:  Wait a minute.

17 Why am I paying you all this money down when you owe me money

18 for advancing?  We're the management company.

19      THE COURT:  And we may get there.  I don't know

20 that I'm going -- I don't necessarily agree that Seatran gets

21 all these monies reimbursed.  I know that might be the intent,

22 but they're going to have to come in and prove to me that

23 this --

24      MR. PECK:  Okay.

25      THE COURT:  -- that they have a legitimate setoff

1  right under the Code.

2      MR. DRAPER:  And look, honestly I agree with you,

3  and that's --

4      THE COURT:  Now, this seems to be similar to a case

5  when I was reviewing this, that was a case that was tried

6  before Judge Haik a few years ago, involving Seatran and

7  these three entities that went down to two.

8      And the issue there was whether Seatran had a right

9  to claim some proceeds when the secured creditor went out

10 there and tried to secure the ship in that case, I think it

11 was Komar Marine, if I'm remembering the right case.

12     And I'm not so certain the judge there agreed that

13 it was a right -- that they had a right to setoff or had any

14 kind of claims ahead of the mortgage holder.

15     MR. DRAPER:  But the mortgage holder -- look.

16 Look, at the end of the day, it is a legal issue as to who

17 has a right.  I recognize that.  The money is held up.

18     But I could tell you in connection with the vessels

19 that are operating now, the three, there's over $200,000

20 sitting in the account.  That money is flowing, the net money

21 is flowing down.  I mean that's what's going on.

22     THE COURT:  Well, when I look at the monthly

23 operating reports, I still see all of these accounts

24 receivable from the asset company, which is the ship that the

25 folks are having the bankruptcy here from IMS is what that

1    shows.

2              MR. DRAPER:  But what I'm saying to you is that

3    there's a prepetition number that's there, that --

4              THE COURT:  I see that, but then we have December

5    in there.

6              MR. DRAPER:  Right.

7              THE COURT:  And it's --

8              MR. DRAPER:  There is money -- there's --

9              MR. PECK:  It's the timing -- timing --

10             MR. DRAPER:  It's a timing issue.  In January, all

11   that money went into these accounts.  The disclosure statement

12   has the date of the deposits and the amounts that went in.

13             THE COURT:  Let me ask you this question on the

14   disclosure statement and the projections in there, and I know

15   you say that's the only evidence I have here.  But why is that

16   reasonable?

17             MR. DRAPER:  Because --

18             THE COURT:  To expect that in the market that we've

19   had, if I'm looking at whether or not we've got a confirmable

20   plan, why are those projections even remotely reasonable in

21   today's, when I've got a plan that doesn't even appear to

22   cash flow the interest at the rate that you have there?

23             MR. DRAPER:  Here's the answer to that:  Number

24   one, yes, it may not on its face at today's market cover what

25   needs to be covered.  However, there's four to five million

1   dollars sitting there, $4 million in CCF funds and a million

2   dollars that's coming from Mr. Miguez.

3          So the real point is, and I think you want -- and

4   most Debtors don't have a rainy day fund.  They don't have a

5   fund that's available to them to be able to make the payments.

6   The payments that you see under the plan are not interest only

7   though, they're amortizing payments.

8          And so you have that, and I don't -- quite frankly,

9   I have never seen a Debtor where I've had -- where I have a

10  basically a cash fund of approximately 25 percent of the

11  outstanding debt, you know.  I just -- I don't know whether

12  you've seen that either.

13         And that's -- this is a well-financed backstopped

14  Debtor that has dollars available to it.  And with respect to

15  the three vessels today, I mean, one of them is, you know,

16  getting ready to go out to market, you know, and the other

17  two you need -- you need reserve boats.  You'll hear that

18  testimony today.

19         THE COURT:  Well, and where is the money coming

20  from to get it ready for market?

21         MR. DRAPER:  That money is coming from the DIP loan,

22  so it doesn't adversely affect anybody.  Honestly, SBN is

23  better off.  They don't have to fund it to get it ready for

24  market.

25         THE COURT:  Well, I don't know if I necessarily

1   agree with that, because I had a case where at every turn

2   SBN is told you can't touch this.  You can't touch this.  You

3   can't touch this.

4           MR. DRAPER:  That --

5           THE COURT:  The only thing I see that SBN has is

6   the boat.

7           MR. DRAPER:  Well, let me put it this way.  The

8   adequate protection payments that went to Seatran came out of

9   a DIP loan that you approved for Mr. Miguez, so there's

10  $50,000 that's already gone to that.  All right.

11          And that DIP loan as you remember, is not a priming

12  DIP loan.  So that DIP loan only gets paid on the confirmation

13  of a plan of reorganization.  So it's both the make ready

14  money is being spent.  It's basically miniscule, because the

15  facilities are there.  The crew is getting training.  I mean

16  this is about to happen.

17          So I don't understand why they would even want the

18  stay lifted on a boat that may be able to go out to work that

19  is being taken out of -- taken out of being mothballed, or

20  being stacked.  And as you know with fleets, you need reserve

21  boats.

22          And again, the adequate protection payments we

23  propose will take care of that.  We're talking -- Mr. Peck is

24  a little bit over -- I think you're looking at a three months

25  period.  Listen to the evidence for confirmation and see.

1   But as I said, if you look at it on its face and you look at

2   this plan, there's $5 million sitting there that can help

3   service these Debtors and get this where it needs to get

4   to.

5           And look, you and I have been around long enough,

6   this market is cyclical.  The debt that the market was the

7   worst in 2017, it's trending up.  We have testimony --

8           THE COURT:  Well, we're talking about a cycle that

9   started in 2011 or 2012, and in 2015 we thought it was coming

10  back, and now we're sitting in 2019 and it's no different.

11          MR. DRAPER:  Well again, let me give you some

12  statistics, which the evidence will show this.  They -- the

13  banker went and looked at the boats in October of 2017.

14  There were five stacked boats then.

15          In November, in early November of 2017 there were

16  still five stacked boats.  There are now three.  So basically,

17  in what is perceived to be a down market, since sometime in

18  2018 two boats have been put out to work.  We have a third

19  boat that's about to be put out to work.

20          Mr. Steven just, if you want to take that, that --

21  if you look at the use of the vessel -- what's the term?

22  Utilization?  Up until October of 2017 it was running at

23  about 30 to 40 percent, it's now at 100 percent.  So there

24  are things out there and there's activities.

25          We are willing, through Mr. Miguez in terms of the

1  backstop and in terms of the CCF plan, to devote other

2  resources to fund this.  All we need, to be honest with you,

3  and you asked why wasn't it paid?  All they wanted was

4  $23,800,000.  That --

5          THE COURT:  You can tell them you have a default on

6  their loan.

7          MR. DRAPER:  Well, but I understand that.  But you

8  can't --

9          THE COURT:  And in the meantime they've been told:

10  Well, you can't touch the money, you can't touch the money.

11          MR. DRAPER:  No.  They seized all of the money.

12  And quite frankly, there was no discussion.  This has been,

13  to quote Paul Newman, a fundamental breakdown in

14  communication.

15          My real suggestion to you is that once we got

16  through today, just like you're doing in Quality, I suggest

17  we have a mediation so the parties can talk and get to where

18  they need to get to.

19          And there is an economic resolution here.  And as I

20  said to you, this -- you have uncontroverted testimony with

21  respect to the plan.  I understand your -- when you look at

22  the projections, but you have to factor in that there's a

23  backstop here.

24          If those projections were just bald on their face

25  without a backstop, I'd agree with you.  But you have CCF

1  funds.  That's also uncontroverted evidence.  And if you

2  remember, you have the bank statements here that were put

3  into evidence.

4       So this is a little bit different than that.  And

5  so, that's where I -- look, whether there's a right of

6  recoupment or setoff, ultimately, it's a battle between these

7  two.

8       THE COURT:  I know, that's why I don't understand

9  Mr. Miguez joining in with Seatran to almost stop the money

10  from coming to the Debtor.

11       MR. DRAPER:  He didn't really stop -- look, it's

12  Seatran in a sense, the write up of that.  And look, they

13  have a right in some way, in a universal fairness we're going

14  to take how the universe looks at things.  You know, it's not

15  fair for them only to have the part that pays and not to get

16  reimbursed.

17       Their reimbursement, and quite frankly, is just a

18  management fee, which is minimal.  But they're -- to say that

19  they get the benefit of every dollar that they spend to get

20  the vessel ready and for the expenses while this thing was

21  being readied and while the thing wasn't working, and while

22  they were using other monies to debt services is kind of

23  unfair.  It's -- you don't want just the part that eats.

24       THE COURT:  Yes.  I mean but we can't ignore the

25  rights of the secured lender here too.  I mean --

1          MR. DRAPER:  I agree with you.

2          THE COURT:  -- you know, a lot of what I'm hearing,

3    it's like they don't even exist, you know?

4          MR. DRAPER:  No, I -- I don't -- no, that's not

5    true.  They do exist.  You ordered adequate protection

6    payments, they are being made.  The insurance is there.  The

7    money from the other three working boats are coming down.

8    And so it's not -- and you're going to order adequate

9    protection payments today.  We are prepared to pay that, with

10   advances under the DIP loan.

11         So I mean look, you get the plan confirmation, I

12   win or lose.

13         THE COURT:  Thank you, Mr. Draper.

14         MR. WAGUESPACK:  Your Honor, could I briefly

15   respond to -- there's just a number of things that were said

16   that weren't in the record, and I'm just going to go through,

17   very quickly, through the list of these.

18         First, there's the argument of 1129(a)(10), some

19   reference to 1129(b)(2)(A)(1).  Your Honor, you've read the

20   cases.  I mean they're not unambiguous.  They're very clear.

21         Blocking position necessary for an effective

22   reorganization.  If you have a blocking position and we

23   unquestionably do, as each Debtor, and that's McManus.  And

24   the case that he's citing, the --

25         THE COURT:  Talk to me a little bit about that,

1  because that's going to be my question for you, the

2  difference between a McManus case and the case that

3  Mr. Draper is indicating.

4          MR. WAGUESPACK:  The case that I think he's

5  referring to is a case that's a plan case, first of all.  So

6  the cases are, at the lift-stay part, are uncontroverted.

7  I've had them in my brief now two or three times, and they

8  have never responded to them and they're very clear.  The

9  part per Debtor or per plan, that's a plan issue.  And that's

10 whether or not 1129(a)(10) applies to each Debtor or each --

11 or to a plan where you have a substantively consolidated

12 Debtor.

13         The case he's referring to which is a Ninth Circuit

14 case, is where there was a substantive consolidation at the

15 plan.

16         THE COURT:  Which we don't have here.  We're only --

17         MR. WAGUESPACK:  Which we don't have here, okay.

18         And so the case from the Delaware court is very

19 clear.  Each Debtor in a jointly administered case, and we

20 even -- and by the way, and please let me finish.  I'd like to

21 finish and I'd like to correct a lot of stuff --

22         THE COURT:  Sit down Mr. Draper, I'm listening to

23 Mr. Waguespack at this point.

24         MR. DRAPER:  (Complying.)

25         MR. WAGUESPACK:  So the "per debtor" case, which

1    is the Delaware court, goes through all of this, but that's

2    at the plan. With respect for the lift-stay and necessary

3    for an effective reorganization, right now we have a jointly

4    administered non-substantively consolidated group of Debtors,

5    undisputed.

6          So we're not -- what they're talking about is

7    something later and it's with a substantive consolidation

8    plan, which this isn't.

9          But the cases we've cited over and over again, they

10   haven't responded to them because they're so clear. So,

11   1129(a)(10) prizes the locking position, and so their plan

12   fails. We are not going to approve this plan.

13         And so they -- and it's necessary for an effective

14   reorganization they can't satisfy. And as to each Debtor on

15   McManus, they don't have equity. And they don't have equity

16   from their own projections and the disclosure statement of

17   the values, even if you were to group everything. And they

18   don't have a -- and the other notion, and let me just go

19   through this, Your Honor.

20         The Till rate, okay? There's -- I'm sure you're

21   aware of this. I mean there's so much conjecture and

22   speculation about what "till" means. The one thing it means

23   is that the rate of interest and the terms have to bear some

24   resemblance to the market, okay? How do you figure all of

25   that out and there's a lot of argument, a lot of conflicting

1  cases.  It's got to bear some resemblance to the market,

2  okay?  It's not going to be five percent 20 years

3  amortization.  It would never --

4        Um.  The document, this underwriting analysis;

5  first of all they asked me two weeks ago for the documents,

6  by an e-mail.  Not even by a formal document request.  They

7  asked me by an e-mail.  There was -- they said:  Wait on

8  Friday.  We produced it.

9        I produced it when they asked me to produce it, by

10  on two weeks notice, all of the entire bank file.  I produced

11  everything, okay?  This document that he's talking about

12  doesn't say anything about Seatran -- it refers to Seatran

13  as the manager, okay?  And that they have a management

14  agreement.  But that doesn't refer to any of the terms of the

15  management agreement, transferring the charter rights or

16  transferring the sole control of the vessels.  It doesn't

17  say anything other than that they're a manager.  It's the

18  same stuff that was in Mr. Tizzard's e-mail.

19        So I don't known why Mr. Peck stood up and acted

20  like that was some sort of new document.  It's the same stuff

21  if they -- there's no -- they were a manager.  And that's no

22  different than an office building who has a manager and they

23  lease the space, and when they get the money, they give it to

24  the owner of the building.

25        And then when there's a default, okay, it's all

1   over.  We have a mortgage very clearly on the vessels and on

2   the charter rights and on the charter payments.  And Your

3   Honor, you were on to that, and they did intercept the money

4   and until today, they said:  Well, they wanted to recover the

5   money.

6          That was presented at the hearing.  I don't know

7   how much, when, what -- it doesn't really matter, okay?

8   Because they're winning defaults on the mortgage.  And so

9   this motion that somehow once you're in default, there's

10   some sharing arrangement with other creditors, which is I

11   guess what Seatran is, if they funded this, that they're an

12   unsecured creditor.

13          But I, you know, there's a lot of creative

14   arguments made, but again, you know, these are arguments that

15   are being made by counsel at the podium and not in the briefs

16   and not in the record.

17          Your Honor, the allowed secured claim, I think

18   there was some notion:  Well, if we treat them as an allowed

19   secured claim in the plan that means they're allowed a secured

20   claim in the full amount.  No, you've got to have a valuation

21   hearing, okay?  And if we contest that and say:  No, we're --

22   the collateral value is actually this, I mean you know, so

23   you can't just say we're going to confirm a plan because

24   we're going to treat you as a fully allowed claim.

25          Again, that's not anything that has been argued in

1 the briefs or established through any case law, and it's

2 nonsensical. If our collateral is only worth "X", and they're

3 showing us as fully allowed, then we have the right to come in

4 and show that the collateral is worth less. But only the

5 disclosure statement shows it's worth less.

6      You know, Your Honor, it's not only -- they've

7 previously testified that they are using the money to fund

8 other boats, to fund the operating losses in the other boats.

9 I mean they've already testified to that.

10      Your Honor, I'm not going to belabor this. I think

11 you've got it. This is a case where I would just ask that you

12 look at the evidence and the case law cited in the briefs, and

13 I think this is very clear.

14      Thank you.

15      THE COURT: Okay. Thank you.

16      MR. DRAPER: Could I comment, Your Honor, just --

17      THE COURT: No, I think I'm done. I'm going to take

18 a brief recess and I'm going to decide if I can rule on this

19 today, if I'm going to need just a little bit more time as I

20 parse this out. But I don't know that I need anything else.

21      MR. DRAPER: Just two comments that I have. If you

22 look at 1129(b)(2)(A), Mr. Waguespack is dead wrong. It says

23 at least. Mr. Waguespack's reading reads out the words least.

24 It just -- it says at least that sets a floor, it doesn't set

25 a ceiling.

1     And so 506 analysis, if I say that I'm going to

2   pay them more than the value of their claim, under

3   1129(b)(2)(A), I can do that.

4     Just two -- the cases he's talking about are not

5   substantive consolidation cases.  Merit, the Delaware cases,

6   the Ninth Circuit case were not substantive consolidation.

7   They dealt with a plan, a joint plan, and whether you needed

8   an accepting impaired class in each joint plan.  That, as I

9   read it, is a test for necessary for an effective

10  reorganization of the Debtor.

11    Can I confirm a plan?

12    THE COURT:  Did you argue that brief in your

13  opposition, did you argue it?

14    MR. DRAPER:  I mentioned that the Court recognized

15  it as joint plans.  I mentioned that --

16    THE COURT:  Did you cite this Merit case, those

17  owners?

18    MR. DRAPER:  I didn't cite Merit.  But Merit allows

19  it.  There's a Ninth Circuit case that talks about "per

20  debtor" and I can give the Court --

21    THE COURT:  Because this argument from day one is

22  you don't have it?

23    MR. DRAPER:  No, his --

24    THE COURT:  But we can view these on an individual

25  basis.

1          MR. DRAPER:  No.  His argument is a little bit

2    different than that.  His argument is I have a large

3    deficiency claim, and therefore I swamp the class.  I'm

4    telling you if you look at 1120 -- 362(b)(2)(A), it uses the

5    term "at least."

6          So in fact you never get to that issue.  I will get

7    an accepting impaired class in one of the cases.  That's all

8    I need.  But the Code specifically uses the word "least".

9    And just look at that.  That's the -- there's a reason that

10   word is in there.

11         THE COURT:  All right.

12         MR. PECK:  Okay.  Your Honor, also, I would like

13   for the Court -- I don't care about his spin, Your Honor.

14   I've read this, this bank write up and all of the attachments

15   to it, and it's pretty clear this was disclosed what was

16   going on with Seatran and the fact that all of -- that

17   Seatran was collecting all of the receivables, and it's right

18   there.

19         I don't care what his spin is.  I would like the

20   Court to consider this, because the Court didn't have this

21   the last time.  And there's certain -- Seatran has talked a

22   lot about -- and also the balance sheet of Seatran is in

23   here, which is part of the package.  And also, the audited

24   statement from Iberia Marine Service talks about related

25   transactions and  how Seatran is responsible for the rentals,

1    handles all the rentals.

2          So it's right here.  I don't care what he spends,

3    the Court needs to look at this evidence, Your Honor.  This

4    is important to us.  This undercuts him saying there's

5    nothing supported, this is subterfuge, this was hidden.  This

6    is not hidden.  Where's --

7          THE COURT:  But I already had evidence on the 18th

8    about all of this, didn't I?

9          MR. PECK:  Yes, you did.

10         THE COURT:  Didn't Mr. Tizzard touch on all of

11   that?

12         MR. PECK:  Right.  But he was -- they said you

13   couldn't believe it, he tried to cross-examine -- this is

14   back what Mr. Tizzard told them and how it worked.  It's

15   right in here, Your Honor.

16         THE COURT:  And I know we had told Mr. Tizzard that,

17   but you would agree with me they can't vary now the documents

18   that he -- that the parties signed, right?

19         MR. PECK:  He can't what?

20         THE COURT:  He can't vary the documents that the

21   parties signed.  In other words, SBN has what SBN has, which

22   is a mortgage on the boat.

23         MR. PECK:  Right.  And you're right.

24         THE COURT:  A security interest from --

25         MR. PECK:  And --

1          THE COURT:  -- Iberia Marine Services that now is

2    essentially I guess default, because they're not really

3    managing any more, and now it goes to Seatran.  So we got rid

4    of them, I'm assuming --

5          MR. PECK:  But we always had Seatran.  So, only

6    Seatran was doing it.  The charter --

7          THE COURT:  I know only Seatran.

8          MR. PECK:  And it was --

9          THE COURT:  But the way this was set up originally

10   was the money was going to flow to Iberia Marine Services who

11   had the security interest, but now they essentially --

12   essentially don't exist anymore.  And now Seatran is there,

13   and they don't have a security interest from Seatran.

14         MR. PECK:  But Mr. Tizzard told them that Seatran

15   -- that we couldn't give any guarantees for security.

16         THE COURT:  He told them Seatran is a pass-through

17   entity, we're not here to make a profit, all of those

18   things.

19         MR. PECK:  That's true.

20         THE COURT:  I heard all of that.

21         MR. PECK:  And Mr. Tizzard says all the money comes

22   down, you pay all of the expenses up, but if you don't pay my

23   expenses, we can set it off.  And that's what he said, and

24   that's what the agreement provides, Your Honor.

25         But they don't have a lien against that.  They

1   don't have a security interest because as a charter, they

2   don't.  And that's -- as a matter of law, they --

3           THE COURT:  But they've got the boat.

4           MR. PECK:  They've got the boat.

5           THE COURT:  They've got the boat.

6           MR. PECK:  They've got the boat, absolutely.

7           THE COURT:  And without the boat you don't have a

8   charter.

9           MR. PECK:  I understand that Your Honor.  But I

10  understand contractually --

11          THE COURT:  Do you see the conundrum I'm in?

12          MR. PECK:  Yeah, but --

13          THE COURT:  You're arguing here that they don't --

14  they can't touch it.  They've got -- you've got the charter,

15  but all they have is the boat.

16          MR. PECK:  But they've got the receivable and the

17  contractual -- the Debtor's contractual --

18          THE COURT:  Well, they normally have the receivable

19  because there's never -- I mean I'm right back where I was.

20          MR. PECK:  Okay.

21          THE COURT:  You know, I just -- I'm having trouble

22  figuring out -- I know you're arguing here that they bargained

23  for it, but at the end of the day, yeah, they -- whatever

24  they've got they bargained for.  They've got the boat, because

25  they're not allowed to touch anything else is the argument

1  that has been made to me.

2          They've got the boat, but yet they're not really

3  protected here.

4          MR. PECK:  But the Debtor has the obligation -- but

5  Seatran and the Debtor has the obligations with that

6  agreement, "We'll pay it down to you."  And when it comes down

7  to them, they can claim that, Your Honor.  Okay?

8          And when the money comes down, because the problem

9  was Seatran had other owners.  But when the money comes down,

10  they have a right to it.  Nobody says we're not going to pay

11  the money down.  I just can't -- we have a contractual

12  obligation to pay the money down.

13          THE COURT:  On the contract that was entered the

14  eve before -- I know what you're saying, it existed all the

15  time.

16          MR. PECK:  But this contract existed, even

17  referenced it.  It has been -- and I showed you how the

18  contract they operated as it --

19          THE COURT:  I know.  I know we had a draft on the

20  14th --

21          MR. PECK:  And they --

22          THE COURT:  -- that was here, and then they didn't

23  sign it until the eve of the bankruptcy.

24          MR. PECK:  But even the financial statements, you'll

25  see the capital was put up as per the agreement in these

1  financial statements, all three owners --

2            THE COURT:  Is that the $75,000 per ship?

3            MR. PECK:  They put the deposits down, also they

4  put up $100 in capital, all the balance sheets.  So the

5  parties really responded.  They put up the capital for

6  Seatran, they put the deposits up, everything that's in here.

7  They looked up, there was this homeowner that didn't want to

8  sign it, but they operated as if the agreements existed.  And

9  that was an agreement.

10           And the bank knew about it and they referenced it

11  in their credit writeup, as Mr. Tizzard said.  And

12  Mr. Tizzard said they knew about the relationship, they knew

13  it.  He told them about it.

14           There was nothing hidden, Judge.  And there's

15  nothing that means we're not going to pay the money down.  I

16  just -- I think if this Court thinks we're going to take the

17  million dollars and just keep it, we're not.  We can't.  We

18  have an obligation --

19           THE COURT:  I'm not saying that.  All I'm saying is

20  that you want all of the benefits over here, and them to get

21  nothing.  It just seems there's a lot of inequities there to

22  me.

23           MR. PECK:  But they also got the benefit, we pay

24  all of that money to get Seatran on its own, expending all of

25  those funds to keep a vessel a going charter, and it hasn't

1    been reimbursed for it.  You'd spend all of that money to

2    spend it to get it ready to go onshore.

3              It's not that it hasn't done anything.  It has

4    managed the vessel.  Okay.  I just -- it is not being hidden

5    here.  There's no subterfuge as this document shows, Your

6    Honor.

7              THE COURT:  But I've got all of that.  I don't need

8    any additional evidence on that, I don't think, Mr. Peck,

9    because I think I understood what Mr. Tizzard said.

10             MR. PECK:  Okay.

11             THE COURT:  That that -- I don't think it varies

12   the written agreements, and I think that's Mr. Waguespack's

13   argument.  Yeah, they may have had all of this going on, and

14   maybe the bank took whatever it took, but now you've got to

15   live by that too.

16             MR. PECK:  I understand.  And we will --

17             THE COURT:  Now, there's two sides of this.

18             MR. PECK:  And we're going to live up to the

19   agreement that we have.

20             THE COURT:  Okay.  I'm going to take a brief

21   recess.

22        **(Recess from 2:44 p.m. to 3:33 p.m.)**

23             THE COURT:  Please be seated.

24             This is the *Mr. Steven, LLC* and the related

25   matters.

1          I really hoped that I might be able to come to a

2    conclusion.  There are just a few other things that I still

3    need to look at on this matter, still go back and look at the

4    evidence.  Here's what the Court's commitment is:

5          Within two weeks from today the Court is going to

6    have its written reasons and an order in place on these

7    Motions for Lift Stay on these, on all four of these vessels.

8    I've heard some additional things today that I need to go

9    look at, and so I'm going to do that.  And so, two weeks from

10   today the Court will have its opinion and no longer than

11   that.  So that's where we are.

12          But I've heard enough today.  I will say coming in

13   to this hearing, and you can take this for what it's worth,

14   but anyhow this is a -- and there are some pretty good

15   arguments to be made here to lift the stay, at least on some

16   of these vessels, and there are some other issues.

17          I understand we've got a legitimate company out

18   here that we're trying to reorganize, but I, you know, it's

19   a pretty close call, so I'll just say that.

20          And I've got it under advisement and you'll have my

21   decision one way or the other, two weeks from today.

22          On the Motion to -- on the Rule 12(b)(6) Motion to

23   Dismiss, I'm going to take that as part of this, no further

24   argument.  I can take that on the briefs, I don't need

25   anything additional on that.

1          And then on the Adversary Proceeding, the Motion

2   for Turnover, I think that needs to be converted to an

3   Adversary Proceeding on that Motion for Turnover.  I'm going

4   to ask that -- I don't know who it needs to be filed by, but

5   that money needs to be put in the registry of the Court and

6   we need an interpleader on that, because I need to see where

7   Seatran's claims to that money is.

8          MR. DRAPER:  Are you talking about the money that

9   Guice is holding?

10         THE COURT:  That's correct.

11         MR. DRAPER:  Do you want me to prepare the order?

12         THE COURT:  If we -- we just need that converted to

13  an interpleader, you know, to an adversary interpleader type

14  action so the parties can come in and make their claims to

15  the money.

16         MR. DRAPER:  I'm just thinking procedurally, what

17  probably is the best thing to do is through Guice and I to do

18  it as an interpleader and then have the parties --

19         THE COURT:  That, to me when I've had this come up

20  before when I was practicing, normally that the Debtor's

21  lawyer would take the lead on it.  I just don't know, you

22  know, I've got Mr. Peck here, I've got you, I'm not certain

23  who the right party is to do this.

24         But the issue I see there is -- and you know, is

25  that issue is to determine what if any rights Seatran or

1    anyone else may have to the funds that are being held by

2    Guice.  My position is the Debtor ought to be in here arguing

3    for all of the money, and we've got these other issues.

4            MR. DRAPER:  No, I'll interplead it.

5            One thing, just so the Court is aware:  As I get

6    older, my mind slips at times.  Merit is not the case on

7    joint plan, it's an Enron case, and there's one out of the

8    Ninth Circuit which is Transwest.

9            THE COURT:  Transwest?

10           MR. DRAPER:  Yeah.

11           THE COURT:  Because that's one of the things I need

12   to go look at.

13           MR. DRAPER:  And Enron -- it's Enron out of New

14   York.

15           THE COURT:  And I --

16           MR. DRAPER:  And the Delaware case is Tribune.

17           THE COURT:  Tribute?

18           MR. DRAPER:  Tribune.

19           THE COURT:  Oh, the Tribune case?

20           MR. DRAPER:  Yeah.

21           THE COURT:  And now let me ask you this question,

22   Mr. Waguespack:  The case that you're citing, the -- the name

23   is escaping me, the Fifth Circuit case, McManus.  Have you

24   cited that in your briefs?

25           MR. WAGUESPACK:  Yes.

1          THE COURT:  Okay.

2          MR. WAGUESPACK:  McManus, and then also the cases

3   about -- at the stage where we are now, which is on the lift-

4   stay.

5          THE COURT:  Right.

6          MR. WAGUESPACK:  That our blocking position -- even

7   and jointly administered -- and this is I believe probably

8   most thoroughly briefed in our reply that we filed before the

9   December 18th hearing, the jointly administered cases, which

10  deal with our blocking position and the necessary for an

11  effective reorganization test at that time.

12         THE COURT:  And I have been through most of this.

13  I mean this case has now been going over and it's partly my

14  fault, but I want to make sure that I get to the best opinion

15  I have, and I just need an additional two weeks, because I'm

16  committing to the parties.

17         MR. DRAPER:  One other thing just --

18         THE COURT:  I know the parties are at the stage

19  where they need to know something, and it's not going to go

20  beyond the two weeks.

21         MR. DRAPER:  I need the Court to extend the stay so

22  I don't get caught by where I was last time, so I need the

23  stay extended for all four cases.

24         THE COURT:  To the two weeks from today or to the

25  Court's ruling?

1          MR. DRAPER:  Yes.

2          THE COURT:  Any objection to that?

3          I'm going to do it anyway, so I think it's

4   reasonable while I sit here and ponder this.  I know I'm

5   asking if you have an objection, but I mean I think it's

6   reasonable to extend the stay until I can come up with my

7   opinion on this.  I mean I know the position of the parties

8   and I know that it's time to have this decision so you can

9   see in what form if any the case will move forward towards

10  plan confirmation.  We've got to get past these issues.

11          MR. WAGUESPACK:  Judge, I was so confident when I

12  took the ethical position we did to waive -- that we were so

13  confident in victory when we did that.  But I'm sure that my

14  client will agree to the two weeks, which is just not

15  (inaudible), so --

16          THE COURT:  Well, I mean the issue is, I mean I've

17  got a Motion to Lift Stay and I've got a contest to it, and

18  now I've got it under decision.

19          MR. WAGUESPACK:  Well, yes.

20          THE COURT:  And I'm the one that's pushing it off.

21  And so I think it's reasonable to do that.

22          MR. WAGUESPACK:  Thank you Your Honor.

23          THE COURT:  But I also appreciate that the -- I

24  also appreciate the fact that the parties have waited long

25  enough, and you need a decision.  But I mean there has been

1  quite a -- this to me is the big part -- I mean this is the

2  case.  It's kind of how I view it.  I mean it's a lot of the

3  case.  I know there's other ships out there.  I mean, you

4  know, other vessels out there.

5          But I want to make sure that I've got this part

6  right, because it's going to greatly affect the tenor of the

7  rest of this case.  And I've heard things today, despite how

8  I may have felt walking in here today that I want to make

9  sure that I completely considered in light of the previous

10 testimony.

11         I don't need any other evidence today, I don't

12 think.  I think the only additional evidence I was going to

13 get was that record, but I've already got that testimony

14 from December 18th.  And so I think I can go on the record

15 that I've got before me and the parties' arguments today and

16 the briefing that we've had.

17         MR. DRAPER:  All right.  The only thing I'd say is,

18 just so the Court is aware, we had two witnesses to address

19 adequate protection payments on the three vessels, and to

20 address the status of one of the boats in terms of what has

21 been cold stacked, and that is getting ready to be put out

22 in the marketplace.

23         If you -- and I didn't -- look, the truth is I

24 think part of that goes for the record.  Now, I think I know

25 the Court is I think hung up on -- and I don't mean to speak

1   for you, but what I've put on may -- or what we've put on

2   with respect to the other three boats may be irrelevant, the

3   fact that one is going to go out on the market -- is out

4   there on the bid and is being readied for bid, I think that

5   you could take that as you want.

6          And the other two, I have somebody who'll testified

7   that A, you don't sell in today's market, it's horrible.  And

8   number two, that you need backup boats.

9          But that's -- I don't think there's anybody that's

10  going to controvert that evidence either, but --

11         MR. PECK:  We have Charlie's affidavit, too.

12         MR. DRAPER:  What?

13         MR. PECK:  We have Charlie's affidavit.

14         MR. DRAPER:  Yes.  And you have Charlie's affidavit

15  in the record, which I think addresses that.

16         THE COURT:  I think I've got all the record I need.

17         Mr. Waguespack, do you want to address that?

18         MR. WAGUESPACK:  Your Honor, I mean, I think you've

19  got the legal arguments, to me, and the evidence you have is

20  more than enough for you to make your ruling.

21         THE COURT:  I think I've got sufficient record.  I

22  mean I hear what you're saying that on these issues for added

23  protection maybe I would need an additional record, and

24  perhaps you're right.  But I think that based on the briefing

25  I have, I'm going to be able to render my decision on the

1   record.

2          And going back to what we had before the Court for

3   the December 18th -- I don't think I need anything.  And the

4   parties did a good job of following that up with additional

5   briefing on that and I don't really want to ask the parties

6   to spend any more money on this.  It's really in my court

7   now.  And so, that's where we are.

8          And so on the Rule 12(b)(6) I'm going to render

9   that decision, because that will go hand in hand with the

10  decision on the Motion to Lift Stay.  I don't need argument

11  on that.

12         On the Turnover Motion, that needs to be converted

13  and Mr. Draper, you and Mr. Kaufman are going to work on

14  that?

15         MR. DRAPER:  Yes.

16         THE COURT:  And of course, Mr. Waguespack, I don't

17  know where your client stands on this if they have a claim,

18  but I mean, the purpose of that -- I mean frankly, the

19  response was  it should be an adversary proceeding.  I'm not

20  so certain if I don't convert that to an adversary

21  proceeding, because if it went up on appeal and the Fifth

22  Circuit would have sent it back down to me.

23         And so, regardless, we probably should have made

24  that decision a while back, but that I think definitely needs

25  to be converted into an adversary proceeding, because I've

1  got the issues with Seatran, the additional work on that

2  particular Mr. Steven, and whether or not that falls under a

3  maritime lien or a setoff right, or whatever it may be under

4  the Code or outside the Code, I don't know, but that all needs

5  to be teed up somehow and we might as well get that going,

6  because I can't decide it I don't think in the procedural

7  format that it's in.

8           And so I think it just makes sense to go ahead and

9  get that one converted into an adversary proceeding.

10          MR. PECK:  Your Honor, we do have this, the credit

11 file.  I would be remiss -- if the Court doesn't want it, I've

12 just got to proffer and put it in the record, just in case.

13 I would hate to not put this in.

14          THE COURT:  Mr. Waguespack?

15          MR. WAGUESPACK:  Yes, sir?

16          THE COURT:  Do you have an objection to it being

17 proffered?

18          MR. WAGUESPACK:  No objection.

19          THE COURT:  We'll take it as a proffer.  I don't

20 think I -- I mean I'm not admitting it into evidence, I mean

21 unless there's no objection to it coming into evidence.  I

22 mean frankly, I've got the testimony I think that's -- your

23 position is that this just corroborates what I have already

24 heard?

25          MR. PECK:  Well yeah, but they said stuff that's

1  not supported.  I just felt for the record that I have to

2  put this in.

3          THE COURT:  Mr. Waguespack?

4          MR. WAGUESPACK:  Your Honor, I have no objection.

5  It's the absence of what's in there that's important and that

6  absolutely supports our case.

7          MR. PECK:  Well but --

8          MR. WAGUESPACK:  So that's fine.

9          MR. PECK:  And I think it supports my case and I

10  just wanted to fill in --

11          THE COURT:  All right.  Then we'll admit that into

12  evidence, and I'll have it before the Court.

13          MR. WAGUESPACK:  Can I have a copy of what you're --

14          MR. PECK:  Yeah.

15          MR. WAGUESPACK:  -- putting in?

16          MR. PECK:  That's what we had the other day.

17          MR. WAGUESPACK:  Okay.

18          MR. DRAPER:  Do you want Stewart's secret notes like

19  you had yesterday?

20          MR. WAGUESPACK:  Yes, that would be fine.

21          THE COURT:  So that's the only additional reason

22  then for me to take this for an additional two weeks.  I can

23  go through this, because they have been offered before.  But

24  if there's no objection, I'll take it.

25          Again, I think everything I need was said on

1  December 18th.

2         MR. PECK:  But, and for the record, Your Honor,

3  when I took the deposition I had a -- I added these little

4  point notes on here.  It was, you know, just to show the

5  witness.  So this wasn't part of the original document.  I

6  just wanted to make that clear.

7         THE COURT:  But it's not attorney-client privilege,

8  is it?

9         MR. PECK:  No, no, no.  It was just -- I just made

10  some dots on it, just when I asked the witness where they

11  were, the relevant points were.

12         MR. WAGUESPACK:  No, he needs to have a clean copy.

13  Because I could go through here and make all the dots with

14  all the stuff that directly --

15         MR. PECK:  I'll do it.  What I'll do is I'll

16  substitute it.

17         THE COURT:  All right, supplement the record.  If

18  you will supplement the record with ones that don't have any

19  dots on it.

20         MR. PECK:  I'll have to get it from you, because

21  I --

22         MR. WAGUESPACK:  It's in electronic form.

23         MR. PECK:  Okay, electronic.  So, I'll --

24         THE COURT:  Can you upload it?

25         MR. PECK:  I'll upload it, Your Honor, without the

1  dots.

2          THE COURT:  Well, do this for me, because I don't

3  want there to be any debate over what's coming to the Court.

4          We are admitting into evidence whatever this stack

5  of documents is, and I don't happen to know what it is.

6          MR. PECK:  Just one document.

7          THE COURT:  But I need that one document, I just

8  need you two to agree that what gets uploaded to the Court

9  can become the record of the Court.

10          MR. PECK:  Okay.

11          MR. WAGUESPACK:  Okay, that's fine.

12          MR. PECK:  That's good.

13          THE COURT:  And do it soon, because I'm giving

14  myself a deadline now so I want it soon.

15          MR. PECK:  We'll do it --

16          THE COURT:  Like within the next two days.

17          MR. PECK:  We'll do it tomorrow.  I'll just pull it

18  from the electronic data then.

19          THE COURT:  Okay, very good gentlemen.

20          I think that concludes the court today.  We'll be

21  adjourned.

22      (All Counsel reply, "Thank you Your Honor.")

23          THE CLERK:  All rise.

24                      *    *    *    *    *

25                      (Hearing is Concluded)

# C E R T I F I C A T E

        I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.

**S/Sherryl P. Robinson**                    **_3/19/19_**
**Sherryl P. Robinson**                           **Date**